# Exhibit "B"



**WILCOX & FETZER LTD.**

In the Matter Of:

# Van Scoy

v.

# Van Scoy Diamond Mine of Delaware, Inc.

C.A. # 05-108 (KAJ)

---

Transcript of:

Kurt Van Scoy

October 3, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 10

1  that. That was all his dealings. He did what he had to
2  do. All we did is just hung around until he's ready to
3  go or ready to go to the hotel.
4     Q. Were you aware of any other stores that were not
5  part of the chain of stores of Van Scoy Diamond Mine
6  operated by your father, operating under the name of
7  Van Scoy Diamond Mine?
8     A. All I know is the stores that my father visited.
9  I mean, that's -- I went with him. If he had to go to
10 New England, you know, Rhode Island, Connecticut,
11 wherever he had to go, one of us had to go travel with my
12 father.
13    Q. But the answer is that you were not aware of any
14 other one?
15       MS. MORGAN: Objection.
16    A. All -- no.
17       I actually don't understand the question
18 really.
19    Q. Were you aware of any other Van -- of any other
20 jewelry store operating under the name Van Scoy Diamond
21 Mine which was not part of your father's licensing
22 operation?
23       MS. MORGAN: Objection.
24       What time frame are we talking about?

Page 11

1        MR. PETOCK: We're talking about in the
2  1980's.
3     A. I don't know.
4     Q. You don't know if you knew?
5     A. I don't know if I knew.
6     Q. Did you think that someone could open a
7  Van Scoy Diamond Mine store in the 1980's without
8  permission from your father?
9        MS. MORGAN: Objection.
10    A. Like I said, I was 18 years old. And really on
11 that side of it, that's my father's dealings. I'm not my
12 father. And what his dealings did with that, I don't
13 know.
14    Q. But you were managing the New Haven store at that
15 time; is that correct?
16    A. It was his store, my father's store. And I'm his
17 son. And he sent me up there to work at the store.
18    Q. Well, you were a manager of it?
19    A. I was manager, garbage changer, bench man,
20 salesman, you know. And I said -- you basically did a
21 little bit of everything. I had to run to the other
22 store sometimes to fill in for people at the other
23 stores. It was a family business. I'm a family member.
24 I had to do what I had to do.

Page 12

1     Q. But there was no one senior to you at the store
2  in New Haven, Connecticut; is that correct?
3        MS. MORGAN: Objection.
4     A. There was quite a few people actually just kind
5  of, you know, bounced around, if they were assistant
6  manager or manager. I mean, you know, I did my thing and
7  I was family -- you know, a family member of the
8  business. If there was other people there, if they were
9  classified as higher than me... You know, I think as a
10 family member, I think you have a little more say than
11 certainly with a manager.
12    Q. Did your father ever complain to you that another
13 store was using the Van Scoy Diamond Mine without his
14 permission?
15    A. Not to my knowledge.
16    Q. When you worked in the Wilkes-Barre store, did
17 everyone there know that the mark was a registered
18 trademark and service mark?
19    A. Again, like I stated before, I wasn't -- or,
20 anyone -- I'm not anybody else. I'm speaking for myself.
21 I was not aware of any, certainly, mark or trademark or
22 anything of that sort until actually November 18th of
23 2004. That's the first time I have heard of anything
24 about any kind of a mark. And I stated that before.

Page 13

1     Q. You were at the deposition of Marie Kornish a few
2  days ago; is that correct?
3     A. That is correct.
4     Q. And did you hear her testify about everyone
5  knowing about the mark?
6     A. That's her testimony. I'm not Marie.
7     Q. You disagree with her then?
8        MS. MORGAN: Objection. This is outside the
9  scope of this. Let's move on with this, Michael.
10 BY MR. PETOCK:
11    Q. When did your father -- first of all, did your
12 father give any permission -- strike that.
13       Did your father or his company, Van Scoy
14 Diamond Mine, Inc., give any permission to your
15 corporation, Van Scoy Diamond Mine of Delaware, to use
16 the mark Van Scoy Diamond Mine?
17    A. If you're stating if my father gave me the name,
18 yes, he gave me the name physically. Yes, he did.
19    Q. What do you mean physically he gave you the name?
20    A. Gave me the sign that was in the store, Van Scoy
21 Diamond Mine. He gave me that sign and put it in. He
22 was there for my grand opening and did advertising for
23 me, for my grand opening of Van Scoy Diamond Mine.
24    Q. And you think that was permission also for the

Page 14

1  corporation?
2  A. Absolutely. He was there selling merchandise.
3  Q. Was there anything in writing?
4  A. My father rarely did anything in writing with
5  anybody. It was more of a handshake, because that's the
6  honest gentleman that he is. And that's the way I was
7  brought up, being fair and honest.
8       There was no documents or anything, no. I'm
9  his son. He said, "I'm proud of you. Good luck to you.
10 You can do it. And I love you." That's his exact words.
11 Q. So your answer is no, there is nothing in
12 writing?
13 A. No, there's nothing in writing. No.
14 Q. And when was this permission given?
15 A. This was in October actually when he gave me the
16 sign. And --
17 Q. October of what year?
18 A. Of 1994. Excuse me.
19 Q. Okay. And where did he give you this permission
20 at? Where was he physically when he said that?
21 A. Actually the Mundy Street store. We've talked
22 about it in his office a few times. I told him what I
23 planned on doing. We actually planned a strategy, if you
24 will, to how we're going to get the tan safe out. And he

Page 15

1  took me over to the warehouse, physically helped me carry
2  the sign into the back of the U-Haul truck and gave me
3  the showcase. And then we took it on down to the store.
4       And then we actually came back up and moved
5  the tan safe, him and I. Physically him and I moved that
6  tan safe from the Wilkes-Barre store. Your -- the
7  plaintiff was sitting there, was witness to see that,
8  actually moving the safe, my father and I, and taking it
9  down to the Delaware store.
10 Q. Was there -- were there any acts of your father
11 which you consider to be part of the permission other
12 than what you've just testified to?
13 A. No. Selling at the store and doing ads for me,
14 visiting the store. No, that would be it.
15 Q. What kind of ads did he do for you?
16 A. Radio spots.
17 Q. And when was this?
18      THE WITNESS: I believe this is for
19 attorneys only, if I'm not mistaken, because we had --
20 Charlie had -- we had some --
21      MS. MORGAN: Yeah. I think if you're going
22 to get into that, we need to introduce the protective
23 order.
24

Page 16

1  BY MR. PETOCK:
2  Q. All right. Well, let me ask you, first of all --
3  I want to show you what's been previously marked as
4  Plaintiff's Exhibit 6 in your previous deposition.
5  A. Yes.
6  Q. Can you tell me what that is?
7  A. That is a letter that my father sent to me in his
8  own handwriting from the Wilkes-Barre -- Van Scoy Diamond
9  Mine on Mundy Street in Wilkes-Barre. That was in 1997.
10      And on the second page -- excuse me -- is an
11 ad that my father actually wrote -- or, should I say --
12 scratch that. He faxed this -- no. He wrote -- this is
13 a faxed copy, and that he mailed this to me.
14      This one, on the bottom, it says Mundy
15 Street store. Obviously -- you basically just change the
16 ads around. Which the plaintiff is aware that he used to
17 make his ads. And just at the ends, he would add in the
18 different addresses for the different stores.
19      And the same thing on page 3. It's a
20 handwritten ad that my dad did. And this was actually
21 for the Vestal store. But, again, it's -- as plaintiff
22 is aware as well, that our dad actually changed the
23 names. He just changed the address of the ads and
24 basically used the wording.

Page 17

1  Q. And what's the significance of this ad, if any?
2  A. It's an ad that you put on the radio. It's very
3  significant. My father was very, very good at doing
4  advertising. And certainly if you at any time tried to
5  come up with something a little different or a little
6  creative -- he was very creative.
7  Q. Do you consider this part of the permission
8  given?
9  A. Absolutely.
10 Q. You already testified this was 1997, correct?
11 A. It's right on the top there, yes. The seal and
12 the post office.
13 Q. In fact, it was, I guess, 18 September 1997?
14 A. That's what it says, yes. That would be correct.
15      MR. PETOCK: Okay. Wayne, why don't you
16 leave the room for a few minutes? And we'll come get
17 you.
18      (Whereupon, Wayne Van Scoy left the
19 proceedings.)
20
21
22      **REDACTED**
23
24

Page 34

1  then Wayne's handwriting says -- it says, "Wayne."
2  Q. Wasn't that, in fact -- wasn't, in fact, Wayne
3  saying there that he had received goods which you had
4  ordered and he's asking you to ship statements -- asked
5  the company to ship statements directly to you instead of
6  to him.
7      MS. MORGAN: Objection.
8  A. "How is the family? I hope very good. Please
9  call this company and ship statements to you," meaning
10 they're shipping statements to Wayne instead of shipping
11 them to me.
12 Q. Statements for bills for goods, right?
13 A. Bills, sure. Merchandise.
14 Q. So it's merchandise that was directed to you and
15 he was getting the statements by mistake; is that
16 correct?
17     MS. MORGAN: Objection.
18 A. I would have to say yes.
19 Q. And do you know what D1815 is?
20 A. I sure do.
21 Q. What is that?
22 A. That's my father's handwriting, God love him.
23 And he made a sale at our store. We had a sale at our
24 store and he was down for the weekend. And that's a sale

Page 35

1  that he made in 1998 for a tennis bracelet.
2  Q. And what is D1816?
3  A. Let's see here. This is an invoice that has come
4  to -- it's come to us, if I'm not mistaken. And that
5  needed to go back to Wilkes-Barre. We're not Rings of
6  Romance.
7  Q. Isn't it, in fact -- the invoice 4111 is directed
8  to Rings of Romance at Wilkes-Barre, Pennsylvania?
9  A. That is correct.
10 Q. So the invoice was actually mailed by Paramount
11 Gems to Rings of Romance; is that correct?
12     MS. MORGAN: Objection.
13 A. That is correct. But if you -- I have to state
14 the companies that we deal with are foreign people. And
15 we've got -- we have a package actually at our store
16 right now that was from a total different company,
17 nothing to do with the name at all. And we got a $20,000
18 shipment of merchandise from some store I've never even
19 heard, and it showed up at our place.
20      These are foreigners, very hard to speak to.
21 And the plaintiff is aware, too, that billing always gets
22 mixed up quite a bit with these guys and other companies
23 as well.
24 Q. But this was an invoice to Rings of Romance?

Page 36

1  A. That's what is stated on there, yes.
2  Q. And it's in your hands because it was supposed to
3  be for you, correct?
4      MS. MORGAN: Objection.
5  A. Not that I'm aware of.
6  Q. Well, how did you get your hands on this?
7      Wayne must have sent it to you; isn't that
8  correct?
9      MS. MORGAN: Objection.
10 A. What's the date here? 9/13/96.
11     To be honest with you, I really -- I
12 can't -- you know, I'm not sure if he did or not. Rings
13 of Romance shipped to -- billed to and shipped to.
14 Q. And, in fact, the next document, D1817 --
15 A. 219.
16 Q. I'm sorry?
17 A. No. I'm just looking at the total amounts here.
18 Yes. This is --
19 Q. That's your payment to Wayne for that invoice,
20 isn't that correct, that he paid for you?
21     MS. MORGAN: Objection.
22 A. 219. 219. There's no check number on here, on
23 the invoice itself. The amount is the same, but there's
24 no check -- it says invoice number 4111, yes.

Page 37

1  Q. So it is --
2  A. That's correct, yes.
3  Q. And D1818 --
4  A. Yes.
5  Q. -- isn't that, in fact, a payment from you for
6  misdirected merchandise?
7      MS. MORGAN: Objection.
8  A. No. That's the band that Wayne actually he had
9  made for us.
10 Q. Does Van Scoy Diamond Mine of Delaware, Inc.,
11 your company, does that company use a sign in the front
12 of the store called Van Scoy Diamond Mine?
13 A. Yes, it does. It's the sign that my father gave
14 me.
15 Q. Your father gave you the lower half of that sign,
16 Diamond Mine; is that correct?
17 A. That's correct. My name is up on the top, yes.
18 Q. And you use Van Scoy Diamond Mine on your
19 website -- on the company's website; isn't that correct?
20     MS. MORGAN: Objection.
21 A. On the actual website itself when you go to, it
22 says Van Scoy Diamond Mine of Delaware, Inc.
23 Q. I'm not talking about the domain name. I'm
24 talking about when you go into your website --

Page 114

1  nationally-known name, like I said, like a McDonald's or
2  Nike, you know, something like that, or Donald Trump.
3  Trump Plaza, who do you think? You think of Donald
4  Trump. Van Scoy Diamond Mine, who do you think of?
5  There's nothing.
6     Q. The mark was, in fact, used up and down the
7  East Coast with some 40 stores at one point in time;
8  isn't that correct?
9     A. At one time.
10    Q. And there were races, NASCAR races under the mark
11  Van Scoy Diamond Mine 500; isn't that correct?
12        MS. MORGAN: Objection.
13    A. In the Poconos.
14    Q. And aren't those races televised?
15        MS. MORGAN: Objection.
16    A. Televised? Sure. I guess.
17        MS. MORGAN: Don't guess.
18        THE WITNESS: Okay.
19        Yes.
20  BY MR. PETOCK:
21    Q. In paragraph 62 and 63, you claim that the mark
22  has been abandoned by plaintiff or by plaintiff's
23  predecessor and title. What's the basis for those
24  allegations?

Page 115

1     A. Well, I'm not an attorney. And the best of my
2  knowledge -- it's under my understanding that my father
3  and Wayne have both abandoned the name after the
4  bankruptcy.
5     Q. After the bankruptcy?
6     A. Correct.
7     Q. By doing what or not doing what?
8     A. Changing the name. Taking the name down.
9     Q. Any other reason?
10    A. No. They took the name down.
11    Q. Paragraph 76 of your -- of your company's
12  counterclaim says Van Scoy Diamond Mine is not infringed
13  by the business activities of defendant Van Scoy Diamond
14  Mine of Delaware. What's your basis for that statement?
15    A. It's not infringement. Mark Maurer -- they're
16  using other -- along with other people using that mark
17  without any supervision by my brother.
18        They have a store -- they run a store, Van
19  Scoy, Van Scoy Diamonds, Van Scoy Jewelers. And the
20  plaintiff does not monitor anything of what they do. He
21  don't do anything. He doesn't do anything. He doesn't
22  talk to them, nothing.
23    Q. Is there any other basis for your allegation of
24  noninfringement?

Page 116

1        You have to answer --
2     A. It's not infringement. But, no.
3     Q. What I meant is you can't be shaking -- you're
4  shaking your head no.
5     A. I have to answer. No, I understand. Sorry about
6  that.
7     Q. Paragraph 76 goes on to say that the mark
8  Van Scoy Diamond Mine has become generic as a result of
9  the use of that mark and/or colorable validations and
10  imitations of that mark by third parties in the retail
11  and jewelry business with knowledge and acquiescence of
12  plaintiff, Wayne Van Scoy, and, thus, is not capable of
13  serving as a valid trademark.
14        What's your basis for that allegation?
15    A. Like I just said, Mark Maurer and a lot of other
16  people are using the mark without supervision of my
17  brother Wayne. The person who holds the trademark, the
18  plaintiff, has not been looking at their goods and
19  services. It's generic. It's generic. You know, he's
20  not going to any stores or certainly following up with
21  anything. Other people are using the name.
22    Q. And is there any other basis for that?
23    A. No.
24    Q. And paragraph 78 I think is somewhat similar to

Page 117

1  paragraph 76. But you go on to allege there that Van
2  Scoy Diamond Mine has become generic or at least
3  misdescriptive and, in any event, not capable of serving
4  as a valid trademark as a result of use of that mark or
5  designation and/or colorable variations and imitations of
6  that mark or designations by third parties in the jewelry
7  business with the knowledge and acquiescence of
8  plaintiff, Wayne Van Scoy.
9        What's your basis for that allegation?
10    A. It would still be the same answer as 76. A lot
11  of people -- other people are using the mark.
12    Q. Any other basis?
13    A. No.
14    Q. And you previously identified those people?
15    A. That is correct, yes.
16    Q. I think you've testified -- well, I know you
17  testified in your previous deposition that your sales
18  area is the Wilmington area, which includes the Newark,
19  Delaware area; is that correct?
20    A. That is correct.
21    Q. And your sales area is separate from the sales
22  area in Lancaster, Pennsylvania?
23    A. I've -- yes. I would have to say yes.
24    Q. It's also separate from the sales area in

Page 130

1  I'm asking you did --
2  A.  The trademark.
3      MS. MORGAN: Let him finish.
4  Q.  Trade name issues. Item three says trade name
5  issues.
6  A.  Correct.
7  Q.  Last time we asked you in the deposition, you
8  said you had absolutely no idea or words to that effect.
9  Now you have some idea.
10     MS. MORGAN: Objection.
11 Q.  The question is, did you do anything to refresh
12 your recollection with respect to the trade name issues
13 discussed at the meeting of August 22, 1996?
14 A.  All I remember -- I thought I certainly said
15 in -- the last time you asked me this question about it
16 is that the trade name issues, it's just -- it's basic
17 questions that were asked: Again, how is everything
18 going? There was nothing -- no trademark issues. It's
19 not here. Just trade name issues. Here, your name that
20 you're using. And it's just the trade name. Everything
21 is fine. Everything is good. Great.
22 Q.  You've never had another meeting on trade name
23 issues, have you?
24     MS. MORGAN: Objection.

Page 131

1      Go ahead. Answer.
2  A.  I don't know that. I don't recall.
3      MR. PETOCK: What's the basis of your
4  objection?
5      MS. MORGAN: Because you're telling him --
6  how about asking him as a question: Have you had any
7  other meetings on trade name issues?
8      You're feeding him the answer before he has
9  a chance to answer it himself. It's leading.
10     MR. PETOCK: I'm entitled to lead an adverse
11 party.
12     MS. MORGAN: Same objection.
13     You can answer it. Go ahead and answer it.
14     THE WITNESS: The question again?
15     MR. PETOCK: Can you read the question back,
16 please?
17     THE REPORTER: There's no question pending.
18 There is a question and an answer. The last question and
19 answer: "You've never had another meeting on trade name
20     issues, have you?"
21     Then there was an objection. "Go ahead and
22     answer."
23     "I don't know that. I don't recall."
24

Page 132

1  BY MR. PETOCK:
2  Q.  Have you ever had another meeting on trade name
3  issues?
4  A.  I don't know that offhand. I don't know that.
5  Q.  Have all the minutes of meetings been produced
6  for us?
7  A.  There was one -- I don't know. You said there
8  was a few years -- I think it was '95 or '97 or something
9  I think you guys stated you didn't get that. We're
10 certainly still working on that, trying to get a hold of
11 actually our old accountant who had the corporate book.
12 Q.  After 1998, which is the last -- the first
13 minutes that you produced, have you had any meeting of
14 the corporation in which the minutes reflected that you
15 discussed trade name issues?
16 A.  I don't know that right now. I'd have to take a
17 look at my corporate books, corporate book.
18 Q.  Have you produced all the minutes of the meetings
19 from 1998 through 2005?
20 A.  I believe I have, yes.
21 Q.  And you opened your store on November 12, 1994;
22 is that correct?
23 A.  Yes, sir.
24 Q.  And Tommy, Sr. gave you the sign in October of

Page 133

1  1994; is that correct?
2  A.  Yes, sir.
3  Q.  And he had filed -- had Tommy filed for
4  bankruptcy in September of 1994?
5  A.  I believe so, yes. Chapter 13.
6  Q.  And I show you what's been previously marked as
7  Plaintiff's Exhibit 9 from your previous deposition. In
8  the upper right, it shows that Tommy Van Scoy, Sr.
9  actually filed for bankruptcy on September 23rd, 1994; is
10 that correct?
11 A.  September 23rd, 1994, yes. Chapter 13.
12 Q.  Right. And it was what? Converted to a
13 Chapter 7 on December 29, 1994; is that correct?
14 A.  That's correct.
15 Q.  The day you were up getting these bankruptcy
16 papers from the Bankruptcy Court, did you make a call to
17 Wayne?
18 A.  Actually not -- when I was in the courthouse?
19 Q.  Mm-hmm.
20 A.  Is that what you're asking me?
21 Q.  Well, at any time that day.
22 A.  That particular day, no. I called him, I believe
23 it was Sunday morning was the day that I called him. And
24 I asked him if he was -- he answered the phone. And I