# Exhibit "E"

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WAYNE VAN SCOY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | 05-108 (KAJ) |
| VAN SCOY DIAMOND MINE OF ) | |
| DELAWARE, INC., KURT VAN SCOY ) | |
| and DONNA VAN SCOY, ) | |
| ) | |
| Defendants. ) | |

Video deposition of KURT VAN SCOY taken pursuant to notice at the offices of Ashby & Geddes, 17th Floor, 222 Delaware Avenue, Wilmington, Delaware, beginning at 10:00 a.m. on Tuesday, July 26, 2005, before Anne L. Adams, Registered Professional Reporter and Notary Public.

APPEARANCES:

    MICHAEL F. PETOCK, ESQ.
    MICHAEL C. PETOCK, ESQ.
    PETOCK & PETOCK
      46 The Commons at Valley Forge
      1220 Valley Forge Road
      Valley Forge, Pennsylvania 19482-0856
      for the Plaintiff,

    CHARLES N. QUINN, ESQ.
    FOX ROTHSCHILD
      2000 Market Street, 10th Floor
      Philadelphia, Pennsylvania 19103-3291
      for the Defendants.

ALSO PRESENT:   Wayne Van Scoy
                   Donna Van Scoy
                   Lisa Bauer - Video Specialist

---

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters



```
 1  put them on, that's fine.
 2              MR. F. PETOCK:  That's all you're allowed to
 3  do, objection as to the form of the question.
 4              MR. QUINN:  All objections are reserved,
 5  correct?
 6              MR. F. PETOCK:  Except as to form of the
 7  question, right.
 8              MR. QUINN:  Except as to the form of the
 9  question, is that stipulated?
10              MR. PETOCK:  Yes.
11              MR. QUINN:  Okay.
12  BY MR. PETOCK:
13      Q.   Do you remember who was present at that meeting?
14      A.   I don't.
15      Q.   Who would have been present?  Who is normally
16  present at a corporate meeting?
17      A.   Myself --
18              MR. QUINN:  Objection.  That's two
19  questions.
20  BY MR. PETOCK:
21      Q.   Who is normally present at a corporate meeting?
22      A.   Me.
23      Q.   Is there anyone that would remember what trade
24  name issues were discussed?
```

1   A.   Not in a while. I, actually, I forgot to take
2   it on vacation. I wanted to, actually, review it again.
3   Q.   From what you remember, do you agree with the
4   statements he makes regarding the diamond business in the
5   book?
6   A.   I don't recall.
7   Q.   Was your father incorporated?
8   A.   To be honest, I didn't know until, actually, just
9   seeing the statements. Again, I don't know that he was
10  actually incorporated until I saw the filing of the
11  papers.
12  Q.   Which papers are you referring to?
13  A.   To the lawsuit.
14  Q.   You never saw -- did you ever see any of the
15  sales receipts or invoices or anything when you were
16  working for the business?
17  A.   Yeah, you do.
18  Q.   Describe to me exactly what you did when you were
19  working for the business for your father. That was
20  during what years? I'm going to ask you that first.
21  What years did you work for your father's business?
22  A.   I started when I was, personally, I started when
23  I was about 10 years old. So I'm 39. Geez, 29 years
24  ago.

1  opinion?

2  A.  Yes.

3  Q.  Did you have knowledge of the fact that -- do you
4  have knowledge of the fact that the mark Van Scoy Diamond
5  Mine is federally registered?

6  A.  No.

7  Q.  I asked you -- I will repeat the question.

8       Do you have knowledge of the fact that the
9  mark Van Scoy Diamond Mine is federally registered?

10 A.  No, until now.

11 Q.  Do you know now that the mark Van Scoy Diamond
12 Mine is federally registered?

13 A.  Yes.

14 Q.  When did you first become aware of this?

15 A.  November the 18th of 2004.

16 Q.  How did you become aware of it that day?

17 A.  From a letter from your office or your dad's
18 office.

19 Q.  What did you do after you received the cease and
20 desist letter of November 18th, 2004?

21 A.  Seeked counsel.

22 Q.  Who did you contact to be your counsel?

23 A.  It was actually in Wilmington.  Someone -- it was
24 just a brief encounter with counsel in Wilmington.  And

1  BY MR. PETOCK:

2  Q. I will rephrase the question. Was it easier to
3  open your Van Scoy Diamond Mine in a location where your
4  father had for several years already operated a Van Scoy
5  Diamond Mine?

6  A. After it was closed 16 months, and that was the
7  location that we reopened, yes.

8  Q. Is your answer yes?

9  A. Yes.

10 Q. You originally opened using the name Van Scoy
11 Diamond Mine, correct?

12 A. That's correct, Van Scoy Diamond Mine of
13 Delaware, Incorporated.

14 Q. When you originally opened, were you using the
15 name Van Scoy Diamond Mine or Van Scoy Diamond Mine of
16 Delaware, Incorporated?

17 A. I don't understand the question.

18 Q. When you originally opened your store, were you
19 using the name Van Scoy Diamond Mine or were you using
20 the name Van Scoy Diamond Mine of Delaware, Incorporated?

21 A. I still don't understand the question.

22 Q. What don't you understand about the question?

23 A. If you are talking outside the store or -- you
24 know what I mean? What's outside, the marquee outside?

1  Q.  Yeah.

2  A.  Okay.

3  Q.  Okay. What was outside the store?

4  A.  Van Scoy Diamond Mine.

5  Q.  What about, what did you use on your sales
6  receipts?

7  A.  Van Scoy Diamond Mine of Delaware, Incorporated.

8  Q.  Did you use those when you first opened your
9  store?

10  A.  When we first opened up, actually, no. My father
11  gave me sales pads, actually, from the Gateway Shopping
12  Center store and also the 154 Mundy Street store.

13  Q.  Did they just say Van Scoy Diamond Mine on them?

14  A.  I did and then we had to put a sticker over for
15  our new address. My father was trying to save me money.

16  Q.  Did you inform Wayne, in any way, that you were
17  opening a Van Scoy Diamond Mine in Delaware?

18  A.  He clearly knew.

19  Q.  How do you know that he clearly knew?

20  A.  I remember specifically when we were trying to
21  move the safe out of the Wilkes-Barre store, my brother
22  Kenny and him sat on a Lazy Boy chair, and his exact
23  quotes as my father and I -- my father was helping me
24  move the safe. And they just sat there. Wayne said to

1   my brother Kenny, quote, unquote, Kenny, I give him two
2   months. No, I give him three months and he's going to be
3   in so much debt he won't even know what happened to him,
4   quote, unquote.
5       Q.   Who selected the name Van Scoy Diamond Mine for
6   your store?
7       A.   My father and I.
8       Q.   Why was the name Van Scoy Diamond Mine selected?
9       A.   Because that's our family business.
10      Q.   Did the name have goodwill attached to it?
11      A.   The store was closed for 15 months, 16 months
12  roughly, somewhere around there. That's what they said.
13  The store was closed and people actually weren't very
14  happy.
15      Q.   Who wasn't happy?
16      A.   Customers from the area that purchased rings in
17  the past.
18      Q.   Where did you receive that information?
19      A.   From customers actually coming to the
20  Wilkes-Barre store from driving up and weren't very
21  happy. And also the fact after I opened the store,
22  customers came in and, you here today, are you going to
23  be here next week? So I had to put up with that for
24  probably about two or three years.

1  de-confuse you. That all kind of got, you guys got
2  talking at the same time. I don't think the record is
3  going to be clear. It's certainly not clear in my mind
4  as to what was happening.
5  BY MR. PETOCK:
6     Q. Did you ever register the domain name
7  vanscoydiamondmine.com?
8     A. Yes.
9        MR. QUINN: Objection to the form of the
10 question in the sense when he says you, are you referring
11 to the defendant personally or the entity, the three
12 defendants or what?
13 BY MR. PETOCK:
14    Q. I am referring to you and your company. I'm
15 referring to you personally, Kurt. Did you register the
16 domain name vanscoydiamondmine.com?
17    A. Personally, no.
18    Q. Did your company register the domain name
19 vanscoydiamondmine.com?
20    A. Yes.
21    Q. When did that occur?
22    A. June -- July 12th, I think, 2002.
23    Q. Did someone recently renew the registration?
24    A. I'm not sure. I'm really not sure.

1    store or outside the store?

2    A.    The only thing that was left was actually on the
3    top.  Just the "Van Scoy" was there.  And, actually, the
4    "Diamond Mine" part down here is actually inside the
5    premises.  And that's actually the sign that we took out
6    of my father's warehouse, he actually helped me load up
7    in the U-Haul truck.

8    Q.    So your father did not give you a sign that said
9    Van Scoy Diamond Mine; he gave you a sign that said
10   Diamond Mine.

11   A.    Diamond Mine, right.  Well, Van Scoy, he said
12   part of the sign is there.  He says, here, just take the
13   bottom part.  This is what you need, Van Scoy Diamond
14   Mine.  He left the sign there.  The top part he left
15   there.

16   Q.    And the landlord had not taken the sign down?

17   A.    No, he did not.

18   Q.    How big is the safe in your store?

19   A.    Exact, I'm not sure.

20   Q.    Is it a walk-in safe?

21   A.    No.

22   Q.    What is the sign that the Diamond Mine is made
23   out of?

24   A.    Fiberglass, fiberglass and metal, aluminum.

```
 1   click on it or certainly E-mail us if they are interested
 2   in purchasing or call us.
 3       Q.   Have you made any sales through your website?
 4       A.   One for a mounting. One.
 5       Q.   Do you know where that customer was located?
 6       A.   Actually, it was from a gentleman that I know
 7   from DOD training. He lives in North Carolina. He
 8   contacted his son. He had his son go on the website,
 9   find a mounting that he liked. He contacted me and I
10   sent the mounting down to his son.
11       Q.   Do you have a picture of all your products on
12   your website?
13       A.   No.
14       Q.   On your current website,
15   vanscoydiamondsofdelaware, there are pictures of at least
16   716 of your products. Does that sound about right?
17       A.   Products that are available, sure.
18       Q.   Did you ever make any sales through your website
19   at vanscoydiamondmine.com?
20       A.   No. Actually, that was, it was a mounting. That
21   was it.
22       Q.   That was the sale that you made?
23       A.   The guy, he said, tell him to go to the website
24   and take a look at the mounting.
```

1   Q. So you made your sale through the website,
2   vanscoydiamondmine.com?
3   A. He had a style what he was looking for. And I
4   told him there was a picture on the website. If you go
5   to that picture, he took a look at it. And he said I'm
6   going to use your best judgment. Send me what you have
7   that looks similar to what he's looking for.
8   Q. But that sale was made through
9   vanscoydiamondmine.com?
10  A. I can't say that, no. Directly through that, no,
11  no.
12  Q. I mean, when was this purchase made?
13  A. Oh, God. Probably 10 months ago, 11 months ago
14  at least.
15  Q. So at that time vanscoydiamondsofdelaware didn't
16  exist; it was vanscoydiamondmine.com, correct?
17  A. I believe so.
18  Q. Is Newark, Delaware, a different geographic
19  market for diamonds than Wilkes-Barre, PA?
20  A. I don't understand that question. What do you
21  mean by that?
22  Q. How would you define your sales market for your
23  business?
24  A. Very competitive.

