# Exhibit
# "I"

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

* * *

WAYNE VAN SCOY,
    Plaintiff and
    Counterclaim
    Defendant

vs

VAN SCOY DIAMOND MINE
OF DELAWARE, INC., KURT
VAN SCOY and DONNA
VAN SCOY,
    Defendants and
    Counterclaim
    Defendants    : NO. 05-108



* * *

Oral deposition of JACQUELINE SAVOCA, taken at the law offices of Burke & Burke, 1460 Wyoming Avenue, Forty Fort, Pennsylvania 18704, on Friday, September 30, 2005, beginning at 2:00 p.m. before Pamela Pratt, Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

* * *

ACCUSCRIPT, INC.
COURT REPORTERS
218 North Wyoming Street
Hazleton, Pennsylvania 18201
(570) 455-4558    (570) 823-2667    (800) 596-0001

ACCUSCRIPT, INC.

JACQUELINE SAVOCA

1   A.   No.

2   Q.   Any idea how you'd come to get
3   customers from Boston?

4   A.   One particular customer, I remember,
5   was coming to the Van Scoy Diamond Mine 500.  And
6   they would always come to the store to purchase
7   something when they would go to the Pocono race.

8   Q.   I'm assuming the Van Scoy Diamond Mine
9   500 is a race?

10  A.   Yeah.  NASCAR race.  When they would
11  come to the local race, they would come to the
12  store and purchase something.

13  Q.   Okay.  Does that race still take place?

14  A.   Yeah.

15  Q.   Okay.  It's once a year?

16  A.   There's actually two NASCAR races now.
17  Twice a year.

18  Q.   I apologize.  I'm not from the area.

19  A.   Yeah.

20  Q.   Does the Mundy Street location operate
21  a web site?

22  A.   No.

23  Q.   Has the Mundy Street location ever
24  owned -- rather, run a web site, to the best of
25  your knowledge?

JACQUELINE SAVOCA

1      A.    No.

2      Q.    Is it something that you've considered?

3      MR. PETOCK:  Objection.

4      MS. MORGAN:  Let me rephrase that.  I

5  can save your objection.

6  BY MS. MORGAN:

7      Q.    Strike that question.

8      Is it something that has ever been

9  considered by Wayne?

10     A.    No.

11     Q.    Okay.  Is it something that you've

12 talked about with Wayne?

13     A.    Yeah, we've talked about it.

14     Q.    Is there lack of interest in having a

15 web site?

16     A.    That would -- you'd have to ask Wayne

17 that.

18     Q.    Do you have an opinion about it?

19     A.    No.

20     Q.    Has any attempt been made to start a

21 web site?

22     A.    No.

23     Q.    Okay.  Is that something your customers

24 ask you about?

25     A.    Yeah, they do.  Some do, yeah.

JACQUELINE SAVOCA

1  A.    Last year.

2  Q.    How did you become aware?

3  A.    Wayne had told me.

4  Q.    What did Wayne say about it?

5  A.    That when Kurt had an internet site,
6  that he felt it wasn't right and that he was going
7  to, I guess, go after him for using the name.

8  Q.    For using the name on the internet
9  site, or other --

10 A.    Uh-huh.

11 Q.    Okay.  Did Wayne feel that he lost
12 business because of Kurt's use of the internet
13 site?

14 A.    I think so.

15 Q.    Do you think Wayne lost business
16 because of Kurt's internet site?

17 A.    Possibly, yes.

18 Q.    How so?

19 A.    Because anybody can go on and just buy
20 from him.

21 Q.    Did you have this conversation with
22 Wayne before the suit was filed?

23 A.    We've had conversations over the years
24 about the name usage, but --

25 Q.    I'm sorry.  About the --

ACCUSCRIPT, INC.

I-3

JACQUELINE SAVOCA                                28

1  store?
2      A.    When?  I think he's been at the store,
3  but I don't, you know, know that -- he probably was
4  at the store when we went to the hospitals down in
5  Christiana.
6      Q.    Let me ask you this.  Why were you down
7  at the hospitals in Christiana?
8      A.    Because his parents were down there.
9      Q.    And what year or years would that have
10 been?
11     A.    Probably -- gosh.  Past several years.
12 I don't know the exact dates.  I mean, his parents
13 had many sicknesses and they always wanted to go
14 out of the area to hospitals.
15     Q.    Have you been to the Delaware store?
16     A.    I think once.
17     Q.    Do you remember when that was?
18     A.    No.
19     Q.    Do you remember why you were there?
20     A.    Probably, I think, just to, you know,
21 stop in.  It was on the way to the hospital, I'm
22 sure.
23     Q.    Okay.  Do you remember if you were with
24 Wayne?
25     A.    I'm sure I was.

ACCUSCRIPT, INC.

I-3.5

Case 1:05-cv-00108-KAJ   Document 119-12   Filed 11/01/2005   Page 7 of 13

37

JACQUELINE SAVOCA

1   A.   He said, you do what you have to do.

2   Q.   How many conversations did Wayne and

3 Kurt have about the use of the name before the

4 lawsuit was filed?

5   A.   Many. I would say -- I don't know how

6 many, but many.

7   Q.   More than ten?

8   A.   Probably, yeah.

9   Q.   Over what period of time?

10  A.   Years.

11  Q.   By "years," more than two?

12  A.   Yes.

13  Q.   And where would those conversations

14 take place?

15  A.   Usually on the phone.

16  Q.   Okay. How often were they?

17  A.   I couldn't be certain. I mean...

18  Q.   More than once a month?

19  A.   No, I don't think so.

20  Q.   Okay. Who would initiate the call or

21 the conversation?

22  A.   I have no idea.

23  Q.   Did Wayne place calls to Kurt to have

24 this discussion with him?

25  A.   I don't know.

```
                                                              38
                        JACQUELINE SAVOCA
   1        Q.      Okay.  Prior to the lawsuit being
   2   filed, what was Kurt's response to Wayne's
   3   statement -- well, let me step back.
   4               What exactly did Wayne say to Kurt
   5   about the use of the name?
   6        A.      Just you're using the name down there
   7   and not paying for it.
   8        Q.      "Using the name down there" -- I don't
   9   want to put words in your mouth.
  10        A.      Meaning Delaware.
  11        Q.      What do you mean by --
  12        A.      Using the name in Newark, Delaware at
  13   the store and not paying for it.
  14        Q.      And what did he ask Kurt to do about
  15   it?
  16        A.      That I'm not sure.  Probably, you know,
  17   pay for it.
  18        Q.      Did you ever hear him ask Kurt to pay
  19   for it?
  20        A.      No.  I mean, you know, in passing.
  21        Q.      Did you ever hear him ask Kurt to stop
  22   using the name?
  23        A.      Probably, but I couldn't say exactly
  24   when.  I don't -- you know.
  25        Q.      You don't have a recollection one way
```

JACQUELINE SAVOCA

1  or the other?

2      A.    No.

3      Q.    Did these conversations start after
4  Wayne purchased the store through the bankruptcy?

5      A.    I don't think so.  I think it was after
6  he had gotten the name back from the bankruptcy
7  court.

8      Q.    Okay.  Do you recall what year that
9  was?

10     A.    Possibly 2001.

11     Q.    So the conversations between Wayne and
12 Kurt would have taken place between 2001 and 2004
13 when the suit was filed?

14     A.    I guess, yeah.

15     Q.    After all those conversations, why did
16 Wayne make the decision to file the lawsuit?

17     A.    Because he'd gone on the internet and
18 opened an internet site.

19     Q.    Did he get onto the internet to look
20 for that internet site?

21     A.    Did he?

22     Q.    Yes.  "He" meaning Wayne.  Strike that.
23        Did Wayne know that Kurt had a web
24 site?

25     A.    When?

JACQUELINE SAVOCA                                46

1    A.    I think he did three NASCAR and one
2  Indy -- one Indy car race.
3    Q.    Okay. Is that considered a big deal
4  around here when he did it?
5    A.    Yeah. Yeah.
6    Q.    I believe you stated that you take care
7  of bookkeeping for the Mundy Street store.
8    A.    Uh-huh.
9    Q.    Can you tell me exactly what that
10 entails?
11   A.    When a customer purchases something, I
12 make, you know, an account card stating what they
13 purchased so we have, you know, the sales receipts,
14 balance the checkbook, write checks and give stuff
15 to the accountant.
16   Q.    Okay. Are you involved in the
17 preparation of income tax returns?
18   A.    No.
19   Q.    Who handles that?
20   A.    Wayne.
21   Q.    Previously -- strike that.
22         I believe you testified earlier that
23 Wayne had expressed some resentment over him caring
24 for his parents.
25   A.    Huh-uh.

ACCUSCRIPT, INC.

JACQUELINE SAVOCA

1    MR. PETOCK: Objection as to
2    characterization of testimony.
3    BY MS. MORGAN:
4    Q.    Is that a fair characterization?
5    A.    When I said he objection [sic], he
6    would want -- if every one of their family members
7    took one day to take their parents out or do
8    something with them, he wanted them to do that.
9    But not everybody did. That was his resentment.
10   Not taking care of them. He never resented it. It
11   would just be so that everybody would take a chance
12   and get to visit with his family and get them out
13   of the nursing home, get them out of the house.
14   With seven siblings, one person could do it one day
15   a week. That's the resentment, not him taking care
16   of them, not at all.
17   Q.    Did he express that to his siblings?
18   A.    Yeah. I think he did, yeah.
19   Q.    Did he have any other particular gripe?
20        MR. PETOCK: Objection.
21   BY MS. MORGAN:
22   Q.    Did he have any other we'll call
23   resentment other than what you just stated with
24   respect to Kurt?
25   A.    Not that I know.

1  a long-term personal relationship with Wayne Van
2  Scoy?
3       A.    Yes.
4       Q.    Is it your contention that Kurt Van
5  Scoy should have as much knowledge about the
6  day-to-day life of Wayne Van Scoy as you do?
7            MR. PETOCK:  Objection.  She never said
8       that.  Mischaracterization of testimony.
9  BY MS. MORGAN:
10      Q.    I believe you testified that if you
11 knew certain things about the trademark that Wayne
12 acquired, then Kurt should as well, correct?
13      A.    No.  I don't understand what you're
14 saying.
15      Q.    What is the basis for your testimony
16 that you believe Kurt knew of the registration of
17 the trademark by Wayne?
18           MR. PETOCK:  Not necessarily by Wayne.
19      That it was a registered mark.
20           THE WITNESS:  Right.  Like the, you
21      know --
22 BY MS. MORGAN:
23      Q.    Well, I believe you testified that
24 there came a point in time when the registered
25 trademark -- when the trademark was acquired by

JACQUELINE SAVOCA

1    MR. PETOCK:  No further questions.

2                    *  *  *

3                  EXAMINATION

4                    *  *  *

5  BY MS. MORGAN:

6        Q.    Can you tell me what a federally
7  registered trademark is?
8        A.    It's when someone has a name and they
9  have to pay to keep that name.  They go and they
10 register it and they pay every -- I don't know if
11 it's every year or two years to have ownership of
12 that name.
13       Q.    Do you have an understanding as to what
14 effect that has on other peoples' use of the name?
15       A.    Do I have an understanding?  A little
16 bit.
17       Q.    What's your understanding?
18       A.    That the person that owns it has the
19 right to say who can use it and who cannot use it.
20 Because he's paying for that right to have the
21 name.
22       Q.    Prior to this lawsuit, did Wayne ever
23 tell Kurt that he could not use the name?
24       A.    I don't know that.
25       Q.    Would it be fair to say that you've had