# EXHIBIT C

# REDACTED

# EXHIBIT D

LAW OFFICES OF
# MICHAEL F. PETOCK
INTELLECTUAL PROPERTY ATTORNEY
46 THE COMMONS AT VALLEY FORGE
1220 VALLEY FORGE ROAD
POST OFFICE BOX 856
VALLEY FORGE, PENNSYLVANIA 19482-0856

TELEPHONE
610-935-8600

FAX 610-933-9300
MFP@IPLaw-Petock.com
www.IPLaw-Petock.com

PATENT, TRADEMARK
AND
RELATED MATTERS

November 18, 2004

Kurt and Donna Van Scoy
Diamond Mine of Delaware, Inc.
1117 Churchmans Road
Newark, DE 19713

**CERTIFIED MAIL**
**Return Receipt Requested**

Re:   Infringement of Service Marks and Trademark of
Mr. Wayne Van Scoy - U.S. Service Mark Reg. No.
1,140,958 for the Mark "VAN SCOY DIAMOND MINE"
for Retail Jewelry Store Services in International Class 42
and Trademark Reg. No. 1,140,711 for the Mark
"VAN SCOY DIAMOND MINE" for Jewelry and
Precious Stones in International Class 14
My File:  443-12

Dear Mr. and Mrs. Van Scoy:

I represent Mr. Wayne Van Scoy in intellectual property matters.

My client owns the rights in the above-identified service mark and trademark
registrations.  I am enclosing a copy of each of the above-identified registrations for your
convenience.

It is hereby demanded that you immediately cease and desist from infringement of the
above-identified federally registered service mark and trademark of Mr. Wayne Van Scoy
and account for past infringement.  You must immediately stop using any form of the name
"VAN SCOY DIAMOND MINE" and confusing similar variations thereof on the name of
your store, in advertising, in commercials, on stationary, boxes, bags, literature, internet
website and any other place where you are using the mark in connection with your business.
It is important that you stop all use immediately as Mr. Wayne Van Scoy intends to have a
franchise moving into your area.

The Trademark Laws provide for significant remedies including, but not limited to,
recovery of your profits, damages multiplied by three, an injunction and the payment of Mr.
Wayne Van Scoy's attorney's fees.





Kurt and Donna Van Scoy          -2-          November 18, 2004

      A response to this letter is due within ten (10) days giving assurance that infringement will cease.

      This letter is written without prejudice to any position that Mr. Wayne Van Scoy may take should litigation prove necessary.

      If I do not receive a response from you, it will be understood that the foregoing is correct.

              Sincerely,

              MICHAEL F. PETOCK

Certified Mail No. 7099 3400 0003 9206 3270

CC: Mr. Wayne Van Scoy

MFP/rks
KVanSc11.014

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

Article Sent To:

| | |
|---|---|
| Postage | $ .60 |
| Certified Fee | 2.30 |
| Return Receipt Fee (Endorsement Required) | 1.75 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 4.65 |

Postmark Here

Name (Please Print Clearly) (to be completed by mailer)
Kurt + Donna Van Scoy - Diamond Mine of DE, Inc.
Street, Apt. No.; or PO Box No.
1117 Churchmans Road
City, State, ZIP+4
Newark, DE 19713

PS Form 3800, July 1999     See Reverse for Instructions

Is your RETURN ADDRESS completed on the reverse side?

SENDER:
• Complete items 1 and/or 2 for additional services.
• Complete items 3, 4a, and 4b.
• Print your name and address on the reverse of this form so that we can return this card to you.
• Attach this form to the front of the mailpiece, or on the back if space does not permit.
• Write "Return Receipt Requested" on the mailpiece below the article number.
• The Return Receipt will show to whom the article was delivered and the date delivered.

3. Article Addressed to:

Kurt and Donna Van Scoy
Diamond Mine of Delaware, Inc.
1117 Churchmans Road
Newark, DE 19713

4a. Article Number
7099 3400 0003 9206 3270

4b. Service Type
☐ Registered
☐ Express Mail
☐ Return Receipt for Merchandise
☑ Certified
☐ Insured
☐ COD

7. Date of Delivery
11/20/04

I also wish to receive the following services (for an extra fee):
1. ☐ Addressee's Address
2. ☐ Restricted Delivery
Consult postmaster for fee.

5. Received By: (Print Name)

6. Signature: (Addressee or Agent)
X

8. Addressee's Address (Only if requested and fee is paid)

PS Form 3811, December 1994    Domestic Return Receipt

Thank you for using Return Receipt Service.

Int. Cl.: 42

Prior U.S. Cl.: 101

Reg. No. 1,140,958

United States Patent and Trademark Office   Registered Oct. 28, 1980

10 Year Renewal/New Cert.   Renewal Term Begins Oct. 28, 2000

## SERVICE MARK
## PRINCIPAL REGISTER
## REGISTRATION ASSIGNED

## VAN SCOY DIAMOND MINE

VAN SCOY, WAYNE (UNITED STATES CITIZEN)
154 MUNDY STREET
WILKES-BARRE, PA 18702, BY ASSIGNMENT VAN SCOY DIAMOND MINES, INC. (PENNSYLVANIA CORPORATION) EDWARDSVILLE, PA

APPLICANT MAKES NO CLAIM TO THE EXCLUSIVE USE OF THE WORD "DIAMOND" APART FROM THE MARK AS SHOWN IN THE DRAWINGS, BUT RESERVES ANY COMMONLAW RIGHTS IT MAY HAVE THEREIN.

FOR: [ RENDERING OF TECHNICAL AID AND ASSISTANCE IN THE ESTABLISHMENT AND/OR OPERATION OF RETAIL JEWELRY STORES ], IN CLASS 35 (U.S. CLS. 100, 101 AND 102).
FIRST USE 5-26-1977; IN COMMERCE 5-26-1977.

FOR: RETAIL JEWELRY STORE SERVICES, IN CLASS 42 (U.S. CL. 101).
FIRST USE 11-0-1976; IN COMMERCE 3-11-1977.
SER. NO. 73-169,527, FILED 5-8-1978.



*In testimony whereof I have hereunto set my hand and caused the seal of The Patent and Trademark Office to be affixed on Oct. 2, 2001.*

*Nicholas P. Godici*

**DIRECTOR OF THE U.S. PATENT AND TRADEMARK OFFICE**

Int. Cl.: 14

Prior U.S. Cl.: 28

Reg. No. 1,140,711

United States Patent and Trademark Office     Registered Oct. 21, 1980

10 Year Renewal/New Cert.          Renewal Term Begins Oct. 21, 2000

## TRADEMARK
## PRINCIPAL REGISTER
## REGISTRATION ASSIGNED

## VAN SCOY DIAMOND MINE

VAN SCOY, WAYNE (UNITED STATES CITIZEN)
154 MUNDY STREET
WILKES-BARRE, PA 18702, BY ASSIGNMENT VAN SCOY DIAMOND MINES, INC. (PENNSYLVANIA CORPORATION) EDWARDSVILLE, PA
APPLICANT MAKES NO CLAIM TO THE EXCLUSIVE USE OF THE WORD "DIAMOND" APART FROM THE MARK AS SHOWN, BUT RESERVES ANY COMMON LAW RIGHTS IT MAY HAVE THEREIN.

FOR: JEWELRY AND PRECIOUS STONES, IN CLASS 14 (U.S. CL. 28).

FIRST USE 3-11-1977; IN COMMERCE 3-11-1977.

SER. NO. 73-169,526, FILED 5-8-1978.



*In testimony whereof I have hereunto set my hand and caused the seal of The Patent and Trademark Office to be affixed on Oct. 2, 2001.*

**DIRECTOR OF THE U.S. PATENT AND TRADEMARK OFFICE**

# EXHIBIT E

# REDACTED

# EXHIBIT F



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Van Scoy

## v.

# Van Scoy Diamond Mine of Delaware, Inc.

## C.A. # 05-108 (KAJ)

---

### Transcript of:

### Donna Van Scoy

### September 19, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com



EXHIBIT

F

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WAYNE VAN SCOY,                    )
                                   )
            Plaintiff,             )
                                   )   Civil Action
v.                                 )   No. 05-108 (KAJ)
                                   )
VAN SCOY DIAMOND MINE OF           )
DELAWARE, INC., KURT VAN SCOY)
AND DONNA VAN SCOY,                )
                                   )
            Defendants.            )

     Videotape deposition of DONNA VAN SCOY taken
pursuant to notice at the law offices of Ashby &
Geddes, 17th floor, 222 Delaware Avenue, Wilmington,
Delaware, beginning at 9:58 a.m. on September 19,
2005, before Lucinda M. Reeder, Registered Diplomate
Reporter and Notary Public.

APPEARANCES:

        MICHAEL F. PETOCK, ESQ.
        MICHAEL C. PETOCK, ESQ.
        PETOCK & PETOCK, LLC
          222 Delaware Avenue, 17th Floor
          Wilmington, Delaware  19801
          for the Plaintiff,

        CHARLES N. QUINN  ESQ.
        FOX ROTHSCHILD LLP
          2000 Market Street - Tenth Floor
          Philadelphia, PA  19103-3291
          for the Defendants.

ALSO PRESENT:

  WAYNE VAN SCOY
  KURT VAN SCOY
  CAROL FEENEY, DISCOVERY VIDEO SERVICES
- - - - - - - - - - - - - - - - - - - - - - - - - -
            WILCOX & FETZER, LTD.
   1330 King Street - Wilmington, Delaware  19801
                (302) 655-0477

e1d9445b-06e6-45b4-8108-014bd9814fd0

Page 2

1    THE VIDEOGRAPHER: This is the videotaped
2  deposition of Donna Van Scoy, taken by the plaintiff
3  in the matter of Wayne Van Scoy versus Van Scoy
4  Diamond Mine of Delaware, Incorporated, Kurt Van Scoy,
5  and Donna Van Scoy, Civil Action No. 05-108- (KAJ)
6  held in the offices of Ashby & Geddes, 222 Delaware
7  Avenue, Wilmington, Delaware on September 19th, 2005
8  at approximately 9:58 a.m.
9       The court reporter is Cindy Reeder, from
10  the firm of Wilcox & Fetzer. My name is Carol Feeley,
11  a video specialist from Discovery Video Services, in
12  association with Wilcox & Fetzer.
13      Counsel will introduce themselves, and the
14  reporter will swear in the witness.
15      .
16      MR. MICHAEL F. PETOCK: I'm Michael F.
17  Petock, for the plaintiff.
18      MR. QUINN: I'm Charles M. Quinn, for the
19  defendants.
20      MR. MICHAEL C. PETOCK: Michael C. Petock,
21  for plaintiff.
22
23
24

Page 3

1       DONNA VAN SCOY,
2  the witness herein, having first been
3  duly sworn on oath, was examined and
4  testified as follows:
5      MR. QUINN: I would like to make a
6  statement before we start. The notice of deposition
7  for Mrs. Van Scoy asked that she bring and produce any
8  documents that have not already been produced for the
9  plaintiff that she reviewed in preparation for this
10  deposition. And I state to you that there are none.
11      MR. MICHAEL F. PETOCK: Thank you.
12  BY MR. MICHAEL F. PETOCK:
13  Q.  Mrs. Van Scoy, I am going to ask you some
14  questions today.
15      MR. QUINN: Excuse me. Are we going to
16  have a stipulation as to read, signing?
17      MR. MICHAEL F. PETOCK: If you want to,
18  yes.
19      MR. QUINN: We had it before. I think
20  it's appropriate.
21      MR. MICHAEL F. PETOCK: So she's going to
22  reserve the right to read and sign you are saying?
23      MR. QUINN: Yes.
24      MR. MICHAEL F. PETOCK: Fine.

Page 4

1      Anything else?
2      MR. QUINN: No. That's fine by me.
3      MR. MICHAEL F. PETOCK: Okay.
4      MR. QUINN: She can sign before any notary
5  public.
6      MR. MICHAEL C. PETOCK: Do you want to
7  stipulate to objections, Dad?
8      MR. MICHAEL F. PETOCK: Well, all
9  objections are reserved until the time of trial except
10  to the form of the question.
11      MR. QUINN: That's fine.
12      MR. MICHAEL F. PETOCK: The same
13  stipulation continues.
14  BY MR. MICHAEL F. PETOCK:
15  Q.  Mrs. Van Scoy, I am going to ask you some
16  questions today. The court reporter is taking down
17  everything that is said. Do you understand that?
18  A.  Yes.
19  Q.  And you understand you are under oath and you
20  have an obligation to tell the truth?
21  A.  Yes.
22  Q.  You also understand that you are not to consult
23  with your counsel during the deposition with respect
24  to any questions that have been asked or anticipated

Page 5

1  to be asked?
2  A.  Yes.
3  Q.  Do you understand that?
4  A.  Yes.
5  Q.  Do you understand that you have to answer the
6  questions unless your counsel instructs you not to
7  answer the question.
8  A.  Mm-hmm.
9  Q.  Can you tell me: How old are you?
10  A.  42.
11  Q.  And do you have any education beyond high
12  school?
13  A.  Yes.
14  Q.  What is that?
15  A.  An X-ray technician.
16  Q.  When did you -- did you get a certificate as an
17  X-ray technician?
18  A.  Yes. A certificate. I have four years of
19  schooling after high school.
20  Q.  Where did you get that certificate from?
21  A.  Connecticut.
22  Q.  Where in Connecticut?
23  A.  I don't remember the name right now.
24  Q.  Where did you grow up at?

2 (Pages 2 to 5)

e1d9445b-06e6-45b4-8108-014bd9814fd0

Page 6

1  A. Nanticoke, Pennsylvania.
2  Q. And how far is that from Wilkes-Barre?
3  A. Ten miles.
4  Q. Were you familiar with Van Scoy Diamond Mine
5  Stores at the time you grew up in Wilkes-Barre?
6  A. Yes.
7  Q. Was there radio advertising on the radio by
8  Tommy Van Scoy, Sr.?
9  A. Yes.
10  Q. Did you consider the name to have been well
11  known at the time you were growing up in Wilkes-Barre?
12  A. Yes.
13  Q. What is your work experience after high school?
14  A. My work experience. I went to school and
15  became an X-ray technician.
16  Q. Did you work as an X-ray technician?
17  A. Yes.
18  Q. For how long?
19  A. Ten years.
20  Q. Did you hold any other jobs?
21  A. No.
22  Q. Did you ever work in a Van Scoy Diamond Mine
23  Store?
24  A. I work in one now.

Page 7

1  Q. I'm sorry. Did you ever work in a Van Scoy
2  diamond store before -- strike that. When did you
3  open a store Van Scoy Diamond Mine of Delaware, Inc.?
4  A. My husband opened it in November of '94.
5  Q. Did you also open it as part of the
6  corporation?
7  A. I wasn't there until a year and a half later.
8  Q. Did you ever work in a Van Scoy Diamond Mine
9  store prior to November of 1994?
10  A. No.
11  Q. Did you invest some money in the opening of the
12  Van Scoy Diamond Mine store in Delaware?
13  A. Yes.
14  Q. How much did you invest?
15  A. 20,000.
16  Q. Where did that money come from?
17  A. I took out two consecutive loans at the same
18  time.
19  Q. In your name?
20  A. Yes.
21  Q. And at that time, you became a percentage owner
22  in Van Scoy Diamond Mine of Delaware, Inc. Is that
23  correct?
24  A. I don't know. I just gave my husband money to

Page 8

1  open the store. I don't really know that percentage.
2  Q. Do you know what your percentage is today?
3  A. No, I do not.
4  Q. You are part owner of the store?
5  A. I guess I would say, 50 percent. We do
6  everything half and half.
7      MR. QUINN: I am sure Mr. Petock does not
8  want you to guess. Correct?
9  Q. Yes. You give us your best information.
10  A. Okay.
11  Q. What are your -- do you work in the store
12  Van Scoy Diamond Mine of Delaware, Inc., right now?
13  A. Yes.
14  Q. I'll refer to it as "Van Scoy Diamond Mine
15  store in Delaware." Okay?
16  A. Okay.
17  Q. What are your job duties there?
18  A. I pay the receipts and I pay the bills.
19  Q. What do you mean when you say you do the
20  receipts?
21  A. I open the receipts every day and do -- put the
22  money in the checkbook, and then I pay the bills in
23  turn.
24  Q. These receipts are payments coming in from

Page 9

1  customers?
2  A. Payments and sales, yes.
3  Q. What do you mean by "sales"?
4  A. Anything that is sold. Anything that is
5  documented from a customer.
6  Q. So that's sales in the store and sales -- and
7  receipts that come in through the mail. Is that
8  correct?
9  A. There are none in the mail. It's just usually
10  people coming in.
11  Q. Do you have any other job responsibilities at
12  Van Scoy Diamond Mine in Delaware?
13  A. No. I'm very part-time.
14  Q. How much time do you spend at the store?
15  A. Four hours a day, maybe if I'm there. Maybe
16  four days a week.
17  Q. What days a week do you work?
18  A. Usually Tuesday through Friday.
19  Q. Have these responsibilities, job duties changed
20  from 1994?
21  A. No.
22  Q. From 1994 to present, you were always doing the
23  same thing, working part-time and only handling the
24  receipts and deposits. Is that correct?

Page 10

1  A. Correct.
2  Q. Does your husband Kurt Van Scoy have any
3  education beyond high school?
4  A. No.
5  Q. When did you meet Kurt Van Scoy?
6  A. 1992.
7  Q. Where did you meet him?
8  A. The Woodlands.
9  Q. What is that?
10 A. A nightclub.
11 Q. And where is that?
12 A. In Wilkes-Barre.
13 Q. And has your relationship with Kurt been good?
14 A. Yes.
15 Q. Do you communicate freely on everything?
16 A. Yes.
17 Q. Do you communicate freely with respect to the
18 operation of Van Scoy Diamond Mine store in Delaware?
19 A. Not in a business sense; just how was our day.
20 Some days are very stressful.
21 Q. What about decisions on when to advertise and
22 how to advertise?
23 A. He solely does the advertising.
24 Q. You don't give him any communication or input

Page 11

1  on that?
2  A. I think it's expensive and I'd rather not.
3  Q. Do you discuss like, it's good to advertise
4  before Christmas or something like that?
5  A. No, I don't.
6  Q. What about the layout of the ads, do you get
7  involved in that at all?
8  A. No.
9  Q. Do you wait on customers?
10 A. At Christmas time, yes.
11 Q. Do you wait on customers at any other time of
12 the year?
13 A. Not usually.
14 Q. How would you define "Christmas time"?
15 A. Our busiest time of the year.
16 Q. But from when to when would that extend?
17 A. I would say, it depends every year, but mostly
18 two weeks prior.
19 Q. So in November, you wouldn't be waiting on
20 customers?
21 A. Not necessarily.
22 Q. What do you mean by "not necessarily"?
23 A. If someone were to be on vacation, I may have
24 to cover. We usually have enough staff to cover how

Page 12

1  many customers come in the door.
2  Q. And when does the Christmas period end as far
3  as your selling is concerned?
4  A. Christmas eve.
5  Q. Do you do anything with respect to keeping
6  track of finances?
7  A. No.
8  Q. Who does that?
9  A. Our accountant.
10 Q. How does he do that?
11 A. He comes to our store twice a month and does
12 the bookkeeping.
13 Q. What does he use to do the bookkeeping?
14 A. My computer.
15 Q. What's on your computer?
16 A. The invoices that go in and the checks that
17 come out.
18 Q. Who is your accountant?
19 A. James Bellenger.
20 Q. He is located where?
21 A. In Bear, Delaware.
22 Q. Does the accountant give you back a summary
23 each month?
24 A. No.

Page 13

1  Q. Does the accountant give you anything back?
2  A. No. He does everything.
3  Q. What do you mean "he does everything"?
4  A. I don't need a summary because he does the
5  taxes. So he does what he needs to do on my computer
6  and then follows up with it every month and at the end
7  of the year.
8  Q. At some point in time, you changed the name of
9  your website address from Van Scoy Diamond Mine.com to
10 Van Scoy Diamonds of Delaware.com. Do you know when
11 you did that?
12 A. No.
13 Q. Was there an invoice for doing that?
14 A. No. The only invoice I get is from the company
15 itself.
16 Q. What company is that?
17 A. I believe it was Trusion.
18 Q. Trusion. T-R-U-S-I-O-N?
19 A. Mm-hmm. Yes.
20 Q. What do they do?
21 A. I am not sure. I didn't have anything to do
22 with the Internet.
23 Q. You don't recall ever getting an invoice that
24 you had to pay for making that change?

Page 14

1   A.  No.  It was just a monthly Internet fee.
2   Q.  Do you know what Scoy Development, S-C-O-Y-
3   D-E-V is?
4   A.  No.
5   Q.  Have you ever seen that before?
6   A.  Never heard of it.
7   Q.  Why did you decide to open a store in
8   Wilmington, Delaware?
9       MR. QUINN:  Objection to the form of the
10  question. I don't think the foundation for that has
11  been established.
12  Q.  You can answer the question. He objected, but
13  you still have to answer the question.
14  A.  Why, I don't really remember.
15  Q.  Why didn't you open one in Wilkes-Barre?
16  A.  Because there was already one there.
17  Q.  Did the same thing apply for Allentown?
18  A.  I don't know.  I don't know.  Sorry.
19  Q.  And the store that was opened in Wilmington at
20  1117 Churchmans Road or street, that was the same
21  location that Tommy Van Scoy previously had a store
22  there. Is that correct?
23      MR. QUINN:  Objection to the form of the
24  question. The question presumes a store was opened in

Page 15

1   Wilmington.  I think that's actually not actually
2   correct.
3   Q.  Can you answer the question?
4   A.  I forgot it now.  I'm sorry.
5       MR. QUINN:  You can have it read back if
6   you'd like.
7   Q.  You opened a store at 1117 Churchmans Road, is
8   it?
9   A.  Yes.
10  Q.  You opened that in about November of 1994. Is
11  that correct?
12  A.  Yes.
13  Q.  And at that same location, about a year and a
14  half year earlier Tommy Van Scoy, Sr. had operated a
15  store there. Is that correct?
16  A.  I was told that.
17  Q.  Who told you that?
18  A.  My father-in-law and my husband.
19  Q.  Your father-in-law was Tommy Van Scoy, Sr.?
20  A.  Yes.
21  Q.  You signed a personal guarantee on the lease on
22  that property when you opened it. Isn't that correct?
23  A.  I don't remember.
24      MR. MICHAEL F. PETOCK:  I would like to

Page 16

1   have this marked as Plaintiff's Exhibit 17.
2       (Plaintiff's Exhibit No. 17 was marked for
3   identification.)
4   BY MR. MICHAEL F. PETOCK:
5   Q.  I show you what's been marked as Plaintiff's
6   Exhibit 17. Can you identify that?
7   A.  It's a lease agreement.
8   Q.  For what is the lease agreement?
9   A.  To lease the property.
10  Q.  What property? Is it the lease for your store?
11  A.  Yes.
12  Q.  That's Van Scoy Diamond Mine of Delaware, Inc.
13  Is that correct?
14  A.  Yes.
15  Q.  And I direct your attention to the fourth page
16  of the document, which is identified in the lower
17  right-hand corner as D 000754. Do you see that?
18  A.  Mm-hmm.
19  Q.  Isn't that -- is that your signature on there,
20  Donna Van Scoy?
21  A.  Yes.
22  Q.  That's a lease guarantee. Isn't that correct?
23  A.  Yes.
24  Q.  It's for the location of your Van Scoy Diamond

Page 17

1   Mine store. Is that not correct?
2   A.  Yes.
3   Q.  That was in October of 1994?
4   A.  Yes.
5   Q.  Were you an officer or director of Van Scoy
6   Diamond Mine of Delaware, Inc.?
7   A.  Secretary.
8   Q.  When you say you're secretary?
9   A.  That's what it says on the form.
10  Q.  On what form?
11  A.  The corporation form.
12      MR. MICHAEL F. PETOCK:  I guess we
13  haven't received that form, Charlie. I'd ask that you
14  produce it.
15  BY MR. MICHAEL F. PETOCK:
16  Q.  What do you do as secretary of the corporation?
17  A.  As I told you before, receipts and the bills.
18  Q.  Do you do anything else --
19  A.  No.
20  Q.  -- in connection with being secretary of the
21  corporation?
22  A.  Well, I do sales and take out the trash as
23  well.
24  Q.  Have you attended any corporate meetings?

Page 18

1  A.  No.
2  Q.  Have you ever attended any corporate meetings?
3  A.  I don't remember.
4       MR. MICHAEL F. PETOCK:  I would like to
5  have this marked as Plaintiff's Exhibit 18.
6       (Plaintiff's Deposition Exhibit No. 18 was
7  marked for identification.)
8  BY MR. MICHAEL F. PETOCK:
9  Q.  I show you what's been marked as Plaintiff's
10 Exhibit 18.  Do you recognize that?
11 A.  No.
12 Q.  Do you know what it is?
13 A.  Minutes of annual meeting of shareholders and
14 directors.
15 Q.  Of what corporation?
16 A.  Van Scoy.
17 Q.  Diamond Mine of Delaware, Inc.  Isn't that
18 correct?
19 A.  Correct.
20 Q.  It says there that the only shareholder present
21 was Kurt Van Scoy, is that correct, in the lower
22 portion of the page?
23 A.  Yes.
24 Q.  Those are the minutes for 2005, is that

Page 19

1  correct, the first paragraph?
2  A.  I guess.  I don't know.
3  Q.  That's what it says, isn't that correct, the
4  second line, the first paragraph?
5  A.  I guess.
6  Q.  Is that correct?
7  A.  If that's what it says.
8  Q.  Isn't it true that on page 2 you were appointed
9  as vice-president or elected as vice-president?
10 A.  No.
11 Q.  I direct your attention to the second group of
12 names listing.  It says, "President, Kurt Van Scoy,
13 vice-president, Donna Van Scoy."  Do you see that?
14 A.  Yes.
15 Q.  Isn't it true that you are vice-president of
16 the corporation?
17 A.  I never heard of that before.
18      MR. MICHAEL F. PETOCK:  I would like to
19 have this marked as Plaintiff's Exhibit 19.
20      (Plaintiff's Exhibit No. 19 was marked for
21 identification.)
22 By MR. MICHAEL F. PETOCK:
23 Q.  I show you what's been marked as Plaintiff's
24 Exhibit 19, P-19, Plaintiff's 19.  Can you identify

Page 20

1  that?
2  A.  It looks like the same thing as the prior one.
3  Q.  That's minutes for Van Scoy Diamond Mine of
4  Delaware, Inc., the annual meeting?
5  A.  Yes.
6  Q.  But it's for 2004.  Is that correct?
7  A.  That's what it says, yes.
8  Q.  Again, you were not present at the meeting.  Is
9  that correct?
10 A.  Correct.
11 Q.  Again on the second page, you are nominated and
12 were unanimously elected to be vice-president?
13 A.  No, I was not.
14 Q.  You were not?
15 A.  I am not the vice-president.
16 Q.  You are the secretary?
17 A.  I am the secretary.
18 Q.  Even though the minutes say you are
19 vice-president?
20 A.  It must have been a mistake.
21      MR. MICHAEL F. PETOCK:  I would like to
22 have this marked as P-20.
23      (Plaintiff's Exhibit No. 20 was marked for
24 identification.)

Page 21

1  BY MR. MICHAEL F. PETOCK:
2  Q.  I show you what's been marked as Plaintiff's
3  Exhibit 20.  Can you identify that?
4  A.  I guess it's the same thing again for 2003.
5  Q.  And, again, does it show that you were not
6  present at the meeting?
7  A.  Yes.
8  Q.  And, again, does it show that you were elected
9  to be vice-president of the corporation?
10 A.  My name is listed as vice-president, but I am
11 secretary.  On every form, income tax form, I am
12 secretary.  This must be a mistake at my accountant's
13 office.
14      MR. MICHAEL F. PETOCK:  Charlie, we
15 request that you provide us with all documents that
16 show Donna Van Scoy to be secretary of the
17 corporation.
18      MR. MICHAEL F. PETOCK:  Would you mark
19 this as Plaintiff's Exhibit 21?
20      (Plaintiff's Deposition Exhibit No. 21 was
21 marked for identification.)
22 BY MR. MICHAEL F. PETOCK:
23 Q.  I show you what's been marked as Plaintiff's
24 Exhibit 21.  Can you identify that?

e1d9445b-06e6-45b4-8108-014bd9814fd0

Page 22

1    A.   Shareholders and directors.
2    Q.   Is it the minutes of the annual meeting of
3    shareholders and directors for Van Scoy Diamond Mine
4    of Delaware, Inc. for the year 2002?
5    A.   Yes.
6    Q.   It shows you were not present at the meeting.
7    Is that correct?
8    A.   Correct.
9    Q.   On page 2, it shows again you were elected to
10   be vice-president of the corporation. Is that
11   correct?
12   A.   As far as I know, I am the secretary.
13   Q.   But the document says you are vice-president.
14   Is that correct?
15   A.   It does say that, yes.
16   Q.   Do you have any idea how what you characterize
17   as a mistake happened?
18   A.   No, I don't.
19   Q.   And to your knowledge, you don't recall
20   attending any corporate meetings?
21   A.   No.
22   Q.   Even though you are 50 percent stockholder?
23   A.   Yes.
24        MR. MICHAEL F. PETOCK:  I would like to

Page 23

1    have this marked as Plaintiff's Exhibit 22.
2         (Plaintiff's Exhibit No. 22 was marked for
3    identification.)
4    BY MR. PETOCK:
5    Q.   Can you identify Plaintiff's Exhibit 22?
6    A.   Shareholders meeting, 2001.
7    Q.   Of the corporation Van Scoy Diamond Mine of
8    Delaware, Inc. Isn't that correct?
9    A.   Yes.
10   Q.   And it shows, again, you were not present at
11   the meeting. Is that correct?
12   A.   Correct.
13   Q.   On page 2, it shows also you were elected to be
14   vice-president of the corporation?
15   A.   Yes.
16        MR. MICHAEL F. PETOCK:  Is the next
17   number 23?
18        (Plaintiff's Exhibit No. 23 was marked for
19   identification.)
20   BY MR. MICHAEL F. PETOCK:
21   Q.   I show you what's been marked as Plaintiff's
22   Exhibit 23. Do you recognize that?
23   A.   Some minutes of a meeting.
24   Q.   It's the minutes of the annual meeting of

Page 24

1    shareholders and directors of Van Scoy Diamond Mine of
2    Delaware, Inc. for the year 2000. Is that correct?
3    A.   Yes.
4    Q.   It shows you were present at that meeting. Is
5    that correct?
6    A.   I don't remember.
7    Q.   Do you recall being at any meetings at the
8    offices of Ralph V. Estep?
9    A.   No.
10   Q.   Again, on page 2, it shows you being elected as
11   vice-president of the corporation. Is that correct?
12   A.   Yes.
13   Q.   But, again, you say that was an error and that
14   you were secretary. Is that correct?
15   A.   Yes.
16   Q.   What forms have you listed as secretary?
17   A.   What forms do I have?
18   Q.   What forms are you referring to that list you
19   as secretary of the corporation?
20   A.   When we first started it. That's the only
21   thing I could think of that would say that, the very
22   first form. The one that would be Cayman
23   incorporated.
24   Q.   You think the articles of incorporation say

Page 25

1    that?
2    A.   Yes. To my knowledge.
3    Q.   Take a look at Plaintiff's Exhibit P-23. Take
4    a look at the last page, which is marked D000758.
5    A.   Mm-hmm.
6    Q.   Is that your signature on there?
7    A.   No.
8    Q.   Above the name "Donna Van Scoy," is that not
9    your signature?
10   A.   No.
11   Q.   Do you know who signed your name?
12   A.   No.
13   Q.   Do you know who wrote that signature on there?
14   A.   No.
15        MR. QUINN: Objection. The question has
16   been asked and answered.
17   Q.   Can you take a look at P-22, the last page?
18   Whose signature is that?
19   A.   Kurt's.
20        MR. QUINN: Objection. I instruct the
21   witness to give me a second to get my objection in
22   before you give the answer.
23   A.   Sorry.
24        MR. QUINN: To what signature does the

Page 26

1  question refer?
2      MR. MICHAEL F. PETOCK: Well, okay. The
3  signature above the name "Kurt Van Scoy."
4  Q. You can answer the question now.
5  A. Kurt Van Scoy.
6  Q. Can I ask you to go back and take a look at
7  P-23 again?
8  A. Absolutely.
9  Q. The last page, D000758. Above the name "Kurt
10 Van Scoy" in two places, whose signature is that?
11 A. Kurt Van Scoy.
12     (Plaintiff's Exhibit No. 24 was marked for
13 identification.)
14 BY MR. MICHAEL F. PETOCK:
15 Q. I show you what's been marked as Plaintiff's
16 Exhibit 24. Is that the minutes of the annual meeting
17 of shareholders and directors of Van Scoy Diamond Mine
18 of Delaware, Inc., for the year 1999?
19 A. Yes.
20 Q. It shows you were present as a shareholder at
21 that meeting. Is that correct?
22 A. Yes.
23 Q. The second page also shows that you were
24 elected vice-president of the corporation for the

Page 27

1  year. Is that correct?
2  A. Yes.
3  Q. On the third page, which is D000761, there is a
4  signature for Donna Van Scoy. Is that your signature
5  on there?
6  A. No.
7  Q. Do you know who signed that?
8  A. No.
9  Q. Did Kurt sign that?
10     MR. QUINN: Object. Asked and answered.
11 She's already answered the question she doesn't know.
12 You don't need to answer the question.
13 Q. Did Kurt sign?
14 A. I don't know.
15 Q. Above the -- in two places on that same page
16 above the signature line "Kurt Van Scoy," is that
17 Kurt's signature?
18 A. Yes.
19     MR. MICHAEL F. PETOCK: I would like to
20 have this marked as Plaintiff's Exhibit 25.
21     (Plaintiff's Exhibit No. 25 was marked for
22 identification.)
23
24 BY MR. MICHAEL F. PETOCK:

Page 28

1  Q. I show you what's been marked as Plaintiff's
2  Exhibit 25. Is that the minutes of the annual meeting
3  of shareholders and directors of Van Scoy Diamond Mine
4  of Delaware, Inc. for the year 1998?
5  A. Yes.
6  Q. That also shows that you were present at that
7  meeting. Is that correct?
8  A. It says I was.
9  Q. Were you present at that meeting?
10 A. I don't remember.
11 Q. On page 2, which is D000763, it shows you being
12 elected as vice-president of the corporation. Is that
13 correct?
14 A. Yes.
15 Q. I direct your attention to page 3, which is
16 D000764. Above the signature line "Donna Van Scoy,"
17 is that your signature?
18 A. No.
19 Q. Did you authorize anyone to put your signature
20 on that?
21 A. I don't recall.
22 Q. Above the -- in two places, above the signature
23 line "Kurt Van Scoy," is that Kurt's signature?
24 A. Yes.

Page 29

1  Q. Did you ever attend a corporate meeting at a
2  lawyer's name of Aregood in Wilkes-Barre?
3  A. I believe so.
4  Q. Do you believe that would have been at the 1996
5  meeting?
6  A. I don't remember.
7  Q. Do you recall being at any meeting in
8  Mr. Aregood's office in which tradename issues were
9  discussed?
10 A. No.
11 Q. In 1996, were you aware that there was a
12 proceeding started in the bankruptcy court to enjoin
13 the use of the Van Scoy Diamond Mine?
14 A. I knew there was a bankruptcy case. That's all
15 I knew.
16 Q. How did you know there was a bankruptcy case?
17 A. Because my father-in-law was going through it.
18 I didn't know the details.
19 Q. Did you know that the store in Wilkes-Barre --
20 that the Van Scoy Diamond Mine in Wilkes-Barre was
21 padlocked by the bankruptcy court at one time?
22 A. Yes. I was told that.
23 Q. Did you also know at some later date they had
24 to take the name down, they had to change their name

Page 30

1  on the store in Wilkes-Barre?
2    A.  As of this trial, I found that out.
3    Q.  Prior to the institution of this lawsuit, you
4  didn't know about that?
5    A.  No, I did not.
6    Q.  Do you know where the meetings are for -- or
7  the minutes for the meetings for the corporation
8  Van Scoy Diamond Mine for '95, '96, '97?
9    A.  No.
10       MR. MICHAEL F. PETOCK:  Charlie, I'd ask
11  that you produce the minutes for the meetings for the
12  years '95, '96 and '97.
13  BY MR. MICHAEL F. PETOCK:
14    Q.  Was there ever any concern expressed by Kurt or
15  concern on your behalf about using the name "Van Scoy
16  Diamond Mine"?
17    A.  No.
18    Q.  Did Tommy Van Scoy, Sr. ever say anything to
19  you that would give you permission to use the name
20  "Van Scoy Diamond Mine"?
21    A.  Yes.  He gave it to us.
22    Q.  What did he say to you?
23    A.  He said, "Good luck and I hope you guys do
24  well."

Page 31

1    Q.  When did he say that?
2    A.  When we opened the store.  No.  Prior, when he
3  gave us all the showcases and the sign and everything.
4    Q.  Where was he when he said that?
5    A.  In my store.
6    Q.  He was in your store and he was giving you the
7  showcases and the sign in your store?  Is that
8  correct?
9       MR. QUINN:  Object.
10    A.  He gave Kurt the equipment.  He didn't
11  physically bring it.  He said, "Good luck to you."
12  That's all.
13    Q.  That's all he said?
14    A.  I am sure there was more, but I don't recall.
15    Q.  Did he ever do anything which would imply any
16  type of permission to use the name "Van Scoy Diamond
17  Mine?"
18    A.  He used to come down to our store and work when
19  we had a sale or something big or just to come down
20  and help us out.
21    Q.  When was that?
22    A.  Numerous times.
23    Q.  In what year?
24    A.  '94, '95.

Page 32

1    Q.  How did he help you out?
2    A.  Actually just stood and helped make sales and
3  helped keep the girls motivated.
4    Q.  Did he ever say anything about the corporation
5  Van Scoy Diamond Mine of Delaware, Inc. impliedly
6  received any permission to use the mark "Van Scoy
7  Diamond Mine"?
8    A.  I knew nothing about a mark until this trial.
9    Q.  So he was telling you good luck with the store
10  hoping you were successful.  Is that correct?
11    A.  That's correct.
12    Q.  And you took his comments "good luck" to mean
13  that you could use the mark in Delaware, is that
14  correct, in Newark, Delaware?
15    A.  I don't understand the question.
16    Q.  What was your understanding of the scope of the
17  permission that was granted to you, allegedly granted
18  to you by the words "good luck"?
19    A.  He allowed us to open the store and wished us
20  good luck.
21    Q.  In Newark, Delaware?
22    A.  Yes.
23    Q.  Nowhere else?
24    A.  Nowhere else was ever brought up, I guess.

Page 33

1    Q.  Are you aware that at some point in time
2  somebody blocked out the word "Mine" from the sales
3  receipts of Delaware Diamond Mine of Delaware, Inc.?
4    A.  Yes.
5    Q.  Did you ever block out of any of those?
6    A.  No.
7    Q.  Do you know who did it?
8    A.  Yes.  My employees.
9    Q.  Who was that?
10    A.  Pardon?
11    Q.  Who was that?
12    A.  Megan Rump and Karen Vayo.
13    Q.  Megan Rump, R-U-M-P?
14    A.  Yes.
15    Q.  What was the other name?
16    A.  Karen Vayo, V-A-Y-O.
17    Q.  V-A-Y-L-E?
18    A.  V-A-Y-O.
19    Q.  How do you identify yourself on sales receipts?
20    A.  "DVS."
21    Q.  Did the two girls do this jointly?
22    A.  Yes.
23    Q.  Megan and Karen?
24    A.  Yes.

1    Q.  When did they do that?
2    A.  After we received notification of the lawsuit.
3    Q.  You mean after you received the cease and
4    desist letter?
5    A.  Yes.
6    Q.  These sales receipts, do they come in a booklet
7    or in individual forms, multi-part individual forms?
8    A.  In a carbon copy form notebook.
9    Q.  They are in a notebook?
10   A.  Mm-hmm.
11   Q.  So you tear one off as you use it?
12   A.  Yes.
13   Q.  Were these crossed out one at a time as --
14   A.  No.
15   Q.  How many were done at one time, do you know?
16   A.  Well, the entire book.
17   Q.  Did you use any of the sales receipts with the
18   name "Mine" blocked out?
19   A.  Yes.
20   Q.  Were you upset that you were doing that?
21   A.  No.
22   Q.  Did you tell the girls Megan and Karen Rump --
23   Megan Rump and Karen --
24   A.  Vayo.

1    Q.  -- Vayo not to do it?
2    A.  I'm confused.
3    Q.  Did you tell Karen Rump -- I'm sorry.  Did you
4    tell Megan Rump and Karen Vayo not to cross out the
5    word "Mine" from the sales receipts any longer?
6    A.  Yes.
7    Q.  You felt that there was no need to cross out
8    the word "Mine."  Is that correct?
9    A.  Yes.
10   Q.  Did you chastise Karen and Megan for crossing
11   out the sales receipts?
12   A.  "Chastise" meaning?
13   Q.  Tell them they really did a wrong thing by
14   crossing it out, that they shouldn't take -- I presume
15   they took this on themselves and did it?
16       MR. QUINN:  Objection.  There is no
17   question on the table.
18   Q.  How did it come that Karen and Megan crossed
19   out the word "Mine" on the sales receipts?
20   A.  I told them to.
21   Q.  You told them to?
22   A.  Yes.
23   Q.  And then you later told them not to do it
24   anymore?

1    A.  No.  I later said we didn't need to do it.
2    Q.  Why did you later tell her that you did not
3    need to do it?
4    A.  Under the advice of counsel.
5    Q.  What was that advice?
6        MR. QUINN:  Objection.  That's privileged
7    information.  You are instructed not to answer.
8        MR. MICHAEL F. PETOCK:  If she's relying
9    upon advice of counsel, it's not privileged.
10       MR. QUINN:  It certainly is.
11       MR. MICHAEL F. PETOCK:  It certainly is
12   not.
13   BY MR. MICHAEL F. PETOCK:
14   Q.  So when you first directed them to cross out
15   "Mine" from the sales receipts, did you believe that
16   crossing out "Mine" would avoid infringement?
17       MR. QUINN:  Objection to the form of the
18   question.  It's leading.
19   A.  I don't understand it anyway.
20   Q.  In the beginning, you requested Megan and Karen
21   to cross out "Mine" from the sales receipt.  Is that
22   correct?
23       MR. QUINN:  Objection.  Misleading.
24   A.  Yes.

1    Q.  And when you asked them to do that, did you
2    believe that would solve the problem with respect to
3    the cease and desist letter and being a violation of
4    "Van Scoy Diamond Mine"?
5        MR. QUINN:  Objection to the form of the
6    question.  It's a leading question.
7    A.  I don't understand.
8    Q.  When you instructed Megan and Karen to cross
9    out the sales receipts, did you believe that was going
10   to solve the problem with respect to Van Scoy Diamond
11   Mine.
12       MR. QUINN:  Objection to the question, the
13   form.  It's a leading question.
14       MR. PETOCK:  This is an adverse witness.
15   I'm entitled to lead the witness.
16       MR. QUINN:  And objections to form are to
17   be made today.  We agreed on that at the beginning.
18   By MR. MICHAEL F. PETOCK:
19   Q.  Can you answer the question?
20   A.  I can tell you what I did.  I don't really
21   understand your question.
22       MR. QUINN:  If you don't understand the
23   question, you should not answer it.
24   Q.  Tell me what you did.

1       MR. QUINN: Is that a question?
2       MR. MICHAEL F. PETOCK: Yes. Tell me what
3  you did.
4       MR. QUINN: That's not a question.
5       MR. MICHAEL F. PETOCK: I'm asking: What
6  did you do?
7       MR. QUINN: That's a question.
8    A.  I received the letter and it said to stop using
9  the name, so I thought I should cross it out, it would
10  be a good idea. That's it.
11    Q.  By crossing out "Mine," you thought that would
12  avoid the problem with "Van Scoy Diamond Mine"?
13       MR. QUINN: Objection. That's not a
14  question.
15    Q.  Is that correct?
16       MR. QUINN: That's a leading question. I
17  object to it as to form.
18    Q.  Is that correct?
19    A.  I don't know.
20    Q.  Just so the record is clear, what was the
21  advice that you got from counsel with respect to
22  blocking out the name "Mine"?
23       MR. QUINN: Objection. That calls for
24  inquiry into and to break the attorney-client

1  privilege. The witness should not answer that
2  question.
3    Q.  When did you tell employees to stop blocking
4  out "Mine" from the sales receipts?
5    A.  They never started and stopped. They just did
6  it one time.
7    Q.  When did you tell them not to do it any longer?
8    A.  I don't believe I have.
9    Q.  You said earlier that you told them not to do
10  it any longer. Isn't that correct?
11       MR. QUINN: Objection. The record will
12  show what she said.
13    A.  I don't remember.
14       MR. MICHAEL F. PETOCK: I guess you need
15  a break now?
16       THE VIDEOGRAPHER: Yes. Going off the
17  record at 10:56 a.m.
18       -- -- -- --
19       THE VIDEOGRAPHER: Going back on the
20  record at 11:05 a.m.
21  BY MR. MICHAEL F. PETOCK:
22    Q.  During the break, did you discuss any of this
23  testimony with your counsel, Mr. Quinn?
24    A.  No.

1    Q.  Just so I'm clear here. You said -- is it
2  correct that you said you told Megan and Karen to
3  cross out "Mine" from the receipts?
4       MR. QUINN: Objection. The record will
5  show what she said. The question has been asked and
6  answered.
7    Q.  Will you answer that? I'm unclear.
8    A.  Yes.
9    Q.  When Kurt and you -- when Kurt goes on
10  vacation, do you usually go with him?
11       MR. QUINN: Objection. That's not a
12  question.
13    Q.  Do you usually go with Kurt on vacations?
14    A.  Vacations, yes.
15    Q.  Was Kurt in the store when the cease and desist
16  letter came in?
17    A.  No.
18    Q.  Did you consult with Kurt before you told Megan
19  and Karen to cross out the word "Mine" from the sales
20  receipts?
21    A.  No.
22    Q.  And you said you consulted with counsel with
23  respect to the crossing out of "Mine" from the sales
24  receipts. What counsel was that?

1    A.  I never discussed it with counsel. It was
2  what -- I am not sure. I believe it was told to
3  counsel what was done and I was told that it wasn't
4  necessary.
5       MR. QUINN: Limit your response to the
6  question that was asked.
7  BY MR. MICHAEL F. PETOCK:
8    Q.  Who told you it wasn't necessary?
9    A.  I don't recall.
10    Q.  Was it Kurt?
11    A.  I don't recall.
12    Q.  When did this occur?
13    A.  What occur?
14    Q.  That you were told that it was no longer
15  necessary to cross out "mine."
16       MR. QUINN: Objection. That's not a
17  question.
18    Q.  When did it occur?
19    A.  I don't recall.
20    Q.  When you told Megan and Karen to cross out
21  "Mine" from the sales receipts, did you also consider
22  changing the store sign?
23    A.  No.
24    Q.  And why not?

Page 42

1   A.  I don't make those kinds of decisions.
2   Q.  Did you consider changing "Van Scoy Diamond
3   Mine" on the Internet?
4   A.  I don't deal with the Internet.
5   Q.  Who deals with the Internet?
6   A.  Kurt.
7   Q.  Did you believe that "Van Scoy Diamonds of
8   Delaware, Inc." would not be an infringement of
9   "Van Scoy Diamond Mine"?
10  A.  I don't know.
11  Q.  Do you have any belief as to that?
12  A.  I don't really understand the question.
13  Q.  Did you believe that deleting the word "Mine"
14  from "Van Scoy Diamond Mine of Delaware, Inc." would
15  obviate or eliminate the problem with the cease and
16  desist letter?
17  A.  I still don't understand.
18  Q.  What don't you understand about it?
19  A.  I just did it because it said to stop using the
20  name.  That was my own decision.  And I don't know why
21  I did it.
22        (Plaintiff's Exhibit No. 26 was marked for
23  identification.)
24  BY MR. MICHAEL F. PETOCK:

Page 43

1   Q.  I show you what's been marked as Plaintiff's
2   Exhibit No. 26.  Can you identify that?
3   A.  It's a receipt to a customer.
4   Q.  And it's a receipt of the store Van Scoy
5   Diamond Mine of Delaware, Inc.  Is that correct?
6   A.  Yes.
7   Q.  On that receipt the word "Mine" is blocked out.
8   Is that correct?
9   A.  Yes.
10  Q.  The date of this is November 24th, 2004?
11  A.  Yes.
12        MR. QUINN:  Objection.  Leading.  It's not
13  a question.
14  Q.  Whose initials are in there where it says "sold
15  by"?
16  A.  Mine, "DVS."
17  Q.  And was this the first day that a sales receipt
18  was used with the word "Mine" blocked out of the
19  "Van Scoy Diamond Mine of Delaware, Inc."?
20  A.  I am not sure of the first day.
21  Q.  By the way, did you receive the cease and
22  desist letter?
23  A.  I didn't sign for it, no.
24  Q.  Did you open it?

Page 44

1   A.  Yes.
2        (Plaintiff's Exhibit No. 27 was marked for
3   identification.)
4   BY MR. MICHAEL F. PETOCK:
5   Q.  I show you what's been marked as Plaintiff's
6   27.  Can you identify that?
7   A.  It's a receipt.
8   Q.  Of what?
9   A.  From our store.
10  Q.  What date is that?
11  A.  11/24.
12  Q.  That doesn't have "Mine" blocked out.  Is that
13  correct?
14  A.  Correct.
15  Q.  Is that by Megan Rump?
16  A.  Yes.
17  Q.  Does that help refresh your recollection as to
18  whether the first day that sales occurred with "Mine"
19  blocked out was November 24th?
20  A.  It would seem so.
21  Q.  I'll also represent for the record that we
22  requested your counsel to produce all the sales
23  invoices with "Mine" blocked out and the first date
24  was November 24th.

Page 45

1   A.  Okay.
2   Q.  Do you believe that "Van Scoy Jewelers" would
3   not infringe the service mark or trademark "Van Scoy
4   Diamond Mine"?
5   A.  I don't know.
6   Q.  What's your belief?
7        MR. QUINN:  She just answered the
8   question.  So she doesn't have to answer it again.  I
9   object.
10        MR. MICHAEL F. PETOCK:  It's a different
11  question.
12        MR. QUINN:  The first question was:  Do
13  you believe?  And the second question was:  What is
14  your belief?  Those are the same questions.  We can
15  have the reporter read them back.
16  BY MR. MICHAEL F. PETOCK:
17  Q.  Do you have any personal opinion on it?
18        MR. QUINN:  How does that question differ
19  from her belief?
20  Q.  Answer the question, please.
21        MR. QUINN:  I have an objection to the
22  question as to the form.  It's been asked and
23  answered.
24  A.  I don't know.

e1d9445b-06e6-45b4-8108-014bd9814fd0

Page 46

1    Q.  How did it come about that -- I'll represent to
2  you that the last date that an invoice was produced by
3  your counsel with "Mine" blocked out was March 31,
4  2005. How did it come about that you stopped blocking
5  out "Mine"?
6    A.  I only blocked it out one time, all the
7  receipts we had.
8    Q.  Were they then told not to block it out any
9  further, any longer?
10    A.  It was never really brought up again. We just
11  blocked out the ones we had, and that was the end of
12  it.
13    Q.  You never told them not to block it out
14  anymore?
15       MR. QUINN: Objection. It's been asked
16  and answered.
17       MR. MICHAEL F. PETOCK:  You are
18  obstructing this deposition, Charlie.
19       MR. QUINN: I'm trying to get the
20  questions to be asked in the proper form.
21       MR. MICHAEL F. PETOCK:  Can you read back
22  the last question, please?
23       (The reporter read as requested.)
24  BY MR. MICHAEL F. PETOCK:

Page 47

1    Q.  You testified they blocked out the word "Mine"
2  on one occasion. Is that correct?
3    A.  Correct.
4    Q.  And is it your testimony that they were never
5  instructed to block it out again after that?
6    A.  That is correct.
7       (Plaintiff's Exhibit No. 28 was marked for
8  identification.)
9  BY MR. MICHAEL F. PETOCK:
10    Q.  I show you what's been marked as Plaintiff's
11  Exhibit 28. Would you look through that? Are all of
12  those sales receipts sales made by you?
13    A.  Some are payments, so, no.
14    Q.  I'm sorry. What?
15    A.  No, they are not sales made by me.
16    Q.  Which ones are not sales made by you?
17    A.  11/29/04, Joe Lamonaco; Tom Sharrar, 3/9/05;
18  Michael Lenoir, 12/24.
19       MR. QUINN: Speak up so she can hear you.
20    A.  Michael Lenoir, 12/24/04; David Fillippone,
21  12/28/04; Mark Garcia, 12/21.
22       MR. QUINN: Is that all?
23    A.  Chris Harrison, 1/10/05.
24    Q.  You said 1/10/05? Is that 1105?

Page 48

1    A.  1/10/05.
2       MR. MICHAEL C. PETOCK:  She's talking
3  about dates.
4       MR. MICHAEL F. PETOCK:  Oh.
5  BY MR. MICHAEL F. PETOCK:
6    Q.  First of all, all of those are sales receipts
7  of Van Scoy Diamond Mine of Delaware, Inc. Is that
8  correct?
9    A.  Yes.
10    Q.  And all of them except for the first one has
11  "Mine" blocked out of "Van Scoy Diamond Mine of
12  Delaware, Inc." Isn't that correct?
13    A.  And the last one was.
14    Q.  I think you said the invoice -- first of all,
15  these are all sales receipts of Van Scoy Diamond Mine
16  of Delaware, Inc. Is that correct?
17    A.  Yes.
18    Q.  And I believe you said the invoice of 11/29/04,
19  which is D001269, to Joe Lamonaco --
20    A.  Yes.
21    Q.  -- was not a sale made by you?
22       MR. QUINN: I instruct the witness to wait
23  till the question is asked before you respond.
24    A.  It was a payment taken.

Page 49

1    Q.  I'm sorry?
2    A.  A payment.
3    Q.  Oh. So you are distinguishing between sales
4  and payments?
5    A.  Yes.
6    Q.  But all of these sales receipts are invoices --
7  are transactions handled by you on these invoices. Is
8  that correct?
9    A.  Except one.
10    Q.  Which one is that?
11    A.  Dr. Garcia.
12    Q.  11/21/04?
13    A.  Yes.
14    Q.  And that bears the initials "DVS." Is that
15  correct?
16    A.  Yes.
17    Q.  Are you saying that's not your initial on
18  there?
19    A.  It is my initials, but it was Kurt's sale.
20    Q.  But you wrote up the sales receipt, is that
21  correct, where you marked Garcia on 11/21/04?
22    A.  I just put my initials.
23    Q.  Is that your handwriting on the sales receipt?
24    A.  No. It's Kurt's. Yes, it's Kurt's.

Page 50

1    Q.  Kurt's.  Why did you put your initials on it?
2    A.  Because he forgot to.  When I was doing the
3    receipts, I probably just put "DVS."
4    Q.  Why is that important?
5    A.  Well, just if a customer comes in, you know who
6    waited on them.
7    Q.  Are commissions paid to the salespeople?
8    A.  No.
9         (Plaintiff's Deposition Exhibit No. 29 was
10   marked for identification.)
11        MR. QUINN:  Excuse me.  Does that mean
12   this whole collection?  They're paper-clipped, but not
13   stapled like the others were.
14        MR. MICHAEL C. PETOCK:  It's all a
15   collection.  It should have been stapled.
16        MR. QUINN:  Thank you.
17   BY MR. MICHAEL F. PETOCK:
18   Q.  I show you what's been marked as Plaintiff's
19   Exhibit 29.  First of all, are all of these sales
20   receipts, sales receipts of Van Scoy Diamond Mine of
21   Delaware, Inc.?
22   A.  Yes.
23   Q.  And do all of them have "Mine" crossed out?
24   A.  Yes.

Page 51

1    Q.  Are these all sales made by Kurt?
2    A.  Yes.
3    Q.  Where was Kurt when the cease and desist letter
4    came in.  Do you know?
5    A.  Yes.  He was out of town on a hunting trip.
6    Q.  In Northeast, Pennsylvania?
7    A.  Yes.
8         MR. QUINN:  Object.
9    A.  Sorry.
10        MR. QUINN:  That's not a question.
11   Q.  There are question marks after all those
12   things.
13        MR. QUINN:  Well, it may be in your mind,
14   but not --
15        MR. MICHAEL C. PETOCK:  Charlie, you asked
16   questions in the same exact way in your deposition,
17   and we didn't do that to you.  It's -- you did the
18   exact same thing.  I just want to point that out.
19        MR. QUINN:  Thank you for your assistance.
20   I don't agree with that characterization.
21        MR. MICHAEL C. PETOCK:  Read the
22   transcript, Charlie.  It's very clear from the
23   transcript.
24

Page 52

1    BY MR. MICHAEL F. PETOCK:
2    Q.  Van Scoy Diamond Mine of Delaware, Inc. changed
3    its website address from Van Scoy Diamond Mine.com to
4    Van Scoy Diamonds of Delaware.com.  Is that correct?
5         MR. QUINN:  Objection.  Leading.
6    Q.  Is that correct?
7    A.  I don't know anything about the website.
8    Q.  You don't know that?
9    A.  I have already stated that, nothing.
10   Q.  You don't know that the name has been changed?
11   A.  No.
12   Q.  Do you ever look at the website?
13   A.  No.
14   Q.  Do you know how long that website has been up?
15   A.  No, I do not.
16   Q.  Do you have a computer at home?
17   A.  No.
18   Q.  Do you have Internet access at your computer at
19   your desk in the store?
20   A.  I believe so.
21   Q.  Do you ever go on the Internet?
22   A.  No.
23        (Plaintiff's Exhibit No. 30 was marked for
24   identification.)

Page 53

1    BY MR. MICHAEL F. PETOCK:
2    Q.  I show you what's been marked as Plaintiff's
3    Exhibit 30.  Do you recognize that?
4    A.  Yes.
5    Q.  What is that?
6    A.  The letter that we received in the mail.
7    Q.  That's the cease and desist letter.  Is that
8    correct?
9    A.  If that's what it's called, yes.
10   Q.  In that letter, I am telling you that I
11   represent Mr. Wayne Van Scoy.  Is that correct?
12   A.  Yes.
13   Q.  And attached to the letter were copies of
14   trademark -- copies of the trademark and a service
15   mark registration.  Is that correct?
16   A.  Mm-hmm.  Yes.
17   Q.  And you saw that there were two registrations
18   for "Van Scoy Diamond Mine," both owned by Wayne
19   Van Scoy?
20   A.  Yes.
21   Q.  The letter also represented to you that my
22   client, Wayne Van Scoy, owned the service mark and
23   trademark registrations.  Isn't that correct?
24   A.  Yes.

**Page 54**

1   Q.   At that point in time, you were also -- it was
2   demanded that you immediately cease and desist from
3   infringement of the -- of the identified federally
4   registered service mark and trademark of Mr. Wayne
5   Van Scoy.  Is that correct?
6        MR. QUINN:  Objection.  The letter says
7   what it says.
8   Q.   Isn't that correct?
9   A.   That's what it says.
10   Q.   When you read that letter, you knew then that
11   Wayne Van Scoy owned the federal trademark
12   registration.  Isn't that correct?
13   A.   At that moment, yes.
14   Q.   And that Wayne Van Scoy, the plaintiff, was
15   demanding that you stop any further use of the marks
16   "Van Scoy Diamond Mine."  Isn't that correct?
17   A.   Yes.
18   Q.   And also you knew that any permission which was
19   allegedly given by Tommy Van Scoy, Jr. -- Sr., was
20   terminated.  Isn't that correct?
21   A.   No.
22   Q.   Why do you say that?
23   A.   I didn't even know there was a trademark.
24   Q.   But when you received the letter, you knew

**Page 55**

1   that.  Correct?
2        MR. QUINN:  Objection.  Objection.  That's
3   leading.
4        MR. MICHAEL F. PETOCK:  Objection.  You
5   are obstructing the deposition.
6        MR. QUINN:  The letter is silent --
7        MR. MICHAEL F. PETOCK:  Objection.
8        MR. QUINN:  -- with respect to anything
9   about Mr. Tommy Van Scoy.
10        MR. MICHAEL F. PETOCK:  Objection.  You
11   are testifying.  Mr. Quinn, you are testifying.  And I
12   demand that you stop testifying.
13        MR. QUINN:  You can demand it all you
14   want.  I am not going to stop raising my objections.
15        MR. MICHAEL F. PETOCK:  You are making a
16   speaking objection.
17        MR. QUINN:  Let me speak so we get
18   something clear.  Otherwise, I'm going to talk while
19   you are talking and the transcript is not going to be
20   clear.
21        MR. MICHAEL F. PETOCK:  I don't care.
22   You are not allowed to coach the witness or lead the
23   witness.  You are coaching the witness.
24        MR. QUINN:  When you asked the question

**Page 56**

1   and characterized this letter as saying something
2   about Mr. Tommy Van Scoy and make --
3        MR. MICHAEL F. PETOCK:  I didn't
4   characterize that in the letter.
5        MR. QUINN:  You did.  Please read the last
6   question back.
7        (The reporter read as requested.)
8        MR. QUINN:  I stand on what I just said.
9   There is no mention of Tommy Van Scoy in this letter.
10   And the question as read back mentions his name and
11   asks the question --
12        MR. MICHAEL F. PETOCK:  It mentions his
13   name, but it asks a different question.
14        MR. QUINN:  -- as to what permission was
15   given about Mr. Tommy Van Scoy.  The question is
16   objectionable.  The letter says what it says.  And
17   that's my position.
18   BY MR. MICHAEL F. PETOCK:
19   Q.   Can you answer the question?
20   A.   What question?
21   Q.   The question was:  When you received the cease
22   and desist letter, you knew that any alleged
23   permission given by Tommy Van Scoy, if any, was
24   terminated?

**Page 57**

1   A.   No.
2   Q.   Why do you say that?
3   A.   Because my father-in-law gave us the name to
4   use.  And he was still alive at this time.
5   Q.   But there was nothing in writing as to any
6   permission.  Is that correct?
7        MR. QUINN:  Objection.  Leading.
8   A.   To my knowledge.
9   Q.   And the only permission that was given -- the
10   only words that were given in the form of permission
11   were "good luck"?
12        MR. QUINN:  Objection.  Leading.
13   Q.   Isn't that correct?
14        MR. QUINN:  Objection.  Leading.
15   A.   To my knowledge.
16        MR. MICHAEL F. PETOCK:  Charlie, I am
17   allowed to lead an adverse witness, an adverse party.
18   I wish you'd stop objecting these frivolous objections
19   and obstructing this deposition.
20        MR. QUINN:  I am not obstructing the
21   deposition.
22        MR. MICHAEL F. PETOCK:  Yes, you are.
23        MR. QUINN:  We stipulated at the beginning
24   that all objections were waived until the time of

Page 58

1  trial, except for the form of the question. And those
2  are the objections I am making. They're leading
3  questions.
4       MR. MICHAEL C. PETOCK: The judge would
5  not appreciate a leading objection to an adverse
6  witness. I am sure he wouldn't allow that and I am
7  sure if we were to take it to the judge --
8       MR. QUINN: Then there shouldn't have been
9  any stipulation as to the leading -- all objections
10  being waived except as to leading because then it's
11  meaningless. The stipulation is meaningless.
12       MR. MICHAEL C. PETOCK: It's not an
13  objection in good faith when you know you can't make a
14  leading objection to an adverse witness.
15       MR. QUINN: It is an objection made in
16  good faith. I resent any implication or assertion
17  that these objections are not made in good faith.
18       MR. MICHAEL F. PETOCK: They cannot be
19  made in good faith when you know there is a perfect
20  right to ask leading questions as to an adverse party.
21       MR. QUINN: I am standing on what I said
22  before. If you didn't want leading objections, we
23  should have stipulated that at the beginning, but we
24  didn't. We stipulated that all objections were waived

Page 59

1  except for leading -- objections as to the form of the
2  question. And an objection as to a leading question
3  is an objection as to the form; therefore, I must make
4  them now or they are waived. And I don't intend to
5  waive them. You made the stipulation. We're going to
6  live with it.
7       MR. MICHAEL F. PETOCK: You are not acting
8  in good faith.
9       MR. QUINN: Pardon me?
10       MR. MICHAEL F. PETOCK: You are not acting
11  in good faith.
12       MR. QUINN: I resent that. I tell you I
13  am acting in the best of faith. I am trying to do my
14  job and create a record that is going to be clear for
15  the benefit of both parties and for the court.
16  BY MR. MICHAEL F. PETOCK:
17    Q. Were you ever involved in any discussions with
18  respect to any contributions to a bankruptcy
19  settlement in the bankruptcy proceeding of Tommy
20  Van Scoy, Sr.?
21    A. No.
22    Q. Did Kurt ever say anything to you about --
23    A. No.
24    Q. -- a request from Wayne to contribute to the

Page 60

1  bankruptcy settlement?
2    A. No.
3    Q. Did you know anything about a settlement being
4  negotiated with the bankruptcy court on behalf of
5  Tommy Van Scoy, Sr. at the time that it was occurring
6  in 2000?
7    A. No.
8    Q. On the website, on your website, Van Scoy
9  Diamond Mine of Delaware.com., do you know whether
10  prices are on that site?
11    A. I do not.
12    Q. Do you know whether pictures of product are
13  shown on it?
14    A. I do not.
15    Q. Do you have any knowledge of any sales having
16  been made via the Internet, via your Internet website
17  in the last two months?
18    A. No, I do not.
19    Q. Would you know if sales were made via the
20  Internet?
21    A. No.
22    Q. Do you know what portion of your website is
23  called where the products are shown?
24    A. Once again, I am not associated with the

Page 61

1  website at all.
2    Q. You have never looked at it?
3    A. Never. I don't have time.
4    Q. Why do you not have time?
5    A. I don't know.
6       (Van Scoy Deposition Exhibit No. 31 was
7  mark for identification.)
8  BY MR. MICHAEL F. PETOCK:
9    Q. Before we go on to Plaintiff's Exhibit 31, do
10  you recall what day of the week it was when you
11  received the cease and desist letter?
12       MR. QUINN: Excuse me. This is marked as
13  5. So this is -- do you want to keep the same number?
14       MR. MICHAEL F. PETOCK: Well, we're going
15  to mark it again as 31.
16       MR. QUINN: All right.
17  BY MICHAEL F. PETOCK:
18    Q. Do you recall what day of the week it was when
19  the cease and desist letter was received?
20    A. Yes.
21    Q. What day of the week was it?
22    A. Saturday.
23    Q. That would have been November 20th. Isn't that
24  correct?

Page 62

1  A. If that's a Saturday, I would say, yes.
2  Q. I show you now what's been marked as
3  Plaintiff's Exhibit 31. Can you identify that?
4  A. Yes. It's the warranty that Mr. Van Scoy gave
5  us to use to give to our customers after they purchase
6  something.
7  Q. And do you use that warranty in your store now?
8  A. Yes.
9  Q. And have you always used it?
10  A. Yes.
11  Q. And that's signed "Van Scoy Diamond Mine." Is
12  that correct?
13  A. Yes.
14  Q. And also the address "1117 Churchmans Place."
15  Is that correct?
16  A. Yes.
17  Q. The last paragraph of that warranty requires
18  you to provide free cleaning and inspection for
19  damaged prongs for free for diamonds or product
20  purchased at any other Van Scoy Diamond Mine. Is that
21  correct?
22  A. Yes.
23  Q. Do you honor that policy?
24  A. Yes.

Page 63

1  Q. Is that your policy to honor it?
2  A. Yes.
3  Q. Have you always used the warranty --
4  A. Yes.
5  Q. -- since opening in 1994?
6  A. Yes.
7  Q. Have you ever refused to honor a warranty for
8  products sold by plaintiff Wayne Van Scoy?
9  A. Not that I know of.
10  Q. Do you know of anyone in your store refusing to
11  clean jewelry which was purchased at plaintiff Wayne
12  Van Scoy's store?
13  A. Not that I know of.
14      (Plaintiff's Exhibit No. 32 was marked for
15  identification.)
16  BY MR. MICHAEL F. PETOCK:
17  Q. I show you what's been marked as Plaintiff's
18  Exhibit 32. Have you ever seen that letter before?
19  A. Yes.
20  Q. When did you see it?
21  A. In March, probably.
22  Q. And did you take any steps to preserve evidence
23  after seeing this letter?
24  A. No.

Page 64

1  Q. Did you take any steps to preserve any evidence
2  after seeing the cease and desist letter in November?
3  A. No.
4  Q. Do you know anything about the bankruptcy
5  proceeding other than what you have already told us?
6  A. No.
7  Q. Did you ever go to the bankruptcy court?
8  A. No.
9  Q. Do you know if Kurt went to the bankruptcy
10  court?
11  A. I don't know.
12  Q. Did Kurt bring back some documents from
13  Wilkes-Barre when he came back from his hunting trip
14  in the end of November of 2004?
15  A. I don't know.
16  Q. Did you ever see any documents from the
17  bankruptcy court?
18  A. Maybe in some of the evidence. I don't
19  remember.
20  Q. Did you ever see any at home or in the store?
21  A. No.
22  Q. Did Kurt ever show you any bankruptcy
23  documents?
24  A. Not that I recall.

Page 65

1      MR. MICHAEL F. PETOCK: 33.
2      (Plaintiff's Exhibit No. 33 was marked for
3  identification.)
4  BY MR. MICHAEL F. PETOCK:
5  Q. I show you what's been marked Plaintiff's
6  Exhibit No. 33.
7  A. Part of the tax for advertising that you had
8  requested.
9  Q. That document contains blocked out portions of
10  your corporate tax returns Form 1120S for the years
11  1994 through 2004. Is that correct?
12  A. Yes.
13  Q. On that are shown -- the only numbers that were
14  not blocked out was the advertising expenses?
15  A. Yes.
16  Q. And are those correct figures to the best of
17  your knowledge?
18  A. Did you ask if they are?
19  Q. Yes, if they are correct figures to the best of
20  your knowledge.
21  A. Yes.
22  Q. These are authentic copies of your corporate
23  tax returns showing the advertising expenses for the
24  years 1994 through 2004. Is that correct?

Page 66

1   A.  Yes.
2   Q.  Continuing to look at Plaintiff's Exhibit 33.
3   The advertising figures fluctuate somewhat.  Do you
4   know any particular reason that they do that?
5   A.  The amounts each year?
6   Q.  Yes.  Is that just normal variation or is there
7   any reason for it?
8   A.  I am not really sure.  Kurt does the
9   advertising.  There could be different expenses, I
10  guess.
11  Q.  Like advertising expenses for 2004 were
12  $52,270.  Do you see that?
13  A.  Yes.
14  Q.  That's slightly less than the advertising
15  expenses for 1995 of $54,803?
16  A.  Yes.
17  Q.  Any comment on why the advertising expenses are
18  just -- stayed constant even though there is
19  inflation, ten years of inflation involved there?
20  A.  I couldn't answer that.  I don't know.
21  Q.  I noticed there was a jump in advertising
22  expenses from '99 to 2000.  Approximately a little
23  less than $60,000 to $84,000.  Any particular reason
24  for that?

Page 67

1   A.  I don't know.
2   Q.  Do you think that's just normal business
3   variation, depending upon what advertising was done a
4   particular year?
5       MR. QUINN:  Is that a question?
6       MR. MICHAEL F. PETOCK:  Yes.  Go ahead.
7   A.  Yes.
8   Q.  I am going to show you a plastic bag I'll
9   represent has been produced by your counsel and marked
10  as D001813.  It bears on both sides marked "Van Scoy's
11  Diamond Mine."  Is this a bag that's used in the
12  operation of your store, Van Scoy Diamond Mine?
13  A.  Yes.
14  Q.  How long have you been using that bag?
15  A.  Since 1994.
16  Q.  I show you a box produced by your counsel,
17  which is marked D001811 and bears the mark on the
18  inside of the box cover "Van Scoy Diamond Mine."  Is
19  that a box that's used in the operation of your
20  business, Van Scoy Diamond Mine of Delaware, Inc.?
21  A.  Yes.
22  Q.  How long has that been used?
23  A.  1994.
24  Q.  Both the bag and this box have been used

Page 68

1   continuously from 1994 to present?
2   A.  Correct.
3   Q.  I show you another box produced by your counsel
4   that's been marked as D001812 and bears on the inside
5   of the box cover "Van Scoy Diamond Mine."  Is that a
6   box that's used in the operation of your business,
7   Van Scoy Diamond Mine of Delaware, Inc.?
8   A.  Yes.
9   Q.  How long has that been used?
10  A.  I am not sure.
11  Q.  More than two years?
12  A.  Yes.
13  Q.  And you are continuing to use all three of
14  these in your business?
15  A.  Yes.
16  Q.  And the boxes and bags are given to customers
17  with product sales.  Is that correct?
18  A.  Correct.
19  Q.  You also have in your possession, isn't it
20  correct, some advertising audio tapes made by Thomas
21  Van Scoy, Sr.  Is that correct?
22  A.  Audio tapes?
23  Q.  Advertising audio tapes.
24  A.  Yes.

Page 69

1       MR. MICHAEL F. PETOCK: Is there any
2   problem with "attorney's eyes only" to ask about these
3   tapes?  I am not hearing any.  I am just asking some
4   questions about it.  It's already been filed in court
5   papers.
6       MR. QUINN:  Let's start.  If there is,
7   I'll raise the objection.  Is that fair?
8       MR. MICHAEL F. PETOCK:  Okay.
9   BY MR. MICHAEL F. PETOCK:
10  Q.  What are these tapes?
11  A.  Advertisements.
12  Q.  And where did you get them?
13  A.  Tommy Van Scoy.
14  Q.  Sr.?
15  A.  Sr.
16  Q.  Were they made by Tommy Van Scoy, Sr.?
17  A.  Yes.
18  Q.  Where did he make these at?
19  A.  The radio station in Wilkes-Barre, I believe.
20  Q.  Were they used in advertising on the radio?
21  A.  Yes.
22  Q.  And for how long?
23  A.  I am not sure.
24  Q.  Are they still being used on the radio

### Page 70

1  advertising?
2  A.  I don't believe so.
3  Q.  When did you stop using them?
4  A.  I don't recall.
5  Q.  A year ago?
6  MR. QUINN: Objection. She's answered the
7  question. She doesn't recall.
8  Q.  Was it more than a year ago when you stopped
9  using them?
10  MR. QUINN: She's answered that question.
11  She said she didn't recall.
12  MR. MICHAEL F. PETOCK: Objection. You
13  are coaching the witness and you are --
14  MR. QUINN: I am not coaching the witness.
15  MR. MICHAEL F. PETOCK: Yes, you are.
16  MR. QUINN: You have asked the question
17  once and now you are twisting the words.
18  MR. MICHAEL F. PETOCK: It's a different
19  question. I want to get some --
20  MR. QUINN: She said she doesn't know.
21  MR. MICHAEL F. PETOCK: I want to test the
22  ability of her knowledge and of what her recollection
23  is.
24  MR. QUINN: She said she didn't know. How

### Page 71

1  many times does she have to answer the question?
2  Q.  Was it more than a year ago?
3  MR. QUINN: Objection. That question has
4  already been asked.
5  Q.  Was it more than a year ago?
6  A.  I don't know.
7  MR. QUINN: Objection again. It's been
8  asked again.
9  A.  We --
10  MR. QUINN: She's answered it twice now
11  that she doesn't know.
12  MR. MICHAEL F. PETOCK: Let the witness
13  speak, Charlie.
14  MR. QUINN: I'll let her speak when I get
15  my objection out.
16  Q.  Will you answer the question?
17  A.  All I know is the advertising is updated. So
18  that's all I can tell you. I don't know. You can't
19  use the same ads over and over.
20  Q.  Well, were these audio tapes used many years
21  ago or just a few years ago?
22  A.  I don't know.
23  MR. QUINN: Objection. She's answered the
24  question again she doesn't know.

### Page 72

1  Q.  Why don't you want Wayne Van Scoy to hear or
2  see these tapes?
3  A.  I don't know that either.
4  Q.  Wouldn't the radio stations have copies of
5  these tapes on file?
6  A.  I don't know.
7  Q.  What was the extent of the advertising?
8  MR. QUINN: Objection. Vague and
9  indefinite. What does "extent" mean?
10  Q.  You can answer the question, please, still?
11  A.  I don't know. I don't do the advertising.
12  Q.  But you know they were used on radio
13  advertising?
14  A.  Yes.
15  Q.  Did you hear them on the radio?
16  A.  Yes.
17  Q.  Was it more than one station?
18  A.  I don't remember.
19  Q.  What did the tape say?
20  A.  I don't remember.
21  MR. MICHAEL F. PETOCK: Why don't we
22  break?
23  THE VIDEOGRAPHER: Going off the record at
24  12:02 p.m.

### Page 73

1  -- -- -- --
2  THE VIDEOGRAPHER: Going back on the
3  record at 12:11 p.m.
4  MR. MICHAEL F. PETOCK: Charlie, what I
5  would request that you do is to produce the remainder
6  of the lease documents which are missing. We've only
7  received a few pages. We received a page or two of
8  the current renewal and apparently a signature page
9  from back in '94. And we request that you produce the
10  lease documents and any other documents that we've
11  requested here today prior to the 30(b)(6) deposition
12  scheduled for next week.
13  BY MR. MICHAEL F. PETOCK:
14  Q.  Did you discuss with your counsel any of the
15  questions that are being asked or anticipated being
16  asked in the deposition during the break?
17  A.  No.
18  Q.  Are you under the influence of any medications
19  or alcohol or anything when you are testifying here
20  today which would affect your memory?
21  A.  No.
22  Q.  Have you ever carried ought any
23  responsibilities or duties as secretary of the
24  corporation known as Van Scoy Diamond Mine of

Page 74

1  Delaware, Inc.?
2   A.  I don't know what they would be.  No.
3   Q.  The answer is "no"?
4   A.  What do you mean "responsibilities."
5   Q.  Well, have you done anything?  Do you keep any
6  minutes?  Do you do anything?
7   A.  No.
8   Q.  Do you still have family living in Nanticoke?
9   A.  Yes.
10   Q.  How often do you get up to visit them?
11   A.  Not often.
12   Q.  In the period of 1994 to 2000, did you get up
13  there often then?
14   A.  I don't recall.
15   Q.  Do you know any other store besides your store
16  and plaintiff's store which operates under the name
17  "Van Scoy Diamond Mine"?
18   A.  I believe my brother-in-law Rick in Scranton.
19   Q.  Doesn't he operate under "Van Scoy Diamonds"?
20   A.  I'm not sure.  It's confusing in the phone
21  book.
22   Q.  Is there anyone else that you are aware of?
23   A.  I know there is a store in Lancaster and one in
24  North Carolina and one in Allentown and Reading.

Page 75

1   Q.  Do you know what those stores are using for
2  names?
3   A.  No.
4   Q.  You don't know if they're using "Van Scoy
5  Diamond Mine."  Is that correct?
6   A.  Correct.
7   Q.  How did you and Kurt get to Charlie Quinn?
8   A.  I don't know.
9   Q.  Have you ever spoken to Mark Maurer?
10   A.  No.
11   Q.  Do you know anything about Mark Maurer?
12   A.  Just what I have heard.
13   Q.  What have you heard?
14   A.  That he owned a store.
15   Q.  Where did he own a store at?
16   A.  I am not sure.
17   Q.  Do you know where he lives?
18   A.  No.
19   Q.  Do you know where you would call him at if you
20  were going to call him?
21   A.  No.
22   Q.  Have you ever spoken with him?
23   A.  No.
24   Q.  What is Kurt's relationship with Mark Maurer?

Page 76

1   A.  I don't know.
2   Q.  Do you know the last time Kurt spoke to Mark
3  Maurer?
4   A.  No, I do not.
5   Q.  You don't know what the names of the stores are
6  that he operates under, do you?
7   A.  No.
8   Q.  Who made the decision to open the store
9  "Van Scoy Diamond Mine" in Delaware?
10   A.  Kurt.
11   Q.  You were part of that.  Weren't you?
12   A.  I helped.
13   Q.  You contributed $20,000.  Isn't that correct?
14   A.  Yes.
15   Q.  Did you ever have any discussions with Tommy,
16  Sr. about opening the store?
17   A.  Not that I recall.
18   Q.  Do you believe that it was easier to open a
19  store at 1117 Churchmans Road in Newark where
20  previously Tommy, Sr. had operated a store for a
21  number of years?
22   A.  I don't know.  I never opened a store before.
23  I don't know if it was easier.
24   Q.  Do you believe it was easier?

Page 77

1    MR. QUINN:  Easier than what?
2    MR. MICHAEL F. PETOCK:  Easier than
3  opening a store someplace where there had never been a
4  Van Scoy Diamond Mine.
5   A.  No.
6   Q.  What do you mean by "no"?  No, you don't know
7  or no --
8   A.  No, I don't believe it would have been easier.
9   Q.  Do you know what was in the store when you
10  first arrived?
11   A.  Nothing.  Oh.  There was a safe.
12   Q.  Wasn't there also a sign on top "Van Scoy"?
13   A.  That I don't remember.
14   Q.  What kind of safe was there when you arrived?
15   A.  I don't know what kind it is.
16   Q.  What size was it?
17   A.  I don't know what size it is.
18   Q.  Six feet tall?
19   A.  Probably four or six.
20   Q.  Do you know where it came from?
21   A.  No.
22   Q.  But it was in the store when you arrived there.
23  Right?
24   A.  Yes.

| | |
|---|---|
| **Page 78** | **Page 80** |

**Page 78**

1  Q. Was it blue?
2  A. Yes.
3  Q. Did Wayne ever expressly give you permission to
4  use the name "Van Scoy Diamond Mine," Wayne Van Scoy?
5  A. No.
6  Q. Did he ever give Kurt any permission to use
7  "Van Scoy Diamond Mine"?
8  A. I don't know.
9  Q. To your knowledge, did he ever give the
10  corporation any permission to use the name "Van Scoy
11  Diamond Mine"?
12  A. I don't know.
13  Q. Did Wayne Van Scoy ever imply he gave
14  permission to use the name "Van Scoy Diamond Mine"?
15  A. I didn't know we needed permission.
16  Q. That same answer would apply to Kurt and the
17  corporation. Correct?
18  A. That's correct.
19  Q. How did you find out about the bankruptcy of
20  Tommy Van Scoy, Sr.?
21  A. I don't remember. I just heard it, I guess.
22  Q. Where would you have heard it from?
23  A. That I don't remember.
24  Q. What did you know about the source of the

**Page 79**

1  financial difficulties of Tommy Van Scoy, Sr.?
2  A. I didn't know much.
3  Q. I'm sorry?
4  A. I didn't know much.
5  Q. What did you know?
6  A. Not much at all. Just that there was a
7  bankruptcy.
8  Q. Did you know that Pam and Rick Sendrick's store
9  in Scranton were enjoined from using the name
10  "Van Scoy Diamond Mine"?
11  A. No. I knew they were involved in the
12  bankruptcy. But that's all I know.
13  Q. How did you know they were involved in the
14  bankruptcy?
15  A. Just hearing it, I guess.
16  Q. Did you know that Betsy Williams was enjoined
17  from using the name "Van Scoy Diamond Mine" in the
18  bankruptcy court?
19  A. I knew her name was in the bankruptcy, but
20  that's all.
21  Q. How did you know her name was in the
22  bankruptcy?
23  A. I don't know.
24  Q. Did you know that the store, Van Scoy Diamond

**Page 80**

1  Mine store on Monday Street in Wilkes-Barre was
2  enjoined from using the name "Van Scoy Diamond Mine" by
3  the bankruptcy court?
4  A. I just know that there was a bankruptcy thing.
5  I don't know that anyone was told not to use the name
6  or anything, the details of it. Only that there was a
7  bankruptcy. That's it.
8  Q. Do you recall any discussion at all of anyone
9  approaching your store, your company or you or Kurt
10  with respect to seeking a franchise to franchise
11  Van Scoy Diamond Mine, possibly in Baltimore or
12  something like that?
13  A. No.
14  Q. No knowledge of that?
15  A. No.
16  Q. Am I correct in saying that you don't know why
17  the domain name was changed from "Van Scoy Diamond
18  Mine.com" to "Van Scoy Diamonds of Delaware.com." Is
19  that correct?
20  A. Yes.
21  Q. Who made that decision?
22  A. For me not to know?
23  Q. No. To make that change in the domain name.
24  A. I don't know. I don't know anything about

**Page 81**

1  that, I have stated before.
2  Q. If it wasn't you, it would have been Kurt.
3  Right?
4  A. I guess.
5  Q. Since there is only two of you that have an
6  ownership interest in your company, is that correct,
7  Van Scoy Diamond Mine of Delaware?
8  A. Yes.
9  Q. Do you consider "Van Scoy Diamond Mine" to be
10  the same as "Van Scoy Diamonds" as far as the mark the
11  jewelry store services?
12  A. It depends.
13  Q. Depends on what?
14  A. Who is using it. If the person is Van Scoy, I
15  guess, yes.
16  Q. You would consider those two to be the same
17  then if the person was a Van Scoy?
18  A. I think so, in my opinion.
19  Q. Is "Van Scoy Diamond Mine" a better or more
20  creative mark than "Van Scoy Diamonds"?
21  A. I don't know if it's more creative. I don't
22  know. But I don't think about it that much.
23  Q. Do you think your business would be harmed if
24  it was forced to stop using "Van Scoy Diamond Mine"

Page 82

1  but was permitted to use "Van Scoy Diamonds"?
2     A.  No.
3     Q.  Are you aware of any customers of your store
4  Van Scoy Diamond Mine that were customers of the
5  previous Van Scoy Diamond Mine previous to 1994?
6     A.  Not that I know of.
7     Q.  Where do the majority of the customers of
8  Van Scoy Diamond Mine of Delaware, Inc. come from?
9        MR. QUINN:  Where did or do?
10    Q.  Do come from.
11    A.  Newark, surrounding areas.
12    Q.  How far does the average person travel to buy a
13  diamond ring or jewelry?
14    A.  I don't know.
15    Q.  Do you think that someone on the Internet that
16  came across the website Van Scoy Diamond Mine.com
17  would think there is a connection between that website
18  and the store in Wilkes-Barre, Pennsylvania, operated
19  by plaintiff?
20        MR. QUINN:  I think that question lacks
21  foundation.  So I object to it.
22    A.  I don't really know.
23    Q.  Are you aware of any complaints against any
24  Van Scoy Diamond Mine store?

Page 83

1     A.  From customers?
2     Q.  Yes.
3     A.  Yes.
4     Q.  What are you aware of?
5     A.  There's always going to be some complaints.
6  You can't just run a perfect business.  I don't know
7  of a particular instance.
8     Q.  Do you know anything specific?
9     A.  There was one recent that came to mind about
10  someone purchased a diamond and they went to trade it
11  in and they said it wasn't the diamond that it was
12  supposedly purchased.  I do have a letter from that
13  person.
14    Q.  Where was that diamond purchased from?
15    A.  I don't recall which store, but Wayne
16  Van Scoy's name is at the bottom of the appraisal.
17    Q.  Is that the Delaware store?
18    A.  I don't recall which store it was purchased in.
19  It was before my time.
20    Q.  That was purchased back prior to 1994?
21    A.  Yes.
22    Q.  But you don't know that the diamond that was
23  brought in is the same diamond that was sold to that
24  person either.  Do you?

Page 84

1     A.  No.  All I saw was the letter.
2     Q.  What's your relationship with Tommy Van Scoy,
3  Jr.?
4     A.  My brother-in-law.
5     Q.  What is your relationship with your
6  brother-in-law?
7     A.  Very good.  Close.
8     Q.  How often do you speak to him?
9     A.  A couple times a week.
10    Q.  What do you speak about?
11    A.  Kids.
12    Q.  Kids?
13    A.  Children.  He has a son the same age as my son.
14  Just personal.
15    Q.  Do you ever talk about the litigation?
16    A.  No.
17    Q.  What's your relationship with Tony Van Scoy?
18    A.  Close.
19    Q.  How often do you speak to him?
20    A.  Not as often.  Maybe once a month.
21    Q.  Have you spoken to him at all about the
22  litigation?
23    A.  No.
24    Q.  When was the last time Kurt spoke to Tommy

Page 85

1  Van Scoy, Jr.?
2     A.  Yesterday.
3     Q.  Do you know what the substance of that
4  discussion was?
5     A.  Fish.
6     Q.  Anything about the litigation?
7     A.  No.
8     Q.  What's your relationship with Rick Sendrick?
9     A.  We don't have one.
10    Q.  Do you have any relationship with his wife,
11  Pam?
12    A.  Not really.
13    Q.  What's your relationship with Ken Van Scoy?
14    A.  We don't really have one.
15    Q.  When was the last time you saw Ken?
16    A.  At the funeral, Mr.'s funeral.
17    Q.  What's your relationship with Wayne Van Scoy's?
18    A.  Don't have one.
19    Q.  My understanding is that at one time in the ten
20  years since you've had the store you made some
21  improvements to the store.  Is that correct?
22    A.  Yes.
23    Q.  And what were those improvements?
24    A.  New carpeting, wallpaper.

Page 86

1  Q. Did you extend the showroom, too?
2  A. Yes.
3  Q. By how much?
4  A. Four feet, five feet.
5  Q. When did that take place?
6  A. I am not sure of the exact date.
7  Q. What's your best estimate of the date?
8  A. Either '99 or 2000.
9  Q. How much did it cost?
10 A. I don't recall.
11 Q. Do you have some estimate?
12 A. A couple thousand.
13        MR. MICHAEL F. PETOCK: I would like to
14 take a five-minute break.
15        THE VIDEOGRAPHER: Going off the record at
16 12:31 p.m.
17        – – – –
18        THE VIDEOGRAPHER: Going back on the
19 record at 12:37 p.m.
20        MR. MICHAEL F. PETOCK: We would -- we're
21 going to retain the originals of the exhibits and make
22 copies for the court reporter. Is that acceptable?
23        MR. QUINN: You are going to retain the
24 original?

Page 87

1        MR. MICHAEL F. PETOCK: Yes.
2        MR. QUINN: That's fine. We have a set.
3  Are you finished?
4        MR. MICHAEL F. PETOCK: We have no
5  further questions.
6        THE WITNESS: Okay.
7        THE VIDEOGRAPHER: Going off the record at
8  12:38 p.m.
9        – – – –
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 88

INDEX

1
2  WITNESS: DONNA VAN SCOY                    PAGE
3  Examination by Mr. Petock          3
4        PLAINTIFF'S DEPOSITION EXHIBITS
   NO.                    MARKED
5
   17  Lease agreement              16
6
   18  1/10/05 Minutes of annual meeting    18
7     of shareholders and directors
8  19  1/10/04 Minutes of annual meeting    19
      of shareholders and directors
9
   20  1/10/03 Minutes of annual meeting    20
10    of shareholders and directors
11 21  1/10/02 Minutes of annual meeting    22
      of shareholders and directors
12
   22  1/10/01 Minutes of annual meeting    23
13    of shareholders and directors
14 23  1/10/00 Minutes of annual meeting    23
      of shareholders and directors
15
   24  1/10/99 Minutes of annual meeting    26
16    of shareholders and directors
17 25  1/10/98 Minutes of annual meeting    27
      of shareholders and directors
18
   26  Receipt, stamped D1243          42
19
   27  Receipt, stamped D1239          44
20
   28  Series of receipts, stamped D1233    47
21    1243, 1268, 1269, D1390, D1391,
      D1438, D1509, D1513, D1539, D1540,
22    D1588, D1633, D1638, D1644, D1657,
      D1684, D1698, D1729, D1738, D1751,
23    D1762, D1767, D1775, D1791, D1799,
      D1296, D1340, D1370, D1374, D0987,
24    D1013, D1016, D1067, D1080, D1083,

Page 89

1        PLAINTIFF'S DEPOSITION EXHIBITS
2  NO.                            MARKED
3  29  Series of receipts, stamped D0979,    50
      D1092, D1395, D1404, D1416, D1449,
4     D1455, D1464, D1479, D1488, D1532,
      D1541, D1548, D1573, D1579, D1607,
5     D1639, D1650, D1652, D1662, D1683,
      D1737, D1295, D1299, D1335, D1362,
6     D1377, D1380
7  30  Cease and desist letter          52
8  31  Van Scoy Diamond Mine Registration    61
      and Certificate, stamped D0750
9
   32  Letter, dated 2/22/05, to C. Quinn    63
10    from M. F. Petock
11 33  Form 1120S U. S. Income Tax Returns,  65
      dated 1994 through 2004
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 90

```
1
2
3        REPLACE THIS PAGE
4        WITH THE ERRATA SHEET
5        AFTER IT HAS BEEN
6        COMPLETED AND SIGNED
7        BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 91

```
1    State of Delaware   )
                          )
2    New Castle County   )
3
4            CERTIFICATE OF REPORTER
5
         I, Lucinda M. Reeder, Registered Diplomate
6    Reporter and Notary Public, do hereby certify that
     there came before me on the 19th day of September
7    2005, the witness herein, DONNA VAN SCOY, who was duly
     sworn by me and thereafter examined by counsel for the
8    respective parties; that the questions asked of said
     witness and the answers given were taken down by me in
9    Stenotype notes and thereafter transcribed by use of
     computer-aided transcription and computer printer
10   under my direction.
11       I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.
13       I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.
15
16
17           Lucinda M. Reeder, RDR, CRR
             Certification No. 132-RPR
18           (Expires January 31, 2008)
19
20
     DATED:    9-26-05
21
22
23
24
```

# EXHIBIT G



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Van Scoy

## v.

# Van Scoy Diamond Mine of Delaware, Inc.

### C.A. # 05-108 (KAJ)

---

### Transcript of:

### Lori B. McMichael

### September 19, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com



EXHIBIT

G

Page 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WAYNE VAN SCOY,                    )
                                   )
              Plaintiff,           )
                                   )   Civil Action
v.                                 )   No. 05-108 (KAJ)
                                   )
VAN SCOY DIAMOND MINE OF           )
DELAWARE, INC., KURT VAN SCOY)
AND DONNA VAN SCOY,                )
                                   )
              Defendants.          )

     Deposition of LORI B. McMICHAEL taken pursuant to
notice at the law offices of Ashby & Geddes, 17th
floor, 222 Delaware Avenue, Wilmington, Delaware,
beginning at 1:40 p.m. on September 19, 2005, before
Lucinda M. Reeder, Registered Diplomate Reporter and
Notary Public.

APPEARANCES:

          MICHAEL F. PETOCK, ESQ.
          MICHAEL C. PETOCK, ESQ.
          PETOCK & PETOCK, LLC
             222 Delaware Avenue, 17th Floor
             Wilmington, Delaware  19801
             for the Plaintiff.

          CHARLES N. QUINN  ESQ.
          FOX ROTHSCHILD LLP
             2000 Market Street - Tenth Floor
             Philadelphia, PA  19103-3291
             for the Defendants.

ALSO PRESENT:

   WAYNE VAN SCOY
   KURT VAN SCOY
- - - - - - - - - - - - - - - - - - - - - - - - --
            WILCOX & FETZER, LTD.
   1330 King Street - Wilmington, Delaware  19801
                (302) 655-0477

2c16248d-4c10-4460-bc6d-62036ea2dd70

Page 2

1       LORI BETH McMICHAEL,
2   the witness herein, having first been
3   duly sworn on oath, was examined and
4   testified as follows:
5   BY MR. MICHAEL C. PETOCK:
6   Q.  Hi, Lori.
7   A.  Hello.
8   Q.  My name is Michael Petock. I'm an attorney for
9   plaintiff Wayne Van Scoy.  Thank you for coming today.
10  This is Wayne over here.  This is my Dad over here,
11  Michael F. Petock.
12       I am going to ask you some questions today
13  to find out if you know any information that might be
14  relevant to the case we're involved in.  Okay?  If you
15  don't understand any of the questions that I ask you,
16  just let me know, and I'll rephrase them.  If you
17  don't hear a question, just let me know, and I'll
18  repeat it for you.  Okay?  Do you have any questions?
19  A.  No.
20  Q.  You're employed by Van Scoy Diamond Mine of
21  Delaware, Inc.  Is that correct?
22  A.  Yes.
23  Q.  How long have you been employed by that
24  corporation?

Page 3

1   A.  Over eight years.
2   Q.  So you began working in approximately when?
3   A.  '97.
4   Q.  '97.  Okay.  How did you get that job?
5   A.  A sign on the door "Help Wanted."  My mother
6   was a customer.
7   Q.  Okay.  What is your position with that company?
8   A.  Retail management, sales.
9   Q.  Are you a manager?
10  A.  Per se, yes.
11  Q.  Supervisor?
12  A.  Yes.
13  Q.  Are you the most senior salesperson?
14  A.  Yes.
15  Q.  Could you name the other employees at Van Scoy
16  Diamond Mine of Delaware, Incorporated?
17  A.  Yes.  Annette D'Angelo, Sam Shoemaker, Karen
18  Vayo, and Megan Rump.
19  Q.  Who is your boss?
20  A.  Kurt and Donna Van Scoy.
21  Q.  How often does Kurt work?
22  A.  I don't know.
23  Q.  Is he there every day that the store is opened,
24  approximately?

Page 4

1   A.  For the most part.
2   Q.  What about Donna, how often does she work?
3   A.  I'd say about the same.
4   Q.  So she's pretty much there except for -- would
5   you say she's there every day that the store is open,
6   pretty much?
7   A.  Not every day.  It depends.
8   Q.  Approximately how often?
9   A.  At least five out of the six days we're open.
10  Q.  What are your job duties and responsibilities?
11  A.  Oversee the sales floor as well as the other
12  employees' daily tasks, anything.  We all are pretty
13  much the same.  It's just that I can instruct anybody
14  that doesn't know how to do something, only because I
15  have been there for a long time.
16  Q.  What about Kurt, what are his job duties?
17  A.  He's the same as well, that his jobs include
18  doing benchwork, advertising?
19  Q.  What about Donna?
20  A.  Donna would be secretary of the corporation.
21  Q.  Does she make sales?
22  A.  Yes.
23  Q.  Is she a salesperson?
24  A.  She's the same, equal, just like the rest of

Page 5

1   us, but she would do secretarial.
2   Q.  Does she make approximately as many sales as
3   you do?
4   A.  It depends.
5   Q.  Does she sell throughout the year?
6   A.  Yes.
7   Q.  Is there any period she doesn't sell?
8   A.  No.  Not unless she's sick.
9   Q.  Do you open the mail?
10  A.  Yes.
11  Q.  Do you check the e-mail?
12  A.  Yes.
13  Q.  How often do you check the e-mail?
14  A.  Now?  No, I don't.
15  Q.  You don't check the e-mail anymore?
16  A.  No.
17  Q.  Why not?
18  A.  It hasn't been getting any.
19  Q.  What type of e-mails come in?
20  A.  Customers.
21  Q.  And what do the e-mails from customers say?
22  A.  Specifically, I don't recall, but anything from
23  where are you located to how many -- information,
24  pricing of merchandise.

2c16248d-4c10-4460-bc6d-62036ea2dd70

Page 6

1    Q. Do they make inquiries about products through
2 e-mail?
3    A. Sure.
4    Q. And where do they -- do you have any
5 understanding as to where they have come to see these
6 products in which they're making inquiries to?
7    A. I don't understand.
8    Q. Okay. I'll rephrase. Do you know if any of
9 these e-mails ever make inquiries as to the products
10 that are shown on the website Van Scoy Diamond
11 Mine.com or Van Scoy Diamonds of Delaware.com?
12    A. Yes.
13    Q. They do? Okay. Do you save your e-mails?
14    A. Yes.
15    Q. Do you print them?
16    A. A few.
17    Q. Just a few?
18    A. Ones that people e-mail me and thank us for our
19 service. And I print them and show the staff.
20    Q. Do you answer the phone?
21    A. Yes.
22    Q. How do you answer the phone? What do you say?
23    A. "Good morning, afternoon, evening, Van Scoy's."
24    Q. Is the mark "Van Scoy Diamond Mine" used in the

Page 7

1 store?
2    A. Yes.
3    Q. Could you tell me where it's used in the store,
4 please?
5    A. The sign, our business cards, receipts,
6 paperwork, warranties, appraisals, boxes.
7    Q. Anywhere else?
8    A. That I am -- use with, that's all I would --
9    Q. Okay. Thank you.
10    A. That's all I use.
11    Q. What do you know about Wayne Van Scoy?
12    A. I know he's a brother of Kurt Van Scoy.
13    Q. Do you know anything else?
14    A. And he has worked in the same industry, Van
15 Scoy, for probably as long as Kurt has. And that's
16 about it.
17    Q. Have you ever met him before today?
18    A. Yes, I have.
19    Q. Where have you met him?
20    A. At Van Scoy, in Delaware.
21    Q. Do you know when -- at your store?
22    A. Yes.
23    Q. Do you know when that was?
24    A. Approximately '98 or '99. Within that time

Page 8

1 frame. I was still in school.
2    Q. Do you know what the purpose of Wayne's visit
3 was at that time?
4    A. No, I don't.
5    Q. Do you remember anything more about the visit?
6    A. No. All I know is he was the only brother I
7 hadn't met, and it was a shake, "this is Wayne."
8 That's it.
9    Q. How long was he in the store?
10    A. I don't know total.
11    Q. Was it a few hours, a few minutes?
12    A. I don't know.
13    Q. Okay. Have you ever seen or talked to Wayne
14 Van Scoy since that visit you characterized as '98,
15 '99, I think?
16    A. No.
17    Q. To your knowledge, has the store or the
18 business had any contact with Wayne Van Scoy since
19 that visit in '97 or '98?
20    A. Yes.
21    Q. What kind of contact do you have knowledge of?
22    A. Family, the brothers.
23    Q. So you think that Kurt has -- could you
24 elaborate on what you mean by "family"?

Page 9

1    A. Kurt goes home regularly to see his family,
2 parents -- well, parent. Holidays, funerals,
3 unfortunately.
4    Q. Are you familiar with the former website that
5 was called -- that was hosted with the domain name
6 www.Van Scoy Diamond Mine.com?
7    A. Yes.
8    Q. Are you also familiar with the present website
9 that has a domain name of www.Van Scoy Diamonds of
10 Delaware.com?
11    A. Yes.
12    Q. Could you tell me what you know about those
13 websites?
14    A. One was a website we had used before, and this
15 is one that is used now.
16    Q. Do you know: Were you working at the store
17 when the original website www.Van Scoy Diamond
18 Mine.com was first published to the Internet?
19    A. Yes.
20    Q. Do you remember when it was first published to
21 the Internet?
22    A. No.
23    Q. Do you have an approximate year as to when it
24 was?

Page 10

1    A.  I couldn't even -- it could be anywhere from
2  2000 to 2004 because I wasn't active on it.
3    Q.  Do you remember any discussions as to between
4  you and Kurt or between you and anyone else or between
5  anyone in the store as to getting the website Van Scoy
6  Diamond Mine.com?
7    A.  No.
8    Q.  How are the websites used in the business or
9  have they been?
10    A.  Like a catalog.
11    Q.  What do you mean?
12    A.  Customers that just want to get visual ideas
13  that may -- that's really -- and locations.  Anything.
14    Q.  So you would characterize the website like a
15  catalog?
16    A.  Yes.
17    Q.  Like similar to a catalog that sells products,
18  like a J. Crew catalog or a GAP catalog?
19    A.  No.  I think ours is more an informative
20  catalog, an idea catalog, with options.
21    Q.  There are pictures of the products on the
22  website, is that correct, that you sell?
23    A.  Yes.
24    Q.  Do you know who took those pictures?

Page 11

1    A.  No.
2    Q.  Do you know when the last time pictures were
3  taken of the products in your store?
4    A.  No.
5    Q.  Have you ever known pictures to be taken of
6  products?
7    A.  In our store?
8    Q.  Yes.
9    A.  No.
10    Q.  Have you ever told a customer to go to the
11  website?
12    A.  Yes.
13    Q.  And what is the purpose of telling a customer
14  to go to the website?
15    A.  Get ideas, different mountings, options they
16  have they can't visually imagine.
17    Q.  Do you know why there was a switch from the
18  former website domain name www.Van Scoy Diamond
19  Mine.com to the present website domain www.Van Scoy
20  Diamonds of Delaware.com?
21    A.  No.
22    Q.  Do you know when that change took place?
23    A.  No.
24    Q.  Do you know who made the change?

Page 12

1    A.  No.
2        (Plaintiff's Exhibit No. 34 was marked for
3  identification.)
4  BY MR. MICHAEL C. PETOCK:
5    Q.  I am going to show you what we're going to mark
6  as Plaintiff's Exhibit 34.  Do you recognize what's
7  been marked as Plaintiff's Exhibit 34?
8    A.  Yes.
9    Q.  What is it?
10    A.  Receipt, a copy of a receipt.
11    Q.  And does it indicate who made the sale that is
12  the subject of this receipt?
13    A.  It's not a sale.  It's a payment.
14    Q.  Does it indicate who received the payment?
15    A.  Yes.
16    Q.  Who would that be?
17    A.  Me.
18    Q.  It says "Lori."  That's how you indicate --
19    A.  Yes.
20    Q.  Do you agree that the website "www.Van Scoy
21  Diamond Mine.com" is crossed out?
22    A.  Yes.
23    Q.  Do you know who crossed it out?
24    A.  No.

Page 13

1    Q.  Did you cross it out?
2    A.  No.
3    Q.  Are there other sales receipts that you know of
4  in which the website was crossed out?
5    A.  This is actually the first time I've seen the
6  website crossed out.
7    Q.  Do you think it was crossed out after you
8  made -- received this payment or before?
9    A.  I don't know.
10    Q.  The date on the receipt is 3/18/2005.  Is that
11  correct?
12    A.  Yes.
13    Q.  What website is listed on the sales receipts
14  that you are using now, presently?
15    A.  I don't know.
16    Q.  Is it the same sales receipt as this, as far as
17  you know?
18        MR. QUINN:  Objection.  She just said she
19  doesn't know what website is being used.
20        MR. MICHAEL C. PETOCK:  Okay.
21        MR. QUINN:  The question has been asked
22  and answered.
23        MR. MICHAEL C. PETOCK:  It's a little
24  different, I think.

Page 14

1      MR. QUINN: Not different enough in my
2 book.
3      MR. MICHAEL C. PETOCK: Okay. Could you
4 read back the question, please?
5      (The reporter read as requested.)
6 BY MR. MICHAEL F. PETOCK:
7   Q. Could you answer the question, please?
8   A. Is this the same sales receipt?
9   Q. Are you presently using this sales receipt?
10  A. I don't know.
11     MR. MICHAEL C. PETOCK: Charlie, we'll ask
12 that you produce any other sales receipts with the
13 domain name crossed out, please. And also a sample of
14 the sales receipt that you are currently using,
15 please.
16 BY MR. MICHAEL C. PETOCK:
17  Q. Lori, were you aware that a letter was received
18 by Van Scoy Diamond Mine, Incorporated, Van Scoy
19 Diamond Mine of Delaware, Incorporated in
20 approximately November of this year from my law
21 firm -- November of 2004, demanding that Kurt and
22 Donna Van Scoy end -- their corporation cease using
23 the name "Van Scoy Diamond Mine"?
24  A. No.

Page 15

1   Q. When did you first become aware of any issues
2 regarding the use of the name "Van Scoy Diamond Mine"
3 by the defendants in this case?
4   A. Exact dates?
5   Q. No, not exact dates. Approximate dates.
6   A. I honestly couldn't tell you. I know it's been
7 going on for months. That's about as best I can --
8   Q. Would you say it was approximately in November?
9   A. I really don't remember.
10     (Plaintiff's Deposition Exhibit No. 35 was
11 marked for identification.)
12 BY MR. MICHAEL F. PETOCK:
13  Q. Is there familiar to you, which has been marked
14 as Plaintiff's Exhibit 35?
15  A. No.
16  Q. Could you look at the last page, please? Could
17 you tell me who this was received by, according to
18 the --
19  A. This?
20  Q. Yes.
21  A. Annette D'Angelo.
22  Q. Is she somebody that you work with?
23  A. Yes.
24  Q. Did you ever talk to Annette or did Annette

Page 16

1 ever tell you about receiving this letter?
2   A. No.
3   Q. Or any type of letter?
4   A. No.
5   Q. Who told you about this litigation originally?
6   A. Probably everybody, like the store in general.
7 It was made common knowledge in the store.
8   Q. What was said about it?
9   A. That we were being sued by Wayne Van Scoy,
10 something to do with our name.
11  Q. Anything else said about it?
12  A. That's what it came down to when I first found
13 out.
14  Q. Did you ever discuss the litigation with Kurt?
15  A. I don't understand.
16  Q. Have you ever discussed the fact that Kurt was
17 being sued with Kurt?
18  A. With Kurt?
19  Q. Have you ever discussed with Kurt Van Scoy
20 that -- have you had any discussions pertaining to
21 this litigation with Kurt Van Scoy?
22  A. Yes.
23  Q. What have you spoken about?
24  A. Just the fact that he is being sued.

Page 17

1   Q. Anything more specific than that?
2   A. I can't be specific, no. It's his business.
3   Q. Has he told you the reason he's being sued?
4   A. From what I gather, it's because of the website
5 and a name and whose name it actually is.
6   Q. Did he tell you specifically what it is about
7 the website that could be a basis for a lawsuit
8 against him?
9   A. "Van Scoy Diamond Mine."
10  Q. Any other reason?
11  A. That's it.
12  Q. Are you familiar with the fact that for several
13 months the word "Mine" was blocked out of the sales
14 receipts used by "Van Scoy Diamond Mine of Delaware,
15 Inc."?
16  A. Familiar with, yes.
17  Q. What do you know about the fact that the word
18 "Mine" was blocked out of the sales receipts?
19  A. That they were blocked off the sales receipts.
20  Q. Do you know who blocked out the word "Mine"
21 from the sales receipts?
22  A. No.
23  Q. Do you know who made the decision?
24  A. No.

Page 18

1    Q.   To block out the word "Mine"? Do you know what
2    the purpose of blocking out the word "Mine" was?
3    A.   No.
4    Q.   Did you ever personally block out the word
5    "Mine" from a sales receipt?
6    A.   No.
7    Q.   Did you ever ask Kurt why you were using -- you
8    were using -- you used sales receipts with the word
9    "Mine" blocked out. Is that correct?
10   A.   Yes.
11   Q.   Did you ever ask Kurt why you were using sales
12   receipts with that word blocked out?
13   A.   No.
14   Q.   Did you ever ask Donna?
15   A.   No.
16   Q.   Did Kurt ever say anything to you with respect
17   to the fact that "Mine" was being blocked out from the
18   sales receipts?
19   A.   No.
20   Q.   Did Donna ever say anything to you with respect
21   to that matter?
22   A.   No.
23   Q.   Did you ever have any discussions with anyone
24   concerning the fact that the word "Mine" was being

Page 19

1    blocked out from the sales receipts?
2    A.   No.
3    Q.   At some point, the word "Mine" was no longer
4    blocked out from the sales receipts. Is that correct?
5    A.   Sure. Yes.
6    Q.   Is the word "Mine" blocked out presently from
7    the sales receipts that you are using?
8    A.   No.
9    Q.   Do you know: Was there any discussion as to --
10   did anyone tell you to no longer use sales receipts
11   with the word "Mine" blocked out?
12   A.   No.
13   Q.   Did a customer ever ask you why the word "Mine"
14   was blocked out from the sales receipts?
15   A.   No.
16   Q.   Who does the advertising for the corporation?
17   A.   Kurt Van Scoy.
18   Q.   Does Donna do any advertising for the
19   corporation?
20   A.   No.
21   Q.   Are you familiar with a policy of the store
22   regarding cleaning and/or inspection for damaged
23   prongs of jewelry that may have been bought from other
24   Van Scoy Diamond Mine stores?

Page 20

1        MR. QUINN:  Objection to the extent I
2    don't think there is a foundation for the fact that
3    there is a policy. Otherwise --
4    Q.   Are you familiar with any policy regarding
5    cleaning jewelry that has been bought from other
6    Van Scoy Diamond Mine stores?
7    A.   No.
8    Q.   If a customer brought in a piece of jewelry and
9    told you it was bought from another Van Scoy Diamond
10   Mine store, how much would you charge them if they
11   wanted a cleaning? Do you have any idea?
12   A.   Usually, none.
13   Q.   But there is no policy that you are aware of
14   regarding --
15   A.   We are told to clean Van Scoy Diamond Mine
16   merchandise.
17   Q.   For free?
18   A.   Yes.
19   Q.   Was there an incident where a customer came to
20   your store and requested a cleaning of a piece of
21   jewelry that they bought from Wayne Van Scoy's store?
22   A.   I don't know. Not that I know of.
23   Q.   You don't know of any customer of Wayne coming
24   to your store asking for a cleaning?

Page 21

1    A.   No.
2    Q.   Have you ever met any -- you testified that you
3    met all of Kurt's brothers and sisters?
4    A.   No. I met all of his brothers.
5    Q.   All of his brothers. Okay. When did you meet
6    Tony?
7    A.   Probably sooner -- the first time?
8    Q.   Sure. Yes.
9    A.   '97, '98.
10   Q.   How often do you see him?
11   A.   Maybe once a year, twice a year.
12   Q.   Do you know what Tony does now?
13   A.   Jeweler.
14   Q.   Do you know where?
15   A.   No.
16   Q.   What about Ken Van Scoy? Do you know Ken
17   Van Scoy?
18   A.   Yes.
19   Q.   When did you first meet Ken Van Scoy?
20   A.   Definitely, '97.
21   Q.   Why did you meet him in '97 or under what
22   circumstances did you meet him in 1997?
23   A.   Close relationship with Kurt. He visited.
24   Q.   Did he ever work for Kurt?

## Page 22

1  A.  Yes.
2  Q.  When was that?
3  A.  Sporadically helping when Kurt would be away or
4  just wanted to help out.
5  Q.  When was the last time he worked for Kurt?
6  A.  I don't remember.
7  Q.  Has he worked for Kurt in the last year?
8  A.  I would say, no.
9  Q.  Do you know if he's worked for Kurt in the last
10 two years?
11 A.  I don't know.
12 Q.  Have you ever met Tommy Van Scoy, Jr.?
13 A.  Yes.
14 Q.  When was the first time you met Tommy Van Scoy,
15 Jr.?
16 A.  Probably '98, '99.
17 Q.  Do you know what Tommy Van Scoy, Jr. is doing
18 now?
19 A.  He's also a jeweler.
20 Q.  Do you know where?
21 A.  No.
22 Q.  Do you know what the name of his store is?
23 A.  I think it's Tovon.
24 Q.  Do you ever -- do you or the business ever send

## Page 23

1  Tovon or Tommy anything through the mail?
2  A.  Not that I specific -- specifically what's in a
3  package?  No, I don't know.
4  Q.  Do you ever send packages?
5  A.  Yeah.
6  Q.  Who directs you to send packages to Tommy?
7  A.  Kurt or Donna Van Scoy.
8  Q.  Do you know if you are sending him jewelry?
9  A.  I don't know.
10 Q.  Has Tommy Van Scoy, Jr. ever been to the store
11 in Delaware?
12 A.  Yes.
13 Q.  When was the last time he was there?
14 A.  Within the year.
15 Q.  Do you know what the purpose of his visit was?
16 A.  No.
17 Q.  Is there any type of business relationship
18 between Van Scoy Diamond Mine of Delaware and Tommy
19 that you are aware of?
20 A.  No.
21 Q.  Do you know anything about the history of
22 Van Scoy Diamond Mine?
23 A.  Some.
24    MR. QUINN:  Objection.  It's not clear to

## Page 24

1  me as to whether you are referring to the store, the
2  mark, the stores that the father owned, what.
3  Q.  Talking about Tommy Van Scoy, Sr.'s operation
4  of the business.
5  A.  No.
6  Q.  Do you know anything about other Van Scoy
7  Diamond Mines?  Do you know anything about the
8  existence of other Van Scoy Diamond Mines, either --
9  well, ever?
10 A.  Yes.
11 Q.  What do you know about that?
12 A.  Not much, just that they existed.
13 Q.  How do you know about their existence?
14 A.  Through Kurt saying.  That's it.
15 Q.  Have you ever heard the name Mark Maurer?
16 A.  Yes.
17 Q.  How have you heard about that name?
18 A.  Conversations since this lawsuit.
19 Q.  What has been said about Mark Maurer?
20 A.  I don't recall the exact.  All I know is his
21 name.
22 Q.  Who has spoken his name?
23 A.  It could have been Kurt or Donna.
24 Q.  Has he ever called the store?

## Page 25

1  A.  Not that I know of.
2  Q.  Has he ever been to the store?
3  A.  I don't know.
4    (Recess taken.)
5  BY MR. MICHAEL C. PETOCK:
6  Q.  We were talking about the fact that you have
7  heard the name Mark Maurer.  In what context did you
8  hear his name?
9  A.  I don't understand.
10 Q.  Was it in a conversation with someone?
11 A.  Yes.
12 Q.  And was it a casual conversation or was it --
13 was it a casual conversation with someone?
14 A.  Probably.  It wasn't directed to me.
15 Q.  Who was the conversation with?
16 A.  I don't know.
17 Q.  Was it with one of your -- would your other
18 coworkers also have heard the name Mark Maurer?
19 A.  I don't know.
20 Q.  Have you noticed Kurt doing anything
21 differently around the store since he received notice
22 of this litigation?
23 A.  Not that I know of, no.
24 Q.  Has Donna began doing anything differently?

Page 26

1    A.  I don't know.  Not that I know of.
2    Q.  Has Kurt or Donna expressed any belief to you
3    as to whether or not they would win the lawsuit?
4    A.  No.
5    Q.  What did you do to prepare for this deposition?
6    A.  Spoke with Charlie.
7    Q.  When did you first speak with Charlie?
8    A.  Specifically, I don't know.  It was a phone
9    conversation.  Maybe a month ago, two months ago.
10   Q.  And since that phone conversation two months
11   ago, have you spoken to him again?
12   A.  Yes.
13   Q.  When was the most recent time?
14   A.  Last Friday.  This past Friday.
15   Q.  Did you ever read any portion of the deposition
16   transcript of Kurt Van Scoy?
17   A.  Yes.
18   Q.  Did you read the entire transcript?
19   A.  Not the entire.
20   Q.  Which portion did you read?
21   A.  I don't know the exact.
22   Q.  Do you remember which subject matter it
23   pertained to?
24   A.  Specifically, no.

Page 27

1    Q.  Did you read a portion of the deposition
2    transcript pertaining to the blocking out of the word
3    "Mine"?
4    A.  Yes.
5    Q.  Did Kurt direct you to which portions of the
6    deposition transcript he wanted you to review?
7    A.  No.
8    Q.  Did Charlie direct you to that?
9    A.  No.
10   Q.  How did you decide which portions of the
11   deposition transcript to read?
12   A.  I didn't because half of it was the same
13   question, so I just glanced and when you see your own
14   name pop up, so.
15   Q.  Who told you to read the deposition transcript
16   of Kurt?
17       MR. QUINN:  Objection.  There hasn't been
18   any foundation for anybody telling her to read it.
19   Q.  Did somebody tell you to read the deposition
20   transcript of Kurt Van Scoy?
21   A.  No.
22   Q.  How did you obtain a copy of the deposition
23   transcript of Kurt Van Scoy?
24   A.  It was at the store.

Page 28

1    Q.  Where was it at the store?
2    A.  It's been all over the place at the store.
3    Q.  Are there more than one copies of it at the
4    store?
5    A.  I don't know.
6    Q.  Where did you read it?
7    A.  At the store.
8    Q.  Has everyone at the store read it?
9    A.  I don't know.
10   Q.  Are you aware of anyone else having read it at
11   the store?
12   A.  I know I have seen people look at it.
13   Q.  Do you know if anyone has ever given Kurt
14   Van Scoy permission to use the mark "Van Scoy Diamond
15   Mine"?
16   A.  What I have been told, yes.
17   Q.  What have you been told?
18   A.  I have been told that his father gave Kurt the
19   name "Van Scoy Diamond Mine" with regards to the very
20   first day he opened his doors as well as his father
21   gave to his other siblings.
22   Q.  Who told you this?
23   A.  I have heard it from Kurt.
24   Q.  Who else have you heard it from, anyone else?

Page 29

1    A.  A pretty known fact because I have seen pretty
2    much all of his family members, except for one, in the
3    store, so.
4    Q.  Have you talked to the other family members
5    about Kurt's use of the mark "Van Scoy Diamond Mine"?
6    A.  No.
7    Q.  Have you talked to any of the other family
8    members with respect to this litigation?
9    A.  No.
10       MR. MICHAEL F. PETOCK:  I have nothing
11   further.
12       MR. QUINN:  No cross at this time.
13       MR. MICHAEL F. PETOCK:  The same
14   stipulation is that we'll retain the original
15   exhibits.
16       (Deposition concluded at 2:28 p.m.)
17       - - - -
18
19
20
21
22
23
24

Page 30

1        **I N D E X**
2    WITNESS: LORI B. McMICHAEL        PAGE
3    Examination by Mr. Michael C. Petock    2
4        PLAINTIFF'S DEPOSITION EXHIBITS
5    NO.                        MARKED
6    34    Receipt, stamped D0908        12
7    35    Cease and desist letter        15
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 32

1    State of Delaware    )
                          )
2    New Castle County    )
3
4        CERTIFICATE OF REPORTER
5
        I, Lucinda M. Reeder, Registered Diplomate
6    Reporter and Notary Public, do hereby certify that
     there came before me on the 19th day of September
7    2005, the witness herein, LORI B. McMICHAEL  who was
     duly sworn by me and thereafter examined by counsel
8    for the respective parties; that the questions asked
     of said witness and the answers given were taken down
9    by me in Stenotype notes and thereafter transcribed by
     use of computer-aided transcription and computer
10   printer under my direction.
11        I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.
13        I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.
15
16
17        Lucinda M. Reeder, RDR, CRR
          Certification No. 132-RPR
18        (Expires January 31, 2008)
19
20
     DATED:    9-27-05
21
22
23
24

Page 31

1
2
3    REPLACE THIS PAGE
4    WITH THE ERRATA SHEET
5    AFTER IT HAS BEEN
6    COMPLETED AND SIGNED
7    BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# EXHIBIT H

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

WAYNE VAN SCOY,                                   :
                                                  :
    Plaintiff and                             :
    Counterclaim-Defendant,                   :
                                                  :
       v.                                 :
                                                  :
VAN SCOY DIAMOND MINE OF                          :     Case No. 05-108 (KAJ)
DELAWARE, INC., a Delaware Corporation            :
KURT VAN SCOY, and DONNA VAN SCOY,                :
                                                  :
    Defendants and                            :
    Counterclaim-Plaintiff.                   :

## DEFENDANTS' AMENDED AND SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure Defendants Van Scoy Diamond Mine of Delaware, Inc., Kurt Van Scoy, and Donna Van Scoy hereby supplement their 7 June 2005 responses to plaintiff's first set of interrogatories.

## GENERAL OBJECTIONS

1.     Plaintiff's first set of interrogatories is defective and, hence, invalid, as it fails to comply with Fed. R. Civ. P. 33.

2.     Defendants object to each and every interrogatory in its entirety to the extent it seeks information that is not relevant to the subject matter of this litigation and is not reasonably calculated to lead to the discovery of admissible evidence.

3.     Defendants object to each and every interrogatory to the extent it calls for information that could have been obtained more efficiently by other means of discovery.

PH2 231578v1 06/22/05 5:22:13 PM                    1

EXHIBIT

H

94214.90101

ii)    Defendants withdraw the objection to this contention interrogatory as being premature, as stated above.

iii)    Defendants withdraw the objection to this contention interrogatory as being premature, as stated above.

iv)    See above.

**************************************************

9.    With respect to Defendants' Eighth Affirmative Defense alleging that "Plaintiff's claims are barred by the doctrine of estoppel,"

  i)  state all of Defendants' contentions for why Plaintiffs claims are allegedly barred by the doctrine of estoppel,

  ii)  state all facts,

  iii) identify all documents and things in support thereof and

  iv) identify the persons most knowledgeable with respect to such facts, documents and things.

Defendants' response:

  i)  Defendants object to this interrogatory as being a contention interrogatory when defendants' trial plans are incomplete. Defendants will supplement and respond to this interrogatory once defendants' trial plans are more complete. Plaintiff has known of Defendants' use of the mark at issue for many, many years and has not, until November 2004, objected in any manner to Defendants' use of the mark at issue. Defendants' have relied on plaintiff's inaction and silent respecting Defendants' ongoing use of the mark at issue.

  ii)  Defendants object to this interrogatory as being a contention interrogatory when defendants' trial plans are incomplete. Defendants will supplement and respond to

15

this interrogatory once defendants' trial plans are more complete. Plaintiff has known of Defendants' use of the mark at issue for many, many years and has not, until November 2004, objected in any manner to Defendants' use of the mark at issue. Defendants' have relied on plaintiff's inaction and silence respecting Defendants' ongoing use of the mark at issue. Additionally, Defendants' have worked for 11 years to build goodwill in the name and mark used by Defendants all the time with the knowledge of the plaintiff during which time plaintiff has been silence respecting Defendants' use of the mark at issue.

iii) Defendants object to this interrogatory as being a contention interrogatory when defendants' trial plans are incomplete. Defendants will supplement and respond to this interrogatory once defendants' trial plans are more complete. See the response to plaintiff's requests for production 11, 14, 15, 16, 35, 36 and 37.

iv) Kurt Van Scoy

**************************

Defendants' Supplemental Response:

i)     Defendants withdraw the objection to this contention interrogatory as being premature, as stated above.

ii)     Defendants withdraw the objection to this contention interrogatory as being premature, as stated above.

iii)     Defendants withdraw the objection to this contention interrogatory as being premature, as stated above.

iv)     See above.

***************************************************

PH2 231578v1 06/22/05 5:22:13 PM

94214.90101

**************************

We, the undersigned, hereby declare under 18 United States Code 1001 and penalty of perjury that all answers given above are true and correct to the best of our knowledge, information and belief.

_____
Kurt Van Scoy

_____
Donna Van Scoy

_____
Kurt Van Scoy, President
Van Scoy Diamond Mine of Delaware, Inc.

As to objections:

_____
Charles N. Quinn
Fox Rothschild LLP

Attorneys for Defendants and
Counterclaim Plaintiff

34

## CERTIFICATE OF SERVICE

I , the undersigned, hereby certify that the date written below adjacent to my signature I served the following document

## DEFENDANTS AMENDED AND SUPPLEMENTAL
## RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

on Michael C. Petock, Esquire, as an attachment to e-mails addressed to:

MP@IPLaw-Petock.com and

mfpetock@comcast.net

and on John G. Day, Esquire, as an attachment to an e-mail addressed to:

jday@ashby-geddes.com

and by United States Postal Service first class mail, postage prepaid, to the following addresses:

> **Michael C. Petock, Esquire**
> **Michael F. Petock, Esquire**
> **Petock & Petock LLC**
> **4 The Commons at Valley Forge**
> **1220 Valley Forge Road**
> **P.O. Box 856**
> **Valley Forge, PA  19482-0856**

> and

> **John G. Day, Esquire**
> **Ashby & Geddes**
> **222 Delaware Avenue, 17th Floor**
> **P.O. B1150**
> **Wilmington, DE 19899**

FOX ROTHSCHILD LLP

Charles N. Quinn

22 June 2005
(date)

PH2 231578v1 06/22/05 5:22:13 PM                    94214.90101