# EXHIBIT A



1345723

# THE UNITED STATES OF AMERICA

### TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

**United States Patent and Trademark Office**

**July 20, 2005**

THE ATTACHED U.S. TRADEMARK REGISTRATION *1,140,958* IS CERTIFIED TO BE A TRUE COPY WHICH IS IN FULL FORCE AND EFFECT WITH NOTATIONS OF ALL STATUTORY ACTIONS TAKEN THEREON AS DISCLOSED BY THE RECORDS OF THE UNITED STATES PATENT AND TRADEMARK OFFICE.

REGISTERED FOR A TERM OF *20* YEARS FROM  *October 28, 1980*
*1st* RENEWAL FOR A TERM OF *10* YEARS FROM  *October 28, 2000*
*SECTION 8 PARTIAL & 15*
*AMENDMENT/CORRECTION/NEW CERT(SEC7) ISSUED*
*LESS GOODS*
CLASS(ES) CANCELLED:
   *INT CL 35*

SAID RECORDS SHOW TITLE TO BE IN:
   *VAN SCOY, WAYNE*
   *AN INDIVIDUAL OF THE UNITED STATES*

By Authority of the

Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

N. WILLIAMS

**Certifying Officer**

Int. Cl.: 42

Prior U.S. Cl.: 101

**United States Patent and Trademark Office**

18 Year Renewal/New Cert.

Reg. No. 1,140,958

Registered Oct. 28, 1980

Renewal Term Begins Oct. 28, 2000

## SERVICE MARK
## PRINCIPAL REGISTER
## REGISTRATION ASSIGNED

# VAN SCOY DIAMOND MINE

VAN SCOY, WAYNE (UNITED STATES CITIZEN)
154 MUNDY STREET
WILKES-BARRE, PA 18702, BY ASSIGNMENT VAN SCOY DIAMOND MINES, INC. (PENNSYLVANIA CORPORATION) EDWARDSVILLE, PA

APPLICANT MAKES NO CLAIM TO THE EXCLUSIVE USE OF THE WORD "DIAMOND" APART FROM THE MARK AS SHOWN IN THE DRAWINGS, BUT RESERVES ANY COMMONLAW RIGHTS IT MAY HAVE THEREIN.

FOR: [ RENDERING OF TECHNICAL AID AND ASSISTANCE IN THE ESTABLISHMENT AND/OR OPERATION OF RETAIL JEWELRY STORES ], IN CLASS 35 (U.S. CLS. 100, 101 AND 102).
FIRST USE 5-26-1977; IN COMMERCE 5-26-1977.

FOR: RETAIL JEWELRY STORE SERVICES, IN CLASS 42 (U.S. CL. 101).
FIRST USE 11-0-1976; IN COMMERCE 3-11-1977.
SER. NO. 73-169,527, FILED 5-8-1976.

*In testimony whereof I have hereunto set my hand and caused the seal of The Patent and Trademark Office to be affixed on Oct. 2, 2001.*

DIRECTOR OF THE U.S. PATENT AND TRADEMARK OFFICE

Int. Cls.: 35 and 42

Prior U.S. Cl.: 101

**United States Patent and Trademark Office**

Reg. No. 1,140,958
Registered Oct. 28, 1980

## SERVICE MARK
### Principal Register

# VAN SCOY DIAMOND MINE

Van Scoy Diamond Mines, Inc. (Pennsylvania corporation)
Gateway Shopping Center
Edwardsville, Pa. 18704

For: RENDERING OF TECHNICAL AID AND ASSISTANCE IN THE ESTABLISHMENT AND/OR OPERATION OF RETAIL JEWELRY STORES, in CLASS 35 (U.S. Cl. 101).
First use May 26, 1977; in commerce May. 26, 1977.

For: RETAIL JEWELRY STORE SERVICES, in CLASS 42 (U.S. Cl. 101).
First use Nov. 1976; in commerce Mar. 11, 1977.
Applicant makes no claim to the exclusive use of the word "Diamond" apart from the mark as shown in the drawings, but reserves any commonlaw rights it may have therein.

Ser. No. 169,527, filed May 8, 1978.

ROBERT PEVERADA, Primary Examiner

# EXHIBIT B



1345723

# THE UNITED STATES OF AMERICA

### TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

July 20, 2005

THE ATTACHED U.S. TRADEMARK REGISTRATION *1,140,711* IS CERTIFIED TO BE A TRUE COPY WHICH IS IN FULL FORCE AND EFFECT WITH NOTATIONS OF ALL STATUTORY ACTIONS TAKEN THEREON AS DISCLOSED BY THE RECORDS OF THE UNITED STATES PATENT AND TRADEMARK OFFICE.

REGISTERED FOR A TERM OF *20* YEARS FROM  *October 21, 1980*
*1st* RENEWAL FOR A TERM OF *10* YEARS FROM  *October 21, 2000*
SECTION 8 & 15
AMENDMENT/CORRECTION/NEW CERT(SEC7) ISSUED
SAID RECORDS SHOW TITLE TO BE IN:
  *VAN SCOY, WAYNE*
  *AN IDIVIDUAL OF THE UNITED STATES*

By Authority of the

Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

N. WILLIAMS

Certifying Officer

Int. Cl.: 14

Prior U.S. Cl.: 28                                                    Reg. No. 1,140,711

**United States Patent and Trademark Office**     Registered Oct. 21, 1980

10 Year Renewal/New Cert.                                 Renewal Term Begins Oct. 21, 2000

## TRADEMARK
## PRINCIPAL REGISTER
## REGISTRATION ASSIGNED

## VAN SCOY DIAMOND MINE

VAN SCOY, WAYNE (UNITED STATES CITIZEN)
154 MUNDY STREET
WILKES-BARRE, PA 18702, BY ASSIGN-
MENT VAN SCOY DIAMOND MINES,
INC. (PENNSYLVANIA CORPORA-
TION) EDWARDSVILLE, PA
APPLICANT MAKES NO CLAIM TO
THE EXCLUSIVE USE OF THE WORD
"DIAMOND" APART FROM THE MARK
AS SHOWN, BUT RESERVES ANY COM-
MON LAW RIGHTS IT MAY HAVE
THEREIN.

FOR: JEWELRY AND PRECIOUS STONES, IN CLASS 14 (U.S. CL. 28).

FIRST USE 3-11-1977; IN COMMERCE 3-11-1977.

SER. NO. 73-169,526, FILED 5-8-1978.

*In testimony whereof I have hereunto set my hand and caused the seal of The Patent and Trademark Office to be affixed on Oct. 2, 2001.*

DIRECTOR OF THE U.S. PATENT AND TRADEMARK OFFICE

Int. Cl.: 14

Prior U.S. Cl.: 28

United States Patent and Trademark Office

Reg. No. 1,140,711
Registered Oct. 21, 1980

## TRADEMARK
### Principal Register

## VAN SCOY DIAMOND MINE

Van Scoy Diamond Mines, Inc. (Pennsylvania corporation)
Gateway Shopping Center
Edwardsville, Pa. 18704

For: JEWELRY AND PRECIOUS STONES, in CLASS 14 (U.S. Cl. 28).

First use Mar. 11, 1977; in commerce Mar. 11, 1977.

Applicant makes no claim to the exclusive use of the word "Diamond" apart from the mark as shown, but reserves any common law rights it may have therein.

Ser. No. 169,526, filed May 8, 1978.

ROBERT PEVERADA, Primary Examiner

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
THE DISTRICT OF DELAWARE

WAYNE VAN SCOY
     PLAINTIFF :   C.A.NO. 05-108 (KAJ)
            :
  V.          :
            :
VAN SCOY DIAMOND MINE OF  :
DELAWARE, INC., :      :
KURT VAN SCOY AND    :
DONNA VAN SCOY      :
     DEFENDANTS :
            :

---

## DECLARATION OF WAYNE VAN SCOY

I, Wayne Van Scoy, declare and say as follows:

1. I am the Plaintiff in this action.

2. I am the owner of Federal Service Mark Registration No. 1,140,958 (Exhibit A) and Federal Trademark Registration No. 1,140,711 (Exhibit B), both registrations being for the mark "VAN SCOY DIAMOND MINE" (the "Marks at Issue").

3. Both Registrations for the Marks at Issue are in full force and effect and have been made incontestable under Section 15 of the Lanham Trademark Act. See Exhibits A and B.

4. I acquired the Marks at Issue along with Registrations 1,140,958 and 1,140,711 and associated good will pursuant to a settlement approved by the United States Bankruptcy Court for the Middle District of Pennsylvania by its order of January 4, 2001. (See Exhibit S). I have renewed both registrations in my name.

WVSInf10.075
443-12

1



5.    I have operated a jewelry store in Wilkes-Barre, PA continuously since 1995. In connection with this jewelry store, I have used the mark VAN SCOY DIAMOND MINE except for the period of September, 1999 until January of 2001 while I was enjoined from using the same by the United States Bankruptcy Court for the Middle District of Pennsylvania. I have continuously used the mark VAN SCOY DIAMOND MINE since January of 2001 in connection with the retail jewelry store which is operated by a corporation which I own, Rings of Romance, Inc. d/b/a Van Scoy Diamond Mine, as a licensee under the marks VAN SCOY DIAMOND MINE and their registrations. Gross sales of jewelry under the mark VAN SCOY DIAMOND MINE and my advertising expenses for the mark VAN SCOY DIAMOND MINE are shown on redacted tax returns of Rings of Romance, Inc. for the years 2001 through 2004, which comprise Exhibit M.

6.    I sell diamonds and other jewelry to consumers through my retail store Van Scoy Diamond Mine in Wilkes-Barre, PA. In connection with this, I rely heavily on radio advertising as did my predecessor father since 1977.

7.    I have visited Defendants' store in 1996, 1998 and 2003. I have also viewed information about Defendants' store on their website, which includes pictures of the store. Defendants' store has operated under trade name Van Scoy Diamond Mine of Delaware, Inc. using the mark VAN SCOY DIAMOND MINE and is very similar in operation to my VAN SCOY DIAMOND MINE store.

8.    I have had a consumer, who purchased a product from Defendants, come to my store for services, namely, sizing of a ring purchased from Defendants.

9.    Recently, I made a payment to one of my suppliers, Independent Source, in an amount of approximately $44,000.00. On October 7, 2005, I learned that the supplier, as a result of confusion, had misapplied my payment to Defendants' account.

10.    I have attended the depositions of Kurt and Donna Van Scoy. It is my understanding from their testimony that a substantial portion of their advertising is radio advertising.

11.    I, through my licensee, and Defendants, sell diamonds and jewelry to customers through retail jewelry stores.

12.    I have reviewed the website of Defendants both when it was at the domain name www.vanscoydiamondmine.com and as it currently exists at the domain name www.vanscoydiamondsofdelaware.com, and particularly have reviewed their Showcase Gallery, and many of the products sold by Defendant as shown on their website are also sold by me through my licensee in my VAN SCOY DIAMOND MINE store.

13.    The warranty certificate identified as Exhibit K is a warranty certificate utilized by my licensee in the operation of the VAN SCOY DIAMOND MINE store in Wilkes-Barre, PA.

14.    Exhibit L is Defendants warranty certificate which was identified in depositions by Defendants as the warranty certificate used by them. Defendants' warranty certificate is substantially identical to my warranty certificate.

15.    I have personal knowledge of the facts set forth in this Declaration unless specifically indicated otherwise.

WVSLnf10.075
443-12

3

# EXHIBIT D



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Van Scoy

### v.

# Van Scoy Diamond Mine of Delaware, Inc.

### C.A. # 05-108 (KAJ)

---

### Transcript of:

### Kurt Van Scoy

### July 26, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Van Scoy                                   v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy        C.A. # 05-108 (KAJ)        July 26, 2005

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

WAYNE VAN SCOY,                    )
                                   )
              Plaintiff,           )
                                   )
v.                                 )      Civil Action No.
                                   )        05-108 (KAJ)
VAN SCOY DIAMOND MINE OF           )
DELAWARE, INC., KURT VAN SCOY      )
and DONNA VAN SCOY,                )
                                   )
              Defendants.          )

        Video deposition of KURT VAN SCOY taken
pursuant to notice at the offices of Ashby & Geddes, 17th
Floor, 222 Delaware Avenue, Wilmington, Delaware,
beginning at 10:00 a.m. on Tuesday, July 26, 2005, before
Anne L. Adams, Registered Professional Reporter and
Notary Public.

APPEARANCES:

              MICHAEL F. PETOCK, ESQ.
              MICHAEL C. PETOCK, ESQ.
              PETOCK & PETOCK
                46 The Commons at Valley Forge
                1220 Valley Forge Road
                Valley Forge, Pennsylvania 19482-0856
                for the Plaintiff,

              CHARLES N. QUINN, ESQ.
              FOX ROTHSCHILD
                2000 Market Street, 10th Floor
                Philadelphia, Pennsylvania 19103-3291
                for the Defendants.

ALSO PRESENT:    Wayne Van Scoy
                 Donna Van Scoy
                 Lisa Bauer - Video Specialist

--------------------------------------------------------
                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                     (302) 655-0477

Van Scoy
**Kurt Van Scoy**    C.A. # 05-108 (KAJ)    v. Van Scoy Diamond Mine of Delaware, Inc.
July 26, 2005

---

Page 2

1  VIDEO SPECIALIST: This is the videotaped
2  deposition of Kurt Van Scoy taken by the plaintiff in the
3  matter of Wayne Van Scoy versus Van Scoy Diamond Mine of
4  Delaware, Incorporated, et al., held in the office of
5  Ashby & Geddes on July 26, 2005, at 10 a.m.
6      The court reporter is Anne Adams from the
7  firm of Wilcox & Fetzer. My name is Lisa Bauer, a video
8  specialist from Discovery Video Services, Incorporated,
9  in association with Wilcox & Fetzer.
10      Counsel will now introduce themselves.
11      MR. PETOCK: Michael C. Petock for
12  plaintiff, Wayne Van Scoy.
13      MR. F. PETOCK: Michael F. Petock for
14  plaintiff, Wayne Van Scoy.
15      MR. W. VAN SCOY: Wayne Van Scoy, plaintiff.
16      MR. QUINN: Charles N. Quinn for the
17  defendants.
18      VIDEO SPECIALIST: The court reporter will
19  now swear in the witness.
20          KURT VAN SCOY,
21      the witness herein, having first been
22      duly sworn on oath, was examined and
23 r    testified as follows:
24          EXAMINATION

Page 3

1  BY MR. PETOCK:
2  Q. Good morning, Kurt.
3  A. Good morning.
4  Q. I'm going to ask you some questions today to see
5  what you know about the facts giving rise to this
6  lawsuit. If you don't understand a question, ask me to
7  repeat it. If you don't understand the substance of a
8  question, tell me so I can rephrase it. If you realize
9  that an earlier answer you gave was inaccurate or
10 incomplete, just let me know and you will be allowed to
11 go back and supplement your earlier answer.
12      During this deposition, you are not allowed
13 to consult with your attorney about the substance of the
14 deposition. In other words, you can't talk to your
15 attorney about the deposition testimony that you either
16 have given or you anticipate to give. Do you understand
17 that?
18 A. Yes.
19 Q. That includes during recesses also.
20      MR. QUINN: And what is your authority for
21 that proposition?
22      MR. PETOCK: We have a case. I can pull it
23 out if you would like.
24      MR. QUINN: I would like to see it.

Page 4

1      MR. F. PETOCK: We can do that later.
2      MR. QUINN: We can go forward, but I would
3  like to see that case.
4      MR. PETOCK: Sure. No problem.
5      MR. F. PETOCK: There is definitely case law
6  here in this district that holds that.
7      MR. QUINN: I would like to see it.
8  BY MS. VAUGHAN:
9  Q. During the deposition, I will, from time to time,
10 I will refer to your father, Thomas Van Scoy, Senior.
11 A. Yes.
12 Q. Unless the context is clearly contrary, when I
13 refer to your father, I'm also referring to your father's
14 company, Van Scoy Diamond Mine, Inc.
15 A. Okay.
16 Q. Do you understand the instructions as I have
17 given them to you?
18 A. Yes.
19 Q. You have taken an oath this morning under the
20 penalty of perjury to tell the truth. Do you understand
21 that oath?
22 A. Yes, I do.
23 Q. Could you, please, you state your name and
24 address for the record?

Page 5

1  A. Kurt Van Scoy, 820 Old Harmony Road, Newark,
2  Delaware.
3  Q. You're married to Donna Van Scoy; is that
4  correct?
5  A. Donna Marie Van Scoy, that's correct.
6  Q. When did you two get married?
7  A. July 31st, 1994.
8  Q. Are you an owner of Van Scoy Diamond Mine of
9  Delaware, Inc.?
10 A. I am the president.
11 Q. Who else has an ownership -- are you an owner?
12 A. I am owner, yes.
13 Q. Who else has an ownership interest?
14 A. Actually, my wife is secretary.
15 Q. And what percentage ownership do you have?
16 A. We are 50/50.
17 Q. You have a 50 percent ownership and Donna has a
18 50 percent ownership interest?
19 A. Yes.
20 Q. And you said you're president?
21 A. Correct.
22 Q. Do you make the decisions for the corporation?
23 A. I do.
24 Q. So you authorize and approve the advertising of

Van Scoy                              v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy         C.A. # 05-108 (KAJ)         July 26, 2005

---

Page 6

1  the corporation?
2      A.  Yes, I do.
3      Q.  Do you authorize and approve what trade name to
4  use?
5      A.  I don't understand the question.
6      Q.  Do you make the decisions as to what trade name
7  to use?
8      A.  Yes.
9          MR. PETOCK:  I would like to have this
10  marked as Exhibit 1, please.
11          (Van Scoy Deposition Exhibit No. 1, Meeting
12  Minutes of August 22, 1996, was marked for
13  identification.)
14  BY MR. PETOCK:
15      Q.  Kurt, can you please tell me what you have in
16  front of you that has been marked Exhibit 1?
17      A.  This is the minutes from a corporate meeting.
18      Q.  Okay. I'm particularly interested in bullet point
19  Number 3, the trade name issues. What trade name issues
20  were discussed in this corporate meeting?  It was a
21  special meeting of the board of directors; is that
22  correct?
23      A.  That would be correct.
24      Q.  That took place on August 22nd, 1996?

---

Page 7

1      A.  Correct.
2      Q.  Could you, please, tell me what the trade name
3  issues that were discussed were?
4      A.  I don't remember.
5      Q.  You have no recollection of what trade name
6  issues were discussed?
7      A.  1996, that's nine years ago. I don't remember.
8      Q.  Would you -- what did you mean by trade name
9  issues?
10      A.  I don't remember.
11      Q.  Is there any reason that you would have been
12  talking about trade name issues in 1996?
13      A.  None whatsoever. I don't remember.
14      Q.  Is it common for you to have discussed trade name
15  issues at corporate meetings?
16      A.  I don't recall.
17      Q.  Did you talk about trade name issues at your last
18  corporate meeting?
19      A.  To be -- I don't recall. I don't know.
20      Q.  You don't remember -- do you remember your last
21  corporate meeting?
22      A.  Briefly, but I don't recall any issues about
23  trade name issues.
24      Q.  When was your last corporate meeting?

---

Page 8

1      A.  Offhand, I don't know.
2      Q.  Do you hold corporate meetings on a regular
3  basis?
4      A.  We do once a year, twice a year sometimes, yes.
5      Q.  Do you remember what trade name you were using at
6  the time in 1996, August 22nd?
7          MR. QUINN:  Objection.  Define trade name.
8      Q.  Kurt, could you define trade name issues to what
9  it means to you today?
10      A.  It's the name of my business.
11      Q.  Which is what?
12      A.  Van Scoy Diamond Mine of Delaware, Incorporated.
13      Q.  Is it the name you use in your advertising?
14      A.  Actually, no.
15      Q.  How is it different?
16      A.  It's Van Scoy Diamond Mine. That's what my
17  father gave me.
18      Q.  What do you mean your father gave you the name
19  Van Scoy Diamond Mine? Could you explain that to me?
20      A.  I sure will.  In 1994, prior opening of our
21  business on November 12th, my father actually gave me the
22  sign, literally gave me the sign, Van Scoy Diamond Mine,
23  from our warehouse and actually brought that down to our
24  location here in Delaware.

---

Page 9

1      Q.  What was the date that he gave you the sign that
2  said Van Scoy Diamond Mine?
3      A.  The exact date I can't recall.  I know it was
4  roughly, probably, about a month prior to the November
5  12th. So I would have to say sometime in October.
6      Q.  November 12th was the opening of your store?
7      A.  That is correct.
8      Q.  Does that sign still exist?
9      A.  Absolutely.
10      Q.  Is it on your store now?
11      A.  Yes, it is.
12      Q.  Does it say Van Scoy or does it say Van Scoy
13  Diamond Mine?
14      A.  It says Van Scoy Diamond Mine.
15      Q.  Where is that located on your store?
16      A.  On the front of the store.
17      Q.  Did your dad actually tell you you had permission
18  to the use the mark or did you infer that from the fact
19  that he gave you the sign?
20      A.  He gave me the right to use that name.
21      Q.  What did he say to you exactly?
22      A.  Here's the sign. Good luck to you. I love you
23  very much and I'm proud of you.
24      Q.  Getting back to the minutes, your testimony is

---

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

237c0978-7df2-492f-be79-16c76b54a422

Page 10

1  that you have no recollection of what trade name issues
2  were discussed?
3     A.  At that time, no.
4     Q.  At this time no or at that time no?
5     A.  At that time -- well, this time, no.
6        MR. QUINN:  Clarify that.  Is the question
7  does he have any recollection now or what happened then?
8        MR. PETOCK:  Obviously, yes.
9  BY MR. PETOCK:
10    Q.  Do you have any recollection --
11       MR. QUINN:  It sounded like you were asking
12 whether he had recollection now of what's going on now as
13 opposed to recollections now of what went on then.
14 BY MR. PETOCK:
15    Q.  Your testimony is that you have no
16 recollection --
17       MR. QUINN:  Let me get my objection out.
18       MR. F. PETOCK:  You are leading the witness.
19 You are coaching the witness.
20       MR. QUINN:  I'm making an objection.
21       MR. F. PETOCK:  Objection as to the form of
22 the question.  That's all you're allowed to do.
23       MR. QUINN:  We didn't have any stipulations
24 on the record as far as the objections.  If you want to

Page 11

1  put them on, that's fine.
2        MR. F. PETOCK:  That's all you're allowed to
3  do, objection as to the form of the question.
4        MR. QUINN:  All objections are reserved,
5  correct?
6        MR. F. PETOCK:  Except as to form of the
7  question, right.
8        MR. QUINN:  Except as to the form of the
9  question, is that stipulated?
10       MR. PETOCK:  Yes.
11       MR. QUINN:  Okay.
12 BY MR. PETOCK:
13    Q.  Do you remember who was present at that meeting?
14    A.  I don't.
15    Q.  Who would have been present?  Who is normally
16 present at a corporate meeting?
17    A.  Myself --
18       MR. QUINN:  Objection.  That's two
19 questions.
20 BY MR. PETOCK:
21    Q.  Who is normally present at a corporate meeting?
22    A.  Me.
23    Q.  Is there anyone that would remember what trade
24 name issues were discussed?

Page 12

1     A.  Nine years ago, no.
2     Q.  What other -- any other documents exist as to
3  what went on at this meeting?
4     A.  No.
5     Q.  You said you were the only person present at the
6  meeting?
7     A.  Well, me, my accountant, he was present.  And
8  usually at my meetings, that's usually who is there.
9     Q.  Donna isn't usually present?
10    A.  Sometimes.
11    Q.  Where did this meeting take place?
12    A.  I don't recall.  Again, you are asking me
13 something nine years.  I don't recall.
14    Q.  Was it at 1218 South Main?
15    A.  Obviously, then that's where it would be.
16    Q.  What is that location?  What location is 1218
17 South Main in Wilkes-Barre?
18    A.  That would be -- I would ask the other attorney,
19 if I'm not mistaken, the attorney I had from back home.
20    Q.  What was his name?
21    A.  Argood, Pat Argood.
22       MR. PETOCK:  I would like to have this
23 marked as Exhibit 2.
24       (Van Scoy Deposition Exhibit No. 2, Cease

Page 13

1  and Desist Letter, was marked for identification.)
2  BY MR. PETOCK:
3     Q.  Can you tell me what you have in front of you
4  that has been marked as Exhibit 2?
5     A.  A notification via filing a suit towards me for
6  using the name Van Scoy.
7     Q.  I'm going to refer to this as a cease and desist
8  letter.  Is that okay?  Is that understood?
9     A.  That's fine.
10    Q.  Did you receive this cease and desist letter?
11    A.  Yes.
12    Q.  Do you remember the approximate date that you
13 received it?
14    A.  November the 18th, 2004.
15    Q.  After you received the cease and desist letter,
16 did you continue to direct the acts of your corporation?
17    A.  I did because I believe this was in disbelief.
18    Q.  What do you mean you believe it was in disbelief?
19    A.  I wasn't aware of a trademark.
20    Q.  You weren't aware of -- what do you mean?  Could
21 you explain that further, you weren't aware of a
22 trademark?
23    A.  When I received this letter, this is the first
24 time I knew anything, certainly, about a trademark for

Van Scoy
Kurt Van Scoy

v. Van Scoy Diamond Mine of Delaware, Inc.

C.A. # 05-108 (KAJ)    July 26, 2005

Page 14

1  Van Scoy Diamond Mine.
2    Q. So after you received this cease and desist
3  letter, you continued to authorize and approve the
4  advertising of the corporation?
5    A. I seeked counsel.
6    Q. And you continued to author and approve -- is
7  that a yes?
8    A. That is a yes.
9    Q. Did you continue to author and approve what
10  trademark to use?
11    A. Yes.
12    Q. And did you continue to authorize and approve the
13  design and publication of the website hosted at
14  vanscoydiamondmine.com?
15    A. After I seeked counsel, we agreed to, actually to
16  shut it down until we find out the results.
17    Q. Of this litigation?
18    A. Correct.
19    Q. Did you review all of our requests for documents
20  that you have received during this discovery period?
21    A. Yes.
22    Q. Have you produced everything that we have asked
23  for?
24    MR. QUINN: The record's clear that we

Page 15

1  produced representative samples in many cases. And we
2  invited you to come to the premises to make the copies.
3    MR. PETOCK: Okay. I'm going to ask Kurt to
4  answer the questions.
5    MR. QUINN: Well, as best he can.
6    MR. PETOCK: Well, that doesn't mean you
7  have the right to answer. If he can't, he can say he
8  doesn't know or something to that effect.
9    MR. QUINN: He can say whatever he knows.
10    THE WITNESS: I don't know.
11    MR. PETOCK: I'm going to have this marked
12  as Exhibit 3, please.
13    (Van Scoy Deposition Exhibit No. 3, Letter
14  to Fox Rothschild Dated February 22, 2005, was marked for
15  identification.)
16  BY MR. PETOCK:
17    Q. Could you tell me what you have in front of you
18  that's been marked as Exhibit 3?
19    A. This is, obviously, the beginning of a suit for
20  using the name.
21    Q. It's, actually, it's a letter addressed to your
22  lawyer, Charlie, correct?
23    A. Correct.
24    Q. Do you remember if this letter was forwarded to

Page 16

1  you?
2    A. I believe so.
3    Q. Did Mr. Quinn inform you that you had an
4  obligation to preserve evidence during this litigation,
5  including electronic evidence such as your website?
6    MR. QUINN: Objection to the extent that
7  that asks for a question involving the attorney/client
8  privilege.
9  BY MR. PETOCK:
10    Q. Did you review this letter when you got it?
11    A. Yes.
12    Q. Did you know you had an obligation to preserve
13  evidence?
14    A. Yes.
15    Q. Could you tell me why you have not turned over
16  any files related to your website hosted at
17  vanscoydiamondmine.com?
18    A. I don't understand the question.
19    Q. We have asked for documents related to your
20  website that was hosted at vanscoydiamondmine.com. You
21  did have a website at vanscoydiamondmine.com at one time,
22  correct?
23    A. Correct.
24    Q. And, in fact, when you received your cease and

Page 17

1  desist letter, that was where your website was hosted,
2  correct?
3    A. Yes.
4    MR. QUINN: Clarify the question.
5    MR. PETOCK: Okay.
6    MR. QUINN: You said that was where the
7  website was hosted?
8    MR. PETOCK: He said yes. He said yes. I
9  don't see why I need to clarify the question.
10    MR. QUINN: So I can understand it.
11    MR. F. PETOCK: It's not for you -- if the
12  witness doesn't understand the question, he can say he
13  doesn't understand it. It's for the witness to
14  understand the question.
15    MR. QUINN: Well, if I can't understand the
16  question, how can I advise this guy?
17    MR. PETOCK: You're not advising him.
18    MR. QUINN: I'm certainly going to advise
19  him after this deposition is over. If I can't understand
20  what the question was when it was asked, I can't advise
21  him after it's over.
22    MR. PETOCK: You can argue about that later.
23    MR. QUINN: And we certainly will.
24  BY MR. PETOCK:

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

237c0978-7df2-492f-be79-16c76b54a422

Page 18

1    Q.  You said that you had a website hosted, that
2  there was a website that was hosted at
3  vanscoydiamondmine.com, that was where your website was,
4  correct?
5    A.  Yes.
6        MR. QUINN:  Wait a minute.  At
7  vanscoydiamondmine.com does not define a geographic
8  place.
9        MR. PETOCK:  It's not a geographic place.
10  It's a place on the internet.
11        MR. QUINN:  That's the inference that you
12  were trying to draw from the witness a minute ago.
13        MR. PETOCK:  Charlie, you know quite well
14  that that question is clear.
15        MR. QUINN:  If you clarify what you mean by
16  at, then it's clear.  But an ordinary listener reading
17  that transcript could conclude that the question inquires
18  as to whether the website was at the jewelry store.
19        MR. PETOCK:  At vanscoydiamondmine.com is a
20  domain name.
21        MR. QUINN:  That's correct.
22  BY MR. PETOCK:
23    Q.  You had a domain name vanscoydiamondmine.com?
24    A.  Yes.

Page 19

1    Q.  And your website was hosted at
2  vanscoydiamondmine.com.  Yes?
3    A.  I still don't understand the question.
4    Q.  You understood it before.
5    A.  I know, but something -- I don't understand the
6  question.
7    Q.  If someone is surfing the internet, was to type
8  in vanscoydiamondmine.com, www.vanscoydiamondmine.com,
9  your website would show up on their computer; is that
10  correct?
11    A.  Correct.
12    Q.  Now, we asked for you to give is a printout of
13  that website.  You did not produce that.
14    A.  That's something I needed to talk to counsel.
15    Q.  No, I'm asking you.  We asked you to produce it
16  but did you not produce it.  Could you tell me why it
17  wasn't produced?  Was that website destroyed?
18        MR. QUINN:  How many questions are you going
19  to ask at one time?
20        THE WITNESS:  I don't know.
21        MR. QUINN:  Don't answer until he decides
22  which question you're to answer.
23  BY MR. PETOCK:
24    Q.  Was the website that we are talking about,

Page 20

1  vanscoydiamondmine.com, any records of it destroyed?
2    A.  I don't know.
3    Q.  You don't know whether the records were
4  destroyed?
5    A.  I don't know.
6    Q.  Okay.  Could you tell me the names of your
7  brothers and sisters?
8    A.  Sure will.  Tommy Van Scoy, Sr.  And, I'm sorry,
9  Junior.  Tony Van Scoy, Betsy Williams, Pam Sendrick,
10  Wayne Van Scoy, Ken Van Scoy, my deceased brother, Keith
11  Van Scoy, and myself, Kurt Van Scoy.
12    Q.  Can you tell me where Tommy Van Scoy lives, Tommy
13  Van Scoy, Jr.?
14    A.  In Dallas, Pennsylvania.
15    Q.  He owns a jewelry store by the name of Tovon; is
16  that correct?
17    A.  Correct.
18    Q.  That's approximately an eighth of a mile from
19  where Wayne's store is located right now; is that
20  correct?
21    A.  I believe so.
22    Q.  So he's in direct competition with Wayne's store?
23    A.  I would say so.
24    Q.  You helped finance Tommy opening up his jewelry

Page 21

1  store; is that correct?
2    A.  No.
3    Q.  Did you cosign in some way on the loan?
4    A.  No.
5    Q.  In any way?
6    A.  No.
7    Q.  Did you help him, in any way, opening his jewelry
8  store?
9    A.  No.
10    Q.  When was the last time you have spoken to Tommy?
11    A.  Yesterday actually.
12    Q.  What did you guys speak about yesterday?
13    A.  How's things going?  What's going on?  How's the
14  kids?
15    Q.  Do you guys have any sort of business
16  relationship at all?
17    A.  No.
18    Q.  Do you supply him with anything?
19    A.  Absolutely not.
20    Q.  Have you -- do you send him things?
21    A.  No.
22        MR. PETOCK:  I would like to have this
23  marked as the next exhibit.
24        (Van Scoy Deposition Exhibit No. 4, UPS

6 (Pages 18 to 21)

Van Scoy                                  v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

---

Page 22

1   Invoices, was marked for identification.)
2   BY MR. PETOCK:
3     Q.  You just testified that you do not send Tommy
4   Van Scoy anything.  Could you tell me what you have in
5   front of you?
6         MR. QUINN:  I think that's a
7   mischaracterization of his testimony.
8         MR. PETOCK:  All you need to say is
9   objection.  You stipulated to the fact that objecting to
10  the form of the question is the only objection you need.
11  You are coaching the witness.  You are instructing the
12  deposition.
13        MR. QUINN:  Well, if it's a
14  mischaracterization, that's a pretty specific objection
15  as to the form.
16        MR. PETOCK:  You are coaching the witness by
17  saying that.  There is no question about it.  And I know
18  this.  I mean, I even know this.
19        How am I mischaracterizing his testimony
20  when I asked when he said --
21        MR. QUINN:  He hadn't answered the question.
22  He just restated what he said in the answer.
23  BY MR. PETOCK:
24    Q.  Could you tell me what this is?

---

Page 23

1         MR. QUINN:  You can have the answer read
2   back.  You can have the question read back.
3   BY MR. PETOCK:
4     Q.  Could you tell me what has been marked as
5   Plaintiff's Exhibit 4, please?
6     A.  Sure.  This, obviously, if you are talking about
7   business related stuff, I have to say no.  I know there
8   is times he stayed down and, actually, stuff that was
9   left at my house from his kids I know we shipped back to
10  his place.
11    Q.  Could you answer the question?  I said:  What is
12  this?
13    A.  It's a shipping, billing/shipping paper.
14    Q.  And what was -- is there a shipment from you to
15  Tommy or to Tovon?
16    A.  No.  There is a name on there.  It says Lori
17  McMichael.
18    Q.  Above Lori McMichael, what does it say?
19    A.  It says Van Scoy Diamond Mine.
20    Q.  What's the address of the Van Scoy Diamond Mine?
21    A.  1117 Churchmans Road.
22    Q.  Is that your Van Scoy Diamond Mine?
23    A.  Yes, it is.
24    Q.  Now, this is the UPS billing summary.

---

Page 24

1     A.  Yes.
2     Q.  The UPS billing summary on the third page, if you
3   look at this third page, this one was actually something
4   was sent from Tovon and Company in DuPont, PA, and the
5   receiver was Kurt.
6     A.  Okay.
7     Q.  Can you tell me what that was?
8     A.  I don't recall.
9     Q.  On February 12th, 2005, you can't remember
10  receiving anything from Tommy?
11    A.  No.
12    Q.  Do you receive many things in the mail or through
13  courier services from Tommy?
14    A.  Many?  No.
15    Q.  How often?
16    A.  If I'm up there, I forget something, he'll send
17  it down to me.  I get packages from my other brothers, my
18  sister.
19    Q.  And yet -- so it's not that afternoon that you
20  can't remember February 12th, 2005, what he sent to you?
21    A.  What was sent to me, no.
22    Q.  Let's look at the FedEx on the billing receipt.
23  Do you remember this?  Do you agree that this FedEx
24  billing summary shows something being sent from Van Scoy

---

Page 25

1   Diamond Mine in Newark, Delaware, at 1117 Churchmans Road
2   to Tommy on February 25th, 2004, at Tovon and Company?
3     A.  Again, that's -- yes.
4     Q.  You don't remember what you sent him; is that
5   your testimony?
6     A.  There is a name there, Lori.  I'm not Lori.
7     Q.  Are you in charge of Lori?  Is she your employee?
8     A.  She's an employee.
9         MR. QUINN:  That's two questions.  Ask them
10  one at a time, please.
11  BY MR. PETOCK:
12    Q.  Is she your employee?
13    A.  Yes.
14    Q.  Would you have directed her to send something to
15  Tommy or would you have directed something -- would you
16  have directed her to send something to Tommy?
17    A.  Sure, yeah.
18    Q.  She wouldn't have just sent it on her own?
19    A.  No.  If he left something there, yeah, send it,
20  just send it back.
21    Q.  How often does Tommy come to your store?
22    A.  He comes to my residence.  Maybe half a dozen
23  times through the year roughly.
24    Q.  Your testimony is that you can't remember what

---

Wilcox & Fetzer, Ltd.    Professional Court Reporters

Van Scoy                              v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

---

Page 26

1  you sent to him on February 25th.
2      A.  No.
3          MR. QUINN:  That's not a question.
4      Q.  You can't remember what you sent to him on
5  February 25th.
6          MR. QUINN:  That's still not a question.
7      Q.  Can you remember what you sent to him on February
8  25th?
9      A.  No.
10     Q.  Do you have aspirations of one day owning the
11 Mundy Street store?
12     A.  No.
13     Q.  Does Tommy?
14     A.  I'm not Tommy.  I can't answer that question.
15     Q.  Have you ever heard Tommy say that one day I'll
16 own the Mundy Street store?
17     A.  Not to my knowledge.
18     Q.  Are you aware of him ever saying that to anyone
19 else?
20     A.  No.  I live in Delaware.
21     Q.  Where does Tony live?
22     A.  Tony, Forty Ft., Pennsylvania.
23     Q.  What's his occupation?
24     A.  Jeweler.

---

Page 27

1      Q.  What is — does he have a store?
2      A.  He does.
3      Q.  Does he own the store?
4      A.  I don't know.  I don't know.
5      Q.  Do you know what the name of the store is?
6      A.  I think it's Van Scoy Jewelers.
7      Q.  Do you know how long he has either owned or
8  operated that store?
9      A.  I don't know.  25 years roughly.
10     Q.  Continuously?
11     A.  I don't know that.
12     Q.  Are you friendly with Tony?
13     A.  I speak to him.
14     Q.  How often?
15     A.  Maybe once every other day.  He's my brother.
16     Q.  What have you spoken to him about concerning this
17 case?
18     A.  Not much.
19     Q.  What specifically?
20     A.  Just what's going on?  Being sued by my brother,
21 Wayne.  That's all.
22     Q.  Nothing more specific?
23     A.  No.
24     Q.  Where does Betsy live?

---

Page 28

1      A.  It's a nursing home in Binghamton, New York.
2      Q.  She doesn't work; is that correct?
3      A.  That's correct.  As far as I know.
4      Q.  And you haven't talked to her any time recently?
5      A.  No.
6      Q.  What about her husband?
7      A.  No.
8      Q.  Is Betsy sick right now?
9      A.  Yes.
10     Q.  Did she have an occupation before she got sick?
11     A.  She did.
12     Q.  What was that?
13     A.  Ran the jewelry store, Van Scoy Diamond Mine, in
14 Binghamton, New York.
15     Q.  How did you know the name was Van Scoy Diamond
16 Mine?
17     A.  I have been there.
18     Q.  When was the last time you were there?
19     A.  We go back about 12 years, probably 12, 13 years.
20     Q.  When do you believe she stopped running the
21 store?
22     A.  I don't know.
23     Q.  Approximately?
24     A.  I don't know.

---

Page 29

1      Q.  Was it 13 years ago?
2      A.  I don't know.
3      Q.  Why were you at the store 13 years ago?
4      A.  Because that was my job.  I had to go to the
5  store to work.
6      Q.  Did you work there?
7      A.  I worked for a weekend or a couple days to fill
8  in for her.  Sure.
9      Q.  Did your father own that store or --
10     A.  I'm not sure on that side of it.
11     Q.  What about Pam, where does she live?
12     A.  190 Sahara Drive, Kingston, PA.
13     Q.  What is her occupation?
14     A.  Housewife.
15     Q.  Are you friendly with her?
16     A.  She's my sister.
17     Q.  Are you friendly with her?
18     A.  She's my sister.
19     Q.  Are you friendly with Wayne?
20     A.  No.  Not right now, no.
21     Q.  Is he your brother?
22     A.  Yes, he is.
23     Q.  Are you friendly with Pam?
24     A.  She's my sister, yeah.

---

8 (Pages 26 to 29)

Van Scoy                                v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

---

Page 30

1  Q.  How often do you talk to her?
2  A.  Oh, God, once a week, if that.
3  Q.  What have you discussed with her concerning this
4  case?
5  A.  Actually, nothing. We are just more trying to
6  collect funds from everybody for my father's funeral and
7  his personal stuff that was not around.
8  Q.  Has Pam ever owned a jewelry store or been in the
9  jewelry business?
10  A.  Yeah. Her and her husband own a store in
11  Scranton, Pennsylvania.
12  Q.  So she's not just a housewife. She also owns a
13  store?
14  A.  Well, her husband runs the store. She stays
15  home.
16  Q.  Do you have knowledge as to whether she owns that
17  store?
18  A.  I believe she does have part ownership of that
19  store, yes.
20  Q.  Who else would be an owner? Do you know?
21  A.  Her husband, Rick Sendrick.
22  Q.  Are you friendly with Rick?
23  A.  I speak to him once in a while.
24  Q.  What have you spoken with him -- have you spoken

Page 31

1  to him about this case?
2  A.  Briefly a little bit, yeah.
3  Q.  What did you guys talk about?
4  A.  Off the top -- I don't recall. Just in general.
5  Q.  When you say in general, what did you talk about?
6  A.  Still in disbelief and wonder where his stocks
7  are and how ridiculous it really is. And that's really
8  just in general.
9  Q.  Are you the one that thinks it's ridiculous?
10  A.  Everybody does.
11  Q.  What do you think is ridiculous?
12  A.  The whole situation we're in.
13  Q.  Which is what?
14  A.  Being sued for using a name that was given to me.
15  Q.  Is that the reason why you believe -- do you
16  believe you have a right to use the mark Van Scoy Diamond
17  Mine?
18  A.  Absolutely.
19  Q.  Are you using the mark Van Scoy Diamond Mine?
20  A.  Yes.
21  Q.  And the reason you believe that you have the
22  right to use -- why do you believe, specifically, you
23  have the right to use the mark Van Scoy Diamond Mine?
24  A.  Because my father gave me the name.

Page 32

1  Q.  Did your father put anything in writing when he
2  gave you the name?
3  A.  I have things in writing. As a contract, there
4  was no contract. It was just he gave me the name and
5  said, good luck, I love you and I'm proud of you.
6  Q.  And the approximate date that you said he gave
7  you the name was in October of 1994; is that correct?
8  A.  Approximately that date, yes.
9  Q.  Could it have been later?
10  A.  No.
11  Q.  Could it have been earlier?
12  A.  Within a month I guess.
13  Q.  Now, when he supposedly gave you the name --
14  A.  Gave me the name.
15  Q.  -- you knew he was bankrupt, right?
16  A.  I knew he was going through a tough time with
17  that. Sure. Yes.
18  Q.  One other question I want to ask you about Pam
19  and Rick's store is what mark are they using?
20  What mark are they using?
21  A.  Van Scoy Diamonds. Well, the phone book say Van
22  Scoy Diamond Mine. The store says Van Scoy Diamonds.
23  Q.  Have you seen the store recently?
24  A.  I have not.

Page 33

1  Q.  Do you know which one it is, which mark, whether
2  it's Van Scoy Diamond Mine or Van Scoy Diamonds.
3  A.  No. As far as I know, it's Van Scoy Diamonds
4  that's outside the store itself. In the phone book it
5  says Van Scoy Diamond Mine.
6  Q.  Where does Ken live?
7  A.  He, actually, just got a new place. I'm not sure
8  what the address is of where Ken lives right now.
9  Q.  What is his occupation?
10  A.  He just, actually, works for my sister around the
11  house. He's just kind of doing some yard work for her.
12  Q.  Which sister?
13  A.  Pam.
14  Q.  Are you friendly with Ken?
15  A.  Yes. He's my brother.
16  Q.  How often do you talk to him?
17  A.  Just about every day.
18  Q.  What have you discussed with him concerning the
19  case.
20  A.  Pretty much the same as everybody else, just in
21  general, just what's going on, what's next and all that.
22  Q.  What kind of relationship did you have with your
23  father?
24  A.  Very good actually.

9 (Pages 30 to 33)

237c0978-7df2-492f-be79-16c76b54a422

Van Scoy                              v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

---

Page 34

1    Q.   Would you care to elaborate on that at all?
2         MR. QUINN:  Is that a question or not?
3         MR. PETOCK:  Yes, it is.
4         THE WITNESS:  I don't understand it.  What
5    do you mean?
6    BY MR. PETOCK:
7    Q.   Would you like to tell me more about your
8    relationship with your father?
9    A.   He's my father.  I'm his son.  I was his youngest
10   son.  He taught me the business.  I ran, managed the
11   stores in Connecticut, Hartford.  Traveled between
12   Springfield, Hartford and New Haven since I was,
13   actually, out of school.  And just did the business my
14   whole life.  Used to go with him when I was about 12, 13
15   years old to the radio stations, sit there and watch him
16   for about an hour-and-a-half make ads.  Had a good time
17   with my father.  He was a caring guy, respectful and was
18   a man of his word.  And I miss him.  He's a great guy.
19   Q.   You said you traveled to Hartford.
20   A.   Uh-huh.
21   Q.   Why did you travel the Hartford?
22   A.   Hartford, Springfield, because that where the
23   stores were.  He had stores up in the New England area.
24   And I managed the one in New Haven Connecticut for three

Page 35

1    years.
2    Q.   Did you travel -- have you visited all of those
3    New England stores?
4    A.   Just those three.  I was in Providence, Rhode
5    Island, with my dad when he used to go up to see the
6    franchises.
7    Q.   How often did your dad go to visit the
8    franchises?
9    A.   I can't recall.
10   Q.   But you would go with him sometimes?
11   A.   Sometimes I would go.  Sure.  I had no other
12   choice.
13   Q.   What would you do when you would visit these
14   franchises?  By the way, when I say the word "franchise,"
15   I'm not sure whether it was a franchise or not.  I just
16   mean the fact that your father licensed the mark.
17   A.   It was a franchise, yes.
18   Q.   What would you do when you go to these stores
19   with your father?
20   A.   He would sit down talk with somebody.  I'd
21   probably go grab something to eat.  I was young.  That's
22   one place that I don't want to certainly be.
23   Q.   What years did this take place that you were
24   visiting your father's franchises?

Page 36

1    A.   '80, '81 to -- oh, God.  I went to Connecticut in
2    '83.  I would say early '80s, early '80, 1980, 1981.
3    Q.   What was your position with the company at this
4    point?
5    A.   Garbage man, salesman, bench guy, light bulb
6    changer, car washer, wash the windows, everything.
7    Q.   Was Wayne also traveling with your father to meet
8    with franchises during this time?
9    A.   I don't recall to be honest with you.
10   Q.   Do you recall any of your other brothers and
11   sisters traveling to franchises?
12   A.   Some of them.  We all did once in a while.
13   Q.   Did you go to anywhere else besides New England
14   to visit the franchises?
15   A.   I did actually.
16   Q.   Where else?
17   A.   To the franchise down in Clear Water, Florida.
18   Q.   Did your father frequently visit the franchises?
19   A.   He made his rounds.  Again, at that time, I was
20   young.  I wanted to go play at the park instead of being
21   at work.
22   Q.   What was he doing making these rounds?
23   A.   Checking on the stores.  My recollection, is he
24   was checking on the stores and seeing what's going on

Page 37

1    and, obviously, trying to maintain the mark.
2    Q.   What kind of relationship did you have with Wayne
3    before the lawsuit?
4    A.   Well, do you want me to be honest?
5    Q.   Yes.
6    A.   I'm going to be honest.  Not good.  I remember
7    him from when I was a little kid.  I will never forget
8    one example.  I was riding a bicycle down Hamilton Park.
9    And there was about 30 people sitting across a lot that
10   they blocked the roads off.  And Hamilton Park was the
11   place to hang, if you will.  And I remember I had a bike.
12   And I had the choppers.  I cut the forks off of one and I
13   slid it on the other one and I'm running down.  And, boy,
14   I'm running popping a wheelie.  You know, I'm cool in
15   front of everybody when I was a kid.  The tire came off.
16   I fell.  Scraped up.  Everybody comes over.  Are you
17   okay?  Are you okay?  Are you okay?  He comes over.
18   Slaps me in the head.  Get on with it, quote, unquote,
19   asshole.  You're cool.  That's just the beginning.  I'm
20   going to go on.
21        Later on just growing up, he's just been
22   very -- I'm going to leave it at that.
23   Q.   He's your big brother?
24   A.   Middle.

---

10 (Pages 34 to 37)

Van. Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

---

**Page 38**

1  Q. Where did you live growing up?
2  A. 360 Joseph Drive, Kingston, Pennsylvania, 18704.
3  Q. Over the years, where else have you lived besides
4  that?
5  A. New Haven, Connecticut.
6  Q. When did you move originally from Wilkes-Barre?
7  Or from Kingston, is that where it was?
8  A. Kingston, yes. Kingston, when did I move? I
9  moved to, New England, actually, to Orange, Connecticut.
10 And that was in, I think it was 1983 to run the store in
11 New Haven for my dad.
12 Q. Was your dad the owner of the New Haven,
13 Connecticut, store?
14 A. Yes, he was.
15 Q. Just for the record, what business was your
16 father in?
17 A. The diamond business.
18 Q. Did he primarily hold himself out as a diamond
19 dealer?
20 A. He did, the diamond king.
21 Q. And was that all he sold, diamonds?
22 A. Diamonds, diamonds, jewelry.
23 Q. Diamonds and jewelry?
24 A. And jewelry, yeah. I'm sorry. Yeah, diamonds

---

**Page 39**

1  and jewelry.
2  Q. Was it primarily diamonds?
3  A. Yes.
4  Q. How did you father get into the diamond business?
5  A. He's, actually, he was a lieutenant in the Army,
6  from what remember him telling me, lieutenant in the
7  Army. And he saw another gentleman going around the
8  barracks, actually, fixing watches. And the other guys
9  would go out and hit the bars and all that and my father
10 would stay with this guy and go to different soldiers and
11 actually watch this guy fix watches. And then he started
12 doing it himself. And he got out of the service after
13 World War II. And he came home. He wasn't sure what he
14 was going to do. So he said he's going to be Tommy
15 Van Scoy, the GI jeweler. The rest is history from
16 there.
17 Q. He wrote a book, right?
18 A. Yes, he did.
19 Q. What is the name of that book?
20 A. You Can If You Want to. It's a copyright there.
21 Q. Have you read it?
22 A. Bits and pieces of it I have, yeah, bits and
23 pieces.
24 Q. You haven't read the entire thing?

---

**Page 40**

1  A. Not in a while. I, actually, I forgot to take
2  it on vacation. I wanted to, actually, review it again.
3  Q. From what you remember, do you agree with the
4  statements he makes regarding the diamond business in the
5  book?
6  A. I don't recall.
7  Q. Was your father incorporated?
8  A. To be honest, I didn't know until, actually, just
9  seeing the statements. Again, I don't know that he was
10 actually incorporated until I saw the filing of the
11 papers.
12 Q. Which papers are you referring to?
13 A. To the lawsuit.
14 Q. You never saw -- did you ever see any of the
15 sales receipts or invoices or anything when you were
16 working for the business?
17 A. Yeah, you do.
18 Q. Describe to me exactly what you did when you were
19 working for the business for your father. That was
20 during what years? I'm going to ask you that first.
21 What years did you work for your father's business?
22 A. I started when I was, personally, I started when
23 I was about 10 years old. So I'm 39. Geez, 29 years
24 ago.

---

**Page 41**

1  Q. 29 years ago?
2  A. That's correct.
3  Q. So early '80s, '70s, early '80s?
4  A. Oh, yeah.
5  Q. Mid '80s?
6  A. Yes.
7  Q. Up until probably early '90s?
8  A. Yeah. I was in and out, in and out, yes.
9  Q. And during that time, '70s to the early '90s,
10 what did you do in your father's business? I know you
11 said you took out trash, but tell me what else.
12 A. That's what we did. I set earrings, set rings,
13 sold rings. I'd run errands to the post office, anything
14 and everything. It was a family business. And we all
15 ran it as a family and did everything we had to do.
16 Q. Did you ever get involved with any of the
17 ordering or anything like that, ordering of the
18 merchandise?
19 A. No, not so much. Later on as I was doing more of
20 a selling up front, I would sit down sometimes and kind
21 of get a little more involved in what stones we needed
22 and what stones we didn't need.
23 Q. Any of the accounting or anything like that?
24 A. The accounting wise, no. My brother Keith did

---

Wilcox & Fetzer, Ltd.    Professional Court Reporters          (302)655-0477
237c0976-7df2-492f-be79-16c76b54a422

Van Scoy                           v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

---

Page 42

1  it. And I was pretty much there's papers, file them. So
2  I was --
3      Q. Your father owned a store in Wilkes-Barre; is
4  that correct?
5      A. That's correct.
6      Q. Did he own other stores?
7      A. Yes, he did.
8      Q. Where else?
9      A. Springfield; Hartford, Connecticut; New Haven,
10 Connecticut; at the time, Binghamton, New York; Scranton;
11 Wilkes-Barre and Delaware.
12     Q. Could you repeat them, please?
13     A. Wilkes-Barre; Scranton; Delaware; Binghamton, New
14 York; Springfield, Massachusetts; Hartford, Connecticut
15 and New Haven, Connecticut.
16     Q. Do you remember what years he owned those stores?
17     A. I don't. This is early '80s.
18     Q. What mark did your father operate those stores
19 under?
20     A. The name was Van Scoy Diamond Mine.
21     Q. How did he come up with the name Van Scoy Diamond
22 Mine?
23     A. Very creative.
24     Q. Do you think that's a creative name?

Page 43

1      A. Well, I mean, he's a creative guy. That's
2  what -- he's a creative guy. It's just creative. I
3  don't personally know.
4      Q. Do you know when he started to use Van Scoy
5  Diamond Mine?
6      A. No, I don't.
7      Q. Did your father advertise the mark Van Scoy
8  Diamond Mine?
9      A. He advertised Van Scoy Diamond Mine, yes.
10     Q. How did he advertise?
11     A. I don't understand the question.
12     Q. Radio, television?
13     A. Radio, television, newspaper, yes.
14     Q. Do you remember anything about his
15 advertisements?
16     A. Yes.
17     Q. What do you remember about his advertisements?
18     A. He's very stern in his advertising. How to take
19 his jewelry off. I remember I used to go with him to the
20 radio station when I was young. And he had to his rings
21 off and everything because he was actually, they were
22 picking up on the mike. And he was very -- just as if
23 he's talking to 10,000 people, very distinct advertising.
24     Q. Did he advertise in all of those areas where he

Page 44

1  owned stores?
2      A. Yes. At the time, yes.
3      Q. Were they popular ads, to your knowledge, in the
4  areas in which he owned stores?
5      A. He advertised quite a bit. Sure.
6      Q. Did he advertise in the Newark, Delaware, area?
7      A. Yes.
8      Q. Do you remember anything specifically about those
9  ads?
10     A. Just ads are ads.
11     Q. Do you know how much he advertised in Newark?
12     A. No, no idea.
13     Q. You said your father had what you described as
14 franchises.
15     A. Yes.
16     Q. Could you tell me what your understanding of the
17 word "franchise" is?
18     A. Yeah. Actually, they were, purchased the name or
19 using the name Van Scoy Diamond Mine and actually was all
20 done on a handshake with my father. And he, actually,
21 put them up in an area and start them in the business and
22 my father would do the advertising for them.
23     Q. So they would -- do you know how much these
24 people paid to use the mark?

Page 45

1      A. That's personal information. I don't know.
2      Q. Did they pay money to use the mark?
3      A. As far as I know.
4      Q. Did all of the franchisees or licensees operate
5  under the mark Van Scoy Diamond Mine?
6      A. That I don't know.
7      Q. But what they were paying for was the right to
8  use the mark Van Scoy Diamond Mine; is that correct?
9      A. I don't know. I'm not my father. I don't know.
10     Q. What else would they have been paying for?
11         MR. QUINN: Calls for speculation on the
12 part of the witness.
13         MR. PETOCK: There is no problem with that.
14         MR. F. PETOCK: Objection. You are leading the
15 the witness.
16         MR. QUINN: Again, I state, restate the
17 objection.
18         MR. PETOCK: You are leading the witness,
19 Charlie, when you say that. You are coaching him.
20         MR. QUINN: You started the deposition by
21 saying you were going to ask him for the facts that he
22 knew about this case. Now you are asking him to
23 speculate. That is a shift of gears.
24 BY MR. PETOCK:

12 (Pages 42 to 45)

237c0978-7df2-492f-be79-16c76b54a422