# EXHIBIT A



1345723

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

**United States Patent and Trademark Office**

**July 20, 2005**

THE ATTACHED U.S. TRADEMARK REGISTRATION *1,140,958* IS CERTIFIED TO BE A TRUE COPY WHICH IS IN FULL FORCE AND EFFECT WITH NOTATIONS OF ALL STATUTORY ACTIONS TAKEN THEREON AS DISCLOSED BY THE RECORDS OF THE UNITED STATES PATENT AND TRADEMARK OFFICE.

REGISTERED FOR A TERM OF *20* YEARS FROM   *October 28, 1980*
*1st* RENEWAL FOR A TERM OF *10* YEARS FROM   *October 28, 2000*
*SECTION 8 PARTIAL & 15*
*AMENDMENT/CORRECTION/NEW CERT(SEC7) ISSUED*
*LESS GOODS*
CLASS(ES) CANCELLED:
   *INT CL 35*

SAID RECORDS SHOW TITLE TO BE IN:
   *VAN SCOY, WAYNE*
   *AN INDIVIDUAL OF THE UNITED STATES*

By Authority of the

**Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office**

N. WILLIAMS

**Certifying Officer**

Int. Cl.: 42

Prior U.S. Cl.: 101                                             Reg. No. 1,140,958

**United States Patent and Trademark Office**     Registered Oct. 28, 1980

10 Year Renewal/New Cert.                    Renewal Term Begins Oct. 28, 2000

## SERVICE MARK
## PRINCIPAL REGISTER
## REGISTRATION ASSIGNED

## VAN SCOY DIAMOND MINE

VAN SCOY, WAYNE (UNITED STATES CITIZEN)
154 MUNDY STREET
WILKES-BARRE, PA 18702, BY ASSIGNMENT VAN SCOY DIAMOND MINES, INC. (PENNSYLVANIA CORPORATION) EDWARDSVILLE, PA

APPLICANT MAKES NO CLAIM TO THE EXCLUSIVE USE OF THE WORD "DIAMOND" APART FROM THE MARK AS SHOWN IN THE DRAWINGS, BUT RESERVES ANY COMMONLAW RIGHTS IT MAY HAVE THEREIN.

FOR: [ RENDERING OF TECHNICAL AID AND ASSISTANCE IN THE ESTABLISHMENT AND/OR OPERATION OF RETAIL JEWELRY STORES ], IN CLASS 35 (U.S. CLS. 100, 101 AND 102).
FIRST USE 5-26-1977; IN COMMERCE 5-26-1977.

FOR: RETAIL JEWELRY STORE SERVICES, IN CLASS 42 (U.S. CL. 101).
FIRST USE 11-0-1976; IN COMMERCE 3-11-1977.
SER. NO. 73-169,527, FILED 5-8-1978.

*In testimony whereof I have hereunto set my hand and caused the seal of The Patent and Trademark Office to be affixed on Oct. 2, 2001.*

DIRECTOR OF THE U.S. PATENT AND TRADEMARK OFFICE

Int. Cls.: 35 and 42

Prior U.S. Cl.: 101

## United States Patent and Trademark Office

**Reg. No. 1,140,958**
Registered Oct. 28, 1980

## SERVICE MARK
### Principal Register

# VAN SCOY DIAMOND MINE

Van Scoy Diamond Mines, Inc. (Pennsylvania corporation)
Gateway Shopping Center
Edwardsville, Pa. 18704

For: RENDERING OF TECHNICAL AID AND ASSISTANCE IN THE ESTABLISHMENT AND/OR OPERATION OF RETAIL JEWELRY STORES, in CLASS 35 (U.S. Cl. 101).
First use May 26, 1977; in commerce May 26, 1977.

For: RETAIL JEWELRY STORE SERVICES, in CLASS 42 (U.S. Cl. 101).
First use Nov. 1976; in commerce Mar. 11, 1977.
Applicant makes no claim to the exclusive use of the word "Diamond" apart from the mark as shown in the drawings, but reserves any commonlaw rights it may have therein.

Ser. No. 169,527, filed May 8, 1978.

ROBERT PEVERADA, Primary Examiner



1345723

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

### UNITED STATES DEPARTMENT OF COMMERCE

#### United States Patent and Trademark Office

**July 20, 2005**

THE ATTACHED U.S. TRADEMARK REGISTRATION *1,140,711* IS CERTIFIED TO BE A TRUE COPY WHICH IS IN FULL FORCE AND EFFECT WITH NOTATIONS OF ALL STATUTORY ACTIONS TAKEN THEREON AS DISCLOSED BY THE RECORDS OF THE UNITED STATES PATENT AND TRADEMARK OFFICE.

REGISTERED FOR A TERM OF *20* YEARS FROM   *October 21, 1980*
*1st* RENEWAL FOR A TERM OF *10* YEARS FROM   *October 21, 2000*
SECTION 8 & 15
AMENDMENT/CORRECTION/NEW CERT(SEC7) ISSUED
SAID RECORDS SHOW TITLE TO BE IN:
   *VAN SCOY, WAYNE*
   *AN IDIVIDUAL OF THE UNITED STATES*

By Authority of the

Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

N. WILLIAMS

**Certifying Officer**

Int. Cl.: 14

Prior U.S. Cl.: 28

Reg. No. 1,140,711

**United States Patent and Trademark Office**    Registered Oct. 21, 1980

10 Year Renewal/New Cert.    Renewal Term Begins Oct. 21, 2000

## TRADEMARK
## PRINCIPAL REGISTER
## REGISTRATION ASSIGNED

### VAN SCOY DIAMOND MINE

VAN SCOY, WAYNE (UNITED STATES CITIZEN)
154 MUNDY STREET
WILKES-BARRE, PA 18702, BY ASSIGNMENT VAN SCOY DIAMOND MINES, INC. (PENNSYLVANIA CORPORATION) EDWARDSVILLE, PA
APPLICANT MAKES NO CLAIM TO THE EXCLUSIVE USE OF THE WORD "DIAMOND" APART FROM THE MARK AS SHOWN, BUT RESERVES ANY COMMON LAW RIGHTS IT MAY HAVE THEREIN.

FOR: JEWELRY AND PRECIOUS STONES, IN CLASS 14 (U.S. CL. 28).

FIRST USE 3-11-1977; IN COMMERCE 3-11-1977.

SER. NO. 73-169,526, FILED 5-8-1978.

*In testimony whereof I have hereunto set my hand and caused the seal of The Patent and Trademark Office to be affixed on Oct. 2, 2001.*

DIRECTOR OF THE U.S. PATENT AND TRADEMARK OFFICE

Int. Cl.: 14

Prior U.S. Cl.: 28

United States Patent and Trademark Office

Reg. No. 1,140,711
Registered Oct. 21, 1980

## TRADEMARK
### Principal Register

# VAN SCOY DIAMOND MINE

Van Scoy Diamond Mines, Inc. (Pennsylvania corporation)
Gateway Shopping Center
Edwardsville, Pa. 18704

For: JEWELRY AND PRECIOUS STONES, in CLASS 14 (U.S. Cl. 28).

First use Mar. 11, 1977; in commerce Mar. 11, 1977.

Applicant makes no claim to the exclusive use of the word "Diamond" apart from the mark as shown, but reserves any common law rights it may have therein.

Ser. No. 169,526, filed May 8, 1978.

ROBERT PEVERADA, Primary Examiner

# EXHIBIT B

IN THE UNITED SaTATES DISTRICT COURT
THE DISTRICT OF DELAWARE

WAYNE VAN SCOY      :
     PLAINTIFF  :  C.A.NO. 05-108 (KAJ)
          :
    V.      :
          :
VAN SCOY DIAMOND MINE OF :
DELAWARE, INC., :    :
KURT VAN SCOY AND    :
DONNA VAN SCOY     :
     DEFENDANTS :
          :

---

## DECLARATION OF WAYNE VAN SCOY

I, Wayne Van Scoy, declare and say as follows:

1. I am the Plaintiff in this action.

2. The United States Patent and Trademark Office granted on October 21, 1980 Federal Trademark Registration No. 1,140,711 for the mark "VAN SCOY DIAMOND MINE" and granted on October 28, 1980 Federal Service Mark Registration No. 1,140,958 for the mark "VAN SCOY DIAMOND MINE" (the "Marks at Issue") to my father's corporation Van Scoy Diamond Mine, Inc. Both Registrations are in full force and effect and have been made incontestable under Section 15 of the Trademark Act

3. I acquired the Marks at Issue along with the Registrations and associated good will pursuant to a settlement approved by the United States Bankruptcy Court for the Middle District of Pennsylvania by its Order of January 4, 2001. I have renewed the Registrations in my name. My corporation Rings of Romance, Inc. owns and operates a

jewelry store in Wilkes-Barre, Pennsylvania under the mark "VAN SCOY DIAMOND MINE."

4.    Starting in the late 1970's until approximately 1993 my father's corporation Van Scoy Diamond Mine, Inc. licensed the Marks at Issue to jewelry stores along the East Coast of the United States.  Individual licensees were licensed to operate Van Scoy Diamond Mine stores in geographic markets that were separate from the geographic markets of other licensees and from any stores operated personally by my father or his corporation.

5.    In approximately 1993 my father (acting on behalf of his corporation) conveyed limited geographic rights to the Marks at Issue to several of his former licensees for use in limited geographic territories.  In the context of the retail jewelry store business, these limited geographic territories were separate markets from each other.

6.    Besides the license granted to my own corporation, Rings of Romance, Inc. d/b/a Van Scoy Diamond Mine, and the license granted to my brother-in-law, Rick Sendrick, there has been no other licensing of the Marks at Issue since 1993.  I have since I became owner of the marks "VAN SCOY DIAMOND MINE" overseen the operations of my licensees.

7.    I have continuously used the marks "VAN SCOY DIAMOND MINE" in connection with my retail jewelry store since the termination of Defendants' alleged license by my Cease and Desist Letter of November 18, 2004.

8.    My predecessor used the marks "Van Scoy Diamond Mine" continuously between 1977 and 1993 in connection with his retail jewelry stores.

9.     My predecessor father filed for Chapter 13 bankruptcy on September 23, 1994 in the United States Bankruptcy Court for the Middle District of Pennsylvania.

10.     The United States Bankruptcy Court for the Middle District of Pennsylvania forced the closure of the "VAN SCOY DIAMOND MINE" store operated by my predecessor in Wilkes-Barre, Pennsylvania between December 29, 1994 and November 1995. At all times during this period it was intended as soon as possible to re-open and continue operation as a "VAN SCOY DIAMOND MINE." My corporation Rings of Romance, Inc. d/b/a VAN SCOY DIAMOND MINE reopened the store in November 1995.

11.     Between September 17, 1999 and January 4, 2001 I along with several of my family members were enjoined by order of the United States Bankruptcy Court for the Middle District of Pennsylvania from use of the marks "VAN SCOY DIAMOND MINE." I changed the name of my store to "VAN SCOY DIAMOND CENTER" after I was enjoined but at all times I intended to resume use of the name "VAN SCOY DIAMOND MINE" as soon as I was permitted.

12.     I expended a great deal of effort and finances acquiring the marks "Van Scoy Diamond Mine" along with their Registrations and associated goodwill pursuant to a settlement of the bankruptcy of my predecessor.

13.     I have used the marks "VAN SCOY DIAMOND MINE" continuously since January, 2001 in connection with my jewelry store in Wilkes-Barre, Pennsylvania on *inter alia* bags given to customers, jewelry boxes, sales receipts and in numerous radio advertisements.

14.    I renewed the Registrations for the Marks at Issue in my own name by applications in April 2001, the renewals being effective as of October, 2000.

15.    I have personal knowledge of the facts set forth in this Declaration unless specifically indicated otherwise.

Wayne Van Scoy deposes and says that he is the Plaintiff in this matter; that the foregoing is true and correct to the best of his knowledge and belief, that statements made on information and belief are believed to be true; and that pursuant to 28 U.S.C. §1746, he declares under penalty of perjury that the foregoing is true and correct.

Date: _10-18-05_

_____
Wayne Van Scoy
Plaintiff

# EXHIBIT C



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Van Scoy

## v.

# Van Scoy Diamond Mine of Delaware, Inc.

## C.A. # 05-108 (KAJ)

---

### Transcript of:

### Kurt Van Scoy

### July 26, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com



Van Scoy                         v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy        C.A. # 05-108 (KAJ)        July 26, 2005

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

WAYNE VAN SCOY,                )
                              )
            Plaintiff,         )
                              )
v.                            )     Civil Action No.
                              )        05-108 (KAJ)
VAN SCOY DIAMOND MINE OF       )
DELAWARE, INC., KURT VAN SCOY  )
and DONNA VAN SCOY,            )
                              )
            Defendants.        )

        Video deposition of KURT VAN SCOY taken
pursuant to notice at the offices of Ashby & Geddes, 17th
Floor, 222 Delaware Avenue, Wilmington, Delaware,
beginning at 10:00 a.m. on Tuesday, July 26, 2005, before
Anne L. Adams, Registered Professional Reporter and
Notary Public.

APPEARANCES:

            MICHAEL F. PETOCK, ESQ.
            MICHAEL C. PETOCK, ESQ.
            PETOCK & PETOCK
            46 The Commons at Valley Forge
            1220 Valley Forge Road
            Valley Forge, Pennsylvania 19482-0856
            for the Plaintiff,

            CHARLES N. QUINN, ESQ.
            FOX ROTHSCHILD
            2000 Market Street, 10th Floor
            Philadelphia, Pennsylvania 19103-3291
            for the Defendants.

ALSO PRESENT:   Wayne Van Scoy
                Donna Van Scoy
                Lisa Bauer - Video Specialist

------------------------------------------------------
                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477

237c0978-7df2-492f-be79-16c76b54a422

Van Scoy                                          v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy              C.A. # 05-108 (KAJ)       July 26, 2005

---

Page 2

1        VIDEO SPECIALIST: This is the videotaped
2   deposition of Kurt Van Scoy taken by the plaintiff in the
3   matter of Wayne Van Scoy versus Van Scoy Diamond Mine of
4   Delaware, Incorporated, et al., held in the office of
5   Ashby & Geddes on July 26, 2005, at 10 a.m.
6        The court reporter is Anne Adams from the
7   firm of Wilcox & Fetzer. My name is Lisa Bauer, a video
8   specialist from Discovery Video Services, Incorporated,
9   in association with Wilcox & Fetzer.
10       Counsel will now introduce themselves.
11       MR. PETOCK: Michael C. Petock for
12   plaintiff, Wayne Van Scoy.
13       MR. F. PETOCK: Michael F. Petock for
14   plaintiff, Wayne Van Scoy.
15       MR. W. VAN SCOY: Wayne Van Scoy, plaintiff.
16       MR. QUINN: Charles N. Quinn for the
17   defendants.
18       VIDEO SPECIALIST: The court reporter will
19   now swear in the witness.
20            KURT VAN SCOY,
21       the witness herein, having first been
22       duly sworn on oath, was examined and
23   r   testified as follows:
24            EXAMINATION

---

Page 3

1   BY MR. PETOCK:
2   Q.  Good morning, Kurt.
3   A.  Good morning.
4   Q.  I'm going to ask you some questions today to see
5   what you know about the facts giving rise to this
6   lawsuit. If you don't understand a question, ask me to
7   repeat it. If you don't understand the substance of a
8   question, tell me so I can rephrase it. If you realize
9   that an earlier answer you gave was inaccurate or
10  incomplete, just let me know and you will be allowed to
11  go back and supplement your earlier answer.
12       During this deposition, you are not allowed
13  to consult with your attorney about the substance of the
14  deposition. In other words, you can't talk to your
15  attorney about the deposition testimony that you either
16  have given or you anticipate to give. Do you understand
17  that?
18  A.  Yes.
19  Q.  That includes during recesses also.
20       MR. QUINN: And what is your authority for
21  that proposition?
22       MR. PETOCK: We have a case. I can pull it
23  out if you would like.
24       MR. QUINN: I would to see it.

---

Page 4

1        MR. F. PETOCK: We can do that later.
2        MR. QUINN: We can go forward, but I would
3   like to see that case.
4        MR. PETOCK: Sure. No problem.
5        MR. F. PETOCK: There is definitely case law
6   here in this district that holds that.
7        MR. QUINN: I would like to see it.
8   BY MS. VAUGHAN:
9   Q.  During the deposition, I will, from time to time,
10  I will refer to your father, Thomas Van Scoy, Senior.
11  A.  Yes.
12  Q.  Unless the context is clearly contrary, when I
13  refer to your father, I'm also referring to your father's
14  company, Van Scoy Diamond Mine, Inc.
15  A.  Okay.
16  Q.  Do you understand the instructions as I have
17  given them to you?
18  A.  Yes.
19  Q.  You have taken an oath this morning under the
20  penalty of perjury to tell the truth. Do you understand
21  that oath?
22  A.  Yes, I do.
23  Q.  Could you, please, you state your name and
24  address for the record?

---

Page 5

1   A.  Kurt Van Scoy; 820 Old Harmony Road, Newark,
2   Delaware.
3   Q.  You're married to Donna Van Scoy; is that
4   correct?
5   A.  Donna Marie Van Scoy, that's correct.
6   Q.  When did you two get married?
7   A.  July 31st, 1994.
8   Q.  Are you an owner of Van Scoy Diamond Mine of
9   Delaware, Inc.?
10  A.  I am the president.
11  Q.  Who else has an ownership -- are you an owner?
12  A.  I am owner, yes.
13  Q.  Who else has an ownership interest?
14  A.  Actually, my wife is secretary.
15  Q.  And what percentage ownership do you have?
16  A.  We are 50/50.
17  Q.  You have a 50 percent ownership and Donna has a
18  50 percent ownership interest?
19  A.  Yes.
20  Q.  And you said you're president?
21  A.  Correct.
22  Q.  Do you make the decisions for the corporation?
23  A.  I do.
24  Q.  So you authorize and approve the advertising of

---

Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

Page 6

1   the corporation?
2       A.  Yes, I do.
3       Q.  Do you authorize and approve what trade name to
4   use?
5       A.  I don't understand the question.
6       Q.  Do you make the decisions as to what trade name
7   to use?
8       A.  Yes.
9           MR. PETOCK:  I would like to have this
10  marked as Exhibit 1, please.
11          (Van Scoy Deposition Exhibit No. 1, Meeting
12  Minutes of August 22, 1996, was marked for
13  identification.)
14  BY MR. PETOCK:
15      Q.  Kurt, can you please tell me what you have in
16  front of you that has been marked Exhibit 1?
17      A.  This is the minutes from a corporate meeting.
18      Q.  Okay. I'm particularly interested in bullet point
19  Number 3, the trade name issues.  What trade name issues
20  were discussed in this corporate meeting?  It was a
21  special meeting of the board of directors; is that
22  correct?
23      A.  That would be correct.
24      Q.  That took place on August 22nd, 1996?

Page 7

1       A.  Correct.
2       Q.  Could you, please, tell me what the trade name
3   issues that were discussed were?
4       A.  I don't remember.
5       Q.  You have no recollection of what trade name
6   issues were discussed?
7       A.  1996, that's nine years ago.  I don't remember.
8       Q.  Would you -- what did you mean by trade name
9   issues?
10      A.  I don't remember.
11      Q.  Is there any reason that you would have been
12  talking about trade name issues in 1996?
13      A.  None whatsoever.  I don't remember.
14      Q.  Is it common for you to have discussed trade name
15  issues at corporate meetings?
16      A.  I don't recall.
17      Q.  Did you talk about trade name issues at your last
18  corporate meeting?
19      A.  To be -- I don't recall.  I don't know.
20      Q.  You don't remember -- do you remember your last
21  corporate meeting?
22      A.  Briefly, but I don't recall any issues about
23  trade name issues.
24      Q.  When was your last corporate meeting?

Page 8

1       A.  Offhand, I don't know.
2       Q.  Do you hold corporate meetings on a regular
3   basis?
4       A.  We do once a year, twice a year sometimes, yes.
5       Q.  Do you remember what trade name you were using at
6   the time in 1996, August 22nd?
7           MR. QUINN:  Objection.  Define trade name.
8       Q.  Kurt, could you define trade name issues to what
9   it means to you today?
10      A.  It's the name of my business.
11      Q.  Which is what?
12      A.  Van Scoy Diamond Mine of Delaware, Incorporated.
13      Q.  Is it the name you use in your advertising?
14      A.  Actually, no.
15      Q.  How is it different?
16      A.  It's Van Scoy Diamond Mine.  That's what my
17  father gave me.
18      Q.  What do you mean your father gave you the name
19  Van Scoy Diamond Mine?  Could you explain that to me?
20      A.  I sure will.  In 1994, prior opening of our
21  business on November 12th, my father actually gave me the
22  sign, literally gave me the sign, Van Scoy Diamond Mine,
23  from our warehouse and actually brought that down to our
24  location here in Delaware.

Page 9

1       Q.  What was the date that he gave you the sign that
2   said Van Scoy Diamond Mine?
3       A.  The exact date I can't recall.  I know it was
4   roughly, probably, about a month prior to the November
5   12th.  So I would have to say sometime in October.
6       Q.  November 12th was the opening of your store?
7       A.  That is correct.
8       Q.  Does that sign still exist?
9       A.  Absolutely.
10      Q.  Is it on your store now?
11      A.  Yes, it is.
12      Q.  Does it say Van Scoy or does it say Van Scoy
13  Diamond Mine?
14      A.  It says Van Scoy Diamond Mine.
15      Q.  Where is that located on your store?
16      A.  On the front of the store.
17      Q.  Did your dad actually tell you you had permission
18  to the use the mark or did you infer that from the fact
19  that he gave you the sign?
20      A.  He gave me the right to use that name.
21      Q.  What did he say to you exactly?
22      A.  Here's the sign.  Good luck to you.  I love you
23  very much and I'm proud of you.
24      Q.  Getting back to the minutes, your testimony is

3 (Pages 6 to 9)

Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

Page 10

1   that you have no recollection of what trade name issues
2   were discussed?
3       A. At that time, no.
4       Q. At this time no or at that time no?
5       A. At that time -- well, this time, no.
6           MR. QUINN: Clarify that. Is the question
7   does he have any recollection now or what happened then?
8           MR. PETOCK: Obviously, yes.
9   BY MR. PETOCK:
10      Q. Do you have any recollection --
11          MR. QUINN: It sounded like you were asking
12  whether he had recollection now of what's going on now as
13  opposed to recollections now of what went on then.
14  BY MR. PETOCK:
15      Q. Your testimony is that you have no
16  recollection --
17          MR. QUINN: Let me get my objection out.
18          MR. F. PETOCK: You are leading the witness.
19  You are coaching the witness.
20          MR. QUINN: I'm making an objection.
21          MR. F. PETOCK: Objection as to the form of
22  the question. That's all you're allowed to do.
23          MR. QUINN: We didn't have any stipulations
24  on the record as far as the objections. If you want to

Page 11

1   put them on, that's fine.
2           MR. F. PETOCK: That's all you're allowed to
3   do, objection as to the form of the question.
4           MR. QUINN: All objections are reserved,
5   correct?
6           MR. F. PETOCK: Except as to form of the
7   question, right.
8           MR. QUINN: Except as to the form of the
9   question, is that stipulated?
10          MR. PETOCK: Yes.
11          MR. QUINN: Okay.
12  BY MR. PETOCK:
13      Q. Do you remember who was present at that meeting?
14      A. I don't.
15      Q. Who would have been present? Who is normally
16  present at a corporate meeting?
17      A. Myself --
18          MR. QUINN: Objection. That's two
19  questions.
20  BY MR. PETOCK:
21      Q. Who is normally present at a corporate meeting?
22      A. Me.
23      Q. Is there anyone that would remember what trade
24  name issues were discussed?

Page 12

1       A. Nine years ago, no.
2       Q. What other -- any other documents exist as to
3   what went on at this meeting?
4       A. No.
5       Q. You said you were the only person present at the
6   meeting?
7       A. Well, me, my accountant, he was present. And
8   usually at my meetings, that's usually who is there.
9       Q. Donna isn't usually present?
10      A. Sometimes.
11      Q. Where did this meeting take place?
12      A. I don't recall. Again, you are asking me
13  something nine years. I don't recall.
14      Q. Was it at 1218 South Main?
15      A. Obviously, then that's where it would be.
16      Q. What is that location? What location is 1218
17  South Main in Wilkes-Barre?
18      A. That would be -- I would ask the other attorney,
19  if I'm not mistaken, the attorney I had from back home.
20      Q. What was his name?
21      A. Argood, Pat Argood.
22          MR. PETOCK: I would like to have this
23  marked as Exhibit 2.
24          (Van Scoy Deposition Exhibit No. 2, Cease

Page 13

1   and Desist Letter, was marked for identification.)
2   BY MR. PETOCK:
3       Q. Can you tell me what you have in front of you
4   that has been marked as Exhibit 2?
5       A. A notification via filing a suit towards me for
6   using the name Van Scoy.
7       Q. I'm going to refer to this as a cease and desist
8   letter. Is that okay? Is that understood?
9       A. That's fine.
10      Q. Did you receive this cease and desist letter?
11      A. Yes.
12      Q. Do you remember the approximate date that you
13  received it?
14      A. November the 18th, 2004.
15      Q. After you received the cease and desist letter,
16  did you continue to direct the acts of your corporation?
17      A. I did because I believe this was in disbelief.
18      Q. What do you mean you believe it was in disbelief?
19      A. I wasn't aware of a trademark.
20      Q. You weren't aware of -- what do you mean? Could
21  you explain that further, you weren't aware of a
22  trademark?
23      A. When I received this letter, this is the first
24  time I knew anything, certainly, about a trademark for

4 (Pages 10 to 13)

Van Scoy
Kurt Van Scoy

v. Van Scoy Diamond Mine of Delaware, Inc.

C.A. # 05-108 (KAJ)    July 26, 2005

Page 14

1  Van Scoy Diamond Mine.
2      Q.  So after you received this cease and desist
3  letter, you continued to authorize and approve the
4  advertising of the corporation?
5      A.  I seeked counsel.
6      Q.  And you continued to author and approve -- is
7  that a yes?
8      A.  That is a yes.
9      Q.  Did you continue to author and approve what
10  trademark to use?
11      A.  Yes.
12      Q.  And did you continue to authorize and approve the
13  design and publication of the website hosted at
14  vanscoydiamondmine.com?
15      A.  After I seeked counsel, we agreed to, actually to
16  shut it down until we find out the results.
17      Q.  Of this litigation?
18      A.  Correct.
19      Q.  Did you review all of our requests for documents
20  that you have received during this discovery period?
21      A.  Yes.
22      Q.  Have you produced everything that we have asked
23  for?
24          MR. QUINN:  The record's clear that we

Page 15

1  produced representative samples in many cases.  And we
2  invited you to come to the premises to make the copies.
3          MR. PETOCK:  Okay.  I'm going to ask Kurt to
4  answer the questions.
5          MR. QUINN:  Well, as best he can.
6          MR. PETOCK:  Well, that doesn't mean you
7  have the right to answer.  If he can't, he can say he
8  doesn't know or something to that effect.
9          MR. QUINN:  He can say whatever he knows.
10          THE WITNESS:  I don't know.
11          MR. PETOCK:  I'm going to have this marked
12  as Exhibit 3, please.
13          (Van Scoy Deposition Exhibit No. 3, Letter
14  to Fox Rothschild Dated February 22, 2005, was marked for
15  identification.)
16  BY MR. PETOCK:
17      Q.  Could you tell me what you have in front of you
18  that's been marked as Exhibit 3?
19      A.  This is, obviously, the beginning of a suit for
20  using the name.
21      Q.  It's, actually, it's a letter addressed to your
22  lawyer, Charlie, correct?
23      A.  Correct.
24      Q.  Do you remember if this letter was forwarded to

Page 16

1  you?
2      A.  I believe so.
3      Q.  Did Mr. Quinn inform you that you had an
4  obligation to preserve evidence during this litigation,
5  including electronic evidence such as your website?
6          MR. QUINN:  Objection to the extent that
7  that asks for a question involving the attorney/client
8  privilege.
9  BY MR. PETOCK:
10      Q.  Did you review this letter when you got it?
11      A.  Yes.
12      Q.  Did you know you had an obligation to preserve
13  evidence?
14      A.  Yes.
15      Q.  Could you tell me why you have not turned over
16  any files related to your website hosted at
17  vanscoydiamondmine.com?
18      A.  I don't understand the question.
19      Q.  We have asked for documents related to your
20  website that was hosted at vanscoydiamondmine.com.  You
21  did have a website at vanscoydiamondmine.com at one time,
22  correct?
23      A.  Correct.
24      Q.  And, in fact, when you received your cease and

Page 17

1  desist letter, that was where your website was hosted,
2  correct?
3      A.  Yes.
4          MR. QUINN:  Clarify the question.
5          MR. PETOCK:  Okay.
6          MR. QUINN:  You said that was where the
7  website was hosted?
8          MR. PETOCK:  He said yes.  He said yes.  I
9  don't see why I need to clarify the question.
10          MR. QUINN:  So I can understand it.
11          MR. F. PETOCK:  It's not for you — if the
12  witness doesn't understand the question, he can say he
13  doesn't understand it.  It's for the witness to
14  understand the question.
15          MR. QUINN:  Well, if I can't understand the
16  question, how can I advise this guy?
17          MR. PETOCK:  You're not advising him.
18          MR. QUINN:  I'm certainly going to advise
19  him after this deposition is over.  If I can't understand
20  what the question was when it was asked, I can't advise
21  him after it's over.
22          MR. PETOCK:  You can argue about that later.
23          MR. QUINN:  And we certainly will.
24  BY MR. PETOCK:

5 (Pages 14 to 17)

Van Scoy                              v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy        C.A. # 05-108 (KAJ)        July 26, 2005

---

Page 18

1    Q.  You said that you had a website hosted, that
2    there was a website that was hosted at
3    vanscoydiamondmine.com, that was where your website was,
4    correct?
5    A.  Yes.
6         MR. QUINN:  Wait a minute.  At
7    vanscoydiamondmine.com does not define a geographic
8    place.
9         MR. PETOCK:  It's not a geographic place.
10   It's a place on the internet.
11        MR. QUINN:  That's the inference that you
12   were trying to draw from the witness a minute ago.
13        MR. PETOCK:  Charlie, you know quite well
14   that that question is clear.
15        MR. QUINN:  If you clarify what you mean by
16   at, then it's clear.  But an ordinary listener reading
17   that transcript could conclude that the question inquires
18   as to whether the website was at the jewelry store.
19        MR. PETOCK:  At vanscoydiamondmine.com is a
20   domain name.
21        MR. QUINN:  That's correct.
22   BY MR. PETOCK:
23   Q.  You had a domain name vanscoydiamondmine.com?
24   A.  Yes.

---

Page 19

1    Q.  And your website was hosted at
2    vanscoydiamondmine.com.  Yes?
3    A.  I still don't understand the question.
4    Q.  You understood it before.
5    A.  I know, but something -- I don't understand the
6    question.
7    Q.  If someone is surfing the internet, was to type
8    in vanscoydiamondmine.com, www.vanscoydiamondmine.com,
9    your website would show up on their computer; is that
10   correct?
11   A.  Correct.
12   Q.  Now, we asked for you to give is a printout of
13   that website.  You did not produce that.
14   A.  That's something I needed to talk to counsel.
15   Q.  No, I'm asking you.  We asked you to produce it
16   but did you not produce it.  Could you tell me why it
17   wasn't produced?  Was that website destroyed?
18        MR. QUINN:  How many questions are you going
19   to ask at one time?
20        THE WITNESS:  I don't know.
21        MR. QUINN:  Don't answer until he decides
22   which question you're to answer.
23   BY MR. PETOCK:
24   Q.  Was the website that we are talking about,

---

Page 20

1    vanscoydiamondmine.com, any records of it destroyed?
2    A.  I don't know.
3    Q.  You don't know whether the records were
4    destroyed?
5    A.  I don't know.
6    Q.  Okay.  Could you tell me the names of your
7    brothers and sisters?
8    A.  Sure will.  Tommy Van Scoy, Sr.  And, I'm sorry,
9    Junior.  Tony Van Scoy, Betsy Williams, Pam Sendrick,
10   Wayne Van Scoy, Ken Van Scoy, my deceased brother, Keith
11   Van Scoy, and myself, Kurt Van Scoy.
12   Q.  Can you tell me where Tommy Van Scoy lives, Tommy
13   Van Scoy, Jr.?
14   A.  In Dallas, Pennsylvania.
15   Q.  He owns a jewelry store by the name of Tovon; is
16   that correct?
17   A.  Correct.
18   Q.  That's approximately an eighth of a mile from
19   where Wayne's store is located right now; is that
20   correct?
21   A.  I believe so.
22   Q.  So he's in direct competition with Wayne's store?
23   A.  I would say so.
24   Q.  You helped finance Tommy opening up his jewelry

---

Page 21

1    store; is that correct?
2    A.  No.
3    Q.  Did you cosign in some way on the loan?
4    A.  No.
5    Q.  In any way?
6    A.  No.
7    Q.  Did you help him, in any way, opening his jewelry
8    store?
9    A.  No.
10   Q.  When was the last time you have spoken to Tommy?
11   A.  Yesterday actually.
12   Q.  What did you guys speak about yesterday?
13   A.  How's things going?  What's going on?  How's the
14   kids?
15   Q.  Do you guys have any sort of business
16   relationship at all?
17   A.  No.
18   Q.  Do you supply him with anything?
19   A.  Absolutely not.
20   Q.  Have you -- do you send him things?
21   A.  No.
22        MR. PETOCK:  I would like to have this
23   marked as the next exhibit.
24        (Van Scoy Deposition Exhibit No. 4, UPS

---

6 (Pages 18 to 21)

Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy        C.A. # 05-108 (KAJ)            July 26, 2005

---

Page 22

1  Invoices, was marked for identification.)
2  BY MR. PETOCK:
3    Q.  You just testified that you do not send Tommy
4  Van Scoy anything. Could you tell me what you have in
5  front of you?
6         MR. QUINN: I think that's a
7  mischaracterization of his testimony.
8         MR. PETOCK: All you need to say is
9  objection. You stipulated to the fact that objecting to
10 the form of the question is the only objection you need.
11 You are coaching the witness. You are instructing the
12 deposition.
13        MR. QUINN: Well, if it's a
14 mischaracterization, that's a pretty specific objection
15 as to the form.
16        MR. PETOCK: You are coaching the witness by
17 saying that. There is no question about it. And I know
18 this. I mean, I even know this.
19        How am I mischaracterizing his testimony
20 when I asked when he said --
21        MR. QUINN: He hadn't answered the question.
22 He just restated what he said in the answer.
23 BY MR. PETOCK:
24    Q.  Could you tell me what this is?

Page 23

1         MR. QUINN: You can have the answer read
2  back. You can have the question read back.
3  BY MR. PETOCK:
4    Q.  Could you tell me what has been marked as
5  Plaintiff's Exhibit 4, please?
6    A.  Sure. This, obviously, if you are talking about
7  business related stuff, I have to say no. I know there
8  is times he stayed down and, actually, stuff that was
9  left at my house from his kids I know we shipped back to
10 his place.
11   Q.  Could you answer the question? I said: What is
12 this?
13   A.  It's a shipping, billing/shipping paper.
14   Q.  And what was -- is there a shipment from you to
15 Tommy or to Tovon?
16   A.  No. There is a name on there. It says Lori
17 McMichael.
18   Q.  Above Lori McMichael, what does it say?
19   A.  It says Van Scoy Diamond Mine.
20   Q.  What's the address of the Van Scoy Diamond Mine?
21   A.  1117 Churchmans Road.
22   Q.  Is that your Van Scoy Diamond Mine?
23   A.  Yes, it is.
24   Q.  Now, this is the UPS billing summary.

Page 24

1    A.  Yes.
2    Q.  The UPS billing summary on the third page, if you
3  look at this third page, this one was actually something
4  was sent from Tovon and Company in DuPont, PA, and the
5  receiver was Kurt.
6    A.  Okay.
7    Q.  Can you tell me what that was?
8    A.  I don't recall.
9    Q.  On February 12th, 2005, you can't remember
10 receiving anything from Tommy?
11   A.  No.
12   Q.  Do you receive many things in the mail or through
13 courier services from Tommy?
14   A.  Many? No.
15   Q.  How often?
16   A.  If I'm up there, I forget something, he'll send
17 it down to me. I get packages from my other brothers, my
18 sister.
19   Q.  And yet -- so it's not that afternoon that you
20 can't remember February 12th, 2005, what he sent to you?
21   A.  What was sent to me, no.
22   Q.  Let's look at the FedEx on the billing receipt.
23 Do you remember this? Do you agree that this FedEx
24 billing summary shows something being sent from Van Scoy

Page 25

1  Diamond Mine in Newark, Delaware, at 1117 Churchmans Road
2  to Tommy on February 25th, 2004, at Tovon and Company?
3    A.  Again, that's -- yes.
4    Q.  You don't remember what you sent him; is that
5  your testimony?
6    A.  There is a name there, Lori. I'm not Lori.
7    Q.  Are you in charge of Lori? Is she your employee?
8    A.  She's an employee.
9         MR. QUINN: That's two questions. Ask them
10 one at a time, please.
11 BY MR. PETOCK:
12   Q.  Is she your employee?
13   A.  Yes.
14   Q.  Would you have directed her to send something to
15 Tommy or would you have directed something -- would you
16 have directed her to send something to Tommy?
17   A.  Sure, yeah.
18   Q.  She wouldn't have just sent it on her own?
19   A.  No. If he left something there, yeah, send it,
20 just send it back.
21   Q.  How often does Tommy come to your store?
22   A.  He comes to my residence. Maybe half a dozen
23 times through the year roughly.
24   Q.  Your testimony is that you can't remember what

Wilcox & Fetzer, Ltd.    Professional Court Reporters        (302)655-0477
237c0978-7df2-492f-be79-16c76b54a422

Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

Page 26

1  you sent to him on February 25th.
2     A.  No.
3        MR. QUINN:  That's not a question.
4     Q.  You can't remember what you sent to him on
5  February 25th.
6        MR. QUINN:  That's still not a question.
7     Q.  Can you remember what you sent to him on February
8  25th?
9     A.  No.
10    Q.  Do you have aspirations of one day owning the
11  Mundy Street store?
12    A.  No.
13    Q.  Does Tommy?
14    A.  I'm not Tommy.  I can't answer that question.
15    Q.  Have you ever heard Tommy say that one day I'll
16  own the Mundy Street store?
17    A.  Not to my knowledge.
18    Q.  Are you aware of him ever saying that to anyone
19  else?
20    A.  No.  I live in Delaware.
21    Q.  Where does Tony live?
22    A.  Tony, Forty Ft., Pennsylvania.
23    Q.  What's his occupation?
24    A.  Jeweler.

Page 27

1     Q.  What is -- does he have a store?
2     A.  He does.
3     Q.  Does he own the store?
4     A.  I don't know.  I don't know.
5     Q.  Do you know what the name of the store is?
6     A.  I think it's Van Scoy Jewelers.
7     Q.  Do you know how long he has either owned or
8  operated that store?
9     A.  I don't know.  25 years roughly.
10    Q.  Continuously?
11    A.  I don't know that.
12    Q.  Are you friendly with Tony?
13    A.  I speak to him.
14    Q.  How often?
15    A.  Maybe once every other day.  He's my brother.
16    Q.  What have you spoken to him about concerning this
17  case?
18    A.  Not much.
19    Q.  What specifically?
20    A.  Just what's going on?  Being sued by my brother,
21  Wayne.  That's all.
22    Q.  Nothing more specific?
23    A.  No.
24    Q.  Where does Betsy live?

Page 28

1     A.  It's a nursing home in Binghamton, New York.
2     Q.  She doesn't work; is that correct?
3     A.  That's correct.  As far as I know.
4     Q.  And you haven't talked to her any time recently?
5     A.  No.
6     Q.  What about her husband?
7     A.  No.
8     Q.  Is Betsy sick right now?
9     A.  Yes.
10    Q.  Did she have an occupation before she got sick?
11    A.  She did.
12    Q.  What was that?
13    A.  Ran the jewelry store, Van Scoy Diamond Mine, in
14  Binghamton, New York.
15    Q.  How did you know the name was Van Scoy Diamond
16  Mine?
17    A.  I have been there.
18    Q.  When was the last time you were there?
19    A.  We go back about 12 years, probably 12, 13 years.
20    Q.  When do you believe she stopped running the
21  store?
22    A.  I don't know.
23    Q.  Approximately?
24    A.  I don't know.

Page 29

1     Q.  Was it 13 years ago?
2     A.  I don't know.
3     Q.  Why were you at the store 13 years ago?
4     A.  Because that was my job.  I had to go to the
5  store to work.
6     Q.  Did you work there?
7     A.  I worked for a weekend or a couple days to fill
8  in for her.  Sure.
9     Q.  Did your father own that store or --
10    A.  I'm not sure on that side of it.
11    Q.  What about Pam, where does she live?
12    A.  190 Sahara Drive, Kingston, PA.
13    Q.  What is her occupation?
14    A.  Housewife.
15    Q.  Are you friendly with her?
16    A.  She's my sister.
17    Q.  Are you friendly with her?
18    A.  She's my sister.
19    Q.  Are you friendly with Wayne?
20    A.  No.  Not right now, no.
21    Q.  Is he your brother?
22    A.  Yes, he is.
23    Q.  Are you friendly with Pam?
24    A.  She's my sister, yeah.

8 (Pages 26 to 29)

Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

Page 30

1   Q. How often do you talk to her?
2   A. Oh, God, once a week, if that.
3   Q. What have you discussed with her concerning this
4 case?
5   A. Actually, nothing. We are just more trying to
6 collect funds from everybody for my father's funeral and
7 his personal stuff that was not around.
8   Q. Has Pam ever owned a jewelry store or been in the
9 jewelry business?
10   A. Yeah. Her and her husband own a store in
11 Scranton, Pennsylvania.
12   Q. So she's not just a housewife. She also owns a
13 store?
14   A. Well, her husband runs the store. She stays
15 home.
16   Q. Do you have knowledge as to whether she owns that
17 store?
18   A. I believe she does have part ownership of that
19 store, yes.
20   Q. Who else would be an owner? Do you know?
21   A. Her husband, Rick Sendrick.
22   Q. Are you friendly with Rick?
23   A. I speak to him once in a while.
24   Q. What have you spoken with him -- have you spoken

Page 31

1 to him about this case?
2   A. Briefly a little bit, yeah.
3   Q. What did you guys talk about?
4   A. Off the top -- I don't recall. Just in general.
5   Q. When you say in general, what did you talk about?
6   A. Still in disbelief and wonder where his stocks
7 are and how ridiculous it really is. And that's really
8 just in general.
9   Q. Are you the one that thinks it's ridiculous?
10   A. Everybody does.
11   Q. What do you think is ridiculous?
12   A. The whole situation we're in.
13   Q. Which is what?
14   A. Being sued for using a name that was given to me.
15   Q. Is that the reason why you believe -- do you
16 believe you have a right to use the mark Van Scoy Diamond
17 Mine?
18   A. Absolutely.
19   Q. Are you using the mark Van Scoy Diamond Mine?
20   A. Yes.
21   Q. And the reason you believe that you have the
22 right to use -- why do you believe, specifically, you
23 have the right to use the mark Van Scoy Diamond Mine?
24   A. Because my father gave me the name.

Page 32

1   Q. Did your father put anything in writing when he
2 gave you the name?
3   A. I have things in writing. As a contract, there
4 was no contract. It was just he gave me the name and
5 said, good luck, I love you and I'm proud of you.
6   Q. And the approximate date that you said he gave
7 you the name was in October of 1994; is that correct?
8   A. Approximately that date, yes.
9   Q. Could it have been later?
10   A. No.
11   Q. Could it have been earlier?
12   A. Within a month I guess.
13   Q. Now, when he supposedly gave you the name --
14   A. Gave me the name.
15   Q. -- you knew he was bankrupt, right?
16   A. I knew he was going through a tough time with
17 that. Sure. Yes.
18   Q. One other question I want to ask you about Pam
19 and Rick's store is what mark is that. Do you know?
20 What mark are they using?
21   A. Van Scoy Diamonds. Well, the phone book say Van
22 Scoy Diamond Mine. The store says Van Scoy Diamonds.
23   Q. Have you seen the store recently?
24   A. I have not.

Page 33

1   Q. Do you know which one it is, which mark, whether
2 it's Van Scoy Diamond Mine or Van Scoy Diamonds.
3   A. No. As far as I know, it's Van Scoy Diamonds
4 that's outside the store itself. In the phone book it
5 says Van Scoy Diamond Mine.
6   Q. Where does Ken live?
7   A. He, actually, just got a new place. I'm not sure
8 what the address is of where Ken lives right now.
9   Q. What is his occupation?
10   A. He just, actually, works for my sister around the
11 house. He's just kind of doing some yard work for her.
12   Q. Which sister?
13   A. Pam.
14   Q. Are you friendly with Ken?
15   A. Yes. He's my brother.
16   Q. How often do you talk to him?
17   A. Just about every day.
18   Q. What have you discussed with him concerning the
19 case.
20   A. Pretty much the same as everybody else, just in
21 general, just what's going on, what's next and all that.
22   Q. What kind of relationship did you have with your
23 father?
24   A. Very good actually.

9 (Pages 30 to 33)

Van Scoy                                         v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy           C.A. # 05-108 (KAJ)              July 26, 2005

Page 34

1    Q.   Would you care to elaborate on that at all?
2         MR. QUINN:  Is that a question or not?
3         MR. PETOCK:  Yes, it is.
4         THE WITNESS:  I don't understand it.  What
5    do you mean?
6    BY MR. PETOCK:
7    Q.   Would you like to tell me more about your
8    relationship with your father?
9    A.   He's my father.  I'm his son.  I was his youngest
10   son.  He taught me the business.  I ran, managed the
11   stores in Connecticut, Hartford.  Traveled between
12   Springfield, Hartford and New Haven since I was,
13   actually, out of school.  And just did the business my
14   whole life.  Used to go with him when I was about 12, 13
15   years old to the radio stations, sit there and watch him
16   for about an hour-and-a-half make ads.  Had a good time
17   with my father.  He was a caring guy, respectful and was
18   a man of his word.  And I miss him.  He's a great guy.
19   Q.   You said you traveled to Hartford.
20   A.   Uh-huh.
21   Q.   Why did you travel the Hartford?
22   A.   Hartford, Springfield, because that where the
23   stores were.  He had stores up in the New England area.
24   And I managed the one in New Haven Connecticut for three

Page 35

1    years.
2    Q.   Did you travel -- have you visited all of those
3    New England stores?
4    A.   Just those three.  I was in Providence, Rhode
5    Island, with my dad when he used to go up to see the
6    franchises.
7    Q.   How often did your dad go to visit the
8    franchises?
9    A.   I can't recall.
10   Q.   But you would go with him sometimes?
11   A.   Sometimes I would go.  Sure.  I had no other
12   choice.
13   Q.   What would you do when you would visit these
14   franchises?  By the way, when I say the word "franchise,"
15   I'm not sure whether it was a franchise or not.  I just
16   mean the fact that your father licensed the mark.
17   A.   It was a franchise, yes.
18   Q.   What would you do when you go to these stores
19   with your father?
20   A.   He would sit down talk with somebody.  I'd
21   probably go grab something to eat.  I was young.  That's
22   one place you don't want to certainly be.
23   Q.   What years did this take place that you were
24   visiting your father's franchises?

Page 36

1    A.   '80, '81 -- oh, God.  I went to Connecticut in
2    '83.  I would say early '80s, early '80, 1980, 1981.
3    Q.   What was your position with the company at this
4    point?
5    A.   Garbage man, salesman, bench guy, light bulb
6    changer, car washer, wash the windows, everything.
7    Q.   Was Wayne also traveling with your father to meet
8    with franchises during this time?
9    A.   I don't recall to be honest with you.
10   Q.   Do you recall any of your other brothers and
11   sisters traveling to franchises?
12   A.   Some of them.  We all did once in a while.
13   Q.   Did you go to anywhere else besides New England
14   to visit the franchises?
15   A.   I did actually.
16   Q.   Where else?
17   A.   To the franchise down in Clear Water, Florida.
18   Q.   Did your father frequently visit the franchises?
19   A.   He made his rounds.  Again, at that time, I was
20   young.  I wanted to go play at the park instead of being
21   at work.
22   Q.   What was he doing making these rounds?
23   A.   Checking on the stores.  My recollection, is he
24   was checking on the stores and seeing what's going on

Page 37

1    and, obviously, trying to maintain the mark.
2    Q.   What kind of relationship did you have with Wayne
3    before the lawsuit?
4    A.   Well, do you want me to be honest?
5    Q.   Yes.
6    A.   I'm going to be honest.  Not good.  I remember
7    him from when I was a little kid.  I will never forget
8    one example.  I was riding a bicycle down Hamilton Park.
9    And there was about 30 people sitting across a lot that
10   they blocked the roads off.  And Hamilton Park was the
11   place to hang, if you will.  And I remember I had a bike.
12   And I had the choppers.  I cut the forks off of one and I
13   slid it on the other one and I'm running down.  And, boy,
14   I'm running popping a wheelie.  You know, I'm cool in
15   front of everybody when I was a kid.  The tire came off.
16   I fell.  Scraped up.  Everybody comes over.  Are you
17   okay?  Are you okay?  Are you okay?  He comes over.
18   Slaps me in the head.  Get on with it, quote, unquote,
19   asshole.  You're cool.  That's just the beginning.  I'm
20   going to go on.
21        Later on just growing up, he's just been
22   very -- I'm going to leave it at that.
23   Q.   He's your big brother?
24   A.   Middle.

Wilcox & Fetzer, Ltd.    Professional Court Reporters        (302)655-0477
237c0978-7df2-492f-be79-16c76b54a422

Van Scoy                              v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

Page 38

1   Q. Where did you live growing up?
2   A. 360 Joseph Drive, Kingston, Pennsylvania, 18704.
3   Q. Over the years, where else have you lived besides
4   that?
5   A. New Haven, Connecticut.
6   Q. When did you move originally from Wilkes-Barre?
7   Or from Kingston, is that where it was?
8   A. Kingston, yes. Kingston, when did I move? I
9   moved to, New England, actually, to Orange, Connecticut.
10  And that was in, I think it was 1983 to run the store in
11  New Haven for my dad.
12  Q. Was your dad the owner of the New Haven,
13  Connecticut, store?
14  A. Yes, he was.
15  Q. Just for the record, what business was your
16  father in?
17  A. The diamond business.
18  Q. Did he primarily hold himself out as a diamond
19  dealer?
20  A. He did, the diamond king.
21  Q. And was that all he sold, diamonds?
22  A. Diamonds, diamonds, jewelry.
23  Q. Diamonds and jewelry?
24  A. And jewelry, yeah. I'm sorry. Yeah, diamonds

Page 39

1   and jewelry.
2   Q. Was it primarily diamonds?
3   A. Yes.
4   Q. How did you father get into the diamond business?
5   A. He's, actually, he was a lieutenant in the Army,
6   from what remember him telling me, lieutenant in the
7   Army. And he saw another gentleman going around the
8   barracks, actually, fixing watches. And the other guys
9   would go out and hit the bars and all that and my father
10  would stay with this guy and go to different soldiers and
11  actually watch this guy fix watches. And then he started
12  doing it himself. And he got out of the service after
13  World War II. And he came home. He wasn't sure what he
14  was going to do. So he said he's going to be Tommy
15  Van Scoy, the GI jeweler. The rest is history from
16  there.
17  Q. He wrote a book, right?
18  A. Yes, he did.
19  Q. What is the name of that book?
20  A. You Can If You Want to. It's a copyright there.
21  Q. Have you read it?
22  A. Bits and pieces of it I have, yeah, bits and
23  pieces.
24  Q. You haven't read the entire thing?

Page 40

1   A. Not in a while. I, actually, I forgot to take
2   it on vacation. I wanted to, actually, review it again.
3   Q. From what you remember, do you agree with the
4   statements he makes regarding the diamond business in the
5   book?
6   A. I don't recall.
7   Q. Was your father incorporated?
8   A. To be honest, I didn't know until, actually, just
9   seeing the statements. Again, I don't know that he was
10  actually incorporated until I saw the filing of the
11  papers.
12  Q. Which papers are you referring to?
13  A. To the lawsuit.
14  Q. You never saw -- did you ever see any of the
15  sales receipts or invoices or anything when you were
16  working for the business?
17  A. Yeah, you do.
18  Q. Describe to me exactly what you did when you were
19  working for the business for your father. That was
20  during what years? I'm going to ask you that first.
21  What years did you work for your father's business?
22  A. I started when I was, personally, I started when
23  I was about 10 years old. So I'm 39. Geez, 29 years
24  ago.

Page 41

1   Q. 29 years ago?
2   A. That's correct.
3   Q. So early '80s, '70s, early '80s?
4   A. Oh, yeah.
5   Q. Mid '80s?
6   A. Yes.
7   Q. Up until probably early '90s?
8   A. Yeah. I was in and out, in and out, yes.
9   Q. And during that time, '70s to the early '90s,
10  what did you do in your father's business? I know you
11  said you took out trash, but tell me what else.
12  A. That's what we did. I set earrings, set rings,
13  sold rings. I'd run errands to the post office, anything
14  and everything. It was a family business. And we all
15  ran it as a family and did everything we had to do.
16  Q. Did you ever get involved with any of the
17  ordering or anything like that, ordering of the
18  merchandise?
19  A. No, not so much. Later on as I was doing more of
20  a selling up front, I would sit down sometimes and kind
21  of get a little more involved in what stones we needed
22  and what stones we didn't need.
23  Q. Any of the accounting or anything like that?
24  A. The accounting wise, no. My brother Keith did

11 (Pages 38 to 41)

Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy        C.A. # 05-108 (KAJ)        July 26, 2005

Page 42

1 it. And I was pretty much there's papers, file them. So
2 I was --
3    Q. Your father owned a store in Wilkes-Barre; is
4 that correct?
5    A. That's correct.
6    Q. Did he own other stores?
7    A. Yes, he did.
8    Q. Where else?
9    A. Springfield; Hartford, Connecticut; New Haven,
10 Connecticut; at the time, Binghamton, New York; Scranton;
11 Wilkes-Barre and Delaware.
12    Q. Could you repeat that, please?
13    A. Wilkes-Barre; Scranton; Delaware; Binghamton, New
14 York; Springfield, Massachusetts; Hartford, Connecticut
15 and New Haven, Connecticut.
16    Q. Do you remember what years he owned those stores?
17    A. I don't. This is early '80s.
18    Q. What mark did your father operate those stores
19 under?
20    A. The name was Van Scoy Diamond Mine.
21    Q. How did he come up with the name Van Scoy Diamond
22 Mine?
23    A. Very creative.
24    Q. Do you think that's a creative name?

Page 43

1    A. Well, I mean, he's a creative guy. That's
2 what -- he's a creative guy. It's just creative. I
3 don't personally know.
4    Q. Do you know when he started to use Van Scoy
5 Diamond Mine?
6    A. No, I don't.
7    Q. Did your father advertise the mark Van Scoy
8 Diamond Mine?
9    A. He advertised Van Scoy Diamond Mine, yes.
10    Q. How did he advertise?
11    A. I don't understand the question.
12    Q. Radio, television?
13    A. Radio, television, newspaper, yes.
14    Q. Do you remember anything about his
15 advertisements?
16    A. Yes.
17    Q. What do you remember about his advertisements?
18    A. He's very stern in his advertising. How to take
19 his jewelry off. I remember I used to go with him to the
20 radio station when I was young. And he had to his rings
21 off and everything because he was actually, they were
22 picking up on the mike. And he was very -- just as if
23 he's talking to 10,000 people, very distinct advertising.
24    Q. Did he advertise in all of those areas where he

Page 44

1 owned stores?
2    A. Yes. At the time, yes.
3    Q. Were they popular ads, to your knowledge, in the
4 areas in which he owned stores?
5    A. He advertised quite a bit. Sure.
6    Q. Did he advertise in the Newark, Delaware, area?
7    A. Yes.
8    Q. Do you remember anything specifically about those
9 ads?
10    A. Just ads are ads.
11    Q. Do you know how much he advertised in Newark?
12    A. No, no idea.
13    Q. You said your father had what you described as
14 franchises.
15    A. Yes.
16    Q. Could you tell me what your understanding of the
17 word "franchise" is?
18    A. Yeah. Actually, they were, purchased the name or
19 using the name Van Scoy Diamond Mine and actually was all
20 done on a handshake with my father. And he, actually,
21 put them up in an area and start them in the business and
22 my father would do the advertising for them.
23    Q. So they would -- do you know how much these
24 people paid to use the mark?

Page 45

1    A. That's personal information. I don't know.
2    Q. Did they pay money to use the mark?
3    A. As far as I know.
4    Q. Did all of the franchisees or licensees operate
5 under the mark Van Scoy Diamond Mine?
6    A. That I don't know.
7    Q. But what they were paying for was the right to
8 use the mark Van Scoy Diamond Mine; is that correct?
9    A. I don't know. I'm not my father. I don't know.
10    Q. What else would they have been paying for?
11       MR. QUINN: Calls for speculation on the
12 part of the witness.
13       MR. PETOCK: There is no problem with that.
14       MR. F. PETOCK: Objection. You are leading
15 the witness.
16       MR. QUINN: Again, I state, restate the
17 objection.
18       MR. PETOCK: You are leading the witness,
19 Charlie, when you say that. You are coaching him.
20       MR. QUINN: You started the deposition by
21 saying you were going to ask him for the facts that he
22 knew about this case. Now you are asking him to
23 speculate. That is a shift of gears.
24 BY MR. PETOCK:

12 (Pages 42 to 45)

Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

---

Page 46

1    Q.  Is there anything else you can think of besides
2  the right to use the name that they were paying for?
3    A.  No.
4    Q.  How did your father decide where to open up a new
5  licensee or franchise?
6    A.  I don't know.
7    Q.  Would he open up two stores in the same market,
8  same area very close together?
9    A.  I don't know.
10   Q.  Did he open up two stores in the same market?
11   A.  I don't know.
12       MR. F. PETOCK:  Could you speak up a little
13 bit?
14       THE WITNESS:  I don't know.
15       MR. F. PETOCK:  I'm not sure the court
16 reporter --
17       THE WITNESS:  That's okay.  No problem.
18 Sorry.
19       MR. PETOCK:  We are going to take a break
20 for five minutes.
21       VIDEO SPECIALIST:  This ends Tape Number 1
22 of the video deposition of Kurt Van Scoy.  The time is
23 10:52.
24       (Thereupon, a short recess was had.)

Page 47

1        VIDEO SPECIALIST:  This is Tape Number 2 of
2  the video deposition of Kurt Van Scoy.  The time is
3  11:04.
4  BY MR. PETOCK:
5    Q.  Kurt, did you speak with your attorney about any
6  of your deposition testimony during the break?
7    A.  No.
8    Q.  Okay.  Getting back to your father's companies,
9  franchises or licensees, did you know that they were
10 paying to use, paying for the right to use the mark Van
11 Scoy Diamond Mine?
12   A.  I don't know.
13   Q.  Did you think that they were getting the right to
14 use the mark for free?
15   A.  I don't know.  I can't answer for my father's --
16   Q.  I'm asking what you thought.
17   A.  I don't know.
18   Q.  Did you assume that they were paying for the
19 right to use the mark?
20   A.  I don't know.
21   Q.  Did you assume that your father was giving them
22 the right to use the mark as an act of charity for free?
23   A.  I don't know.
24   Q.  Was your father a good businessman in your

Page 48

1  opinion?
2    A.  Yes.
3    Q.  Did you have knowledge of the fact that -- do you
4  have knowledge of the fact that the mark Van Scoy Diamond
5  Mine is federally registered?
6    A.  No.
7    Q.  I asked you -- I will repeat the question.
8        Do you have knowledge of the fact that the
9  mark Van Scoy Diamond Mine is federally registered?
10   A.  No, until now.
11   Q.  Do you know now that the mark Van Scoy Diamond
12 Mine is federally registered?
13   A.  Yes.
14   Q.  When did you first become aware of this?
15   A.  November the 18th of 2004.
16   Q.  How did you become aware of it that day?
17   A.  From a letter from your office or your dad's
18 office.
19   Q.  What did you do after you received the cease and
20 desist letter of November 18th, 2004?
21   A.  Seeked counsel.
22   Q.  Who did you contact to be your counsel?
23   A.  It was actually in Wilmington.  Someone -- it was
24 just a brief encounter with counsel in Wilmington.  And

Page 49

1  then I actually went to Fox Rothschild.
2    Q.  Counsel in Wilmington you said?
3    A.  Yes.
4    Q.  Did they do any work for you?
5    A.  No, just had conversation.
6    Q.  Did they produce any documents for you or
7  anything or do anything for you in that regard, give you
8  anything?
9    A.  No, not that I recall.
10   Q.  Are you aware of anyone operating a jewelry store
11 under the mark of Van Scoy Diamond Mine at this time
12 other than yourself and Wayne?
13   A.  I don't understand the question.  I'm sorry.
14   Q.  Are you aware of anyone operating a Van Scoy
15 Diamond Mine jewelry store, or any other store for that
16 matter, at this time other than yourself and Wayne?
17   A.  If you are saying the question is Van Scoy
18 Diamond Mine?
19   Q.  That's correct.
20   A.  The only thing I know, in the Scranton store in
21 the newspaper it says Van Scoy Diamond -- or in the phone
22 book, not the store itself, it says Van Scoy Diamonds.
23   Q.  Okay.
24   A.  If the question to that would be if it's just

13 (Pages 46 to 49)

Van Scoy                              v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

---

**Page 50**

1  Wayne and I using that, as far as I know, I would say,
2  yeah, I'm aware of that, just him and I.
3    Q.  Just you and him?
4    A.  Correct.
5    Q.  Are you aware of anyone operating a jewelry store
6  under any mark containing the word "Van Scoy" other than
7  yourself and Wayne?
8    A.  Yes, I am.
9    Q.  Could you go through everyone that you are aware,
10 please, using any —
11   A.  Variation?
12   Q.  Well, the "Van Scoy" in connection with a jewelry
13 store.
14   A.  Charlotte, North Carolina.
15   Q.  What do you know about the Charlotte,
16 North Carolina, store?
17   A.  I just know that there is a store down there with
18 the name.
19   Q.  Do you know if that was one of your father's
20 franchisees or licensees at one point or whether that
21 store — answer the first question.
22   A.  What was the question?
23   Q.  Was that one of your father's licensees at some
24 point? Did you father have a licensee in Charlotte?

---

**Page 51**

1    A.  I don't know.
2    Q.  Do you know anything about the Charlotte store?
3  Have you contacted the Charlotte store?
4    A.  No.
5    Q.  What other stores or what other people are using
6  the name Van Scoy Diamond Mine or just Van Scoy?
7    A.  North Carolina, Reading, Lancaster. I believe
8  there is Allentown, Scranton. That's it. Wilkes-Barre
9  store.
10   Q.  Is that it?
11   A.  And Erie. I'm sorry, Erie.
12   Q.  Is that it?
13   A.  To my knowledge, yes.
14   Q.  What do you know about the North Carolina store?
15 Do you know what mark they are using?
16   A.  I think on the website it says Van Scoy Jewelers
17 if I'm not mistaken.
18   Q.  Do you know who would own that store?
19   A.  I believe his name is Bob Cook.
20   Q.  Have you spoken to Bob Cook?
21   A.  No, I haven't.
22   Q.  Do you know if anyone has spoken to Bob Cook
23 recently?
24   A.  No, I don't know.

---

**Page 52**

1    Q.  What can you tell me about the Reading store?
2    A.  I don't understand the question.
3    Q.  You had mentioned that there was a store in
4  Reading using Van Scoy in connection with jewelry
5  services.
6    A.  Correct.
7    Q.  Do you know anything more than that?
8    A.  No.
9    Q.  Was the Reading, did your father ever have a
10 store in Reading, own a store in Reading?
11   A.  Him personally own a store, not that I know.
12   Q.  Did he ever have a licensee in Reading?
13   A.  I don't know. I don't know that.
14   Q.  Did you ever travel to any store, a Van Scoy
15 Diamond Mine store when you were working for the company
16 in Reading?
17   A.  No.
18   Q.  So, to your knowledge, there was no Van Scoy
19 Diamond —
20   A.  You asked me if I traveled with him to the
21 Reading store. No, I did not.
22   Q.  Have you ever been to a jewelry store in Reading?
23 Let me ask you that.
24   A.  No. Not that I remember, no.

---

**Page 53**

1    Q.  Were you ever aware that there was any sort of
2  jewelry store in Reading using the name Van Scoy in
3  connection with diamonds or jewelry?
4    A.  Yes.
5    Q.  When did you first become aware of this?
6    A.  On the website actually.
7    Q.  When did you first become aware of it?
8    A.  I don't know when exactly. I don't remember.
9    Q.  Approximately.
10   A.  I don't know really.
11   Q.  In the past year?
12   A.  No, it's longer than that I would have to say.
13 When exactly, I'm not really sure.
14   Q.  But it was through a website that you first
15 became aware of a jewelry store —
16   A.  That the store was operating there in Reading,
17 yes. I know there was stores. My father did dealings
18 with gentlemen in that area. And that's all I know.
19   Q.  Do you know what name they are using in Reading?
20   A.  It's — Van Scoy?
21   Q.  Is that a guess?
22   A.  On this website it says Van Scoy.
23   Q.  You mentioned that there is a jewelry store that
24 you are aware of in Lancaster using the name, using Van

---

Van Scoy
Kurt Van Scoy

v. Van Scoy Diamond Mine of Delaware, Inc.
C.A. # 05-108 (KAJ)     July 26, 2005

Page 54

1  Scoy in connection with a jewelry store.
2      A. There was a store, yes, in Lancaster. If -- from
3  what I gather, yeah, there is a store in Lancaster that's
4  using Van Scoy.
5      Q. Where did you receive that information?
6      A. Someone can tell me actually. Who I don't -- someone
7  told me, if it was a customer or not or something.
8      Q. Did your father have a store in Lancaster? Did
9  he ever own a store in Lancaster?
10     A. I don't know that.
11     Q. Do you know what mark the store in Lancaster is
12 using?
13     A. Exact words no, I do not know.
14     Q. Do you have any idea?
15     A. Van Scoy.
16     Q. You mentioned that there is a store in Allentown
17 presently using Van Scoy in connection with a jewelry
18 store. Do you know what mark the store in Allentown is
19 using?
20     A. I do not know exactly.
21     Q. Do you have any idea?
22         MR. QUINN: I think you are asking the
23 witness to speculate.
24         MR. F. PETOCK: You can still answer the

Page 55

1  question.
2         THE WITNESS: I don't know.
3  BY MR. PETOCK:
4      Q. But, to your knowledge, it does have the word
5  "Van Scoy" in its name.
6         MR. QUINN: That's not a question.
7      Q. To your knowledge, does it still have the word
8  "Van Scoy" in the name?
9      A. Yes.
10     Q. Do you know who owns the store in Allentown?
11     A. I believe it's Mark Mower.
12     Q. What can you tell me about Mark Mower?
13     A. He did dealings with my father and was another
14 partner of his from way back. And that's all I really
15 know about Mark and the Allentown store.
16     Q. When was the last time you spoke with Mark Mower?
17     A. Oh, God. I think about three months ago.
18     Q. What did you speak with him about three months
19 ago?
20     A. The situation, what's going on with the suit.
21     Q. Could you tell me specifically what you spoke to
22 him about?
23     A. I don't recall. We covered one thing to this and
24 how's business and all that.

Page 56

1      Q. Do you know if you are planning on calling him as
2  a witness in this trial?
3      A. I don't know that.
4      Q. Have you spoke with anyone about possibly calling
5  him as a witness besides your attorney?
6      A. I don't know that, no.
7      Q. Do you know if Mark Mower owns jewelry stores
8  other than the one in Allentown?
9      A. I don't know that.
10     Q. What did you say to Mark Mower --
11     A. I don't recall.
12     Q. -- in your conversation?
13     A. I don't recall.
14     Q. Did you call him about, because you were being
15 sued?
16     A. Yes.
17     Q. Why did you call Mark Mower because you were
18 being sued?
19     A. Because he's -- actually, to be honest with you,
20 I just told him the situation. And he was in disbelief.
21     Q. Did you call any other person that's operating a
22 store using some variation of the name Van Scoy?
23     A. I don't understand the question.
24     Q. Did you call anyone besides Mark Mower? Did you

Page 57

1  call Bob Cook, for example?
2      A. No.
3      Q. And you didn't call the North Carolina store?
4      A. No.
5      Q. You didn't call the Reading store?
6      A. No.
7      Q. You didn't call the Lancaster store?
8      A. No.
9      Q. What did Mark Mower say to you?
10     A. I don't recall really.
11     Q. Did you call Mark Mower because your attorney
12 asked you to?
13     A. No.
14     Q. Besides three months ago -- did Mark Mower refer
15 you the name of Charlie Quinn?
16     A. I don't recall that to be honest with you.
17     Q. How did you find out about Charlie Quinn?
18     A. Actually, a friend of mine is an attorney as
19 well. And we just went through a list. And this was one
20 that he recommended.
21     Q. Is it just coincidence that Charlie Quinn also
22 represented Mark Mower in the past?
23     A. Actually, I was surprised. Yes.
24     Q. How did you find out about that?

Wilcox & Fetzer, Ltd.     Professional Court Reporters

(302) 655-0477
237c0978-7df2-492f-be79-16c76b54a422

Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

---

Page 58

1    A. I don't understand the question.
2    Q. How did you find out that Charlie Quinn
3  represented Mark Mower in the past?
4    A. Actually, when I spoke to Mark Mower and he
5  mentioned the same name as what I had mentioned.
6    Q. When did this conversation take place?
7    A. Oh, my God. This is going back four months,
8  three months.
9    Q. This was the same conversation we have been
10 talking about all along?
11   A. Correct.
12   Q. Okay. So you just remember that you mentioned
13 Charlie Quinn's name. What else do you remember?
14   A. That's it. That's when you actually pointed it
15 out.
16   Q. You can't remember -- can you remember anything
17 else about what you and Mark Mower spoke about?
18   A. No.
19   Q. What he said to you?
20   A. (Witness indicating.)
21   Q. Are you and Mark Mower friends?
22   A. Not friends -- no.
23   Q. Before the conversation three or four months ago,
24 when was the last time you two had spoken?

Page 59

1    A. I don't recall. Years.
2    Q. Do you know anything about why Mr. Quinn
3  represented Mark Mower?
4    A. No, I don't. I mean, it was personal dealings
5  with my father, nothing to do with me.
6    Q. So Charlie Quinn represented -- did Charlie Quinn
7  represent Mark Mower against your father?
8    A. I don't know that.
9    Q. Was Mark Mower one of your father's licensees or
10 franchisees?
11   A. He was a business acquaintance with my father.
12 That's all I know.
13   Q. Were you aware if Mark Mower was paying your
14 father royalties to use the mark Van Scoy Diamond Mine?
15   A. I don't know that.
16   Q. You don't even -- do you know whether Mark Mower
17 was a franchisee of your father?
18   A. I know he had the name. I know he had a jewelry
19 store, Van Scoy. Sure.
20   Q. So did you know he was a franchisee or licensee
21 of your father?
22       MR. QUINN: Asked and answered. Objection.
23   Q. Did your father --
24       MR. F. PETOCK: He can answer it again.

Page 60

1        MR. QUINN: He can ask it then how many
2  times?
3        MR. F. PETOCK: The fact that your attorney
4  objects to the question doesn't mean you don't answer it.
5  You still answer it.
6        MR. QUINN: I want to see the authority for
7  the proposition that the attorney can ask the same
8  question multiple times in the same deposition session.
9  Do you have authority on that?
10       MR. F. PETOCK: You're obstructing the
11 deposition.
12       MR. QUINN: Do you have authority on that?
13       MR. F. PETOCK: Continue with the
14 deposition. It's not the same question.
15       MR. QUINN: It is the same question and I
16 want to see the authority for it.
17       MR. F. PETOCK: You are required to answer
18 the question unless your attorney instructs you not to
19 answer the question.
20       MR. QUINN: If you believe the question has
21 been asked and answered, I leave it up to you. But if I
22 were you --
23       THE WITNESS: I think I already answered it.
24       MR. F. PETOCK: You are coaching the

Page 61

1  witness.
2        MR. QUINN: I'm giving the witness a piece
3  of legal advice that you seem to suggest that I am
4  improperly doing so. And I'm asking you to give me the
5  authority for that. Where is the case?
6        MR. PETOCK: Was he given the case?
7        MR. F. PETOCK: We have case.
8        By the way, while you have disrupted the
9  deposition so badly and you're obstructing this
10 deposition, I give you three cases here that stand for
11 the proposition that specifically rule that in Delaware,
12 the District Court in Delaware, you are not allowed to
13 advise your client about any testimony that's been given
14 or you are anticipating to be given during the
15 deposition. And these are the Turks Beckers, Inc., case,
16 the Dutchman versus Beneficial Corporation case and ML
17 Lee Acquisitions case. Let's continue the deposition.
18 BY MR. PETOCK:
19   Q. Do you know what mark -- you had said that there
20 is a jewelry store using Van Scoy in connection with
21 jewelry services in Scranton?
22   A. Correct.
23   Q. What mark are they using?
24   A. It's Van Scoy Diamonds from what I'm aware of.

16  (Pages 58 to 61)

Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

---

Page 62

1    Q. That's Rick and Pam Sendrick's store?
2    A. Correct. Excuse me. Correct.
3    Q. What about the store in Erie?
4    A. I'm not sure on that. The store fronts, I don't
5  know that.
6    Q. You are not sure what mark that store in Erie
7  uses?
8    A. I do not know.
9    Q. Who owns that store? Do you know?
10   A. I have no idea.
11   Q. Is it any of your brothers or sisters?
12   A. No, my brother -- I don't -- my brother runs it.
13  That's all I know.
14   Q. Your brother runs the store?
15   A. Yes.
16   Q. Tony runs the store and you are not sure whether
17  he owns it or not?
18   A. That's correct.
19   Q. What do you know about Tony -- has Tony ever
20  owned a Van Scoy Diamond Mine that you are aware of?
21   A. In the past, yeah. He had five stores, if I'm
22  not mistaken, four or five stores.
23   Q. Were any of those in Erie?
24   A. Yes.

---

Page 63

1    Q. Do you know if it was in the same location that
2  he's running the store now?
3    A. I don't know that, I've never been there.
4    Q. Do you know if anyone ever gave him permission to
5  use the mark Van Scoy Diamond Mine?
6    A. He's been in business well over 25 years.
7    Q. Is your answer you don't know?
8    A. I don't know.
9    Q. Your father's company, did it ever have any Van
10  Scoy Diamond Mine franchisee or licensee in Delaware?
11   A. I didn't understand your question.
12   Q. Did your father's company ever have a Van Scoy
13  Diamond Mine franchisee or licensee in Delaware, in the
14  State of Delaware?
15   A. From what I'm aware of, yes, he did.
16   Q. Do you know who the franchisee or licensee was?
17   A. Actually, no, I don't.
18   Q. Do you remember what years he had that store?
19   A. No, I don't.
20   Q. Approximately.
21   A. I have no idea.
22   Q. Do you know if Van Scoy Diamond Mine was
23  advertised in Delaware during that time, the time in
24  which there was a franchisee there?

---

Page 64

1    A. I don't know that.
2    Q. Did you ever visit the Delaware store when there
3  was a franchisee there?
4    A. No.
5    Q. Did your father?
6    A. I don't know that. I'm not my father.
7    Q. Did your father ever personally operate and own a
8  Van Scoy Diamond Mine in Delaware?
9    A. Yes, he did.
10   Q. Where was that store located?
11   A. Kirkwood Highway, Astro Shopping Centre. And
12  then he relocated to the location to where we are at
13  right now, 1117 Churchmans Road, Newark, Delaware.
14   Q. What years was the store operated and owned by
15  your father in the Astro Shopping Centre?
16   A. I don't know that.
17   Q. Do you know what year the store your father owned
18  in Delaware that is located at 1117 Churchmans Road in
19  the Churchmans Plaza was opened by your father?
20   A. I don't know that.
21   Q. Approximately.
22   A. I don't know that.
23   Q. Did you ever have any dealings with your father's
24  Delaware store?

---

Page 65

1    A. I don't understand the question.
2    Q. Did you ever visit it?
3    A. I don't understand the question.
4    Q. When your father owned the Delaware store in the
5  Churchmans Plaza, had you ever been there?
6    A. I have.
7    Q. When had you been there?
8    A. When we had sales, half price sales. When
9  exactly, I can't pinpoint that.
10   Q. So from time to time you worked in your father's
11  Churchmans Plaza store?
12   A. For the weekend we all did, yeah.
13   Q. Do you know how many years your father had the
14  Churchmans Plaza store open?
15   A. I don't know that. You would have to talk to the
16  landlord.
17   Q. Was it more than one year?
18   A. Yes.
19   Q. Was it more than two years?
20   A. From what I gather -- I don't know. How many
21  years, I really don't know.
22   Q. Was it more than two years?
23   A. I don't know that.
24   Q. Do you remember approximately how many times you

---

17 (Pages 62 to 65)

Van Scoy                              v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy           C.A. # 05-108 (KAJ)          July 26, 2005

Page 66

1  worked in his store?
2    A. No, I really don't.
3    Q. Do you know if you worked in his store over the
4  course of more than one year?
5    A. I don't understand the question. What store?
6    Q. The Churchmans, the store your father owned in
7  the Churchmans Plaza, the same store you own right now.
8    A. Right, correct.
9    Q. You don't remember whether or not your father had
10 owned that store for more than one or two years.
11       MR. QUINN: Objection. That's not a
12 question.
13 BY MR. PETOCK:
14   Q. Do you remember whether your father owned that
15 store for more than one year?
16   A. More than one year, yes.
17   Q. More than two years?
18   A. I really don't know the length of time. I mean,
19 more than one year, yes, to answer the question.
20   Q. Do you currently operate a Van Scoy Diamond Mine
21 in the same location as your father's store?
22   A. Yes, I do.
23   Q. When did you open that store?
24   A. November 12th, 1994.

Page 67

1    Q. Was your father's store still operating there
2  when you opened your store on November 12th, 1994?
3    A. No, it was not. It was closed for a
4  year-and-a-half prior to that.
5    Q. So you do know when your father's store closed;
6  is that correct?
7    A. When it closed, from what my landlord said, it
8  was vacant for 16 months. I'm going off my landlord.
9    Q. When you opened your store, were any remnants of
10 your father's store still there?
11   A. The wallpaper, lighting fixtures. And what else?
12 That's was about it, and the alarm system.
13   Q. Safe?
14   A. No, the safe I brought down from the Wilkes-Barre
15 store.
16   Q. Cases?
17   A. No, none of that was left there.
18   Q. Sign?
19   A. The sign I got from my father.
20   Q. Was the sign already there?
21   A. No, it was actually in the warehouse, my father's
22 warehouse.
23   Q. Where is your father's warehouse located?
24   A. Frederick Street in Wilkes-Barre at the time.

Page 68

1  That's where he had the showcases.
2    Q. You said your father gave you that sign.
3    A. Yes, he did.
4    Q. Did he drive it down to Wilmington to give it to
5  you?
6    A. He actually helped me load it up into our U-Haul.
7    Q. In Wilkes-Barre?
8    A. Correct. And my father gave me the safe.
9    Q. Was that also in the warehouse?
10   A. No.
11   Q. Where was the safe?
12   A. In Mundy Street.
13   Q. What did he say to you when he gave you the safe?
14   A. Good luck to you, I love you and I'm very proud
15 of you.
16   Q. Why did you choose the location in Churchmans
17 Plaza to open a Van Scoy Diamond Mine?
18   A. I don't know. Just a location and there it is
19 and open up.
20   Q. What about the location? Was it easier to open
21 in a store where a Van Scoy, in a location where a Van
22 Scoy Diamond Mine already existed?
23       MR. QUINN: Objection. That's two
24 questions.

Page 69

1  BY MR. PETOCK:
2    Q. I will rephrase the question. Was it easier to
3  open your Van Scoy Diamond Mine in a location where your
4  father had for several years already operated a Van Scoy
5  Diamond Mine?
6    A. After it was closed 16 months, and that was the
7  location that we reopened, yes.
8    Q. Is your answer yes?
9    A. Yes.
10   Q. You originally opened using the name Van Scoy
11 Diamond Mine, correct?
12   A. That's correct, Van Scoy Diamond Mine of
13 Delaware, Incorporated.
14   Q. When you originally opened, were you using the
15 name Van Scoy Diamond Mine or Van Scoy Diamond Mine of
16 Delaware, Incorporated?
17   A. I don't understand the question.
18   Q. When you originally opened your store, were you
19 using the name Van Scoy Diamond Mine or were you using
20 the name Van Scoy Diamond Mine of Delaware, Incorporated?
21   A. I still don't understand the question.
22   Q. What don't you understand about the question?
23   A. If you are talking outside the store or — you
24 know what I mean? What's outside, the marquee outside?

18 (Pages 66 to 69)

Van Scoy                              v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

Page 70

1  Q. Yeah.
2  A. Okay.
3  Q. Okay. What was outside the store?
4  A. Van Scoy Diamond Mine.
5  Q. What about, what did you use on your sales
6  receipts?
7  A. Van Scoy Diamond Mine of Delaware, Incorporated.
8  Q. Did you use those when you first opened your
9  store?
10  A. When we first opened up, actually, no. My father
11  gave me sales pads, actually, from the Gateway Shopping
12  Center store and also the 154 Mundy Street store.
13  Q. Did they just say Van Scoy Diamond Mine on them?
14  A. I did and then we had to put a sticker over for
15  our new address. My father was trying to save me money.
16  Q. Did you inform Wayne, in any way, that you were
17  opening a Van Scoy Diamond Mine in Delaware?
18  A. He clearly knew.
19  Q. How do you know that he clearly knew?
20  A. I remember specifically when we were trying to
21  move the safe out of the Wilkes-Barre store, my brother
22  Kenny and him sat on a Lazy Boy chair, and his exact
23  quotes as my father and I -- my father was helping me
24  move the safe. And they just sat there. Wayne said to

Page 71

1  my brother Kenny, quote, unquote, Kenny, I give him two
2  months. No, I give him three months and he's going to be
3  in so much debt he won't even know what happened to him,
4  quote, unquote.
5  Q. Who selected the name Van Scoy Diamond Mine for
6  your store?
7  A. My father and I.
8  Q. Why was the name Van Scoy Diamond Mine selected?
9  A. Because that's our family business.
10  Q. Did the name have goodwill attached to it?
11  A. The store was closed for 15 months, 16 months
12  roughly, somewhere around there. That's what they said.
13  The store was closed and people actually weren't very
14  happy.
15  Q. Who wasn't happy?
16  A. Customers from the area that purchased rings in
17  the past.
18  Q. Where did you receive that information?
19  A. From customers actually coming to the
20  Wilkes-Barre store from driving up and weren't very
21  happy. And also the fact after I opened the store,
22  customers came in and, you here today, are you going to
23  be here next week? So I had to put up with that for
24  probably about two or three years.

Page 72

1  Q. Did you receive a lot of complaints like that?
2  A. Quite a few, yes.
3  Q. Approximately how many?
4  A. The number off the top of my head, I can't
5  recall.
6  Q. You have quite a few customers now that were also
7  customers of your father's Van Scoy Diamond Mine; is that
8  correct?
9  A. They've actually -- no. I would have to say not
10  many, no, not many at all actually.
11  Q. Well, you have people coming in that were very
12  upset that they had bought diamonds at your store, at
13  your father's store. They had bought jewelry at your
14  father's store and then he closed down.
15  A. Yes.
16  Q. But now you are testifying that there weren't,
17  they weren't the same customers?
18  A. People that came back, you know, just, geez, you
19  guys were left and, you know, you are back here. Are you
20  here for another week and going again? That's basically
21  what they were stating, not in goodwill.
22  Q. So have you had repeat customers? Have you had
23  customers that were your father's customers and now are
24  your customers?

Page 73

1  A. I don't recall that. I really --
2  Q. Did you talk to an attorney when you decided to
3  open up a jewelry store under the name Van Scoy Diamond
4  Mine about whether it was okay to use the mark Van Scoy
5  Diamond Mine?
6  A. No, I did not.
7  Q. Did you speak with anyone?
8  A. No, I did not.
9  Q. Were there any other names considered for your
10  store?
11  A. No.
12  Q. Does the name Van Scoy Diamonds have the same
13  meaning to the public as Van Scoy Diamond Mine in your
14  opinion?
15  A. I don't know. Van Scoy Diamond and Van Scoy
16  Diamond Mine, I don't know.
17  Q. Do you have an opinion as to whether they are the
18  same mark?
19  A. I don't know that.
20  Q. When did you decide to start using the name Van
21  Scoy Diamond Mine of Delaware?
22  A. From the day I opened the store because that's
23  when my father actually gave me the name.
24  Q. He didn't give you the name Van Scoy Diamond

19 (Pages 70 to 73)

Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy           C.A. # 05-108 (KAJ)           July 26, 2005

---

Page 74

1  Mine; he gave you the name Van Scoy Diamond Mine of
2  Delaware?
3      A.  He gave me the name Van Scoy Diamond Mine.  And
4  what I did, we just incorporated Van Scoy Diamond Mine of
5  Delaware, Incorporated.  That's what he recommended me to
6  do.
7      Q.  Why did he recommend you to do that?
8      A.  If things didn't work out for me, I guess, in a
9  legal standpoint.  I guess they can't, you know,
10  certainly come after you.  I'm not up on that.
11      Q.  If who would come after you?
12      A.  If the store failed, landlord or whatever the
13  case may be.  I don't know what his thought was with
14  that.  I don't know.  But that's what he recommended me
15  to do.
16      Q.  What difference would it make if you were using
17  the mark Van Scoy Diamond Mine or Van Scoy Diamond Mine
18  of Delaware if the store failed and someone tried to come
19  after you?
20      A.  I don't understand the question.
21      Q.  I'm not sure I understood your answer to the
22  original question.  You said that your father recommended
23  that you use the mark Van Scoy Diamond Mine of Delaware
24  rather Van Scoy Diamond Mine; is that correct?

---

Page 75

1      A.  No.  He said to incorporate so you are actually a
2  president as opposed to a sole proprietor, he said just
3  to go under in the corporation.  And that's what he
4  recommended to do.  He said you should just go Van Scoy
5  Diamond Mine of Delaware, Incorporated, which in fact
6  that's what I did.
7      Q.  Did he tell you that's what he did also?
8      A.  No, that's what he recommended me to do.
9      Q.  Is your testimony that from the very beginning
10  you are using both Van Scoy Diamond Mine and Van Scoy
11  Diamond Mine of Delaware as your marks?
12      A.  I don't follow the question.
13      Q.  Was there ever a time where you decided rather
14  than using Van Scoy Diamond Mine as your mark you would
15  use Van Scoy Diamond Mine of Delaware?
16      A.  No.  We used Van Scoy Diamond Mine out front of
17  the store.
18      Q.  So is that what you used, is that what your mark
19  is?
20      A.  It's Van Scoy Diamond Mine of Delaware,
21  Incorporated.  And the sign that my father gave me, it's
22  Van Scoy Diamond Mine.  So on the paperwork, it's Van
23  Scoy Diamond Mine of Delaware.
24      Q.  Right.  What is the name you tell customers that

---

Page 76

1  you use?
2      A.  Van Scoy Diamond Mine.
3      Q.  Is that how you answer the phone?
4      A.  Good afternoon, Van Scoy's.
5      Q.  How about on your bags?
6      A.  Van Scoy Diamond Mine.
7      Q.  Jewelry boxes?
8      A.  Van Scoy Diamond Mine.
9      Q.  Where else is Van Scoy Diamond Mine used in the
10  store?
11      A.  That's it, just in the sign, Van Scoy Diamond
12  Mine.  That's what was given to me.
13          MR. PETOCK:  I would like to have this
14  marked as the next exhibit, please.
15          (Van Scoy Deposition Exhibit No. 5,
16  Warranty, was marked for identification.)
17  BY MR. PETOCK:
18      Q.  What is this, Kurt?
19      A.  That's a warranty.
20      Q.  Do you give this warranty to your customers?
21      A.  I do.
22      Q.  How long have you been giving this particular
23  warranty to your customers?
24      A.  As far as I can remember.

---

Page 77

1      Q.  Where did you get this warranty?
2      A.  Actually from my father.
3      Q.  It says Van Scoy Diamond Mine on it; is that
4  correct?
5      A.  That is correct.
6      Q.  When did your father give you this warranty?
7      A.  The beginning of opening the store when he gave
8  me the sales receipts to use as well.
9      Q.  This is a genuine sample of the certificate, the
10  warranty that you give to your customers, right?
11      A.  Yes.
12      Q.  Did your father ever visit your store after you
13  opened it?
14      A.  Yes, he has.
15      Q.  Could you tell me when he visited it?
16      A.  I don't have some specifics, I mean, paper wise.
17  But, yeah, I have in writing when he has actually sold
18  something in our store.  And quite a few times I have a
19  picture of him and my mom at my house.  There is numbers
20  of times that, actually, he stopped by.  Sure.
21      Q.  Okay.  Do you remember the last time your father
22  visited your store, the most recent?
23      A.  I don't recall.  I know he was in and out of
24  health there a little bit and, really, I don't recall.  I

---

20 (Pages 74 to 77)

Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy        C.A. # 05-108 (KAJ)        July 26, 2005

---

Page 78

1  know my mom was in the hospital. He'd stop by.
2  Q. When was the first time he visited your store?
3  A. Actually, that was the opening.
4  Q. On November 14th?
5  A. 12th.
6  Q. November 12th, 2004?
7  A. 1994.
8  Q. 1994. He was there at the opening?
9  A. Yes.
10 Q. Do you remember what he was doing there at the
11 opening?
12 A. Yeah. He was, actually, giving everybody
13 pointers and also waiting on customers.
14     MR. PETOCK: Let's mark this as the next
15 exhibit, please.
16     (Van Scoy Deposition Exhibit No. 6,
17 Valentine's Ad, was marked for identification.)
18 BY MR. PETOCK:
19 Q. What is this?
20 A. What is this? This is a —
21 Q. This is, by the way, just for the record, this is
22 Exhibit Number 6. Can you tell me what it is, please?
23 A. Yes. This is, actually, an ad that my father has
24 sent to me to actually run for a, to run an ad,

---

Page 79

1  obviously, for a Valentine's ad.
2  Q. It says Vestil Plaza. Your store is not located
3  at Vestil Plaza; is it?
4  A. No. That's, obviously, where you actually would
5  change the name and put the location of where you are at.
6  Q. And when was this sent to you?
7  A. It was sent to me -- let's see here. Was it
8  September 18th, 1997?
9  Q. Thank you.
10 A. Sure.
11 Q. You said you had permission to use the mark; is
12 that correct?
13 A. To use the name Van Scoy Diamond Mine, yes.
14 Q. Were you licensed?
15 A. I don't understand the question.
16 Q. If not for the permission given by your father to
17 use the mark, do you think that that would have been
18 trademark infringement, your using the mark?
19 A. Say that again.
20 Q. If it weren't for the permission that you say
21 that you got from your father to use the mark, would your
22 use of the mark have been infringement?
23 A. I don't understand it. I don't understand the
24 question.

---

Page 80

1  Q. If you weren't given permission by your father to
2  use the mark --
3  A. If I was given permission --
4  Q. If you were not, if you were not given permission
5  to use the mark, would your use have been infringement,
6  your using the mark been infringement?
7  A. Not to my knowledge.
8  Q. If you didn't have any permission to use the mark
9  Van Scoy Diamond Mine right now, do you think you would
10 be infringing?
11     MR. QUINN: Objection. The question has
12 been asked and answered.
13     MR. PETOCK: No, it was different, Charlie.
14     MR. QUINN: Different in one percent of the
15 words perhaps.
16     MR. PETOCK: It was a completely different
17 question, Charlie.
18     MR. QUINN: Objection stands.
19     MR. F. PETOCK: Answer the question.
20     THE WITNESS: Repeat it again.
21     MR. F. PETOCK: Read the question back,
22 please.
23     (Thereupon, the reporter read back the
24 pending question.)

---

Page 81

1      THE WITNESS: I don't know.
2      MR. PETOCK: I would like to have this
3  marked as Number 7, please.
4      (Van Scoy Deposition Exhibit No. 7, Sales
5  Receipts, was marked for identification.)
6  BY MR. PETOCK:
7  Q. Kurt, at some point you started blacking out the
8  name "Mine" from your sales receipts; is that correct?
9  A. Actually, one of the girls did.
10 Q. Did you ask -- one of the girls, are you
11 referring to one of your employees?
12 A. Yeah, correct.
13 Q. Did you ask her to do that?
14 A. Actually, no, I don't recall doing that. I know
15 they -- we were actually away when the paper was served
16 to us, if you will, for the suit. And the one girl, I
17 guess, took it upon herself to do that. And I said there
18 is no real need to do that.
19 Q. What was her name?
20 A. Actually, I'm not sure which one it was to be
21 honest with you. I'm not sure.
22 Q. Name all of the girls in your office that are
23 employees of yours.
24 A. Lori McMichael, Sands Shoemaker, Karen Vale,

---

21 (Pages 78 to 81)

Van Scoy
Kurt Van Scoy

v. Van Scoy Diamond Mine of Delaware, Inc.
C.A. # 05-108 (KAJ)      July 26, 2005

Page 82

1  Annette D'Angelo, Megan Rump.
2      Q.  Who would be the person most likely to tell me
3  who blacked out this word out of those names you just
4  listed if I wanted to depose one of them?
5      A.  To be honest with you, we were gone away at this
6  time.  We were on vacation, actually.
7      Q.  Where were you on vacation when these got blacked
8  out?
9      A.  Where were we?  In the Caribbean, I believe.
10      Q.  Do you know the first sales receipt that, date
11  wise, the date of the first sales receipt that was
12  blacked out, the word "Mine" was blacked out?
13      A.  No, I do not, actually, no.
14      Q.  Although they were blacked out, you continued to
15  use the blacked out --
16      A.  No.  Obviously, it showed -- as soon as she went
17  through one sales receipt, if I'm not mistaken, and I
18  told them there is no need to do that.  And, obviously,
19  it went back to the way it was.
20      Q.  Were you on vacation from January 15th until
21  March 3rd?
22      A.  No.
23      Q.  Why did you continue to use sales receipts with
24  the word "Mine" blacked out of the sales receipt from at

Page 83

1  least January 15th to March 1st, 2005?
2      A.  This is just -- I mean, this is very few people.
3  I mean, obviously, it was one sales pad that they were,
4  obviously, just using until I got back and find out
5  what's going on.
6          MR. PETOCK:  We would ask that all of the
7  sales receipts from this period are produced.
8          MR. QUINN:  Define the period, please.
9          MR. PETOCK:  Well, I'm going to ask him from
10  the cease and desist letter until at least 3/1/2005.
11  BY MR. PETOCK:
12      Q.  Do you know why your employees decided to black
13  out the word "Mine?"
14      A.  They actually saw on a thing, on the letter,
15  actually, when we got it is just stating that we were
16  being sued for using the name Van Scoy Diamond Mine.  And
17  it was a sheriff that came and handled the, handed the
18  paper over.  And it wasn't in an envelope or anything.
19  It just stated for the name.  So they just put it on
20  their own -- she just scratched it out until we got back
21  to find out what was going on.
22      Q.  Who would be the supervisor that would have the
23  capacity to make a decision like that while you were away
24  out of those names?

Page 84

1      A.  There is Lori McMichael was the manager.  But,
2  really, it's -- the way we operate, it's not just kind of
3  one -- it won't be no bigger than the other one and all
4  that.  You know, we just kind of work as a team.
5      Q.  So you were away when you got this November --
6      A.  The 18th I was away, yes, I was.
7      Q.  Do you remember when you got back?
8      A.  Yeah.  It was actually about two days later,
9  three days later from the original letter.
10      Q.  From the original letter which is --
11      A.  The one from November the 18th.
12      Q.  -- November the 18th?
13      A.  Correct.
14      Q.  Do you remember what day of the week it was you
15  got back from your vacation?
16      A.  I think it was Monday.  We went hunting.  It
17  was Monday, the first day of hunting for Pennsylvania.
18      Q.  And when you got back, the word "Mine" had
19  already been blacked out from these sales receipts; is
20  that correct?
21      A.  I don't think so, no.  If I'm not mistaken.
22  That's why I said, this is, I have to seek counsel to
23  really see exactly what's going on with this.
24      Q.  You need to do what?

Page 85

1      A.  To seek counsel, to see an attorney to see what's
2  exactly going on.  Because as far as I was concerned,
3  until the November 18th of 2004, I was not aware of any
4  point at all that there was any trademark of Van Scoy
5  Diamond Mine after the bankruptcy.
6      Q.  But when you got back from your vacation on that
7  Sunday or Monday, hunting season, the word "Mine" had
8  already been blacked out; is that correct?
9      A.  Not that I know of.
10      Q.  So do you believe it happened sometime after you
11  got back?
12      A.  From what I remember, I think it was when we were
13  away and then we had the papers actually served.
14      Q.  So you were back and one of your employees
15  blacked out the word "Mine" from your sales receipts
16  without even asking you; they could have asked you?
17      A.  To be honest with you, I really don't know.  I
18  don't recall, really, when this all first really took
19  place.
20      Q.  Your father advertised Van Scoy Diamond Mine in
21  connection with NASCAR, correct?
22      A.  25 years ago, yes.
23      Q.  NASCAR is very popular in Delaware; would you
24  agree with that?

22  (Pages 82 to 85)

Page 86

1    A.  In the last five years, yeah.
2    Q.  Have you ever advertised in connection with
3  NASCAR?
4    A.  No.
5    Q.  Have you ever had TV commercials or TV spots
6  during any of the NASCAR races?
7    A.  No.
8        MR. PETOCK:  Let's take another break.
9        VIDEO SPECIALIST:  This ends Tape Number 2
10  of the video deposition of Mr. Van Scoy.  The time is
11  11:56.
12        (Thereupon, a short recess was had.)
13        VIDEO SPECIALIST:  This is Tape Number 3 of
14  the video deposition of Kurt Van Scoy.  The time is
15  12:07.
16  BY MR. PETOCK:
17    Q.  Kurt, did you consult with your attorney during
18  the break about any of your testimony given or that you
19  expect to give today?
20    A.  No.
21    Q.  Where do the majority of your customers come
22  from?
23    A.  I don't know that.
24    Q.  Do the majority of your customers come from the

Page 87

1  Newark area?
2    A.  I don't know that.
3    Q.  Is it general practice for you to ask your
4  customers what their address is?
5    A.  Yes.
6    Q.  So where do the majority come from?
7        MR. QUINN:  Asked and answered.
8    Q.  Where do you advertise?
9    A.  Radio and TV.
10    Q.  Where in geographically?
11    A.  In Delaware.
12    Q.  All of Delaware?
13    A.  No.
14    Q.  What parts of Delaware?
15    A.  Wilmington area.
16    Q.  Newark area, do you consider Newark to be part of
17  the Wilmington area?
18    A.  Yes.
19    Q.  Why do you only advertise in that limited area?
20    A.  Because it's within the reasonable location of,
21  close proximity of my location for my store.
22    Q.  How far do people -- how far would a customer
23  travel to go to a jewelry store?
24    A.  I don't know.

Page 88

1    Q.  Would you think the majority of your customers
2  would come from the area in which you advertise?
3    A.  Yes.
4    Q.  And that's why you advertise in that area,
5  because that how far people would come to a jewelry
6  store?
7    A.  Yes.
8    Q.  On the website of vanscoydiamondmine.com and the
9  website of Van Scoy Diamond Mine of Delaware, you state
10  that you have been in business for over 70 years serving
11  customers.  Could you explain that statement?
12    A.  It's, actually, it's combined through with my
13  father, family and my personal business combined.
14    Q.  So when you say 70 years, you are also talking
15  about the goodwill of your father that was established in
16  the --
17    A.  Through working with my father and the family
18  together.
19    Q.  You haven't been working for 70 years, correct?
20    A.  No.
21    Q.  Where did you come up with the number 70?
22    A.  If I'm not mistaken, it says over 70 years.
23    Q.  That's correct.
24    A.  I'm 39 years old.  I have been 29 years myself.

Page 89

1  My father has been at least over 50 years in the
2  business.  So combined I think that's over 70 years.
3    Q.  On your website, you also say that you are a
4  jeweler that has a reputation, not an image.
5    A.  Correct.
6    Q.  What do you mean by that?
7    A.  That's reputation of honesty and low pricing and
8  not as opposed to our competition that has a diamond in
9  their beard.
10    Q.  Are you talking about the reputation of your
11  father's business also, the 70 years that the --
12    A.  We have a reputation of doing business as honesty
13  and low pricing and certainly quality for what we offer
14  in the service after the sale.
15    Q.  Is that Van Scoy Diamond Mine that you are
16  referring to?
17    A.  That would be on our website, yes.
18    Q.  And when you say that you have a reputation for
19  honesty and all that, you are talking about the name
20  Van Scoy Diamond Mine?
21    A.  I'm talking about our business, yes.
22    Q.  At least some of the established goodwill of your
23  store, that your store has -- by the way, do you believe
24  that your store has goodwill, that the name you are using

Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

Page 90

1  in Delaware, Van Scoy Diamond Mine in Delaware, is there
2  goodwill associated with that mark in Delaware?
3     A. I don't understand the question.
4     Q. Is there a favorable attitude of the purchasing
5  public towards the goods and services that are coming
6  from your Van Scoy Diamond Mine in Newark, Delaware?
7     A. I don't know that.
8     Q. Do you think that the public has any sort of
9  attitude towards your goods and services coming from
10 Van Scoy Diamond Mine in Newark, Delaware?
11    A. I don't know that.
12    Q. Does your store have a reputation?
13    A. Yes.
14    Q. Does it have a good reputation?
15    A. I do my best, yes.
16    Q. Do you think, in your opinion, has some of that
17 good reputation come from the efforts of your father?
18    A. I don't know that. I do what I do.
19    Q. Have you improved your store in any way since you
20 opened it?
21    A. Yes, I have.
22    Q. Could you tell me how you've improved your store?
23    A. I added two more showcases and actually extended
24 the front room, showroom.

Page 91

1     Q. How much do you think -- when did you do that,
2  the cases, when did you add the few more cases?
3     A. Probably approximately four years, five years.
4     Q. What do you think it was more close to, four
5  years or five years?
6     A. I don't know.
7        MR. F. PETOCK: You said four or five years
8  ago?
9        THE WITNESS: Yes, sir.
10 BY MR. PETOCK:
11    Q. And you said you extended your showroom. Could
12 you be more specific on what you did to your showroom?
13    A. It was just a dividing wall and, actually, we
14 just moved that dividing wall back and we just added more
15 showcases, changed the wallpaper.
16    Q. When was it that you took, you extended your
17 showroom?
18    A. I think I answered that, about four or five years
19 ago.
20    Q. Have you done anything else to improve your
21 store?
22    A. No.
23    Q. So besides those two things that you mentioned,
24 it's substantially the same form as it was when you first

Page 92

1  moved in in 1994?
2     A. Yes.
3     Q. Have you expanded your store or your business in
4  any way since you opened it?
5     A. No.
6     Q. Do you advertise?
7     A. Yes, I do.
8     Q. When did you first start advertising?
9     A. November the 12th, 1994.
10    Q. Where do you advertise? You told me
11 geographically, but tell me the forums that you're
12 advertising.
13    A. Radio, television, paper, little bit of paper.
14    Q. Could you tell me how much you've spent on your
15 advertising? Just for the record, we asked you to
16 produce advertising expenditures for each year going back
17 to 1994. And you have not produced what we have asked
18 for. This was in the Notice of Deposition which you
19 received. We asked for --
20       MR. PETOCK: Could you mark this as the next
21 exhibit, please?
22       (Van Scoy Deposition Exhibit No. 8, Notice
23 of Deposition Resetting Date, was marked for
24 identification.)

Page 93

1  BY MR. PETOCK:
2     Q. Plaintiffs asked for documents sufficient to show
3  advertising expenditures by defendants for each year
4  since the store operated by Van Scoy Diamond Mine of
5  Delaware, Incorporated, in or around November of 1994 and
6  began operation to present.
7        And did you receive this Notice of
8  Deposition, Kurt?
9     A. I believe I have, yes.
10       MR. QUINN: Before you go further, let the
11 record show that defendants produced what was reasonably
12 available to them both this morning and last night when
13 copies were sent to counsel for the plaintiff.
14 BY MR. PETOCK:
15    Q. You produced your U.S. Income Tax Return for
16 2002, 2003 and 2004 to satisfy that request that we were
17 talking about; is that correct?
18    A. Yes.
19    Q. Do you have your U.S. Tax Returns going further
20 back than 2002? Do you have your -- you can answer the
21 question.
22    A. I don't know that offhand.
23    Q. How far back do you keep your records?
24    A. That's my wife's department. I really can't

Page 94

1  answer that. I don't know.
2     Q.  Did your wife decide, Donna decide, was she also
3  involved in the decision to start using the mark Van Scoy
4  Diamond Mine?
5     A.  No. It was just my, it was my father and I. My
6  father gave me the name to use.
7     Q.  Did he give your corporation the right to use the
8  name?
9     A.  He gave me the name to use. He gave me the name
10  to use.
11     Q.  What were your advertising expenditures for last
12  year?
13     A.  I don't recall that.
14     Q.  Do you have your advertising expenditures for
15  years prior to 2002 at your store?
16     A.  I don't know that. I can look. I don't know
17  that right now.
18     Q.  According to your U.S. Income Tax Return for
19  2002, it appears that your advertising expenditures, as
20  you recorded on this, were 63,930. Was that the total
21  for your advertising in that year?
22     A.  I would have to say so if that's my taxes. Sure.
23     Q.  In 2003 your advertising expenditures, according
24  to what you produced, was $72,116; is that correct?

Page 95

1     A.  I would have to say that's on my taxes. Sure.
2     Q.  Was there any reason for the increase in
3  advertising between 2002 and 2003?
4     A.  Not that I recall.
5     Q.  Did it have anything to do with inflation?
6     A.  No, not that I recall.
7     Q.  According to what you produced, your advertising
8  expenditures for 2004 were $52,270. Is that accurate for
9  your advertising expenditures for that year?
10     A.  If it's on my taxes, yes.
11     Q.  Was there any reason for the drop in advertising
12  between 2003 and 2004 and between 2002 and 2004 for that
13  matter?
14     A.  No.
15     Q.  How do you decide how much advertising to do?
16     A.  I just feel certain weeks I want to do it and
17  then that's it.
18     Q.  Do you advertise continuously throughout the year
19  or just at certain intervals?
20     A.  Certain intervals.
21     Q.  And what kind of intervals?
22     A.  I don't understand that.
23     Q.  Do you advertise only during holidays?
24     A.  In radio wise, I do just pretty much holidays and

Page 96

1  in summertime TV a little more than radio.
2     Q.  And are the only places you advertise radio,
3  television and newspaper?
4     A.  Yes.
5     Q.  How much did you advertise the year that you
6  opened, 1994?
7     A.  I don't recall that.
8     Q.  Has your advertising increased dramatically at
9  any point?
10     A.  I don't understand the question.
11     Q.  Has the expenditures, your advertising expenses,
12  has there been any year where there has been a large
13  increase from the previous year?
14     A.  I don't know that.
15     Q.  Do you know if there was an increase between 1994
16  and 1995?
17     A.  I don't know that.
18     Q.  What about between 1995 and 1996?
19     A.  I don't know that.
20     Q.  What about between 1996 and 1997?
21     A.  I really don't know that.
22     Q.  What about between 1997 and 1998?
23     A.  Again, I don't know that. I can't answer that.
24     Q.  '99 and 2000?

Page 97

1     A.  I can't answer that.
2     Q.  2000, 2001?
3     A.  I don't know.
4     Q.  Have you done more or less advertising this year
5  than last year?
6     A.  To be honest, I don't know that. I don't know
7  that.
8     Q.  Last year you spent 52,270 on advertising. And
9  you are not sure how much you spent this year?
10     A.  I really don't know.
11     Q.  So far, obviously.
12     A.  Right.
13     Q.  If you are forced to stop using the mark now, do
14  you think you will be prejudiced in any way?
15     A.  I don't understand that.
16     Q.  Do you think that, if you were forced to stop
17  using the mark right now, you would be placed in a
18  position that you think is somehow unfair?
19     A.  Yes.
20     Q.  Could you tell me why?
21     A.  My father gave me the name.
22     Q.  Is that the only reason why you think you would
23  be prejudiced if you were forced to stop using the mark
24  now?

Van Scoy                              v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

---

Page 98

1    A. My father gave me the name and he gave me the
2  sign for the store.
3    Q. Is that the only reason why you think you would
4  be prejudiced?
5    A. Yes.
6        MR. F. PETOCK: Could you speak up a little
7  bit?
8        THE WITNESS: Yes. My father gave me the
9  name and he gave me the sign. And, yes, that's the
10  reason why, yes, absolutely.
11        MR. F. PETOCK: Thank you.
12        THE WITNESS: Sure.
13  BY MR. PETOCK:
14    Q. Do you think there is a likelihood of confusion
15  between your store and Wayne's store?
16    A. I don't understand that.
17    Q. Would the average member of the public think that
18  there is some sort of connection between the goods and
19  services that you to offer and the goods and services
20  that Wayne's store offers under the mark Van Scoy Diamond
21  Mine?
22    A. I don't know that. I can't answer for a
23  customer.
24    Q. Have you ever experienced a customer being

---

Page 99

1  confused as to your store and Wayne's store?
2    A. Not that I know of, no.
3    Q. Has anyone ever told you that they thought there
4  was a connection between your store and Wayne's store?
5    A. Not that I know of.
6    Q. Is there any connection between your store and
7  Wayne's store?
8    A. Not that I know of.
9    Q. Does Van Scoy Diamond Mine have significance in
10  Wilkes-Barre, PA?
11    A. I don't know that. I can't answer for his store.
12    Q. Do members of the purchasing public associate the
13  mark Van Scoy Diamond Mine with a jewelry store in
14  Wilkes-Barre?
15    A. I don't know that.
16    Q. Does the mark Van Scoy Diamond Mine have
17  significance in Newark, Delaware?
18    A. Yes.
19    Q. Is Van Scoy Diamond Mine well-known in
20  Wilkes-Barre?
21    A. I don't know that.
22    Q. Was it at any time well-known in Wilkes-Barre?
23    A. I don't know that. Really, I can't answer that.
24  I can't answer that.

---

Page 100

1    Q. You grew up in Wilkes-Barre, correct?
2    A. I did, yes.
3    Q. When you were growing up, was Van Scoy Diamond
4  Mine well-known in Wilkes-Barre?
5    A. We were known for a big family.
6    Q. Could you please answer the question?
7    A. I'm sorry. What was the question again?
8    Q. The question is: When you were growing up in
9  Wilkes-Barre, was the name Van Scoy Diamond Mine
10  well-known in Wilkes-Barre?
11    A. I can't answer that. Well-known, I can't answer
12  for somebody else. I mean, people knew that we had a
13  jewelry store if that's what you are asking. Friends
14  knew. Friends knew, sure.
15    Q. Not you, just there was a jewelry store known in
16  Wilkes-Barre that went by the name of Van Scoy Diamond
17  Mine?
18    A. There was a store in Wilkes-Barre by the name of
19  Van Scoy Diamond Mine.
20    Q. And that was well-known by the public?
21    A. I can't answer that. I don't know. You know
22  what I mean? There was a store, Van Scoy Diamond Mine,
23  in Wilkes-Barre, Pennsylvania.
24    Q. Could you answer: Is the mark Wal-Mart

---

Page 101

1  well-known by the public?
2    A. Well, sure, I would have to say so. I think I
3  know of Wal-Mart.
4    Q. Where do you get your diamonds from?
5    A. A number of suppliers.
6    Q. Could you name them, please?
7    A. IGAT. There is many. That's really one that
8  comes to my head right off the top of my head.
9    Q. Could you name the other ones?
10    A. Everybody is changing with everybody and
11  everything else. I mean -- Ivory. I think there is
12  Ivory Diamonds.
13    Q. Any others?
14    A. Paramount Gems.
15    Q. Any others?
16    A. That's all that I can really think of right off
17  the top of my head.
18    Q. Are any of your diamonds supplied by Wayne?
19    A. I'm sorry?
20    Q. Are any of your diamonds supplied by Wayne?
21    A. No.
22    Q. What about by Wayne's company?
23    A. No.
24    Q. Are you a direct importer of diamonds?

---

26 (Pages 98 to 101)

Van Scoy                                        v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

---

Page 102

1    A.  We do buy direct from manufacturers from Israel,
2  yes.
3    Q.  Who is your direct -- who is manufacturing in
4  Israel?
5    A.  IGAT would be, that would be one.  Aton Coozy.
6    Q.  Isn't he located in New York?
7    A.  He has an office in New York.  He has an office
8  in Russia and Israel as well.
9    Q.  Is that what, generally, in the industry, diamond
10  industry, when you say you are a direct importer, does it
11  generally mean that you would import it through someone
12  like Aton Coozy?
13    A.  Sure.
14    Q.  Was there an incident with Aton Coozy where you
15  got diamonds on credit which made Aton Coozy rather angry
16  at you?
17    A.  No.
18    Q.  Was there an incident where you got diamonds on
19  credit and you were supposed to have the money for Aton
20  Coozy for the diamonds that he gave you, but when he came
21  to collect the money, the money was not there, it was
22  already spent?
23    A.  No, not true, no.
24    Q.  There was never any incident with Aton Coozy --

---

Page 103

1    A.  None whatsoever.
2    Q.  -- where you got diamonds on credit and you had
3  spent the money, you sold the diamonds, spent the money?
4    A.  Never.
5    Q.  And Aton came time to collect, you didn't have
6  it?
7    A.  Never.
8    Q.  Do you get a lot of your merchandise COD, cash on
9  deposit?
10    A.  No, I do not.  If it's a new company, first time,
11  but that's, other than that, no.
12    Q.  How is your credit?
13    A.  Very good.
14    Q.  Do you sell colored stones?
15    A.  Sure.
16    Q.  What types?
17    A.  All types of colored stones.
18    Q.  What other merchandise do you sell besides
19  diamonds?
20    A.  Pearls, gold, sterling silver.
21    Q.  What percentage of your business is the sale of
22  merchandise other than diamonds?
23    A.  I don't know that.
24    Q.  Your father built up the name Van Scoy Diamond

---

Page 104

1  Mine around the sale of diamonds, correct?
2    A.  I can't answer for that.  I don't know that.
3    Q.  He didn't sell those other items though that you
4  mentioned.
5    A.  I think he did, actually.  He sold some different
6  stuff, yeah, from what I recall, yes.
7    Q.  Silver?
8    A.  No.
9        MR. QUINN:  Is that a question?
10    Q.  Did they sell silver?
11    A.  I don't know that.
12    Q.  You said no before.
13        MR. QUINN:  Objection.  That's not a
14  question.
15        THE WITNESS:  Repeat the question.
16  BY MR. PETOCK:
17    Q.  Did you testify before -- did you say no when you
18  thought I was asking you a question as to whether your
19  father sold silver?
20        MR. QUINN:  That's two questions.
21    Q.  You thought I asked you a question before as to
22  whether your father sold silver; is that correct?
23    A.  Correct.
24    Q.  And you said no, correct?

---

Page 105

1    A.  Correct.
2    Q.  Did your father sell silver?
3    A.  I'm sorry.  I don't understand that.
4    Q.  Did your father sell silver?
5    A.  Does my father --
6    Q.  Did your father sell silver?
7    A.  Not that I know.  I don't know that.
8    Q.  It's a tongue twister.
9    A.  I don't know that.
10    Q.  Did your father sell colored stones?
11    A.  Yeah, yes.
12    Q.  Have there been complaints about the quality of
13  the goods or services provided by Van Scoy Diamond Mine
14  of Delaware, your store?
15    A.  Not to my knowledge at all, no.
16    Q.  Are you aware of any complaints against any
17  Van Scoy Diamond Mine?
18    A.  I don't understand the question.
19    Q.  Are you aware of any complaints against a
20  Van Scoy Diamond Mine operating anywhere?
21    A.  What kind of question -- what complaints?  Yeah,
22  there is complaints.
23    Q.  What complaints are you aware of?
24    A.  I mean, there is just one that was an appraisal

---

27 (Pages 102 to 105)

Page 106

1  that was done by the plaintiff. And they moved to
2  Alabama. And he's a state trooper in Alabama. And they
3  quoted, he measured a stone of what it was and said what
4  the weight of it was. In fact, they took it to a jeweler
5  to have it weighed and to trade it in. And it was not
6  anywhere near what it was. And, supposedly, what he told
7  me, they were going to contact the Better Business
8  Bureau, I believe, back in Wilkes-Barre on that. That
9  was one of the latest ones. I remember that.
10  Q.  Are you aware of any other complaints against --
11  so are you aware of complaints against the Van Scoy
12  Diamond Mine being operated by the plaintiff in
13  Wilkes-Barre?
14  A.  The one that I know that they contacted -- there
15  was one letter that was sent to us.
16  Q.  Why was that letter sent to you?
17  A.  He was, actually, originally from the area and he
18  moved away.
19  Q.  From what area?
20  A.  Delaware.
21  Q.  He was from Delaware and he moved where?
22  A.  To Alabama.
23  Q.  Why did the state trooper send a letter to you?
24      MR. QUINN:  Asked and answered.

Page 107

1      MR. PETOCK:  No, it's not.
2      MR. F. PETOCK:  You can answer it.
3      MR. QUINN:  The record will show it was
4  asked and answered two questions ago.
5  BY MR. PETOCK:
6  Q.  Did the state trooper think there was a
7  connection between your store and Wayne's store?
8  A.  No. It was, actually, where he originally
9  purchased the ring, where my father had the store there
10  originally.
11  Q.  He originally purchased the ring from your
12  father's store?
13  A.  Correct.
14  Q.  What was the next step in this equation?
15  A.  It was -- the dates exactly I'm not sure. But he
16  stated they went to have the stone -- he moved down to
17  Alabama and had the stone to be traded in. And on the
18  appraisal which has the plaintiff's name on it stating
19  what the quality of the stone is, the color and so forth
20  of the stone and the make of the stone and the weight of
21  the stone, which, in fact, none of the equations matched,
22  quote, unquote, of what this gentleman was stating. And
23  he took it to a gemologist down in the area there. And
24  he was just trying to follow through with it. And he was

Page 108

1  looking for the plaintiff, actually, to pursue this.
2  Q.  What was the plaintiff's name on the certificate?
3  A.  It was Wayne Van Scoy.
4  Q.  This trooper, did he originally buy the stone
5  from the store in Wilkes-Barre or the store in Delaware?
6  A.  Delaware.
7  Q.  And the certificate had the plaintiff's name on
8  it?
9  A.  Yes, it did.
10  Q.  Do you have any idea why the certificate of the
11  store in Delaware would have had, of a diamond sold from
12  a store in Delaware would have had Wayne's name on it?
13  A.  I don't know that. I can't answer that.
14  Q.  Are there any documents related to this?
15  A.  Yeah. There was something. I can certainly --
16  I'll try to find it.
17  Q.  What would that document have been, a letter to
18  you?
19  A.  It was a letter, yes. It was a letter that was
20  sent to me, yes.
21  Q.  Are you aware of any other complaints against a
22  Van Scoy Diamond Mine jewelry store?
23  A.  Not that I know, no.
24  Q.  That's the only complaint that you are aware of?

Page 109

1  A.  Yes.
2  Q.  Have you had any of your brothers or sisters work
3  for you at the store, your store?
4  A.  Yes.
5  Q.  Who?
6  A.  My brother that's deceased, Keith, and my brother
7  Kenny.
8  Q.  When did Kenny work for you?
9  A.  Exact dates I'm not sure. I would probably say
10  approximately three years ago.
11  Q.  What was Kenny's position at the store?
12  A.  Sales.
13  Q.  Has Kenny ever owned a Van Scoy Diamond Mine
14  store?
15  A.  No, not that I know of. No.
16  Q.  Did you ever speak with Kenny with respect to the
17  registered trademark of the name Van Scoy Diamond Mine?
18  A.  I don't understand that question.
19  Q.  Did you ever speak to Kenny about the registered
20  trademark Van Scoy Diamond Mine?
21  A.  Prior to the lawsuit?
22  Q.  Prior to the lawsuit.
23  A.  Not at all.
24  Q.  What about after the lawsuit?

28 (Pages 106 to 109)

Van Scoy                              v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)         July 26, 2005

---

**Page 110**

1  A. Yeah. I was in disbelief. That's pretty much --
2  that's all that was really said.
3  Q. What were you in disbelief about?
4  A. The name, when the name Van Scoy Diamond Mine
5  went bankrupt, I was solely under the impression that the
6  plaintiff and also Rick Sendrick had a letter made up,
7  typed up from an attorney. They paid $5,000 each to
8  state that the name Van Scoy Diamond Mine was worth
9  nothing. And I'm under the impression as well that it
10 was by the court they demanded to take the name down, Van
11 Scoy Diamond Mine.
12       And, at that point, I felt there was no need
13 whatsoever for a trademark or anything. I mean,
14 everybody -- that's all they wanted to do. They didn't
15 want nothing to do with "diamond mine." They wanted
16 nothing to do with that. And that's why I, actually, we
17 went with Van Scoy Diamond Mine of Delaware,
18 Incorporated.
19 Q. So the bankruptcy, before people were told to
20 stop using the mark and stuff, you knew about the
21 trademark?
22 A. No, I knew nothing. I knew nothing, absolutely
23 nothing about any trademark at all, nothing. My father
24 gave me a name. That's all I know.

**Page 111**

1  Q. Were you aware that in approximately 2000, Kenny
2  was placing calls to the trademark office or to anyone
3  else about the renewal of the trademark and service mark
4  for Van Scoy Diamond Mine?
5  A. No, no, I do not.
6  Q. Would you be surprised to know that Kenny knew
7  about the trademark and the fact that it was federally
8  registered?
9  A. I don't know that. I'm not Kenny.
10 Q. Were you ever aware that your father had
11 registered a trademark?
12 A. No, I was not.
13 Q. How often have you seen Wayne since you opened
14 the store in 1994?
15 A. A handful of times I would have to say.
16 Q. Were you home for the holidays, maybe
17 Thanksgiving and Christmas, between 1994 and 2000?
18 A. Yeah, yes.
19 Q. Did you see Wayne during that time?
20 A. I would have to say yes.
21 Q. Could you tell me about any conversations the two
22 of you had during that period?
23 A. Geez, happy holidays. How are you doing? Good
24 to see you. Here's your gifts and all that, just your

**Page 112**

1  basic family gathering for the holidays.
2  Q. During that period, 1994 to 2000, that was during
3  the bankruptcy, correct?
4  A. I don't know that. I'm assuming. I guess. I
5  don't know that.
6  Q. Was there any talk about the bankruptcy during
7  any of those visits home during the holidays between 1994
8  and 2000?
9  A. I don't recall that.
10 Q. Did you ever talk to anyone about the bankruptcy
11 during the bankruptcy, anyone? Was it of interest to
12 you?
13 A. I don't know really. No. I don't know. I don't
14 know that.
15 Q. Your dad was in the hospital, Christiana Hospital
16 in Delaware, in both 1996 and 1998; is that correct?
17 A. I believe so.
18 Q. Did you see Wayne in Delaware at any time during
19 that period?
20 A. Yes, I did.
21 Q. Do you remember anything about any conversations
22 you had during that period?
23 A. Yeah. I mean, just how is he doing? What is the
24 status? What's going on? He actually stopped by the

**Page 113**

1  store to use the bathroom. He was -- yeah, I remember
2  conversations, yes.
3  Q. Did he say anything to you when he stopped by the
4  store to use the bathroom that you recall?
5  A. How are you doing?
6  Q. What year was that?
7  A. I don't recall that, what year.
8  Q. It was either '96 or '98 though, right?
9  A. I would have to say I don't recall that.
10 Q. Did you and Wayne get in an argument about
11 anything while your dad was in the hospital that you
12 recall?
13 A. I don't recall.
14 Q. Was there a fight about you not visiting your dad
15 in the hospital?
16 A. No, I don't recall that.
17 Q. You don't recall a fight between you and Wayne or
18 where Wayne was disturbed that you were not visiting your
19 dad in the hospital?
20 A. No. I don't know. I don't recall that, no.
21 Q. Do you recall calling Wayne in 2002 or
22 approximately 2002 about someone who wanted to open up a
23 franchise using the name Van Scoy Diamond Mine?
24 A. I don't recall that, no, I don't. I really

29 (Pages 110 to 113)

237c0978-7df2-492f-be79-16c76b54a422

Van Scoy                              v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy        C.A. # 05-108 (KAJ)        July 26, 2005

Page 114

1  don't.
2      Q.  Did you call Wayne and ask him about someone who
3  wanted to use the name Van Scoy Diamond Mine?
4      A.  I don't recall that.  That's the same question.
5  I don't recall that.
6      Q.  Has anyone ever approached you about the
7  possibility of franchising the name Van Scoy Diamond Mine
8  or using the name Van Scoy Diamond Mine?
9      A.  Not to my knowledge, no.
10     Q.  Have you called Wayne about anything to do with
11 Van Scoy Diamond Mine?
12     A.  I don't understand that question.
13     Q.  Have you ever placed a call to Wayne on the
14 telephone asking him questions about anything to do with
15 the name Van Scoy Diamond Mine?
16     A.  Not that I know of, no.
17     Q.  At no time did a person, did a person approach
18 you about a possibility of franchising a Van Scoy Diamond
19 Mine in Delaware in any place?
20     A.  No, I don't recall anything.  No, I do not.
21     Q.  Isn't that something you would remember?
22     A.  I don't know to be honest.  I really don't know
23 that.  I have my business.  I focus on my business.
24     Q.  Isn't that related to your business?

Page 115

1      A.  When it comes to franchising and all that stuff
2  or whatever, that has nothing to do with me.  So, really,
3  I don't know that.
4      Q.  Why doesn't it have anything to do with you?
5      A.  Because I have my own business and I focus on my
6  own store.  And that was my store that was given to me
7  with that name.
8      Q.  In 2003 your mother died, correct?
9      A.  Yeah, that's correct.
10     Q.  Do you remember the day you went to pick out the
11 caskets?
12     A.  Yes.
13     Q.  Do you remember a fight that occurred that day
14 between several members of your family, including
15 yourself, a verbal fight?
16     A.  Yes.
17     Q.  What was that fight about?
18     A.  Everybody going over to my parents' house at the
19 time to go have dinner.  Everybody has sent food and
20 everything to the house where we grew up.
21     Q.  Could you explain why there was a fight over that
22 more specifically?
23     A.  The plaintiff had some, obviously, some issues
24 with some of the family members.  And my dad was still

Page 116

1  alive at the time.  And we felt that my father is still
2  alive, which we feel that it was the appropriate thing to
3  do.  It was the house that we all grew up in.  It was the
4  house that my mother, our mother raised us in.  And there
5  was food over there.  And it was very, very hungry.  And
6  we just wanted to go there and have something to eat and
7  sit down and kind of gather our thoughts and our wits and
8  appreciate things that we had and where we grew up in.  I
9  recall that.
10     Q.  Do you recall specifically what was said between
11 you and Wayne?
12     A.  No, I do not.
13     Q.  Was anything said about the trademark?
14     A.  No.
15     Q.  Do you remember a conversation between you and
16 Wayne that ended up in somewhat of an argument concerning
17 your parents going to Atlantic City?
18     A.  No.  Say that question again.
19     Q.  Do you recall a conversation between you and
20 Wayne that ended up becoming a heated conversation and
21 what might be characterized as an argument concerning
22 your parents going to Atlantic City?
23     A.  Yes, I do, several.
24     Q.  What were those -- were they arguments?

Page 117

1      A.  Yes.
2      Q.  What were they about?
3      A.  He was trying to tell my parents they can't go.
4  And he would, actually, withhold my mother's Social
5  Security check until that Monday.
6      Q.  Why, in your opinion -- did your parents have
7  gambling problems?
8      A.  I can't answer that.
9      Q.  What year was that argument?
10     A.  I don't recall.  It was several.
11     Q.  Was it recently?
12     A.  My mom passed away in 2003.
13     Q.  Do you think there may have been an argument in
14 2003?
15     A.  I don't recall.
16     Q.  Have you been in many arguments with your brother
17 Wayne?
18     A.  Growing up, yes.
19     Q.  What about recently but before the litigation?
20     A.  No.  I stayed far away.  I live in Delaware.
21     Q.  When you guys talk, does it usually end up in an
22 argument?
23     A.  Not always.  90 percent.
24     Q.  Have you had any conversations or correspondences

30 (Pages 114 to 117)

Van Scoy                                        v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

---

Page 118

1  with Tommy concerning Wayne in general recently?
2      A.  I don't know.  I can't really -- I don't know
3  about that.  No.  I would have to say no.
4      Q.  What about with Tony?
5      A.  And the question would be again?
6      Q.  Whether you have had any conversations or
7  correspondences with Tony concerning Wayne.
8      A.  It's really -- no, no.
9      Q.  Same question as applied to Betsy.
10     A.  No.
11     Q.  Pam?
12     A.  No.
13     Q.  Ken?
14     A.  No.
15     Q.  What do you know about the bankruptcy proceedings
16  of your father?
17     A.  I know he filed for bankruptcy.  I know the name
18  was stated as being worth nothing from an attorney that
19  wrote up a letter for the plaintiff and Rick Sendrick.
20  And that's all I really know.  That's my father's
21  dealing.  That wasn't mine.
22     Q.  How did you hear about the name being worth
23  nothing?  How did you hear about this letter that was
24  drawn up?

Page 119

1      A.  Through Rick Sendrick.
2      Q.  Rick Sendrick told you?
3      A.  Yes.
4      Q.  What else did he tell you about it?
5      A.  That's all.  He said the name, that was worth
6  nothing.  And the plaintiff, your plaintiff, and Rick
7  Sendrick had both paid, quote, unquote, $5,000 to have
8  this letter written up and to show the court that the
9  name was worth absolutely nothing.
10     Q.  Did you have any idea as to why they were
11  concerned about showing that the name was worth nothing?
12     A.  Because they wanted to -- I'm assuming just to
13  show the court, the bankruptcy court that there is
14  nowhere else to go with this.  This Van Scoy Diamond Mine
15  was in with the bankruptcy and that the value of the name
16  Van Scoy Diamond Mine was worth nothing.  And that's
17  exactly what it came out to, was worth nothing.
18     Q.  When did you first hear talk about the bankruptcy
19  with respect to your father?
20     A.  He filed what?  September, I think, September
21  13th.  I got married in July.  And I foresaw what was
22  coming forward.  And that's why I opted to certainly go
23  out on my own.  And my father gave me the name and said
24  good luck and I love you very much.  I'm proud of you.

Page 120

1      Q.  What happened to your father that forced him to
2  file bankruptcy?
3      A.  I don't know.
4      Q.  Did it have anything to do with gambling?
5      A.  I don't know.
6      Q.  Was your farther a gambler?
7      A.  I don't know.
8      Q.  Did your father go to Atlantic City a lot?
9      A.  I don't know that.
10     Q.  Did you ever know your father to go to Atlantic
11  City?
12     A.  Yeah.
13     Q.  Did you ever know your father to lose any amount
14  of money in Atlantic City?
15     A.  I didn't know that.
16     Q.  Did you ever possess any document related to the
17  bankruptcy?
18     A.  After the suit, yes.
19     Q.  What about before the suit during the bankruptcy?
20     A.  No.
21     Q.  What about that document that you said that Wayne
22  and Rick had drawn up?
23     A.  What about it?
24     Q.  Did you ever see that during the bankruptcy?

Page 121

1      A.  During the bankruptcy, no.
2      Q.  Have you seen it since then?
3      A.  No.  Rick, I believe, said he has a copy though.
4      Q.  When did Rick Sendrick tell you about the letter
5  that him and Wayne had drawn up?
6      A.  Actually, I've heard it several times.
7      Q.  When was the first time?
8      A.  The first time I don't recall.
9      Q.  The second time?
10     A.  I don't recall.  Last time probably about a week
11  ago.
12     Q.  Did you hear about it when it was being first
13  drawn up?
14     A.  No, it was after, after it was already drawn up.
15     Q.  But that was during the bankruptcy at some point,
16  right?
17     A.  Correct.
18     Q.  Back in the mid '90s?
19     A.  Right, exactly.
20         MR. PETOCK:  I would like to have this
21  marked as the next exhibit.
22         (Van Scoy Deposition Exhibit No. 9,
23  Bankruptcy Petition, was marked for identification.)
24  BY MR. PETOCK:

31 (Pages 118 to 121)

Van Scoy
Kurt Van Scoy        C.A. # 05-108 (KAJ)        v. Van Scoy Diamond Mine of Delaware, Inc.
                                                            July 26, 2005

Page 122

1   Q. Kurt, what else did you talk about with Rick
2   Sendrick recently?
3       A. That was really it. That was it. I asked for a
4   deposition from him or an affidavit stating that he knew
5   that Wayne was down here and Wayne knew, certainly, I was
6   in the business and all that. And he didn't want to get
7   involved. And that's when it was stated that he said
8   there was a document that was written up by an attorney.
9   And they both had it written up. And it stated that the
10  name Van Scoy Diamond Mine was worth nothing.
11      Q. Could you tell me more about this affidavit you
12  asked him for?
13      A. Just to state that Wayne knew -- Rick knew that
14  Wayne knew that I was down here, basically.
15      Q. When did this conversation occur?
16      A. About a week ago.
17      Q. What else have you talked to Rick about?
18      A. That's it.
19      Q. Can you tell me what the document is that's in
20  front of you?
21      A. Yes. U.S. Bankruptcy, Middle District of
22  Pennsylvania, Bankruptcy Petition.
23          MR. PETOCK: For the record, this is Exhibit
24  9 that we are talking about now.

Page 123

1   BY MR. PETOCK:
2       Q. Could you tell me where you got this?
3       A. Yeah. The Federal Courthouse in Wilkes-Barre.
4       Q. Did you personally obtain this?
5       A. I did.
6       Q. When?
7       A. It was shortly after I was notified that I was
8   being sued.
9       Q. They printed it for you?
10      A. Yes, she did, yeah.
11      Q. Why did you go to the Federal Courthouse in
12  Wilkes-Barre? What was the purpose of it? What were you
13  trying to find out?
14      A. I was trying to find out where the bankruptcy
15  was. I wanted to, certainly, find out what the name
16  issue, certainly worth nothing. Also, I went to find
17  out, actually, if it was still ongoing and also to find
18  out how long they actually had the name not being used.
19      Q. Whose markings are on this?
20      A. I have no idea. All I know is I got copies.
21      Q. Did you ever hear the name Robert P. Sheils?
22      A. Robert P. Sheils. No. I know a Joe Sheils my
23  dad always used to mention, his best friend. I don't
24  know if it's any relation or not.

Page 124

1   Q. How about Thomas Feissner?
2   A. I heard the name mentioned, yes.
3   Q. Do you know who that is?
4   A. I don't know exactly who he is. I know he was an
5   attorney if I'm not mistaken.
6   Q. By the way, I'm referring back to Exhibit 9. Is
7   this everything that was given to you?
8   A. To the best of my knowledge that I know of.
9   Q. Is anything missing from it?
10  A. I don't really recall right now.
11  Q. Did you take anything out of it?
12  A. Not that I know of. I'm sorry. Not that I know
13  of.
14  Q. Regarding Exhibit 9, has anyone else had access
15  to that document since you got it?
16  A. No, not that I know of, no.
17          MR. PETOCK: Mark this Exhibit 10, please.
18          (Van Scoy Deposition Exhibit No. 10, Order
19  Approving Agreement in Settlement of Adversary
20  Proceedings and Contested Matters, was marked for
21  identification.)
22  BY MR. PETOCK:
23  Q. Exhibit 10 is an Order Approving the Agreement
24  and Settlement of Adversary Proceedings and Contested

Page 125

1   Matters with Releases and Other Provisions; is that
2   correct?
3   A. Yes.
4   Q. Did you obtain this document?
5   A. Yes, I did.
6   Q. Where did you obtain this document?
7   A. Actually, at the bankruptcy court in
8   Wilkes-Barre, Pennsylvania.
9   Q. Had you ever seen this document?
10  A. No. Like I said, it was after I was notified of
11  being sued.
12  Q. That's the first time you ever --
13  A. Yes, sir.
14  Q. Have you read it since?
15  A. No, actually. I mean, it's been a while.
16  Q. But, at some point, you have read it since you
17  obtained it?
18  A. After we had the suit, yes.
19  Q. What assets of your father's did the bankruptcy
20  court seize?
21  A. I know nothing of that, what took place.
22  Q. When you were home for the holidays, Thanksgiving
23  and Christmas, was your father's store always operating
24  when you were up there?

32 (Pages 122 to 125)

237c0978-7df2-492f-be79-16c76b54a422

Page 126

1    A. No. I believe the majority of 1995, actually,
2  that store was closed —
3    Q. Why?
4    A. — by the sheriff.
5    Q. Was that as a result of the bankruptcy?
6    A. That is correct, yes.
7    Q. Was anything seized?
8    A. Whatever was inside they locked up and that was
9  it. It shut down.
10      MR. PETOCK: Break.
11      VIDEO SPECIALIST: This ends Tape Number 3
12  of the video deposition of Kurt Van Scoy. The time is
13  1:01.
14      (Thereupon, a lunch break was had.)
15      VIDEO SPECIALIST: This is Tape Number 4 of
16  the video deposition of Kurt Van Scoy. The time is 1:59.
17  BY MR. PETOCK:
18    Q. Kurt, did you speak with your attorney at all
19  during the break about your deposition testimony that you
20  have given or expect to give today?
21    A. No.
22    Q. Before the break, we were talking about the
23  bankruptcy and, in particular, what assets the bankruptcy
24  court seized from your father or from your father's

Page 127

1  company. Can you tell me what was seized?
2    A. I don't know.
3    Q. Do you know anything that they attempted to
4  seize?
5    A. I know nothing. I was down here at the time.
6    Q. Kurt, didn't you tell me that they seized the
7  jewelry from his jewelry store, Van Scoy Diamond Mine?
8    A. I didn't say that, no.
9    Q. Did they seize the jewelry from his jewelry
10  store?
11    A. I can't answer that question. I don't know. I
12  was not there.
13    Q. Did you hear from anyone as to what they may have
14  seized?
15    A. All I know, he filed for bankruptcy and they
16  closed the store. They padlocked the door.
17    Q. So did they seize the store?
18    A. They padlocked the front door. That's what I
19  heard, yeah.
20    Q. What about your parents' house, your father's
21  house?
22    A. I don't know any of that information.
23    Q. Did the bank try to foreclose on the house?
24    A. I don't know any of that information. I don't

Page 128

1  know that.
2    Q. Did your parents own the house after the
3  bankruptcy?
4    A. I don't know that. I have been down here. I
5  don't know.
6    Q. Who owns the house now?
7    A. I don't know. To be honest, I really don't know.
8    Q. Have you been to the house since 2000?
9    A. Yeah.
10    Q. Did your parents own it then?
11    A. I don't know. Did my parents live there? Yeah,
12  my parents lived there. Who owned it? That's none of my
13  business.
14    Q. Were you close to your parents?
15    A. Sure, I was close to my parents. Absolutely.
16    Q. Yet you didn't know whether they owned the house?
17    A. I don't sit down, boy, do you own the house
18  today, mom? Do you own the house today, dad? It was
19  nothing like that. It was, hi, how are you? I love you
20  very much. Good to see. That was really it. There was
21  nothing financially mentioning anything.
22    Q. Are you aware that Wayne owns the house now?
23    A. I really don't know.
24    Q. Would it be a surprise to you if I told you Wayne

Page 129

1  owns the house now?
2    A. I wouldn't be surprised I guess. I don't know.
3  I don't know the answer to that question really. I
4  really don't.
5    Q. Were you speaking with your brother Tony at all
6  during the bankruptcy proceedings?
7    A. I spoke to him, yes.
8    Q. Were you aware that Tony bid on some diamonds at
9  auction during the bankruptcy?
10    A. I was aware of that, yeah. That was certainly
11  mentioned via your plaintiff.
12    Q. Wayne told you about that?
13    A. Yes.
14    Q. When?
15    A. I don't recall.
16    Q. What else did Wayne tell you about the
17  bankruptcy?
18    A. That's all. When you mentioned about the
19  bidding, I guess, merchandise or whatever, I know that's
20  when the plaintiff mentioned it.
21    Q. Did Wayne tell you that he was attempting to buy
22  the trademark?
23    A. Nothing, nothing in the kind.
24    Q. Did Wayne ever have any discussions with you

Van Scoy
Kurt Van Scoy

v. Van Scoy Diamond Mine of Delaware, Inc.
C.A. # 05-108 (KAJ)    July 26, 2005

---

**Page 130**

1  concerning contributing any money towards a bankruptcy
2  settlement?
3  A.  No, not that I know.  No.
4  Q.  Did he have any conversations with you about
5  contributing money to anything regarding the bankruptcy?
6  A.  None whatsoever.  Not that I know of, no.
7  Q.  When did you learn that the plaintiff, Wayne
8  Van Scoy, bought the trademark Van Scoy Diamond Mine?
9  A.  November 18th, 2004.  I didn't have any idea of
10  anything certainly with a trademark.  2004, yes.
11  Q.  Has Wayne ever asked you to help pay for the
12  trademark?
13  A.  Nothing of the kind, no.
14  Q.  Were you aware that the bankruptcy court ordered
15  that the Mundy Street Van Scoy Diamond Mine be closed?
16  A.  Yes, I was aware of that.  Yes.
17  Q.  How did you find out about that?
18  A.  A family member, if I'm not mistaken.  I think it
19  was my mom actually.
20  Q.  Do you remember when that was that you found out
21  about it?
22  A.  Exact date I don't know.
23  Q.  Was it probably about the date it was forced to
24  be closed, approximately?

---

**Page 131**

1  A.  Yeah, I would say probably that day, if not soon
2  after, a few days.
3  Q.  Were you aware that some members of your family,
4  including Wayne, were told that they had to stop using
5  the mark Van Scoy Diamond Mine by the bankruptcy court?
6  A.  Say that again.  I didn't understand the
7  question.
8  Q.  Were you aware that Wayne was forced to stop
9  using the mark Van Scoy Diamond Mine?
10  A.  It was along the lines of that, yes.  I think it
11  was my mom that told me that, yes.
12  Q.  When do you think she told you that?
13  A.  Shortly after noticing or being noticed that they
14  had to take the name down.
15  Q.  Were you aware of the fact that your sister Pam
16  and her husband, Pam and Rick Sendrick, were forced to
17  take the name down by the bankruptcy court?
18  A.  I'm not so much with that.  I mean, it was pretty
19  much, the main was really the 154 Mundy Street location.
20  Q.  Were you aware that Pam and Rick Sendrick were
21  enjoined by the bankruptcy court; in other words, forced
22  to stop using the mark?
23  A.  Again, I don't know.  More what we discussed with
24  my mom or my parents was more or less the 154 Mundy

---

**Page 132**

1  Street location.
2  Q.  Did you have any information that they might have
3  been forced to take down their mark?  Did your mom
4  mention that also?
5  A.  To be honest with you, I really don't remember.
6  Q.  Were you aware that your sister Betsy and her
7  spouse were enjoined from using the mark by the
8  bankruptcy court?
9  A.  No.  I really didn't know.
10  Q.  Did you ever think that if the bankruptcy court
11  knew of your store in Delaware you would have been
12  enjoined from using the mark also?
13  A.  I don't see any reason or connection.  The store
14  was closed for 16 months prior to being reopened.  But,
15  also, my father filed for Chapter 13 in September and I
16  actually opened up in November.
17  Q.  Did you ever think that if the bankruptcy court
18  learned of your use of the mark, Van Scoy Diamond Mine of
19  Delaware, you would have been enjoined from using the
20  mark?
21  A.  Do I?  No.
22  Q.  Why did you think you would have been treated
23  differently than other members of your family?
24  A.  This store was opened, actually, after the fact

---

**Page 133**

1  that my father filed for bankruptcy.  And the store,
2  actually was, there was nothing there.  I had to provide
3  everything myself, taking out a personal loan to open the
4  store and sleep in the back of the store for six months
5  to try to get the store started.  So there was nothing,
6  quote, unquote, handed to me, if you will, or merchandise
7  or anything of any sort from my father or anything to do
8  with the bankruptcy.
9  Q.  Did you make any effort to avoid the bankruptcy
10  court knowing that you were using the mark Van Scoy
11  Diamond Mine or the fact that you had a store in
12  Delaware?
13  A.  Avoid, no.
14  Q.  Was it known in the family that if -- was it
15  known within your family, your brothers and your sisters,
16  to keep the fact that you had a Van Scoy Diamond Mine in
17  Delaware away from the knowledge of the bankruptcy court?
18  A.  I don't know that answer.  I'm not the rest of
19  the family.
20  Q.  Did you ever ask anyone in the family to keep the
21  fact that you had a Van Scoy Diamond Mine in Delaware a
22  secret from the bankruptcy court or private from the
23  bankruptcy court?
24  A.  No.

---

34 (Pages 130 to 133)

Page 134

1      MR. PETOCK: Could we go off the record?
2      VIDEO SPECIALIST: Off the record at 2:09.
3      (Thereupon, a discussion was had off the
4  record.)
5      VIDEO SPECIALIST: Back on the record at
6  2:10.
7  BY MR. PETOCK:
8      Q. Kurt, I know you've already answered this
9  question. But would you, please, answer it again because
10  I'm not exactly clear.
11     MR. QUINN: Then I will not object because
12  you are not clear as to the answer.
13  BY MR. PETOCK:
14     Q. Why is it that you felt that the bankruptcy court
15  didn't have a right to stop you from using the mark?
16     A. I'm not the bankruptcy court. I can't answer
17  that. I don't know that.
18     Q. Wasn't it your feeling that the bankruptcy
19  court -- did you feel that the bankruptcy court had a
20  right to make you stop using the mark?
21     A. No.
22     Q. Why is it that you felt that the bankruptcy court
23  didn't have a right to make you stop using the mark?
24     A. The bankruptcy was already in progress at the

Page 135

1  time when I actually, when I opened the store. It was
2  already after the fact that the bankruptcy started. He
3  filed in September. I opened November the 12th of 1994,
4  November the 12th, 1994. During that time, it's in the
5  proceedings already of what was going on. I was open
6  after the fact that he already filed for bankruptcy.
7      Q. But the bankruptcy court wasn't concerned about
8  your store. It was concerned about your store's name;
9  isn't that correct?
10     A. I do not know. I can't answer that. I do not
11  know.
12     Q. Do you agree that there is a difference between
13  the fact that the bankruptcy would make a store
14  close and the fact that the bankruptcy would make a store
15  change its name because of the fact that the bankruptcy
16  court owned the mark?
17     MR. QUINN: I object to the form of that
18  question.
19     MR. F. PETOCK: You have to answer the
20  question. He has an objection as to form.
21     THE WITNESS: What was the question again?
22     MR. F. PETOCK: Can you read it back?
23     (Thereupon, the reporter read back the
24  pending question.)

Page 136

1      THE WITNESS: I still don't understand the
2  question.
3  BY MR. PETOCK:
4      Q. I'll rephrase.
5      A. Please.
6      Q. Is there a difference between you owning the
7  store and you owning the mark in the store?
8      A. I don't understand the question. I don't
9  understand that.
10     Q. Is there a difference between the actual physical
11  store and the name of the store?
12     A. I don't understand it. I don't understand it. I
13  don't know.
14     Q. If the bankruptcy court had ordered you to stop
15  using the mark, would you have?
16     A. Well, if it's by court, I think I would have to.
17     Q. Did you think the bankruptcy court had a right to
18  ask you to stop using the mark?
19     A. I don't know.
20     Q. I want to ask you about some of the conversations
21  you had with Wayne that you previously talked about.
22  Specifically, when you were home for the holidays between
23  1994 and 2000, were there any conversations between you
24  and Wayne where Wayne brought up your use of the mark of

Page 137

1  Van Scoy Diamond Mine?
2      A. Absolutely not.
3      Q. What about the time where you, where Wayne was
4  visiting your father in the hospital in 1996 and 1998,
5  did Wayne ever discuss anything with you concerning your
6  use of the trademark or mark Van Scoy Diamond Mine?
7      A. When he stopped in to use the bathroom, no, he
8  did not, at our store.
9      Q. What about any other time?
10     A. Nothing, nothing of the kind.
11     Q. Has Wayne ever talked to you about your use of
12  the mark Van Scoy Diamond Mine?
13     A. Not until November the 18th of 2004 was when I
14  knew anything about any kind of a mark, trademark or
15  anything of any sort. Again, all I know is, in 1994, my
16  father gave me the name and the sign for the business to
17  open.
18     Q. I'm not asking you specifically about whether you
19  knew about the trademark. I'm just asking you whether he
20  ever discussed the name of your store with you.
21     A. None whatsoever.
22     Q. Did he ever tell you that you were getting away
23  with murder with respect to your use of the trademark?
24     A. Not that I'm aware of, no. No, I would

Van Scoy                          v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

| Page 138 |
| --- |

1  definitely have to say no.
2      Q.  Anything to that effect? Did he ever object to
3  you, in any way, as to your use of the mark Van Scoy
4  Diamond Mine?
5      A.  None whatsoever.
6      Q.  Was permission given to your company to use the
7  trademark?
8      A.  The permission was given to me from my father to
9  use the name Van Scoy Diamond Mine, yes.
10     Q.  Was it given to your company?
11     A.  Yeah.
12     Q.  How so?
13     A.  My father.
14     Q.  Did he tell you that your company had a right to
15  use the mark?
16         MR. QUINN:  Already asked already answered.
17  So I object.
18  BY MR. PETOCK:
19     Q.  Are you being financed to defend this lawsuit by
20  any of your family members?
21     A.  No, I'm not.
22     Q.  By anyone else?
23     A.  No, I'm not.
24     Q.  Is anyone giving you any financial help to defend

| Page 139 |
| --- |

1  this lawsuit?
2      A.  It's me, myself and I.  No.
3         MR. PETOCK:  I would like to have this
4  marked as the next exhibit.
5         (Van Scoy Deposition Exhibit Nos. 11 and 12,
6  Website Pages, were marked for identification.)
7  BY MR. PETOCK:
8      Q.  Just so the record is clear, do you agree that
9  Number 11 is a partial printout of your website that was
10  hosted at vanscoydiamondmine.com?
11     A.  Yes.
12     Q.  And do you agree that Exhibit 12 is a printout of
13  the website that is currently hosted at
14  vanscoydiamondsofdelaware.com?
15     A.  That's correct.
16     Q.  Who registered the domain name Van Scoy Diamond
17  Mine of Delaware dot com?  So we can keep it clear, I'm
18  talking about Van Scoy Diamond Mine of Delaware dot come.
19         There is two different domain names,
20  correct?  You originally had Van Scoy Diamond Mine of
21  Delaware --
22     A.  Vanscoydiamondmine.com.  I don't know what --
23     Q.  Okay.  Sure.
24         MR. QUINN:  If you are confused, ask him to

| Page 140 |
| --- |

1  de-confuse you.  That all kind of got, you guys got
2  talking at the same time.  I don't think the record is
3  going to be clear.  It's certainly not clear in my mind
4  as to what was happening.
5  BY MR. PETOCK:
6      Q.  Did you ever register the domain name
7  vanscoydiamondmine.com?
8      A.  Yes.
9         MR. QUINN:  Objection to the form of the
10  question in the sense when he says you, are you referring
11  to the defendant personally or the entity, the three
12  defendants or what?
13  BY MR. PETOCK:
14     Q.  I am referring to you and your company.  I'm
15  referring to you personally, Kurt.  Did you register the
16  domain name vanscoydiamondmine.com?
17     A.  Personally, no.
18     Q.  Did your company register the domain name
19  vanscoydiamondmine.com?
20     A.  Yes.
21     Q.  When did that occur?
22     A.  June -- July 12th, I think, 2002.
23     Q.  Did someone recently renew the registration?
24     A.  I'm not sure.  I'm really not sure.

| Page 141 |
| --- |

1      Q.  Did you recently ask someone to renew the
2  registration?
3      A.  No.  There was -- no, not that I'm aware of, no.
4      Q.  It was said to expire July 12th, 2005, very
5  recently.  And now it is going to expire -- it is not
6  going to expire to until July 12th, 2006.  Can you
7  explain that?
8      A.  I know nothing about it.
9      Q.  Who designed the website, vanscoydiamondmine.com?
10     A.  Certified Solutions in Wilkes-Barre,
11  Pennsylvania.
12     Q.  Who hired the designers?
13     A.  I don't know that.
14     Q.  Did you hire the designers?
15     A.  I hired a company, Certified Solutions.  Who
16  designs in the company and all that, I don't know that.
17     Q.  Did you hire that company to design your website?
18     A.  Yes.
19     Q.  Did you pay them?
20     A.  Yes, I did.
21     Q.  Do you know who currently is hosting the website?
22     A.  Right now, as you said, renewal and all that
23  stuff, I have no idea.  No idea.  Vanscoydiamondmine.com?
24     Q.  Well, yeah.

                                36  (Pages 138 to 141)

Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy         C.A. # 05-108 (KAJ)          July 26, 2005

Page 142

1    A. I have no idea, no idea.
2        MR. QUINN: Wait a minute. You are asking
3    about the current?
4        MR. PETOCK: Right now I'm asking about the
5    current website, yes.
6        MR. QUINN: And he answered about the former
7    I think.
8    BY MR. PETOCK:
9    Q. I'm sorry. I'm talking about the former, yes.
10   That's all we talked about so far is
11   vanscoydiamondmine.com, the former.
12   A. Who has that now? I have no idea, no idea.
13   Q. Did you approve the design of
14   vanscoydiamondmine.com?
15   A. The design? It's a web name.
16   Q. Did you design -- did you approve the design of
17   the layout of the individual web pages of
18   vanscoydiamondmine.com?
19   A. Of Van Scoy Diamond Mine of Delaware,
20   Incorporated, yes, our website, yes.
21       MR. F. PETOCK: That's a different question.
22   He asked Van Scoy Diamond Mine.
23       THE WITNESS: Then I'm confused. I don't
24   understand the question.

Page 143

1        MR. PETOCK: I'll repeat the question.
2        MR. QUINN: I'm going to instruct the
3    witness. Listen very carefully to Mr. Petock's
4    questions. Because there is a close, there is some
5    similarity and some of the words are identical as
6    between, if I may characterize it, as the prior website
7    address and domain name and the current one. And so make
8    it, be very careful that you listen to him carefully so
9    that you know exactly what he's talking about so that you
10   can give an accurate answer.
11       THE WITNESS: Okay.
12   BY MR. PETOCK:
13   Q. Did you approve the design of the website that
14   was hosted at vanscoydiamondmine.com?
15   A. Yes.
16   Q. Have you stopped using the website
17   vanscoydiamondmine.com?
18   A. Yes.
19   Q. When did you stop using it?
20   A. Exact, I'm not sure. It was shortly thereafter.
21   We had, certainly, the notice of the lawsuit and all
22   that. And that's when pretty much, until we get this
23   thing squared away and find out where we are at, put a
24   holt to that particular website, absolutely.

Page 144

1    Q. Would you be willing to assign the domain name
2    vanscoydiamondmine to Wayne?
3    A. I don't know.
4    Q. And you have a new website, Van Scoy Diamond Mine
5    of Delaware; is that correct -- or
6    vanscoydiamondsofdelaware? I'm sorry.
7    A. Yes.
8    Q. Besides the domain names, are there any
9    differences between the actual substance of the websites
10   between the website vanscoydiamondmine.com and
11   vanscoydiamondsofdelaware.com?
12   A. No.
13   Q. They are exactly the same in substance?
14   A. Yes.
15   Q. I want you to look at Page 3 of
16   vanscoydiamondsofdelaware. It's Exhibit Number 12. Are
17   you there?
18   A. Do you have directions?
19   Q. It's the third page. On that web page, that is a
20   picture of a page on your website, correct?
21   A. That is correct, yes.
22   Q. There is a picture of your store; is that
23   correct?
24   A. Yes.

Page 145

1    Q. And your store has a sign on it that says Van
2    Scoy Diamond Mine; is that correct?
3    A. That is correct.
4    Q. Does this picture show the sign that was given to
5    you by your father?
6    A. It certainly does.
7    Q. Could you tell me what that sign is?
8    A. Yes. Right in the bottom it says "Diamond Mine."
9    That's the sign my father gave to me.
10   Q. At the top of the window; is that correct?
11   A. Correct.
12   Q. So did he give you the "Van Scoy" on the top?
13   A. That was actually there, my landlord actually.
14   Q. That was already there?
15   A. Yes.
16   Q. Earlier I asked you what remnants of your
17   father's store were left there. And you didn't mention
18   that. Could you explain to me why you didn't mention
19   that?
20   A. Well, you said inside the store.
21   Q. I don't think I did.
22   A. I'm pretty sure you said inside the store.
23   Q. Okay. What remnants of your father's store, were
24   there any remnants of your father's store left on the

Wilcox & Fetzer, Ltd.    Professional Court Reporters        (302)655-0477
237c0978-7df2-492f-be79-16c76b54a422

Page 146

1  store or outside the store?
2      A.  The only thing that was left was actually on the
3  top.  Just the "Van Scoy" was there.  And, actually, the
4  "Diamond Mine" part down here is actually inside the
5  premises.  And that's actually the sign that we took out
6  of my father's warehouse, he actually helped me load up
7  in the U-Haul truck.
8      Q.  So your father did not give you a sign that said
9  Van Scoy Diamond Mine; he gave you a sign that said
10  Diamond Mine.
11     A.  Diamond Mine, right.  Well, Van Scoy, he said
12  part of the sign is there.  He says, here, just take the
13  bottom part.  This is what you need, Van Scoy Diamond
14  Mine.  He left the sign there.  The top part he left
15  there.
16     Q.  And the landlord had not taken the sign down?
17     A.  No, he did not.
18     Q.  How big is the safe in your store?
19     A.  Exact, I'm not sure.
20     Q.  Is it a walk-in safe?
21     A.  No.
22     Q.  What is the sign that the Diamond Mine is made
23  out of?
24     A.  Fiberglass, fiberglass and metal, aluminum.

Page 147

1      Q.  And your website -- actually, referring to
2  Exhibit 11, it's going to be Docket Number 312, is that
3  the same picture that we were just looking at?
4      A.  Yeah.
5      Q.  And this is a page from your website that was at
6  vanscoydiamondmine.com?
7      A.  Say that again.  I'm sorry.
8      Q.  This page that we are looking at is a printout of
9  one of the pages that was at your website
10  vanscoydiamondmine.com?
11     A.  Yes.
12         MR. F. PETOCK:  Clarify this page.
13         MR. PETOCK:  The page that we are now
14  looking at.
15         MR. F. PETOCK:  Is what page?
16  BY MR. PETOCK:
17     Q.  It's identified by Bates Stamp Number 00312; is
18  that correct?  It says it on the bottom.
19     A.  Yes.
20     Q.  This also shows a picture of your store with the
21  sign Van Scoy Diamond Mine, correct?
22     A.  That is correct, yes.
23     Q.  Your website, both of them, both Exhibit Number
24  11 and Exhibit Number 12, refer to your jewelry store as

Page 148

1  Van Scoy Diamond Mine throughout the text of the website;
2  is that correct?
3      A.  Van Scoy Diamond Mine of Delaware, Incorporated,
4  yes.
5      Q.  It doesn't always say Van Scoy Diamond Mine of
6  Delaware, Incorporated, correct, in the text; sometimes
7  it says Van Scoy Diamond Mine?
8      A.  It may as well.  I'm not sure.
9      Q.  The same page we were just looking at that's
10  stamped Bates stamped 00312 of Exhibit 11, right there
11  right below about, it says "Van Scoy Diamond Mine is a
12  direct," and then it's cut off; is that correct?
13     A.  Yeah, that's correct.  Sure.
14     Q.  Go back to Page Number 3 of Exhibit Number 12.
15  It says in the same location, "Van Scoy Diamond Mine is a
16  direct diamond importer of the finest quality diamonds."
17  Is that what that says?
18     A.  That is correct.
19     Q.  So I'm going to ask you again.  Do the websites
20  that are shown in both Exhibit 11 and 12 refer to your
21  jewelry store as Van Scoy Diamond Mine and not Van Scoy
22  Diamonds Mine of Delaware, Incorporated, or anything?
23     A.  I'm not sure of the question.  I don't understand
24  it.

Page 149

1      Q.  Okay.  Do the websites; does your website hosted,
2  that was hosted at vanscoydiamondmine.com refer to your
3  jewelry store as Van Scoy Diamond Mine?
4      A.  Yes.
5      Q.  Does your website at
6  vanscoydiamondsofdelaware.com refer to your jewelry store
7  as Van Scoy Diamond Mine?
8      A.  Yes, it does.
9      Q.  How many hits did your website hosted at
10  vanscoydiamondmine.com get per month?
11     A.  I have no idea.
12     Q.  Is it the same answer for
13  vanscoydiamondsofdelaware?
14     A.  Yeah.  I don't know that.
15     Q.  Did you offer product for sale through your
16  current website, vanscoydiamondsofdelaware.com?
17     A.  It is available.  But nothing was sold.  Sure.
18     Q.  Did you offer products for sale through your
19  website hosted at vanscoydiamondmine.com?
20     A.  It's the same website.
21     Q.  How is it that you offer products for sale?
22     A.  A click on the image that if they see something,
23  they can enlarge it.  And if they want to get more
24  information about it, you get more information about it,

Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy        C.A. # 05-108 (KAJ)        July 26, 2005

Page 150

1  click on it or certainly E-mail us if they are interested
2  in purchasing or call us.
3      Q.  Have you made any sales through your website?
4      A.  One for a mounting.  One.
5      Q.  Do you know where that customer was located?
6      A.  Actually, it was from a gentleman that I know
7  from DOD training.  He lives in North Carolina.  He
8  contacted his son.  He had his son go on the website,
9  find a mounting that he liked.  He contacted me and I
10 sent the mounting down to his son.
11     Q.  Do you have a picture of all your products on
12 your website?
13     A.  No.
14     Q.  On your current website,
15 vanscoydiamondsofdelaware, there are pictures of at least
16 716 of your products.  Does that sound about right?
17     A.  Products that are available, sure.
18     Q.  Did you ever make any sales through your website
19 at vanscoydiamondmine.com?
20     A.  No.  Actually, that was, it was a mounting.  That
21 was it.
22     Q.  That was the sale that you made?
23     A.  The guy, he said, tell him to go to the website
24 and take a look at the mounting.

Page 151

1      Q.  So you made your sale through the website,
2  vanscoydiamondmine.com?
3      A.  He had a style what he was looking for.  And I
4  told him there was a picture on the website.  If you go
5  to that picture, he took a look at it.  And he said I'm
6  going to use your best judgment.  Send me what you have
7  that looks similar to what he's looking for.
8      Q.  But that sale was made through
9  vanscoydiamondmine.com?
10     A.  I can't say that, no.  Directly through that, no,
11 no.
12     Q.  I mean, when was this purchase made?
13     A.  Oh, God.  Probably 10 months ago, 11 months ago
14 at least.
15     Q.  So at that time vanscoydiamondsofdelaware didn't
16 exist; it was vanscoydiamondmine.com, correct?
17     A.  I believe so.
18     Q.  Is Newark, Delaware, a different geographic
19 market for diamonds than Wilkes-Barre, PA?
20     A.  I don't understand that question.  What do you
21 mean by that?
22     Q.  How would you define your sales market for your
23 business?
24     A.  Very competitive.

Page 152

1      Q.  How far does it extend geographically?
2      A.  Tri-state area.
3      Q.  What states are you talking about in the
4  tri-state area?
5      A.  Jersey, Maryland, Pennsylvania.
6      Q.  The entire states?
7      A.  No, the tri-state area.  Do you know what
8  tri-state is?  Just the lower southern part of Jersey,
9  the tri-state area.
10     Q.  And how would you define that, as your market?
11 Could you define that as your market?
12     A.  Not necessarily, to be honest with you, no.  It's
13 more just the Wilmington area market really.
14     Q.  In your experience, how far does a customer
15 travel from their home to purchase a diamond usually?
16     A.  I can't answer that question.  I have no idea.
17     Q.  Do you have a computer at your store?
18     A.  Yes.
19     Q.  What records are kept on your computers?
20     A.  What's on there?  Calendars.  What else is on
21 there?  There is internet access on there, accounts
22 payable, excuse me, accounts payable.  That's as far as I
23 know.  I do the bench work.
24     Q.  Do you have more than one computer?

Page 153

1      A.  Yeah, there is.
2      Q.  How many?
3      A.  Two.
4      Q.  Are the same things kept on both computers?
5      A.  No.  Both of them have internet access.  One has
6  accounts payable.  And the other one is just an internet
7  access and printing things or copying something, stuff
8  like that.
9      Q.  Where is the computer located that you keep your
10 invoices in and things other than the internet access?
11     A.  That's the other computer at the store.
12     Q.  Where is it located in the store?
13     A.  In the back at my wife's desk.
14     Q.  What were your gross sales last year?
15     A.  I have no idea.
16     Q.  Approximately.
17     A.  I have no idea.
18     Q.  What were your gross profits last year?
19     A.  I have no idea.
20     Q.  Approximately.
21     A.  I have no idea.
22     Q.  Can you tell me how much you made last year?
23     A.  Really, I have no idea.  I really don't.  I have
24 no idea.

Wilcox & Fetzer, Ltd.    Professional Court Reporters        (302)655-0477
237c0978-7df2-492f-be79-16c76b54a422

Van Scoy
Kurt Van Scoy          C.A. # 05-108 (KAJ)
v. Van Scoy Diamond Mine of Delaware, Inc.
July 26, 2005

---

Page 154

1  Q. How do you record sales?
2  A. I don't understand the question.
3  Q. How do you record how many sales you make? Your
4  sales, how do you record that? How do you write that
5  down? How do you keep a record of it?
6       MR. QUINN: How many questions is that?
7       MR. PETOCK: They are all the same, Charlie.
8       MR. QUINN: Then ask them one at a time,
9  please.
10 BY MR. PETOCK:
11 Q. How do you record your sales?
12 A. As they come in, account cards.
13 Q. Explain it to me, please.
14 A. Someone, they buy something. You have a receipt.
15 You come in the back. They put it in the box. At the
16 end of day, you come out. You take the receipt out. You
17 mark down the deposit, what it is. If it's a sale, it's
18 a sale. The girl takes the receipt, brings it over here.
19 Her name is John Doe. Okay. This is what she has. And
20 it's on an account card and you put it in the file.
21 Q. At some point, do you have one master list with
22 all your sales?
23 A. No. It's something I don't do. The girls do. I
24 don't know.

Page 155

1  Q. Who does do it?
2  A. My staff actually.
3  Q. Is there one person in charge of doing that?
4  A. No, not really.
5  Q. Do you have an accountant?
6  A. I do.
7  Q. Would your accountant know what your sales were
8  for last year or the year before or the year before that?
9  A. I would hope so. Sure.
10 Q. What is the name of your accountant?
11 A. Jim Bellinger.
12 Q. How do you record what your expenses are?
13 A. That's why I have an accountant.
14 Q. How does your accountant find out what your
15 expenses were?
16 A. That's something you would have to ask my
17 accountant to be honest. I don't know. I really don't
18 know. Your accounts payable, your expenses, all that, it
19 all spits right out. That's his department.
20 Q. So you don't keep track of what your expenses
21 are?
22 A. No, I don't, to be honest with you.
23 Q. Do you use E-mail to communicate?
24 A. Very little. Me personally, very little.

Page 156

1  Q. Who in the store records your sales? Just name
2  every person that records your sales.
3  A. The names I gave to you before really.
4  Q. Give them to me again, please.
5  A. Sands Shoemaker, Karen Vale, Annette D'Angelo,
6  Lori McMichael and Megan Rump.
7  Q. And then at some point -- they record the sales.
8  How do they record the sales? By writing out a sales
9  receipt; is that how they record the sales?
10 A. No. They take the sales receipt that comes in.
11 And you have an account card. And you take the name and
12 you write down the name, the street address. All the
13 information they put on a card and that goes in an
14 alphabetical box. And that's how you keep your accounts.
15 Q. And, at some point, does that box get transferred
16 to someone else?
17 A. No. It stays there for the year. People come
18 in. They make payments, what they bought. You don't
19 know.
20 Q. Do all those sales eventually get added up by
21 someone?
22 A. By the end -- when you do your printouts on your
23 computer for the end of the year, sure. You have your
24 deposits and what you put in and all your expenses and

Page 157

1  all that.
2  Q. You didn't mention anything about anything
3  getting put in the computer.
4  A. Well, when you are talking about accounts
5  payable, when you got accounts payable, you have your
6  total amounts of your income, what you took in, what your
7  expenses are and what your actual expenses were. It
8  breaks your expenses down and all that, your rent and
9  your payable and all that stuff. It, basically, just
10 breaks everything down.
11 Q. So all of that is inputted into your computer?
12 A. Correct.
13 Q. So that's all information that is in your
14 computer?
15 A. Yeah, I mean, I guess. That's where my
16 accountant comes in. I would have to assume, yes.
17 Q. Who puts it in the computer?
18 A. Actually, that's my wife.
19 Q. How come you didn't tell me this when I first
20 asked you?
21      MR. QUINN: Objection. I don't think that's
22 a fair characterization of what was asked before.
23 BY MR. PETOCK:
24 Q. So when does your wife input this information

40 (Pages 154 to 157)

**Page 158**

1 into the computer?
2     A. Almost on a daily basis I would say.
3     Q. Would she know what your gross profits were for
4 last year?
5     A. I don't know. I would doubt it. But I can't
6 answer for her.
7     Q. Did your father ever have a situation where one
8 of his licensees stopped paying royalties to him?
9     A. I have no idea. I do not know.
10     Q. Does Mark Mower currently operate a jewelry store
11 in Allentown?
12     A. My recollection, I believe he does, yes.
13     Q. Do you know what name it is?
14     A. I think it's actually three different -- it's
15 three guys that are joined together. But it's Van Scoy
16 something and something.
17     Q. Do you know if he has any other stores?
18     A. I don't know. I never really discussed with him
19 about anything else.
20     Q. Mark Mower, at one point, operated a Van Scoy
21 Diamond Mine; is that correct?
22     A. I believe so, yes.
23     Q. At some point it went out of business; is that
24 correct?

**Page 159**

1     A. Not that I'm aware of.
2     Q. Are you aware, at any time, of Mark Mower
3 operating a jewelry store by the name of Avalon Jewelers?
4     A. No. Actually, I'm not really aware of that.
5     Q. When you say you are not really aware of that,
6 could you tell me what that means?
7     A. I don't know.
8     Q. Do you retain the E-mails that you send or do you
9 delete them?
10     A. I don't do that myself. So I can't answer that.
11 I don't know.
12     Q. Who does do that?
13     A. Usually Lori McMichael.
14     Q. What is Lori McMichael's job duty in that regard?
15     A. Change the garbage, wipe the windows, sell a
16 ring, buff a ring, run to the post office, check E-mails,
17 copies. We're all, we just do what has to be done.
18 There is no set, you are this, you are that, you are
19 that, you are that, you are that. It's a team. We work
20 as a team.
21     Q. Have you told Lori McMichael that she has a duty
22 not to erase E-mails related to this case?
23     A. No. To be honest with you, no.
24     Q. Did you know you had a duty to tell her that?

**Page 160**

1     A. No, I did not.
2     MR. PETOCK: Let's take a break, please.
3     VIDEO SPECIALIST: Off the record at 2:48.
4 (Thereupon, a short recess was had.)
5     VIDEO SPECIALIST: Back on the record at
6 2:57.
7     MR. QUINN: I want to make it clear that,
8 when this suit started and the issue came up about the
9 retention of electronic communications related to the
10 case, that Mr. Van Scoy was instructed to retain anything
11 relating to the case that he had or generated
12 it be E-mail or otherwise, that he had or generated
13 during the course of the suit.
14     Now, what he uses or did use or does use his
15 E-mail or doesn't use his E-mail for is another issue.
16 But those were the instructions that he was given.
17     THE WITNESS: Yeah, anything regardless to
18 the case is certainly anything -- and we don't use E-mail
19 for that. We have everything that was mailed to us from
20 the beginning to where it stands right now. But anything
21 via E-mail regarding the trademark or anything about the
22 case itself, there is nothing there. If there is, there
23 is absolutely, it's still available I'm sure.
24     Again, everything was done through mail.

**Page 161**

1 E-mail is certainly with the business wise. Do you have
2 a ruby ring for X amount of dollars and all that? Sure.
3 That's a different thing. That's not regarding the case
4 itself.
5 BY MR. PETOCK:
6     Q. Did you talk about the substance of your
7 deposition testimony during the break with your lawyer?
8     MR. QUINN: I refreshed his recollection.
9     MR. PETOCK: I didn't ask you, Charlie.
10     MR. QUINN: I'm telling you what was
11 discussed during the break. I refreshed his recollection
12 as to the instructions that were given.
13     MR. PETOCK: But I didn't ask you.
14     MR. QUINN: I'm putting it on the record
15 whether you asked me or not. It's on the record.
16     MR. PETOCK: You put that on the record
17 before I get the answer from him?
18     MR. QUINN: I just did.
19     MR. F. PETOCK: Talking objection when there
20 is a question pending.
21     MR. QUINN: There was no question pending.
22     MR. F. PETOCK: There certainly was.
23     MR. PETOCK: You read the case that we gave
24 you. That's exactly what I'm allowed to do, ask that

Page 162

1  question.
2       MR. QUINN: There was no question asked when
3  I put that on the record. That's why I said to the lady
4  I wanted to put something on the record when she started.
5       MR. F. PETOCK: After you finished your
6  statement he asked the question. The witness was asked a
7  question and then you interjected. And that's the
8  question that was asked.
9       MR. QUINN: The record will show what the
10 record shows. It is what it is.
11 BY MR. PETOCK:    .
12     Q. How far back --
13       MR. F. PETOCK: You didn't get an answer to
14 that question.
15 BY MR. PETOCK:
16     Q. Well, did you talk about the substance of your
17 deposition testimony during the break?
18     A. He informed me on something, yes.
19     Q. About what areas of your testimony already given,
20 were expected to be given did you consult with Mr. Quinn?
21     A. He was just saying with the E-mails, what more
22 defined of what we meant, if anything, is revolving
23 around the trademark issue or about this case in via
24 E-mails is what he's saying, if that was deleted or not

Page 163

1  or anything. And I said I don't do any E-mailing of any
2  sort certainly with that about this case or the
3  trademark. Everything is by paper mailed via mail to us.
4  I have a stack that high of everything that was mailed to
5  us through this whole thing.
6       So that's what he was correcting me about.
7  He said if there is a ring and it's a ruby and all that
8  other stuff, that has nothing to do with the case itself
9  or the trademark.
10     Q. You just mentioned a stack of papers --
11     A. From what you --
12     Q. -- concerning the case. Have they been produced
13 to us?
14     A. It's what you have produced to us and what we
15 have been sending back and forth to you. It's
16 accumulating as we go. That's what I'm talking about as
17 a stack of papers.
18     Q. Do you want to change your deposition testimony
19 as a result of anything that Mr. Quinn said to you during
20 the break?
21     A. No.
22     Q. How far do the records that you keep go back, the
23 tangible records, not the ones on your computer?
24     A. From 1994.

Page 164

1      Q. How far do the records go back that you keep on
2  your computer?
3      A. That I can't -- I can't answer that. I can't
4  answer that. I don't know.
5      Q. Who could answer that?
6      A. Probably my wife.
7      Q. How much do your employees get paid per year?
8      A. I don't know that.
9      Q. Approximately how much?
10     A. I have no idea.
11     Q. Do some get paid more than others or do they all
12 get paid the same amount?
13     A. I have no idea.
14     Q. Do you know if they make more than $50,000 a
15 year?
16     A. I don't know that.
17     Q. Do you have a blue safe in your store?
18     A. Actually, yeah. That's from the landlord. Yes.
19     Q. Was it, at one point, your father's safe?
20     A. I don't know that to be honest with you. When we
21 opened up and the safe was in there. And my landlord
22 said, if you can get it open, you can use it. That's his
23 exact words. He did.
24     Q. Were you able to get it open?

Page 165

1      A. Actually, yeah. I had a guy open it up, yeah.
2  There is a tan safe that my father helped me move down.
3      Q. If you were a betting man, would you bet that
4  that safe was probably your father's?
5       MR. QUINN: Objection to the form of the
6  question.
7  BY MR. PETOCK:
8      Q. Do you think that safe was probably your father's
9  safe?
10     A. I have no idea. I really don't.
11     Q. Did you ever see that blue safe in the store when
12 you worked in your father's Delaware store in Churchmans
13 Plaza?
14     A. To be honest, he had a lot of safes. Blue safes,
15 I really, I don't know that. All I know is what he gave
16 me to bring down to the store.
17     Q. You understand now that you have a duty to
18 preserve evidence, correct?
19     A. Absolutely, sure.
20     Q. Related to the case.
21     A. Correct.
22       MR. PETOCK: I would like to move the
23 following three exhibits into evidence: The tax returns
24 that were produced for 2002, tax returns produced for

Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)            July 26, 2005

---

Page 166

1  2003.
2         MR. QUINN: '02, '03, '04?
3         MR. PETOCK: Yeah.
4         (Van Scoy Deposition Exhibit Nos. 13, 14 and
5  15, Tax Returns, were marked for identification.)
6         VIDEO SPECIALIST: This ends Tape Number 4
7  of the video deposition of Kurt Van Scoy. The time is
8  3:06.
9         (Thereupon, a short recess was had.)
10        VIDEO SPECIALIST: This is Tape Number 5 of
11 the video deposition of Kurt Van Scoy. The time is 3:11.
12 BY MR. PETOCK:
13    Q.  Do you know what a trade name is, Kurt?
14    A.  I'm not sure I understand the question.
15    Q.  Do you know what the word — do you know what the
16 phraseology "trade name" is? Do you know what a trade
17 name is?
18    A.  A trademark name?
19    Q.  Is there a difference between a trade name and a
20 trademark?
21    A.  I don't know.
22    Q.  Okay. That's fine. Did your company help
23 finance Tovon or your brother Tommy in any way?
24    A.  No.

---

Page 167

1     Q.  Did your company cosign on any loans or anything?
2     A.  No.
3     Q.  Did you help him in any way?
4     A.  No.
5     Q.  Your company?
6     A.  Nothing, no.
7     Q.  I'm going to show you Exhibit 13, 14 and 15.
8  Could you tell me what they are?
9     A.  That's 1120-S Forms, income tax forms for
10 S Corporation, 2002, 2003 and 2004.
11        MR. F. PETOCK: For what corporation?
12        THE WITNESS: Van Scoy Diamond Mine of
13 Delaware, Incorporated.
14 BY MR. PETOCK:
15    Q.  Are those the documents that you produced in
16 response to your Notice of Deposition?
17    A.  Yes.
18        MR. QUINN: Among others. They are not all,
19 correct?
20        MR. PETOCK: Yes, that's correct.
21 BY MR. PETOCK:
22    Q.  Those are the documents that you produced in
23 response to our request for advertising expenditures from
24 the year you opened your store until the present; is that

---

Page 168

1  correct?
2     A.  That's correct.
3     Q.  And those are all the documents you produced with
4  respect to that question?
5     A.  Yes.
6         MR. PETOCK: I'm going to put on the record
7  that this deposition is left open because all of the
8  documents in respect to that request have not been
9  produced. But other than that, I have nothing more for
10 today.
11        MR. QUINN: Okay. I have nothing.
12        VIDEO SPECIALIST: This concludes the video
13 deposition of —
14        MR. F. PETOCK: One more thing. You reserve
15 the right to read and sign the deposition? Does your
16 client reserve that right?
17        MR. QUINN: I assume you want to do that, do
18 you not, read and sign the deposition? You want the
19 opportunity to read your transcript?
20        THE WITNESS: Sure.
21        MR. F. PETOCK: I want the court reporter to
22 keep the transcript. And the court reporter, for
23 convenience, can send the signature sheet and errata
24 sheet to you. But the court reporter should retain the

---

Page 169

1  original of the transcript.
2         VIDEO SPECIALIST: This concludes the video
3  deposition of Kurt Van Scoy. The time is 3:14.
4         (Thereupon, the deposition concluded at 3:14
5  p.m.)
6         - - - - -
7
8               INDEX TO TESTIMONY
9
   KURT VAN SCOY                    PAGE
10
   Examination by Mr. Petock                3
11
12         - - - - -
          INDEX TO EXHIBITS
13
   VAN SCOY DEPOSITION EXHIBIT NO.      PAGE
14
   1, Meeting Minutes of August 22, 1996 ...... 6:11
15 2, Cease and Desist Letter.................... 12:24
   3, Letter to Fox Rothschild Dated February 22,
16 2005................................. 15:13
   4, UPS Invoices............................ 21:24
17 5, Warranty.............................. 76:15
   6, Valentine's Ad......................... 78:16
18 7, Sales Receipts.......................... 81:4
   8, Notice of Deposition Resetting Date ........ 92:22
19 9, Bankruptcy Petition.................... 121:22
   10, Order Approving Agreement in Settlement
20 of Adversary Proceedings and Contested Matters 124:18
   11 and 12, Website Pages.................... 139:5
21 13, 14 and 15, Tax Returns................ 166:4
22
23
24

---

43 (Pages 166 to 169)

237c0978-7df2-492f-be79-16c76b54a422

Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

|  | Page 170 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | REPLACE THIS PAGE |
| 7 | |
| 8 | WITH THE ERRATA SHEET |
| 9 | |
| 10 | AFTER IT HAS BEEN |
| 11 | |
| 12 | COMPLETED AND SIGNED |
| 13 | |
| 14 | BY THE DEPONENT. |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Page 171

State of Delaware )
               )
New Castle County )
        CERTIFICATE OF REPORTER
    I, Anne L. Adams, Registered Professional
Reporter and Notary Public, do hereby certify that there
came before me on the 26th day of July, 2005, the
deponent herein, KURT VAN SCOY, who was duly sworn by me
and thereafter examined by counsel for the respective
parties; that the questions asked of said deponent and
the answers given were taken down by me in Stenotype
notes and thereafter transcribed into typewriting under
my direction.
    I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.
    I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


        Anne L. Adams
        Certification No. 105-RPR
        (Expires January 31, 2008)

Wilcox & Fetzer, Ltd.    Professional Court Reporters          (302)655-0477
                                                    237c0978-7df2-492f-be79-16c76b54a422