# EXHIBIT K



**WILCOX & FETZER LTD.**

In the Matter Of:

# Van Scoy

## v.

# Van Scoy Diamond Mine of Delaware, Inc.

### C.A. # 05-108 (KAJ)

---

Transcript of:

Kurt Van Scoy

July 26, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

EXHIBIT K

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

WAYNE VAN SCOY,                    )
                                   )
            Plaintiff,             )
                                   )
v.                                 )    Civil Action No.
                                   )      05-108 (KAJ)
VAN SCOY DIAMOND MINE OF           )
DELAWARE, INC., KURT VAN SCOY      )
and DONNA VAN SCOY,                )
                                   )
            Defendants.            )

          Video deposition of KURT VAN SCOY taken
pursuant to notice at the offices of Ashby & Geddes, 17th
Floor, 222 Delaware Avenue, Wilmington, Delaware,
beginning at 10:00 a.m. on Tuesday, July 26, 2005, before
Anne L. Adams, Registered Professional Reporter and
Notary Public.

APPEARANCES:

            MICHAEL F. PETOCK, ESQ.
            MICHAEL C. PETOCK, ESQ.
            PETOCK & PETOCK
              46 The Commons at Valley Forge
              1220 Valley Forge Road
              Valley Forge, Pennsylvania 19482-0856
              for the Plaintiff,

            CHARLES N. QUINN, ESQ.
            FOX ROTHSCHILD
              2000 Market Street, 10th Floor
              Philadelphia, Pennsylvania 19103-3291
              for the Defendants.

ALSO PRESENT:   Wayne Van Scoy
                Donna Van Scoy
                Lisa Bauer - Video Specialist

------------------------------------------------------
                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477

237c0978-7df2-492f-be79-16c76b54a422

Van Scoy Case 1:05-cv-00108-KAJ    Document 142-4    Filed 12/12/2005    Page 4 of 23
Kurt Van Scoy              C.A. # 05-108 (KAJ)       v. Van Scoy Diamond Mine of Delaware, Inc.
                                                              July 26, 2005

### Page 2

1  VIDEO SPECIALIST:  This is the videotaped
2  deposition of Kurt Van Scoy taken by the plaintiff in the
3  matter of Wayne Van Scoy versus Van Scoy Diamond Mine of
4  Delaware, Incorporated, et al., held in the office of
5  Ashby & Geddes on July 26, 2005, at 10 a.m.
6       The court reporter is Anne Adams from the
7  firm of Wilcox & Fetzer.  My name is Lisa Bauer, a video
8  specialist from Discovery Video Services, Incorporated,
9  in association with Wilcox & Fetzer.
10      Counsel will now introduce themselves.
11      MR. PETOCK:  Michael C. Petock for
12  plaintiff, Wayne Van Scoy.
13      MR. F. PETOCK:  Michael F. Petock for
14  plaintiff, Wayne Van Scoy.
15      MR. W. VAN SCOY:  Wayne Van Scoy, plaintiff.
16      MR. QUINN:  Charles N. Quinn for the
17  defendants.
18      VIDEO SPECIALIST:  The court reporter will
19  now swear in the witness.
20              KURT VAN SCOY,
21      the witness herein, having first been
22      duly sworn on oath, was examined and
23  r   testified as follows:
24              EXAMINATION

### Page 3

1  BY MR. PETOCK:
2    Q.  Good morning, Kurt.
3    A.  Good morning.
4    Q.  I'm going to ask you some questions today to see
5  what you know about the facts giving rise to this
6  lawsuit.  If you don't understand a question, ask me to
7  repeat it.  If you don't understand the substance of a
8  question, tell me so I can rephrase it.  If you realize
9  that an earlier answer you gave was inaccurate or
10 incomplete, just let me know and you will be allowed to
11 go back and supplement your earlier answer.
12      During this deposition, you are not allowed
13 to consult with your attorney about the substance of the
14 deposition.  In other words, you can't talk to your
15 attorney about the deposition testimony that you either
16 have given or you anticipate to give.  Do you understand
17 that?
18   A.  Yes.
19   Q.  That includes during recesses also.
20      MR. QUINN:  And what is your authority for
21 that proposition?
22      MR. PETOCK:  We have a case.  I can pull it
23 out if you would like.
24      MR. QUINN:  I would to see it.

### Page 4

1       MR. F. PETOCK:  We can do that later.
2       MR. QUINN:  We can go forward, but I would
3  like to see that case.
4       MR. PETOCK:  Sure.  No problem.
5       MR. F. PETOCK:  There is definitely case law
6  here in this district that holds that.
7       MR. QUINN:  I would like to see it.
8  BY MS. VAUGHAN:
9    Q.  During the deposition, I will, from time to time,
10 I will refer to your father, Thomas Van Scoy, Senior.
11   A.  Yes.
12   Q.  Unless the context is clearly contrary, when I
13 refer to your father, I'm also referring to your father's
14 company, Van Scoy Diamond Mine, Inc.
15   A.  Okay.
16   Q.  Do you understand the instructions as I have
17 given them to you?
18   A.  Yes.
19   Q.  You have taken an oath this morning under the
20 penalty of perjury to tell the truth.  Do you understand
21 that oath?
22   A.  Yes, I do.
23   Q.  Could you, please, you state your name and
24 address for the record?

### Page 5

1    A.  Kurt Van Scoy, 820 Old Harmony Road, Newark,
2  Delaware.
3    Q.  You're married to Donna Van Scoy; is that
4  correct?
5    A.  Donna Marie Van Scoy, that's correct.
6    Q.  When did you two get married?
7    A.  July 31st, 1994.
8    Q.  Are you an owner of Van Scoy Diamond Mine of
9  Delaware, Inc.?
10   A.  I am the president.
11   Q.  Who else has an ownership -- are you an owner?
12   A.  I am owner, yes.
13   Q.  Who else has an ownership interest?
14   A.  Actually, my wife is secretary.
15   Q.  And what percentage ownership do you have?
16   A.  We are 50/50.
17   Q.  You have a 50 percent ownership and Donna has a
18 50 percent ownership interest?
19   A.  Yes.
20   Q.  And you said you're president?
21   A.  Correct.
22   Q.  Do you make the decisions for the corporation?
23   A.  I do.
24   Q.  So you authorize and approve the advertising of

Van Scoy                                          v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy              C.A. # 05-108 (KAJ)              July 26, 2005

Page 6

1    the corporation?
2      A.  Yes, I do.
3      Q.  Do you authorize and approve what trade name to
4    use?
5      A.  I don't understand the question.
6      Q.  Do you make the decisions as to what trade name
7    to use?
8      A.  Yes.
9          MR. PETOCK:  I would like to have this
10   marked as Exhibit 1, please.
11         (Van Scoy Deposition Exhibit No. 1, Meeting
12   Minutes of August 22, 1996, was marked for
13   identification.)
14   BY MR. PETOCK:
15     Q.  Kurt, can you please tell me what you have in
16   front of you that has been marked Exhibit 1?
17     A.  This is the minutes from a corporate meeting.
18     Q.  Okay. I'm particularly interested in bullet point
19   Number 3, the trade name issues.  What trade name issues
20   were discussed in this corporate meeting?  It was a
21   special meeting of the board of directors; is that
22   correct?
23     A.  That would be correct.
24     Q.  That took place on August 22nd, 1996?

Page 7

1      A.  Correct.
2      Q.  Could you, please, tell me what the trade name
3    issues that were discussed were?
4      A.  I don't remember.
5      Q.  You have no recollection of what trade name
6    issues were discussed?
7      A.  1996, that's nine years ago. I don't remember.
8      Q.  Would you -- what did you mean by trade name
9    issues?
10     A.  I don't remember.
11     Q.  Is there any reason that you would have been
12   talking about trade name issues in 1996?
13     A.  None whatsoever. I don't remember.
14     Q.  Is it common for you to have discussed trade name
15   issues at corporate meetings?
16     A.  I don't recall.
17     Q.  Did you talk about trade name issues at your last
18   corporate meeting?
19     A.  To be -- I don't recall.  I don't know.
20     Q.  You don't remember -- do you remember your last
21   corporate meeting?
22     A.  Briefly, but I don't recall any issues about
23   trade name issues.
24     Q.  When was your last corporate meeting?

Page 8

1      A.  Offhand, I don't know.
2      Q.  Do you hold corporate meetings on a regular
3    basis?
4      A.  We do once a year, twice a year sometimes, yes.
5      Q.  Do you remember what trade name you were using at
6    the time in 1996, August 22nd?
7          MR. QUINN:  Objection. Define trade name.
8      Q.  Kurt, could you define trade name issues to what
9    it means to you today?
10     A.  It's the name of my business.
11     Q.  Which is what?
12     A.  Van Scoy Diamond Mine of Delaware, Incorporated.
13     Q.  Is it the name you use in your advertising?
14     A.  Actually, no.
15     Q.  How is it different?
16     A.  It's Van Scoy Diamond Mine.  That's what my
17   father gave me.
18     Q.  What do you mean your father gave you the name
19   Van Scoy Diamond Mine?  Could you explain that to me?
20     A.  I sure will.  In 1994, prior opening of our
21   business on November 12th, my father actually gave me the
22   sign, literally gave me the sign, Van Scoy Diamond Mine,
23   from our warehouse and actually brought that down to our
24   location here in Delaware.

Page 9

1      Q.  What was the date that he gave you the sign that
2    said Van Scoy Diamond Mine?
3      A.  The exact date I can't recall.  I know it was
4    roughly, probably, about a month prior to the November
5    12th. So I would have to say sometime in October.
6      Q.  November 12th was the opening of your store?
7      A.  That is correct.
8      Q.  Does that sign still exist?
9      A.  Absolutely.
10     Q.  Is it on your store now?
11     A.  Yes, it is.
12     Q.  Does it say Van Scoy or does it say Van Scoy
13   Diamond Mine?
14     A.  It says Van Scoy Diamond Mine.
15     Q.  Where is that located on your store?
16     A.  On the front of the store.
17     Q.  Did your dad actually tell you you had permission
18   to the use the mark or did you infer that from the fact
19   that he gave you the sign?
20     A.  He gave me the right to use that name.
21     Q.  What did he say to you exactly?
22     A.  Here's the sign.  Good luck to you.  I love you
23   very much and I'm proud of you.
24     Q.  Getting back to the minutes, your testimony is

3 (Pages 6 to 9)

Van Scoy                              v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy        C.A. # 05-108 (KAJ)        July 26, 2005

---

Page 10

1   that you have no recollection of what trade name issues
2   were discussed?
3       A.  At that time, no.
4       Q.  At this time no or at that time no?
5       A.  At that time -- well, this time, no.
6           MR. QUINN:  Clarify that.  Is the question
7   does he have any recollection now or what happened then?
8           MR. PETOCK:  Obviously, yes.
9   BY MR. PETOCK:
10      Q.  Do you have any recollection --
11          MR. QUINN:  It sounded like you were asking
12  whether he had recollection now of what's going on now as
13  opposed to recollections now of what went on then.
14  BY MR. PETOCK:
15      Q.  Your testimony is that you have no
16  recollection --
17          MR. QUINN:  Let me get my objection out.
18          MR. F. PETOCK:  You are leading the witness.
19  You are coaching the witness.
20          MR. QUINN:  I'm making an objection.
21          MR. F. PETOCK:  Objection as to the form of
22  the question.  That's all you're allowed to do.
23          MR. QUINN:  We didn't have any stipulations
24  on the record as far as the objections.  If you want to

---

Page 11

1   put them on, that's fine.
2           MR. F. PETOCK:  That's all you're allowed to
3   do, objection as to the form of the question.
4           MR. QUINN:  All objections are reserved,
5   correct?
6           MR. F. PETOCK:  Except as to form of the
7   question, right.
8           MR. QUINN:  Except as to the form of the
9   question, is that stipulated?
10          MR. PETOCK:  Yes.
11          MR. QUINN:  Okay.
12  BY MR. PETOCK:
13      Q.  Do you remember who was present at that meeting?
14      A.  I don't.
15      Q.  Who would have been present?  Who is normally
16  present at a corporate meeting?
17      A.  Myself --
18          MR. QUINN:  Objection.  That's two
19  questions.
20  BY MR. PETOCK:
21      Q.  Who is normally present at a corporate meeting?
22      A.  Me.
23      Q.  Is there anyone that would remember what trade
24  name issues were discussed?

---

Page 12

1       A.  Nine years ago, no.
2       Q.  What other -- any other documents exist as to
3   what went on at this meeting?
4       A.  No.
5       Q.  You said you were the only person present at the
6   meeting?
7       A.  Well, me, my accountant, he was present.  And
8   usually at my meetings, that's usually who is there.
9       Q.  Donna isn't usually present?
10      A.  Sometimes.
11      Q.  Where did this meeting take place?
12      A.  I don't recall.  Again, you are asking me
13  something nine years.  I don't recall.
14      Q.  Was it at 1218 South Main?
15      A.  Obviously, then that's where it would be.
16      Q.  What is that location?  What location is 1218
17  South Main in Wilkes-Barre?
18      A.  That would be -- I would ask the other attorney,
19  if I'm not mistaken, the attorney I had from back home.
20      Q.  What was his name?
21      A.  Argood, Pat Argood.
22          MR. PETOCK:  I would like to have this
23  marked as Exhibit 2.
24          (Van Scoy Deposition Exhibit No. 2, Cease

---

Page 13

1   and Desist Letter, was marked for identification.)
2   BY MR. PETOCK:
3       Q.  Can you tell me what you have in front of you
4   that has been marked as Exhibit 2?
5       A.  A notification via filing a suit towards me for
6   using the name Van Scoy.
7       Q.  I'm going to refer to this as a cease and desist
8   letter.  Is that okay?  Is that understood?
9       A.  That's fine.
10      Q.  Did you receive this cease and desist letter?
11      A.  Yes.
12      Q.  Do you remember the approximate date that you
13  received it?
14      A.  November the 18th, 2004.
15      Q.  After you received the cease and desist letter,
16  did you continue to direct the acts of your corporation?
17      A.  I did because I believe this was in disbelief.
18      Q.  What do you mean you believe it was in disbelief?
19      A.  I wasn't aware of a trademark.
20      Q.  You weren't aware of -- what do you mean?  Could
21  you explain that further, you weren't aware of a
22  trademark?
23      A.  When I received this letter, this is the first
24  time I knew anything, certainly, about a trademark for

---

Wilcox & Fetzer, Ltd.    Professional Court Reporters
                                              (302)655-0477
                                              237c0978-7df2-492f-be79-16c76b54a422

Van Scoy                                   v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

Page 14

1   Van Scoy Diamond Mine.
2      Q.  So after you received this cease and desist
3   letter, you continued to authorize and approve the
4   advertising of the corporation?
5      A.  I seeked counsel.
6      Q.  And you continued to author and approve -- is
7   that a yes?
8      A.  That is a yes.
9      Q.  Did you continue to author and approve what
10  trademark to use?
11     A.  Yes.
12     Q.  And did you continue to authorize and approve
13  the design and publication of the website hosted at
14  vanscoydiamondmine.com?
15     A.  After I seeked counsel, we agreed to, actually to
16  shut it down until we find out the results.
17     Q.  Of this litigation?
18     A.  Correct.
19     Q.  Did you review all of our requests for documents
20  that you have received during this discovery period?
21     A.  Yes.
22     Q.  Have you produced everything that we have asked
23  for?
24          MR. QUINN:  The record's clear that we

Page 15

1   produced representative samples in many cases. And we
2   invited you to come to the premises to make the copies.
3          MR. PETOCK:  Okay.  I'm going to ask Kurt to
4   answer the questions.
5          MR. QUINN:  Well, as best he can.
6          MR. PETOCK:  Well, that doesn't mean you
7   have the right to answer.  If he can't, he can say he
8   doesn't know or something to that effect.
9          MR. QUINN:  He can say whatever he knows.
10         THE WITNESS:  I don't know.
11         MR. PETOCK:  I'm going to have this marked
12  as Exhibit 3, please.
13         (Van Scoy Deposition Exhibit No. 3, Letter
14  to Fox Rothschild Dated February 22, 2005, was marked for
15  identification.)
16  BY MR. PETOCK:
17     Q.  Could you tell me what you have in front of you
18  that's been marked as Exhibit 3?
19     A.  This is, obviously, the beginning of a suit for
20  using the name.
21     Q.  It's, actually, it's a letter addressed to your
22  lawyer, Charlie, correct?
23     A.  Correct.
24     Q.  Do you remember if this letter was forwarded to

Page 16

1   you?
2      A.  I believe so.
3      Q.  Did Mr. Quinn inform you that you had an
4   obligation to preserve evidence during this litigation,
5   including electronic evidence such as your website?
6          MR. QUINN:  Objection to the extent that
7   that asks for a question involving the attorney/client
8   privilege.
9   BY MR. PETOCK:
10     Q.  Did you review this letter when you got it?
11     A.  Yes.
12     Q.  Did you know you had an obligation to preserve
13  evidence?
14     A.  Yes.
15     Q.  Could you tell me why you have not turned over
16  any files related to your website hosted at
17  vanscoydiamondmine.com?
18     A.  I don't understand the question.
19     Q.  We have asked for documents related to your
20  website that was hosted at vanscoydiamondmine.com.  You
21  did have a website at vanscoydiamondmine.com at one time,
22  correct?
23     A.  Correct.
24     Q.  And, in fact, when you received your cease and

Page 17

1   desist letter, that was where your website was hosted,
2   correct?
3      A.  Yes.
4          MR. QUINN:  Clarify the question.
5          MR. PETOCK:  Okay.
6          MR. QUINN:  You said that was where the
7   website was hosted?
8          MR. PETOCK:  He said yes.  He said yes.  I
9   don't see why I need to clarify the question.
10         MR. QUINN:  So I can understand it.
11         MR. F. PETOCK:  It's not for you -- if the
12  witness doesn't understand the question, he can say he
13  doesn't understand it.  It's for the witness to
14  understand the question.
15         MR. QUINN:  Well, if I can't understand the
16  question, how can I advise this guy?
17         MR. PETOCK:  You're not advising him.
18         MR. QUINN:  I'm certainly going to advise
19  him after this deposition is over.  If I can't understand
20  what the question was when it was asked, I can't advise
21  him after it's over.
22         MR. PETOCK:  You can argue about that later.
23         MR. QUINN:  And we certainly will.
24  BY MR. PETOCK:

5 (Pages 14 to 17)

Van Scoy          Case 1:05-cv-00108-KAJ   Document 142-4   Filed 12/12/2005   Page 8 of 23
                                        v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

Page 18

1    Q.  You said that you had a website hosted, that
2   there was a website that was hosted at
3   vanscoydiamondmine.com, that was where your website was,
4   correct?
5    A.  Yes.
6        MR. QUINN:  Wait a minute.  At
7   vanscoydiamondmine.com does not define a geographic
8   place.
9        MR. PETOCK:  It's not a geographic place.
10  It's a place on the internet.
11       MR. QUINN:  That's the inference that you
12  were trying to draw from the witness a minute ago.
13       MR. PETOCK:  Charlie, you know quite well
14  that that question is clear.
15       MR. QUINN:  If you clarify what you mean by
16  at, then it's clear.  But an ordinary listener reading
17  that transcript could conclude that the question inquires
18  as to whether the website was at the jewelry store.
19       MR. PETOCK:  At vanscoydiamondmine.com is a
20  domain name.
21       MR. QUINN:  That's correct.
22  BY MR. PETOCK:
23   Q.  You had a domain name vanscoydiamondmine.com?
24   A.  Yes.

Page 19

1    Q.  And your website was hosted at
2   vanscoydiamondmine.com.  Yes?
3    A.  I still don't understand the question.
4    Q.  You understood it before.
5    A.  I know, but something -- I don't understand the
6   question.
7    Q.  If someone is surfing the internet, was to type
8   in vanscoydiamondmine.com, www.vanscoydiamondmine.com,
9   your website would show up on their computer; is that
10  correct?
11   A.  Correct.
12   Q.  Now, we asked for you to give is a printout of
13  that website.  You did not produce that.
14   A.  That's something I needed to talk to counsel.
15   Q.  No, I'm asking you.  We asked you to produce it
16  but did you not produce it.  Could you tell me why it
17  wasn't produced?  Was that website destroyed?
18       MR. QUINN:  How many questions are you going
19  to ask at one time?
20       THE WITNESS:  I don't know.
21       MR. QUINN:  Don't answer until he decides
22  which question you're to answer.
23  BY MR. PETOCK:
24   Q.  Was the website that we are talking about,

Page 20

1   vanscoydiamondmine.com, any records of it destroyed?
2    A.  I don't know.
3    Q.  You don't know whether the records were
4   destroyed?
5    A.  I don't know.
6    Q.  Okay.  Could you tell me the names of your
7   brothers and sisters?
8    A.  Sure will.  Tommy Van Scoy, Sr.  And, I'm sorry,
9   Junior.  Tony Van Scoy, Betsy Williams, Pam Sendrick,
10  Wayne Van Scoy, Ken Van Scoy, my deceased brother, Keith
11  Van Scoy, and myself, Kurt Van Scoy.
12   Q.  Can you tell me where Tommy Van Scoy lives, Tommy
13  Van Scoy, Jr.?
14   A.  In Dallas, Pennsylvania.
15   Q.  He owns a jewelry store by the name of Tovon; is
16  that correct?
17   A.  Correct.
18   Q.  That's approximately an eighth of a mile from
19  where Wayne's store is located right now; is that
20  correct?
21   A.  I believe so.
22   Q.  So he's in direct competition with Wayne's store?
23   A.  I would say so.
24   Q.  You helped finance Tommy opening up his jewelry

Page 21

1   store; is that correct?
2    A.  No.
3    Q.  Did you cosign in some way on the loan?
4    A.  No.
5    Q.  In any way?
6    A.  No.
7    Q.  Did you help him, in any way, opening his jewelry
8   store?
9    A.  No.
10   Q.  When was the last time you have spoken to Tommy?
11   A.  Yesterday actually.
12   Q.  What did you guys speak about yesterday?
13   A.  How's things going?  What's going on?  How's the
14  kids?
15   Q.  Do you guys have any sort of business
16  relationship at all?
17   A.  No.
18   Q.  Do you supply him with anything?
19   A.  Absolutely not.
20   Q.  Have you -- do you send him things?
21   A.  No.
22       MR. PETOCK:  I would like to have this
23  marked as the next exhibit.
24       (Van Scoy Deposition Exhibit No. 4, UPS

Van Scoy    Case 1:05-cv-00108-KAJ    Document 142-4    Filed 12/12/2005    Page 9 of 23
Kurt Van Scoy    C.A. # 05-108 (KAJ)     v. Van Scoy Diamond Mine of Delaware, Inc.
                                             July 26, 2005

**Page 22**

1  Invoices, was marked for identification.)
2  BY MR. PETOCK:
3     Q. You just testified that you do not send Tommy
4  Van Scoy anything. Could you tell me what you have in
5  front of you?
6        MR. QUINN: I think that's a
7  mischaracterization of his testimony.
8        MR. PETOCK: All you need to say is
9  objection. You stipulated to the fact that objecting to
10  the form of the question is the only objection you need.
11  You are coaching the witness. You are instructing the
12  deposition.
13        MR. QUINN: Well, if it's a
14  mischaracterization, that's a pretty specific objection
15  as to the form.
16        MR. PETOCK: You are coaching the witness by
17  saying that. There is no question about it. And I know
18  this. I mean, I even know this.
19        How am I mischaracterizing his testimony
20  when I asked when he said --
21        MR. QUINN: He hadn't answered the question.
22  He just restated what he said in the answer.
23  BY MR. PETOCK:
24     Q. Could you tell me what this is?

**Page 23**

1        MR. QUINN: You can have the answer read
2  back. You can have the question read back.
3  BY MR. PETOCK:
4     Q. Could you tell me what has been marked as
5  Plaintiff's Exhibit 4, please?
6     A. Sure. This, obviously, if you are talking about
7  business related stuff, I have to say no. I know there
8  is times he stayed down and, actually, stuff that was
9  left at my house from his kids I know we shipped back to
10  his place.
11     Q. Could you answer the question? I said: What is
12  this?
13     A. It's a shipping, billing/shipping paper.
14     Q. And what was -- is there a shipment from you to
15  Tommy or to Tovon?
16     A. No. There is a name on there. It says Lori
17  McMichael.
18     Q. Above Lori McMichael, what does it say?
19     A. It says Van Scoy Diamond Mine.
20     Q. What's the address of the Van Scoy Diamond Mine?
21     A. 1117 Churchmans Road.
22     Q. Is that your Van Scoy Diamond Mine?
23     A. Yes, it is.
24     Q. Now, this is the UPS billing summary.

**Page 24**

1     A. Yes.
2     Q. The UPS billing summary on the third page, if you
3  look at this third page, this one was actually something
4  was sent from Tovon and Company in DuPont, PA, and the
5  receiver was Kurt.
6     A. Okay.
7     Q. Can you tell me what that was?
8     A. I don't recall.
9     Q. On February 12th, 2005, you can't remember
10  receiving anything from Tommy?
11     A. No.
12     Q. Do you receive many things in the mail or through
13  courier services from Tommy?
14     A. Many? No.
15     Q. How often?
16     A. If I'm up there, I forget something, he'll send
17  it down to me. I get packages from my other brothers, my
18  sister.
19     Q. And yet -- so it's not that afternoon that you
20  can't remember February 12th, 2005, what he sent to you?
21     A. What was sent to me, no.
22     Q. Let's look at the FedEx on the billing receipt.
23  Do you remember this? Do you agree that this FedEx
24  billing summary shows something being sent from Van Scoy

**Page 25**

1  Diamond Mine in Newark, Delaware, at 1117 Churchmans Road
2  to Tommy on February 25th, 2004, at Tovon and Company?
3     A. Again, that's -- yes.
4     Q. You don't remember what you sent him; is that
5  your testimony?
6     A. There is a name there, Lori. I'm not Lori.
7     Q. Are you in charge of Lori? Is she your employee?
8     A. She's an employee.
9        MR. QUINN: That's two questions. Ask them
10  one at a time, please.
11  BY MR. PETOCK:
12     Q. Is she your employee?
13     A. Yes.
14     Q. Would you have directed her to send something to
15  Tommy or would you have directed something -- would you
16  have directed her to send something to Tommy?
17     A. Sure, yeah.
18     Q. She wouldn't have just sent it on her own?
19     A. No. If he left something there, yeah, send it,
20  just send it back.
21     Q. How often does Tommy come to your store?
22     A. He comes to my residence. Maybe half a dozen
23  times through the year roughly.
24     Q. Your testimony is that you can't remember what

Wilcox & Fetzer, Ltd.    Professional Court Reporters
                                      (302) 655-0477
                                 237c0978-7df2-492f-be79-16c76b54a422

**Page 26**

1 you sent to him on February 25th.

2    A. No.

3       MR. QUINN: That's not a question.

4    Q. You can't remember what you sent to him on

5 February 25th.

6       MR. QUINN: That's still not a question.

7    Q. Can you remember what you sent to him on February

8 25th?

9    A. No.

10    Q. Do you have aspirations of one day owning the

11 Mundy Street store?

12    A. No.

13    Q. Does Tommy?

14    A. I'm not Tommy. I can't answer that question.

15    Q. Have you ever heard Tommy say that one day I'll

16 own the Mundy Street store?

17    A. Not to my knowledge.

18    Q. Are you aware of him ever saying that to anyone

19 else?

20    A. No. I live in Delaware.

21    Q. Where does Tony live?

22    A. Tony, Forty Ft., Pennsylvania.

23    Q. What's his occupation?

24    A. Jeweler.

**Page 27**

1    Q. What is -- does he have a store?

2    A. He does.

3    Q. Does he own the store?

4    A. I don't know. I don't know.

5    Q. Do you know what the name of the store is?

6    A. I think it's Van Scoy Jewelers.

7    Q. Do you know how long he has either owned or

8 operated that store?

9    A. I don't know. 25 years roughly.

10    Q. Continuously?

11    A. I don't know that.

12    Q. Are you friendly with Tony?

13    A. I speak to him.

14    Q. How often?

15    A. Maybe once every other day. He's my brother.

16    Q. What have you spoken to him about concerning this

17 case?

18    A. Not much.

19    Q. What specifically?

20    A. Just what's going on? Being sued by my brother,

21 Wayne. That's all.

22    Q. Nothing more specific?

23    A. No.

24    Q. Where does Betsy live?

**Page 28**

1    A. It's a nursing home in Binghamton, New York.

2    Q. She doesn't work; is that correct?

3    A. That's correct. As far as I know.

4    Q. And you haven't talked to her any time recently?

5    A. No.

6    Q. What about her husband?

7    A. No.

8    Q. Is Betsy sick right now?

9    A. Yes.

10    Q. Did she have an occupation before she got sick?

11    A. She did.

12    Q. What was that?

13    A. Ran the jewelry store, Van Scoy Diamond Mine, in

14 Binghamton, New York.

15    Q. How did you know the name was Van Scoy Diamond

16 Mine?

17    A. I have been there.

18    Q. When was the last time you were there?

19    A. We go back about 12 years, probably 12, 13 years.

20    Q. When do you believe she stopped running the

21 store?

22    A. I don't know.

23    Q. Approximately?

24    A. I don't know.

**Page 29**

1    Q. Was it 13 years ago?

2    A. I don't know.

3    Q. Why were you at the store 13 years ago?

4    A. Because that was my job. I had to go to the

5 store to work.

6    Q. Did you work there?

7    A. I worked for a weekend or a couple days to fill

8 in for her. Sure.

9    Q. Did your father own that store or --

10    A. I'm not sure on that side of it.

11    Q. What about Pam, where does she live?

12    A. 190 Sahara Drive, Kingston, PA.

13    Q. What is her occupation?

14    A. Housewife.

15    Q. Are you friendly with her?

16    A. She's my sister.

17    Q. Are you friendly with her?

18    A. She's my sister.

19    Q. Are you friendly with Wayne?

20    A. No. Not right now, no.

21    Q. Is he your brother?

22    A. Yes, he is.

23    Q. Are you friendly with Pam?

24    A. She's my sister, yeah.

Van Scoy
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005
v. Van Scoy Diamond Mine of Delaware, Inc.

---

Page 30

1    Q.  How often do you talk to her?
2    A.  Oh, God, once a week, if that.
3    Q.  What have you discussed with her concerning this
4  case?
5    A.  Actually, nothing.  We are just more trying to
6  collect funds from everybody for my father's funeral and
7  his personal stuff that was not around.
8    Q.  Has Pam ever owned a jewelry store or been in the
9  jewelry business?
10   A.  Yeah.  Her and her husband own a store in
11 Scranton, Pennsylvania.
12   Q.  So she's not just a housewife.  She also owns a
13 store?
14   A.  Well, her husband runs the store.  She stays
15 home.
16   Q.  Do you have knowledge as to whether she owns that
17 store?
18   A.  I believe she does have part ownership of that
19 store, yes.
20   Q.  Who else would be an owner?  Do you know?
21   A.  Her husband, Rick Sendrick.
22   Q.  Are you friendly with Rick?
23   A.  I speak to him once in a while.
24   Q.  What have you spoken with him -- have you spoken

---

Page 31

1  to him about this case?
2    A.  Briefly a little bit, yeah.
3    Q.  What did you guys talk about?
4    A.  Off the top -- I don't recall.  Just in general.
5    Q.  When you say in general, what did you talk about?
6    A.  Still in disbelief and wonder where his stocks
7  are and how ridiculous it really is.  And that's really
8  just in general.
9    Q.  Are you the one that thinks it's ridiculous?
10   A.  Everybody does.
11   Q.  What do you think is ridiculous?
12   A.  The whole situation we're in.
13   Q.  Which is what?
14   A.  Being sued for using a name that was given to me.
15   Q.  Is that the reason why you believe -- do you
16 believe you have a right to use the mark Van Scoy Diamond
17 Mine?
18   A.  Absolutely.
19   Q.  Are you using the mark Van Scoy Diamond Mine?
20   A.  Yes.
21   Q.  And the reason you believe that you have the
22 right to use -- why do you believe, specifically, you
23 have the right to use the mark Van Scoy Diamond Mine?
24   A.  Because my father gave me the name.

---

Page 32

1    Q.  Did your father put anything in writing when he
2  gave you the name?
3    A.  I have things in writing.  As a contract, there
4  was no contract.  It was just he gave me the name and
5  said, good luck, I love you and I'm proud of you.
6    Q.  And the approximate date that you said he gave
7  you the name was in October of 1994; is that correct?
8    A.  Approximately that date, yes.
9    Q.  Could it have been later?
10   A.  No.
11   Q.  Could it have been earlier?
12   A.  Within a month I guess.
13   Q.  Now, when he supposedly gave you the name --
14   A.  Gave me the name.
15   Q.  -- you knew he was bankrupt, right?
16   A.  I knew he was going through a tough time with
17 that.  Sure.  Yes.
18   Q.  One other question I want to ask you about Pam
19 and Rick's store is what mark is that.  Do you know?
20 What mark are they using?
21   A.  Van Scoy Diamonds.  Well, the phone book say Van
22 Scoy Diamond Mine.  The store says Van Scoy Diamonds.
23   Q.  Have you seen the store recently?
24   A.  I have not.

---

Page 33

1    Q.  Do you know which one it is, which mark, whether
2  it's Van Scoy Diamond Mine or Van Scoy Diamonds?
3    A.  No.  As far as I know, it's Van Scoy Diamonds
4  that's outside the store itself.  In the phone book it
5  says Van Scoy Diamond Mine.
6    Q.  Where does Ken live?
7    A.  He, actually, just got a new place.  I'm not sure
8  what the address is of where Ken lives right now.
9    Q.  What is his occupation?
10   A.  He just, actually, works for my sister around the
11 house.  He's just kind of doing some yard work for her.
12   Q.  Which sister?
13   A.  Pam.
14   Q.  Are you friendly with Ken?
15   A.  Yes.  He's my brother.
16   Q.  How often do you talk to him?
17   A.  Just about every day.
18   Q.  What have you discussed with him concerning the
19 case.
20   A.  Pretty much the same as everybody else, just in
21 general, just what's going on, what's next and all that.
22   Q.  What kind of relationship did you have with your
23 father?
24   A.  Very good actually.

---

Wilcox & Fetzer, Ltd.    Professional Court Reporters
(302)655-0477
237c0978-7df2-492f-be79-16c76b54a422

Van Scoy                    Case 1:05-cv-00108-KAJ    Document 142-4    Filed 12/12/2005    Page 12 of 23
                                                           v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy              C.A. # 05-108 (KAJ)                    July 26, 2005

Page 34

1  Q.  Would you care to elaborate on that at all?
2        MR. QUINN:  Is that a question or not?
3        MR. PETOCK:  Yes, it is.
4        THE WITNESS:  I don't understand it.  What
5  do you mean?
6  BY MR. PETOCK:
7  Q.  Would you like to tell me more about your
8  relationship with your father?
9  A.  He's my father.  I'm his son.  I was his youngest
10 son.  He taught me the business.  I ran, managed the
11 stores in Connecticut, Hartford.  Traveled between
12 Springfield, Hartford and New Haven since I was,
13 actually, out of school.  And just did the business my
14 whole life.  Used to go with him when I was about 12, 13
15 years old to the radio stations, sit there and watch him
16 for about an hour-and-a-half make ads.  Had a good time
17 with my father.  He was a caring guy, respectful and was
18 a man of his word.  And I miss him.  He's a great guy.
19 Q.  You said you traveled to Hartford.
20 A.  Uh-huh.
21 Q.  Why did you travel the Hartford?
22 A.  Hartford, Springfield, because that where the
23 stores were.  He had stores up in the New England area.
24 And I managed the one in New Haven Connecticut for three

Page 35

1  years.
2  Q.  Did you travel -- have you visited all of those
3  New England stores?
4  A.  Just those three.  I was in Providence, Rhode
5  Island, with my dad when he used to go up to see the
6  franchises.
7  Q.  How often did your dad go to visit the
8  franchises?
9  A.  I can't recall.
10 Q.  But you would go with him sometimes?
11 A.  Sometimes I would go.  Sure.  I had no other
12 choice.
13 Q.  What would you do when you would visit these
14 franchises?  By the way, when I say the word "franchise,"
15 I'm not sure whether it was a franchise or not.  I just
16 mean the fact that your father licensed the mark.
17 A.  It was a franchise, yes.
18 Q.  What would you do when you go to these stores
19 with your father?
20 A.  He would sit down talk with somebody.  I'd
21 probably go grab something to eat.  I was young.  That's
22 one place you don't want to certainly be.
23 Q.  What years did this take place that you were
24 visiting your father's franchises?

Page 36

1  A.  '80, '81 to -- oh, God.  I went to Connecticut in
2  '83.  I would say early '80s, early '80, 1980, 1981.
3  Q.  What was your position with the company at this
4  point?
5  A.  Garbage man, salesman, bench guy, light bulb
6  changer, car washer, wash the windows, everything.
7  Q.  Was Wayne also traveling with your father to meet
8  with franchises during this time?
9  A.  I don't recall to be honest with you.
10 Q.  Do you recall any of your other brothers and
11 sisters traveling to franchises?
12 A.  Some of them.  We all did once in a while.
13 Q.  Did you go to anywhere else besides New England
14 to visit the franchises?
15 A.  I did actually.
16 Q.  Where else?
17 A.  To the franchise down in Clear Water, Florida.
18 Q.  Did your father frequently visit the franchises?
19 A.  He made his rounds.  Again, at that time, I was
20 young.  I wanted to go play at the park instead of being
21 at work.
22 Q.  What was he doing making these rounds?
23 A.  Checking on the stores.  My recollection, is he
24 was checking on the stores and seeing what's going on

Page 37

1  and, obviously, trying to maintain the mark.
2  Q.  What kind of relationship did you have with Wayne
3  before the lawsuit?
4  A.  Well, do you want me to be honest?
5  Q.  Yes.
6  A.  I'm going to be honest.  Not good.  I remember
7  him from when I was a little kid.  I will never forget
8  one example.  I was riding a bicycle down Hamilton Park.
9  And there was about 30 people sitting across a lot that
10 they blocked the roads off.  And Hamilton Park was the
11 place to hang, if you will.  And I remember I had a bike.
12 And I had the choppers.  I cut the forks off of one and I
13 slid it on the other one and I'm running down.  And, boy,
14 I'm running popping a wheelie.  You know, I'm cool in
15 front of everybody when I was a kid.  The tire came off.
16 I fell.  Scraped up.  Everybody comes over.  Are you
17 okay?  Are you okay?  Are you okay?  He comes over.
18 Slaps me in the head.  Get on with it, quote, unquote,
19 asshole.  You're cool.  That's just the beginning.  I'm
20 going to go on.
21        Later on just growing up, he's just been
22 very -- I'm going to leave it at that.
23 Q.  He's your big brother?
24 A.  Middle.

Van Scoy          Case 1:05-cv-00108-KAJ    Document 142-4    Filed 12/12/2005    Page 13 of 23
Kurt Van Scoy          C.A. # 05-108 (KAJ)          v. Van Scoy Diamond Mine of Delaware, Inc.
          July 26, 2005

Page 38

1    Q.  Where did you live growing up?
2    A.  360 Joseph Drive, Kingston, Pennsylvania, 18704.
3    Q.  Over the years, where else have you lived besides
4    that?
5    A.  New Haven, Connecticut.
6    Q.  When did you move originally from Wilkes-Barre?
7    Or from Kingston, is that where it was?
8    A.  Kingston, yes.  Kingston, when did I move?  I
9    moved to, New England, actually, to Orange, Connecticut.
10   And that was in, I think it was 1983 to run the store in
11   New Haven for my dad.
12   Q.  Was your dad the owner of the New Haven,
13   Connecticut, store?
14   A.  Yes, he was.
15   Q.  Just for the record, what business was your
16   father in?
17   A.  The diamond business.
18   Q.  Did he primarily hold himself out as a diamond
19   dealer?
20   A.  He did, the diamond king.
21   Q.  And was that all he sold, diamonds?
22   A.  Diamonds, diamonds, jewelry.
23   Q.  Diamonds and jewelry?
24   A.  And jewelry, yeah.  I'm sorry.  Yeah, diamonds

Page 39

1    and jewelry.
2    Q.  Was it primarily diamonds?
3    A.  Yes.
4    Q.  How did you father get into the diamond business?
5    A.  He's, actually, he was a lieutenant in the Army,
6    from what remember him telling me, lieutenant in the
7    Army.  And he saw another gentleman going around the
8    barracks, actually, fixing watches.  And the other guys
9    would go out and hit the bars and all that and my father
10   would stay with this guy and go to different soldiers and
11   actually watch this guy fix watches.  And then he started
12   doing it himself.  And he got out of the service after
13   World War II.  And he came home.  He wasn't sure what he
14   was going to do.  So he said he's going to be Tommy
15   Van Scoy, the GI jeweler.  The rest is history from
16   there.
17   Q.  He wrote a book, right?
18   A.  Yes, he did.
19   Q.  What is the name of that book?
20   A.  You Can If You Want to.  It's a copyright there.
21   Q.  Have you read it?
22   A.  Bits and pieces of it I have, yeah, bits and
23   pieces.
24   Q.  You haven't read the entire thing?

Page 40

1    A.  Not in a while.  I, actually, I forgot to take
2    it on vacation.  I wanted to, actually, review it again.
3    Q.  From what you remember, do you agree with the
4    statements he makes regarding the diamond business in the
5    book?
6    A.  I don't recall.
7    Q.  Was your father incorporated?
8    A.  To be honest, I didn't know until, actually, just
9    seeing the statements.  Again, I don't know that he was
10   actually incorporated until I saw the filing of the
11   papers.
12   Q.  Which papers are you referring to?
13   A.  To the lawsuit.
14   Q.  You never saw -- did you ever see any of the
15   sales receipts or invoices or anything when you were
16   working for the business?
17   A.  Yeah, you do.
18   Q.  Describe to me exactly what you did when you were
19   working for the business for your father.  That was
20   during what years?  I'm going to ask you that first.
21   What years did you work for your father's business?
22   A.  I started when I was, personally, I started when
23   I was about 10 years old.  So I'm 39.  Geez, 29 years
24   ago.

Page 41

1    Q.  29 years ago?
2    A.  That's correct.
3    Q.  So early '80s, '70s, early '80s?
4    A.  Oh, yeah.
5    Q.  Mid '80s?
6    A.  Yes.
7    Q.  Up until probably early '90s?
8    A.  Yeah.  I was in and out, in and out, yes.
9    Q.  And during that time, '70s to the early '90s,
10   what did you do in your father's business?  I know you
11   said you took out trash, but tell me what else.
12   A.  That's what we did.  I set earrings, set rings,
13   sold rings.  I'd run errands to the post office, anything
14   and everything.  It was a family business.  And we all
15   ran it as a family and did everything we had to do.
16   Q.  Did you ever get involved with any of the
17   ordering or anything like that, ordering of the
18   merchandise?
19   A.  No, not so much.  Later on as I was doing more of
20   a selling up front, I would sit down sometimes and kind
21   of get a little more involved in what stones we needed
22   and what stones we didn't need.
23   Q.  Any of the accounting or anything like that?
24   A.  The accounting wise, no.  My brother Keith did

11 (Pages 38 to 41)

Van Scoy
Kurt Van Scoy
Case 1:05-cv-00108-KAJ    Document 142-4    Filed 12/12/2005    Page 14 of 23
v. Van Scoy Diamond Mine of Delaware, Inc.
C.A. # 05-108 (KAJ)    July 26, 2005

## Page 42

1 it. And I was pretty much there's papers, file them. So
2 I was --
3 Q. Your father owned a store in Wilkes-Barre; is
4 that correct?
5 A. That's correct.
6 Q. Did he own other stores?
7 A. Yes, he did.
8 Q. Where else?
9 A. Springfield; Hartford, Connecticut; New Haven,
10 Connecticut; at the time, Binghamton, New York; Scranton;
11 Wilkes-Barre and Delaware.
12 Q. Could you repeat that, please?
13 A. Wilkes-Barre; Scranton; Delaware; Binghamton, New
14 York; Springfield, Massachusetts; Hartford, Connecticut
15 and New Haven, Connecticut.
16 Q. Do you remember what years he owned those stores?
17 A. I don't. This is early '80s.
18 Q. What mark did your father operate those stores
19 under?
20 A. The name was Van Scoy Diamond Mine.
21 Q. How did he come up with the name Van Scoy Diamond
22 Mine?
23 A. Very creative.
24 Q. Do you think that's a creative name?

## Page 43

1 A. Well, I mean, he's a creative guy. That's
2 what -- he's a creative guy. It's just creative. I
3 don't personally know.
4 Q. Do you know when he started to use Van Scoy
5 Diamond Mine?
6 A. No, I don't.
7 Q. Did your father advertise the mark Van Scoy
8 Diamond Mine?
9 A. He advertised Van Scoy Diamond Mine, yes.
10 Q. How did he advertise?
11 A. I don't understand the question.
12 Q. Radio, television?
13 A. Radio, television, newspaper, yes.
14 Q. Do you remember anything about his
15 advertisements?
16 A. Yes.
17 Q. What do you remember about his advertisements?
18 A. He's very stern in his advertising. How to take
19 his jewelry off. I remember I used to go with him to the
20 radio station when I was young. And he had to his rings
21 off and everything because he was actually, they were
22 picking up on the mike. And he was very -- just as if
23 he's talking to 10,000 people, very distinct advertising.
24 Q. Did he advertise in all of those areas where he

## Page 44

1 owned stores?
2 A. Yes. At the time, yes.
3 Q. Were they popular ads, to your knowledge, in the
4 areas in which he owned stores?
5 A. He advertised quite a bit. Sure.
6 Q. Did he advertise in the Newark, Delaware, area?
7 A. Yes.
8 Q. Do you remember anything specifically about those
9 ads?
10 A. Just ads are ads.
11 Q. Do you know how much he advertised in Newark?
12 A. No, no idea.
13 Q. You said your father had what you described as
14 franchises.
15 A. Yes.
16 Q. Could you tell me what your understanding of the
17 word "franchise" is?
18 A. Yeah. Actually, they were, purchased the name or
19 using the name Van Scoy Diamond Mine and actually was all
20 done on a handshake with my father. And he, actually,
21 put them up in an area and start them in the business and
22 my father would do the advertising for them.
23 Q. So they would -- do you know how much these
24 people paid to use the mark?

## Page 45

1 A. That's personal information. I don't know.
2 Q. Did they pay money to use the mark?
3 A. As far as I know.
4 Q. Did all of the franchisees or licensees operate
5 under the mark Van Scoy Diamond Mine?
6 A. That I don't know.
7 Q. But what they were paying for was the right to
8 use the mark Van Scoy Diamond Mine; is that correct?
9 A. I don't know. I'm not my father. I don't know.
10 Q. What else would they have been paying for?
11       MR. QUINN: Calls for speculation on the
12 part of the witness.
13       MR. PETOCK: There is no problem with that.
14       MR. F. PETOCK: Objection. You are leading
15 the witness.
16       MR. QUINN: Again, I state, restate the
17 objection.
18       MR. PETOCK: You are leading the witness,
19 Charlie, when you say that. You are coaching him.
20       MR. QUINN: You started the deposition by
21 saying you were going to ask him for the facts that he
22 knew about this case. Now you are asking him to
23 speculate. That is a shift of gears.
24 BY MR. PETOCK:

Van Scoy
Kurt Van Scoy

Case 1:05-cv-00108-KAJ    Document 142-4    Filed 12/12/2005    Page 15 of 23
v. Van Scoy Diamond Mine of Delaware, Inc.
C.A. # 05-108 (KAJ)                    July 26, 2005

Page 46

1    Q.  Is there anything else you can think of besides
2  the right to use the name that they were paying for?
3    A.  No.
4    Q.  How did your father decide where to open up a new
5  licensee or franchise?
6    A.  I don't know.
7    Q.  Would he open up two stores in the same market,
8  same area very close together?
9    A.  I don't know.
10    Q.  Did he open up two stores in the same market?
11    A.  I don't know.
12        MR. F. PETOCK:  Could you speak up a little
13  bit?
14        THE WITNESS:  I don't know.
15        MR. F. PETOCK:  I'm not sure the court
16  reporter --
17        THE WITNESS:  That's okay.  No problem.
18  Sorry.
19        MR. PETOCK:  We are going to take a break
20  for five minutes.
21        VIDEO SPECIALIST:  This ends Tape Number 1
22  of the video deposition of Kurt Van Scoy.  The time is
23  10:52.
24        (Thereupon, a short recess was had.)

Page 47

1        VIDEO SPECIALIST:  This is Tape Number 2 of
2  the video deposition of Kurt Van Scoy.  The time is
3  11:04.
4  BY MR. PETOCK:
5    Q.  Kurt, did you speak with your attorney about any
6  of your deposition testimony during the break?
7    A.  No.
8    Q.  Okay.  Getting back to your father's companies,
9  franchises or licensees, did you know that they were
10  paying to use, paying for the right to use the mark Van
11  Scoy Diamond Mine?
12    A.  I don't know.
13    Q.  Did you think that they were getting the right to
14  use the mark for free?
15    A.  I don't know.  I can't answer for my father's --
16    Q.  I'm asking what you thought.
17    A.  I don't know.
18    Q.  Did you assume that they were paying for the
19  right to use the mark?
20    A.  I don't know.
21    Q.  Did you assume that your father was giving them
22  the right to use the mark as an act of charity for free?
23    A.  I don't know.
24    Q.  Was your father a good businessman in your

Page 48

1  opinion?
2    A.  Yes.
3    Q.  Did you have knowledge of the fact that -- do you
4  have knowledge of the fact that the mark Van Scoy Diamond
5  Mine is federally registered?
6    A.  No.
7    Q.  I asked you -- I will repeat the question.
8        Do you have knowledge of the fact that the
9  mark Van Scoy Diamond Mine is federally registered?
10    A.  No, until now.
11    Q.  Do you know now that the mark Van Scoy Diamond
12  Mine is federally registered?
13    A.  Yes.
14    Q.  When did you first become aware of this?
15    A.  November the 18th of 2004.
16    Q.  How did you become aware of it that day?
17    A.  From a letter from your office or your dad's
18  office.
19    Q.  What did you do after you received the cease and
20  desist letter of November 18th, 2004?
21    A.  Seeked counsel.
22    Q.  Who did you contact to be your counsel?
23    A.  It was actually in Wilmington.  Someone -- it was
24  just a brief encounter with counsel in Wilmington.  And

Page 49

1  then I actually went to Fox Rothschild.
2    Q.  Counsel in Wilmington you said?
3    A.  Yes.
4    Q.  Did they do any work for you?
5    A.  No, just had conversation.
6    Q.  Did they produce any documents for you or
7  anything or do anything for you in that regard, give you
8  anything?
9    A.  No, not that I recall.
10    Q.  Are you aware of anyone operating a jewelry store
11  under the mark of Van Scoy Diamond Mine at this time
12  other than yourself and Wayne?
13    A.  I don't understand the question.  I'm sorry.
14    Q.  Are you aware of anyone operating a Van Scoy
15  Diamond Mine jewelry store, or any other store for that
16  matter, at this time other than yourself and Wayne?
17    A.  If you are saying the question is Van Scoy
18  Diamond Mine?
19    Q.  That's correct.
20    A.  The only thing I know, in the Scranton store in
21  the newspaper it says Van Scoy Diamond -- or in the phone
22  book, not the store itself, it says Van Scoy Diamonds.
23    Q.  Okay.
24    A.  If the question to that would be if it's just

13  (Pages 46 to 49)

## Page 50

1  Wayne and I using that, as far as I know, I would say,
2  yeah, I'm aware of that, just him and I.
3     Q.  Just you and him?
4     A.  Correct.
5     Q.  Are you aware of anyone operating a jewelry store
6  under any mark containing the word "Van Scoy" other than
7  yourself and Wayne?
8     A.  Yes, I am.
9     Q.  Could you go through everyone that you are aware,
10 please, using any --
11    A.  Variation?
12    Q.  Well, the "Van Scoy" in connection with a jewelry
13 store.
14    A.  Charlotte, North Carolina.
15    Q.  What do you know about the Charlotte,
16 North Carolina, store?
17    A.  I just know that there is a store down there with
18 the name.
19    Q.  Do you know if that was one of your father's
20 franchisees or licensees at one point or whether that
21 store -- answer the first question.
22    A.  What was the question?
23    Q.  Was that one of your father's licensees at some
24 point? Did you father have a licensee in Charlotte?

## Page 51

1     A.  I don't know.
2     Q.  Do you know anything about the Charlotte store?
3  Have you contacted the Charlotte store?
4     A.  No.
5     Q.  What other stores or what other people are using
6  the name Van Scoy Diamond Mine or just Van Scoy?
7     A.  North Carolina, Reading, Lancaster. I believe
8  there is Allentown, Scranton. That's it. Wilkes-Barre
9  store.
10    Q.  Is that it?
11    A.  And Erie. I'm sorry, Erie.
12    Q.  Is that it?
13    A.  To my knowledge, yes.
14    Q.  What do you know about the North Carolina store?
15 Do you know what mark they are using?
16    A.  I think on the website it says Van Scoy Jewelers
17 if I'm not mistaken.
18    Q.  Do you know who would own that store?
19    A.  I believe his name is Bob Cook.
20    Q.  Have you spoken to Bob Cook?
21    A.  No, I haven't.
22    Q.  Do you know if anyone has spoken to Bob Cook
23 recently?
24    A.  No, I don't know.

## Page 52

1     Q.  What can you tell me about the Reading store?
2     A.  I don't understand the question.
3     Q.  You had mentioned that there was a store in
4  Reading using Van Scoy in connection with jewelry
5  services.
6     A.  Correct.
7     Q.  Do you know anything more than that?
8     A.  No.
9     Q.  Was the Reading, did your father ever have a
10 store in Reading, own a store in Reading?
11    A.  Him personally own a store, not that I know.
12    Q.  Did he ever have a licensee in Reading?
13    A.  I don't know. I don't know that.
14    Q.  Did you ever travel to any store, a Van Scoy
15 Diamond Mine store when you were working for the company
16 in Reading?
17    A.  No.
18    Q.  So, to your knowledge, there was no Van Scoy
19 Diamond Mine --
20    A.  You asked me if I traveled with him to the
21 Reading store. No, I did not.
22    Q.  Have you ever been to a jewelry store in Reading?
23 Let me ask you that.
24    A.  No. Not that I remember, no.

## Page 53

1     Q.  Were you ever aware that there was any sort of
2  jewelry store in Reading using the name Van Scoy in
3  connection with diamonds or jewelry?
4     A.  Yes.
5     Q.  When did you first become aware of this?
6     A.  On the website actually.
7     Q.  When did you first become aware of it?
8     A.  I don't know when exactly. I don't remember.
9     Q.  Approximately.
10    A.  I don't know really.
11    Q.  In the past year?
12    A.  No, it's longer than that I would have to say.
13 When exactly, I'm not really sure.
14    Q.  But it was through a website that you first
15 became aware of a jewelry store --
16    A.  That the store was operating there in Reading,
17 yes. I know there was stores. My father did dealings
18 with gentlemen in that area. And that's all I know.
19    Q.  Do you know what name they are using in Reading?
20    A.  It's -- Van Scoy.
21    Q.  Is that a guess?
22    A.  On this website it says Van Scoy.
23    Q.  You mentioned that there is a jewelry store that
24 you are aware of in Lancaster using the name, using Van

Van Scoy
Kurt Van Scoy

v. Van Scoy Diamond Mine of Delaware, Inc.
C.A. # 05-108 (KAJ)
July 26, 2005

Page 54

1  Scoy in connection with a jewelry store.
2      A. There was a store, yes, in Lancaster. If -- from
3  what I gather, yeah, there is a store in Lancaster that's
4  using Van Scoy.
5      Q. Where did you receive that information?
6      A. Someone told me actually. Who I don't -- someone
7  told me, if it was a customer or not or something.
8      Q. Did your father have a store in Lancaster? Did
9  he ever own a store in Lancaster?
10     A. I don't know.
11     Q. Do you know what mark the store in Lancaster is
12 using?
13     A. Exact words no, I do not know.
14     Q. Do you have any idea?
15     A. Van Scoy.
16     Q. You mentioned that there is a store in Allentown
17 presently using Van Scoy in connection with a jewelry
18 store. Do you know what mark the store in Allentown is
19 using?
20     A. I do not know exactly.
21     Q. Do you have any idea?
22         MR. QUINN: I think you are asking the
23 witness to speculate.
24         MR. F. PETOCK: You can still answer the

Page 55

1  question.
2         THE WITNESS: I don't know.
3  BY MR. PETOCK:
4      Q. But, to your knowledge, it does have the word
5  "Van Scoy" in its name.
6         MR. QUINN: That's not a question.
7      Q. To your knowledge, does it still have the word
8  "Van Scoy" in the name?
9      A. Yes.
10     Q. Do you know who owns the store in Allentown?
11     A. I believe it's Mark Mower.
12     Q. What can you tell me about Mark Mower?
13     A. He did dealings with my father and was another
14 partner of his from way back. And that's all I really
15 know about Mark and the Allentown store.
16     Q. When was the last time you spoke with Mark Mower?
17     A. Oh, God. I think about three months ago.
18     Q. What did you speak with him about three months
19 ago?
20     A. The situation, what's going on with the suit.
21     Q. Could you tell me specifically what you spoke to
22 him about?
23     A. I don't recall. We covered one thing to this and
24 how's business and all that.

Page 56

1      Q. Do you know if you are planning on calling him as
2  a witness in this trial?
3      A. I don't know that.
4      Q. Have you spoke with anyone about possibly calling
5  him as a witness besides your attorney?
6      A. I don't know that, no.
7      Q. Do you know if Mark Mower owns jewelry stores
8  other than the one in Allentown?
9      A. I don't know that.
10     Q. What did you say to Mark Mower --
11     A. I don't recall.
12     Q. -- in your conversation?
13     A. I don't recall.
14     Q. Did you call him about, because you were being
15 sued?
16     A. Yes.
17     Q. Why did you call Mark Mower because you were
18 being sued?
19     A. Because he's -- actually, to be honest with you,
20 I just told him the situation. And he was in disbelief.
21     Q. Did you call any other person that's operating a
22 store using some variation of the name Van Scoy?
23     A. I don't understand the question.
24     Q. Did you call anyone besides Mark Mower? Did you

Page 57

1  call Bob Cook, for example?
2      A. No.
3      Q. And you didn't call the North Carolina store?
4      A. No.
5      Q. You didn't call the Reading store?
6      A. No.
7      Q. You didn't call the Lancaster store?
8      A. No.
9      Q. What did Mark Mower say to you?
10     A. I don't recall really.
11     Q. Did you call Mark Mower because your attorney
12 asked you to?
13     A. No.
14     Q. Besides three months ago -- did Mark Mower refer
15 you the name of Charlie Quinn?
16     A. I don't recall that to be honest with you.
17     Q. How did you find out about Charlie Quinn?
18     A. Actually, a friend of mine is an attorney as
19 well. And we just went through a list. And this was one
20 that he recommended.
21     Q. Is it just coincidence that Charlie Quinn also
22 represented Mark Mower in the past?
23     A. Actually, I was surprised. Yes.
24     Q. How did you find out about that?

15 (Pages 54 to 57)

Page 58

1    A. I don't understand the question.
2    Q. How did you find out that Charlie Quinn
3  represented Mark Mower in the past?
4    A. Actually, when I spoke to Mark Mower and he
5  mentioned the same name as what I had mentioned.
6    Q. When did this conversation take place?
7    A. Oh, my God. This is going back four months,
8  three months.
9    Q. This was the same conversation we have been
10  talking about all along?
11   A. Correct.
12   Q. Okay. So you just remember that you mentioned
13  Charlie Quinn's name. What else do you remember?
14   A. That's it. That's when you actually pointed it
15  out.
16   Q. You can't remember -- can you remember anything
17  else about what you and Mark Mower spoke about?
18   A. No.
19   Q. What he said to you?
20   A. (Witness indicating.)
21   Q. Are you and Mark Mower friends?
22   A. Not friends -- no.
23   Q. Before the conversation three or four months ago,
24  when was the last time you two had spoken?

Page 59

1    A. I don't recall. Years.
2    Q. Do you know anything about why Mr. Quinn
3  represented Mark Mower?
4    A. No, I don't. I mean, it was personal dealings
5  with my father, nothing to do with me.
6    Q. So Charlie Quinn represented -- did Charlie Quinn
7  represent Mark Mower against your father?
8    A. I don't know that.
9    Q. Was Mark Mower one of your father's licensees or
10  franchisees?
11   A. He was a business acquaintance with my father.
12  That's all I know.
13   Q. Were you aware if Mark Mower was paying your
14  father royalties to use the mark Van Scoy Diamond Mine?
15   A. I don't know that.
16   Q. You don't even -- do you know whether Mark Mower
17  was a franchisee of your father?
18   A. I know he had the name. I know he had a jewelry
19  store, Van Scoy. Sure.
20   Q. So did you know he was a franchisee or licensee
21  of your father?
22       MR. QUINN: Asked and answered. Objection.
23   Q. Did your father --
24       MR. F. PETOCK: He can answer it again.

Page 60

1        MR. QUINN: He can ask it then how many
2  times?
3        MR. F. PETOCK: The fact that your attorney
4  objects to the question doesn't mean you don't answer it.
5  You still answer it.
6        MR. QUINN: I want to see the authority for
7  the proposition that the attorney can ask the same
8  question multiple times in the same deposition session.
9  Do you have authority on that?
10        MR. F. PETOCK: You're obstructing the
11  deposition.
12        MR. QUINN: Do you have authority on that?
13        MR. F. PETOCK: Continue with the
14  deposition. It's not the same question.
15        MR. QUINN: It is the same question and I
16  want to see the authority for it.
17        MR. F. PETOCK: You are required to answer
18  the question unless your attorney instructs you not to
19  answer the question.
20        MR. QUINN: If you believe the question has
21  been asked and answered, I leave it up to you. But if I
22  were you --
23        THE WITNESS: I think I already answered it.
24        MR. F. PETOCK: You are coaching the

Page 61

1  witness.
2        MR. QUINN: I'm giving the witness a piece
3  of legal advice that you seem to suggest that I am
4  improperly doing so. And I'm asking you to give me the
5  authority for that. Where is the case?
6        MR. PETOCK: Was he given the case?
7        MR. F. PETOCK: We have case.
8        By the way, while you have disrupted the
9  deposition so badly and you're obstructing this
10  deposition, I give you three cases here that stand for
11  the proposition that specifically rule that in Delaware,
12  the District Court in Delaware, you are not allowed to
13  advise your client about any testimony that's been given
14  or you are anticipating to be given during the
15  deposition. And these are the Turks Beckers, Inc., case,
16  the Dutchman versus Beneficial Corporation case and ML
17  Lee Acquisitions case. Let's continue the deposition.
18  BY MR. PETOCK:
19   Q. Do you know what mark -- you had said that there
20  is a jewelry store using Van Scoy in connection with
21  jewelry services in Scranton?
22   A. Correct.
23   Q. What mark are they using?
24   A. It's Van Scoy Diamonds from what I'm aware of.

16 (Pages 58 to 61)

Page 62

1  Q.  That's Rick and Pam Sendrick's store?
2  A.  Correct.  Excuse me.  Correct.
3  Q.  What about the store in Erie?
4  A.  I'm not sure on that.  The store fronts, I don't
5  know that.
6  Q.  You are not sure what mark that store in Erie
7  uses?
8  A.  I do not know.
9  Q.  Who owns that store?  Do you know?
10  A.  I have no idea.
11  Q.  Is it any of your brothers or sisters?
12  A.  No, my brother -- I don't -- my brother runs it.
13  That's all I know.
14  Q.  Your brother runs the store?
15  A.  Yes.
16  Q.  Tony runs the store and you are not sure whether
17  he owns it or not?
18  A.  That's correct.
19  Q.  What do you know about Tony -- has Tony ever
20  owned a Van Scoy Diamond Mine that you are aware of?
21  A.  In the past, yeah.  He had five stores, if I'm
22  not mistaken, four or five stores.
23  Q.  Were any of those in Erie?
24  A.  Yes.

Page 63

1  Q.  Do you know if it was in the same location that
2  he's running the store now?
3  A.  I don't know that.  I've never been there.
4  Q.  Do you know if anyone ever gave him permission to
5  use the mark Van Scoy Diamond Mine?
6  A.  He's been in business well over 25 years.
7  Q.  Is your answer you don't know?
8  A.  I don't know.
9  Q.  Your father's company, did it ever have any Van
10  Scoy Diamond Mine franchisee or licensee in Delaware?
11  A.  I didn't understand your question.
12  Q.  Did your father's company ever have a Van Scoy
13  Diamond Mine franchisee or licensee in Delaware, in the
14  State of Delaware?
15  A.  From what I'm aware of, yes, he did.
16  Q.  Do you know who the franchisee or licensee was?
17  A.  Actually, no, I don't.
18  Q.  Do you remember what years he had that store?
19  A.  No, I don't.
20  Q.  Approximately.
21  A.  I have no idea.
22  Q.  Do you know if Van Scoy Diamond Mine was
23  advertised in Delaware during that time, the time in
24  which there was a franchisee there?

Page 64

1  A.  I don't know that.
2  Q.  Did you ever visit the Delaware store when there
3  was a franchisee there?
4  A.  No.
5  Q.  Did your father?
6  A.  I don't know that.  I'm not my father.
7  Q.  Did your father ever personally operate and own a
8  Van Scoy Diamond Mine in Delaware?
9  A.  Yes, he did.
10  Q.  Where was that store located?
11  A.  Kirkwood Highway, Astro Shopping Centre.  And
12  then he relocated to the location to where we are at
13  right now, 1117 Churchmans Road, Newark, Delaware.
14  Q.  What years was the store operated and owned by
15  your father in the Astro Shopping Centre?
16  A.  I don't know that.
17  Q.  Do you know what year the store your father owned
18  in Delaware that is located at 1117 Churchmans Road in
19  the Churchmans Plaza was opened by your father?
20  A.  I don't know that.
21  Q.  Approximately.
22  A.  I don't know that.
23  Q.  Did you ever have any dealings with your father's
24  Delaware store?

Page 65

1  A.  I don't understand the question.
2  Q.  Did you ever visit it?
3  A.  I don't understand the question.
4  Q.  When your father owned the Delaware store in the
5  Churchmans Plaza, had you ever been there?
6  A.  I have.
7  Q.  When had you been there?
8  A.  When we had sales, half price sales.  When
9  exactly, I can't pinpoint that.
10  Q.  So from time to time you worked in your father's
11  Churchmans Plaza store?
12  A.  For the weekend we all did, yeah.
13  Q.  Do you know how many years your father had the
14  Churchmans Plaza store open?
15  A.  I don't know that.  You would have to talk to the
16  landlord.
17  Q.  Was it more than one year?
18  A.  Yes.
19  Q.  Was it more than two years?
20  A.  From what I gather -- I don't know.  How many
21  years, I really don't know.
22  Q.  Was it more than two years?
23  A.  I don't know that.
24  Q.  Do you remember approximately how many times you

17 (Pages 62 to 65)

Van Scoy        Case 1:05-cv-00108-KAJ    Document 142-4    Filed 12/12/2005    Page 20 of 23
                                        v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)         July 26, 2005

**Page 66**

1 worked in his store?
2    A. No, I really don't.
3    Q. Do you know if you worked in his store over the
4 course of more than one year?
5    A. I don't understand the question. What store?
6    Q. The Churchmans, the store your father owned in
7 the Churchmans Plaza, the same store you own right now.
8    A. Right, correct.
9    Q. You don't remember whether or not your father had
10 owned that store for more than one or two years.
11      MR. QUINN: Objection. That's not a
12 question.
13 BY MR. PETOCK:
14    Q. Do you remember whether your father owned that
15 store for more than one year?
16    A. More than one year, yes.
17    Q. More than two years?
18    A. I really don't know the length of time. I mean,
19 more than one year, yes, to answer the question.
20    Q. Do you currently operate a Van Scoy Diamond Mine
21 in the same location as your father's store?
22    A. Yes, I do.
23    Q. When did you open that store?
24    A. November 12th, 1994.

**Page 67**

1    Q. Was your father's store still operating there
2 when you opened your store on November 12th, 1994?
3    A. No, it was not. It was closed for a
4 year-and-a-half prior to that.
5    Q. So you do know when your father's store closed;
6 is that correct?
7    A. When it closed, from what my landlord said, it
8 was vacant for 16 months. I'm going off my landlord.
9    Q. When you opened your store, were any remnants of
10 your father's store still there?
11    A. The wallpaper, lighting fixtures. And what else?
12 That's about it, and the alarm system.
13    Q. Safe?
14    A. No, the safe I brought down from the Wilkes-Barre
15 store.
16    Q. Cases?
17    A. No, none of that was left there.
18    Q. Sign?
19    A. The sign I got from my father.
20    Q. Was the sign already there?
21    A. No, it was actually in the warehouse, my father's
22 warehouse.
23    Q. Where is your father's warehouse located?
24    A. Frederick Street in Wilkes-Barre at the time.

**Page 68**

1 That's where he had the showcases.
2    Q. You said your father gave you that sign.
3    A. Yes, he did.
4    Q. Did he drive it down to Wilmington to give it to
5 you?
6    A. He actually helped me load it up into our U-Haul.
7    Q. In Wilkes-Barre?
8    A. Correct. And my father gave me the safe.
9    Q. Was that also in the warehouse?
10    A. No.
11    Q. Where was the safe?
12    A. In Mundy Street.
13    Q. What did he say to you when he gave you the safe?
14    A. Good luck to you, I love you and I'm very proud
15 of you.
16    Q. Why did you choose the location in Churchmans
17 Plaza to open a Van Scoy Diamond Mine?
18    A. I don't know. Just a location and there it is
19 and open up.
20    Q. What about the location? Was it easier to open
21 in a store where a Van Scoy, in a location where a Van
22 Scoy Diamond Mine already existed?
23      MR. QUINN: Objection. That's two
24 questions.

**Page 69**

1 BY MR. PETOCK:
2    Q. I will rephrase the question. Was it easier to
3 open your Van Scoy Diamond Mine in a location where your
4 father had for several years already operated a Van Scoy
5 Diamond Mine?
6    A. After it was closed 16 months, and that was the
7 location that we reopened, yes.
8    Q. Is your answer yes?
9    A. Yes.
10    Q. You originally opened using the name Van Scoy
11 Diamond Mine, correct?
12    A. That's correct, Van Scoy Diamond Mine of
13 Delaware, Incorporated.
14    Q. When you originally opened, were you using the
15 name Van Scoy Diamond Mine or Van Scoy Diamond Mine of
16 Delaware, Incorporated?
17    A. I don't understand the question.
18    Q. When you originally opened your store, were you
19 using the name Van Scoy Diamond Mine or were you using
20 the name Van Scoy Diamond Mine of Delaware, Incorporated?
21    A. I still don't understand the question.
22    Q. What don't you understand about the question?
23    A. If you are talking outside the store or -- you
24 know what I mean? What's outside, the marquee outside?

18 (Pages 66 to 69)

Page 70

1   Q.  Yeah.
2   A.  Okay.
3   Q.  Okay.  What was outside the store?
4   A.  Van Scoy Diamond Mine.
5   Q.  What about, what did you use on your sales
6   receipts?
7   A.  Van Scoy Diamond Mine of Delaware, Incorporated.
8   Q.  Did you use those when you first opened your
9   store?
10  A.  When we first opened up, actually, no.  My father
11  gave me sales pads, actually, from the Gateway Shopping
12  Center store and also the 154 Mundy Street store.
13  Q.  Did they just say Van Scoy Diamond Mine on them?
14  A.  I did and then we had to put a sticker over for
15  our new address.  My father was trying to save me money.
16  Q.  Did you inform Wayne, in any way, that you were
17  opening a Van Scoy Diamond Mine in Delaware?
18  A.  He clearly knew.
19  Q.  How do you know that he clearly knew?
20  A.  I remember specifically when we were trying to
21  move the safe out of the Wilkes-Barre store, my brother
22  Kenny and him sat on a Lazy Boy chair, and his exact
23  quotes as my father and I -- my father was helping me
24  move the safe.  And they just sat there.  Wayne said to

Page 71

1   my brother Kenny, quote, unquote, Kenny, I give him two
2   months.  No, I give him three months and he's going to be
3   in so much debt he won't even know what happened to him,
4   quote, unquote.
5   Q.  Who selected the name Van Scoy Diamond Mine for
6   your store?
7   A.  My father and I.
8   Q.  Why was the name Van Scoy Diamond Mine selected?
9   A.  Because that's our family business.
10  Q.  Did the name have goodwill attached to it?
11  A.  The store was closed for 15 months, 16 months
12  roughly, somewhere around there.  That's what they said.
13  The store was closed and people actually weren't very
14  happy.
15  Q.  Who wasn't happy?
16  A.  Customers from the area that purchased rings in
17  the past.
18  Q.  Where did you receive that information?
19  A.  From customers actually coming to the
20  Wilkes-Barre store from driving up and weren't very
21  happy.  And also the fact after I opened the store,
22  customers came in and, you here today, you are going to
23  be here next week?  So I had to put up with that for
24  probably about two or three years.

Page 72

1   Q.  Did you receive a lot of complaints like that?
2   A.  Quite a few, yes.
3   Q.  Approximately how many?
4   A.  The number off the top of my head, I can't
5   recall.
6   Q.  You have quite a few customers now that were also
7   customers of your father's Van Scoy Diamond Mine; is that
8   correct?
9   A.  They've actually -- no.  I would have to say not
10  many, no, not many at all actually.
11  Q.  Well, you have people coming in that were very
12  upset that they had bought diamonds at your store, at
13  your father's store.  They had bought jewelry at your
14  father's store and then he closed down.
15  A.  Yes.
16  Q.  But now you are testifying that there weren't,
17  they weren't the same customers?
18  A.  People that came back, you know, just, geez, you
19  guys have left and, you know, you are back here.  Are you
20  here for another week and going again?  That's basically
21  what they were stating, not in goodwill.
22  Q.  So have you had repeat customers?  Have you had
23  customers that were your father's customers and now are
24  your customers?

Page 73

1   A.  I don't recall that.  I really --
2   Q.  Did you talk to an attorney when you decided to
3   open up a jewelry store under the name Van Scoy Diamond
4   Mine about whether it was okay to use the mark Van Scoy
5   Diamond Mine?
6   A.  No, I did not.
7   Q.  Did you speak with anyone?
8   A.  No, I did not.
9   Q.  Were there any other names considered for your
10  store?
11  A.  No.
12  Q.  Does the name Van Scoy Diamonds have the same
13  meaning to the public as Van Scoy Diamond Mine in your
14  opinion?
15  A.  I don't know.  Van Scoy Diamond and Van Scoy
16  Diamond Mine, I don't know.
17  Q.  Do you have an opinion as to whether they are the
18  same mark?
19  A.  I don't know that.
20  Q.  When did you decide to start using the name Van
21  Scoy Diamond Mine of Delaware?
22  A.  From the day I opened the store because that's
23  when my father actually gave me the name.
24  Q.  He didn't give you the name Van Scoy Diamond

19 (Pages 70 to 73)

Van Scoy                                          v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy        C.A. # 05-108 (KAJ)        July 26, 2005

Page 74

1  Mine; he gave you the name Van Scoy Diamond Mine of
2  Delaware?
3     A.  He gave me the name Van Scoy Diamond Mine.  And
4  what I did, we just incorporated Van Scoy Diamond Mine of
5  Delaware, Incorporated.  That's what he recommended me to
6  do.
7     Q.  Why did he recommend you to do that?
8     A.  If things didn't work out for me, I guess, in a
9  legal standpoint.  I guess they can't, you know,
10 certainly come after you.  I'm not up on that.
11    Q.  If who would come after you?
12    A.  If the store failed, landlord or whatever the
13 case may be.  I don't know what his thought was with
14 that.  I don't know.  But that's what he recommended me
15 to do.
16    Q.  What difference would it make if you were using
17 the mark Van Scoy Diamond Mine or Van Scoy Diamond Mine
18 of Delaware if the store failed and someone tried to come
19 after you?
20    A.  I don't understand the question.
21    Q.  I'm not sure I understood your answer to the
22 original question.  You said that your father recommended
23 that you use the mark Van Scoy Diamond Mine of Delaware
24 rather Van Scoy Diamond Mine; is that correct?

Page 75

1     A.  No.  He said to incorporate so you are actually a
2  president as opposed to a sole proprietor, he said just
3  to go under in the corporation.  And that's what he
4  recommended to do.  He said you should just go Van Scoy
5  Diamond Mine of Delaware, Incorporated, which in fact
6  that's what I did.
7     Q.  Did he tell you that's what he did also?
8     A.  No, that's what he recommended me to do.
9     Q.  Is your testimony that from the very beginning
10 you are using both Van Scoy Diamond Mine and Van Scoy
11 Diamond Mine of Delaware as your marks?
12    A.  I don't follow the question.
13    Q.  Was there ever a time where you decided rather
14 than using Van Scoy Diamond Mine as your mark you would
15 use Van Scoy Diamond Mine of Delaware?
16    A.  No.  We used Van Scoy Diamond Mine out front of
17 the store.
18    Q.  So is that what you used, is that what your mark
19 is?
20    A.  It's Van Scoy Diamond Mine of Delaware,
21 Incorporated.  And the sign that my father gave me, it's
22 Van Scoy Diamond Mine.  So on the paperwork, it's Van
23 Scoy Diamond Mine of Delaware.
24    Q.  Right.  What is the name you tell customers that

Page 76

1  you use?
2     A.  Van Scoy Diamond Mine.
3     Q.  Is that how you answer the phone?
4     A.  Good afternoon, Van Scoy's.
5     Q.  How about on your bags?
6     A.  Van Scoy Diamond Mine.
7     Q.  Jewelry boxes?
8     A.  Van Scoy Diamond Mine.
9     Q.  Where else is Van Scoy Diamond Mine used in the
10 store?
11    A.  That's it, just in the sign, Van Scoy Diamond
12 Mine.  That's what was given to me.
13        MR. PETOCK:  I would like to have this
14 marked as the next exhibit, please.
15        (Van Scoy Deposition Exhibit No. 5,
16 Warranty, was marked for identification.)
17 BY MR. PETOCK:
18    Q.  What is this, Kurt?
19    A.  That's a warranty.
20    Q.  Do you give this warranty to your customers?
21    A.  I do.
22    Q.  How long have you been giving this particular
23 warranty to your customers?
24    A.  As far as I can remember.

Page 77

1     Q.  Where did you get this warranty?
2     A.  Actually from my father.
3     Q.  It says Van Scoy Diamond Mine on it; is that
4  correct?
5     A.  That is correct.
6     Q.  When did your father give you this warranty?
7     A.  The beginning of opening the store when he gave
8  me the sales receipts to use as well.
9     Q.  This is a genuine sample of the certificate, the
10 warranty that you give to your customers, right?
11    A.  Yes.
12    Q.  Did your father ever visit your store after you
13 opened it?
14    A.  Yes, he has.
15    Q.  Could you tell me when he visited it?
16    A.  I don't have some specifics, I mean, paper wise.
17 But, yeah, I have in writing when he has actually sold
18 something in our store.  And quite a few times I have a
19 picture of him and my mom at my house.  There is numbers
20 of times that, actually, he stopped by.  Sure.
21    Q.  Okay.  Do you remember the last time your father
22 visited your store, the most recent?
23    A.  I don't recall.  I know he was in and out of
24 health there a little bit and, really, I don't recall.  I

20 (Pages 74 to 77)

Van Scoy
Kurt Van Scoy    C.A. # 05-108 (KAJ)

v. Van Scoy Diamond Mine of Delaware, Inc.
July 26, 2005

---

Page 78

1  know my mom was in the hospital. He'd stop by.
2  Q.  When was the first time he visited your store?
3  A.  Actually, that was the opening.
4  Q.  On November 14th?
5  A.  12th.
6  Q.  November 12th, 2004?
7  A.  1994.
8  Q.  1994. He was there at the opening?
9  A.  Yes.
10 Q.  Do you remember what he was doing there at the
11 opening?
12 A.  Yeah. He was, actually, giving everybody
13 pointers and also waiting on customers.
14     MR. PETOCK:  Let's mark this as the next
15 exhibit, please.
16     (Van Scoy Deposition Exhibit No. 6,
17 Valentine's Ad, was marked for identification.)
18 BY MR. PETOCK:
19 Q.  What is this?
20 A.  What is this? This is a --
21 Q.  This is, by the way, just for the record, this is
22 Exhibit Number 6. Can you tell me what it is, please?
23 A.  Yes. This is, actually, an ad that my father has
24 sent to me to actually run for a, to run an ad,

---

Page 79

1  obviously, for a Valentine's ad.
2  Q.  It says Vestil Plaza. Your store is not located
3  at Vestil Plaza; is it?
4  A.  No. That's, obviously, where you actually would
5  change the name and put the location of where you are at.
6  Q.  And when was this sent to you?
7  A.  It was sent to me -- let's see here. Was it
8  September 18th, 1997?
9  Q.  Thank you.
10 A.  Sure.
11 Q.  You said you had permission to use the mark; is
12 that correct?
13 A.  To use the name Van Scoy Diamond Mine, yes.
14 Q.  Were you licensed?
15 A.  I don't understand the question.
16 Q.  If not for the permission given by your father to
17 use the mark, do you think that would have been
18 trademark infringement, your using the mark?
19 A.  Say that again.
20 Q.  If it weren't for the permission that you say
21 that you got from your father to use the mark, would your
22 use of the mark have been infringement?
23 A.  I don't understand it. I don't understand the
24 question.

---

Page 80

1  Q.  If you weren't given permission by your father to
2  use the mark --
3  A.  If I was given permission --
4  Q.  If you were not, if you were not given permission
5  to use the mark, would your use have been infringement,
6  your using the mark been infringement?
7  A.  Not to my knowledge.
8  Q.  If you didn't have any permission to use the mark
9  Van Scoy Diamond Mine right now, do you think you would
10 be infringing?
11     MR. QUINN:  Objection. The question has
12 been asked and answered.
13     MR. PETOCK:  No, it was different, Charlie.
14     MR. QUINN:  Different in one percent of the
15 words perhaps.
16     MR. PETOCK:  It was a completely different
17 question, Charlie.
18     MR. QUINN:  Objection stands.
19     MR. F. PETOCK:  Answer the question.
20     THE WITNESS:  Repeat it again.
21     MR. F. PETOCK:  Read the question back,
22 please.
23     (Thereupon, the reporter read back the
24 pending question.)

---

Page 81

1      THE WITNESS:  I don't know.
2      MR. PETOCK:  I would like to have this
3  marked as Number 7, please.
4      (Van Scoy Deposition Exhibit No. 7, Sales
5  Receipts, was marked for identification.)
6  BY MR. PETOCK:
7  Q.  Kurt, at some point you started blacking out the
8  name "Mine" from your sales receipts; is that correct?
9  A.  Actually, one of the girls did.
10 Q.  Did you ask -- one of the girls, are you
11 referring to one of your employees?
12 A.  Yeah, correct.
13 Q.  Did you ask her to do that?
14 A.  Actually, no, I don't recall doing that. I know
15 they -- we were actually away when the paper was served
16 to us, if you will, for the suit. And the one girl, I
17 guess, took it upon herself to do that. And I said there
18 is no real need to do that.
19 Q.  What was her name?
20 A.  Actually, I'm not sure which one it was to be
21 honest with you. I'm not sure.
22 Q.  Name all of the girls in your office that are
23 employees of yours.
24 A.  Lori McMichael, Sands Shoemaker, Karen Vale,

---

Wilcox & Fetzer, Ltd.    Professional Court Reporters
(302)655-0477
237c0978-7df2-492f-be79-16c76b54a422