Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

---

**Page 82**

1  Annette D'Angelo, Megan Rump.
2    Q.  Who would be the person most likely to tell me
3  who blacked out this word out of those names you just
4  listed if I wanted to depose one of them?
5    A.  To be honest with you, we were gone away at this
6  time.  We were on vacation, actually.
7    Q.  Where were you on vacation when these got blacked
8  out?
9    A.  Where were we?  In the Caribbean, I believe.
10   Q.  Do you know the first sales receipt that, date
11  wise, the date of the first sales receipt that was
12  blacked out, the word "Mine" was blacked out?
13   A.  No, I do not, actually, no.
14   Q.  Although they were blacked out, you continued to
15  use the blacked out --
16   A.  No.  Obviously, it showed -- as soon as she went
17  through one sales receipt, if I'm not mistaken, and I
18  told them there is no need to do that.  And, obviously,
19  it went back to the way it was.
20   Q.  Were you on vacation from January 15th until
21  March 3rd?
22   A.  No.
23   Q.  Why did you continue to use sales receipts with
24  the word "Mine" blacked out of the sales receipt from at

**Page 83**

1  least January 15th to March 1st, 2005?
2    A.  This is just -- I mean, this is very few people.
3  I mean, obviously, it was one sales pad that they were,
4  obviously, just using until I got back and find out
5  what's going on.
6         MR. PETOCK:  We would ask that all of the
7  sales receipts from this period are produced.
8         MR. QUINN:  Define the period, please.
9         MR. PETOCK:  Well, I'm going to ask him from
10  the cease and desist letter until at least 3/1/2005.
11  BY MR. PETOCK:
12   Q.  Do you know why your employees decided to black
13  out the word "Mine?"
14   A.  They actually saw on a thing, on the letter,
15  actually, when we got it is just stating that we were
16  being sued for using the name Van Scoy Diamond Mine.  And
17  it was a sheriff that came and handled the, handed the
18  paper over.  And it wasn't in an envelope or anything.
19  It just stated for the name.  So they just put it on
20  their own -- she just scratched it out until we got back
21  to find out what was going on.
22   Q.  Who would be the supervisor that would have the
23  capacity to make a decision like that while you were away
24  out of those names?

**Page 84**

1    A.  There is Lori McMichael was the manager.  But,
2  really, it's -- the way we operate, it's not just kind of
3  one -- it won't be no bigger than the other one and all
4  that.  You know, we just kind of work as a team.
5    Q.  So you were away when you got this November --
6    A.  The 18th I was away, yes, I was.
7    Q.  Do you remember when you got back?
8    A.  Yeah.  It was actually about two days later,
9  three days later from the original letter.
10   Q.  From the original letter which is --
11   A.  The one from November the 18th.
12   Q.  -- November the 18th?
13   A.  Correct.
14   Q.  Do you remember what day of the week it was you
15  got back from your vacation?
16   A.  I think it was that Monday.  We went hunting.  It
17  was Monday, the first day of hunting for Pennsylvania.
18   Q.  And when you got back, the word "Mine" had
19  already been blacked out from these sales receipts; is
20  that correct?
21   A.  I don't think so, no.  If I'm not mistaken.
22  That's why I said, this is, I have to seek counsel to
23  really see exactly what's going on with this.
24   Q.  You need to do what?

**Page 85**

1    A.  To seek counsel, to see an attorney to see what's
2  exactly going on.  Because as far as I was concerned,
3  until the November 18th of 2004, I was not aware of any
4  point at all that there was any trademark of Van Scoy
5  Diamond Mine after the bankruptcy.
6    Q.  But when you got back from your vacation on that
7  Sunday or Monday, hunting season, the word "Mine" had
8  already been blacked out; is that correct?
9    A.  Not that I know of.
10   Q.  So do you believe it happened sometime after you
11  got back?
12   A.  From what I remember, I think it was when we were
13  away and then we had the papers actually served.
14   Q.  So you were back and one of your employees
15  blacked out the word "Mine" from your sales receipts
16  without even asking you; they could have asked you?
17   A.  To be honest with you, I really don't know.  I
18  don't recall, really, when this all first really took
19  place.
20   Q.  Your father advertised Van Scoy Diamond Mine in
21  connection with NASCAR, correct?
22   A.  25 years ago, yes.
23   Q.  NASCAR is very popular in Delaware; would you
24  agree with that?

---

Wilcox & Fetzer, Ltd.    Professional Court Reporters
(302)655-0477
237c0978-7df2-492f-be79-16c76b54a422

Van Scoy
Kurt Van Scoy          C.A. # 05-108 (KAJ)      v. Van Scoy Diamond Mine of Delaware, Inc.
                                                          July 26, 2005

Page 86

1    A.  In the last five years, yeah.
2    Q.  Have you ever advertised in connection with
3  NASCAR?
4    A.  No.
5    Q.  Have you ever had TV commercials or TV spots
6  during any of the NASCAR races?
7    A.  No.
8        MR. PETOCK:  Let's take another break.
9        VIDEO SPECIALIST:  This ends Tape Number 2
10  of the video deposition of Mr. Van Scoy.  The time is
11  11:56.
12       (Thereupon, a short recess was had.)
13       VIDEO SPECIALIST:  This is Tape Number 3 of
14  the video deposition of Kurt Van Scoy.  The time is
15  12:07.
16  BY MR. PETOCK:
17   Q.  Kurt, did you consult with your attorney during
18  the break about any of your testimony given or that you
19  expect to give today?
20   A.  No.
21   Q.  Where do the majority of your customers come
22  from?
23   A.  I don't know that.
24   Q.  Do the majority of your customers come from the

Page 87

1  Newark area?
2    A.  I don't know that.
3    Q.  Is it general practice for you to ask your
4  customers what their address is?
5    A.  Yes.
6    Q.  So where do the majority come from?
7        MR. QUINN:  Asked and answered.
8    Q.  Where do you advertise?
9    A.  Radio and TV.
10   Q.  Where in geographically?
11   A.  In Delaware.
12   Q.  All of Delaware?
13   A.  No.
14   Q.  What parts of Delaware?
15   A.  Wilmington area.
16   Q.  Newark area, do you consider Newark to be part of
17  the Wilmington area?
18   A.  Yes.
19   Q.  Why do you only advertise in that limited area?
20   A.  Because it's within the reasonable location of,
21  close proximity of my location for my store.
22   Q.  How far do people -- how far would a customer
23  travel to go to a jewelry store?
24   A.  I don't know.

Page 88

1    Q.  Would you think the majority of your customers
2  would come from the area in which you advertise?
3    A.  Yes.
4    Q.  And that's why you advertise in that area,
5  because that how far people would come to a jewelry
6  store?
7    A.  Yes.
8    Q.  On the website of vanscoydiamondmine.com and the
9  website of Van Scoy Diamond Mine of Delaware, you state
10  that you have been in business for over 70 years serving
11  customers.  Could you explain that statement?
12   A.  It's, actually, it's combined through with my
13  father, family and my personal business combined.
14   Q.  So when you say 70 years, you are also talking
15  about the goodwill of your father that was established in
16  the --
17   A.  Through working with my father and the family
18  together.
19   Q.  You haven't been working for 70 years, correct?
20   A.  No.
21   Q.  Where did you come up with the number 70?
22   A.  If I'm not mistaken, it says over 70 years.
23   Q.  That's correct.
24   A.  I'm 39 years old.  I have been 29 years myself.

Page 89

1  My father has been at least over 50 years in the
2  business.  So combined I think that's over 70 years.
3    Q.  On your website, you also say that you are a
4  jeweler that has a reputation, not an image.
5    A.  Correct.
6    Q.  What do you mean by that?
7    A.  That's reputation of honesty and low pricing and
8  not as opposed to our competition that has a diamond in
9  their beard.
10   Q.  Are you talking about the reputation of your
11  father's business also, the 70 years that the --
12   A.  We have a reputation of doing business as honesty
13  and low pricing and certainly quality for what we offer
14  in the service after the sale.
15   Q.  Is that Van Scoy Diamond Mine that you are
16  referring to?
17   A.  That would be on our website, yes.
18   Q.  And when you say that you have a reputation for
19  honesty and all that, you are talking about the name
20  Van Scoy Diamond Mine?
21   A.  I'm talking about our business, yes.
22   Q.  At least some of the established goodwill of your
23  store, that your store has -- by the way, do you believe
24  that your store has goodwill, that the name you are using

23 (Pages 86 to 89)

Van Scoy
Kurt Van Scoy

Case 1:05-cv-00108-KAJ    Document 142-5    Filed 12/12/2005    Page 3 of 23
v. Van Scoy Diamond Mine of Delaware, Inc.
C.A. # 05-108 (KAJ)                    July 26, 2005

Page 90

1 in Delaware, Van Scoy Diamond Mine in Delaware, is there
2 goodwill associated with that mark in Delaware?
3    A.  I don't understand the question.
4    Q.  Is there a favorable attitude of the purchasing
5 public towards the goods and services that are coming
6 from your Van Scoy Diamond Mine in Newark, Delaware?
7    A.  I don't know that.
8    Q.  Do you think that the public has any sort of
9 attitude towards your goods and services coming from
10 Van Scoy Diamond Mine in Newark, Delaware?
11    A.  I don't know that.
12    Q.  Does your store have a reputation?
13    A.  Yes.
14    Q.  Does it have a good reputation?
15    A.  I do my best, yes.
16    Q.  Do you think, in your opinion, has some of that
17 good reputation come from the efforts of your father?
18    A.  I don't know that.  I do what I do.
19    Q.  Have you improved your store in any way since you
20 opened it?
21    A.  Yes, I have.
22    Q.  Could you tell me how you've improved your store?
23    A.  I added two more showcases and actually extended
24 the front room, showroom.

Page 91

1    Q.  How much do you think -- when did you do that,
2 the cases, when did you add the few more cases?
3    A.  Probably approximately four years, five years.
4    Q.  What do you think it was more close to, four
5 years or five years?
6    A.  I don't know.
7       MR. F. PETOCK:  You said four or five years
8 ago?
9       THE WITNESS:  Yes, sir.
10 BY MR. PETOCK:
11    Q.  And you said you extended your showroom.  Could
12 you be more specific on what you did to your showroom?
13    A.  It was just a dividing wall and, actually, we
14 just moved that dividing wall back and we just added more
15 showcases, changed the wallpaper.
16    Q.  When was it that you took, you extended your
17 showroom?
18    A.  I think I answered that, about four or five years
19 ago.
20    Q.  Have you done anything else to improve your
21 store?
22    A.  No.
23    Q.  So besides those two things that you mentioned,
24 it's substantially the same form as it was when you first

Page 92

1 moved in 1994?
2    A.  Yes.
3    Q.  Have you expanded your store or your business in
4 any way since you opened it?
5    A.  No.
6    Q.  Do you advertise?
7    A.  Yes, I do.
8    Q.  When did you first start advertising?
9    A.  November the 12th, 1994.
10    Q.  Where do you advertise?  You told me
11 geographically, but tell me the forums that you're
12 advertising.
13    A.  Radio, television, paper, little bit of paper.
14    Q.  Could you tell me how much you've spent on your
15 advertising?  Just for the record, we asked you to
16 produce advertising expenditures for each year going back
17 to 1994.  And you have not produced what we have asked
18 for.  This was in the Notice of Deposition which you
19 received.  We asked for --
20       MR. PETOCK:  Could you mark this as the next
21 exhibit, please?
22          (Van Scoy Deposition Exhibit No. 8, Notice
23 of Deposition Resetting Date, was marked for
24 identification.)

Page 93

1 BY MR. PETOCK:
2    Q.  Plaintiffs asked for documents sufficient to show
3 advertising expenditures by defendants for each year
4 since the store operated by Van Scoy Diamond Mine of
5 Delaware, Incorporated, in or around November of 1994 and
6 began operation to present.
7       And did you receive this Notice of
8 Deposition, Kurt?
9    A.  I believe I have, yes.
10       MR. QUINN:  Before you go further, let the
11 record show that defendants produced what was reasonably
12 available to them both this morning and last night when
13 copies were sent to counsel for the plaintiff.
14 BY MR. PETOCK:
15    Q.  You produced your U.S. Income Tax Return for
16 2002, 2003 and 2004 to satisfy that request that we were
17 talking about; is that correct?
18    A.  Yes.
19    Q.  Do you have your U.S. Tax Returns going further
20 back than 2002?  Do you have your -- you can answer the
21 question.
22    A.  I don't know that offhand.
23    Q.  How far back do you keep your records?
24    A.  That's my wife's department.  I really can't

Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy        C.A. # 05-108 (KAJ)              July 26, 2005

Page 94

1  answer that. I don't know.
2    Q. Did your wife decide, Donna decide, was she also
3  involved in the decision to start using the mark Van Scoy
4  Diamond Mine?
5    A. No. It was just my, it was my father and I. My
6  father gave me the name to use.
7    Q. Did he give your corporation the right to use the
8  name?
9    A. He gave me the name to use. He gave me the name
10 to use.
11   Q. What were your advertising expenditures for last
12 year?
13   A. I don't recall that.
14   Q. Do you have your advertising expenditures for
15 years prior to 2002 at your store?
16   A. I don't know that. I can look. I don't know
17 that right now.
18   Q. According to your U.S. Income Tax Return for
19 2002, it appears that your advertising expenditures, as
20 you recorded on this, were 63,930. Was that the total
21 for your advertising in that year?
22   A. I would have to say so if that's my taxes. Sure.
23   Q. In 2003 your advertising expenditures, according
24 to what you produced, was $72,116; is that correct?

Page 95

1    A. I would have to say that's on my taxes. Sure.
2    Q. Was there any reason for the increase in
3  advertising between 2002 and 2003?
4    A. Not that I recall.
5    Q. Did it have anything to do with inflation?
6    A. No, not that I recall.
7    Q. According to what you produced, your advertising
8  expenditures for 2004 were $52,270. Is that accurate for
9  your advertising expenditures for that year?
10   A. If it's on my taxes, yes.
11   Q. Was there any reason for the drop in advertising
12 between 2003 and 2004 and between 2002 and 2004 for that
13 matter?
14   A. No.
15   Q. How do you decide how much advertising to do?
16   A. I just feel certain weeks I want to do it and
17 then that's it.
18   Q. Do you advertise continuously throughout the year
19 or just at certain intervals?
20   A. Certain intervals.
21   Q. And what kind of intervals?
22   A. I don't understand that.
23   Q. Do you advertise only during holidays?
24   A. In radio wise, I do just pretty much holidays and

Page 96

1  in summertime TV a little more than radio.
2    Q. And are the only places you advertise radio,
3  television and newspaper?
4    A. Yes.
5    Q. How much did you advertise the year that you
6  opened, 1994?
7    A. I don't recall that.
8    Q. Has your advertising increased dramatically at
9  any point?
10   A. I don't understand the question.
11   Q. Has the expenditures, your advertising expenses,
12 has there been any year where there has been a large
13 increase from the previous year?
14   A. I don't know that.
15   Q. Do you know if there was an increase between 1994
16 and 1995?
17   A. I don't know that.
18   Q. What about between 1995 and 1996?
19   A. I don't know that.
20   Q. What about between 1996 and 1997?
21   A. I really don't know that.
22   Q. What about between 1997 and 1998?
23   A. Again, I don't know that. I can't answer that.
24   Q. '99 and 2000?

Page 97

1    A. I can't answer that.
2    Q. 2000, 2001?
3    A. I don't know.
4    Q. Have you done more or less advertising this year
5  than last year?
6    A. To be honest, I don't know that. I don't know
7  that.
8    Q. Last year you spent 52,270 on advertising. And
9  you are not sure how much you spent this year?
10   A. I really don't know.
11   Q. So far, obviously.
12   A. Right.
13   Q. If you are forced to stop using the mark now, do
14 you think you will be prejudiced in any way?
15   A. I don't understand that.
16   Q. Do you think that, if you were forced to stop
17 using the mark right now, you would be placed in a
18 position that you think is somehow unfair?
19   A. Yes.
20   Q. Could you tell me why?
21   A. My father gave me the name.
22   Q. Is that the only reason why you think you would
23 be prejudiced if you were forced to stop using the mark
24 now?

25 (Pages 94 to 97)

Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy         C.A. # 05-108 (KAJ)          July 26, 2005

---

Page 98

1    A.  My father gave me the name and he gave me the
2  sign for the store.
3    Q.  Is that the only reason why you think you would
4  be prejudiced?
5    A.  Yes.
6       MR. F. PETOCK:  Could you speak up a little
7  bit?
8       THE WITNESS:  Yes.  My father gave me the
9  name and he gave me the sign.  And, yes, that's the
10 reason why, yes, absolutely.
11      MR. F. PETOCK:  Thank you.
12      THE WITNESS:  Sure.
13 BY MR. PETOCK:
14   Q.  Do you think there is a likelihood of confusion
15 between your store and Wayne's store?
16   A.  I don't understand that.
17   Q.  Would the average member of the public think that
18 there is some sort of connection between the goods and
19 services that you to offer and the goods and services
20 that Wayne's store offers under the mark Van Scoy Diamond
21 Mine?
22   A.  I don't know that.  I can't answer for a
23 customer.
24   Q.  Have you ever experienced a customer being

---

Page 99

1  confused as to your store and Wayne's store?
2    A.  Not that I know of, no.
3    Q.  Has anyone ever told you that they thought there
4  was a connection between your store and Wayne's store?
5    A.  Not that I know of.
6    Q.  Is there any connection between your store and
7  Wayne's store?
8    A.  Not that I know of.
9    Q.  Does Van Scoy Diamond Mine have significance in
10 Wilkes-Barre, PA?
11   A.  I don't know that.  I can't answer for his store.
12   Q.  Do members of the purchasing public associate the
13 mark Van Scoy Diamond Mine with a jewelry store in
14 Wilkes-Barre?
15   A.  I don't know that.
16   Q.  Does the mark Van Scoy Diamond Mine have
17 significance in Newark, Delaware?
18   A.  Yes.
19   Q.  Is Van Scoy Diamond Mine well-known in
20 Wilkes-Barre?
21   A.  I don't know that.
22   Q.  Was it at any time well-known in Wilkes-Barre?
23   A.  I don't know that.  Really, I can't answer that.
24 I can't answer that.

---

Page 100

1    Q.  You grew up in Wilkes-Barre, correct?
2    A.  I did, yes.
3    Q.  When you were growing up, was Van Scoy Diamond
4  Mine well-known in Wilkes-Barre?
5    A.  We were known for a big family.
6    Q.  Could you please answer the question?
7    A.  I'm sorry.  What was the question again?
8    Q.  The question is:  When you were growing up in
9  Wilkes-Barre, was the name Van Scoy Diamond Mine
10 well-known in Wilkes-Barre?
11   A.  I can't answer that.  Well-known, I can't answer
12 for somebody else.  I mean, people knew that we had a
13 jewelry store if that's what you are asking.  Friends
14 knew.  Friends knew, sure.
15   Q.  Not you, just there was a jewelry store known in
16 Wilkes-Barre that went by the name of Van Scoy Diamond
17 Mine?
18   A.  There was a store in Wilkes-Barre by the name of
19 Van Scoy Diamond Mine.
20   Q.  And that was well-known by the public?
21   A.  I can't answer that.  I don't know.  You know
22 what I mean?  There was a store, Van Scoy Diamond Mine,
23 in Wilkes-Barre, Pennsylvania.
24   Q.  Could you answer:  Is the mark Wal-Mart

---

Page 101

1  well-known by the public?
2    A.  Well, sure, I would have to say so.  I think I
3  know of Wal-Mart.
4    Q.  Where do you get your diamonds from?
5    A.  A number of suppliers.
6    Q.  Could you name them, please?
7    A.  IGAT.  There is many.  That's really one that
8  comes to my head right off the top of my head.
9    Q.  Could you name the other ones?
10   A.  Everybody is changing with everybody and
11 everything else.  I mean -- Ivory.  I think there is
12 Ivory Diamonds.
13   Q.  Any others?
14   A.  Paramount Gems.
15   Q.  Any others?
16   A.  That's all that I can really think of right off
17 the top of my head.
18   Q.  Are any of your diamonds supplied by Wayne?
19   A.  I'm sorry?
20   Q.  Are any of your diamonds supplied by Wayne?
21   A.  No.
22   Q.  What about by Wayne's company?
23   A.  No.
24   Q.  Are you a direct importer of diamonds?

---

26 (Pages 98 to 101)

Van Scoy
Kurt Van Scoy
C.A. # 05-108 (KAJ)
v. Van Scoy Diamond Mine of Delaware, Inc.
July 26, 2005

Case 1:05-cv-00108-KAJ    Document 142-5    Filed 12/12/2005    Page 6 of 23

Page 102

1  A. We do buy direct from manufacturers from Israel,
2  yes.
3  Q. Who is your direct -- who is manufacturing in
4  Israel?
5  A. IGAT would be, that would be one. Aton Coozy.
6  Q. Isn't he located in New York?
7  A. He has an office in New York. He has an office
8  in Russia and Israel as well.
9  Q. Is that what, generally, in the industry, diamond
10 industry, when you say you are a direct importer, does it
11 generally mean that you would import it through someone
12 like Aton Coozy?
13 A. Sure.
14 Q. Was there an incident with Aton Coozy where you
15 got diamonds on credit which made Aton Coozy rather angry
16 at you?
17 A. No.
18 Q. Was there an incident where you got diamonds on
19 credit and you were supposed to have the money for Aton
20 Coozy for the diamonds that he gave you, but when he came
21 to collect the money, the money was not there, it was
22 already spent?
23 A. No, not true, no.
24 Q. There was never any incident with Aton Coozy --

Page 103

1  A. None whatsoever.
2  Q. -- where you got diamonds on credit and you had
3  spent the money, you sold the diamonds, spent the money?
4  A. Never.
5  Q. And Aton came time to collect, you didn't have
6  it?
7  A. Never.
8  Q. Do you get a lot of your merchandise COD, cash on
9  deposit?
10 A. No, I do not. If it's a new company, first time,
11 but that's, other than that, no.
12 Q. How is your credit?
13 A. Very good.
14 Q. Do you sell colored stones?
15 A. Sure.
16 Q. What types?
17 A. All types of colored stones.
18 Q. What other merchandise do you sell besides
19 diamonds?
20 A. Pearls, gold, sterling silver.
21 Q. What percentage of your business is the sale of
22 merchandise other than diamonds?
23 A. I don't know that.
24 Q. Your father built up the name Van Scoy Diamond

Page 104

1  Mine around the sale of diamonds, correct?
2  A. I can't answer for that. I don't know that.
3  Q. He didn't sell those other items though that you
4  mentioned.
5  A. I think he did, actually. He sold some different
6  stuff, yeah, from what I recall, yes.
7  Q. Silver?
8  A. No.
9     MR. QUINN: Is that a question?
10 Q. Did they sell silver?
11 A. I don't know that.
12 Q. You said no before.
13    MR. QUINN: Objection. That's not a
14 question.
15    THE WITNESS: Repeat the question.
16 BY MR. PETOCK:
17 Q. Did you testify before -- did you say no when you
18 thought I was asking you a question as to whether your
19 father sold silver?
20    MR. QUINN: That's two questions.
21 Q. You thought I asked you a question before as to
22 whether your father sold silver; is that correct?
23 A. Correct.
24 Q. And you said no, correct?

Page 105

1  A. Correct.
2  Q. Did your father sell silver?
3  A. I'm sorry. I don't understand that.
4  Q. Did your father sell silver?
5  A. Does my father --
6  Q. Did your father sell silver?
7  A. Not that I know. I don't know that.
8  Q. It's a tongue twister.
9  A. I don't know that.
10 Q. Did your father sell colored stones?
11 A. Yeah, yes.
12 Q. Have there been complaints about the quality of
13 the goods or services provided by Van Scoy Diamond Mine
14 of Delaware, your store?
15 A. Not to my knowledge at all, no.
16 Q. Are you aware of any complaints against any
17 Van Scoy Diamond Mine?
18 A. I don't understand the question.
19 Q. Are you aware of any complaints against a
20 Van Scoy Diamond Mine operating anywhere?
21 A. What kind of question -- what complaints? Yeah,
22 there is complaints.
23 Q. What complaints are you aware of?
24 A. I mean, there is just one that was an appraisal

27 (Pages 102 to 105)

Van Scoy
Kurt Van Scoy          C.A. # 05-108 (KAJ)

v. Van Scoy Diamond Mine of Delaware, Inc.
July 26, 2005

## Page 106

1 that was done by the plaintiff. And they moved to
2 Alabama. And he's a state trooper in Alabama. And they
3 quoted, he measured a stone of what it was and said what
4 the weight of it was. In fact, they took it to a jeweler
5 to have it weighed and to trade it in. And it was not
6 anywhere near what it was. And, supposedly, what he told
7 me, they were going to contact the Better Business
8 Bureau, I believe, back in Wilkes-Barre on that. That
9 was one of the latest ones. I remember that.
10    Q.   Are you aware of any other complaints against --
11 so are you aware of complaints against the Van Scoy
12 Diamond Mine being operated by the plaintiff in
13 Wilkes-Barre?
14    A.   The one that they contacted -- there
15 was one letter that was sent to us.
16    Q.   Why was that letter sent to you?
17    A.   He was, actually, originally from the area and he
18 moved away.
19    Q.   From what area?
20    A.   Delaware.
21    Q.   He was from Delaware and he moved where?
22    A.   To Alabama.
23    Q.   Why did the state trooper send a letter to you?
24       MR. QUINN:   Asked and answered.

## Page 107

1       MR. PETOCK:   No, it's not.
2       MR. F. PETOCK:   You can answer it.
3       MR. QUINN:   The record will show it was
4 asked and answered two questions ago.
5 BY MR. PETOCK:
6    Q.   Did the state trooper think there was a
7 connection between your store and Wayne's store?
8    A.   No.   It was, actually, where he originally
9 purchased the ring, where my father had the store there
10 originally.
11    Q.   He originally purchased the ring from your
12 father's store?
13    A.   Correct.
14    Q.   What was the next step in this equation?
15    A.   It was -- the dates exactly I'm not sure. But he
16 stated they went to have the stone -- he moved down to
17 Alabama and had the stone to be traded in. And on the
18 appraisal which has the plaintiff's name on it stating
19 what the quality of the stone is, the color and so forth
20 of the stone and the make of the stone and the weight of
21 the stone, which, in fact, none of the equations matched,
22 quote, unquote, of what this gentleman was stating. And
23 he took it to a gemologist down in the area there. And
24 he was just trying to follow through with it. And he was

## Page 108

1 looking for the plaintiff, actually, to pursue this.
2    Q.   What was the plaintiff's name on the certificate?
3    A.   It was Wayne Van Scoy.
4    Q.   This trooper, did he originally buy the stone
5 from the store in Wilkes-Barre or the store in Delaware?
6    A.   Delaware.
7    Q.   And the certificate had the plaintiff's name on
8 it?
9    A.   Yes, it did.
10    Q.   Do you have any idea why the certificate of the
11 store in Delaware would have had, of a diamond sold from
12 a store in Delaware would have had Wayne's name on it?
13    A.   I don't know that. I can't answer that.
14    Q.   Are there any documents related to this?
15    A.   Yeah. There was something. I can certainly --
16 I'll try to find it.
17    Q.   What would that document have been, a letter to
18 you?
19    A.   It was a letter, yes. It was a letter that was
20 sent to me, yes.
21    Q.   Are you aware of any other complaints against a
22 Van Scoy Diamond Mine jewelry store?
23    A.   Not that I know, no.
24    Q.   That's the only complaint that you are aware of?

## Page 109

1    A.   Yes.
2    Q.   Have you had any of your brothers or sisters work
3 for you at the store, your store?
4    A.   Yes.
5    Q.   Who?
6    A.   My brother that's deceased, Keith, and my brother
7 Kenny.
8    Q.   When did Kenny work for you?
9    A.   Exact dates I'm not sure. I would probably say
10 approximately three years ago.
11    Q.   What was Kenny's position at the store?
12    A.   Sales.
13    Q.   Has Kenny ever owned a Van Scoy Diamond Mine
14 store?
15    A.   No, not that I know of. No.
16    Q.   Did you ever speak with Kenny with respect to the
17 registered trademark of the name Van Scoy Diamond Mine?
18    A.   I don't understand that question.
19    Q.   Did you ever speak to Kenny about the registered
20 trademark Van Scoy Diamond Mine?
21    A.   Prior to the lawsuit.
22    Q.   Prior to the lawsuit.
23    A.   Not at all.
24    Q.   What about after the lawsuit?

28 (Pages 106 to 109)

Van Scoy
Kurt Van Scoy

Case 1:05-cv-00108-KAJ    Document 142-5    Filed 12/12/2005    Page 8 of 23
v. Van Scoy Diamond Mine of Delaware, Inc.
C.A. # 05-108 (KAJ)    July 26, 2005

---

**Page 110**

1  A. Yeah. I was in disbelief. That's pretty much --
2  that's all that was really said.
3  Q. What were you in disbelief about?
4  A. The name, when the name Van Scoy Diamond Mine
5  went bankrupt, I was solely under the impression that the
6  plaintiff and also Rick Sendrick had a letter made up,
7  typed up from an attorney. They paid $5,000 each to
8  state that the name Van Scoy Diamond Mine was worth
9  nothing. And I'm under the impression as well that it
10 was by the court they demanded to take the name down, Van
11 Scoy Diamond Mine.
12      And, at that point, I felt there was no need
13 whatsoever for a trademark or anything. I mean,
14 everybody -- that's all they wanted to do. They didn't
15 want nothing to do with "diamond mine." They wanted
16 nothing to do with that. And that's why I, actually, we
17 went with Van Scoy Diamond Mine of Delaware,
18 Incorporated.
19 Q. So the bankruptcy, before people were told to
20 stop using the mark and stuff, you knew about the
21 trademark?
22 A. No, I knew nothing. I knew nothing, absolutely
23 nothing about any trademark at all, nothing. My father
24 gave me a name. That's all I know.

---

**Page 111**

1  Q. Were you aware that in approximately 2000, Kenny
2  was placing calls to the trademark office or to anyone
3  else about the renewal of the trademark and service mark
4  for Van Scoy Diamond Mine?
5  A. No, no, I do not.
6  Q. Would you be surprised to know that Kenny knew
7  about the trademark and the fact that it was federally
8  registered?
9  A. I don't know that. I'm not Kenny.
10 Q. Were you ever aware that your father had
11 registered a trademark?
12 A. No, I was not.
13 Q. How often have you seen Wayne since you opened
14 the store in 1994?
15 A. A handful of times I would have to say.
16 Q. Were you home for the holidays, maybe
17 Thanksgiving and Christmas, between 1994 and 2000?
18 A. Yeah, yes.
19 Q. Did you see Wayne during that time?
20 A. I would have to say yes.
21 Q. Could you tell me about any conversations the two
22 you of you had during that period?
23 A. Geez, happy holidays. How are you doing? Good
24 to see you. Here's your gifts and all that, just your

---

**Page 112**

1  basic family gathering for the holidays.
2  Q. During that period, 1994 to 2000, that was during
3  the bankruptcy, correct?
4  A. I don't know that. I'm assuming. I guess. I
5  don't know that.
6  Q. Was there any talk about the bankruptcy during
7  any of those visits home during the holidays between 1994
8  and 2000?
9  A. I don't recall that.
10 Q. Did you ever talk to anyone about the bankruptcy
11 during the bankruptcy, anyone? Was it of interest to
12 you?
13 A. I don't know really. No. I don't know. I don't
14 know that.
15 Q. Your dad was in the hospital, Christiana Hospital
16 in Delaware, in both 1996 and 1998; is that correct?
17 A. I believe so.
18 Q. Did you see Wayne in Delaware at any time during
19 that period?
20 A. Yes, I did.
21 Q. Do you remember anything about any conversations
22 you had during that period?
23 A. Yeah. I mean, just how is he doing? What is the
24 status? What's going on? He actually stopped by the

---

**Page 113**

1  store to use the bathroom. He was -- yeah, I remember
2  conversations, yes.
3  Q. Did he say anything to you when he stopped by the
4  store to use the bathroom that you recall?
5  A. How are you doing?
6  Q. What year was that?
7  A. I don't recall that, what year.
8  Q. It was either '96 or '98 though, right?
9  A. I would have to say I don't recall that.
10 Q. Did you and Wayne get in an argument about
11 anything while your dad was in the hospital that you
12 recall?
13 A. I don't recall.
14 Q. Was there a fight about you not visiting your dad
15 in the hospital?
16 A. No, I don't recall that.
17 Q. You don't recall a fight between you and Wayne or
18 where Wayne was disturbed that you were not visiting your
19 dad in the hospital?
20 A. No. I don't know. I don't recall that, no.
21 Q. Do you recall calling Wayne in 2002 or
22 approximately 2002 about someone who wanted to open up a
23 franchise using the name Van Scoy Diamond Mine?
24 A. I don't recall that, no, I don't. I really

---

Van Scoy Case 1:05-cv-00108-KAJ    Document 142-5    Filed 12/12/2005    Page 9 of 23
Kurt Van Scoy                      v. Van Scoy Diamond Mine of Delaware, Inc.
                        C.A. # 05-108 (KAJ)           July 26, 2005

Page 114

1  don't.
2      Q.  Did you call Wayne and ask him about someone who
3  wanted to use the name Van Scoy Diamond Mine?
4      A.  I don't recall that.  That's the same question.
5  I don't recall that.
6      Q.  Has anyone ever approached you about the
7  possibility of franchising the name Van Scoy Diamond Mine
8  or using the name Van Scoy Diamond Mine?
9      A.  Not to my knowledge, no.
10     Q.  Have you called Wayne about anything to do with
11 Van Scoy Diamond Mine?
12     A.  I don't understand that question.
13     Q.  Have you ever placed a call to Wayne on the
14 telephone asking him questions about anything to do with
15 the name Van Scoy Diamond Mine?
16     A.  Not that I know of, no.
17     Q.  At no time did a person, did a person approach
18 you about a possibility of franchising a Van Scoy Diamond
19 Mine in Delaware or in any place?
20     A.  No, I don't recall anything.  No, I do not.
21     Q.  Isn't that something you would remember?
22     A.  I don't know to be honest.  I really don't know
23 that.  I have my business.  I focus on my business.
24     Q.  Isn't that related to your business?

Page 115

1      A.  When it comes to franchising and all that stuff
2  or whatever, that has nothing to do with me.  So, really,
3  I don't know that.
4      Q.  Why doesn't it have anything to do with you?
5      A.  Because I have my own business and I focus on my
6  own store.  And that was my store that was given to me
7  with that name.
8      Q.  In 2003 your mother died, correct?
9      A.  Yeah, that's correct.
10     Q.  Do you remember the day you went to pick out the
11 caskets?
12     A.  Yes.
13     Q.  Do you remember a fight that occurred that day
14 between several members of your family, including
15 yourself, a verbal fight?
16     A.  Yes.
17     Q.  What was that fight about?
18     A.  Everybody going over to my parents' house at the
19 time to go have dinner.  Everybody has sent food and
20 everything to the house where we grew up.
21     Q.  Could you explain why there was a fight over that
22 more specifically?
23     A.  The plaintiff had some, obviously, some issues
24 with some of the family members.  And my dad was still

Page 116

1  alive at the time.  And we felt that my father is still
2  alive, which we feel that it was the appropriate thing to
3  do.  It was the house that we all grew up in.  It was the
4  house that my mother, our mother raised us in.  And there
5  was food over there.  And it was very, very hungry.  And
6  we just wanted to go there and have something to eat and
7  sit down and kind of gather our thoughts and our wits and
8  appreciate things that we had and where we grew up in.  I
9  recall that.
10     Q.  Do you recall specifically what was said between
11 you and Wayne?
12     A.  No, I do not.
13     Q.  Was anything said about the trademark?
14     A.  No.
15     Q.  Do you remember a conversation between you and
16 Wayne that ended up in somewhat of an argument concerning
17 your parents going to Atlantic City?
18     A.  No.  Say that question again.
19     Q.  Do you recall a conversation between you and
20 Wayne that ended up becoming a heated conversation and
21 what might be characterized as an argument concerning
22 your parents going to Atlantic City?
23     A.  Yes, I do, several.
24     Q.  What were those -- were they arguments?

Page 117

1      A.  Yes.
2      Q.  What were they about?
3      A.  He was trying to tell my parents they can't go.
4  And he would, actually, withhold my mother's Social
5  Security check until that Monday.
6      Q.  Why, in your opinion -- did your parents have
7  gambling problems?
8      A.  I can't answer that.
9      Q.  What year was that argument?
10     A.  I don't recall.  It was several.
11     Q.  Was it recently?
12     A.  My mom passed away in 2003.
13     Q.  Do you think there may have been an argument in
14 2003?
15     A.  I don't recall.
16     Q.  Have you been in many arguments with your brother
17 Wayne?
18     A.  Growing up, yes.
19     Q.  What about recently but before the litigation?
20     A.  No.  I stayed far away.  I live in Delaware.
21     Q.  When you guys talk, does it usually end up in an
22 argument?
23     A.  Not always.  90 percent.
24     Q.  Have you had any conversations or correspondences

Van Scoy
Kurt Van Scoy

Case 1:05-cv-00108-KAJ     Document 142-5     Filed 12/12/2005     Page 10 of 23
v. Van Scoy Diamond Mine of Delaware, Inc.
C.A. # 05-108 (KAJ)          July 26, 2005

Page 118

1  with Tommy concerning Wayne in general recently?
2      A. I don't know. I can't really -- I don't know
3  about that. No. I would have to say no.
4      Q. What about with Tony?
5      A. And the question would be again?
6      Q. Whether you have had any conversations or
7  correspondences with Tony concerning Wayne.
8      A. It's really -- no, no.
9      Q. Same question as applied to Betsy.
10     A. No.
11     Q. Pam?
12     A. No.
13     Q. Ken?
14     A. No.
15     Q. What do you know about the bankruptcy proceedings
16 of your father?
17     A. I know he filed for bankruptcy. I know the name
18 was stated as being worth nothing from an attorney that
19 wrote up a letter for the plaintiff and Rick Sendrick.
20 And that's all I really know. That's my father's
21 dealing. That wasn't mine.
22     Q. How did you hear about the name being worth
23 nothing? How did you hear about this letter that was
24 drawn up?

Page 119

1      A. Through Rick Sendrick.
2      Q. Rick Sendrick told you?
3      A. Yes.
4      Q. What else did he tell you about it?
5      A. That's all. He said the name, that was worth
6  nothing. And the plaintiff, your plaintiff, and Rick
7  Sendrick had both paid, quote, unquote, $5,000 to have
8  this letter written up and to show the court that the
9  name was worth absolutely nothing.
10     Q. Did you have any idea as to why they were
11 concerned about showing that the name was worth nothing?
12     A. Because they wanted to -- I'm assuming just to
13 show the court, the bankruptcy court that there is
14 nowhere else to go with this. This Van Scoy Diamond Mine
15 was in with the bankruptcy and that the value of the name
16 Van Scoy Diamond Mine was worth nothing. And that's
17 exactly what it came out to, was worth nothing.
18     Q. When did you first hear talk about the bankruptcy
19 with respect to your father?
20     A. He filed what? September, I think, September
21 13th. I got married in July. And I foresaw what was
22 coming forward. And that's why I opted to certainly go
23 out on my own. And my father gave me the name and said
24 good luck and I love you very much. I'm proud of you.

Page 120

1      Q. What happened to your father that forced him to
2  file bankruptcy?
3      A. I don't know.
4      Q. Did it have anything to do with gambling?
5      A. I don't know.
6      Q. Was your farther a gambler?
7      A. I don't know.
8      Q. Did your father go to Atlantic City a lot?
9      A. I don't know that.
10     Q. Did you ever know your father to go to Atlantic
11 City?
12     A. Yeah.
13     Q. Did you ever know your father to lose any amount
14 of money in Atlantic City?
15     A. I didn't know that.
16     Q. Did you ever possess any document related to the
17 bankruptcy?
18     A. After the suit, yes.
19     Q. What about before the suit during the bankruptcy?
20     A. No.
21     Q. What about that document that you said that Wayne
22 and Rick had drawn up?
23     A. What about it?
24     Q. Did you ever see that during the bankruptcy?

Page 121

1      A. During the bankruptcy, no.
2      Q. Have you seen it since then?
3      A. No. Rick, I believe, said he has a copy though.
4      Q. When did Rick Sendrick tell you about the letter
5  that him and Wayne had drawn up?
6      A. Actually, I've heard it several times.
7      Q. When was the first time?
8      A. The first time I don't recall.
9      Q. The second time?
10     A. I don't recall. Last time probably about a week
11 ago.
12     Q. Did you hear about it when it was being first
13 drawn up?
14     A. No, it was after, after it was already drawn up.
15     Q. But that was during the bankruptcy at some point,
16 right?
17     A. Correct.
18     Q. Back in the mid '90s?
19     A. Right, exactly.
20         MR. PETOCK: I would like to have this
21 marked as the next exhibit.
22         (Van Scoy Deposition Exhibit No. 9,
23 Bankruptcy Petition, was marked for identification.)
24 BY MR. PETOCK:

Van Scoy                Case 1:05-cv-00108-KAJ    Document 142-5    Filed 12/12/2005    Page 11 of 23
Kurt Van Scoy          C.A. # 05-108 (KAJ)       v. Van Scoy Diamond Mine of Delaware, Inc.
                                                 July 26, 2005

**Page 122**

1   Q. Kurt, what else did you talk about with Rick
2 Sendrick recently?
3   A. That was really it. That was it. I asked for a
4 deposition from him or an affidavit stating that he knew
5 that Wayne was down here and Wayne knew, certainly, I was
6 in the business and all that. And he didn't want to get
7 involved. And that's when it was stated that he said
8 there was a document that was written up by an attorney.
9 And they both had it written up. And it stated that the
10 name Van Scoy Diamond Mine was worth nothing.
11   Q. Could you tell me more about this affidavit you
12 asked him for?
13   A. Just to state that Wayne knew -- Rick knew that
14 Wayne knew that I was down here, basically.
15   Q. When did this conversation occur?
16   A. About a week ago.
17   Q. What else have you talked to Rick about?
18   A. That's it.
19   Q. Can you tell me what the document is that's in
20 front of you?
21   A. Yes. U.S. Bankruptcy, Middle District of
22 Pennsylvania, Bankruptcy Petition.
23   MR. PETOCK: For the record, this is Exhibit
24 9 that we are talking about now.

**Page 123**

1 BY MR. PETOCK:
2   Q. Could you tell me where you got this?
3   A. Yeah. The Federal Courthouse in Wilkes-Barre.
4   Q. Did you personally obtain this?
5   A. I did.
6   Q. When?
7   A. It was shortly after I was notified that I was
8 being sued.
9   Q. They printed it for you?
10   A. Yes, she did, yeah.
11   Q. Why did you go to the Federal Courthouse in
12 Wilkes-Barre? What was the purpose of it? What were you
13 trying to find out?
14   A. I was trying to find out where the bankruptcy
15 was. I wanted to, certainly, find out what the name
16 issue, certainly worth nothing. Also, I went to find
17 out, actually, if it was still ongoing and also to find
18 out how long they actually had the name not being used.
19   Q. Whose markings are on this?
20   A. I have no idea. All I know is I got copies.
21   Q. Did you ever hear the name Robert P. Sheils?
22   A. Robert P. Sheils. No. I know a Joe Sheils my
23 dad always used to mention, his best friend. I don't
24 know if it's any relation or not.

**Page 124**

1   Q. How about Thomas Feissner?
2   A. I heard the name mentioned, yes.
3   Q. Do you know who that is?
4   A. I don't know exactly who he is. I know he was an
5 attorney if I'm not mistaken.
6   Q. By the way, I'm referring back to Exhibit 9. Is
7 this everything that was given to you?
8   A. To the best of my knowledge that I know of.
9   Q. Is anything missing from it?
10   A. I don't really recall right now.
11   Q. Did you take anything out of it?
12   A. Not that I know of. I'm sorry. Not that I know
13 of.
14   Q. Regarding Exhibit 9, has anyone else had access
15 to that document since you got it?
16   A. No, not that I know of, no.
17   MR. PETOCK: Mark this Exhibit 10, please.
18   (Van Scoy Deposition Exhibit No. 10, Order
19 Approving Agreement in Settlement of Adversary
20 Proceedings and Contested Matters, was marked for
21 identification.)
22 BY MR. PETOCK:
23   Q. Exhibit 10 is an Order Approving the Agreement
24 and Settlement of Adversary Proceedings and Contested

**Page 125**

1 Matters with Releases and Other Provisions; is that
2 correct?
3   A. Yes.
4   Q. Did you obtain this document?
5   A. Yes, I did.
6   Q. Where did you obtain this document?
7   A. Actually, at the bankruptcy court in
8 Wilkes-Barre, Pennsylvania.
9   Q. Had you ever seen this document?
10   A. No. Like I said, it was after I was notified of
11 being sued.
12   Q. That's the first time you ever --
13   A. Yes, sir.
14   Q. Have you read it since?
15   A. No, actually. I mean, it's been a while.
16   Q. But, at some point, you have read it since you
17 obtained it?
18   A. After we had the suit, yes.
19   Q. What assets of your father's did the bankruptcy
20 court seize?
21   A. I know nothing of that, what took place.
22   Q. When you were home for the holidays, Thanksgiving
23 and Christmas, was your father's store always operating
24 when you were up there?

Van Scoy  Case 1:05-cv-00108-KAJ    Document 142-5    Filed 12/12/2005    Page 12 of 23
Kurt Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
                        C.A. # 05-108 (KAJ)              July 26, 2005

Page 126

1    A.  No.  I believe the majority of 1995, actually,
2  that store was closed --
3    Q.  Why?
4    A.  -- by the sheriff.
5    Q.  Was that as a result of the bankruptcy?
6    A.  That is correct, yes.
7    Q.  Was anything seized?
8    A.  Whatever was inside they locked up and that was
9  it.  It shut down.
10        MR. PETOCK:  Break.
11        VIDEO SPECIALIST:  This ends Tape Number 3
12  of the video deposition of Kurt Van Scoy.  The time is
13  1:01.
14        (Thereupon, a lunch break was had.)
15        VIDEO SPECIALIST:  This is Tape Number 4 of
16  the video deposition of Kurt Van Scoy.  The time is 1:59.
17  BY MR. PETOCK:
18    Q.  Kurt, did you speak with your attorney at all
19  during the break about your deposition testimony that you
20  have given or expect to give today?
21    A.  No.
22    Q.  Before the break, we were talking about the
23  bankruptcy and, in particular, what assets the bankruptcy
24  court seized from your father or from your father's

Page 127

1  company.  Can you tell me what was seized?
2    A.  I don't know.
3    Q.  Do you know anything that they attempted to
4  seize?
5    A.  I know nothing.  I was down here at the time.
6    Q.  Kurt, didn't you tell me that they seized the
7  jewelry from his jewelry store, Van Scoy Diamond Mine?
8    A.  I didn't say that, no.
9    Q.  Did they seize the jewelry from his jewelry
10  store?
11    A.  I can't answer that question.  I don't know.  I
12  was not there.
13    Q.  Did you hear from anyone as to what they may have
14  seized?
15    A.  All I know, he filed for bankruptcy and they
16  closed the store.  They padlocked the door.
17    Q.  So did they seize the store?
18    A.  They padlocked the front door.  That's what I
19  heard, yeah.
20    Q.  What about your parents' house, your father's
21  house?
22    A.  I don't know any of that information.
23    Q.  Did the bank try to foreclose on the house?
24    A.  I don't know any of the information.  I don't

Page 128

1  know that.
2    Q.  Did your parents own the house after the
3  bankruptcy?
4    A.  I don't know that.  I have been down here.  I
5  don't know.
6    Q.  Who owns the house now?
7    A.  I don't know.  To be honest, I really don't know.
8    Q.  Have you been to the house since 2000?
9    A.  Yeah.
10    Q.  Did your parents own it then?
11    A.  I don't know.  Did my parents live there?  Yeah,
12  my parents lived there.  Who owned it?  That's none of my
13  business.
14    Q.  Were you close to your parents?
15    A.  Sure, I was close to my parents.  Absolutely.
16    Q.  Yet you didn't know whether they owned the house?
17    A.  I don't sit down, boy, do you own the house
18  today, mom?  Do you own the house today, dad?  It was
19  nothing like that.  It was, hi, how are you?  I love you
20  very much.  Good to see.  That was really it.  There was
21  nothing financially mentioning anything.
22    Q.  Are you aware that Wayne owns the house now?
23    A.  I really don't know.
24    Q.  Would it be a surprise you if I told you Wayne

Page 129

1  owns the house now?
2    A.  I wouldn't be surprised I guess.  I don't know.
3  I don't know the answer to that question really.  I
4  really don't.
5    Q.  Were you speaking with your brother Tony at all
6  during the bankruptcy proceedings?
7    A.  I spoke to him, yes.
8    Q.  Were you aware that Tony bid on some diamonds at
9  auction during the bankruptcy?
10    A.  I was aware of that, yeah.  That was certainly
11  mentioned via your plaintiff.
12    Q.  Wayne told you about that?
13    A.  Yes.
14    Q.  When?
15    A.  I don't recall.
16    Q.  What else did Wayne tell you about the
17  bankruptcy?
18    A.  That's all.  When you mentioned about the
19  bidding, I guess, merchandise or whatever, I know that's
20  when the plaintiff mentioned it.
21    Q.  Did Wayne tell you that he was attempting to buy
22  the trademark?
23    A.  Nothing, nothing in the kind.
24    Q.  Did Wayne ever have any discussions with you

Van Scoy
Case 1:05-cv-00108-KAJ    Document 142-5    Filed 12/12/2005    Page 13 of 23
v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

Page 130

1  concerning contributing any money towards a bankruptcy
2  settlement?
3     A.  No, not that I know.  No.
4     Q.  Did he have any conversations with you about
5  contributing money to anything regarding the bankruptcy?
6     A.  None whatsoever.  Not that I know of, no.
7     Q.  When did you learn that the plaintiff, Wayne
8  Van Scoy, bought the trademark Van Scoy Diamond Mine?
9     A.  November 18th, 2004.  I didn't have any idea of
10  anything certainly with a trademark.  2004, yes.
11     Q.  Has Wayne ever asked you to help pay for the
12  trademark?
13     A.  Nothing of the kind, no.
14     Q.  Were you aware that the bankruptcy court ordered
15  that the Mundy Street Van Scoy Diamond Mine be closed?
16     A.  Yes, I was aware of that.  Yes.
17     Q.  How did you find out about that?
18     A.  A family member, if I'm not mistaken.  I think it
19  was my mom actually.
20     Q.  Do you remember when that was that you found out
21  about it?
22     A.  Exact date I don't know.
23     Q.  Was it probably about the date it was forced to
24  be closed, approximately?

Page 131

1     A.  Yeah, I would say probably that day, if not soon
2  after, a few days.
3     Q.  Were you aware that some members of your family,
4  including Wayne, were told that they had to stop using
5  the mark Van Scoy Diamond Mine by the bankruptcy court?
6     A.  Say that again.  I didn't understand the
7  question.
8     Q.  Were you aware that Wayne was forced to stop
9  using the mark Van Scoy Diamond Mine?
10     A.  It was along the lines of that, yes.  I think it
11  was my mom that told me that, yes.
12     Q.  When do you think she told you that?
13     A.  Shortly after noticing or being noticed that they
14  had to take the name down.
15     Q.  Were you aware of the fact that your sister Pam
16  and her husband, Pam and Rick Sendrick, were forced to
17  take the name down by the bankruptcy court?
18     A.  I'm not so much with that.  I mean, it was pretty
19  much, the main was really the 154 Mundy Street location.
20     Q.  Were you aware that Pam and Rick Sendrick were
21  enjoined by the bankruptcy court; in other words, forced
22  to stop using the mark?
23     A.  Again, I don't know.  More what we discussed with
24  my mom or my parents was more or less the 154 Mundy

Page 132

1  Street location.
2     Q.  Did you have any information that they might have
3  been forced to take down their mark?  Did your mom
4  mention that also?
5     A.  To be honest with you, I really don't remember.
6     Q.  Were you aware that your sister Betsy and her
7  spouse were enjoined from using the mark by the
8  bankruptcy court?
9     A.  No.  I really didn't know.
10     Q.  Did you ever think that if the bankruptcy court
11  knew of your store in Delaware you would have been
12  enjoined from using the mark also?
13     A.  I don't see any reason or connection.  The store
14  was closed for 16 months prior to being reopened.  But,
15  also, my father filed for Chapter 13 in September and I
16  actually opened up in November.
17     Q.  Did you ever think that if the bankruptcy court
18  learned of your use of the mark, Van Scoy Diamond Mine of
19  Delaware, you would have been enjoined from using the
20  mark?
21     A.  Do I?  No.
22     Q.  Why did you think you would have been treated
23  differently than other members of your family?
24     A.  This store was opened, actually, after the fact

Page 133

1  that my father filed for bankruptcy.  And the store,
2  actually was, there was nothing there.  I had to provide
3  everything myself, taking out a personal loan to open the
4  store and sleep in the back of the store for six months
5  to try to get the store started.  So there was nothing,
6  quote, unquote, handed to me, if you will, or merchandise
7  or anything of any sort from my father or anything to do
8  with the bankruptcy.
9     Q.  Did you make any effort to avoid the bankruptcy
10  court knowing that you were using the mark Van Scoy
11  Diamond Mine or the fact that you had a store in
12  Delaware?
13     A.  Avoid, no.
14     Q.  Was it known in the family that if -- was it
15  known within your family, your brothers and your sisters,
16  to keep the fact that you had a Van Scoy Diamond Mine in
17  Delaware away from the knowledge of the bankruptcy court?
18     A.  I don't know that answer.  I'm not the rest of
19  the family.
20     Q.  Did you ever ask anyone in the family to keep the
21  fact that you had a Van Scoy Diamond Mine in Delaware a
22  secret from the bankruptcy court or private from the
23  bankruptcy court?
24     A.  No.

Page 134

1      MR. PETOCK: Could we go off the record?
2      VIDEO SPECIALIST: Off the record at 2:09.
3      (Thereupon, a discussion was had off the
4  record.)
5      VIDEO SPECIALIST: Back on the record at
6  2:10.
7  BY MR. PETOCK:
8    Q. Kurt, I know you've already answered this
9  question. But would you, please, answer it again because
10  I'm not exactly clear.
11      MR. QUINN: Then I will not object because
12  you are not clear as to the answer.
13  BY MR. PETOCK:
14    Q. Why is it that you felt that the bankruptcy court
15  didn't have a right to stop you from using the mark?
16    A. I'm not the bankruptcy court. I can't answer
17  that. I don't know that.
18    Q. Wasn't it your feeling that the bankruptcy
19  court -- did you feel that the bankruptcy court had a
20  right to make you stop using the mark?
21    A. No.
22    Q. Why is it that you felt that the bankruptcy court
23  didn't have a right to make you stop using the mark?
24    A. The bankruptcy was already in progress at the

Page 135

1  time when I actually, when I opened the store. It was
2  already after the fact that the bankruptcy started. He
3  filed in September. I opened November the 12th of 1994,
4  November the 12th, 1994. During that time, it's in the
5  proceedings already of what was going on. I was open
6  after the fact that he already filed for bankruptcy.
7    Q. But the bankruptcy court wasn't concerned about
8  your store. It was concerned about your store's name;
9  isn't that correct?
10    A. I do not know. I can't answer that. I do not
11  know.
12    Q. Do you agree that there is a difference between
13  the fact that the bankruptcy court would make a store
14  close and the fact that the bankruptcy would make a store
15  change its name because of the fact that the bankruptcy
16  court owned the mark?
17      MR. QUINN: I object to the form of that
18  question.
19      MR. F. PETOCK: You have to answer the
20  question. He has an objection as to form.
21      THE WITNESS: What was the question again?
22      MR. F. PETOCK: Can you read it back?
23      (Thereupon, the reporter read back the
24  pending question.)

Page 136

1      THE WITNESS: I still don't understand the
2  question.
3  BY MR. PETOCK:
4    Q. I'll rephrase.
5    A. Please.
6    Q. Is there a difference between you owning the
7  store and you owning the mark in the store?
8    A. I don't understand the question. I don't
9  understand that.
10    Q. Is there a difference between the actual physical
11  store and the name of the store?
12    A. I don't understand it. I don't understand it. I
13  don't know.
14    Q. If the bankruptcy court had ordered you to stop
15  using the mark, would you have?
16    A. Well, if it's by court, I think I would have to.
17    Q. Did you think the bankruptcy court had a right to
18  ask you to stop using the mark?
19    A. I don't know.
20    Q. I want to ask you about some of the conversations
21  you had with Wayne that you previously talked about.
22  Specifically, when you were home for the holidays between
23  1994 and 2000, were there any conversations between you
24  and Wayne where Wayne brought up your use of the mark of

Page 137

1  Van Scoy Diamond Mine?
2    A. Absolutely not.
3    Q. What about the time where you, where Wayne was
4  visiting your father in the hospital in 1996 and 1998,
5  did Wayne ever discuss anything with you concerning your
6  use of the trademark or mark Van Scoy Diamond Mine?
7    A. When he stopped in to use the bathroom, no, he
8  did not, at our store.
9    Q. What about any other time?
10    A. Nothing, nothing of the kind.
11    Q. Has Wayne ever talked to you about your use of
12  the mark Van Scoy Diamond Mine?
13    A. Not until November the 18th of 2004 was when I
14  knew anything about any kind of a mark, trademark or
15  anything of any sort. Again, all I know is, in 1994, my
16  father gave me the name and the sign for the business to
17  open.
18    Q. I'm not asking you specifically about whether you
19  knew about the trademark. I'm just asking you whether he
20  ever discussed the name of your store with you.
21    A. None whatsoever.
22    Q. Did he ever tell you that you were getting away
23  with murder with respect to your use of the trademark?
24    A. Not that I'm aware of, no. No, I would

35 (Pages 134 to 137)

Van Scoy Case 1:05-cv-00108-KAJ    Document 142-5    Filed 12/12/2005    Page 15 of 23
Kurt Van Scoy                                        v. Van Scoy Diamond Mine of Delaware, Inc.
                    C.A. # 05-108 (KAJ)              July 26, 2005

Page 138

1  definitely have to say no.
2    Q.  Anything to that effect?  Did he ever object to
3  you, in any way, as to your use of the mark Van Scoy
4  Diamond Mine?
5    A.  None whatsoever.
6    Q.  Was permission given to your company to use the
7  trademark?
8    A.  The permission was given to me from my father to
9  use the name Van Scoy Diamond Mine, yes.
10   Q.  Was it given to your company?
11   A.  Yeah.
12   Q.  How so?
13   A.  My father.
14   Q.  Did he tell you that your company had a right to
15  use the mark?
16       MR. QUINN:  Already asked already answered.
17  So I object.
18  BY MR. PETOCK:
19   Q.  Are you being financed to defend this lawsuit by
20  any of your family members?
21   A.  No, I'm not.
22   Q.  By anyone else?
23   A.  No, I'm not.
24   Q.  Is anyone giving you any financial help to defend

Page 139

1  this lawsuit?
2    A.  It's me, myself and I.  No.
3        MR. PETOCK:  I would like to have this
4  marked as the next exhibit.
5        (Van Scoy Deposition Exhibit Nos. 11 and 12,
6  Website Pages, were marked for identification.)
7  BY MR. PETOCK:
8    Q.  Just so the record is clear, do you agree that
9  Number 11 is a partial printout of your website that was
10 hosted at vanscoydiamondmine.com?
11   A.  Yes.
12   Q.  And do you agree that Exhibit 12 is a printout of
13 the website that is currently hosted at
14 vanscoydiamondsofdelaware.com?
15   A.  That's correct.
16   Q.  Who registered the domain name Van Scoy Diamond
17 Mine of Delaware dot com?  So we can keep it clear, I'm
18 talking about Van Scoy Diamond Mine of Delaware dot come.
19       There is two different domain names,
20 correct?  You originally had Van Scoy Diamond Mine of
21 Delaware --
22   A.  Vanscoydiamondmine.com.  I don't know what --
23   Q.  Okay.  Sure.
24       MR. QUINN:  If you are confused, ask him to

Page 140

1  de-confuse you.  That all kind of got, you guys got
2  talking at the same time.  I don't think the record is
3  going to be clear.  It's certainly not clear in my mind
4  as to what was happening.
5  BY MR. PETOCK:
6    Q.  Did you ever register the domain name
7  vanscoydiamondmine.com?
8    A.  Yes.
9        MR. QUINN:  Objection to the form of the
10 question in the sense when he says you, are you referring
11 to the defendant personally or the entity, the three
12 defendants or what?
13 BY MR. PETOCK:
14   Q.  I am referring to you and your company.  I'm
15 referring to you personally, Kurt.  Did you register the
16 domain name vanscoydiamondmine.com?
17   A.  Personally, no.
18   Q.  Did your company register the domain name
19 vanscoydiamondmine.com?
20   A.  Yes.
21   Q.  When did that occur?
22   A.  June -- July 12th, I think, 2002.
23   Q.  Did someone recently renew the registration?
24   A.  I'm not sure.  I'm really not sure.

Page 141

1    Q.  Did you recently ask someone to renew the
2  registration?
3    A.  No.  There was -- no, not that I'm aware of, no.
4    Q.  It was said to expire July 12th, 2005, very
5  recently.  And now it is going to expire -- it is not
6  going to expire to until July 12th, 2006.  Can you
7  explain that?
8    A.  I know nothing about it.
9    Q.  Who designed the website, vanscoydiamondmine.com?
10   A.  Certified Solutions in Wilkes-Barre,
11 Pennsylvania.
12   Q.  Who hired the designers?
13   A.  I don't know that.
14   Q.  Did you hire the designers?
15   A.  I hired a company, Certified Solutions.  Who
16 designs in the company and all that, I don't know that.
17   Q.  Did you hire that company to design your website?
18   A.  Yes.
19   Q.  Did you pay them?
20   A.  Yes, I did.
21   Q.  Do you know who currently is hosting the website?
22   A.  Right now, as you said, renewal and all that
23 stuff, I have no idea.  No idea.  Vanscoydiamondmine.com?
24   Q.  Well, yeah.

Van Scoy  Case 1:05-cv-00108-KAJ    Document 142-5    Filed 12/12/2005    Page 16 of 23
Kurt Van Scoy          v. Van Scoy Diamond Mine of Delaware, Inc.
                C.A. # 05-108 (KAJ)        July 26, 2005

Page 142

1   A.  I have no idea, no idea.
2       MR. QUINN:  Wait a minute.  You are asking
3  about the current?
4       MR. PETOCK:  Right now I'm asking about the
5  current website, yes.
6       MR. QUINN:  And he answered about the former
7  I think.
8  BY MR. PETOCK:
9   Q.  I'm sorry.  I'm talking about the former, yes.
10 That's all we talked about so far is
11 vanscoydiamondmine.com, the former.
12  A.  Who has that now?  I have no idea, no idea.
13  Q.  Did you approve the design of
14 vanscoydiamondmine.com?
15  A.  The design?  It's a web name.
16  Q.  Did you design -- did you approve the design of
17 the layout of the individual web pages of
18 vanscoydiamondmine.com?
19  A.  Of Van Scoy Diamond Mine of Delaware,
20 Incorporated, yes, our website, yes.
21      MR. F. PETOCK:  That's a different question.
22 He asked Van Scoy Diamond Mine.
23      THE WITNESS:  Then I'm confused.  I don't
24 understand the question.

Page 143

1       MR. PETOCK:  I'll repeat the question.
2       MR. QUINN:  I'm going to instruct the
3  witness.  Listen very carefully to Mr. Petock's
4  questions.  Because there is a close, there is some
5  similarity and some of the words are identical as
6  between, if I may characterize it, as the prior website
7  address and domain name and the current one.  And so make
8  it, be very careful that you listen to him carefully so
9  that you know exactly what he's talking about so that you
10 can give an accurate answer.
11      THE WITNESS:  Okay.
12 BY MR. PETOCK:
13  Q.  Did you approve the design of the website that
14 was hosted at vanscoydiamondmine.com?
15  A.  Yes.
16  Q.  Have you stopped using the website
17 vanscoydiamondmine.com?
18  A.  Yes.
19  Q.  When did you stop using it?
20  A.  Exact, I'm not sure.  It was shortly thereafter.
21 We had, certainly, the notice of the lawsuit and all
22 that.  And that's when pretty much, until we get this
23 thing squared away and find out where we are at, put a
24 holt to that particular website, absolutely.

Page 144

1   Q.  Would you be willing to assign the domain name
2  vanscoydiamondmine to Wayne?
3   A.  I don't know.
4   Q.  And you have a new website, Van Scoy Diamond Mine
5  of Delaware; is that correct -- or
6  vanscoydiamondsofdelaware?  I'm sorry.
7   A.  Yes.
8   Q.  Besides the domain names, are there any
9  differences between the actual substance of the websites
10 between the website vanscoydiamondmine.com and
11 vanscoydiamondsofdelaware.com?
12  A.  No.
13  Q.  They are exactly the same in substance?
14  A.  Yes.
15  Q.  I want you to look at Page 3 of
16 vanscoydiamondsofdelaware.  It's Exhibit Number 12.  Are
17 you there?
18  A.  Do you have directions?
19  Q.  It's the third page.  On that web page, that is a
20 picture of a page on your website, correct?
21  A.  That is correct, yes.
22  Q.  There is a picture of your store; is that
23 correct?
24  A.  Yes.

Page 145

1   Q.  And your store has a sign on it that says Van
2  Scoy Diamond Mine; is that correct?
3   A.  That is correct.
4   Q.  Does this picture show the sign that was given to
5  you by your father?
6   A.  It certainly does.
7   Q.  Could you tell me what that sign is?
8   A.  Yes.  Right in the bottom it says "Diamond Mine."
9  That's the sign my father gave to me.
10  Q.  At the top of the window; is that correct?
11  A.  Correct.
12  Q.  So did he give you the "Van Scoy" on the top?
13  A.  That was actually there, my landlord actually.
14  Q.  That was already there?
15  A.  Yes.
16  Q.  Earlier I asked you what remnants of your
17 father's store were left there.  And you didn't mention
18 that.  Could you explain to me why you didn't mention
19 that?
20  A.  Well, you said inside the store.
21  Q.  I don't think I did.
22  A.  I'm pretty sure you said inside the store.
23  Q.  Okay.  What remnants of your father's store, were
24 there any remnants of your father's store left on the

Van Scoy Case 1:05-cv-00108-KAJ    Document 142-5    Filed 12/12/2005    Page 17 of 23
Kurt Van Scoy                                        v. Van Scoy Diamond Mine of Delaware, Inc.
                        C.A. # 05-108 (KAJ)        July 26, 2005

Page 146

1  store or outside the store?
2      A.  The only thing that was left was actually on the
3  top.  Just the "Van Scoy" was there.  And, actually, the
4  "Diamond Mine" part down here is actually inside the
5  premises.  And that's actually the sign that we took out
6  of my father's warehouse, he actually helped me load up
7  in the U-Haul truck.
8      Q.  So your father did not give you a sign that said
9  Van Scoy Diamond Mine; he gave you a sign that said
10  Diamond Mine.
11      A.  Diamond Mine, right.  Well, Van Scoy, he said
12  part of the sign is there.  He says, here, just take the
13  bottom part.  This is what you need, Van Scoy Diamond
14  Mine.  He left the sign there.  The top part he left
15  there.
16      Q.  And the landlord had not taken the sign down?
17      A.  No, he did not.
18      Q.  How big is the safe in your store?
19      A.  Exact, I'm not sure.
20      Q.  Is it a walk-in safe?
21      A.  No.
22      Q.  What is the sign that the Diamond Mine is made
23  out of?
24      A.  Fiberglass, fiberglass and metal, aluminum.

Page 147

1      Q.  And your website -- actually, referring to
2  Exhibit 11, it's going to be Docket Number 312, is that
3  the same picture that we were just looking at?
4      A.  Yeah.
5      Q.  And this is a page from your website that was at
6  vanscoydiamondmine.com?
7      A.  Say that again.  I'm sorry.
8      Q.  This page that we are looking at is a printout of
9  one of the pages that was at your website
10  vanscoydiamondmine.com?
11      A.  Yes.
12          MR. F. PETOCK:  Clarify this page.
13          MR. PETOCK:  The page that we are now
14  looking at.
15          MR. F. PETOCK:  Is what page?
16  BY MR. PETOCK:
17      Q.  It's identified by Bates Stamp Number 00312; is
18  that correct?  It says it on the bottom.
19      A.  Yes.
20      Q.  This also shows a picture of your store with the
21  sign Van Scoy Diamond Mine, correct?
22      A.  That is correct, yes.
23      Q.  Your website, both of them, both Exhibit Number
24  11 and Exhibit Number 12, refer to your jewelry store as

Page 148

1  Van Scoy Diamond Mine throughout the text of the website;
2  is that correct?
3      A.  Van Scoy Diamond Mine of Delaware, Incorporated,
4  yes.
5      Q.  It doesn't always say Van Scoy Diamond Mine of
6  Delaware, Incorporated, correct, in the text; sometimes
7  it says Van Scoy Diamond Mine?
8      A.  It may as well.  I'm not sure.
9      Q.  The same page we were just looking at that's
10  stamped Bates stamped 00312 of Exhibit 11, right there
11  right below about, it says "Van Scoy Diamond Mine is a
12  direct," and then it's cut off; is that correct?
13      A.  Yeah, that's correct.  Sure.
14      Q.  Go back to Page Number 3 of Exhibit Number 12.
15  It says in the same location, "Van Scoy Diamond Mine is a
16  direct diamond importer of the finest quality diamonds."
17  Is that what that says?
18      A.  That is correct.
19      Q.  So I'm going to ask you again.  Do the websites
20  that are shown in both Exhibit 11 and 12 refer to your
21  jewelry store as Van Scoy Diamond Mine and not Van Scoy
22  Diamonds Mine of Delaware, Incorporated, or anything?
23      A.  I'm not sure of the question.  I don't understand
24  it.

Page 149

1      Q.  Okay.  Do the websites, does your website hosted
2  that was hosted at vanscoydiamondmine.com refer to your
3  jewelry store as Van Scoy Diamond Mine?
4      A.  Yes.
5      Q.  Does your website at
6  vanscoydiamondsofdelaware.com refer to your jewelry store
7  as Van Scoy Diamond Mine?
8      A.  Yes, it does.
9      Q.  How many hits did your website hosted at
10  vanscoydiamondmine.com get per month?
11      A.  I have no idea.
12      Q.  Is it the same answer for
13  vanscoydiamondsofdelaware?
14      A.  Yeah.  I don't know that.
15      Q.  Did you offer product for sale through your
16  current website, vanscoydiamondsofdelaware.com?
17      A.  It is available.  But nothing was sold.  Sure.
18      Q.  Did you offer products for sale through your
19  website hosted at vanscoydiamondmine.com?
20      A.  It's the same website.
21      Q.  How is it that you offer products for sale?
22      A.  A click on the map that if they see something,
23  they can enlarge it.  And if they want to get more
24  information about it, you get more information about it,

Kurt Van Scoy
Case 1:05-cv-00108-KAJ    Document 142-5    Filed 12/12/2005    Page 18 of 23
v. Van Scoy Diamond Mine of Delaware, Inc.
C.A. # 05-108 (KAJ)
July 26, 2005

Page 150

1  click on it or certainly E-mail us if they are interested
2  in purchasing or call us.
3      Q.  Have you made any sales through your website?
4      A.  One for a mounting. One.
5      Q.  Do you know where that customer was located?
6      A.  Actually, it was from a gentleman that I know
7  from DOD training. He lives in North Carolina. He
8  contacted his son. He had his son go on the website,
9  find a mounting that he liked. He contacted me and I
10 sent the mounting down to his son.
11     Q.  Do you have a picture of all your products on
12 your website?
13     A.  No.
14     Q.  On your current website,
15 vanscoydiamondsofdelaware, there are pictures of at least
16 716 of your products. Does that sound about right?
17     A.  Products that are available, sure.
18     Q.  Did you ever make any sales through your website
19 at vanscoydiamondmine.com?
20     A.  No. Actually, that was, it was a mounting. That
21 was it.
22     Q.  That was the sale that you made?
23     A.  The guy, he said, tell him to go to the website
24 and take a look at the mounting.

Page 151

1      Q.  So you made your sale through the website,
2  vanscoydiamondmine.com?
3      A.  He had a style what he was looking for. And I
4  told him there was a picture on the website. If you go
5  to that picture, he took a look at it. And he said I'm
6  going to use your best judgment. Send me what you have
7  that looks similar to what he's looking for.
8      Q.  But that sale was made through
9  vanscoydiamondmine.com?
10     A.  I can't say that, no. Directly through that, no,
11 no.
12     Q.  I mean, when was this purchase made?
13     A.  Oh, God. Probably 10 months ago, 11 months ago
14 at least.
15     Q.  So at that time vanscoydiamondsofdelaware didn't
16 exist; it was vanscoydiamondmine.com, correct?
17     A.  I believe so.
18     Q.  Is Newark, Delaware, a different geographic
19 market for diamonds than Wilkes-Barre, PA?
20     A.  I don't understand that question. What do you
21 mean by that?
22     Q.  How would you define your sales market for your
23 business?
24     A.  Very competitive.

Page 152

1      Q.  How far does it extend geographically?
2      A.  Tri-state area.
3      Q.  What states are you talking about in the
4  tri-state area?
5      A.  Jersey, Maryland, Pennsylvania.
6      Q.  The entire states?
7      A.  No, the tri-state area. Do you know what
8  tri-state is? Just the lower southern part of Jersey,
9  the tri-state area.
10     Q.  And how would you define that, as your market?
11 Could you define that as your market?
12     A.  Not necessarily, to be honest with you, no. It's
13 more just the Wilmington area market really.
14     Q.  In your experience, how far does a customer
15 travel from their home to purchase a diamond usually?
16     A.  I can't answer that question. I have no idea.
17     Q.  Do you have a computer at your store?
18     A.  Yes.
19     Q.  What records are kept on your computers?
20     A.  What's on there? Calendars. What else is on
21 there? There is internet access on there, accounts
22 payable, excuse me, accounts payable. That's as far as I
23 know. I do the bench work.
24     Q.  Do you have more than one computer?

Page 153

1      A.  Yeah, there is.
2      Q.  How many?
3      A.  Two.
4      Q.  Are the same things kept on both computers?
5      A.  No. Both of them have internet access. One has
6  accounts payable. And the other one is just an internet
7  access and printing things or copying something, stuff
8  like that.
9      Q.  Where is the computer located that you keep your
10 invoices in and things other than the internet access?
11     A.  That's the other computer at the store.
12     Q.  Where is it located in the store?
13     A.  In the back at my wife's a desk.
14     Q.  What were your gross sales last year?
15     A.  I have no idea.
16     Q.  Approximately.
17     A.  I have no idea.
18     Q.  What were your gross profits last year?
19     A.  I have no idea.
20     Q.  Approximately.
21     A.  I have no idea.
22     Q.  Can you tell me how much you made last year?
23     A.  Really, I have no idea. I really don't. I have
24 no idea.

Van Scoy Case 1:05-cv-00108-KAJ Document 142-5 Filed 12/12/2005 Page 19 of 23
Kurt Van Scoy     C.A. # 05-108 (KAJ)     Van Scoy Diamond Mine of Delaware, Inc.
July 26, 2005

Page 154

1   Q. How do you record sales?

2   A. I don't understand the question.

3   Q. How do you record how many sales you make? Your

4 sales, how do you record that? How do you write that

5 down? How do you keep a record of it?

6      MR. QUINN: How many questions is that?

7      MR. PETOCK: They are all the same, Charlie.

8      MR. QUINN: Then ask them one at a time,

9 please.

10 BY MR. PETOCK:

11   Q. How do you record your sales?

12   A. As they come in, account cards.

13   Q. Explain it to me, please.

14   A. Someone, they buy something. You have a receipt.

15 You come in the back. They put it in the box. At the

16 end of day, you come out. You take the receipt out. You

17 mark down the deposit, what it is. If it's a sale, it's

18 a sale. The girl takes the receipt, brings it over here.

19 Her name is John Doe. Okay. This is what she has. And

20 it's on an account card and you put it in the file.

21   Q. At some point, do you have one master list with

22 all your sales?

23   A. No. It's something I don't do. The girls do. I

24 don't know.

Page 155

1   Q. Who does do it?

2   A. My staff actually.

3   Q. Is there one person in charge of doing that?

4   A. No, not really.

5   Q. Do you have an accountant?

6   A. I do.

7   Q. Would your accountant know what your sales were

8 for last year or the year before or the year before that?

9   A. I would hope so. Sure.

10   Q. What is the name of your accountant?

11   A. Jim Bellinger.

12   Q. How do you record what your expenses are?

13   A. That's why I have an accountant.

14   Q. How does your accountant find out what your

15 expenses were?

16   A. That's something you would have to ask my

17 accountant to be honest. I don't know. I really don't

18 know. Your accounts payable, your expenses, all that, it

19 all spits right out. That's his department.

20   Q. So you don't keep track of what your expenses

21 are?

22   A. No, I don't, to be honest with you.

23   Q. Do you use E-mail to communicate?

24   A. Very little. Me personally, very little.

Page 156

1   Q. Who in the store records your sales? Just name

2 every person that records your sales.

3   A. The names I gave to you before really.

4   Q. Give them to me again, please.

5   A. Sands Shoemaker, Karen Vale, Annette D'Angelo,

6 Lori McMichael and Megan Rump.

7   Q. And then at some point -- they record the sales.

8 How do they record the sales? By writing out a sales

9 receipt; is that how they record the sales?

10   A. No. They take the sales receipt that comes in.

11 And you have an account card. And you take the name and

12 you write down the name, the street address. All the

13 information they put on a card and that goes in an

14 alphabetical box. And that's how you keep your accounts.

15   Q. And, at some point, does that box get transferred

16 to someone else?

17   A. No. It stays there for the year. People come

18 in. They make payments, what they bought. You don't

19 know.

20   Q. Do all those sales eventually get added up by

21 someone?

22   A. By the end -- when you do your printouts on your

23 computer for the end of the year, sure. You have your

24 deposits and what you put in and all your expenses and

Page 157

1 all that.

2   Q. You didn't mention anything about anything

3 getting put in the computer.

4   A. Well, when you are talking about accounts

5 payable, when you got accounts payable, you have your

6 total amounts of your income, what you took in, what your

7 expenses are and what your actual expenses were. It

8 breaks your expenses down and all that, your rent and

9 your payable and all that stuff. It, basically, just

10 breaks everything down.

11   Q. So all of that is inputted into your computer?

12   A. Correct.

13   Q. So that's all information that is in your

14 computer?

15   A. Yeah, I mean, I guess. That's where my

16 accountant comes in. I would have to assume, yes.

17   Q. Who puts it in the computer?

18   A. Actually, that's my wife.

19   Q. How come you didn't tell me this when I first

20 asked you?

21      MR. QUINN: Objection. I don't think that's

22 a fair characterization of what was asked before.

23 BY MR. PETOCK:

24   Q. So when does your wife input this information

Van Scoy
Kurt Van Scoy

Case 1:05-cv-00108-KAJ    Document 142-5    Filed 12/12/2005    Page 20 of 23

v. Van Scoy Diamond Mine of Delaware, Inc.
C.A. # 05-108 (KAJ)
July 26, 2005

**Page 158**

1  into the computer?
2     A.  Almost on a daily basis I would say.
3     Q.  Would she know what your gross profits were for
4  last year?
5     A.  I don't know.  I would doubt it.  But I can't
6  answer for her.
7     Q.  Did your father ever have a situation where one
8  of his licensees stopped paying royalties to him?
9     A.  I have no idea.  I do not know.
10     Q.  Does Mark Mower currently operate a jewelry store
11  in Allentown?
12     A.  My recollection, I believe he does, yes.
13     Q.  Do you know what name it is?
14     A.  I think it's actually three different -- it's
15  three guys that are joined together.  But it's Van Scoy
16  something and something.
17     Q.  Do you know if he has any other stores?
18     A.  I don't know.  I never really discussed with him
19  about anything else.
20     Q.  Mark Mower, at one point, operated a Van Scoy
21  Diamond Mine; is that correct?
22     A.  I believe so, yes.
23     Q.  At some point it went out of business; is that
24  correct?

**Page 159**

1     A.  Not that I'm aware of.
2     Q.  Are you aware, at any time, of Mark Mower
3  operating a jewelry store by the name of Avalon Jewelers?
4     A.  No.  Actually, I'm not really aware of that.
5     Q.  When you say you are not really aware of that,
6  could you tell me what that means?
7     A.  I don't know.
8     Q.  Do you retain the E-mails that you send or do you
9  delete them?
10     A.  I don't do that myself.  So I can't answer that.
11  I don't know.
12     Q.  Who does do that?
13     A.  Usually Lori McMichael.
14     Q.  What is Lori McMichael's job duty in that regard?
15     A.  Change the garbage, wipe the windows, sell a
16  ring, buff a ring, run to the post office, check E-mails,
17  copies.  We're all, we just do what has to be done.
18  There is no set, you are this, you are that, you are
19  that, you are that, you are that.  It's a team.  We work
20  as a team.
21     Q.  Have you told Lori McMichael that she has a duty
22  not to erase E-mails related to this case?
23     A.  No.  To be honest with you, no.
24     Q.  Did you know you had a duty to tell her that?

**Page 160**

1     A.  No, I did not.
2        MR. PETOCK:  Let's take a break, please.
3        VIDEO SPECIALIST:  Off the record at 2:48.
4  (Thereupon, a short recess was had.)
5        VIDEO SPECIALIST:  Back on the record at
6  2:57.
7        MR. QUINN:  I want to make it clear that,
8  when this suit started and the issue came up about the
9  retention of electronic communications related to the
10  case, that Mr. Van Scoy was instructed to retain anything
11  relating to the case that was in electronic form, whether
12  it be E-mail or otherwise, that he had or generated
13  during the course of the suit.
14        Now, what he uses or did use or does use his
15  E-mail or doesn't use his E-mail for is another issue.
16  But those were the instructions that he was given.
17        THE WITNESS:  Yeah, anything regardless to
18  the case is certainly anything -- and we don't use E-mail
19  for that.  We have everything that was mailed to us from
20  the beginning to where it stands right now.  But anything
21  via E-mail regarding the trademark or anything about the
22  case itself, there is nothing there.  If there is, there
23  is absolutely, it's still available I'm sure.
24        Again, everything was done through mail.

**Page 161**

1  E-mail is certainly with the business wise.  Do you have
2  a ruby ring for X amount of dollars and all that?  Sure.
3  That's a different thing.  That's not regarding the case
4  itself.
5  BY MR. PETOCK:
6     Q.  Did you talk about the substance of your
7  deposition testimony during the break with your lawyer?
8        MR. QUINN:  I refreshed his recollection.
9        MR. PETOCK:  I didn't ask you, Charlie.
10        MR. QUINN:  I'm telling you what was
11  discussed during the break.  I refreshed his recollection
12  as to the instructions that were given.
13        MR. PETOCK:  But I didn't ask you.
14        MR. QUINN:  I'm putting it on the record
15  whether you asked me or not.  It's on the record.
16        MR. PETOCK:  You put that on the record
17  before I get the answer from him?
18        MR. QUINN:  I just did.
19        MR. F. PETOCK:  Talking objection when there
20  is a question pending.
21        MR. QUINN:  There was no question pending.
22        MR. F. PETOCK:  There certainly was.
23        MR. PETOCK:  You read the case that we gave
24  you.  That's exactly what I'm allowed to do, ask that

Van Scoy  Case 1:05-cv-00108-KAJ    Document 142-5    Filed 12/12/2005    Page 21 of 23
Kurt Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
                        C.A. # 05-108 (KAJ)            July 26, 2005

Page 162

1  question.
2      MR. QUINN: There was no question asked when
3  I put that on the record. That's why I said to the lady
4  I wanted to put something on the record when she started.
5      MR. F. PETOCK: After you finished your
6  statement he asked the question. The witness was asked a
7  question and then you interjected. And that's the
8  question that was asked.
9      MR. QUINN: The record will show what the
10 record shows. It is what it is.
11 BY MR. PETOCK:        .
12     Q.  How far back --
13     MR. F. PETOCK: You didn't get an answer to
14 that question.
15 BY MR. PETOCK:
16     Q.  Well, did you talk about the substance of your
17 deposition testimony during the break?
18     A.  He informed me on something, yes.
19     Q.  About what areas of your testimony already given,
20 were expected to be given did you consult with Mr. Quinn?
21     A.  He was just saying with the E-mails, what more
22 defined of what we meant, if anything, is revolving
23 around the trademark issue or about this case in via
24 E-mails is what he's saying, if that was deleted or not

Page 163

1  or anything. And I said I don't do any E-mailing of any
2  sort certainly with that about this case or the
3  trademark. Everything is by paper mailed via mail to us.
4  I have a stack that high of everything that was mailed to
5  us through this whole thing.
6      So that's what he was correcting me about.
7  He said if there is a ring and it's a ruby and all that
8  other stuff, that has nothing to do with the case itself
9  or the trademark.
10     Q.  You just mentioned a stack of papers --
11     A.  From what you --
12     Q.  -- concerning the case. Have they been produced
13 to us?
14     A.  It's what you have produced to us and what we
15 have been sending back and forth to you. It's
16 accumulating as we go. That's what I'm talking about as
17 a stack of papers.
18     Q.  Do you want to change your deposition testimony
19 as a result of anything that Mr. Quinn said to you during
20 the break?
21     A.  No.
22     Q.  How far do the records that you keep go back, the
23 tangible records, not the ones on your computer?
24     A.  From 1994.

Page 164

1      Q.  How far do the records go back that you keep on
2  your computer?
3      A.  That I can't -- I can't answer that. I can't
4  answer that. I don't know.
5      Q.  Who could answer that?
6      A.  Probably my wife.
7      Q.  How much do your employees get paid per year?
8      A.  I don't know that.
9      Q.  Approximately how much?
10     A.  I have no idea.
11     Q.  Do some get paid more than others or do they all
12 get paid the same amount?
13     A.  I have no idea.
14     Q.  Do you know if they make more than $50,000 a
15 year?
16     A.  I don't know that.
17     Q.  Do you have a blue safe in your store?
18     A.  Actually, yeah. That's from the landlord. Yes.
19     Q.  Was it, at one point, your father's safe?
20     A.  I don't know that to be honest with you. When we
21 opened up and the safe was in there. And my landlord
22 said, if you can get it open, you can use it. That's his
23 exact words. He did.
24     Q.  Were you able to get it open?

Page 165

1      A.  Actually, yeah. I had a guy open it up, yeah.
2  There is a tan safe that my father helped me move down.
3      Q.  If you were a betting man, would you bet that
4  that safe was probably your father's?
5      MR. QUINN: Objection to the form of the
6  question.
7  BY MR. PETOCK:
8      Q.  Do you think that safe was probably your father's
9  safe?
10     A.  I have no idea. I really don't.
11     Q.  Did you ever see that blue safe in the store when
12 you worked in your father's Delaware store in Churchmans
13 Plaza?
14     A.  To be honest, he had a lot of safes. Blue safes,
15 I really, I don't know that. All I know is what he gave
16 me to bring down to the store.
17     Q.  You understand now that you have a duty to
18 preserve evidence, correct?
19     A.  Absolutely, sure.
20     Q.  Related to the case.
21     A.  Correct.
22     MR. PETOCK: I would like to move the
23 following three exhibits into evidence: The tax returns
24 that were produced for 2002, tax returns produced for

Van Scoy
Kurt Van Scoy

v. Van Scoy Diamond Mine of Delaware, Inc.

C.A. # 05-108 (KAJ)                July 26, 2005

Page 166

1  2003.
2          MR. QUINN: '02, '03, '04?
3          MR. PETOCK: Yeah.
4          (Van Scoy Deposition Exhibit Nos. 13, 14 and
5  15, Tax Returns, were marked for identification.)
6          VIDEO SPECIALIST: This ends Tape Number 4
7  of the video deposition of Kurt Van Scoy. The time is
8  3:06.
9          (Thereupon, a short recess was had.)
10          VIDEO SPECIALIST: This is Tape Number 5 of
11  the video deposition of Kurt Van Scoy. The time is 3:11.
12  BY MR. PETOCK:
13      Q.  Do you know what a trade name is, Kurt?
14      A.  I'm not sure I understand the question.
15      Q.  Do you know what the word -- do you know what the
16  phraseology "trade name" is? Do you know what a trade
17  name is?
18      A.  A trademark name?
19      Q.  Is there a difference between a trade name and a
20  trademark?
21      A.  I don't know.
22      Q.  Okay. That's fine. Did your company help
23  finance Tovon or your brother Tommy in any way?
24      A.  No.

Page 167

1      Q.  Did your company cosign on any loans or anything?
2      A.  No.
3      Q.  Did you help him in any way?
4      A.  No.
5      Q.  Your company?
6      A.  Nothing, no.
7      Q.  I'm going to show you Exhibit 13, 14 and 15.
8  Could you tell me what they are?
9      A.  That's 1120-S Forms, income tax forms for
10  S Corporation, 2002, 2003 and 2004.
11          MR. F. PETOCK: For what corporation?
12          THE WITNESS: Van Scoy Diamond Mine of
13  Delaware, Incorporated.
14  BY MR. PETOCK:
15      Q.  Are those the documents that you produced in
16  response to your Notice of Deposition?
17      A.  Yes.
18          MR. QUINN: Among others. They are not all,
19  correct?
20          MR. PETOCK: Yes, that's correct.
21  BY MR. PETOCK:
22      Q.  Those are the documents that you produced in
23  response to our request for advertising expenditures from
24  the year you opened your store until the present; is that

Page 168

1  correct?
2      A.  That's correct.
3      Q.  And those are all the documents you produced with
4  respect to that question?
5      A.  Yes.
6          MR. PETOCK: I'm going to put on the record
7  that this deposition is left open because all of the
8  documents in respect to that request have not been
9  produced. But other than that, I have nothing more for
10  today.
11          MR. QUINN: Okay. I have nothing.
12          VIDEO SPECIALIST: This concludes the video
13  deposition of --
14          MR. F. PETOCK: One more thing. You reserve
15  the right to read and sign the deposition? Does your
16  client reserve that right?
17          MR. QUINN: I assume you want to do that, do
18  you not, read and sign the deposition? You want the
19  opportunity to read your transcript?
20          THE WITNESS: Sure.
21          MR. F. PETOCK: I want the court reporter to
22  keep the transcript. And the court reporter, for
23  convenience, can send the signature sheet and errata
24  sheet to you. But the court reporter should retain the

Page 169

1  original of the transcript.
2          VIDEO SPECIALIST: This concludes the video
3  deposition of Kurt Van Scoy. The time is 3:14.
4          (Thereupon, the deposition concluded at 3:14
5  p.m.)
6          - - - - -
7
8          INDEX TO TESTIMONY
9
10  KURT VAN SCOY                          PAGE
11      Examination by Mr. Petock              3
12          - - - - -
13          INDEX TO EXHIBITS
14  VAN SCOY DEPOSITION EXHIBIT NO.         PAGE
15  1. Meeting Minutes of August 22, 1996 ......... 6:11
    2. Cease and Desist Letter.................... 12:24
16  3. Letter to Fox Rothschild Dated February 22,
       2005.................................. 15:13
17  4. UPS Invoices ............................ 21:24
    5. Warranty .............................. 76:15
18  6. Valentine's Ad.......................... 78:16
    7. Sales Receipts.......................... 81:4
19  8. Notice of Deposition Resetting Date........ 92:22
    9. Bankruptcy Petition..................... 121:22
20  10. Order Approving Agreement in Settlement
    of Adversary Proceedings and Contested Matters 124:18
21  11 and 12, Website Pages.................... 139:5
    13, 14 and 15, Tax Returns................. 166:4
22
23
24

Wilcox & Fetzer, Ltd.    Professional Court Reporters

(302)655-0477

237c0978-7df2-492f-be79-16c76b54a422

Van Scoy                                    v. Van Scoy Diamond Mine of Delaware, Inc.
Kurt Van Scoy          C.A. # 05-108 (KAJ)          July 26, 2005

Page 170

1
2
3
4
5
6        REPLACE THIS PAGE
7
8        WITH THE ERRATA SHEET
9
10       AFTER IT HAS BEEN
11
12       COMPLETED AND SIGNED
13
14       BY THE DEPONENT.
15
16
17
18
19
20
21
22
23
24

Page 171

State of Delaware )
              )
New Castle County )
              CERTIFICATE OF REPORTER
    I, Anne L. Adams, Registered Professional
Reporter and Notary Public, do hereby certify that there
came before me on the 26th day of July, 2005, the
deponent herein, KURT VAN SCOY, who was duly sworn by me
and thereafter examined by counsel for the respective
parties; that the questions asked of said deponent and
the answers given were taken down by me in Stenotype
notes and thereafter transcribed into typewriting under
my direction.
    I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.
    I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


              Anne L. Adams
              Certification No. 105-RPR
              (Expires January 31, 2008)

Wilcox & Fetzer, Ltd.    Professional Court Reporters
                                    (302)655-0477
                              237c0978-7df2-492f-be79-16c76b54a422