# EXHIBIT L

# REDACTED

# EXHIBIT M

# REDACTED

# EXHIBIT N

# REDACTED

# EXHIBIT O



## WILCOX & FETZER LTD.

### In the Matter Of:

# Van Scoy

## v.

# Van Scoy Diamond Mine of Delaware, Inc.

### C.A. # 05-108 (KAJ)

---

### Transcript of:

### Donna Van Scoy

### September 19, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

EXHIBIT O

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
WAYNE VAN SCOY,                )
                              )
            Plaintiff,         )
                              )   Civil Action
v.                            )   No. 05-108 (KAJ)
                              )
VAN SCOY DIAMOND MINE OF       )
DELAWARE, INC., KURT VAN SCOY  )
AND DONNA VAN SCOY,            )
                              )
            Defendants.        )
```

Videotape deposition of DONNA VAN SCOY taken
pursuant to notice at the law offices of Ashby &
Geddes, 17th floor, 222 Delaware Avenue, Wilmington,
Delaware, beginning at 9:58 a.m. on September 19,
2005, before Lucinda M. Reeder, Registered Diplomate
Reporter and Notary Public.

APPEARANCES:

        MICHAEL F. PETOCK, ESQ.
        MICHAEL C. PETOCK, ESQ.
        PETOCK & PETOCK, LLC
            222 Delaware Avenue, 17th Floor
            Wilmington, Delaware  19801
            for the Plaintiff,

        CHARLES N. QUINN  ESQ.
        FOX ROTHSCHILD LLP
            2000 Market Street - Tenth Floor
            Philadelphia, PA 19103-3291
            for the Defendants.

ALSO PRESENT:

    WAYNE VAN SCOY
    KURT VAN SCOY
    CAROL FEENEY, DISCOVERY VIDEO SERVICES
- - - - - - - - - - - - - - - - - - - - - - - - --
            WILCOX & FETZER, LTD.
    1330 King Street - Wilmington, Delaware  19801
                (302) 655-0477

e1d9445b-06e6-45b4-8108-014bd9814fd0

Page 2

1      THE VIDEOGRAPHER: This is the videotaped
2  deposition of Donna Van Scoy, taken by the plaintiff
3  in the matter of Wayne Van Scoy versus Van Scoy
4  Diamond Mine of Delaware, Incorporated, Kurt Van Scoy,
5  and Donna Van Scoy, Civil Action No. 05-108- (KAJ)
6  held in the offices of Ashby & Geddes, 222 Delaware
7  Avenue, Wilmington, Delaware on September 19th, 2005
8  at approximately 9:58 a.m.
9      The court reporter is Cindy Reeder, from
10  the firm of Wilcox & Fetzer. My name is Carol Feeley,
11  a video specialist from Discovery Video Services, in
12  association with Wilcox & Fetzer.
13      Counsel will introduce themselves, and the
14  reporter will swear in the witness.
15       .
16      MR. MICHAEL F. PETOCK: I'm Michael F.
17  Petock, for the plaintiff.
18      MR. QUINN: I'm Charles M. Quinn, for the
19  defendants.
20      MR. MICHAEL C. PETOCK: Michael C. Petock,
21  for plaintiff.
22
23
24

Page 3

1      DONNA VAN SCOY,
2  the witness herein, having first been
3  duly sworn on oath, was examined and
4  testified as follows:
5      MR. QUINN: I would like to make a
6  statement before we start. The notice of deposition
7  for Mrs. Van Scoy asked that she bring and produce any
8  documents that have not already been produced for the
9  plaintiff that she reviewed in preparation for this
10  deposition. And I state to you that there are none.
11      MR. MICHAEL F. PETOCK: Thank you.
12  BY MR. MICHAEL F. PETOCK:
13  Q. Mrs. Van Scoy, I am going to ask you some
14  questions today.
15      MR. QUINN: Excuse me. Are we going to
16  have a stipulation as to read, signing?
17      MR. MICHAEL F. PETOCK: If you want to,
18  yes.
19      MR. QUINN: We had it before. I think
20  it's appropriate.
21      MR. MICHAEL F. PETOCK: So she's going to
22  reserve the right to read and sign you are saying?
23      MR. QUINN: Yes.
24      MR. MICHAEL F. PETOCK: Fine.

Page 4

1      Anything else?
2      MR. QUINN: No. That's fine by me.
3      MR. MICHAEL F. PETOCK: Okay.
4      MR. QUINN: She can sign before any notary
5  public.
6      MR. MICHAEL C. PETOCK: Do you want to
7  stipulate to objections, Dad?
8      MR. MICHAEL F. PETOCK: Well, all
9  objections are reserved until the time of trial except
10  to the form of the question.
11      MR. QUINN: That's fine.
12      MR. MICHAEL F. PETOCK: The same
13  stipulation continues.
14  BY MR. MICHAEL F. PETOCK:
15  Q. Mrs. Van Scoy, I am going to ask you some
16  questions today. The court reporter is taking down
17  everything that is said. Do you understand that?
18  A. Yes.
19  Q. And you understand you are under oath and you
20  have an obligation to tell the truth?
21  A. Yes.
22  Q. You also understand that you are not to consult
23  with your counsel during the deposition with respect
24  to any questions that have been asked or anticipated

Page 5

1  to be asked?
2  A. Yes.
3  Q. Do you understand that?
4  A. Yes.
5  Q. Do you understand that you have to answer the
6  questions unless your counsel instructs you not to
7  answer the question.
8  A. Mm-hmm.
9  Q. Can you tell me: How old are you?
10  A. 42.
11  Q. And do you have any education beyond high
12  school?
13  A. Yes.
14  Q. What is that?
15  A. An X-ray technician.
16  Q. When did you -- did you get a certificate as an
17  X-ray technician?
18  A. Yes. A certificate. I have four years of
19  schooling after high school.
20  Q. Where did you get that certificate from?
21  A. Connecticut.
22  Q. Where in Connecticut?
23  A. I don't remember the name right now.
24  Q. Where did you grow up at?

Page 6

1   A.  Nanticoke, Pennsylvania.
2   Q.  And how far is that from Wilkes-Barre?
3   A.  Ten miles.
4   Q.  Were you familiar with Van Scoy Diamond Mine
5   Stores at the time you grew up in Wilkes-Barre?
6   A.  Yes.
7   Q.  Was there radio advertising on the radio by
8   Tommy Van Scoy, Sr.?
9   A.  Yes.
10  Q.  Did you consider the name to have been well
11  known at the time you were growing up in Wilkes-Barre?
12  A.  Yes.
13  Q.  What is your work experience after high school?
14  A.  My work experience.  I went to school and
15  became an X-ray technician.
16  Q.  Did you work as an X-ray technician?
17  A.  Yes.
18  Q.  For how long?
19  A.  Ten years.
20  Q.  Did you hold any other jobs?
21  A.  No.
22  Q.  Did you ever work in a Van Scoy Diamond Mine
23  Store?
24  A.  I work in one now.

Page 7

1   Q.  I'm sorry.  Did you ever work in a Van Scoy
2   diamond store before -- strike that.  When did you
3   open a store Van Scoy Diamond Mine of Delaware, Inc.?
4   A.  My husband opened it in November of '94.
5   Q.  Did you also open it as part of the
6   corporation?
7   A.  I wasn't there until a year and a half later.
8   Q.  Did you ever work in a Van Scoy Diamond Mine
9   store prior to November of 1994?
10  A.  No.
11  Q.  Did you invest some money in the opening of the
12  Van Scoy Diamond Mine store in Delaware?
13  A.  Yes.
14  Q.  How much did you invest?
15  A.  20,000.
16  Q.  Where did that money come from?
17  A.  I took out two consecutive loans at the same
18  time.
19  Q.  In your name?
20  A.  Yes.
21  Q.  And at that time, you became a percentage owner
22  in Van Scoy Diamond Mine of Delaware, Inc.  Is that
23  correct?
24  A.  I don't know.  I just gave my husband money to

Page 8

1   open the store.  I don't really know that percentage.
2   Q.  Do you know what your percentage is today?
3   A.  No, I do not.
4   Q.  You are part owner of the store?
5   A.  I guess I would say, 50 percent.  We do
6   everything half and half.
7       MR. QUINN:  I am sure Mr. Petock does not
8   want you to guess.  Correct?
9   Q.  Yes.  You give us your best information.
10  A.  Okay.
11  Q.  What are your -- do you work in the store
12  Van Scoy Diamond Mine of Delaware, Inc., right now?
13  A.  Yes.
14  Q.  I'll refer to it as "Van Scoy Diamond Mine
15  store in Delaware."  Okay?
16  A.  Okay.
17  Q.  What are your job duties there?
18  A.  I pay the receipts and I pay the bills.
19  Q.  What do you mean when you say you do the
20  receipts?
21  A.  I open the receipts every day and do -- put the
22  money in the checkbook, then I pay the bills in
23  turn.
24  Q.  These receipts are payments coming in from

Page 9

1   customers?
2   A.  Payments and sales, yes.
3   Q.  What do you mean by "sales"?
4   A.  Anything that is sold.  Anything that is
5   documented from a customer.
6   Q.  So that's sales in the store and sales -- and
7   receipts that come in through the mail.  Is that
8   correct?
9   A.  There are none in the mail.  It's just usually
10  people coming in.
11  Q.  Do you have any other job responsibilities at
12  Van Scoy Diamond Mine in Delaware?
13  A.  No.  I'm very part-time.
14  Q.  How much time do you spend at the store?
15  A.  Four hours a day, maybe if I'm there.  Maybe
16  four days a week.
17  Q.  What days a week do you work?
18  A.  Usually Tuesday through Friday.
19  Q.  Have these responsibilities, job duties changed
20  from 1994?
21  A.  No.
22  Q.  From 1994 to present, you were always doing the
23  same thing, working part-time and only handling the
24  receipts and deposits.  Is that correct?

e1d9445b-06e6-45b4-8108-014bd9814fd0

Page 10

1    A.  Correct.
2    Q.  Does your husband Kurt Van Scoy have any
3  education beyond high school?
4    A.  No.
5    Q.  When did you meet Kurt Van Scoy?
6    A.  1992.
7    Q.  Where did you meet him?
8    A.  The Woodlands.
9    Q.  What is that?
10   A.  A nightclub.
11   Q.  And where is that?
12   A.  In Wilkes-Barre.
13   Q.  And has your relationship with Kurt been good?
14   A.  Yes.
15   Q.  Do you communicate freely on everything?
16   A.  Yes.
17   Q.  Do you communicate freely with respect to the
18  operation of Van Scoy Diamond Mine store in Delaware?
19   A.  Not in a business sense; just how was our day.
20  Some days are very stressful.
21   Q.  What about decisions on when to advertise and
22  how to advertise?
23   A.  He solely does the advertising.
24   Q.  You don't give him any communication or input

Page 11

1  on that?
2    A.  I think it's expensive and I'd rather not.
3    Q.  Do you discuss like, it's good to advertise
4  before Christmas or something like that?
5    A.  No, I don't.
6    Q.  What about the layout of the ads, do you get
7  involved in that at all?
8    A.  No.
9    Q.  Do you wait on customers?
10   A.  At Christmas time, yes.
11   Q.  Do you wait on customers at any other time of
12  the year?
13   A.  Not usually.
14   Q.  How would you define "Christmas time"?
15   A.  Our busiest time of the year.
16   Q.  But from when to when would that extend?
17   A.  I would say, it depends every year, but mostly
18  two weeks prior.
19   Q.  So in November, you wouldn't be waiting on
20  customers?
21   A.  Not necessarily.
22   Q.  What do you mean by "not necessarily"?
23   A.  If someone were to be on vacation, I may have
24  to cover.  We usually have enough staff to cover how

Page 12

1  many customers come in the door.
2    Q.  And when does the Christmas period end as far
3  as your selling is concerned?
4    A.  Christmas eve.
5    Q.  Do you do anything with respect to keeping
6  track of finances?
7    A.  No.
8    Q.  Who does that?
9    A.  Our accountant.
10   Q.  How does he do that?
11   A.  He comes to our store twice a month and does
12  the bookkeeping.
13   Q.  What does he use to do the bookkeeping?
14   A.  My computer.
15   Q.  What's on your computer?
16   A.  The invoices that go in and the checks that
17  come out.
18   Q.  Who is your accountant?
19   A.  James Bellenger.
20   Q.  He is located where?
21   A.  In Bear, Delaware.
22   Q.  Does the accountant give you back a summary
23  each month?
24   A.  No.

Page 13

1    Q.  Does the accountant give you anything back?
2    A.  No.  He does everything.
3    Q.  What do you mean "he does everything"?
4    A.  I don't need a summary because he does the
5  taxes.  So he does what he needs to do on my computer
6  and then follows up with it every month and at the end
7  of the year.
8    Q.  At some point in time, you changed the name of
9  your website address from Van Scoy Diamond Mine.com to
10  Van Scoy Diamonds of Delaware.com.  Do you know when
11  you did that?
12   A.  No.
13   Q.  Was there an invoice for doing that?
14   A.  No.  The only invoice I get is from the company
15  itself.
16   Q.  What company is that?
17   A.  I believe it was Trusion.
18   Q.  Trusion.  T-R-U-S-I-O-N?
19   A.  Mm-hmm.  Yes.
20   Q.  What do they do?
21   A.  I am not sure.  I didn't have anything to do
22  with the Internet.
23   Q.  You don't recall ever getting an invoice that
24  you had to pay for making that change?

Page 14

1    A.  No.  It was just a monthly Internet fee.
2    Q.  Do you know what Scoy Development, S-C-O-Y-
3    D-E-V is?
4    A.  No.
5    Q.  Have you ever seen that before?
6    A.  Never heard of it.
7    Q.  Why did you decide to open a store in
8    Wilmington, Delaware?
9          MR. QUINN:  Objection to the form of the
10   question.  I don't think the foundation for that has
11   been established.
12   Q.  You can answer the question.  He objected, but
13   you still have to answer the question.
14   A.  Why, I don't really remember.
15   Q.  Why didn't you open one in Wilkes-Barre?
16   A.  Because there was already one there.
17   Q.  Did the same thing apply for Allentown?
18   A.  I don't know.  I don't know.  Sorry.
19   Q.  And the store that was opened in Wilmington at
20   1117 Churchmans Road or street, that was the same
21   location that Tommy Van Scoy previously had a store
22   there.  Is that correct?
23         MR. QUINN:  Objection to the form of the
24   question.  The question presumes a store was opened in

Page 15

1    Wilmington.  I think that's actually not actually
2    correct.
3    Q.  Can you answer the question?
4    A.  I forgot it now.  I'm sorry.
5          MR. QUINN:  You can have it read back if
6    you'd like.
7    Q.  You opened a store at 1117 Churchmans Road, is
8    it?
9    A.  Yes.
10   Q.  You opened that in about November of 1994.  Is
11   that correct?
12   A.  Yes.
13   Q.  And at that same location, about a year and a
14   half year earlier Tommy Van Scoy, Sr. had operated a
15   store there.  Is that correct?
16   A.  I was told that.
17   Q.  Who told you that?
18   A.  My father-in-law and my husband.
19   Q.  Your father-in-law was Tommy Van Scoy, Sr.?
20   A.  Yes.
21   Q.  You signed a personal guarantee on the lease on
22   that property when you opened it.  Isn't that correct?
23   A.  I don't remember.
24         MR. MICHAEL F. PETOCK:  I would like to

Page 16

1    have this marked as Plaintiff's Exhibit 17.
2          (Plaintiff's Exhibit No. 17 was marked for
3    identification.)
4    BY MR. MICHAEL F. PETOCK:
5    Q.  I show you what's been marked as Plaintiff's
6    Exhibit 17.  Can you identify that?
7    A.  It's a lease agreement.
8    Q.  For what is the lease agreement?
9    A.  To lease the property.
10   Q.  What property?  Is it the lease for your store?
11   A.  Yes.
12   Q.  That's Van Scoy Diamond Mine of Delaware, Inc.
13   Is that correct?
14   A.  Yes.
15   Q.  And I direct your attention to the fourth page
16   of the document, which is identified in the lower
17   right-hand corner as D 000754.  Do you see that?
18   A.  Mm-hmm.
19   Q.  Isn't that -- is that your signature on there,
20   Donna Van Scoy?
21   A.  Yes.
22   Q.  That's a lease guarantee.  Isn't that correct?
23   A.  Yes.
24   Q.  It's for the location of your Van Scoy Diamond

Page 17

1    Mine store.  Is that not correct?
2    A.  Yes.
3    Q.  That was in October of 1994?
4    A.  Yes.
5    Q.  Were you an officer or director of Van Scoy
6    Diamond Mine of Delaware, Inc.?
7    A.  Secretary.
8    Q.  When you say you're secretary?
9    A.  That's what it says on the form.
10   Q.  On what form?
11   A.  The corporation form.
12         MR. MICHAEL F. PETOCK:  I guess we
13   haven't received that form, Charlie.  I'd ask that you
14   produce it.
15   BY MR. MICHAEL F. PETOCK:
16   Q.  What do you do as secretary of the corporation?
17   A.  As I told you before, receipts and the bills.
18   Q.  Do you do anything else --
19   A.  No.
20   Q.  -- in connection with being secretary of the
21   corporation?
22   A.  Well, I do sales and take out the trash as
23   well.
24   Q.  Have you attended any corporate meetings?

Page 18

1  A. No.
2  Q. Have you ever attended any corporate meetings?
3  A. I don't remember.
4      MR. MICHAEL F. PETOCK:  I would like to
5  have this marked as Plaintiff's Exhibit 18.
6      (Plaintiff's Deposition Exhibit No. 18 was
7  marked for identification.)
8  BY MR. MICHAEL F. PETOCK:
9  Q. I show you what's been marked as Plaintiff's
10 Exhibit 18. Do you recognize that?
11 A. No.
12 Q. Do you know what it is?
13 A. Minutes of annual meeting of shareholders and
14 directors.
15 Q. Of what corporation?
16 A. Van Scoy.
17 Q. Diamond Mine of Delaware, Inc. Isn't that
18 correct?
19 A. Correct.
20 Q. It says there that the only shareholder present
21 was Kurt Van Scoy, is that correct, in the lower
22 portion of the page?
23 A. Yes.
24 Q. Those are the minutes for 2005, is that

Page 19

1  correct, the first paragraph?
2  A. I guess. I don't know.
3  Q. That's what it says, isn't that correct, the
4  second line, the first paragraph?
5  A. I guess.
6  Q. Is that correct?
7  A. If that's what it says.
8  Q. Isn't it true that on page 2 you were appointed
9  as vice-president or elected as vice-president?
10 A. No.
11 Q. I direct your attention to the second group of
12 names listing. It says, "President, Kurt Van Scoy,
13 vice-president, Donna Van Scoy." Do you see that?
14 A. Yes.
15 Q. Isn't it true that you are vice-president of
16 the corporation?
17 A. I never heard of that before.
18     MR. MICHAEL F. PETOCK:  I would like to
19 have this marked as Plaintiff's Exhibit 19.
20     (Plaintiff's Exhibit No. 19 was marked for
21 identification.)
22 By MR. MICHAEL F. PETOCK:
23 Q. I show you what's been marked as Plaintiff's
24 Exhibit 19, P-19, Plaintiff's 19. Can you identify

Page 20

1  that?
2  A. It looks like the same thing as the prior one.
3  Q. That's minutes for Van Scoy Diamond Mine of
4  Delaware, Inc., the annual meeting?
5  A. Yes.
6  Q. But it's for 2004. Is that correct?
7  A. That's what it says, yes.
8  Q. Again, you were not present at the meeting. Is
9  that correct?
10 A. Correct.
11 Q. Again on the second page, you are nominated and
12 were unanimously elected to be vice-president?
13 A. No, I was not.
14 Q. You were not?
15 A. I am not the vice-president.
16 Q. You are the secretary?
17 A. I am the secretary.
18 Q. Even though the minutes say you are
19 vice-president?
20 A. It must have been a mistake.
21     MR. MICHAEL F. PETOCK:  I would like to
22 have this marked as P-20.
23     (Plaintiff's Exhibit No. 20 was marked for
24 identification.)

Page 21

1  BY MR. MICHAEL F. PETOCK:
2  Q. I show you what's been marked as Plaintiff's
3  Exhibit 20. Can you identify that?
4  A. I guess it's the same thing again for 2003.
5  Q. And, again, does it show that you were not
6  present at the meeting?
7  A. Yes.
8  Q. And, again, does it show that you were elected
9  to be vice-president of the corporation?
10 A. My name is listed as vice-president, but I am
11 secretary. On every form, income tax form, I am
12 secretary. This must be a mistake at my accountant's
13 office.
14     MR. MICHAEL F. PETOCK:  Charlie, we
15 request that you provide us with all documents that
16 show Donna Van Scoy to be secretary of the
17 corporation.
18     MR. MICHAEL F. PETOCK:  Would you mark
19 this as Plaintiff's Exhibit 21?
20     (Plaintiff's Deposition Exhibit No. 21 was
21 marked for identification.)
22 BY MR. MICHAEL F. PETOCK:
23 Q. I show you what's been marked as Plaintiff's
24 Exhibit 21. Can you identify that? .

Page 22

1    A.  Shareholders and directors.
2    Q.  Is it the minutes of the annual meeting of
3  shareholders and directors for Van Scoy Diamond Mine
4  of Delaware, Inc. for the year 2002?
5    A.  Yes.
6    Q.  It shows you were not present at the meeting.
7  Is that correct?
8    A.  Correct.
9    Q.  On page 2, it shows again you were elected to
10  be vice-president of the corporation.  Is that
11  correct?
12    A.  As far as I know, I am the secretary.
13    Q.  But the document says you are vice-president.
14  Is that correct?
15    A.  It does say that, yes.
16    Q.  Do you have any idea how what you characterize
17  as a mistake happened?
18    A.  No, I don't.
19    Q.  And to your knowledge, you don't recall
20  attending any corporate meetings?
21    A.  No.
22    Q.  Even though you are 50 percent stockholder?
23    A.  Yes.
24        MR. MICHAEL F. PETOCK:  I would like to

Page 23

1  have this marked as Plaintiff's Exhibit 22.
2        (Plaintiff's Exhibit No. 22 was marked for
3  identification.)
4  BY MR. PETOCK:
5    Q.  Can you identify Plaintiff's Exhibit 22?
6    A.  Shareholders meeting, 2001.
7    Q.  Of the corporation Van Scoy Diamond Mine of
8  Delaware, Inc.  Isn't that correct?
9    A.  Yes.
10    Q.  And it shows, again, you were not present at
11  the meeting.  Is that correct?
12    A.  Correct.
13    Q.  On page 2, it shows also you were elected to be
14  vice-president of the corporation?
15    A.  Yes.
16        MR. MICHAEL F. PETOCK:  Is the next
17  number 23?
18        (Plaintiff's Exhibit No. 23 was marked for
19  identification.)
20  BY MR. MICHAEL F. PETOCK:
21    Q.  I show you what's been marked as Plaintiff's
22  Exhibit 23.  Do you recognize that?
23    A.  Some minutes of a meeting.
24    Q.  It's the minutes of the annual meeting of

Page 24

1  shareholders and directors of Van Scoy Diamond Mine of
2  Delaware, Inc. for the year 2000.  Is that correct?
3    A.  Yes.
4    Q.  It shows you were present at that meeting.  Is
5  that correct?
6    A.  I don't remember.
7    Q.  Do you recall being at any meetings at the
8  offices of Ralph V. Estep?
9    A.  No.
10    Q.  Again, on page 2, it shows you being elected as
11  vice-president of the corporation.  Is that correct?
12    A.  Yes.
13    Q.  But, again, you say that was an error and that
14  you were secretary.  Is that correct?
15    A.  Yes.
16    Q.  What forms have you listed as secretary?
17    A.  What forms do I have?
18    Q.  What forms are you referring to that list you
19  as secretary of the corporation?
20    A.  When we first started it.  That's the only
21  thing I could think of that would say that, the very
22  first form.  The one that would be Cayman
23  incorporated.
24    Q.  You think the articles of incorporation say

Page 25

1  that?
2    A.  Yes.  To my knowledge.
3    Q.  Take a look at Plaintiff's Exhibit P-23.  Take
4  a look at the last page, which is marked D000758.
5    A.  Mm-hmm.
6    Q.  Is that your signature on there?
7    A.  No.
8    Q.  Above the name "Donna Van Scoy," is that not
9  your signature?
10    A.  No.
11    Q.  Do you know who signed your name?
12    A.  No.
13    Q.  Do you know who wrote that signature on there?
14    A.  No.
15        MR. QUINN:  Objection.  The question has
16  been asked and answered.
17    Q.  Can you take a look at P-22, the last page?
18  Whose signature is that?
19    A.  Kurt's.
20        MR. QUINN:  Objection.  I instruct the
21  witness to give me a second to get my objection in
22  before you give the answer.
23    A.  Sorry.
24        MR. QUINN:  To what signature does the

**Page 26**

1  question refer? .

2      MR. MICHAEL F. PETOCK: Well, okay. The

3  signature above the name "Kurt Van Scoy."

4      Q. You can answer the question now.

5      A. Kurt Van Scoy.

6      Q. Can I ask you to go back and take a look at

7  P-23 again?

8      A. Absolutely.

9      Q. The last page, D000758. Above the name "Kurt

10  Van Scoy" in two places, whose signature is that?

11      A. Kurt Van Scoy.

12      (Plaintiff's Exhibit No. 24 was marked for

13  identification.)

14  BY MR. MICHAEL F. PETOCK:

15      Q. I show you what's been marked as Plaintiff's

16  Exhibit 24. Is that the minutes of the annual meeting

17  of shareholders and directors of Van Scoy Diamond Mine

18  of Delaware, Inc., for the year 1999?

19      A. Yes.

20      Q. It shows you were present as a shareholder at

21  that meeting. Is that correct?

22      A. Yes.

23      Q. The second page also shows that you were

24  elected vice-president of the corporation for the

**Page 27**

1  year. Is that correct?

2      A. Yes.

3      Q. On the third page, which is D000761, there is a

4  signature for Donna Van Scoy. Is that your signature

5  on there?

6      A. No.

7      Q. Do you know who signed that?

8      A. No.

9      Q. Did Kurt sign that?

10      MR. QUINN: Object. Asked and answered.

11  She's already answered the question she doesn't know.

12  You don't need to answer the question.

13      Q. Did Kurt sign?

14      A. I don't know.

15      Q. Above the -- in two places on that same page

16  above the signature line "Kurt Van Scoy," is that

17  Kurt's signature?

18      A. Yes.

19      MR. MICHAEL F. PETOCK: I would like to

20  have this marked as Plaintiff's Exhibit 25.

21      (Plaintiff's Exhibit No. 25 was marked for

22  identification.)

23

24  BY MR. MICHAEL F. PETOCK:

**Page 28**

1      Q. I show you what's been marked as Plaintiff's

2  Exhibit 25. Is that the minutes of the annual meeting

3  of shareholders and directors of Van Scoy Diamond Mine

4  of Delaware, Inc. for the year 1998?

5      A. Yes.

6      Q. That also shows that you were present at that

7  meeting. Is that correct?

8      A. It says I was.

9      Q. Were you present at that meeting?

10      A. I don't remember.

11      Q. On page 2, which is D000763, it shows you being

12  elected as vice-president of the corporation. Is that

13  correct?

14      A. Yes.

15      Q. I direct your attention to page 3, which is

16  D000764. Above the signature line "Donna Van Scoy,"

17  is that your signature?

18      A. No.

19      Q. Did you authorize anyone to put your signature

20  on that?

21      A. I don't recall.

22      Q. Above the -- in two places, above the signature

23  line "Kurt Van Scoy," is that Kurt's signature?

24      A. Yes.

**Page 29**

1      Q. Did you ever attend a corporate meeting at a

2  lawyer's name of Aregood in Wilkes-Barre?

3      A. I believe so.

4      Q. Do you believe that would have been at the 1996

5  meeting?

6      A. I don't remember.

7      Q. Do you recall being at any meeting in

8  Mr. Aregood's office in which tradename issues were

9  discussed?

10      A. No.

11      Q. In 1996, were you aware that there was a

12  proceeding started in the bankruptcy court to enjoin

13  the use of the Van Scoy Diamond Mine?

14      A. I knew there was a bankruptcy case. That's all

15  I knew.

16      Q. How did you know there was a bankruptcy case?

17      A. Because my father-in-law was going through it.

18  I didn't know the details.

19      Q. Did you know that the store in Wilkes-Barre --

20  that the Van Scoy Diamond Mine in Wilkes-Barre was

21  padlocked by the bankruptcy court at one time?

22      A. Yes. I was told that.

23      Q. Did you also know at some later date they had

24  to take the name down, they had to change their name

Page 30

1   on the store in Wilkes-Barre?
2   A.  As of this trial, I found that out.
3   Q.  Prior to the institution of this lawsuit, you
4   didn't know about that?
5   A.  No, I did not.
6   Q.  Do you know where the meetings are for -- or
7   the minutes for the meetings for the corporation
8   Van Scoy Diamond Mine for '95, '96, '97?
9   A.  No.
10      MR. MICHAEL F. PETOCK:  Charlie, I'd ask
11  that you produce the minutes for the meetings for the
12  years '95, '96 and '97.
13  BY MR. MICHAEL F. PETOCK:
14  Q.  Was there ever any concern expressed by Kurt or
15  concern on your behalf about using the name "Van Scoy
16  Diamond Mine"?
17  A.  No.
18  Q.  Did Tommy Van Scoy, Sr. ever say anything to
19  you that would give you permission to use the name
20  "Van Scoy Diamond Mine"?
21  A.  Yes.  He gave it to us.
22  Q.  What did he say to you?
23  A.  He said, "Good luck and I hope you guys do
24  well."

Page 31

1   Q.  When did he say that?
2   A.  When we opened the store.  No.  Prior, when he
3   gave us all the showcases and the sign and everything.
4   Q.  Where was he when he said that?
5   A.  In my store.
6   Q.  He was in your store and he was giving you the
7   showcases and the sign in your store?  Is that
8   correct?
9       MR. QUINN:  Object.
10  A.  He gave Kurt the equipment.  He didn't
11  physically bring it.  He said, "Good luck to you."
12  That's all.
13  Q.  That's all he said?
14  A.  I am sure there was more, but I don't recall.
15  Q.  Did he ever do anything which would imply any
16  type of permission to use the name "Van Scoy Diamond
17  Mine?"
18  A.  He used to come down to our store and work when
19  we had a sale or something big or just to come down
20  and help us out.
21  Q.  When was that?
22  A.  Numerous times.
23  Q.  In what year?
24  A.  '94, '95.

Page 32

1   Q.  How did he help you out?
2   A.  Actually just stood and helped make sales and
3   helped keep the girls motivated.
4   Q.  Did he ever say anything about the corporation
5   Van Scoy Diamond Mine of Delaware, Inc. impliedly
6   received any permission to use the mark "Van Scoy
7   Diamond Mine"?
8   A.  I knew nothing about a mark until this trial.
9   Q.  So he was telling you good luck with the store
10  hoping you were successful.  Is that correct?
11  A.  That's correct.
12  Q.  And you took his comments "good luck" to mean
13  that you could use the mark in Delaware, is that
14  correct, in Newark, Delaware?
15  A.  I don't understand the question.
16  Q.  What was your understanding of the scope of the
17  permission that was granted to you, allegedly granted
18  to you by the words "good luck"?
19  A.  He allowed us to open the store and wished us
20  good luck.
21  Q.  In Newark, Delaware?
22  A.  Yes.
23  Q.  Nowhere else?
24  A.  Nowhere else was ever brought up, I guess.

Page 33

1   Q.  Are you aware that at some point in time
2   somebody blocked out the word "Mine" from the sales
3   receipts of Delaware Diamond Mine of Delaware, Inc.?
4   A.  Yes.
5   Q.  Did you ever block out of any of those?
6   A.  No.
7   Q.  Do you know who did it?
8   A.  Yes.  My employees.
9   Q.  Who was that?
10  A.  Pardon?
11  Q.  Who was that?
12  A.  Megan Rump and Karen Vayo.
13  Q.  Megan Rump, R-U-M-P?
14  A.  Yes.
15  Q.  What was the other name?
16  A.  Karen Vayo, V-A-Y-O.
17  Q.  V-A-Y-L-E?
18  A.  V-A-Y-O.
19  Q.  How do you identify yourself on sales receipts?
20  A.  "DVS."
21  Q.  Did the two girls do this jointly?
22  A.  Yes.
23  Q.  Megan and Karen?
24  A.  Yes.

Page 34

1   Q.  When did they do that?
2   A.  After we received notification of the lawsuit.
3   Q.  You mean after you received the cease and
4   desist letter?
5   A.  Yes.
6   Q.  These sales receipts, do they come in a booklet
7   or in individual forms, multi-part individual forms?
8   A.  In a carbon copy form notebook.
9   Q.  They are in a notebook?
10  A.  Mm-hmm.
11  Q.  So you tear one off as you use it?
12  A.  Yes.
13  Q.  Were these crossed out one at a time as --
14  A.  No.
15  Q.  How many were done at one time, do you know?
16  A.  Well, the entire book.
17  Q.  Did you use any of the sales receipts with the
18  name "Mine" blocked out?
19  A.  Yes.
20  Q.  Were you upset that you were doing that?
21  A.  No.
22  Q.  Did you tell the girls Megan and Karen Rump --
23  Megan Rump and Karen --
24  A.  Vayo.

Page 35

1   Q.  -- Vayo not to do it?
2   A.  I'm confused.
3   Q.  Did you tell Karen Rump -- I'm sorry.  Did you
4   tell Megan Rump and Karen Vayo not to cross out the
5   word "Mine" from the sales receipts any longer?
6   A.  Yes.
7   Q.  You felt that there was no need to cross out
8   the word "Mine."  Is that correct?
9   A.  Yes.
10  Q.  Did you chastise Karen and Megan for crossing
11  out the sales receipts?
12  A.  "Chastise" meaning?
13  Q.  Tell them they really did a wrong thing by
14  crossing it out, that they shouldn't take -- I presume
15  they took this on themselves and did it?
16      MR. QUINN:  Objection.  There is no
17  question on the table.
18  Q.  How did it come that Karen and Megan crossed
19  out the word "Mine" on the sales receipts?
20  A.  I told them to.
21  Q.  You told them to?
22  A.  Yes.
23  Q.  And then you later told them not to do it
24  anymore?

Page 36

1   A.  No.  I later said we didn't need to do it.
2   Q.  Why did you later tell her that you did not
3   need to do it?
4   A.  Under the advice of counsel.
5   Q.  What was that advice?
6       MR. QUINN:  Objection.  That's privileged
7   information.  You are instructed not to answer.
8       MR. MICHAEL F. PETOCK:  If she's relying
9   upon advice of counsel, it's not privileged.
10      MR. QUINN:  It certainly is.
11      MR. MICHAEL F. PETOCK:  It certainly is
12  not.
13  BY MR. MICHAEL F. PETOCK:
14  Q.  So when you first directed them to cross out
15  "Mine" from the sales receipts, did you believe that
16  crossing out "Mine" would avoid infringement?
17      MR. QUINN:  Objection to the form of the
18  question.  It's leading.
19  A.  I don't understand it anyway.
20  Q.  In the beginning, you requested Megan and Karen
21  to cross out "Mine" from the sales receipt.  Is that
22  correct?
23      MR. QUINN:  Objection.  Misleading.
24  A.  Yes.

Page 37

1   Q.  And when you asked them to do that, did you
2   believe that would solve the problem with respect to
3   the cease and desist letter and being a violation of
4   "Van Scoy Diamond Mine"?
5       MR. QUINN:  Objection to the form of the
6   question.  It's a leading question.
7   A.  I don't understand.
8   Q.  When you instructed Megan and Karen to cross
9   out the sales receipts, did you believe that was going
10  to solve the problem with respect to Van Scoy Diamond
11  Mine.
12      MR. QUINN:  Objection to the question, the
13  form.  It's a leading question.
14      MR. PETOCK:  This is an adverse witness.
15  I'm entitled to lead the witness.
16      MR. QUINN:  And objections to form are to
17  be made today.  We agreed on that at the beginning.
18  By MR. MICHAEL F. PETOCK:
19  Q.  Can you answer the question?
20  A.  I can tell you what I did.  I don't really
21  understand your question.
22      MR. QUINN:  If you don't understand the
23  question, you should not answer it.
24  Q.  Tell me what you did.

e1d9445b-06e6-45b4-8108-014bd9814fd0

Page 38

1    MR. QUINN: Is that a question?
2    MR. MICHAEL F. PETOCK: Yes. Tell me what
3  you did.
4    MR. QUINN: That's not a question.
5    MR. MICHAEL F. PETOCK: I'm asking: What
6  did you do?
7    MR. QUINN: That's a question.
8    A. I received the letter and it said to stop using
9  the name, so I thought I should cross it out, it would
10  be a good idea. That's it.
11    Q. By crossing out "Mine," you thought that would
12  avoid the problem with "Van Scoy Diamond Mine"?
13    MR. QUINN: Objection. That's not a
14  question.
15    Q. Is that correct?
16    MR. QUINN: That's a leading question. I
17  object to it as to form.
18    Q. Is that correct?
19    A. I don't know.
20    Q. Just so the record is clear, what was the
21  advice that you got from counsel with respect to
22  blocking out the name "Mine"?
23    MR. QUINN: Objection. That calls for
24  inquiry into and to break the attorney-client

Page 39

1  privilege. The witness should not answer that
2  question.
3    Q. When did you tell employees to stop blocking
4  out "Mine" from the sales receipts?
5    A. They never started and stopped. They just did
6  it one time.
7    Q. When did you tell them not to do it any longer?
8    A. I don't believe I have.
9    Q. You said earlier that you told them not to do
10  it any longer. Isn't that correct?
11    MR. QUINN: Objection. The record will
12  show what she said.
13    A. I don't remember.
14    MR. MICHAEL F. PETOCK: I guess you need
15  a break now?
16    THE VIDEOGRAPHER: Yes. Going off the
17  record at 10:56 a.m.
18    -- -- -- -- --
19    THE VIDEOGRAPHER: Going back on the
20  record at 11:05 a.m.
21  BY MR. MICHAEL F. PETOCK:
22    Q. During the break, did you discuss any of this
23  testimony with your counsel, Mr. Quinn?
24    A. No.

Page 40

1    Q. Just so I'm clear here. You said -- is it
2  correct that you said you told Megan and Karen to
3  cross out "Mine" from the receipts?
4    MR. QUINN: Objection. The record will
5  show what she said. The question has been asked and
6  answered.
7    Q. Will you answer that? I'm unclear.
8    A. Yes.
9    Q. When Kurt and you -- when Kurt goes on
10  vacation, do you usually go with him?
11    MR. QUINN: Objection. That's not a
12  question.
13    Q. Do you usually go with Kurt on vacations?
14    A. Vacations, yes.
15    Q. Was Kurt in the store when the cease and desist
16  letter came in?
17    A. No.
18    Q. Did you consult with Kurt before you told Megan
19  and Karen to cross out the word "Mine" from the sales
20  receipts?
21    A. No.
22    Q. And you said you consulted with counsel with
23  respect to the crossing out of "Mine" from the sales
24  receipts. What counsel was that?

Page 41

1    A. I never discussed it with counsel. It was
2  what -- I am not sure. I believe it was told to
3  counsel what was done and I was told that it wasn't
4  necessary.
5    MR. QUINN: Limit your response to the
6  question that was asked.
7  BY MR. MICHAEL F. PETOCK:
8    Q. Who told you it wasn't necessary?
9    A. I don't recall.
10    Q. Was it Kurt?
11    A. I don't recall.
12    Q. When did this occur?
13    A. What occur?
14    Q. That you were told that it was no longer
15  necessary to cross out "mine."
16    MR. QUINN: Objection. That's not a
17  question.
18    Q. When did it occur?
19    A. I don't recall.
20    Q. When you told Megan and Karen to cross out
21  "Mine" from the sales receipts, did you also consider
22  changing the store sign?
23    A. No.
24    Q. And why not?

Page 42

1   A. I don't make those kinds of decisions.
2   Q. Did you consider changing "Van Scoy Diamond
3   Mine" on the Internet?
4   A. I don't deal with the Internet.
5   Q. Who deals with the Internet?
6   A. Kurt.
7   Q. Did you believe that "Van Scoy Diamonds of
8   Delaware, Inc." would not be an infringement of
9   "Van Scoy Diamond Mine"?
10  A. I don't know.
11  Q. Do you have any belief as to that?
12  A. I don't really understand the question.
13  Q. Did you believe that deleting the word "Mine"
14  from "Van Scoy Diamond Mine of Delaware, Inc." would
15  obviate or eliminate the problem with the cease and
16  desist letter?
17  A. I still don't understand.
18  Q. What don't you understand about it?
19  A. I just did it because it said to stop using the
20  name. That was my own decision. And I don't know why
21  I did it.
22      (Plaintiff's Exhibit No. 26 was marked for
23  identification.)
24  BY MR. MICHAEL F. PETOCK:

Page 43

1   Q. I show you what's been marked as Plaintiff's
2   Exhibit No. 26. Can you identify that?
3   A. It's a receipt to a customer.
4   Q. And it's a receipt of the store Van Scoy
5   Diamond Mine of Delaware, Inc. Is that correct?
6   A. Yes.
7   Q. On that receipt the word "Mine" is blocked out.
8   Is that correct?
9   A. Yes.
10  Q. The date of this is November 24th, 2004?
11  A. Yes.
12      MR. QUINN: Objection. Leading. It's not
13  a question.
14  Q. Whose initials are in there where it says "sold
15  by"?
16  A. Mine, "DVS."
17  Q. And was this the first day that a sales receipt
18  was used with the word "Mine" blocked out of the
19  "Van Scoy Diamond Mine of Delaware, Inc."?
20  A. I am not sure of the first day.
21  Q. By the way, did you receive the cease and
22  desist letter?
23  A. I didn't sign for it, no.
24  Q. Did you open it?

Page 44

1   A. Yes.
2      (Plaintiff's Exhibit No. 27 was marked for
3   identification.)
4   BY MR. MICHAEL F. PETOCK:
5   Q. I show you what's been marked as Plaintiff's
6   27. Can you identify that?
7   A. It's a receipt.
8   Q. Of what?
9   A. From our store.
10  Q. What date is that?
11  A. 11/24.
12  Q. That doesn't have "Mine" blocked out. Is that
13  correct?
14  A. Correct.
15  Q. Is that by Megan Rump?
16  A. Yes.
17  Q. Does that help refresh your recollection as to
18  whether the first day that sales occurred with "Mine"
19  blocked out was November 24th?
20  A. It would seem so.
21  Q. I'll also represent for the record that we
22  requested your counsel to produce all the sales
23  invoices with "Mine" blocked out and the first date
24  was November 24th.

Page 45

1   A. Okay.
2   Q. Do you believe that "Van Scoy Jewelers" would
3   not infringe the service mark or trademark "Van Scoy
4   Diamond Mine"?
5   A. I don't know.
6   Q. What's your belief?
7      MR. QUINN: She just answered the
8   question. So she doesn't have to answer it again. I
9   object.
10     MR. MICHAEL F. PETOCK: It's a different
11  question.
12     MR. QUINN: The first question was: Do
13  you believe? And the second question was: What is
14  your belief? Those are the same questions. We can
15  have the reporter read them back.
16  BY MR. MICHAEL F. PETOCK:
17  Q. Do you have any personal opinion on it?
18     MR. QUINN: How does that question differ
19  from her belief?
20  Q. Answer the question, please.
21     MR. QUINN: I have an objection to the
22  question as to the form. It's been asked and
23  answered.
24  A. I don't know.

Page 46

1  Q.  How did it come about that -- I'll represent to
2  you that the last date that an invoice was produced by
3  your counsel with "Mine" blocked out was March 31,
4  2005. How did it come about that you stopped blocking
5  out"Mine"?
6  A.  I only blocked it out one time, all the
7  receipts we had.
8  Q.  Were they then told not to block it out any
9  further, any longer?
10  A.  It was never really brought up again. We just
11  blocked out the ones we had, and that was the end of
12  it.
13  Q.  You never told them not to block it out
14  anymore?
15      MR. QUINN:  Objection. It's been asked
16  and answered.
17      MR. MICHAEL F. PETOCK:  You are
18  obstructing this deposition, Charlie.
19      MR. QUINN:  I'm trying to get the
20  questions to be asked in the proper form.
21      MR. MICHAEL F. PETOCK:  Can you read back
22  the last question, please?
23      (The reporter read as requested.)
24  BY MR. MICHAEL F. PETOCK:

Page 47

1  Q.  You testified they blocked out the word "Mine"
2  on one occasion. Is that correct?
3  A.  Correct.
4  Q.  And is it your testimony that they were never
5  instructed to block it out again after that?
6  A.  That is correct.
7      (Plaintiff's Exhibit No. 28 was marked for
8  identification.)
9  BY MR. MICHAEL F. PETOCK:
10  Q.  I show you what's been marked as Plaintiff's
11  Exhibit 28. Would you look through that? Are all of
12  those sales receipts sales made by you?
13  A.  Some are payments, so, no.
14  Q.  I'm sorry. What?
15  A.  No, they are not sales made by me.
16  Q.  Which ones are not sales made by you?
17  A.  11/29/04, Joe Lamonaco; Tom Sharrar, 3/9/05;
18  Michael Lenoir, 12/24.
19      MR. QUINN:  Speak up so she can hear you.
20  A.  Michael Lenoir, 12/24/04; David Fillippone,
21  12/28/04; Mark Garcia, 12/21.
22      MR. QUINN:  Is that all?
23  A.  Chris Harrison, 1/10/05.
24  Q.  You said 1/10/05? Is that 1105?

Page 48

1  A.  1/10/05.
2      MR. MICHAEL C. PETOCK:  She's talking
3  about dates.
4      MR. MICHAEL F. PETOCK:  Oh.
5  BY MR. MICHAEL F. PETOCK:
6  Q.  First of all, all of those are sales receipts
7  of Van Scoy Diamond Mine of Delaware, Inc. Is that
8  correct?
9  A.  Yes.
10  Q.  And all of them except for the first one has
11  "Mine" blocked out of "Van Scoy Diamond Mine of
12  Delaware, Inc." Isn't that correct?
13  A.  And the last one was.
14  Q.  I think you said the invoice -- first of all,
15  these are all sales receipts of Van Scoy Diamond Mine
16  of Delaware, Inc. Is that correct?
17  A.  Yes.
18  Q.  And I believe you said the invoice of 11/29/04,
19  which is D001269, to Joe Lamonaco --
20  A.  Yes.
21  Q.  -- was not a sale made by you?
22      MR. QUINN:  I instruct the witness to wait
23  till the question is asked before you respond.
24  A.  It was a payment taken.

Page 49

1  Q.  I'm sorry?
2  A.  A payment.
3  Q.  Oh. So you are distinguishing between sales
4  and payments?
5  A.  Yes.
6  Q.  But all of these sales receipts are invoices --
7  are transactions handled by you on these invoices. Is
8  that correct?
9  A.  Except one.
10  Q.  Which one is that?
11  A.  Dr. Garcia.
12  Q.  11/21/04?
13  A.  Yes.
14  Q.  And that bears the initials "DVS." Is that
15  correct?
16  A.  Yes.
17  Q.  Are you saying that's not your initial on
18  there?
19  A.  It is my initials, but it was Kurt's sale.
20  Q.  But you wrote up the sales receipt, is that
21  correct, where you marked Garcia on 11/21/04?
22  A.  I just put my initials.
23  Q.  Is that your handwriting on the sales receipt?
24  A.  No. It's Kurt's. Yes, it's Kurt's.

Page 50

1  Q.  Kurt's.  Why did you put your initials on it?
2  A.  Because he forgot to.  When I was doing the
3  receipts, I probably just put "DVS."
4  Q.  Why is that important?
5  A.  Well, just if a customer comes in, you know who
6  waited on them.
7  Q.  Are commissions paid to the salespeople?
8  A.  No.
9       (Plaintiff's Deposition Exhibit No. 29 was
10 marked for identification.)
11      MR. QUINN:  Excuse me.  Does that mean
12 this whole collection?  They're paper-clipped, but not
13 stapled like the others were.
14      MR. MICHAEL C. PETOCK:  It's all a
15 collection.  It should have been stapled.
16      MR. QUINN:  Thank you.
17 BY MR. MICHAEL F. PETOCK:
18  Q.  I show you what's been marked as Plaintiff's
19 Exhibit 29.  First of all, are all of these sales
20 receipts, sales receipts of Van Scoy Diamond Mine of
21 Delaware, Inc.?
22  A.  Yes.
23  Q.  And do all of them have "Mine" crossed out?
24  A.  Yes.

Page 51

1  Q.  Are these all sales made by Kurt?
2  A.  Yes.
3  Q.  Where was Kurt when the cease and desist letter
4  came in.  Do you know?
5  A.  Yes.  He was out of town on a hunting trip.
6  Q.  In Northeast, Pennsylvania?
7  A.  Yes.
8       MR. QUINN:  Object.
9  A.  Sorry.
10      MR. QUINN:  That's not a question.
11  Q.  There are question marks after all those
12 things.
13      MR. QUINN:  Well, it may be in your mind,
14 but not --
15      MR. MICHAEL C. PETOCK:  Charlie, you asked
16 questions in the same exact way in your deposition,
17 and we didn't do that to you.  It's -- you did the
18 exact same thing.  I just want to point that out.
19      MR. QUINN:  Thank you for your assistance.
20 I don't agree with that characterization.
21      MR. MICHAEL C. PETOCK:  Read the
22 transcript, Charlie.  It's very clear from the
23 transcript.
24

Page 52

1  BY MR. MICHAEL F. PETOCK:
2   Q.  Van Scoy Diamond Mine of Delaware, Inc. changed
3  its website address from Van Scoy Diamond Mine.com to
4  Van Scoy Diamonds of Delaware.com.  Is that correct?
5       MR. QUINN:  Objection.  Leading.
6   Q.  Is that correct?
7   A.  I don't know anything about the website.
8   Q.  You don't know that?
9   A.  I have already stated that, nothing.
10  Q.  You don't know that the name has been changed?
11  A.  No.
12  Q.  Do you ever look at the website?
13  A.  No.
14  Q.  Do you know how long that website has been up?
15  A.  No, I do not.
16  Q.  Do you have a computer at home?
17  A.  No.
18  Q.  Do you have Internet access at your computer at
19 your desk in the store?
20  A.  I believe so.
21  Q.  Do you ever go on the Internet?
22  A.  No.
23       (Plaintiff's Exhibit No. 30 was marked for
24 identification.)

Page 53

1  BY MR. MICHAEL F. PETOCK:
2   Q.  I show you what's been marked as Plaintiff's
3  Exhibit 30.  Do you recognize that?
4   A.  Yes.
5   Q.  What is that?
6   A.  The letter that we received in the mail.
7   Q.  That's the cease and desist letter.  Is that
8  correct?
9   A.  If that's what it's called, yes.
10  Q.  In that letter, I am telling you that I
11 represent Mr. Wayne Van Scoy.  Is that correct?
12  A.  Yes.
13  Q.  And attached to the letter were copies of
14 trademark -- copies of the trademark and a service
15 mark registration.  Is that correct?
16  A.  Mm-hmm.  Yes.
17  Q.  And you saw that there were two registrations
18 for "Van Scoy Diamond Mine," both owned by Wayne
19 Van Scoy?
20  A.  Yes.
21  Q.  The letter also represented to you that my
22 client, Wayne Van Scoy, owned the service mark and
23 trademark registrations.  Isn't that correct?
24  A.  Yes.

Page 54

1   Q.  At that point in time, you were also -- it was
2   demanded that you immediately cease and desist from
3   infringement of the -- of the identified federally
4   registered service mark and trademark of Mr. Wayne
5   Van Scoy.  Is that correct?
6        MR. QUINN:  Objection.  The letter says
7   what it says.
8   Q.  Isn't that correct?
9   A.  That's what it says.
10  Q.  When you read that letter, you knew then that
11  Wayne Van Scoy owned the federal trademark
12  registration.  Isn't that correct?
13  A.  At that moment, yes.
14  Q.  And that Wayne Van Scoy, the plaintiff, was
15  demanding that you stop any further use of the marks
16  "Van Scoy Diamond Mine."  Isn't that correct?
17  A.  Yes.
18  Q.  And also you knew that any permission which was
19  allegedly given by Tommy Van Scoy, Jr. -- Sr., was
20  terminated.  Isn't that correct?
21  A.  No.
22  Q.  Why do you say that?
23  A.  I didn't even know there was a trademark.
24  Q.  But when you received the letter, you knew

Page 55

1   that.  Correct?
2        MR. QUINN:  Objection.  Objection.  That's
3   leading.
4        MR. MICHAEL F. PETOCK:  Objection.  You
5   are obstructing the deposition.
6        MR. QUINN:  The letter is silent --
7        MR. MICHAEL F. PETOCK:  Objection.
8        MR. QUINN:  -- with respect to anything
9   about Mr. Tommy Van Scoy.
10       MR. MICHAEL F. PETOCK:  Objection.  You
11  are testifying.  Mr. Quinn, you are testifying.  And I
12  demand that you stop testifying.
13       MR. QUINN:  You can demand it all you
14  want.  I am not going to stop raising my objections.
15       MR. MICHAEL F. PETOCK:  You are making a
16  speaking objection.
17       MR. QUINN:  Let me speak so we get
18  something clear.  Otherwise, I'm going to talk while
19  you are talking and the transcript is not going to be
20  clear.
21       MR. MICHAEL F. PETOCK:  I don't care.
22  You are not allowed to coach the witness or lead the
23  witness.  You are coaching the witness.
24       MR. QUINN:  When you asked the question

Page 56

1   and characterized this letter as saying something
2   about Mr. Tommy Van Scoy and make --
3        MR. MICHAEL F. PETOCK:  I didn't
4   characterize that in the letter.
5        MR. QUINN:  You did.  Please read the last
6   question back.
7        (The reporter read as requested.)
8        MR. QUINN:  I stand on what I just said.
9   There is no mention of Tommy Van Scoy in this letter.
10  And the question as read back mentions his name and
11  asks the question --
12       MR. MICHAEL F. PETOCK:  It mentions his
13  name, but it asks a different question.
14       MR. QUINN:  -- as to what permission was
15  given about Mr. Tommy Van Scoy.  The question is
16  objectionable.  The letter says what it says.  And
17  that's my position.
18  BY MR. MICHAEL F. PETOCK:
19  Q.  Can you answer the question?
20  A.  What question?
21  Q.  The question was:  When you received the cease
22  and desist letter, you knew that any alleged
23  permission given by Tommy Van Scoy, if any, was
24  terminated?

Page 57

1   A.  No.
2   Q.  Why do you say that?
3   A.  Because my father-in-law gave us the name to
4   use.  And he was still alive at this time.
5   Q.  But there was nothing in writing as to any
6   permission.  Is that correct?
7        MR. QUINN:  Objection.  Leading.
8   A.  To my knowledge.
9   Q.  And the only permission that was given -- the
10  only words that were given in the form of permission
11  were "good luck"?
12       MR. QUINN:  Objection.  Leading.
13  Q.  Isn't that correct?
14       MR. QUINN:  Objection.  Leading.
15  A.  To my knowledge.
16       MR. MICHAEL F. PETOCK:  Charlie, I am
17  allowed to lead an adverse witness, an adverse party.
18  I wish you'd stop objecting these frivolous objections
19  and obstructing this deposition.
20       MR. QUINN:  I am not obstructing the
21  deposition.
22       MR. MICHAEL F. PETOCK:  Yes, you are.
23       MR. QUINN:  We stipulated at the beginning
24  that all objections were waived until the time of

Page 58

1 trial, except for the form of the question. And those
2 are the objections I am making. They're leading
3 questions.
4     MR. MICHAEL C. PETOCK: The judge would
5 not appreciate a leading objection to an adverse
6 witness. I am sure he wouldn't allow that and I am
7 sure if we were to take it to the judge --
8     MR. QUINN: Then there shouldn't have been
9 any stipulation as to the leading -- all objections
10 being waived except as to leading because then it's
11 meaningless. The stipulation is meaningless.
12     MR. MICHAEL C. PETOCK: It's not an
13 objection in good faith when you know you can't make a
14 leading objection to an adverse witness.
15     MR. QUINN: It is an objection made in
16 good faith. I resent any implication or assertion
17 that these objections are not made in good faith.
18     MR. MICHAEL F. PETOCK: They cannot be
19 made in good faith when you know there is a perfect
20 right to ask leading questions as to an adverse party.
21     MR. QUINN: I am standing on what I said
22 before. If you didn't want leading objections, we
23 should have stipulated that at the beginning, but we
24 didn't. We stipulated that all objections were waived

Page 59

1 except for leading -- objections as to the form of the
2 question. And an objection as to a leading question
3 is an objection as to the form; therefore, I must make
4 them now or they are waived. And I don't intend to
5 waive them. You made the stipulation. We're going to
6 live with it.
7     MR. MICHAEL F. PETOCK: You are not acting
8 in good faith.
9     MR. QUINN: Pardon me?
10     MR. MICHAEL F. PETOCK: You are not acting
11 in good faith.
12     MR. QUINN: I resent that. I tell you I
13 am acting in the best of faith. I am trying to do my
14 job and create a record that is going to be clear for
15 the benefit of both parties and for the court.
16 BY MR. MICHAEL F. PETOCK:
17 Q. Were you ever involved in any discussions with
18 respect to any contributions to a bankruptcy
19 settlement in the bankruptcy proceeding of Tommy
20 Van Scoy, Sr.?
21 A. No.
22 Q. Did Kurt ever say anything to you about --
23 A. No.
24 Q. -- a request from Wayne to contribute to the

Page 60

1 bankruptcy settlement?
2 A. No.
3 Q. Did you know anything about a settlement being
4 negotiated with the bankruptcy court on behalf of
5 Tommy Van Scoy, Sr. at the time that it was occurring
6 in 2000?
7 A. No.
8 Q. On the website, on your website, Van Scoy
9 Diamond Mine of Delaware.com., do you know whether
10 prices are on that site?
11 A. I do not.
12 Q. Do you know whether pictures of product are
13 shown on it?
14 A. I do not.
15 Q. Do you have any knowledge of any sales having
16 been made via the Internet, via your Internet website
17 in the last two months?
18 A. No, I do not.
19 Q. Would you know if sales were made via the
20 Internet?
21 A. No.
22 Q. Do you know what portion of your website is
23 called where the products are shown?
24 A. Once again, I am not associated with the

Page 61

1 website at all.
2 Q. You have never looked at it?
3 A. Never. I don't have time.
4 Q. Why do you not have time?
5 A. I don't know.
6     (Van Scoy Deposition Exhibit No. 31 was
7 mark for identification.)
8 BY MR. MICHAEL F. PETOCK:
9 Q. Before we go on to Plaintiff's Exhibit 31, do
10 you recall what day of the week it was when you
11 received the cease and desist letter?
12     MR. QUINN: Excuse me. This is marked as
13 5. So this is -- do you want to keep the same number?
14     MR. MICHAEL F. PETOCK: Well, we're going
15 to mark it again as 31.
16     MR. QUINN: All right.
17 BY MICHAEL F. PETOCK:
18 Q. Do you recall what day of the week it was when
19 the cease and desist letter was received?
20 A. Yes.
21 Q. What day of the week was it?
22 A. Saturday.
23 Q. That would have been November 20th. Isn't that
24 correct?

Page 62

1    A.  If that's a Saturday, I would say, yes.
2    Q.  I show you now what's been marked as
3  Plaintiff's Exhibit 31.  Can you identify that?
4    A.  Yes.  It's the warranty that Mr. Van Scoy gave
5  us to use to give to our customers after they purchase
6  something.
7    Q.  And do you use that warranty in your store now?
8    A.  Yes.
9    Q.  And have you always used it?
10   A.  Yes.
11   Q.  And that's signed "Van Scoy Diamond Mine."  Is
12  that correct?
13   A.  Yes.
14   Q.  And also the address "1117 Churchmans Place."
15  Is that correct?
16   A.  Yes.
17   Q.  The last paragraph of that warranty requires
18  you to provide free cleaning and inspection for
19  damaged prongs for free for diamonds or product
20  purchased at any other Van Scoy Diamond Mine.  Is that
21  correct?
22   A.  Yes.
23   Q.  Do you honor that policy?
24   A.  Yes.

Page 63

1    Q.  Is that your policy to honor it?
2    A.  Yes.
3    Q.  Have you always used the warranty --
4    A.  Yes.
5    Q.  -- since opening in 1994?
6    A.  Yes.
7    Q.  Have you ever refused to honor a warranty for
8  products sold by plaintiff Wayne Van Scoy?
9    A.  Not that I know of.
10   Q.  Do you know of anyone in your store refusing to
11  clean jewelry which was purchased at plaintiff Wayne
12  Van Scoy's store?
13   A.  Not that I know of.
14       (Plaintiff's Exhibit No. 32 was marked for
15  identification.)
16  BY MR. MICHAEL F. PETOCK:
17   Q.  I show you what's been marked as Plaintiff's
18  Exhibit 32.  Have you ever seen that letter before?
19   A.  Yes.
20   Q.  When did you see it?
21   A.  In March, probably.
22   Q.  And did you take any steps to preserve evidence
23  after seeing this letter?
24   A.  No.

Page 64

1    Q.  Did you take any steps to preserve any evidence
2  after seeing the cease and desist letter in November?
3    A.  No.
4    Q.  Do you know anything about the bankruptcy
5  proceeding other than what you have already told us?
6    A.  No.
7    Q.  Did you ever go to the bankruptcy court?
8    A.  No.
9    Q.  Do you know if Kurt went to the bankruptcy
10  court?
11   A.  I don't know.
12   Q.  Did Kurt bring back some documents from
13  Wilkes-Barre when he came back from his hunting trip
14  in the end of November of 2004?
15   A.  I don't know.
16   Q.  Did you ever see any documents from the
17  bankruptcy court?
18   A.  Maybe in some of the evidence.  I don't
19  remember.
20   Q.  Did you ever see any at home or in the store?
21   A.  No.
22   Q.  Did Kurt ever show you any bankruptcy
23  documents?
24   A.  Not that I recall.

Page 65

1       MR. MICHAEL F. PETOCK: 33.
2       (Plaintiff's Exhibit No. 33 was marked for
3  identification.)
4  BY MR. MICHAEL F. PETOCK:
5    Q.  I show you what's been marked Plaintiff's
6  Exhibit No. 33.
7    A.  Part of the tax for advertising that you had
8  requested.
9    Q.  That document contains blocked out portions of
10  your corporate tax returns Form 1120S for the years
11  1994 through 2004.  Is that correct?
12   A.  Yes.
13   Q.  On that are shown -- the only numbers that were
14  not blocked out was the advertising expenses?
15   A.  Yes.
16   Q.  And are those correct figures to the best of
17  your knowledge?
18   A.  Did you ask if they are?
19   Q.  Yes, if they are correct figures to the best of
20  your knowledge.
21   A.  Yes.
22   Q.  These are authentic copies of your corporate
23  tax returns showing the advertising expenses for the
24  years 1994 through 2004.  Is that correct?

e1d9445b-06e6-45b4-8108-014bd9814fd0

Page 66

1   A.  Yes.
2   Q.  Continuing to look at Plaintiff's Exhibit 33.
3   The advertising figures fluctuate somewhat.  Do you
4   know any particular reason that they do that?
5   A.  The amounts each year?
6   Q.  Yes.  Is that just normal variation or is there
7   any reason for it?
8   A.  I am not really sure.  Kurt does the
9   advertising.  There could be different expenses, I
10  guess.
11  Q.  Like advertising expenses for 2004 were
12  $52,270.  Do you see that?
13  A.  Yes.
14  Q.  That's slightly less than the advertising
15  expenses for 1995 of $54,803?
16  A.  Yes.
17  Q.  Any comment on why the advertising expenses are
18  just -- stayed constant even though there is
19  inflation, ten years of inflation involved there?
20  A.  I couldn't answer that.  I don't know.
21  Q.  I noticed there was a jump in advertising
22  expenses from '99 to 2000.  Approximately a little
23  less than $60,000 to $84,000.  Any particular reason
24  for that?

Page 67

1   A.  I don't know.
2   Q.  Do you think that's just normal business
3   variation, depending upon what advertising was done a
4   particular year?
5   MR. QUINN:  Is that a question?
6   MR. MICHAEL F. PETOCK:  Yes.  Go ahead.
7   A.  Yes.
8   Q.  I am going to show you a plastic bag I'll
9   represent has been produced by your counsel and marked
10  as D001813.  It bears on both sides marked "Van Scoy's
11  Diamond Mine."  Is this a bag that's used in the
12  operation of your store, Van Scoy Diamond Mine?
13  A.  Yes.
14  Q.  How long have you been using that bag?
15  A.  Since 1994.
16  Q.  I show you a box produced by your counsel,
17  which is marked D001811 and bears the mark on the
18  inside of the box cover "Van Scoy Diamond Mine."  Is
19  that a box that's used in the operation of your
20  business, Van Scoy Diamond Mine of Delaware, Inc.?
21  A.  Yes.
22  Q.  How long has that been used?
23  A.  1994.
24  Q.  Both the bag and this box have been used

Page 68

1   continuously from 1994 to present?
2   A.  Correct.
3   Q.  I show you another box produced by your counsel
4   that's been marked as D001812 and bears on the inside
5   of the box cover "Van Scoy Diamond Mine."  Is that a
6   box that's used in the operation of your business,
7   Van Scoy Diamond Mine of Delaware, Inc.?
8   A.  Yes.
9   Q.  How long has that been used?
10  A.  I am not sure.
11  Q.  More than two years?
12  A.  Yes.
13  Q.  And you are continuing to use all three of
14  these in your business?
15  A.  Yes.
16  Q.  And the boxes and bags are given to customers
17  with product sales.  Is that correct?
18  A.  Correct.
19  Q.  You also have in your possession, isn't it
20  correct, some advertising audio tapes made by Thomas
21  Van Scoy, Sr.  Is that correct?
22  A.  Audio tapes?
23  Q.  Advertising audio tapes.
24  A.  Yes.

Page 69

1   MR. MICHAEL F. PETOCK: Is there any
2   problem with "attorney's eyes only" to ask about these
3   tapes?  I am not hearing any.  I am just asking some
4   questions about it.  It's already been filed in court
5   papers.
6   MR. QUINN:  Let's start.  If there is,
7   I'll raise the objection.  Is that fair?
8   MR. MICHAEL F. PETOCK:  Okay.
9   BY MR. MICHAEL F. PETOCK:
10  Q.  What are these tapes?
11  A.  Advertisements.
12  Q.  And where did you get them?
13  A.  Tommy Van Scoy.
14  Q.  Sr.?
15  A.  Sr.
16  Q.  Were they made by Tommy Van Scoy, Sr.?
17  A.  Yes.
18  Q.  Where did he make these at?
19  A.  The radio station in Wilkes-Barre, I believe.
20  Q.  Were they used in advertising on the radio?
21  A.  Yes.
22  Q.  And for how long?
23  A.  I am not sure.
24  Q.  Are they still being used on the radio

e1d9445b-06e6-45b4-8108-014bd9814fd0

Page 70

1  advertising?
2      A.  I don't believe so.
3      Q.  When did you stop using them?
4      A.  I don't recall.
5      Q.  A year ago?
6          MR. QUINN:  Objection.  She's answered the
7  question.  She doesn't recall.
8      Q.  Was it more than a year ago when you stopped
9  using them?
10         MR. QUINN:  She's answered that question.
11 She said she didn't recall.
12         MR. MICHAEL F. PETOCK:  Objection.  You
13 are coaching the witness and you are --
14         MR. QUINN:  I am not coaching the witness.
15         MR. MICHAEL F. PETOCK:  Yes, you are.
16         MR. QUINN:  You have asked the question
17 once and now you are twisting the words.
18         MR. MICHAEL F. PETOCK:  It's a different
19 question.  I want to get some --
20         MR. QUINN:  She said she doesn't know.
21         MR. MICHAEL F. PETOCK:  I want to test the
22 ability of her knowledge and of what her recollection
23 is.
24         MR. QUINN:  She said she didn't know.  How

Page 71

1  many times does she have to answer the question?
2      Q.  Was it more than a year ago?
3          MR. QUINN:  Objection.  That question has
4  already been asked.
5      Q.  Was it more than a year ago?
6      A.  I don't know.
7          MR. QUINN:  Objection again.  It's been
8  asked again.
9      A.  We --
10         MR. QUINN:  She's answered it twice now
11 that she doesn't know.
12         MR. MICHAEL F. PETOCK:  Let the witness
13 speak, Charlie.
14         MR. QUINN:  I'll let her speak when I get
15 my objection out.
16     Q.  Will you answer the question?
17     A.  All I know is the advertising is updated.  So
18 that's all I can tell you.  I don't know.  You can't
19 use the same ads over and over.
20     Q.  Well, were these audio tapes used many years
21 ago or just a few years ago?
22     A.  I don't know.
23         MR. QUINN:  Objection.  She's answered the
24 question again she doesn't know.

Page 72

1      Q.  Why don't you want Wayne Van Scoy to hear or
2  see these tapes?
3      A.  I don't know that either.
4      Q.  Wouldn't the radio stations have copies of
5  these tapes on file?
6      A.  I don't know.
7      Q.  What was the extent of the advertising?
8          MR. QUINN:  Objection.  Vague and
9  indefinite.  What does "extent" mean?
10     Q.  You can answer the question, please, still?
11     A.  I don't know.  I don't do the advertising.
12     Q.  But you know they were used on radio
13 advertising?
14     A.  Yes.
15     Q.  Did you hear them on the radio?
16     A.  Yes.
17     Q.  Was it more than one station?
18     A.  I don't remember.
19     Q.  What did the tape say?
20     A.  I don't remember.
21         MR. MICHAEL F. PETOCK:  Why don't we
22 break?
23         THE VIDEOGRAPHER:  Going off the record at
24 12:02 p.m.

Page 73

1          -- -- -- --
2          THE VIDEOGRAPHER:  Going back on the
3  record at 12:11 p.m.
4          MR. MICHAEL F. PETOCK:  Charlie, what I
5  would request that you do is to produce the remainder
6  of the lease documents which are missing.  We've only
7  received a few pages.  We received a page or two of
8  the current renewal and apparently a signature page
9  from back in '94.  And we request that you produce the
10 lease documents and any other documents that we've
11 requested here today prior to the 30(b)(6) deposition
12 scheduled for next week.
13 BY MR. MICHAEL F. PETOCK:
14     Q.  Did you discuss with your counsel any of the
15 questions that are being asked or anticipated being
16 asked in the deposition during the break?
17     A.  No.
18     Q.  Are you under the influence of any medications
19 or alcohol or anything when you are testifying here
20 today which would affect your memory?
21     A.  No.
22     Q.  Have you ever carried ought any
23 responsibilities or duties as secretary of the
24 corporation known as Van Scoy Diamond Mine of

e1d9445b-06e6-45b4-8108-014bd9814fd0

Page 74

1  Delaware, Inc.?
2    A.  I don't know what they would be.  No.
3    Q.  The answer is "no"?
4    A.  What do you mean "responsibilities."
5    Q.  Well, have you done anything?  Do you keep any
6  minutes?  Do you do anything?
7    A.  No.
8    Q.  Do you still have family living in Nanticoke?
9    A.  Yes.
10   Q.  How often do you get up to visit them?
11   A.  Not often.
12   Q.  In the period of 1994 to 2000, did you get up
13  there often then?
14   A.  I don't recall.
15   Q.  Do you know any other store besides your store
16  and plaintiff's store which operates under the name
17  "Van Scoy Diamond Mine"?
18   A.  I believe my brother-in-law Rick in Scranton.
19   Q.  Doesn't he operate under "Van Scoy Diamonds"?
20   A.  I'm not sure.  It's confusing in the phone
21  book.
22   Q.  Is there anyone else that you are aware of?
23   A.  I know there is a store in Lancaster and one in
24  North Carolina and one in Allentown and Reading.

Page 75

1    Q.  Do you know what those stores are using for
2  names?
3    A.  No.
4    Q.  You don't know if they're using "Van Scoy
5  Diamond Mine."  Is that correct?
6    A.  Correct.
7    Q.  How did you and Kurt get to Charlie Quinn?
8    A.  I don't know.
9    Q.  Have you ever spoken to Mark Maurer?
10   A.  No.
11   Q.  Do you know anything about Mark Maurer?
12   A.  Just what I have heard.
13   Q.  What have you heard?
14   A.  That he owned a store.
15   Q.  Where did he own a store at?
16   A.  I am not sure.
17   Q.  Do you know where he lives?
18   A.  No.
19   Q.  Do you know where you would call him at if you
20  were going to call him?
21   A.  No.
22   Q.  Have you ever spoken with him?
23   A.  No.
24   Q.  What is Kurt's relationship with Mark Maurer?

Page 76

1    A.  I don't know.
2    Q.  Do you know the last time Kurt spoke to Mark
3  Maurer?
4    A.  No, I do not.
5    Q.  You don't know what the names of the stores are
6  that he operates under, do you?
7    A.  No.
8    Q.  Who made the decision to open the store
9  "Van Scoy Diamond Mine" in Delaware?
10   A.  Kurt.
11   Q.  You were part of that.  Weren't you?
12   A.  I helped.
13   Q.  You contributed $20,000.  Isn't that correct?
14   A.  Yes.
15   Q.  Did you ever have any discussions with Tommy,
16  Sr. about opening the store?
17   A.  Not that I recall.
18   Q.  Do you believe that it was easier to open a
19  store at 1117 Churchmans Road in Newark where
20  previously Tommy, Sr. had operated a store for a
21  number of years?
22   A.  I don't know.  I never opened a store before.
23  I don't know if it was easier.
24   Q.  Do you believe it was easier?

Page 77

1      MR. QUINN:  Easier than what?
2      MR. MICHAEL F. PETOCK:  Easier than
3  opening a store someplace where there had never been a
4  Van Scoy Diamond Mine.
5    A.  No.
6    Q.  What do you mean by "no"?  No, you don't know
7  or no --
8    A.  No, I don't believe it would have been easier.
9    Q.  Do you know what was in the store when you
10  first arrived?
11   A.  Nothing.  Oh.  There was a safe.
12   Q.  Wasn't there also a sign on top "Van Scoy"?
13   A.  That I don't remember.
14   Q.  What kind of safe was there when you arrived?
15   A.  I don't know what kind it is.
16   Q.  What size was it?
17   A.  I don't know what size it is.
18   Q.  Six feet tall?
19   A.  Probably five or six.
20   Q.  Do you know where it came from?
21   A.  No.
22   Q.  But it was in the store when you arrived there.
23  Right?
24   A.  Yes.

Page 78

1  Q.  Was it blue?
2  A.  Yes.
3  Q.  Did Wayne ever expressly give you permission to
4  use the name "Van Scoy Diamond Mine," Wayne Van Scoy?
5  A.  No.
6  Q.  Did he ever give Kurt any permission to use
7  "Van Scoy Diamond Mine"?
8  A.  I don't know.
9  Q.  To your knowledge, did he ever give the
10  corporation any permission to use the name "Van Scoy
11  Diamond Mine"?
12  A.  I don't know.
13  Q.  Did Wayne Van Scoy ever imply he gave
14  permission to use the name "Van Scoy Diamond Mine"?
15  A.  I didn't know we needed permission.
16  Q.  That same answer would apply to Kurt and the
17  corporation.  Correct?
18  A.  That's correct.
19  Q.  How did you find out about the bankruptcy of
20  Tommy Van Scoy, Sr.?
21  A.  I don't remember.  I just heard it, I guess.
22  Q.  Where would you have heard it from?
23  A.  That I don't remember.
24  Q.  What did you know about the source of the

Page 79

1  financial difficulties of Tommy Van Scoy, Sr.?
2  A.  I didn't know much.
3  Q.  I'm sorry?
4  A.  I didn't know much.
5  Q.  What did you know?
6  A.  Not much at all.  Just that there was a
7  bankruptcy.
8  Q.  Did you know that Pam and Rick Sendrick's store
9  in Scranton were enjoined from using the name
10  "Van Scoy Diamond Mine"?
11  A.  No.  I knew they were involved in the
12  bankruptcy.  But that's all I know.
13  Q.  How did you know they were involved in the
14  bankruptcy?
15  A.  Just hearing it, I guess.
16  Q.  Did you know that Betsy Williams was enjoyed
17  from using the name "Van Scoy Diamond Mine" in the
18  bankruptcy court?
19  A.  I knew her name was in the bankruptcy, but
20  that's all.
21  Q.  How did you know her name was in the
22  bankruptcy?
23  A.  I don't know.
24  Q.  Did you know that the store, Van Scoy Diamond

Page 80

1  Mine store on Monday Street in Wilkes-Barre was
2  enjoyed from using the name "Van Scoy Diamond Mine" by
3  the bankruptcy court?
4  A.  I just know that there was a bankruptcy thing.
5  I don't know that anyone was told not to use the name
6  or anything, the details of it.  Only that there was a
7  bankruptcy.  That's it.
8  Q.  Do you recall any discussion at all of anyone
9  approaching your store, your company or you or Kurt
10  with respect to seeking a franchise to franchise
11  Van Scoy Diamond Mine, possibly in Baltimore or
12  something like that?
13  A.  No.
14  Q.  No knowledge of that?
15  A.  No.
16  Q.  Am I correct in saying that you don't know why
17  the domain name was changed from "Van Scoy Diamond
18  Mine.com" to "Van Scoy Diamonds of Delaware.com."  Is
19  that correct?
20  A.  Yes.
21  Q.  Who made that decision?
22  A.  For me not to know?
23  Q.  No.  To make that change in the domain name.
24  A.  I don't know.  I don't know anything about

Page 81

1  that, I have stated before.
2  Q.  If it wasn't you, it would have been Kurt.
3  Right?
4  A.  I guess.
5  Q.  Since there is only two of you that have an
6  ownership interest in your company, is that correct,
7  Van Scoy Diamond Mine of Delaware?
8  A.  Yes.
9  Q.  Do you consider "Van Scoy Diamond Mine" to be
10  the same as "Van Scoy Diamonds" as far as the mark the
11  jewelry store services?
12  A.  It depends.
13  Q.  Depends on what?
14  A.  Who is using it.  If the person is Van Scoy, I
15  guess, yes.
16  Q.  You would consider those two to be the same
17  then if the person was a Van Scoy?
18  A.  I think so, in my opinion.
19  Q.  Is "Van Scoy Diamond Mine" a better or more
20  creative mark than "Van Scoy Diamonds"?
21  A.  I don't know if it's more creative.  I don't
22  know.  But I don't think about it that much.
23  Q.  Do you think your business would be harmed if
24  it was forced to stop using "Van Scoy Diamond Mine"

e1d9445b-06e6-45b4-8108-014bd9814fd0

**Page 82**

1  but was permitted to use "Van Scoy Diamonds"?
2    A.  No.
3    Q.  Are you aware of any customers of your store
4  Van Scoy Diamond Mine that were customers of the
5  previous Van Scoy Diamond Mine previous to 1994?
6    A.  Not that I know of.
7    Q.  Where do the majority of the customers of
8  Van Scoy Diamond Mine of Delaware, Inc. come from?
9        MR. QUINN:  Where did or do?
10   Q.  Do come from.
11   A.  Newark, surrounding areas.
12   Q.  How far does the average person travel to buy a
13  diamond ring or jewelry?
14   A.  I don't know.
15   Q.  Do you think that someone on the Internet that
16  came across the website Van Scoy Diamond Mine.com
17  would think there is a connection between that website
18  and the store in Wilkes-Barre, Pennsylvania, operated
19  by plaintiff?
20       MR. QUINN:  I think that question lacks
21  foundation.  So I object to it.
22   A.  I don't really know.
23   Q.  Are you aware of any complaints against any
24  Van Scoy Diamond Mine store?

**Page 83**

1    A.  From customers?
2    Q.  Yes.
3    A.  Yes.
4    Q.  What are you aware of?
5    A.  There's always going to be some complaints.
6  You can't just run a perfect business.  I don't know
7  of a particular instance.
8    Q.  Do you know anything specific?
9    A.  There was one recent that came to mind about
10  someone purchased a diamond and they went to trade it
11  in and they said it wasn't the diamond that it was
12  supposedly purchased.  I do have a letter from that
13  person.
14   Q.  Where was that diamond purchased from?
15   A.  I don't recall which store, but Wayne
16  Van Scoy's name is at the bottom of the appraisal.
17   Q.  Is that the Delaware store?
18   A.  I don't recall which store it was purchased in.
19  It was before my time.
20   Q.  That was purchased back prior to 1994?
21   A.  Yes.
22   Q.  But you don't know that the diamond that was
23  brought in is the same diamond that was sold to that
24  person either.  Do you?

**Page 84**

1    A.  No.  All I saw was the letter.
2    Q.  What's your relationship with Tommy Van Scoy,
3  Jr.?
4    A.  My brother-in-law.
5    Q.  What is your relationship with your
6  brother-in-law?
7    A.  Very good.  Close.
8    Q.  How often do you speak to him?
9    A.  A couple times a week.
10   Q.  What do you speak about?
11   A.  Kids.
12   Q.  Kids?
13   A.  Children.  He has a son the same age as my son.
14  Just personal.
15   Q.  Do you ever talk about the litigation?
16   A.  No.
17   Q.  What's your relationship with Tony Van Scoy?
18   A.  Close.
19   Q.  How often do you speak to him?
20   A.  Not as often.  Maybe once a month.
21   Q.  Have you spoken to him at all about the
22  litigation?
23   A.  No.
24   Q.  When was the last time Kurt spoke to Tommy

**Page 85**

1  Van Scoy, Jr.?
2    A.  Yesterday.
3    Q.  Do you know what the substance of that
4  discussion was?
5    A.  Fish.
6    Q.  Anything about the litigation?
7    A.  No.
8    Q.  What's your relationship with Rick Sendrick?
9    A.  We don't have one.
10   Q.  Do you have any relationship with his wife,
11  Pam?
12   A.  Not really.
13   Q.  What's your relationship with Ken Van Scoy?
14   A.  We don't really have one.
15   Q.  When was the last time you saw Ken?
16   A.  At the funeral, Mr.'s funeral.
17   Q.  What's your relationship with Wayne Van Scoy's?
18   A.  Don't have one.
19   Q.  My understanding is that at one time in the ten
20  years since you've had the store you made some
21  improvements to the store.  Is that correct?
22   A.  Yes.
23   Q.  And what were those improvements?
24   A.  New carpeting, wallpaper.

Page 86

1  Q. Did you extend the showroom, too?
2  A. Yes.
3  Q. By how much?
4  A. Four feet, five feet.
5  Q. When did that take place?
6  A. I am not sure of the exact date.
7  Q. What's your best estimate of the date?
8  A. Either '99 or 2000.
9  Q. How much did it cost?
10  A. I don't recall.
11  Q. Do you have some estimate?
12  A. A couple thousand.
13      MR. MICHAEL F. PETOCK:  I would like to
14  take a five-minute break.
15      THE VIDEOGRAPHER:  Going off the record at
16  12:31 p.m.
17          -- -- -- --
18      THE VIDEOGRAPHER:  Going back on the
19  record at 12:37 p.m.
20      MR. MICHAEL F. PETOCK:  We would -- we're
21  going to retain the originals of the exhibits and make
22  copies for the court reporter.  Is that acceptable?
23      MR. QUINN:  You are going to retain the
24  original?

Page 87

1      MR. MICHAEL F. PETOCK:  Yes.
2      MR. QUINN:  That's fine.  We have a set.
3  Are you finished?
4      MR. MICHAEL F. PETOCK:  We have no
5  further questions.
6      THE WITNESS:  Okay.
7      THE VIDEOGRAPHER:  Going off the record at
8  12:38 p.m.
9          -- -- -- --
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 88

1          I N D E X
WITNESS: DONNA VAN SCOY          PAGE
2
3  Examination by Mr. Petock          3
4    PLAINTIFF'S DEPOSITION EXHIBITS
   NO.          MARKED
5
   17  Lease agreement          16
6
   18  1/10/05 Minutes of annual meeting     18
7      of shareholders and directors
8  19  1/10/04 Minutes of annual meeting     19
      of shareholders and directors
9
   20  1/10/03 Minutes of annual meeting     20
10     of shareholders and directors
11  21  1/10/02 Minutes of annual meeting     22
      of shareholders and directors
12
   22  1/10/01 Minutes of annual meeting     23
13     of shareholders and directors
14  23  1/10/00 Minutes of annual meeting     23
      of shareholders and directors
15
   24  1/10/99 Minutes of annual meeting     26
16     of shareholders and directors
17  25  1/10/98 Minutes of annual meeting     27
      of shareholders and directors
18
   26  Receipt, stamped D1243          42
19
   27  Receipt, stamped D1239          44
20
   28  Series of receipts, stamped D1233     47
21     1243, 1268, 1269, D1390, D1391,
      D1438, D1509, D1513, D1539, D1540,
22     D1588, D1633, D1638, D1644, D1657,
      D1684, D1698, D1729, D1738, D1751,
23     D1762, D1767, D1775, D1791, D1799,
      D1296, D1340, D1370, D1374, D0987,
24     D1013, D1016, D1067, D1080, D1083,

Page 89

1     PLAINTIFF'S DEPOSITION EXHIBITS
2   NO.          MARKED
3  29  Series of receipts, stamped D0979,     50
      D1092, D1395, D1404, D1416, D1449,
4     D1455, D1464, D1479, D1488, D1532,
      D1541, D1548, D1573, D1579, D1607,
5     D1639, D1650, D1652, D1662, D1683,
      D1737, D1295, D1299, D1335, D1362,
6     D1377, D1380
7  30  Cease and desist letter          52
8  31  Van Scoy Diamond Mine Registration     61
      and Certificate, stamped D0750
9
   32  Letter, dated 2/22/05, to C. Quinn     63
10     from M. F. Petock
11  33  Form 1120S U. S. Income Tax Returns,     65
      dated 1994 through 2004
12
13
14
15
16
17
18
19
20
21
22
23
24

e1d9445b-06e6-45b4-8108-014bd9814fd0

Page 90

```
 1
 2
 3        REPLACE THIS PAGE
 4        WITH THE ERRATA SHEET
 5        AFTER IT HAS BEEN
 6        COMPLETED AND SIGNED
 7        BY THE DEPONENT.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 91

```
 1   State of Delaware  )
                        )
 2   New Castle County  )
 3
 4           CERTIFICATE OF REPORTER
 5
          I, Lucinda M. Reeder, Registered Diplomate
 6   Reporter and Notary Public, do hereby certify that
     there came before me on the 19th day of September
 7   2005, the witness herein, DONNA VAN SCOY, who was duly
     sworn by me and thereafter examined by counsel for the
 8   respective parties; that the questions asked of said
     witness and the answers given were taken down by me in
 9   Stenotype notes and thereafter transcribed by use of
     computer-aided transcription and computer printer
10   under my direction.
11          I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.
13          I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.
15
16
17           Lucinda M. Reeder, RDR, CRR
             Certification No. 132-RPR
18           (Expires January 31, 2008)
19
20
     DATED:   9-26-05
21
22
23
24
```