# EXHIBIT P



**WILCOX & FETZER LTD.**

In the Matter Of:

# Van Scoy

## v.

# Van Scoy Diamond Mine of Delaware, Inc.

## C.A. # 05-108 (KAJ)

---

Transcript of:

## Lori B. McMichael

## September 19, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

EXHIBIT P

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WAYNE VAN SCOY,                    )
                                  )
              Plaintiff,          )
                                  )   Civil Action
v.                                )   No. 05-108 (KAJ)
                                  )
VAN SCOY DIAMOND MINE OF          )
DELAWARE, INC., KURT VAN SCOY)
AND DONNA VAN SCOY,               )
                                  )
              Defendants.         )

    Deposition of LORI B. McMICHAEL taken pursuant to
notice at the law offices of Ashby & Geddes, 17th
floor, 222 Delaware Avenue, Wilmington, Delaware,
beginning at 1:40 p.m. on September 19, 2005, before
Lucinda M. Reeder, Registered Diplomate Reporter and
Notary Public.

APPEARANCES:

        MICHAEL F. PETOCK, ESQ.
        MICHAEL C. PETOCK, ESQ.
        PETOCK & PETOCK, LLC
          222 Delaware Avenue, 17th Floor
          Wilmington, Delaware  19801
          for the Plaintiff,

        CHARLES N. QUINN  ESQ.
        FOX ROTHSCHILD LLP
          2000 Market Street - Tenth Floor
          Philadelphia, PA  19103-3291
          for the Defendants.

ALSO PRESENT:

  WAYNE VAN SCOY
  KURT VAN SCOY
- - - - - - - - - - - - - - - - - - - - - - - - - --
          WILCOX & FETZER, LTD.
    1330 King Street - Wilmington, Delaware  19801
          (302) 655-0477

Page 2

1      LORI BETH McMICHAEL,
2   the witness herein, having first been
3   duly sworn on oath, was examined and
4   testified as follows:
5   BY MR. MICHAEL C. PETOCK:
6   Q.  Hi, Lori.
7   A.  Hello.
8   Q.  My name is Michael Petock. I'm an attorney for
9   plaintiff Wayne Van Scoy. Thank you for coming today.
10  This is Wayne over here. This is my Dad over here,
11  Michael F. Petock.
12      I am going to ask you some questions today
13  to find out if you know any information that might be
14  relevant to the case we're involved in. Okay? If you
15  don't understand any of the questions that I ask you,
16  just let me know, and I'll rephrase them. If you
17  don't hear a question, just let me know, and I'll
18  repeat it for you. Okay? Do you have any questions?
19  A.  No.
20  Q.  You're employed by Van Scoy Diamond Mine of
21  Delaware, Inc. Is that correct?
22  A.  Yes.
23  Q.  How long have you been employed by that
24  corporation?

Page 3

1   A.  Over eight years.
2   Q.  So you began working in approximately when?
3   A.  '97.
4   Q.  '97. Okay. How did you get that job?
5   A.  A sign on the door "Help Wanted." My mother
6   was a customer.
7   Q.  Okay. What is your position with that company?
8   A.  Retail management, sales.
9   Q.  Are you a manager?
10  A.  Per se, yes.
11  Q.  Supervisor?
12  A.  Yes.
13  Q.  Are you the most senior salesperson?
14  A.  Yes.
15  Q.  Could you name the other employees at Van Scoy
16  Diamond Mine of Delaware, Incorporated?
17  A.  Yes. Annette D'Angelo; Sam Shoemaker, Karen
18  Vayo, and Megan Rump.
19  Q.  Who is your boss?
20  A.  Kurt and Donna Van Scoy.
21  Q.  How often does Kurt work?
22  A.  I don't know.
23  Q.  Is he there every day that the store is opened,
24  approximately?

Page 4

1   A.  For the most part.
2   Q.  What about Donna, how often does she work?
3   A.  I'd say about the same.
4   Q.  So she's pretty much there except for -- would
5   you say she's there every day that the store is open,
6   pretty much?
7   A.  Not every day. It depends.
8   Q.  Approximately how often?
9   A.  At least five out of the six days we're open.
10  Q.  What are your job duties and responsibilities?
11  A.  Oversee the sales floor as well as the other
12  employees' daily tasks, anything. We all are pretty
13  much the same. It's just that I can instruct anybody
14  that doesn't know how to do something, only because I
15  have been there for a long time.
16  Q.  What about Kurt, what are his job duties?
17  A.  He's the same as well, that his jobs include
18  doing benchwork, advertising?
19  Q.  What about Donna?
20  A.  Donna would be secretary of the corporation.
21  Q.  Does she make sales?
22  A.  Yes.
23  Q.  Is she a salesperson?
24  A.  She's the same, equal, just like the rest of

Page 5

1   us, but she would do secretarial.
2   Q.  Does she make approximately as many sales as
3   you do?
4   A.  It depends.
5   Q.  Does she sell throughout the year?
6   A.  Yes.
7   Q.  Is there any period she doesn't sell?
8   A.  No. Not unless she's sick.
9   Q.  Do you open the mail?
10  A.  Yes.
11  Q.  Do you check the e-mail?
12  A.  Yes.
13  Q.  How often do you check the e-mail?
14  A.  Now? No, I don't.
15  Q.  You don't check the e-mail anymore?
16  A.  No.
17  Q.  Why not?
18  A.  It hasn't been getting any.
19  Q.  What type of e-mails come in?
20  A.  Customers.
21  Q.  And what do the e-mails from customers say?
22  A.  Specifically, I don't recall, but anything from
23  where are you located to how many -- information,
24  pricing of merchandise.

Page 6

1   Q.  Do they make inquiries about products through
2   e-mail?
3   A.  Sure.
4   Q.  And where do they -- do you have any
5   understanding as to where they have come to see these
6   products in which they're making inquiries to?
7   A.  I don't understand.
8   Q.  Okay.  I'll rephrase.  Do you know if any of
9   these e-mails ever make inquiries as to the products
10  that are shown on the website Van Scoy Diamond
11  Mine.com or Van Scoy Diamonds of Delaware.com?
12  A.  Yes.
13  Q.  They do?  Okay.  Do you save your e-mails?
14  A.  Yes.
15  Q.  Do you print them?
16  A.  A few.
17  Q.  Just a few?
18  A.  Ones that people e-mail me and thank us for our
19  service.  And I print them and show the staff.
20  Q.  Do you answer the phone?
21  A.  Yes.
22  Q.  How do you answer the phone?  What do you say?
23  A.  "Good morning, afternoon, evening, Van Scoy's."
24  Q.  Is the mark "Van Scoy Diamond Mine" used in the

Page 7

1   store?
2   A.  Yes.
3   Q.  Could you tell me where it's used in the store,
4   please?
5   A.  The sign, our business cards, receipts,
6   paperwork, warranties, appraisals, boxes.
7   Q.  Anywhere else?
8   A.  That I am -- use with, that's all I would --
9   Q.  Okay.  Thank you.
10  A.  That's all I use.
11  Q.  What do you know about Wayne Van Scoy?
12  A.  I know he's a brother of Kurt Van Scoy.
13  Q.  Do you know anything else?
14  A.  And he has worked in the same industry, Van
15  Scoy, for probably as long as Kurt has.  And that's
16  about it.
17  Q.  Have you ever met him before today?
18  A.  Yes, I have.
19  Q.  Where have you met him?
20  A.  At Van Scoy, in Delaware.
21  Q.  Do you know when -- at your store?
22  A.  Yes.
23  Q.  Do you know when that was?
24  A.  Approximately '98 or '99.  Within that time

Page 8

1   frame.  I was still in school.
2   Q.  Do you know what the purpose of Wayne's visit
3   was at that time?
4   A.  No, I don't.
5   Q.  Do you remember anything more about the visit?
6   A.  No.  All I know is he was the only brother I
7   hadn't met, and it was a shake, "this is Wayne."
8   That's it.
9   Q.  How long was he in the store?
10  A.  I don't know total.
11  Q.  Was it a few hours, a few minutes?
12  A.  I don't know.
13  Q.  Okay.  Have you ever seen or talked to Wayne
14  Van Scoy since that visit you characterized as '98,
15  '99, I think?
16  A.  No.
17  Q.  To your knowledge, has the store or the
18  business had any contact with Wayne Van Scoy since
19  that visit in '97 or '98?
20  A.  Yes.
21  Q.  What kind of contact do you have knowledge of?
22  A.  Family, the brothers.
23  Q.  So you think that Kurt has -- could you
24  elaborate on what you mean by "family"?

Page 9

1   A.  Kurt goes home regularly to see his family,
2   parents -- well, parent.  Holidays, funerals,
3   unfortunately.
4   Q.  Are you familiar with the former website that
5   was called -- that was hosted with the domain name
6   www.Van Scoy Diamond Mine.com?
7   A.  Yes.
8   Q.  Are you also familiar with the present website
9   that has a domain name of www.Van Scoy Diamonds of
10  Delaware.com?
11  A.  Yes.
12  Q.  Could you tell me what you know about those
13  websites?
14  A.  One was a website we had used before, and this
15  is one that is used now.
16  Q.  Do you know: Were you working at the store
17  when the original website www.Van Scoy Diamond
18  Mine.com was first published to the Internet?
19  A.  Yes.
20  Q.  Do you remember when it was first published to
21  the Internet?
22  A.  No.
23  Q.  Do you have an approximate year as to when it
24  was?

2c16248d-4c10-4460-bc6d-62036ea2dd70

Page 10

1    A.  I couldn't even -- it could be anywhere from
2    2000 to 2004 because I wasn't active on it.
3    Q.  Do you remember any discussions as to between
4    you and Kurt or between you and anyone else or between
5    anyone in the store as to getting the website Van Scoy
6    Diamond Mine.com?
7    A.  No.
8    Q.  How are the websites used in the business or
9    have they been?
10   A.  Like a catalog.
11   Q.  What do you mean?
12   A.  Customers that just want to get visual ideas
13   that may -- that's really -- and locations.  Anything.
14   Q.  So you would characterize the website like a
15   catalog?
16   A.  Yes.
17   Q.  Like similar to a catalog that sells products,
18   like a J. Crew catalog or a GAP catalog?
19   A.  No.  I think ours is more an informative
20   catalog, an idea catalog, with options.
21   Q.  There are pictures of the products on the
22   website, is that correct, that you sell?
23   A.  Yes.
24   Q.  Do you know who took those pictures?

Page 11

1    A.  No.
2    Q.  Do you know when the last time pictures were
3    taken of the products in your store?
4    A.  No.
5    Q.  Have you ever known pictures to be taken of
6    products?
7    A.  In our store?
8    Q.  Yes.
9    A.  No.
10   Q.  Have you ever told a customer to go to the
11   website?
12   A.  Yes.
13   Q.  And what is the purpose of telling a customer
14   to go to the website?
15   A.  Get ideas, different mountings, options they
16   have they can't visually imagine.
17   Q.  Do you know why there was a switch from the
18   former website domain name www.Van Scoy Diamond
19   Mine.com to the present website domain www.Van Scoy
20   Diamonds of Delaware.com?
21   A.  No.
22   Q.  Do you know when that change took place?
23   A.  No.
24   Q.  Do you know who made the change?

Page 12

1    A.  No.
2         (Plaintiff's Exhibit No. 34 was marked for
3    identification.)
4    BY MR. MICHAEL C. PETOCK:
5    Q.  I am going to show you what we're going to mark
6    as Plaintiff's Exhibit 34.  Do you recognize what's
7    been marked as Plaintiff's Exhibit 34?
8    A.  Yes.
9    Q.  What is it?
10   A.  Receipt, a copy of a receipt.
11   Q.  And does it indicate who made the sale that is
12   the subject of this receipt?
13   A.  It's not a sale.  It's a payment.
14   Q.  Does it indicate who received the payment?
15   A.  Yes.
16   Q.  Who would that be?
17   A.  Me.
18   Q.  It says "Lori."  That's how you indicate --
19   A.  Yes.
20   Q.  Do you agree that the website "www.Van Scoy
21   Diamond Mine.com" is crossed out?
22   A.  Yes.
23   Q.  Do you know who crossed it out?
24   A.  No.

Page 13

1    Q.  Did you cross it out?
2    A.  No.
3    Q.  Are there other sales receipts that you know of
4    in which the website was crossed out?
5    A.  This is actually the first time I've seen the
6    website crossed out.
7    Q.  Do you think it was crossed out after you
8    made -- received this payment or before?
9    A.  I don't know.
10   Q.  The date on the receipt is 3/18/2005.  Is that
11   correct?
12   A.  Yes.
13   Q.  What website is listed on the sales receipts
14   that you are using now, presently?
15   A.  I don't know.
16   Q.  Is it the same sales receipt as this, as far as
17   you know?
18        MR. QUINN:  Objection.  She just said she
19   doesn't know what website is being used.
20        MR. MICHAEL C. PETOCK:  Okay.
21        MR. QUINN:  The question has been asked
22   and answered.
23        MR. MICHAEL C. PETOCK:  It's a little
24   different, I think.

Page 14

1     MR. QUINN:  Not different enough in my
2  book.
3     MR. MICHAEL C. PETOCK:  Okay.  Could you
4  read back the question, please?
5     (The reporter read as requested.)
6  BY MR. MICHAEL F. PETOCK:
7   Q.  Could you answer the question, please?
8   A.  Is this the same sales receipt?
9   Q.  Are you presently using this sales receipt?
10  A.  I don't know.
11     MR. MICHAEL C. PETOCK:  Charlie, we'll ask
12  that you produce any other sales receipts with the
13  domain name crossed out, please.  And also a sample of
14  the sales receipt that you are currently using,
15  please.
16  BY MR. MICHAEL C. PETOCK:
17   Q.  Lori, were you aware that a letter was received
18  by Van Scoy Diamond Mine, Incorporated, Van Scoy
19  Diamond Mine of Delaware, Incorporated in
20  approximately November of this year from my law
21  firm -- November of 2004, demanding that Kurt and
22  Donna Van Scoy end -- their corporation cease using
23  the name "Van Scoy Diamond Mine"?
24  A.  No.

Page 15

1   Q.  When did you first become aware of any issues
2  regarding the use of the name "Van Scoy Diamond Mine"
3  by the defendants in this case?
4   A.  Exact dates?
5   Q.  No, not exact dates.  Approximate dates.
6   A.  I honestly couldn't tell you.  I know it's been
7  going on for months.  That's about as best I can --
8   Q.  Would you say it was approximately in November?
9   A.  I really don't remember.
10     (Plaintiff's Deposition Exhibit No. 35 was
11  marked for identification.)
12  BY MR. MICHAEL F. PETOCK:
13   Q.  Is there familiar to you, which has been marked
14  as Plaintiff's Exhibit 35?
15  A.  No.
16   Q.  Could you look at the last page, please?  Could
17  you tell me who this was received by, according to
18  the --
19  A.  This?
20   Q.  Yes.
21  A.  Annette D'Angelo.
22   Q.  Is she is somebody that you work with?
23  A.  Yes.
24   Q.  Did you ever talk to Annette or did Annette

Page 16

1  ever tell you about receiving this letter?
2   A.  No.
3   Q.  Or any type of letter?
4   A.  No.
5   Q.  Who told you about this litigation originally?
6   A.  Probably everybody, like the store in general.
7  It was made common knowledge in the store.
8   Q.  What was said about it?
9   A.  That we were being sued by Wayne Van Scoy,
10  something to do with our name.
11   Q.  Anything else said about it?
12  A.  That's what it came down to when I first found
13  out.
14   Q.  Did you ever discuss the litigation with Kurt?
15  A.  I don't understand.
16   Q.  Have you ever discussed the fact that Kurt was
17  being sued with Kurt?
18  A.  With Kurt?
19   Q.  Have you ever discussed with Kurt Van Scoy
20  that -- have you had any discussions pertaining to
21  this litigation with Kurt Van Scoy?
22  A.  Yes.
23   Q.  What have you spoken about?
24  A.  Just the fact that he is being sued.

Page 17

1   Q.  Anything more specific than that?
2   A.  I can't be specific, no.  It's his business.
3   Q.  Has he told you the reason he's being sued?
4   A.  From what I gather, it's because of the website
5  and a name and whose name it actually is.
6   Q.  Did he tell you specifically what it is about
7  the website that could be a basis for a lawsuit
8  against him?
9   A.  "Van Scoy Diamond Mine."
10  Q.  Any other reason?
11  A.  That's it.
12  Q.  Are you familiar with the fact that for several
13  months the word "Mine" was blocked out of the sales
14  receipts used by "Van Scoy Diamond Mine of Delaware,
15  Inc."?
16  A.  Familiar with, yes.
17  Q.  What do you know about the fact that the word
18  "Mine" was blocked out of the sales receipts?
19  A.  That they were blocked off the sales receipts.
20  Q.  Do you know who blocked out the word "Mine"
21  from the sales receipts?
22  A.  No.
23  Q.  Do you know who made the decision?
24  A.  No.

Page 18

1  Q.  To block out the word "Mine"? Do you know what
2  the purpose of blocking out the word "Mine" was?
3  A.  No.
4  Q.  Did you ever personally block out the word
5  "Mine" from a sales receipt?
6  A.  No.
7  Q.  Did you ever ask Kurt why you were using -- you
8  were using -- you used sales receipts with the word
9  "Mine" blocked out.  Is that correct?
10  A.  Yes.
11  Q.  Did you ever ask Kurt why you were using sales
12  receipts with that word blocked out?
13  A.  No.
14  Q.  Did you ever ask Donna?
15  A.  No.
16  Q.  Did Kurt ever say anything to you with respect
17  to the fact that "Mine" was being blocked out from the
18  sales receipts?
19  A.  No.
20  Q.  Did Donna ever say anything to you with respect
21  to that matter?
22  A.  No.
23  Q.  Did you ever have any discussions with anyone
24  concerning the fact that the word "Mine" was being

Page 19

1  blocked out from the sales receipts?
2  A.  No.
3  Q.  At some point, the word "Mine" was no longer
4  blocked out from the sales receipts.  Is that correct?
5  A.  Sure.  Yes.
6  Q.  Is the word "Mine" blocked out presently from
7  the sales receipts that you are using?
8  A.  No.
9  Q.  Do you know:  Was there any discussion as to --
10  did anyone tell you to no longer use sales receipts
11  with the word "Mine" blocked out?
12  A.  No.
13  Q.  Did a customer ever ask you why the word "Mine"
14  was blocked out from the sales receipts?
15  A.  No.
16  Q.  Who does the advertising for the corporation?
17  A.  Kurt Van Scoy.
18  Q.  Does Donna do any advertising for the
19  corporation?
20  A.  No.
21  Q.  Are you familiar with a policy of the store
22  regarding cleaning and/or inspection for damaged
23  prongs of jewelry that may have been bought from other
24  Van Scoy Diamond Mine stores?

Page 20

1  MR. QUINN:  Objection to the extent I
2  don't think there is a foundation for the fact that
3  there is a policy.  Otherwise --
4  Q.  Are you familiar with any policy regarding
5  cleaning jewelry that has been bought from other
6  Van Scoy Diamond Mine stores?
7  A.  No.
8  Q.  If a customer brought in a piece of jewelry and
9  told you it was bought from another Van Scoy Diamond
10  Mine store, how much would you charge them if they
11  wanted a cleaning?  Do you have any idea?
12  A.  Usually, none.
13  Q.  But there is no policy that you are aware of
14  regarding --
15  A.  We are told to clean Van Scoy Diamond Mine
16  merchandise.
17  Q.  For free?
18  A.  Yes.
19  Q.  Was there an incident where a customer came to
20  your store and requested a cleaning of a piece of
21  jewelry that they bought from Wayne Van Scoy's store?
22  A.  I don't know.  Not that I know of.
23  Q.  You don't know of any customer of Wayne coming
24  to your store asking for a cleaning?

Page 21

1  A.  No.
2  Q.  Have you ever met any -- you testified that you
3  met all of Kurt's brothers and sisters?
4  A.  No.  I met all of his brothers.
5  Q.  All of his brothers.  Okay.  When did you meet
6  Tony?
7  A.  Probably sooner -- the first time?
8  Q.  Sure.  Yes.
9  A.  '97, '98.
10  Q.  How often do you see him?
11  A.  Maybe once a year, twice a year.
12  Q.  Do you know what Tony does now?
13  A.  Jeweler.
14  Q.  Do you know where?
15  A.  No.
16  Q.  What about Ken Van Scoy?  Do you know Ken
17  Van Scoy?
18  A.  Yes.
19  Q.  When did you first meet Ken Van Scoy?
20  A.  Definitely, '97.
21  Q.  Why did you meet him in '97 or under what
22  circumstances did you meet him in 1997?
23  A.  Close relationship with Kurt.  He visited.
24  Q.  Did he ever work for Kurt?

Page 22

1   A.  Yes.
2   Q.  When was that?
3   A.  Sporadically helping when Kurt would be away or
4   just wanted to help out.
5   Q.  When was the last time he worked for Kurt?
6   A.  I don't remember.
7   Q.  Has he worked for Kurt in the last year?
8   A.  I would say, no.
9   Q.  Do you know if he's worked for Kurt in the last
10  two years?
11  A.  I don't know.
12  Q.  Have you ever met Tommy Van Scoy, Jr.?
13  A.  Yes.
14  Q.  When was the first time you met Tommy Van Scoy,
15  Jr.?
16  A.  Probably '98, '99.
17  Q.  Do you know what Tommy Van Scoy, Jr. is doing
18  now?
19  A.  He's also a jeweler.
20  Q.  Do you know where?
21  A.  No.
22  Q.  Do you know what the name of his store is?
23  A.  I think it's Tovon.
24  Q.  Do you ever -- do you or the business ever send

Page 23

1   Tovon or Tommy anything through the mail?
2   A.  Not that I specific -- specifically what's in a
3   package?  No, I don't know.
4   Q.  Do you ever send packages?
5   A.  Yeah.
6   Q.  Who directs you to send packages to Tommy?
7   A.  Kurt or Donna Van Scoy.
8   Q.  Do you know if you are sending him jewelry?
9   A.  I don't know.
10  Q.  Has Tommy Van Scoy, Jr. ever been to the store
11  in Delaware?
12  A.  Yes.
13  Q.  When was the last time he was there?
14  A.  Within the year.
15  Q.  Do you know what the purpose of his visit was?
16  A.  No.
17  Q.  Is there any type of business relationship
18  between Van Scoy Diamond Mine of Delaware and Tommy
19  that you are aware of?
20  A.  No.
21  Q.  Do you know anything about the history of
22  Van Scoy Diamond Mine?
23  A.  Some.
24       MR. QUINN:  Objection.  It's not clear to

Page 24

1   me as to whether you are referring to the store, the
2   mark, the stores that the father owned, what.
3   Q.  Talking about Tommy Van Scoy, Sr.'s operation
4   of the business.
5   A.  No.
6   Q.  Do you know anything about other Van Scoy
7   Diamond Mines?  Do you know anything about the
8   existence of other Van Scoy Diamond Mines, either --
9   well, ever?
10  A.  Yes.
11  Q.  What do you know about that?
12  A.  Not much, just that they existed.
13  Q.  How do you know about their existence?
14  A.  Through Kurt saying.  That's it.
15  Q.  Have you ever heard the name Mark Maurer?
16  A.  Yes.
17  Q.  How have you heard about that name?
18  A.  Conversations since this lawsuit.
19  Q.  What has been said about Mark Maurer?
20  A.  I don't recall the exact.  All I know is his
21  name.
22  Q.  Who has spoken his name?
23  A.  It could have been Kurt or Donna.
24  Q.  Has he ever called the store?

Page 25

1   A.  Not that I know of.
2   Q.  Has he ever been to the store?
3   A.  I don't know.
4       (Recess taken.)
5   BY MR. MICHAEL C. PETOCK:
6   Q.  We were talking about the fact that you have
7   heard the name Mark Maurer.  In what context did you
8   hear his name?
9   A.  I don't understand.
10  Q.  Was it in a conversation with someone?
11  A.  Yes.
12  Q.  And was it a casual conversation or was it --
13  was it a casual conversation with someone?
14  A.  Probably.  It wasn't directed to me.
15  Q.  Who was the conversation with?
16  A.  I don't know.
17  Q.  Was it with one of your -- would your other
18  coworkers also have heard the name Mark Maurer?
19  A.  I don't know.
20  Q.  Have you noticed Kurt doing anything
21  differently around the store since he received notice
22  of this litigation?
23  A.  Not that I know of, no.
24  Q.  Has Donna began doing anything differently?

Page 26

1    A.  I don't know.  Not that I know of.
2    Q.  Has Kurt or Donna expressed any belief to you
3  as to whether or not they would win the lawsuit?
4    A.  No.
5    Q.  What did you do to prepare for this deposition?
6    A.  Spoke with Charlie.
7    Q.  When did you first speak with Charlie?
8    A.  Specifically, I don't know.  It was a phone
9  conversation.  Maybe a month ago, two months ago.
10   Q.  And since that phone conversation two months
11 ago, have you spoken to him again?
12   A.  Yes.
13   Q.  When was the most recent time?
14   A.  Last Friday.  This past Friday.
15   Q.  Did you ever read any portion of the deposition
16 transcript of Kurt Van Scoy?
17   A.  Yes.
18   Q.  Did you read the entire transcript?
19   A.  Not the entire.
20   Q.  Which portion did you read?
21   A.  I don't know the exact.
22   Q.  Do you remember which subject matter it
23 pertained to?
24   A.  Specifically, no.

Page 27

1    Q.  Did you read a portion of the deposition
2  transcript pertaining to the blocking out of the word
3  "Mine"?
4    A.  Yes.
5    Q.  Did Kurt direct you to which portions of the
6  deposition transcript he wanted you to review?
7    A.  No.
8    Q.  Did Charlie direct you to that?
9    A.  No.
10   Q.  How did you decide which portions of the
11 deposition transcript to read?
12   A.  I didn't because half of it was the same
13 question, so I just glanced and when you see your own
14 name pop up, so.
15   Q.  Who told you to read the deposition transcript
16 of Kurt?
17       MR. QUINN:  Objection.  There hasn't been
18 any foundation for anybody telling her to read it.
19   Q.  Did somebody tell you to read the deposition
20 transcript of Kurt Van Scoy?
21   A.  No.
22   Q.  How did you obtain a copy of the deposition
23 transcript of Kurt Van Scoy?
24   A.  It was at the store.

Page 28

1    Q.  Where was it at the store?
2    A.  It's been all over the place at the store.
3    Q.  Are there more than one copies of it at the
4  store?
5    A.  I don't know.
6    Q.  Where did you read it?
7    A.  At the store.
8    Q.  Has everyone at the store read it?
9    A.  I don't know.
10   Q.  Are you aware of anyone else having read it at
11 the store?
12   A.  I know I have seen people look at it.
13   Q.  Do you know if anyone has ever given Kurt
14 Van Scoy permission to use the mark "Van Scoy Diamond
15 Mine"?
16   A.  What I have been told, yes.
17   Q.  What have you been told?
18   A.  I have been told that his father gave Kurt the
19 name "Van Scoy Diamond Mine" with regards to the very
20 first day he opened his doors as well as his father
21 gave to his other siblings.
22   Q.  Who told you this?
23   A.  I have heard it from Kurt.
24   Q.  Who else have you heard it from, anyone else?

Page 29

1    A.  A pretty known fact because I have seen pretty
2  much all of his family members, except for one, in the
3  store, so.
4    Q.  Have you talked to the other family members
5  about Kurt's use of the mark "Van Scoy Diamond Mine"?
6    A.  No.
7    Q.  Have you talked to any of the other family
8  members with respect to this litigation?
9    A.  No.
10       MR. MICHAEL F. PETOCK:  I have nothing
11 further.
12       MR. QUINN:  No cross at this time.
13       MR. MICHAEL F. PETOCK:  The same
14 stipulation is that we'll retain the original
15 exhibits.
16       (Deposition concluded at 2:28 p.m.)
17       -- -- -- --
18
19
20
21
22
23
24

Page 30

```
1                I N D E X
2   WITNESS:  LORI B. McMICHAEL           PAGE
3    Examination by Mr. Michael C. Petock     2
4        PLAINTIFF'S DEPOSITION EXHIBITS
5   NO.                        MARKED
6   34   Receipt, stamped D0908          12
7   35   Cease and desist letter         15
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 32

```
1   State of Delaware   )
                        )
2   New Castle County  )
3
4        CERTIFICATE OF REPORTER
5
        I, Lucinda M. Reeder, Registered Diplomate
6   Reporter and Notary Public, do hereby certify that
    there came before me on the 19th day of September
7   2005, the witness herein, LORI B. McMICHAEL  who was
    duly sworn by me and thereafter examined by counsel
8   for the respective parties; that the questions asked
    of said witness and the answers given were taken down
9   by me in Stenotype notes and thereafter transcribed by
    use of computer-aided transcription and computer
10  printer under my direction.
11       I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
12  examination of said witness.
13       I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15
16
17            Lucinda M. Reeder, RDR, CRR
              Certification No. 132-RPR
18            (Expires January 31, 2008)
19
20  DATED:     9-27-05
21
22
23
24
```

Page 31

```
1
2
3       REPLACE THIS PAGE
4       WITH THE ERRATA SHEET
5       AFTER IT HAS BEEN
6       COMPLETED AND SIGNED
7       BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

# EXHIBIT Q

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WAYNE VAN SCOY,

       Plaintiff

-vs-

VAN SCOY DIAMOND MIND    # 05-108
OF DELAWARE, INC., ET AL,

       Defendants

Valley Forge, Pennsylvania

October 5, 2005

Pretrial examination of LEW HILL,
taken on behalf of the Plaintiff at the
offices of PETOCK & PETOCK, 46 The
Commons at Valley Forge, Valley Forge,
Pennsylvania, on the above date, commencing
at 1:30 p.m., before Julie Zatuchni,
Registered Professional Reporter.

JULIE ZATUCHNI, RPR
202 Fairfax Court
Wayne, Pennsylvania 19087

---

**Page 2**

APPEARANCES:

PETOCK & PETOCK
BY: MICHAEL C. PETOCK and MICHAEL F.
    PETOCK, ESQUIRES
46 The Commons at Valley Forge
Valley Forge, Pennsylvania 19482

    Counsel for Plaintiff

FOX ROTHSCHILD
BY: CHARLES W. QUINN, ESQUIRE
2000 Market Street, 10th Floor
Philadelphia, Pennsylvania 19103

    Counsel for Mr. Hill

ALSO PRESENT:   KURT VAN SCOY
                WAYNE VAN SCOY

---

**Page 3**

I N D E X

WITNESS               EXAMINATION

LEW HILL

By MR. PETOCK         4, 75
By MR. QUINN          64

PLAINTIFF
EXHIBITS             MARKED

#40     Subpoena        6
#41     Agreement       8

---

**Page 4**

2     (It is stipulated and agreed by and
3 between counsel for the respective parties
4 that the reading, signing, sealing,
5 certification and filing of the within
6 deposition be waived; and that all
7 objections, except as to the form of the
8 question, be reserved until the time of
9 trial.)

10       ----

11         LEW HILL,
12 was called as a witness and after having
13 been first sworn, according to law, was
14 examined and testified as follows:
15         EXAMINATION
16 BY MR. PETOCK:
17 Q.    Good morning, Mr. Hill or good
18 afternoon, actually. My client is William
19 Van Scoy. William Van Scoy is the son of
20 Tommy Van Scoy, Senior, who I think you
21 knew. Wayne is a distributor for the mark
22 Van Scoy Diamond Mine.
23       Presently Wayne is involved in
24 litigation against a business in Delaware

---

EXHIBIT Q

**Page 5**

1
2 and its owners respecting the Van Scoy
3 Diamond Mine. The reason that we brought
4 you here today was to find out what
5 information you might know that might be
6 relevant to the present lawsuit, okay.
7 That being said, I'm going to ask you some
8 questions to find out what you might know,
9 okay?
10 A.    Okay.
11 Q.    You understand that you've taken
12 an oath to tell the truth today?
13 A.    I do.
14      MICHAEL F. PETOCK: Before we
15 begin, I'd like to put on the record that
16 one of the defenses raised by Mr. Quinn in
17 this lawsuit is that the mark is generic
18 and therefore the mark is invalid and Mr.
19 Hill, as a part of the partnership, owns or
20 claims to own and I believe has produced an
21 agreement that says he owns, has exclusive
22 rights to the mark and we believe that is a
23 conflict of interest for Mr. Quinn to be
24 representing Mr. Hill in this deposition.

**Page 6**

1
2      MR. QUINN: I disagree. A) I
3 think that's a mischaracterization of the
4 agreement and B) I don't think there's any
5 conflict in interest and that will become
6 quite clear as the testimony comes
7 forward.
8      MR. PETOCK: I'd like to have
9 this first document marked as Plaintiff's
10 Exhibit 40.
11      (Whereupon, Subpoena marked
12 Plaintiff's Exhibit 40, for
13 identification.   )
14 BY MR. PETOCK:
15 Q.    Mr. Hill, do you recognize this
16 document that's been marked as Plaintiff's
17 Exhibit 40?
18 A.    I do.
19 Q.    This is a subpoena issued from
20 the United States District Court, the
21 Eastern District of Pennsylvania and this
22 is the reason that you're here today; is
23 that correct?
24 A.    That's correct.

**Page 7**

1
2 Q.    I just for the record, the
3 subpoena asks you to have produced all
4 agreements with Van Scoy Diamond Mines,
5 Inc. and/or Thomas Van Scoy that you may
6 have entered; is that correct?
7 A.    That's correct.
8 Q.    Just for the record, you did not
9 bring any records with you today?
10 A.    That is correct.
11 Q.    Do you have any such documents?
12 A.    What I have is an unsigned
13 franchise agreement from 1978, and I have a
14 signed agreement which I cannot currently
15 locate, but expect that I will be able to
16 at some point in time, with my
17 interpretation of rights to use the name in
18 three counties in Southeastern
19 Pennsylvania: Schuylkill, Montgomery and
20 Berks. I believe they were sent which I
21 believe you have a copy of.
22      MR. PETOCK: I'd like to have
23 this marked as Plaintiff's Exhibit 41,
24 please.

**Page 8**

1
2      (Whereupon, Agreement marked
3 Plaintiff's Exhibit 41, for
4 identification.)
5 BY MR. PETOCK:
6 Q.    Do you recognize what's been
7 marked as Plaintiff's Exhibit 41?
8 A.    It's been awhile since I've seen
9 it, but in the context that I haven't read
10 it, it appears to be the Agreement that we
11 executed back in 1993, at some point in
12 time, for the exchange of some $30,000, the
13 rights to use the name in those three
14 counts that I mentioned.
15 Q.    Could you take time to review it
16 just to make sure just to the best of your
17 memory and ability that it is the actual
18 Agreement that was executed between you and
19 Tommy Van Scoy, Senior.
20 A.    It looks pretty much okay.
21 Q.    So to the best of your knowledge,
22 this is an accurate copy of the Agreement?
23 A.    Yes.
24 Q.    That was executed between you and

Page 9

1
2  Tommy Van Scoy, Senior?
3  A.    Yes.
4  Q.    If you can find the signed copy
5  of it, when you do find it, could you
6  please send it to us?
7  A.    I will.
8  Q.    Thank you.  According to the
9  Agreement --
10        MR. QUINN:  I'd like a copy of it
11  if you find it, as well.
12  BY MR. PETOCK:
13  Q.    You characterized that Agreement
14  as granting you the right to use the
15  federally registered trademarks for Van
16  Scoy Diamond Mine in Berks, Schuylkill and
17  Montgomery Counties of Pennsylvania; is
18  that correct?
19  A.    Yes.
20  Q.    Have you been told by anyone that
21  the defendants in this lawsuit are claiming
22  that the federally registered trademarks
23  that I just spoke of are invalid or
24  generic?

Page 10

1
2        MR. QUINN:  Objection, leading.
3        THE WITNESS:  No.
4        MR. QUINN:  Please wait until I
5  register any objection.
6  BY MR. PETOCK:
7  Q.    You can answer the objection.
8  A.    I now can?
9  Q.    Yes.
10  A.    No.
11  Q.    Do you understand that if the
12  defendants are able to show that the
13  federally registered trademarks are invalid
14  or generic, someone else would be perfectly
15  within their rights to open up a Van Scoy
16  Diamond Mine store or even possibly a Van
17  Scoy Jewelers across from any store that
18  you might own?
19        MR. QUINN:  Objection, leading.
20  Furthermore, the marks at issue are Van
21  Scoy Diamond Mine and any invalidation
22  would go to the mark Van Scoy Diamond Mine
23  as registered, not to the mark that was the
24  subject of the question.

Page 11

1
2  BY MR. PETOCK:
3  Q.    You can answer the question.
4  A.    I didn't understand the
5  question.
6  Q.    Do you understand that if the
7  defendants are able to show that the marks
8  are invalid or generic, another person
9  would be in their rights, would be
10  perfectly within their rights to open up a
11  Van Scoy Diamond Mine across the street
12  from any jewelry store that you own?
13  A.    Can I answer it?
14        MR. QUINN:  I have no objection
15  to that question.  If you understand the
16  question, you can answer it.
17        MICHAEL F. PETOCK:  Objection,
18  coaching.
19        MR. QUINN:  I object to the
20  question as leading.
21        THE WITNESS:  I would say no, I
22  would think I'd have a right to contest
23  that.  I don't know about them, but I would
24  raise some objection.

Page 12

1
2  BY MR. PETOCK:
3  Q.    Is Charlie representing you in
4  this matter?
5  A.    Yes.
6  Q.    Has anyone explained that Mr.
7  Quinn might have a conflict of interest in
8  his representation of you?
9  A.    No.
10  Q.    And you haven't waived any sort
11  of conflict?
12  A.    No.
13  Q.    I guess I should have asked you
14  this earlier, but can you please state your
15  full name?
16  A.    Lew M. Hill, M as in Michael.
17  A.    What is your date of birth?
18  A.    1/13/1945.
19  Q.    Where were you born?
20  A.    In Reading, Pennsylvania.
21  Q.    Where did you grow up?
22  A.    Reading, Pennsylvania.
23  Q.    Could you state what your
24  education background is?

---

Page 13

```
 1
 2  A.    I graduated from Reading High. I
 3  joined the military, the United States Air
 4  Force, came home from the Air Force, went
 5  to work for International Business
 6  Machines, worked for them for some 17 years
 7  and started this jewelry business back in
 8  1978.
 9  Q.    You mentioned that you worked for
10  International Business Machines?
11  A.    Right.
12  Q.    What did you do for International
13  Business Machines?
14  A.    I was a systems engineer.
15  Q.    What years was that
16  approximately?
17  A.    1967 through 1983.
18  Q.    What happened in 1983?
19  A.    I left, I left and went into the
20  jewelry business full time.
21  Q.    Were you working in the jewelry
22  business prior to 1983?
23  A.    It was a second, I was still full
24  time at IBM from '78 until '83, and I was
```

---

Page 14

```
 1
 2  basically doing both.
 3  Q.    Was 1978, the first year that you
 4  got into the jewelry business?
 5  A.    Yes.
 6  Q.    Did you work for a jewelry store
 7  in 1978?
 8  A.    No. I worked for IBM in 1978.
 9  Q.    But you said you were in the
10  jewelry business in some capacity in 1978?
11  A.    We opened our store in 1978, on
12  November 11 of 1978.
13  Q.    So you were working two jobs at
14  that point, basically?
15  A.    Right.
16  Q.    In 1978, when you first opened up
17  your store, where was that store located?
18  A.    It was at 3039 North 5th Street
19  in Reading, Pennsylvania.
20  Q.    What was the street?
21  A.    North 5th Street.
22  Q.    What was the name of that store?
23  A.    Van Scoy Diamond Mine.
24  Q.    How did you get into the jewelry
```

---

Page 15

```
 1
 2  business in 1978?
 3  A.    We had friends who were
 4  franchising jewelry stores in partnership
 5  with Tommy Van Scoy, Senior and they
 6  approached us and asked us if we were
 7  interested in being partners, my partner
 8  and I at the time and we did.
 9  Q.    Who was your partner at the time?
10  A.    James C. Sweeney.
11  Q.    Who were your friends that were
12  franchising with Tommy Van Scoy, Senior?
13  A.    His name was Al Tooful.
14  Q.    Where was Al tooful, did he -- he
15  was franchising stores in 1978?
16       MR. QUINN: Objection, only
17  because there seem to be two questions
18  there. Just for clarification.
19  BY MR. PETOCK:
20  Q.    Was Al Tooful a franchisee or a
21  licensee of Tommy Van Scoy, Senior or
22  his --
23       MR. QUINN: Wait until Mr. Petock
24  finishes answering his question and then if
```

---

Page 16

```
 1
 2  I have any objection and then please
 3  answer. Because the reporter cannot take
 4  down more than one speaker at once.
 5  BY MR. PETOCK:
 6  Q.    Was Mr. Tooful what you
 7  characterize as a franchisee? Did he have
 8  a franchisee somewhere in 1978, or prior to
 9  1978?
10  A.    He had a store.
11  Q.    Where was the store located?
12  A.    Scranton, Pennsylvania.
13  Q.    Prior to 1978, did you have any
14  experience in the jewelry business?
15  A.    No.
16  Q.    Was there any particular reason
17  you felt that you wanted to get into the
18  jewelry business in 1978?
19  A.    We were looking at a number of
20  businesses and it was probably just an
21  issue of timing that the jewelry business
22  opportunity presented itself.
23  Q.    In 1978, you testified that you
24  became a franchisee of Tommy Van Scoy,
```

Page 17

1
2  Senior at 309 West 5th Street in Reading?
3  A.    3039 North 5th Street, yes.
4  Q.    Is that correct?
5  A.    Yes.
6  Q.    You owned a store there?
7  A.    Yes.
8        MR. QUINN:  Asked and answered,
9  objection.
10 BY MR. PETOCK:
11 Q.    Were you renting it or did you
12 own the store?
13 A.    We were leasing the location.
14 Q.    How long did you operate that
15 store?
16 A.    From November 11, 1978 to April 1
17 of 2003.
18 Q.    During that time period, what was
19 the name of the store that you operated at
20 339 North 5th Street in Reading,
21 Pennsylvania?
22 A.    It was 3039.  Van Scoy Diamond
23 Mine.
24 Q.    Did that store at 3039 North 5th

Page 18

2  Street in Reading, Pennsylvania ever go by
3  any other name beside Van Scoy Diamond
4  Mine?
5  A.    We changed the name to Van Scoy
6  Jewelers probably late '90s, but I don't
7  remember exactly.
8  Q.    Were you operating under the name
9  Van Scoy Diamond Mine and Van Scoy Jewelers
10 at the same time?
11 A.    Well, transitioned a little bit,
12 but we filed a fictitious filing and, you
13 know.
14 Q.    To the best of your memory, it
15 was the late 1990's where you switched from
16 Van Scoy Diamond Mine to Van Scoy Jewelers?
17 A.    Yes.
18 Q.    Do you remember the reason why
19 you made that change?
20 A.    Yes.
21 Q.    What was that reason?
22 A.    There were a lot of bankruptcies
23 occurring within the organization and it
24 was starting to cause problems for us

Page 19

1
2  within the trade, the supply side and it
3  made some sense to differentiate ourselves
4  from that point of view.
5  Q.    Were you aware of any other Van
6  Scoy Diamond Mines being enjoined by the
7  bankruptcy court as to use of the name, Van
8  Scoy Diamond Mine?
9        MR. QUINN:  Objection.  It
10 assumes facts not as issue.  I don't think
11 he's testified about any awareness of any
12 enjoining offer by any bankruptcy court.
13 BY MR. PETOCK:
14 Q.    You were aware that there were
15 other Van Scoy Diamond Mines operating in
16 the 1990's; correct?
17 A.    It was pretty much public
18 knowledge, yes.
19 Q.    And were you aware that, you
20 testified that there was some bankruptcies
21 occurring; is that correct?
22 A.    Yes.
23 Q.    Were you aware of any proceedings
24 within these bankruptcies pertaining to the

Page 20

1
2  bankruptcy court forcing people that were
3  using the name, Van Scoy Diamond Mine from
4  using the name, Van Scoy Diamond Mine?
5  A.    No.
6  Q.    You testified that you had never
7  worked in the jewelry business before you
8  opened your first store in 1978; is that
9  correct?
10 A.    That's correct.
11 Q.    Did you have any experience in
12 the jewelry business at all?
13 A.    No, I don't.  I was a systems
14 engineer for IBM.
15 Q.    Was it difficult to open the
16 jewelry store?
17 A.    It was a lot of hard work, yes.
18 We built the store ourselves, physically
19 built the store ourselves while working
20 another job, took a lot of money and put it
21 into the business.
22 Q.    Did you find the fact that you
23 had never worked in the jewelry business
24 before nor did you have any experience in

Page 21

1
2 the jewelry business, did you find that to
3 be a major obstacle to the fact that you
4 were opening up a jewelry store?
5        MR. QUINN: Objection, leading.
6 BY MR. PETOCK:
7 Q.     You can answer it.
8 A.     We hired knowledgeable people.
9 Q.     Did Tommy Van Scoy, Senior
10 provide you with any training?
11 A.     Yes.
12 Q.     What kinds of training did he
13 provide you with?
14 A.     We sent the guy who was going to
15 be our jeweler up to the Wilkes-Barre store
16 for days, not weeks, but days, three, four
17 days probably, worked with probably these
18 guys to learn some jewelry skills.
19        We sent our store manager who had
20 many years of jewelry experience up to
21 Wilkes-Barre to spend a couple days with
22 the staff there to learn how they ran the
23 store, and then we spent some time with
24 Senior on the approach to advertising the

Page 22

1
2 business, primarily through radio at that
3 time, so probably those three from a
4 training point of view.
5 Q.     Besides the store at 3039 North
6 5th Street in Reading, Pennsylvania, did
7 you operate any other jewelry stores?
8 A.     In 1980, we opened a store in
9 Pottsville, Pennsylvania. In 1983, we
10 opened a store in Pottstown, Pennsylvania.
11 Q.     What year was that?
12 A.     '83. In 1986, I believe we
13 opened a store in Raleigh, North Carolina.
14 Q.     1980 Pottsville store, could you
15 please tell me whether that's still in
16 operation?
17 A.     No.
18 Q.     What year did that close?
19        MR. QUINN: If you don't know,
20 please say you don't know as opposed to
21 shaking your head which the reporter cannot
22 take down.
23        THE WITNESS: I don't know.
24 BY MR. PETOCK:

Page 23

1
2 Q.     Could you approximate it? I
3 don't know if it was yesterday, if it was
4 10 years ago?
5 A.     It was at least 10 years ago.
6 Q.     More than 10 years ago?
7 A.     Probably more than 10 years, yes.
8 Q.     Some time in the '90s?
9        MR. QUINN: Objection. That's
10 not a question, is it.
11 BY MR. PETOCK:
12 Q.     Would you estimate it was more
13 likely in the 1990's or the 1980's that it
14 closed?
15 A.     I'm trying to tie it --
16 Q.     Take your time.
17 A.     I can verify it by looking at
18 leases and things, but I don't know. It
19 was probably right around 1990.
20 Q.     At the time the Agreement was
21 signed that has been marked as Plaintiff's
22 Exhibit 41, do you think the Pottsville
23 store was still in operation?
24 A.     Yes, it probably was, which would

Page 24

1
2 put it into the '90s.
3 Q.     The Pottstown store that you
4 opened up in 1983, do you know
5 approximately what that store closed?
6 A.     I don't remember those dates.
7 Q.     Approximately, though, could you
8 give me a ballpark?
9 A.     No, don't remember.
10 Q.     Do you think that that store was
11 still operating when the agreement was
12 signed?
13 A.     I'm pretty sure it was.
14 Q.     How about the Raleigh, North
15 Carolina store, do you know approximately
16 what year that store closed?
17 A.     That was before the Agreement or
18 the name would have been in there, so I'm
19 guessing that was in the '90 time frame.
20 Q.     Is the store that is operated at
21 3039 North 5th Street in Reading still in
22 operation?
23 A.     We moved that store. That's not
24 in operation at that location anymore.

Page 25

1
2  Q.      Where did you move it to?
3  A.      We moved it to 2733 Paper Mill
4  Road in Wyomissing, Pennsylvania.
5  Q.      When did that move occur?
6  A.      April 1 of 2003.
7  Q.      On April 1, 2003, you opened up
8  your store at 2733 Paper Mill Road in
9  Wyomissing, PA under what name?
10 A.      Van Scoy Jewelers.
11 Q.      Which was the same name you had
12 been previously operating your store in
13 Reading since approximately the late
14 1990's; correct?
15 A.      Correct.
16 Q.      Do you own the store in
17 Wyomissing?
18 A.      It's leased as well.
19 Q.      Are you incorporated?
20 A.      No.
21 Q.      For the business that you operate
22 under the mark Van Scoy Jewelry or
23 Jewelers?
24 A.      Jewelers.

Page 26

1
2  Q.      Van Scoy Jewelers in Wyomissing,
3  do you advertise?
4  A.      Yes.
5  Q.      How do you do your advertising?
6  A.      I use outdoor billboards, radio,
7  newspaper, magazines, direct mail,
8  partnerships with charitable organizations.
9  Q.      Any other mediums that you use
10 for your advertising?
11 A.      TV.
12 Q.      Any others?
13 A.      I think that might be it.
14 Q.      Start with the first one you
15 listed, the billboards and go down the
16 list.  Where do you advertise on
17 billboards?
18 A.      In Berks County.
19 Q.      Anywhere else?
20 A.      Not outside the county, no, Berks
21 County.
22 Q.      Do you do any of your advertising
23 outside Berks County?
24 A.      Yes, I do, some in Schuylkill

Page 27

1
2  County.
3  Q.      Let's continue with just going
4  down the list.  Which radio stations do you
5  advertise on?
6  A.      We advertise on WRFY, YEEU, WRAW.
7  Q.      WRAW?
8  A.      Yes, WRAW and I don't know the
9  call signs, but T102.
10 Q.      Do you know the geographic
11 coverage of WRFY?
12 A.      No.
13 Q.      Is that an AM or FM station?
14 A.      WRFY is FM.
15 Q.      Do you know where it's
16 principally broadcast, what areas?
17 A.      I frankly don't -- it's in
18 Reading.  I don't know where list hours
19 are.  It's a Reading station.
20 Q.      Do the advertisers when they sell
21 advertising to you, do they make any sort
22 of representation as to the geographic
23 coverage of the radio stations in which you
24 advertise?

Page 28

1
2  A.      Yes.
3  Q.      So you would have that
4  information probably if you were to -- you
5  would be able to get that information?
6  A.      I could get it.
7  Q.      You said that WRFY is a radio
8  station?
9  A.      Yes.
10 Q.      Is WEEU a radio station?
11 A.      Yes.
12 Q.      Do you know the geographic scope
13 of that radio station?
14 A.      It's a low power AM.
15 Q.      WRAU, is that a Reading station?
16 A.      WRAW is a Reading station.
17 Q.      T102, is that a Reading station?
18 A.      That's a Schuylkill County
19 station, Pottsville.
20 Q.      For none of those radio stations,
21 you know the exact geographic scope of
22 their broadcasting?
23 A.      No.
24 Q.      But they're all except for the

Case 1:05-cv-00108-KAJ    Document 142-7    Filed 12/12/2005    Page 20 of 32

Condensit!    VAN SCOY V. VAN SCOY, ET AL

Page 29

```
1
2  T102, Reading stations?
3  A.    Correct.
4  Q.    T102 is a Schuylkill County?
5  A.    Schuylkill County station.
6  Q.    What newspapers do you advertise
7  in?
8  A.    The Reading Eagle and
9  occasionally the Pottsville Republican and
10 the Pottstown Mercury.
11 Q.    Pottstown Mercury?
12 A.    Yes.
13 Q.    Do you know what the principle
14 place of circulation of the Reading Eagle
15 is?
16 A.    Berks and a little bit of
17 Schuylkill County and Sundays because they
18 don't have a Sunday paper.
19 Q.    Do you know what the geographic
20 coverage of the circulation of the
21 Pottsville Republican is?
22 A.    No.
23 Q.    Is it a small newspaper?
24 A.    It's the newspaper in Pottsville.
```

Page 30

```
1
2  Q.    Would your guess be the
3  Pottsville Republican is probably
4  circulated pretty limited to the
5  Pottsville?
6  A.    Schuylkill County, I'm sure.
7  Q.    And the Pottstown Mercury, is
8  that what it's called, do you know what the
9  circulation of that is geographically?
10 A.    No.
11 Q.    That's Berks County, though?
12 A.    No. That's Montgomery County.
13 Q.    You mentioned magazines?
14 A.    Yes.
15 Q.    What type of magazines do you
16 advertise in?
17 A.    We have the back page of Berks
18 County Living and we have the back page of
19 the Bravo, which is the symphony orchestra
20 program.
21 Q.    Symphony orchestra of --
22 A.    Reading.
23 Q.    Any other magazines?
24 A.    No.
```

Page 31

```
1
2  Q.    And you also said that you will
3  advertise through direct mail?
4  A.    Correct.
5  Q.    Where do you send this direct
6  mail, is it limited to certain counties?
7  A.    Yes, definitely.  It's close
8  geographical proximity to the store, 19610
9  zip code.
10 Q.    What charitable organizations do
11 you advertise?
12 A.    The Reading Museum, the Reading
13 Hospital, Saint Joseph's Hospital.
14 Q.    Where is Saint Joseph's Hospital?
15 A.    In Reading, the Heart
16 Association.
17 Q.    Is the Heart Association in
18 Reading?
19 A.    The local chapter.
20 Q.    And that's the one that you
21 advertise in connection with?
22 A.    Yes.
23 Q.    Any other charitable
24 organizations?
```

Page 32

```
1
2  A.    Boys club.
3  Q.    Of Reading?
4  A.    Yes.
5  Q.    Are all the charitable
6  organizations that you advertise with in
7  Reading?
8  A.    Yes.
9  Q.    And then television is the last
10 category of advertising you mentioned?
11 A.    Yes.
12 Q.    Do you advertise with cable
13 channels or broadcast channels?
14 A.    All cable.
15 Q.    All cable?
16 A.    Yes.
17 Q.    Which cable company?
18 A.    Comcast.
19 Q.    Do you know where those -- are
20 they commercials that you advertise in
21 connection with television?
22 A.    Yes.
23 Q.    Do you know where those are
24 broadcast geographically?
```

Page 33

1
2 A.    Berks County, primarily Berks
3 County.
4 Q.    Where do you focus your
5 advertising geographically?
6 A.    Berks County.
7 Q.    Berks County?
8 A.    Yes.
9 Q.    Is there any other place where
10 you focus your advertising?
11 A.    A little bit in Schuylkill and a
12 little bit in Montgomery because we once
13 had stores there and have a little bit of
14 us a customer base there.
15 Q.    Where would you say that you draw
16 the majority of your customer base?
17 A.    Within about a six mile radius of
18 the store.
19 Q.    Do you do any advertising in the
20 Wilkes-Barre, Pennsylvania area?
21 A.    No.
22 Q.    Do you do any advertising in the
23 Scranton, Pennsylvania area?
24 A.    No.

Page 34

1
2 Q.    Do you do any advertising in the
3 Wilmington, Delaware area?
4 A.    No.
5 Q.    Any advertising in the Erie,
6 Pennsylvania area?
7 A.    No.
8 Q.    Any advertising in the Allentown,
9 Pennsylvania area?
10 A.    Not intentionally.
11 Q.    Do you do any advertising in the
12 Lancaster, Pennsylvania area?
13 A.    Once again, not intentionally.
14 Q.    Do you do any advertising in the
15 Greensborough, North Carolina area?
16 A.    No.
17 Q.    How would you define your sales
18 market?
19 A.    I don't understand the question.
20 Q.    You mentioned that the majority
21 of your customers come from a six mile
22 radius of your store.
23 A.    Yes.
24 Q.    Would you say that that six mile

Page 35

1
2 radius is your sales market?
3 A.    I don't know what the term, sales
4 market means.
5 Q.    How far would you say the average
6 jewelry store customer would travel to buy
7 a piece of jewelry from their home?
8 A.    In our case, it's probably less
9 than 10 miles, more like six on average, if
10 that.
11 Q.    In the context of the jewelry
12 business, is your market different than the
13 Wilkes-Barre, Pennsylvania market?
14 A.    I don't know the Wilkes-Barre
15 market.
16 Q.    Does that mean you can't answer
17 the question because you don't know the
18 Wilkes-Barre market?
19    MR. QUINN: He stated that he
20 didn't know the Wilkes-Barre market.
21 BY MR. PETOCK:
22 Q.    Do you know the Lancaster,
23 Pennsylvania market in the context of the
24 jewelry business?

Page 36

1
2 A.    I'm more familiar with that.
3 Q.    Would you contend that your
4 market is different than the Lancaster
5 market in the context of the jewelry
6 business?
7 A.    I think each market is unique,
8 but I think there are a lot of similarities
9 between Lancaster County and Berks County.
10 Q.    Let me rephrase the question. Do
11 you think that they are separate geographic
12 markets?
13 A.    Oh yes, yes.
14 Q.    So you would say that -- would
15 you contend that the Lancaster market is a
16 separate geographic market from the, from
17 your sales market?
18 A.    Yes.
19 Q.    Would you contend that the
20 Allentown market is a separate geographic
21 market than your market?
22    MR. QUINN: Objection, leading.
23    THE WITNESS: Yes.
24 BY MR. PETOCK:

Page 37

1
2 Q.    Would you contend that the
3 Wilkes-Barre market in the context of the
4 jewelry business is a different geographic
5 market from your market?
6     MR. QUINN: Objection, leading.
7 BY MR. PETOCK:
8 Q.    You can answer.
9 A.    Yes.
10 Q.    Would you contend that the
11 Wilmington, Delaware market is a different
12 geographic market than than your market?
13     MR. QUINN: Objection, leading,
14 suggests the answer. Obviously Wilmington
15 is different geographically from Reading.
16 You can answer the question.
17     THE WITNESS: In the context of
18 the jewelry business?
19 BY MR. PETOCK:
20 Q.    Yes.
21 A.    Yes.
22 Q.    In the context of the jewelry
23 business, you contend that the Erie,
24 Pennsylvania market is a different

Page 38

1
2 geographic market than your market?
3     MR. QUINN: Objection, leading,
4 suggests the answer.
5     THE WITNESS: Yes.
6 BY MR. PETOCK:
7 Q.    And in the context of the jewelry
8 business, do you think that the
9 Greensborough, North Carolina market is a
10 different geographic market than your
11 market?
12     MR. QUINN: Objection, leading,
13 suggests the answer obviously from
14 Greensborough, North Carolina is different
15 geographically from Reading, Pennsylvania.
16 You can answer the question.
17     THE WITNESS: Yes.
18 BY MR. PETOCK:
19 Q.    You mentioned that you had a
20 store in Pottsville that you opened in
21 1980, and operated until you're not sure
22 when, but that's okay. Did you advertise
23 in connection with the Pottsville store?
24 A.    Yes.

Page 39

1
2 Q.    Which by the way, that was always
3 a Van Scoy Diamond Mine; is that correct?
4     MR. QUINN: Objection, leading.
5     THE WITNESS: Yes.
6 BY MR. PETOCK:
7 Q.    Where did you focus your
8 advertising for the Pottsville store?
9 A.    Schuylkill County.
10 Q.    Where did you draw your customer
11 base for the Pottsville store?
12 A.    Schuylkill County, primarily.
13 Q.    The Pottstown store, which you
14 had opened in 1983, did you advertise in
15 connection with that store?
16 A.    Yes.
17 Q.    What was the name of that store?
18 A.    It was the Van Scoy Diamond Mine
19 when it opened.
20 Q.    Did it ever change?
21 A.    I think it stayed that until we
22 closed it.
23 Q.    You advertise with that store?
24 A.    Yes.

Page 40

1
2 Q.    Where did you focus your
3 advertising?
4 A.    In that county, Montgomery
5 County. I'm saying Montgomery County. I
6 think it's Montgomery County.
7     MR. QUINN: We'll stipulate that
8 Pottstown is Montgomery County because it
9 is.
10 BY MR. PETOCK:
11 Q.    Where did you draw the majority
12 of your customer base for the Pottstown
13 store?
14 A.    The Pottstown store probably drew
15 from a wider geography than any other
16 store, I'm thinking because of 422. We
17 would have traffic from a little closer to
18 Philadelphia come to that store, but
19 primarily Montgomery County.
20 Q.    Would you draw from the Lancaster
21 area at that store?
22 A.    Not in that store.
23 Q.    What about the Allentown area
24 store?

Page 41

```
1
2       MR. QUINN:  What is the
3 question?
4 BY MR. PETOCK:
5 Q.    Would you draw customers in any
6 significant number?
7 A.    No, no.
8 Q.    From Allentown?
9 A.    No.
10 Q.    And then the other store you
11 owned was in Raleigh, North Carolina.  You
12 advertise in connection with the Raleigh,
13 North Carolina store?
14 A.    Yes.
15 Q.    Where did you advertise, where
16 did you focus your advertising?
17 A.    In and about Raleigh.
18 Q.    Was that always a Van Scoy
19 Diamond Mine?
20 A.    Yes.
21 Q.    In 1978, you said you entered a,
22 what you characterize as a franchisee
23 agreement with Tommy Van Scoy, Senior?
24 A.    Yes.
```

Page 42

```
1
2 Q.    What were the terms of that
3 agreement?
4 A.    It was a lengthy agreement.
5 Q.    Do you remember what the main
6 substance of the agreement was?
7 A.    Yes, for an initial payment, the
8 amount of which I can't recall, 25,000
9 comes to mind, we were given a geographical
10 area of Berks County and then for ongoing
11 monthly franchise fee, the right to
12 continue to operate and I think that fee
13 was $2,000.
14       MICHAEL F. PETOCK:  Per month?
15       THE WITNESS:  Correct.
16 BY MR. PETOCK:
17 Q.    Ultimately, did you enter a
18 second franchise agreement with Tommy Van
19 Scoy, Senior in connection with the opening
20 of the other stores?
21 A.    We paid a fee for each store and
22 $1,000 franchise fee, $1,000 monthly.
23 Q.    So in 1983, you paid another up
24 front fee for the Pottstown store; is that
```

Page 43

```
1
2 correct?
3 A.    Pottsville -- I'm sorry, what
4 year did you say?  Pottsville was second.
5 Q.    In 1980, did you pay another up
6 front fee?
7 A.    Yes.
8 Q.    And did that give you the
9 geographic territory of Schuylkill County?
10 A.    I think so.
11 Q.    And you again agreed to pay what
12 you believe is $2,000 a month?
13 A.    A thousand.
14 Q.    $1,000 a month?
15 A.    And I think the initial fee was
16 20,000.
17 Q.    And do you know what that gave
18 you the right to do?
19 A.    Operate a Van Scoy Diamond Mine
20 in Schuylkill County.
21 Q.    1983, you opened up a store in
22 Pottstown.  Did you again pay an up front
23 fee?
24 A.    I believe we did.
```

Page 44

```
1
2 Q.    And again, you paid on a monthly
3 basis?
4 A.    I'm not sure about that.
5 Q.    What did that agreement give you
6 the right to do?
7 A.    Operate a Van Scoy Diamond Mine
8 in Montgomery County.
9 Q.    Then was all this written down in
10 the contract or was it oral?
11 A.    There was a franchise document
12 that I mentioned earlier, but it was never
13 signed.  We never completely agreed on all
14 the stipulations within it and it was never
15 signed, so it was a verbal agreement.
16 Q.    In approximately 1993, whatever
17 agreement you had before with Tommy Van
18 Scoy, Senior changed; is that correct?
19 A.    Correct.
20 Q.    And whatever those changes were
21 is reflected in this Agreement that we've
22 marked as Plaintiff's Exhibit 41; is that
23 correct?
24 A.    The method of operation, yes.
```

Page 45

1
2  Q.     Could you describe to me what
3  those changes were as far as changes in the
4  method of operation?
5  A.     Well primarily, the removal of
6  the obligation to pay an ongoing monthly
7  fee.
8  Q.     What else?
9  A.     Well, there were things in the
10 franchise agreement that had to do with
11 inspection and the like, which I'm
12 imagining those went away, as well.
13 Essentially it severed, I guess pretty much
14 severed the relationship from an
15 operational point of view.
16 Q.     So, after this contract was
17 executed --
18       MR. QUINN: Objection to the
19 extent that it's not clear from what you
20 say this contract, what it is you're
21 referring to.
22 BY MR. PETOCK:
23 Q.     After the Agreement that has been
24 marked as Plaintiff's 41 was executed

Page 46

1
2  between you and Tommy Van Scoy, Senior,
3  your relationship between him was severed;
4  is that correct?
5  A.     That's true.
6  Q.     Did the Agreement grant you the
7  exclusive rights to use the mark Van Scoy
8  Diamond Mine in a defined territory?
9        MR. QUINN: Objection. The
10 agreement speaks for itself.
11       MR. PETOCK: You may answer.
12       THE WITNESS: That was my
13 understanding.
14       MR. PETOCK: What territory was
15 that.
16       MR. QUINN: Objection, agreement
17 speaks for itself.
18 BY MR. PETOCK:
19 Q.     You may answer?
20 A.     Schuylkill, Berks and Montgomery
21 County.
22 Q.     With respect, could you read
23 Section 4.1 of the Agreement that's been
24 marked as Plaintiff's Exhibit 41, please.

Page 47

1
2        MR. QUINN: You're asking him to
3  read it out loud or to himself?
4  BY MR. PETOCK:
5  Q.     No, to himself. Do you agree
6  that section grants you the exclusive
7  right to use and to trade under the mark in
8  the territory?
9        MR. QUINN: Objection. The
10 document speaks for itself.
11       THE WITNESS: That was my
12 interpretation.
13 BY MR. PETOCK:
14 Q.     Could you turn to Section 6.1,
15 please?
16 A.     Yes.
17 Q.     Do you agree that you paid
18 $30,000 for the exclusive right to use and
19 to trade under the mark in the territory?
20       MR. QUINN: Objection to the
21 extent that that seeks to be a
22 characterization of what the Agreement
23 says. That is not what the Agreement
24 says. The question is whether he paid and

Page 48

1
2  if that's the question, I'd ask you to
3  restate it.
4        MR. PETOCK: I think the question
5  is do you agree that you paid, after
6  reading that section, do you agree that you
7  paid $30,000 for the exclusive right to use
8  and trade under the mark in the territory?
9        MR. QUINN: You may answer the
10 question.
11       THE WITNESS: That's my
12 interpretation.
13 BY MR. PETOCK:
14 Q.     Was it your understanding that
15 you bought the rights to the trademark for
16 the limited territory of those three
17 counties?
18       MR. QUINN: Objection to the
19 question in the sense that it asks was your
20 understanding. It does not specify a time
21 frame as to what the understanding was.
22 BY MR. PETOCK:
23 Q.     Was it your understanding at the
24 time the Agreement was executed that you

**Page 49**

1
2 bought the rights to the trademark for Van
3 Scoy Diamond Mine in the territory as
4 defined in the Agreement for $30,000?
5 A.    It was my understanding that we
6 were given the right to use it, use that
7 name. I don't know if buy is the right
8 term.
9 Q.    Is that still your understanding?
10 A.    Yes.
11 Q.    And was that an exclusive right?
12 A.    It says that it is back in 4.1.
13 That was my understanding, yes, exclusive
14 right.
15 Q.    After this Agreement was
16 executed, the Agreement I'm referring to is
17 what's had marked as Plaintiff's Exhibit
18 41, was it your understanding after it was
19 executed to this day that you are no longer
20 a licensee of Tommy Van Scoy, Senior or
21 Tommy Van Scoy's representation?
22      MR. QUINN: Objection as to what
23 it was and is.
24      THE WITNESS: I don't know if I

**Page 50**

1
2 understand the question.
3 BY MR. PETOCK:
4 Q.    What don't you understand about
5 the question?
6 A.    I'm not sure I know what a
7 licensee is, how it would be different from
8 having the rights to use the name versus
9 operating under a franchise agreement. It
10 would be my understanding we were no longer
11 a franchisee at that point.
12 Q.    What was your understanding as to
13 the differences between you having been
14 granted the right to use the mark and how
15 it would have been under a franchisee?
16      MR. QUINN: Objection. There's
17 no time frame stated for what his
18 understanding was.
19 BY MR. PETOCK:
20 Q.    At the time the execution was
21 granted?
22 A.    Looking at it from different
23 points of view, I would not expect anything
24 from him at that point any longer, from one

**Page 51**

1
2 perspective.
3 Q.    Any other respects, perspectives
4 as to why the differences between?
5 A.    That he wouldn't be expecting
6 anything from me, payments, coming to
7 meetings or something like that.
8 Q.    Could you look at Section 3.6,
9 please.
10 A.    Okay.
11 Q.    Could you read it out loud?
12 A.    "Reading partnership shall
13 continue to conduct its retail jewelry
14 business using the same high standards of
15 integrity in dealing with the public and
16 continue to offer the same high quality
17 jewelry products and jewelry service and as
18 Reading Partnership has offered heretofore,
19 to the extent Reading Partnership can do so
20 and yet continue to meet the prices of its
21 competition".
22 Q.    After the Agreement that's been
23 marked as Plaintiff's Exhibit 41 was
24 executed, did you continue to adhere to

**Page 52**

1
2 this section?
3 A.    We, I would say grew beyond that.
4 Q.    Do you think that this Agreement
5 is still in force?
6      MR. QUINN: Objection. The
7 Agreement speaks for itself.
8      THE WITNESS: Yes.
9 BY MR. PETOCK:
10 Q.    And do you operate your present
11 jewelry store in accordance with this
12 Agreement?
13 A.    As in section --
14 Q.    Well, let me ask you whether you
15 operate it in accordance with the limited
16 geographic territories set forth in the
17 Agreement?
18 A.    Yes.
19 Q.    What do you know about Avalon
20 Jewelers, if anything?
21 A.    I've been there. It's no longer
22 Avalon Jewelers. It's Avalon, I think that
23 name's been changed.
24 Q.    Where is Avalon or where was

**Page 53**

1
2 Avalon Jewelers located?
3 A.   It's still where it was, right
4 off of 222 near the Whitehall Shopping
5 Center, I believe.
6 Q.   What town is that?
7 A.   It's either Bethlehem or
8 Allentown.  I don't know which town it's
9 in.
10 Q.   I don't know much about it.  It's
11 just something that's popped up a lot in
12 this litigation.  I'm just trying to find
13 out some things about it, so do you know
14 who owns that store or who did own that
15 store?
16      MR. QUINN:  Objection.  I thought
17 he said it's no longer there.
18 BY MR. PETOCK:
19 Q.   Did you know who owned that
20 store?
21 A.   It was Mark Maurer, the same guy
22 who owns the Lancaster store.
23 Q.   Did Mark Maurer open that store?
24 A.   Yes.

**Page 54**

1
2 Q.   Do you know when?
3 A.   Possibly three years ago.
4 Q.   And that's a jewelry store;
5 right?
6 A.   Correct.
7 Q.   Was a jewelry store.  Was Mark
8 Maurer operating a jewelry store prior to
9 opening up Avalon Jewelers?
10 A.   Yes.
11 Q.   What happened, what was the name
12 of that store that he was operating before
13 he opened up Avalon Jewelers?
14 A.   I believe it was Van Scoy Diamond
15 Mine.
16 Q.   Was that in the same location on
17 22nd and Whitehall Road?
18 A.   No.
19 Q.   Where was the Van Scoy Diamond
20 Mine that he was operating?
21 A.   It was in a strip center off of
22 MacArthur Boulevard.
23 Q.   What town?
24 A.   Once again, I never know where

**Page 55**

1
2 the line between Allentown and Bethlehem
3 is.  It's in that area.
4 Q.   What happened to that store?
5 A.   He closed that and opened up
6 Avalon Jewelers.
7 Q.   When was that?
8 A.   Three years ago.
9 Q.   So did they open and close?
10 A.   One down --
11 Q.   Pretty much simultaneously?
12 A.   Yes.
13 Q.   Are you familiar with any
14 advertisements with respect to the Van Scoy
15 Diamond Mine that was operating the strip
16 center off of MacArthur Boulevard, is that
17 where you said it was?
18 A.   Yes.
19 Q.   Are you familiar with respect to
20 that Van Scoy Diamond Mine, any Going Out
21 Of Business advertisements?
22 A.   No.
23 Q.   Do you know if that store did go
24 out of business -- that store went out of

**Page 56**

1
2 business; right?
3 A.   He closed that store and opened
4 the new store under a different name.
5 Q.   Do you know why he did that?
6 A.   Not really.
7 Q.   Do you have any idea?
8 A.   No, looking for a new name.  I
9 would suspect to increase business.
10 Q.   To your knowledge, did Mark
11 Maurer abandon the name Van Scoy Diamond
12 Mine?
13 A.   I don't know.
14 Q.   Do you know if he still uses the
15 name, Van Scoy Diamond Mine?
16 A.   Not to my knowledge.
17 Q.   Was Mark Maurer a licensee of
18 Tommy Van Scoy, Senior, at one point?
19 A.   To the best of my knowledge he
20 was, yes.
21 Q.   Where did he own stores?
22 A.   He owned stores in Lancaster and
23 Allentown and in Phillipsburg, York.
24 Q.   York, also?

**Page 57**

1
2 A.     York, Pennsylvania.
3 Q.     When was the last time you spoke
4 with Mark?
5 A.     A few days ago.
6 Q.     Did you call him or did he call
7 you?
8 A.     I don't recall.
9 Q.     Was there a telephone
10 conversation or was it in person?
11 A.     It could have been either.  I saw
12 him just recently.  He drives past my store
13 and he goes from Lancaster to Allentown, he
14 drives right by me and he'll occasionally
15 stop in and compare notes.
16 Q.     What did you guys talk about
17 last?
18 A.     Probably advertising, probably
19 sources of supply, probably health care
20 plans, probably commission programs.  We
21 just spent a lot of time talking about how
22 we run our businesses.  It's a business
23 person to business person trying to make
24 our businesses work better.

**Page 58**

1
2 Q.     Did you talk about this
3 litigation?
4 A.     We have talked about this.
5 Q.     Whatever you talked about in that
6 regard?
7 A.     Just that he got a deposition,
8 too, a subpoena for a deposition.
9 Q.     What else has he told you about
10 the litigation?
11 A.     I don't think he knows anymore
12 about it than I do.
13 Q.     Does he know, did he mention
14 whether he was in contact with Kurt Van
15 Scoy or with Charlie Quinn?
16 A.     Yes.
17 Q.     Who did he say he was in contact
18 with of those two?
19 A.     Charlie.
20 Q.     Did he tell you what he spoke
21 about with Charlie Quinn?
22 A.     Just this deposition and are you
23 taking an attorney and should I take my
24 attorney and will Charlie be there, those

**Page 59**

1
2 kinds of things.
3 Q.     Have you been told by anyone that
4 you are at risk of being sued by Wayne Van
5 Scoy?
6 A.     No.
7 Q.     What do you know about this
8 litigation?  Ask you just try to tell me
9 everything you know about it?
10 A.     I have heard that Wayne is suing
11 Kurt for the use of the name, Van Scoy
12 Diamond Mine, whatever that means.
13 Q.     Anything else?
14 A.     No.
15 Q.     When was the first time that you
16 heard about it?
17 A.     When I got the deposition.
18 Q.     You got the subpoena?
19 A.     Yes, the subpoena, I'm sorry.
20 Q.     You knew Wayne prior to today?
21 A.     I met them both, you know, back
22 in the late '70s, when they were probably
23 either in high school or middle school.  I
24 don't remember their exact ages, but it's

**Page 60**

1
2 been a long time.
3 Q.     What capacity did you meet them?
4 A.     I was traveling to Wilkes-Barre,
5 Pennsylvania to meet with Tommy on the
6 negotiations for the franchise agreements
7 and they would sometimes be in the store.
8 Q.     Do you know Nancy Shindu?
9 A.     Yes.
10 Q.     Who is she?
11 A.     She was the second franchisee in
12 Lancaster, Pennsylvania.
13 Q.     Is she still alive?
14 A.     I don't know.
15 Q.     Do you know if anyone else
16 entered any sort of agreement similar to
17 the Agreement that's marked as Plaintiff's
18 No. 41, for any other former franchisees or
19 licensees who entered a similar agreement?
20 A.     Mark Maurer.
21 Q.     Just Mark?
22 A.     That's all I know of.
23 Q.     How did you find out that the
24 mark Van Scoy Diamond Mine was federally

Case 1:05-cv-00108-KAJ     Document 147     Filed 12/12/2005     Page 28 of 32

Page 61

1
2 registered?
3 A.    I didn't know it was.
4 Q.    Do you know it is now?
5 A.    It appears to be, looking at
6 these documents.
7 Q.    Did you know in 1993?
8 A.    You're assuming I read the whole
9 document. I probably didn't.
10 Q.    Could you take a look at
11 Plaintiff's Exhibit 41 for me, please
12 Section 3.7.
13 A.    Okay.
14 Q.    Do you agree that under the
15 Agreement, you are to take reasonable
16 measures to protect the mark and maintain
17 its enforceability?
18 A.    I'm not sure I know what that
19 means, but that's what it says.
20 Q.    What don't you understand about
21 it?
22 A.    Does it mean we have to operate
23 the store? I don't know what it means.
24 Q.    You don't know what reasonable

Page 62

1
2 measures means?
3 A.    Yes.
4 Q.    Other than that, though, you
5 understand it?
6 A.    Yes.
7 Q.    Your partner now, you mentioned
8 that you were partnered up with somebody,
9 James Sweeney?
10 A.    Right.
11 Q.    Is he still your partner?
12 A.    No.
13 Q.    Do you have any other partners?
14 A.    No.
15    (Discussion off the record.)
16    MR. PETOCK: Just a quick --
17    (Brief recess taken.)
18 BY MR. PETOCK:
19 Q.    Just want to make sure the store
20 you operate is Van Scoy Jewelers. Is that
21 the full name?
22 A.    DBA Van Scoy Jewelers of
23 Wyomissing, Pennsylvania, but the name on
24 the sign is Van Scoy Jewelers.

Page 63

1
2 Q.    Getting back to Avalon Jewelers
3 again, was that the full name of that
4 store?
5 A.    That's my understanding.
6 Q.    Is there any store now operating
7 with the word Avalon in it, a jewelry
8 store?
9 A.    Yes.
10 Q.    Where is that?
11 A.    It's the same store, changed the
12 name to Avalon, Maurer and Bash, I believe.
13 Q.    Are you aware of any other stores
14 operating with the word, Van Scoy in it
15 besides your own?
16 A.    I think Bob Cooke in
17 Greensborough, the last I heard it was Van
18 Scoy Diamond Jewelers.
19 Q.    Anyone else?
20 A.    Well, there's some other Van
21 Scoys. I think there's one up in
22 Scranton. I really don't know. There's
23 probably others still operating.
24 Q.    This Agreement, P41, are you

Page 64

1
2 still operating under that Agreement?
3 A.    It's my assumption that I'm still
4 protected by it.
5 Q.    And you're still bound by it?
6 A.    Yes.
7    MR. PETOCK: I don't have any
8 further questions.
9 BY MR. QUINN:
10 Q.    Mr. Hill, you stated at one point
11 during your testimony that you changed to
12 "Van Scoy Jewelers", in the late 1990's
13 and slightly earlier than that, according
14 to my notes, you stated that you changed to
15 Van Scoy Jewelers from Van Scoy Diamond
16 Mine, when you moved to the Paper Mill Road
17 address and then further on you stated
18 that --
19    MICHAEL F. PETOCK: Objection.
20 Are you testifying?
21    MR. QUINN: I'm laying foundation
22 for my question.
23    MICHAEL F. PETOCK: Your question
24 has alot of character in it.

Page 65

1
2      MR. QUINN: If you want me to
3 start again, I'll repeat the whole thing.
4 According to my notes, you testified that
5 you changed to "Van Scoy Jewelers", in the
6 late 1990's, but a little bit earlier,
7 again according to my notes, you stated
8 that you changed from Van Scoy Diamond Mine
9 to Van Scoy Jewelers, when you moved to the
10 Paper Mill Road address in Wyomissing on 1
11 April, 2003, and yet another place in my
12 notes, you indicate or according to my
13 notes, you indicated that the change over
14 was --
15      MICHAEL F. PETOCK: Objection.
16      MR. QUINN: Will you state your
17 objection once and for all and then I'm
18 going to ask the question and we'll have
19 him answer it.
20      MICHAEL F. PETOCK: Why don't you
21 establish the facts because it's awfully
22 confusing as to what you're saying.
23      MR. QUINN: If you let me get the
24 question out, it won't be confusing, but

Page 66

1
2 you keep interrupting me, so I'll start
3 again.
4      MR. PETOCK: Why don't you ask
5 the question again.
6      MR. QUINN: If we have to stay
7 here all afternoon, I'll ask the question,
8 without interruption.
9      MICHAEL F. PETOCK: It's an
10 extended statement.
11      MR. QUINN: I haven't gotten to
12 the question yet. I'm laying the
13 foundation and then I'll ask the question.
14      MICHAEL F. PETOCK: You lay a
15 foundation by asking questions.
16      MR. QUINN: You lay a foundation
17 by stating the preamble of the question.
18      MICHAEL F. PETOCK: Not when it
19 contains half his deposition testimony.
20      MR. QUINN: In this case, I'm
21 laying the foundation that I care to lay
22 and if you interrupt me again, I'll start
23 again.
24      MICHAEL F. PETOCK: You are

Page 67

1
2 mischaracterizing his testimony.
3      MR. QUINN: I'm not
4 mischaracterizing anybody's testimony. I'm
5 telling him what I have in my notes.
6      MICHAEL F. PETOCK: You're
7 mischaracterizing his testimony.
8      MR. QUINN: I'm telling him what I
9 have in my notes.
10 BY MR. QUINN:
11 Q.    Mr. Hill, according to my notes,
12 you testified that you changed the name of
13 your store from "Van Scoy Diamond Mine" to
14 "Van Scoy Jewelers" in the late 1990's.
15 At another place in my notes, I have that
16 you testified that you changed the name of
17 your store from Van Scoy Diamond Mine to
18 Van Scoy Jewelers, when you moved to the
19 Paper Mill Road address on 1 April, 2003.
20 And still another place in my notes, I have
21 it that you testified that the change over
22 from Van Scoy Diamond Mine to Van Scoy
23 Jewelers was that of a gradual thing, it
24 was not an all at once thing.

Page 68

1
2      Would you tell us when you
3 believe you last used the name "Van Scoy
4 Diamond Mine" in any part of your
5 operation?
6 A.    We changed the sign at the old
7 store. I remember doing that. Whether or
8 not that was an exact coincidence with the
9 official filing of the fictitious title and
10 tax returns and the like, I could easily
11 research, but the sign was actually changed
12 on an old store because I remember the sign
13 coming and putting it up and I believe that
14 that was in the late 1990's.
15      The fictitious title filing,
16 those would all be matters of records that
17 I could research for you, but when I say
18 gradual, checkbook probably happened at one
19 time and the stationery probably happened
20 at another time.
21 Q.    Was that --
22 A.    All the advertising, probably
23 residuals stayed, so when I -- I don't know
24 that fictitious title filing happened on a

Page 69

```
1
2  certain date, the sign changed on a certain
3  date.
4  Q.      Did you use the name Van Scoy
5  Diamond Mine on business cards?
6  A.      Yes.
7  Q.      Did you use it on literature in
8  your store?
9  A.      Yes.
10 Q.      Did you use it on advertising?
11         MR. PETOCK:  Objection, time
12 frame.  We're talking about time frame
13 here.
14 BY MR. QUINN:
15 Q.      At any time did you use the name
16 Van Scoy Diamond Mine on advertisement,
17 print advertisements, excuse me?
18 A.      Yes.
19 Q.      Do you know what was the last or
20 the latest date that you used the name Van
21 Scoy Diamond Mine on print advertisements?
22 A.      I would suspect it was in the
23 late '90s.
24 Q.      Do you have any way of pinning
```

Page 70

```
1
2  that date down?
3  A.      Yes.
4  Q.      How is that?
5  A.      I'd go to the newspaper and ask
6  them to look through old advertisements
7  until they found one.
8  Q.      The Reading Eagle?
9  A.      Yes.
10 Q.      Do you maintain any type of
11 archives for your business?
12 A.      By law, yes.
13 Q.      Do those archives contain old
14 advertisements, to your knowledge?
15 A.      Not all of them.  There are
16 particular ads that we ran that I probably
17 have, but not all of them.
18 Q.      In addition to business cards and
19 advertisements and the sign that appeared
20 on the store, did you use the mark Van Scoy
21 Diamond Mine anyplace else?
22 A.      Probably on TV, probably on
23 billboards, most cards, any form of
24 programs for charitable events and the
```

Page 71

```
1
2  like.  They've been used everywhere.
3  Q.      Would any of those materials be
4  in your archives?
5  A.      Some of them would be, yes.
6  Q.      Would they be dated?
7  A.      Some would probably be, yes.
8  Q.      When was the last time you saw
9  Tommy Van Scoy, Senior?
10 A.      Probably when we signed this
11 agreement, early '90s, '93.
12 Q.      To your knowledge, was Tommy Van
13 Scoy, Senior ever in either of your stores
14 after the date of the Agreement, if the
15 date the Agreement marked as Plaintiff's
16 Exhibit No. 41 was signed?
17 A.      Not to my knowledge.
18 Q.      Was he, to your knowledge, was
19 Tommy Van Scoy, Senior ever in your store
20 prior to the date of signing of Plaintiff's
21 No. 41?
22 A.      Yes.
23 Q.      How many times?
24 A.      In the early stages of the
```

Page 72

```
1
2  franchise, he would make fairly regular
3  visits.  That's to say, three or four times
4  a year to collect money and I would assume,
5  see how we were doing and to help with, in
6  the early stages, he made most of our radio
7  ads for us and we would go down to the
8  radio station and make radio ads.
9  Q.      What do you mean by time frame?
10 A.      Up through early '80s; '82, '83
11 possibly.  I don't ever remember him making
12 an ad for the Pottstown store.  I don't
13 ever remember him doing that for that
14 store, so it would put it in the '80s, very
15 early '80s; '81, '80, '81.
16 Q.      So from that time until this
17 Agreement was signed, are we assuming, the
18 question is are we assuming the Agreement
19 is signed around the date that's printed at
20 the top?
21 A.      I'm assuming that at this point,
22 yes.
23 Q.      Which is?
24 A.      March 8, 1993.
```

Page 73

```
 1
 2   Q.    So from the early '80s, if we
 3   define that as '83 to '93, did you have
 4   contact with Tommy Van Scoy?
 5   A.    No.
 6   Q.    Did he visit your store during
 7   that time, any of your stores during that
 8   time?
 9   A.    Not that I recall.
10   Q.    Did anyone representing him and
11   I'm not referring to a lawyer, but I'm
12   referring to a business associate or
13   employee, representing him visit any of
14   your stores during that time?
15   A.    We would see Tommy Van Scoy,
16   Junior from time to time, but I'm not going
17   to say that was an official context.  We
18   were in fact, worked with Tommy to sponsor
19   a race car that Tommy, Junior drove.  So we
20   would see Tommy, Junior on a regular basis,
21   but once again, that ended in the '80s as
22   well.
23         That would have been in the same
24   time frame, '83 and then after that, Tommy,
```

Page 74

```
 1
 2   Junior would visit from time to time just
 3   to compare notes on business operation, you
 4   know, who designed your cases and what kind
 5   of carpet is that because he was building
 6   some stores.
 7         He built a store prior to the
 8   store he just built recently and he came
 9   and looked at what we had done, so I would
10   see him from time to time, but it was not a
11   representation of the franchise board, so
12   to speak.
13   Q.    Of Mr. Van Scoy, Senior?
14   A.    Right.
15   Q.    Subsequent to the signing of this
16   Agreement, did anyone come in any
17   representative capacity?
18   A.    Not in a representative
19   capacity.  Tommy, Junior came to the store
20   just recently, months ago to look at, get
21   some thoughts on the store, but not to
22   represent the organization.
23   Q.    So to your knowledge, from at
24   least 1993 until now, no one representing
```

Page 75

```
 1
 2   the owner of the federal registration for
 3   the trademark at issue in this case has
 4   inspected your store; is that correct?
 5   A.    Not to my knowledge.
 6         MR. QUINN:  I have no further
 7   questions.
 8   BY MR. PETOCK:
 9   Q.    When you refer to the late
10   1990's, what are you referring to?
11   A.    In answer to what?
12   Q.    You've mentioned the late 1990's,
13   with respect to various things, but in
14   particular I guess it was when you switched
15   from Van Scoy Diamond Mine to Van Scoy
16   Jewelers, approximately, what do you mean
17   by late 1990's?
18   A.    I can find out when the
19   fictitious title was filed, it'll give you
20   an exact date, but I just don't recall.
21   Q.    1998, '97.  I don't know.
22   Q.    Prior to 1997, you were licensed
23   by Tommy Van Scoy, Senior to use the mark
24   Van Scoy Diamond Mine; correct?
```

Page 76

```
 1
 2   A.    If I understand license to mean
 3   that we had a franchise agreement with him,
 4   we had a verbal agreement with him.  The
 5   franchise agreement was never signed.
 6   Q.    Is that a yes?
 7   A.    Yes.
 8         MR. QUINN:  His answer was what
 9   it was.
10   BY MR. PETOCK:
11   Q.    This Agreement, P41 terminated
12   the license agreements and terminated any
13   obligation that there may have been as far
14   as inspection on the part of Tommy Van
15   Scoy, Junior; is that correct?
16         MR. QUINN:  Objection.  The
17   agreement speaks for itself.
18         MR. PETOCK:  I'll withdraw the
19   question.  When you said that Tommy, Junior
20   came to your store, did he actually --
21   that's my question.  When you said you saw
22   Tommy, Junior, was he at your store?
23   A.    Tommy, Junior has been at our
24   store numerous times.
```

## Page 77

```
 1
 2  Q.    Including during the 1980's?
 3  A.    Yes.
 4  Q.    Do you know what his occupation
 5  was during the 1980's?
 6  A.    Tommy, Junior at various times
 7  worked in the, worked in the senior store,
 8  as did these gentlemen.  He was a diamond
 9  importer for some period of time and at
10  some point, he opened a store under the
11  name Tovon & Company, which was the name of
12  his import business, but I don't know the
13  exact dates of that.
14  Q.    Between 1983 to 1993, would you
15  say that Tommy Van Scoy, Junior came to
16  your store on any sort of regular basis?
17  A.    Well, it varied.  He hadn't been
18  in our store until just recently probably
19  for four or five years and then he came
20  because he was building a new store and
21  came to get some design ideas from our new
22  store.
23  Q.    But in the period from 1983 to
24  1993?
```

## Page 78

```
 1
 2  A.    It would have just been, you
 3  know, social and I know he would stop from
 4  time to time if he was in the area or going
 5  past or something.
 6  Q.    And he came into your store?
 7  A.    Yes.
 8  Q.    While you characterize it as
 9  social, do you have any knowledge that he
10  went reporting back to his father after he
11  left the store?
12  A.    I would think that he probably
13  was not.
14  Q.    But you don't know that for sure;
15  is that correct?
16  A.    I certainly wouldn't know it for
17  sure, but it would be highly unlikely that
18  he was reporting back to his father,
19  because I think if anything their
20  relationship was estranged at that point in
21  time.
22  Q.    Do you have any sort of business
23  connection between, is there any sort of
24  business connection between your store and
```

## Page 79

```
 1
 2  any other jewelry store?
 3  A.    No.
 4  Q.    There's no affiliation?
 5  A.    No.
 6  Q.    Do you feel the fact that
 7  numerous stores operate under the name, Van
 8  Scoy, some form of Van Scoy allegedly
 9  operate under that name, would be a source
10  of confusion for customers?
11  A.    There are rare occasions where
12  and becoming more rare where someone will
13  come in and sort of make a warranty or a
14  service claim for something that they
15  bought in a store with the name Van Scoy in
16  it someplace other than us.  They either
17  moved into the area or they're passing
18  through and they spotted us, so we'll
19  sometimes get those requests.
20  Q.    In general, do you think it's a
21  source of confusion or not?
22  A.    I think occasionally a customer
23  makes the assumption that the stores are
24  affiliated in some way, yes.  It's
```

## Page 80

```
 1
 2  occasional.
 3        MR. PETOCK:  No further
 4  questions.
 5        MR. QUINN:  No questions from
 6  here.
 7        (Whereupon, the deposition
 8  concluded at 3:20 p.m.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```