# EXHIBIT R

Page 1

IN THE UNITED STATES DISTRICT COURT

THE DISTRICT OF DELAWARE

- - -

WAYNE VAN SCOY          :
                       :
        v.             :
                       :
VAN SCOY DIAMOND       :
MINE OF DELAWARE,      :
INC., KURT VAN SCOY    :
AND DONNA VAN SCOY     :  NO. 05-108(KAJ)

- - -

October 6, 2005

- - -


        Oral deposition of MARK

MAURER, taken pursuant to notice, was

held at the law offices of Michael

Petock, 46 The Commons at Valley

Forge, 1220 Valley Forge Road, Valley

Forge, Pennsylvania, commencing at

1:50 p.m., on the above date, before

Sherry L. Stills, Court Reporter and

Notary Public for the Commonwealth of

Pennsylvania.

- - -


        ESQUIRE DEPOSITION SERVICES
        1880 John F. Kennedy Boulevard
                15th Floor
        Philadelphia, Pennsylvania 19103
               (215) 988-9191


EXHIBIT R

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

Page 2

```
1  APPEARANCES:
2
   LAW OFFICES OF MICHAEL PETOCK
3  BY:  MICHAEL F. PETOCK, ESQUIRE
        MICHAEL C. PETOCK, ESQUIRE
4  46 The Commons at Valley Forge
   1220 Valley Forge Road
5  Valley Forge, Pennsylvania  19482
   MFP@IPLaw-Petock.com
6  (610) 933-9300
   Representing the Plaintiff
7
8
   FOX ROTHSCHILD
9  BY:  CHARLES N. QUINN, ESQUIRE
   2000 Market Street
10 10th Floor
   Philadelphia, Pennsylvania  19103
11 (215) 299-2000
   Representing Mark Maurer
12
13
14
   ALSO PRESENT:
15  Wayne Van Scoy
    Kurt Van Scoy
16
17        - - -
18
19
20
21
22
23
24
```

Page 4

```
1          - - -
2     DEPOSITION SUPPORT INDEX
3          - - -
4
5  Direction to Witness Not to Answer
6  Page Line   Page Line    Page Line
7  None
8
9
10 Request for Production of Documents
11 Page Line   Page Line    Page Line
12 None
13
14
15 Stipulations
16 Page Line   Page Line    Page Line
17 5  6-10
18
19
20 Question Marked
21 Page Line   Page Line    Page Line
22 None
23
24
```

Page 3

```
1          - - -
          I N D E X
2          - - -
3  Testimony of:  MARK MAURER
4    BY MR. MICHAEL C. PETOCK  7
5
6          - - -
         E X H I B I T S
7          - - -
8  NO.      DESCRIPTION     PAGE
9  P-42     Subpoena        10
   P-43     Agreement       38
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
1          - - -
2        MARK MAURER, after having
3  been duly sworn, was examined and
4  testified as follows:
5          - - -
6        MR. MICHAEL C. PETOCK:  All
7  objections are reserved except for
8  form of the question.
9        MR. QUINN:  That's agreeable
10 to us.
11       I'd like to say before we
12 start, so we avoid the kind of
13 argument that we had yesterday,
14 first of all, I'm here today
15 representing Mr. Maurer.  We have
16 discussed the matter of my
17 representation of the defendants
18 in this matter.  Mr. Maurer, and
19 you can ask him this, has waived,
20 to the extent there is any
21 conflict, and we don't believe
22 there is, but to the extent that
23 you may perceive there to be one,
24 Mr. Maurer waives it and you can
```

2 (Pages 2 to 5)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

Page 6

1    ask him that.
2        Secondly, Mr. Maurer's
3    subpoena asked for him to supply
4    certain documents. We sent those
5    documents to you earlier today and
6    Bates numbered them just for
7    purposes of identification. So,
8    you have all of the documents that
9    Mr. Maurer had that are responsive
10   to the request that you made other
11   than a letter that I sent to him
12   that is in the nature of a
13   privileged communication.
14       MR. MICHAEL F. PETOCK: Are
15   you also representing the
16   defendants in this matter at this
17   deposition?
18       MR. QUINN: No.
19       MR. MICHAEL F. PETOCK: You
20   are not? Who is representing the
21   defendants?
22       MR. QUINN: I don't believe
23   they have one today.
24       MR. MICHAEL F. PETOCK: The

Page 7

1    defendants received notice of this
2    deposition; is that correct?
3        MR. QUINN: That's correct.
4        MR. MICHAEL F. PETOCK: And
5    they have chosen voluntarily not
6    to be represented at this
7    deposition?
8        MR. QUINN: That's correct.
9        MR. MICHAEL F. PETOCK: And
10   the deposition is, therefore,
11   usable for any purpose?
12       MR. QUINN: It's usable for
13   whatever purpose by any party.
14       MR. MICHAEL C. PETOCK:
15   Ready?
16       MR. MICHAEL F. PETOCK: Yes.
17       - - -
18       EXAMINATION
19       - - -
20   BY MR. MICHAEL C. PETOCK:
21       Q.   Okay. Good afternoon,
22   Mr. Maurer.
23       A.   How are you?
24       Q.   Is it all right if I call

Page 8

1    you Mark today?
2        A.   Sure. Sure. May I have
3    your card? You have it already. I
4    just wanted to --
5        Q.   My business card?
6        A.   Yes. No, you don't have
7    to go downstairs to get it. I thought
8    you had one laying there.
9        Q.   Actually, I don't have
10   one.
11       A.   May I call you Michael?
12       Q.   Surely. My name is
13   Michael Petock. This is Michael F.
14   Petock. Are you familiar with the
15   litigation that we are involved in
16   here today at all?
17       A.   No, not really.
18       Q.   Just to give you a basic
19   overview, it's litigation involving
20   the use of a trademark and service
21   mark Van Scoy Diamond Mine in the
22   State of Delaware by the defendants
23   who are Van Scoy Diamond Mine of
24   Delaware, Incorporated and the owners

Page 9

1    of that corporation, Kurt and Donna
2    Van Scoy. And the plaintiff in that
3    litigation is Wayne Van Scoy.
4        You understand that you
5    have taken an oath to tell the truth
6    today; is that correct?
7        A.   That's correct.
8        Q.   Okay. Please state your
9    name and address for the record.
10       A.   Mark Maurer, 830 Plaza
11   Boulevard, Lancaster, Pennsylvania.
12       Q.   Is that your home address
13   or your business address?
14       A.   My business address.
15       Q.   What is your home
16   address?
17       A.   1169 Oakmont Drive,
18   Lancaster, Pennsylvania.
19       Q.   Are you here today in
20   response to a subpoena?
21       A.   Yes, I am.
22       MR. MICHAEL C. PETOCK: I
23   would like to have this marked as
24   Plaintiff's Exhibit 42, please.

3 (Pages 6 to 9)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

MARK MAURER

Page 10

1    P-42.
2         - - -
3         (Whereupon, the document was
4    marked as P-42 for
5    identification.)
6         - - -
7    BY MR. MICHAEL C. PETOCK:
8         Q.    What's been marked as
9    Plaintiff's Exhibit 42 is the subpoena
10   that you just testified that you are
11   here in response to; is that correct?
12        A.    That's correct.
13        Q.    Okay.  And the subpoena
14   commands you to bring all agreements
15   with Van Scoy Diamond Mines, Inc.
16   and/or Thomas Van Scoy, Sr., correct?
17        A.    Yeah.
18        Q.    Is it accurate what your
19   counsel represented that what you have
20   previously -- what your counsel
21   previously faxed to us this morning is
22   all the agreements that you have --
23        A.    Yes.
24        Q.    -- between Thomas Van

Page 11

1    Scoy, Sr. or Van Scoy Diamond Mine,
2    Incorporated?
3         A.    Yes.
4         Q.    There are no other
5    documents of that nature?
6         A.    No.
7         Q.    Is it also accurate that
8    you are represented by Charles Quinn?
9         A.    Yes.
10        Q.    And he has explained to
11   you any possible conflicts of interest
12   that may exist in his representation
13   of you?
14        A.    Yes.
15        Q.    Could you tell me what
16   conflicts that he has told you about?
17        A.    Well, he just said -- you
18   know, he didn't really outline
19   conflicts of interest.  He just said
20   there could be a conflict of interest,
21   and I said I don't have a problem with
22   that.  I don't think that there really
23   are any.  I'm really not a part of
24   this action whatever is going on.

Page 12

1         Q.    He didn't disclose to you
2    what the conflict was which he was
3    referring to?
4         A.    Well, he's representing,
5    I think, one of the parties.
6         Q.    Are you aware of the fact
7    that the defendants in this action who
8    are represented by Mr. Quinn are
9    attempting to invalidate the trademark
10   and service mark Van Scoy Diamond
11   Mine?
12        A.    I am not aware of that.
13        Q.    And they are also trying
14   to invalidate or hold the trademark
15   and the service mark Van Scoy Diamond
16   Mine invalid?
17        A.    No, I am not aware of
18   that.
19        Q.    Are you presently
20   operating any jewelry store under the
21   name Van Scoy Diamond Mine?
22        A.    I'm operating two jewelry
23   stores, both of which were operating
24   under Van Scoy Diamond Mine, and I

Page 13

1    maintain clients that have been sold
2    over the years under that name.
3         Q.    Are you aware that if the
4    defendants are successful with their
5    defense and their counterclaims to
6    hold the trademark and service mark of
7    Van Scoy Diamond Mine invalid or
8    generic, any person would be within
9    their rights to open up a Van Scoy
10   Diamond Mine in your town?
11        MR. QUINN:  Objection.
12   First of all, that
13   mischaracterizes the defendants'
14   position.  The invalidation claim
15   is with respect to the federal
16   registrations of those Marks, and
17   it further mischaracterizes the
18   position in the hypothetical in
19   that it does not take account of
20   any common law rights that
21   Mr. Maurer might have developed
22   over the years through use of
23   those Marks.
24        So, I object to that

4  (Pages 10 to 13)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

MARK MAURER

Page 14

1  question on two bases. I think it
2  is misleading and deceptive.
3       MR. MICHAEL C. PETOCK: That
4  is strictly with respect to the
5  invalid defense. However, the
6  generic defense, that objection
7  would not hold, is that not true?
8       MR. QUINN: No, I don't
9  agree with that. I don't agree
10  with that characterization at all.
11       MR. MICHAEL F. PETOCK:
12  Answer the question.
13  BY MR. MICHAEL C. PETOCK:
14       Q.   You can answer the
15  question. I will repeat it, if you
16  don't --
17       A.   I don't really totally
18  understand the question.
19       Q.   Okay. Are you aware of a
20  fact that if the defendants are
21  successful with one or more of their
22  defenses, it may open the possibility
23  that any person would be within their
24  rights to open up a Van Scoy Diamond

Page 15

1  Mine directly across the street from
2  your business?
3       A.   I am not aware of that.
4       MR. QUINN: Same
5  objection.
6  BY MR. MICHAEL C. PETOCK:
7       Q.   And could you repeat your
8  answer?
9       A.   I am not aware of that.
10       Q.   Okay. Mark, where were
11  you born?
12       And you -- did you waive
13  the conflict?
14       A.   Yes, I did.
15       Q.   Where were you born?
16       A.   Reading, Pennsylvania.
17       Q.   Where did you grow up?
18       A.   Reading, Pennsylvania.
19       Q.   Where did you go to high
20  school?
21       A.   Exeter High School.
22       Q.   I have heard of Exeter
23  before. That's up in New England; is
24  that correct?

Page 16

1       A.   We like people to believe
2  that. When they ask a little deeper,
3  they know it's a little township high
4  school outside of Reading.
5       Q.   So, it's in Reading?
6       A.   Yes.
7       Q.   Did you work in high
8  school?
9       A.   Yeah. Yes.
10       Q.   What did you do?
11       A.   Various jobs. I mean,
12  various jobs. My father died at 15.
13  I worked a lot. It would take a long
14  time to describe all of them.
15       Q.   Okay. Your education
16  beyond high school, did you have any?
17       A.   Yes. Millersville
18  University.
19       Q.   Where is that located?
20       A.   Lancaster, Pennsylvania.
21       Q.   Okay.
22       A.   Outside of Lancaster,
23  actually, in Millersville, but it's a
24  little suburb of Lancaster.

Page 17

1       Q.   Do you have any education
2  beyond Millersville?
3       A.   No.
4       Q.   Did you receive a degree
5  from Millersville?
6       A.   No.
7       Q.   How many years did you
8  attend Millersville?
9       A.   Three and a half.
10       Q.   Were you employed during
11  college?
12       A.   Yes.
13       Q.   What did you do during
14  college?
15       A.   I worked at various
16  construction jobs. I worked for The
17  Boys and Girls Club in Lancaster. I
18  worked for the University doing jobs.
19       Q.   What year did you
20  graduate or did you stop attending
21  Millersville?
22       A.   In 1972.
23       Q.   Why didn't you get your
24  degree from Millersville?

5 (Pages 14 to 17)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

MARK MAURER

Page 18

1    A.    Excuse me.  I -- I don't
2  understand what this is pertinent --
3  I'll answer the question but, I mean,
4  let's hurry up here.  This isn't
5  right.
6          I got married.  Okay.
7    Q.    Okay.
8    A.    I'm 55 years old.
9    Q.    I'm just trying to get
10  background information.
11          What was the first job
12  you got after you graduated or after
13  you finished with Millersville?
14    A.    Selling life insurance.
15    Q.    Okay.  And how long did
16  you do that?
17    A.    Oh, about nine years.
18    Q.    Okay.  That takes you up
19  to about 1979, approximately?
20    A.    No.  '70 -- took me up to
21  1980.
22    Q.    1980?
23    A.    Uh-huh.
24    Q.    Did you hold any other

Page 19

1  jobs?
2    A.    No.
3    Q.    Okay.
4    A.    I sold life insurance and
5  I have a securities license.
6    Q.    Okay.  In 1980, did you
7  get another job?
8    A.    Actually, if you're
9  getting to the point when I opened my
10  first jewelry store, it was in 1981,
11  and I actually maintained my insurance
12  license and maintained receiving
13  insurance income while I started my
14  jewelry business.
15    Q.    Okay.  And where did you
16  start this first jewelry business?
17    A.    Allentown, Pennsylvania.
18    Q.    1981?
19    A.    Uh-huh.
20    Q.    What was the name of that
21  jewelry store?
22    A.    Van Scoy Diamond Mine.
23    Q.    Prior to starting -- were
24  you the owner of this Van Scoy Diamond

Page 20

1  Mine?
2    A.    Yes.
3    Q.    Prior to becoming owner
4  of this Van Scoy Diamond Mine in
5  Allentown, did you have any experience
6  in the jewelry business?
7    A.    Well, I was an industrial
8  arts major in college, and I did have
9  silversmithing and those type of
10  experiences in college, yes.
11    Q.    You took a silversmithing
12  class in college?
13    A.    Several.  Silversmithing,
14  metal working.  In college, I was an
15  industrial arts major.
16    Q.    Okay.  Had you ever been
17  in the business of retail jewelry?
18    A.    No, I did not.
19    Q.    Did you ever get involved
20  in any other jewelry stores besides
21  the Allentown, Pennsylvania --
22    A.    Yes.
23        MR. QUINN:  Objection.
24    Seeking clarification what the

Page 21

1      meaning of involved.
2  BY MR. MICHAEL C. PETOCK:
3    Q.    Okay.  How did you get
4  involved -- how did you become owner
5  of a Van Scoy Diamond Mine in
6  Allentown?
7    A.    I -- I met Mr. Thomas Van
8  Scoy, Sr. and he went into business by
9  buying the territory of Allentown.
10  That's how I got involved.
11    Q.    Where did you meet
12  Mr. Van Scoy, Sr.?
13    A.    I met him in the store in
14  Lancaster, Pennsylvania where I was
15  living.
16    Q.    Okay.  And did you enter
17  into an agreement with Mr. Van Scoy
18  with respect to the ownership of the
19  Van Scoy Diamond Mine in Allentown,
20  Pennsylvania?
21    A.    Yes.
22    Q.    What were the terms of
23  that agreement?
24    A.    Terms of the agreement

6 (Pages 18 to 21)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

MARK MAURER

Page 22

1  were that we had rights to the area
2  and use of the name and paid him money
3  to do that.
4       Q.   How much did you pay him
5  for the rights to the use of the name
6  in that area?
7       A.   $50,000.
8       Q.   That was an up-front fee?
9       A.   Up-front fee.
10      Q.   Was there also a
11  monthly --
12      A.   Yes, there was.
13      Q.   -- royalty fee?
14      A.   Yes.
15      Q.   How much was that?
16      A.   $1,000 a month.
17      Q.   You testified that you
18  bought the rights to the area.  Could
19  you be more specific as to what that
20  area was?
21      A.   It was the area of the
22  Lehigh Valley.
23      Q.   And how long did you
24  operate that store in the Lehigh

Page 23

1  Valley?
2       A.   Still operate it today.
3       Q.   Has it always been in the
4  same location?
5       A.   It's moved three miles --
6       Q.   What was the --
7       A.   -- one time.
8       Q.   Okay.  What was the
9  initial original location of the store
10  in Allentown?
11      A.   1882 Catasauqua,
12  C-A-T-A-S-A-U-Q-U-A, Road, Allentown.
13      Q.   And where did it move?
14      A.   It moved to MacArthur
15  Road, M-A-C Capital A-R-T-H-U-R.
16      Q.   What number on MacArthur?
17      A.   I'm sorry.  1457
18  MacArthur Road, Whitehall is actually
19  the suburb.  Whitehall, one word.
20      Q.   And you testified that's
21  about three miles away from the
22  original location?
23      A.   Yes, about.
24      Q.   Now, has this store in

Page 24

1  Allentown always gone by the name Van
2  Scoy Diamond Mine?
3       A.   The old location -- the
4  original location did up until 24
5  months ago, and it now goes as Avalon,
6  Maurer and Bash, and it still operates a
7  phone line in communication to all the
8  Van Scoy customers I built up over 20
9  years.
10      Q.   Did you advertise going
11  out of business with respect to the
12  store that was operated on the
13  original location, Catasauqua Road?
14      A.   We advertised that we
15  were going to be closing that store in
16  that location.
17      Q.   Did you, at any time,
18  have going out of business signs in
19  your window?
20      A.   You know, obviously, we
21  didn't want to give the impression
22  that we were actually going out of
23  business.  That location was going out
24  of business.  I don't recall exactly.

Page 25

1  Always the move was to move the
2  location and to incorporate the other
3  name.
4       Q.   Was there ever a time
5  where there was a billboard along one
6  of the roads from the Allentown or the
7  surrounding areas with a Van Scoy
8  Diamond Mine advertisement with a
9  going out of business banner against
10  it?
11      A.   I don't really know.  It
12  could have.  I don't really know.
13  Closing the store.  I know that
14  closing the store was a big part of
15  our promotion of closing that store
16  and moving to the new store.
17      Q.   Why did you desire to
18  change the name from Van Scoy Diamond
19  Mine to Avalon, Maurer and Bash?
20      A.   We had three stores in
21  that market at one time all operating
22  under Van Scoy Diamond Mine, and they
23  were -- two of them were operating in
24  malls.  One in the South Mall on

7  (Pages 22 to 25)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

MARK MAURER

**Page 26**

1  Lehigh Street, and one in the
2  Phillipsburg Mall in Phillipsburg, New
3  Jersey. And when we got out of the
4  mall business, we sold those stores.
5  We sold them to other operators that
6  operated other jewelry stores, and the
7  perception was that the company was
8  weak, and so my ad agency said, when
9  we move, we can rebuild a new name
10 faster than we can repair that name.
11     Q.  So, was your intent, when
12 you moved to MacArthur Road, to
13 abandon the name Van Scoy Diamond Mine
14 in that area?
15     A.  It was not the intent to
16 abandon it because I spent so much
17 money in advertising and royalty fees
18 to build it up. The intent was to
19 operate under another name but
20 maintain those customers through
21 private communication to them.
22     Q.  Okay.
23     A.  And I may add to that
24 that when Tommy Van Scoy, Sr. filed

**Page 27**

1  for bankruptcy only about 70 miles
2  away or 80 or however far it is, that
3  tremendously damaged the name in the
4  area for me.
5     Q.  Okay. You no longer use
6  the name Van Scoy Diamond Mine in any
7  of your advertising?
8     A.  I do in private
9  communication to the about 10,000
10 customers I built up. Absolutely.
11     MR. MICHAEL F. PETOCK:
12 What's the manner of advertizing?
13     THE WITNESS: Direct mail.
14 BY MR. MICHAEL C. PETOCK:
15     Q.  You do not do the -- do
16 you use the name Van Scoy Diamond Mine
17 in advertising?
18     A.  To those customers, yes.
19     Q.  In what medium?
20     A.  In direct mail.
21     Q.  And how do you
22 communicate with them through direct
23 mail?
24     A.  I have also used it, by

**Page 28**

1  the way, in the radio in that I talk
2  to those customers and tell them
3  that -- where we are and where we're
4  operating under that name at the new
5  location.
6     Q.  How do you say that? Do
7  you say that the business that was
8  formerly Van Scoy Diamond Mine and it
9  is now --
10     A.  No. I say that, you
11 know, we're operating under this new
12 name, but it's the same store, same
13 people, come in, you know, get your
14 jewelry repaired. We honor all the
15 guarantees and all the so forth. You
16 know, that you still have a home.
17     Q.  Okay. Now, you own two
18 stores right now; is that correct?
19     A.  That is correct.
20     Q.  You only own two stores?
21     A.  That's correct.
22     Q.  Where is your other store
23 located?
24     A.  In Lancaster,

**Page 29**

1  Pennsylvania at 830 Plaza Boulevard.
2     Q.  And what name does that
3  store go under?
4     A.  Van Scoy, Maurer and Bash
5  Diamond Jewelers.
6     Q.  How long have you
7  operated a jewelry store in Lancaster,
8  Pennsylvania?
9     A.  Since 1985.
10     Q.  And where did you open up
11 a jewelry store in 1985?
12     A.  I actually took over an
13 existing Van Scoy Diamond Mine store
14 from an existing person.
15     Q.  What was the name of that
16 person?
17     A.  Nancy Shindo,
18 S-H-I-N-D-O.
19     Q.  Was she a licensee of
20 Tommy Van Scoy, Sr. in 1985 when you
21 took over her operation?
22     A.  Yes. She was a
23 franchisee.
24     Q.  That was at 830 Plaza

8 (Pages 26 to 29)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

MARK MAURER

Page 30

1    Boulevard?
2        A.   No.  That store was at
3    958 Plaza Boulevard.
4        Q.   Okay.  And when did you
5    move to --
6        A.   830 Plaza?
7        Q.   -- 830 Plaza Boulevard?
8        A.   May 21st, 2004.
9        Q.   Was 958 Plaza Boulevard
10   always operated under the name Van
11   Scoy Diamond Mine?
12       A.   That's correct.
13       Q.   And, on May 21st, 2004,
14   you moved to 830 Plaza Boulevard and
15   at the same time did you change your
16   name to Van Scoy, Maurer and Bash
17   Diamond Jewelers?
18       A.   That is correct.
19       Q.   Did you advertise going
20   out of business with respect to the
21   958 Plaza Boulevard store?
22       A.   No, I did not.
23       Q.   How close is the 958
24   Plaza Boulevard to the 830 Plaza

Page 31

1    Boulevard?
2        A.   About a driver and a
3    wedge away, however far that is.
4        Q.   So, it's within a few
5    miles or --
6        A.   Oh, no.
7        Q.   Even closer?
8        A.   600 yards.
9        Q.   I don't play golf.
10       A.   600 yards.
11       Q.   Okay.  That would be
12   about two drivers.
13       A.   Well, if you hit it down
14   the road, it's going to roll.
15       Q.   I want to go back to talk
16   about the Allentown store that you
17   operated in -- that was operated under
18   Van Scoy Diamond Mine.
19       A.   Okay.
20       Q.   How do you pronounce that
21   road?
22       A.   Catasauqua Road.
23       Q.   Catasauqua.
24       A.   Uh-huh.

Page 32

1        Q.   Okay.  Did you advertise
2    in connection with that store?
3        A.   Yes.
4        Q.   How did you advertise?
5        A.   Radio, newspaper,
6    billboards, direct mail.
7        Q.   What radio stations did
8    you advertise with?
9        A.   WAEB AM, WAEB FM, WZZO
10   FM, WKAP AM, WXKW FM, WLEV FM, WQQQ
11   FM.
12       Q.   Okay.  Are all of those
13   local Allentown radio stations?
14       A.   They are.
15       Q.   Okay.  Do you have any
16   idea as to the geographic scope of
17   their broadcasting range?
18       A.   Like most radio stations
19   in Pennsylvania with the mountains, I
20   don't know, 25 miles, 30 miles.
21       Q.   Generally, within the
22   Allentown area?
23       A.   Within the Lehigh Valley,
24   that's correct.

Page 33

1        Q.   Okay.  What newspapers
2    did you advertise with?
3        A.   The Morning Call, The
4    Bethlehem Globe, The Easton Times
5    Express.
6        Q.   Is the circulation for
7    all of those the Lehigh Valley?
8        A.   That is correct.
9        Q.   Was all your advertising
10   with respect to the Allentown store in
11   the Lehigh Valley?
12       A.   That is correct.
13       Q.   Presently with your
14   store, would that be the same answer,
15   all your advertising occurs in the
16   Lehigh Valley?
17       A.   That is correct.
18       Q.   Okay.  With respect to
19   your store in Lancaster, do you
20   advertise in connection with that
21   store?
22       A.   Yes.
23       Q.   The former store, the one
24   that was operated as a Van Scoy

9 (Pages 30 to 33)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

MARK MAURER

Page 34

1  Diamond Mine --
2      A.  Yes.
3      Q.  -- did you advertise?
4      A.  Yes.
5      Q.  And did you do the same
6  types of advertising?
7      A.  The same types of
8  advertising, yes.
9      Q.  And how would you
10  describe the geographic scope of that
11  advertising?
12      A.  Same thing.  Local
13  advertising done on local radio
14  stations and local newspaper.
15      Q.  And what was the coverage
16  with respect to which county it was?
17      A.  Lancaster County.
18      Q.  Was it pretty much
19  limited to the Lancaster County?
20      A.  Well, it's only 15 miles
21  to the York County line and we get a
22  lot of customers that come over that
23  area.  Actually, when I bought that
24  area from Tommy Van Scoy because Nancy

Page 35

1  Shindo went out of business, we got
2  Central Pennsylvania.  So, we got
3  Harrisburg, York and Lancaster.  There
4  was a store in Harrisburg at the time
5  and York at the time.  We closed the
6  Harrisburg store and we operated the
7  York store for ten years.
8      Q.  Okay.
9      A.  But the purchase of that
10  marketing area was what's called the
11  Susquehanna Valley, just like it's the
12  Lehigh Valley up in the Allentown
13  area.
14      Q.  Could you, please, name
15  all of the areas in which you have
16  ever owned a Van Scoy Diamond Mine?
17      A.  Sure.  Sure.  Lancaster,
18  Pennsylvania; York Pennsylvania;
19  Harrisburg, Pennsylvania; Allentown,
20  Pennsylvania, two stores in that
21  market; Phillipsburg, New Jersey,
22  Norfolk, Virginia; and Hampton,
23  Virginia.
24      Q.  And did you advertise

Page 36

1  with respect to all of those stores?
2      A.  Yes, I did.
3      Q.  Okay.  With respect to
4  all of those stores, did you advertise
5  within a limited geographic scope?  If
6  you were to put a mileage radius on
7  it, could you do that?
8      A.  Well, advertise within
9  the scope of the local radio stations.
10  However, the -- the most powerful
11  local radio station that I use,
12  however far that reached, that's how
13  far we advertise.
14      Q.  Where did you draw the
15  majority of your customer base with
16  respect to a geographic radius from
17  within these stores, since you seem to
18  be very experienced in the jewelry
19  business?
20      A.  Within 30 to 50 miles of
21  the store.
22      Q.  In the context of the
23  jewelry business, is the geographic
24  market from which you operate your

Page 37

1  Lancaster store a separate geographic
2  market from the Wilmington, Delaware
3  store?
4      A.  Absolutely.
5      Q.  And in the context of the
6  jewelry business, is the geographic
7  market in which you operate your
8  Allentown store a separate geographic
9  market than the Wilmington, Delaware
10  store?
11      A.  Absolutely.
12      Q.  In the context of the
13  jewelry business, is the geographic
14  market in which you operate your
15  Lancaster store a different geographic
16  market than the Wilkes-Barre area
17  market?
18      A.  Absolutely.
19      Q.  In the context of the
20  jewelry business, is the geographic
21  market in which you operate your
22  Allentown store a different geographic
23  market?
24      A.  Yes.

10  (Pages 34 to 37)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

MARK MAURER

Page 38

1    Q.   Do you have any intent of
2 resuming advertising of the name Van
3 Scoy Diamond Mine?
4    A.   I might.
5        MR. MICHAEL C. PETOCK: I
6 would like to have this marked as
7 Exhibit 43, Plaintiff's Exhibit 43
8 please.
9            - - -
10       (Whereupon, the document was
11 marked as P-43 for
12 identification.)
13           - - -
14 BY MR. MICHAEL C. PETOCK:
15    Q.   Before we get into that
16 agreement, you testified earlier, and
17 correct me if I am wrong, that your
18 business was damaged by the bankruptcy
19 of Thomas Van Scoy, Sr. in the
20 Allentown area; is that correct?
21    A.   Yes.
22    Q.   Okay. How did the public
23 know about the bankruptcy of Thomas
24 Van Scoy, Sr.?

Page 39

1    A.   I have no idea.
2    Q.   Do you have any
3 information that they did know about
4 it?
5    A.   Just from people that
6 would come into the store and talk
7 about it, but I have no idea how they
8 found out. I know that the entire
9 supply chain in the industry knew very
10 much about it.
11    Q.   When you say you were
12 damaged, were you damaged by the
13 perception of the public or are you
14 talking about the individual suppliers
15 that came to you?
16    A.   Both.
17    Q.   Did you have customers
18 actually mention the bankruptcy of
19 Thomas Van Scoy, Sr.?
20    A.   Yes.
21    Q.   How many customers would
22 you say?
23    A.   I have no idea how to
24 gauge that.

Page 40

1    Q.   And you have no idea how
2 they found out about his bankruptcy?
3        What kind of things would
4 they say to you?
5        MR. MICHAEL F. PETOCK:
6 You have to answer.
7        MR. QUINN:  Objection.
8 There's two questions. Ask them
9 one at a time, please.
10       THE WITNESS:  I have no idea
11 how they would -- sure.
12 BY MR. MICHAEL C. PETOCK:
13    Q.   What types of things
14 would they say to you with respect
15 to --
16    A.   Well, are you going out
17 of business? You know, they're going
18 out of business. Is my guarantee
19 going to be good?
20       Maybe they wouldn't buy
21 from us because they found out that
22 they were having difficulties and
23 filing for bankruptcy. So, we had to
24 do extra work to try to sell our

Page 41

1 product.
2    Q.   What did you know about
3 the bankruptcy of Thomas Van Scoy,
4 Sr.?
5    A.   I didn't know anything
6 about it other than he filed for
7 bankruptcy.
8    Q.   So, your customers knew
9 more about it than you, is that what
10 you are testifying?
11    A.   Well, I mean, you don't
12 need any more details. Some guy files
13 for bankruptcy, he files for
14 bankruptcy. I don't need to know any
15 other details about it. The --
16    Q.   Go ahead.
17    A.   The suppliers certainly
18 were telling me that they weren't
19 getting paid and, you know, they filed
20 for bankruptcy. They weren't happy
21 about it.
22    Q.   Did you know that some
23 people using the name Van Scoy Diamond
24 Mine were enjoined from use of that

11 (Pages 38 to 41)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

MARK MAURER

Page 42

1  Mark?
2      A.   No, I did not.
3      Q.   Were you aware that the
4  Wilkes-Barre store was forced to
5  change its name at some point?
6      A.   No, I was not.
7      Q.   Are you familiar with
8  what's been marked as Plaintiff's
9  Exhibit 43?
10     A.   Yes.
11     Q.   What is that?
12     A.   It looks like the
13 agreement that was made with Thomas
14 Van Scoy, Sr. to purchase the
15 permanent rights to our areas and stop
16 paying the monthly fee and pay him a
17 lump sum amount.
18     Q.   Is it that agreement?
19     A.   Yes.
20     Q.   This agreement granted
21 you the exclusive right to use and to
22 trade under the Mark in the defined
23 territory; is that correct?
24     A.   Yes.

Page 43

1      Q.   And you paid $25,000 and
2  $25,000 worth of diamonds for that
3  exclusive right; is that correct?
4      A.   That's correct.
5      Q.   After this agreement was
6  executed, you no longer were required
7  to pay the monthly royalty payments;
8  is that correct?
9      A.   That's correct.
10     Q.   Did this agreement change
11 your relationship with respect to
12 Tommy Van Scoy, Sr. or Van Scoy
13 Diamond Mine, Inc. in any way?
14     A.   No, because, at that
15 point, we really didn't have much of a
16 relationship. That's why we got to
17 that point. He was collecting a fee
18 for doing nothing.
19     Q.   Looking back on the
20 amount you paid for the rights to use
21 the Mark, do you think it was a good
22 business decision?
23     A.   Well, there is no way to
24 really judge that. I don't think I

Page 44

1  could really answer that question.
2      Q.   Why can't you answer that
3  question?
4      A.   Well, you know, there's a
5  whole bunch of what ifs. What could
6  have been if it would have been, you
7  know, all that it was promised to be
8  versus what is it really turned out to
9  be. But, you know, would I be in the
10 jewelry business without it today?
11 Probably not. So, I don't really --
12 you know, I could answer that question
13 both ways.
14     Q.   Are you resentful of
15 Tommy Van Scoy, Sr.?
16     A.   Yes.
17     Q.   Do you hold a grudge
18 against him?
19     A.   No.
20     Q.   Despite your contentions
21 as to there not being any
22 relationship, even before you executed
23 this agreement, as a matter of what
24 was put in writing, this agreement

Page 45

1  changed your relationship; is that
2  correct?
3      A.   It changed relationship
4  that I didn't have to pay the money --
5  continue to pay the monthly money,
6  that's correct.
7      Q.   Did it also change the
8  relationship in the sense that --
9  well, let me have you take a look at a
10 specific section. Section seven on
11 page five.
12     A.   Okay.
13     Q.   Is it true that this
14 agreement changed your relationship
15 with Tommy Van Scoy, Sr. such that he
16 no longer was obligated to provide any
17 type of advertising support or
18 promotional assistance for you?
19     A.   Well, yeah, I guess that
20 maybe it does, in that regard. It
21 certainly says that there, but he
22 hadn't done that for years beforehand.
23 I mean, we were doing everything. He
24 was just getting the money and going

12 (Pages 42 to 45)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

MARK MAURER

Page 46

1  to the casinos.
2      Q.   By the way, when I refer
3  to you, I'm referring to --
4      A.   Talking about my company.
5      Q.   -- International.
6      A.   I understand.
7      Q.   Do you know how you would
8  characterize what this agreement
9  granted you?
10     A.   Yes.
11     Q.   What?
12     A.   It grants me the
13  exclusive right to operate a jewelry
14  store and owning the name Van Scoy
15  Diamond Mine in that area.
16     Q.   Okay.
17     A.   In my areas.
18     Q.   Okay.  After this
19  agreement was executed, would you say
20  that you in all ways severed your
21  relationship with Tommy Van Scoy, Sr.,
22  any sort of business relationship that
23  may or may not have been ongoing?
24     A.   No, I don't think that.

Page 47

1  I mean, this agreement also guaranteed
2  that he was not going to or anybody
3  was not going to come into my area and
4  compete with me, based on the half
5  million dollars plus that I had paid
6  him.  I mean, it was at a point in
7  time where he accepted the money,
8  understood he really didn't do
9  anything, and was, I think, grateful
10  to get the money, at that point.
11     Q.   Are you still bound by
12  this agreement, in your opinion?
13     A.   Yes.  I still think that
14  I have the rights to my areas.
15     Q.   And, as a whole, you are
16  still bound by the agreement, correct?
17     A.   I don't know -- what do
18  you mean as a whole versus --
19     Q.   Well, you said that you
20  still have the rights to your area,
21  but there's a lot of provisions.  So,
22  I mean, if that part is good, is the
23  rest of it good, too?
24     A.   I would reserve the right

Page 48

1  to sit here and read it and then
2  answer that question, if I could.  Do
3  you want me to?
4      MR. MICHAEL F. PETOCK:
5  Why don't you read it.  Go ahead
6  and read it.
7      MR. MICHAEL C. PETOCK:
8  Sure.
9      MR. MICHAEL F. PETOCK:  You
10  can go off the record.
11          - - -
12     (Whereupon, there was an
13  off-the-record discussion.)
14          - - -
15  BY MR. MICHAEL C. PETOCK:
16     Q.   Back on the record.
17          You have had time to
18  review the entire agreement?
19     A.   Right.
20     Q.   Okay.  And do you believe
21  that you are bound by all the
22  provisions of the agreement?
23     A.   Yes.
24     Q.   Okay.  Could you look at

Page 49

1  section 3.6 again, please.
2      A.   Yes.
3      Q.   Could you read that
4  section aloud, please.
5      A.   Sure.
6          International shall
7  continue to conduct its retail jewelry
8  business using the same high standards
9  of integrity in dealing with the
10  public and continue to offer the same
11  high quality jewelry products and
12  jewelry service as International has
13  offered heretofore, to the extent
14  International can do so and yet
15  continue to meet the prices of its
16  competition.
17     Q.   Have you continued to do
18  so?
19     A.   Absolutely.
20     Q.   Do you agree that, under
21  the agreement, there was a joint
22  intent to take reasonable measures to
23  protect the Mark and to maintain its
24  enforceability?

13 (Pages 46 to 49)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

MARK MAURER

Page 50

1    MR. QUINN: Objection.
2    The agreement speaks for itself.
3    MR. MICHAEL F. PETOCK: His
4    understanding.
5    MR. QUINN: Pardon me?
6    MR. MICHAEL F. PETOCK: He
7    is asking his understanding of it.
8    MR. MICHAEL C. PETOCK:
9    Section 3.7, if you would like to
10   look at.
11   MR. QUINN: Well, if you
12   would like to phrase the question
13   that way, then I will not object
14   to it, but I don't think it was
15   phrased that way.
16   THE WITNESS: Okay. I have
17   read it.
18   BY MR. MICHAEL C. PETOCK:
19   Q.   Okay. Do you agree
20   that -- is it your understanding that,
21   under the agreement, there was a joint
22   intent to take reasonable measures to
23   protect the Mark and to maintain its
24   enforceability?

Page 51

1    A.   Yes.
2    Q.   And with respect to
3    section 3.8, is it your understanding
4    that, under the agreement,
5    International was not to do anything
6    that would be considered a breach of
7    the agreement?
8    A.   That's correct.
9    Q.   And, in all respects, do
10   you operate your present jewelry store
11   in accordance with this agreement?
12   A.   I do.
13   Q.   Okay. I'm going to ask
14   you about section 3.8 again.
15   A.   Okay.
16   Q.   And is it your
17   understanding, with respect to that
18   section, that neither party, neither
19   you nor Thomas Van Scoy, Sr. shall do,
20   indirectly or through any third party,
21   anything which, if done directly,
22   would amount to a breach of the
23   agreement?
24   A.   That's correct.

Page 52

1    Q.   Okay. And you testified
2    that -- well, you testified to what
3    you testified to.
4    You testified earlier
5    that you owned stores in Lancaster,
6    York, Harrisburg, Allentown,
7    Phillipsburg, Norfolk, Virginia and
8    Hampton, Virginia; is that correct?
9    A.   That's correct.
10   Q.   And is that all the
11   stores that you have owned?
12   A.   That I have owned, yes.
13   Q.   Were they all -- at one
14   time all of them operated under the
15   name Van Scoy Diamond Mine?
16   A.   That's correct.
17   Q.   Okay. And you advertised
18   in connection with each one of these
19   stores?
20   A.   That's correct.
21   Q.   And for each store that I
22   just listed, you only advertised in
23   the geographic market in which the
24   store was located; is that correct?

Page 53

1    A.   That's correct.
2    Q.   Was each one of the
3    geographic markets for those stores a
4    separate geographic market than the
5    Wilmington, Delaware --
6    A.   Oh, yes.
7    Q.   -- market?
8    A.   Yes.
9    Q.   And was each one of those
10   stores -- the geographic market for
11   each one of those stores a separate
12   market than the Wilkes-Barre store?
13   A.   That is correct.
14   Q.   The Wilkes-Barre market?
15   A.   Yes, that's correct.
16   Q.   Okay. For each one of
17   those stores, was the geographic
18   market different than the Erie,
19   Pennsylvania market?
20   A.   That is correct, yes.
21   Q.   And for each one of those
22   stores, was the geographic market
23   different than the Greensboro, North
24   Carolina market?

14 (Pages 50 to 53)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

MARK MAURER

Page 54

1      A.    That is correct.
2      Q.    Could you describe your
3  relationship with Kurt Van Scoy?
4      A.    I don't really have one.
5      Q.    When was the first time
6  you met Kurt Van Scoy?
7      A.    I don't know.  He was
8  real little as a kid.  He was a little
9  kid.
10      Q.    And did you see him at
11  all during the 1980s, to your
12  recollection?
13      A.    Today is the first time
14  I've seen Kurt Van Scoy since he lived
15  at home in Wilkes-Barre.  I have no
16  idea how long that is.  I first met
17  Kurt 25 years ago or whatever it is.
18      Q.    When was the last time
19  you spoke with Kurt Van Scoy before
20  today?
21      A.    I called him to wish him
22  condolences on the death of his
23  father.
24      Q.    And, before that, when

Page 55

1  was the last time you talked to him?
2      A.    I couldn't tell you when
3  it was.
4      Q.    Did Kurt call you in,
5  approximately, this past winter at
6  some point, besides the time that you
7  called him?  Did you speak with him
8  over the telephone?
9      A.    I don't really know
10  that -- I mean, I speak to his
11  brother.
12      Q.    Which brother?
13      A.    Tommy Junior, just as
14  friends.  I can't really recall.  I
15  mean, I have no relationship with
16  Kurt.  He has never been to my store.
17  I have never been to his.  I was
18  shocked to find out he was almost 40
19  today.  I mean, I just don't have a
20  relationship with these people.
21      Q.    All right.  How did you
22  find out that Kurt was being sued?
23      A.    Through Tommy Junior.
24      Q.    Do you recall Kurt

Page 56

1  calling you to talk about the fact
2  that he was involved in litigation?
3      A.    No, I don't.
4      Q.    What did Tommy Junior
5  tell you about the litigation?
6      A.    Said that Wayne is suing
7  Kurt for use of the name.
8      Q.    Did he tell you anything
9  else about it?
10      A.    I don't think he knew,
11  other than he's annoyed about it.  I
12  don't really think he knew much else.
13      Q.    How did he express the
14  fact that he was annoyed about it to
15  you?
16      A.    Oh, by tone of voice.
17  Sad that a brother is fighting a
18  brother, that kind of thing.
19      Q.    Are you aware of anyone
20  using the name Van Scoy Diamond Mine?
21      A.    Am I aware of it?
22      Q.    Yes.
23      A.    Yes.  Sure.
24      Q.    Who is everyone that you

Page 57

1  are aware of using the name Van Scoy
2  Diamond Mine or aware of the stores?
3      A.    Kurt Van Scoy, Wayne Van
4  Scoy, Bob Cooke, and Lou Hill.
5      Q.    Lou Hill is not using the
6  name Van Scoy Diamond Mine; is that
7  correct?
8      A.    He's using Van Scoy
9  Jewelers, I think.
10      Q.    And also Bob Cooke isn't
11  using the name Van Scoy Diamond Mine;
12  is that correct?
13      A.    I did not know that.
14      Q.    Did you give Kurt Charlie
15  Quinn's name?
16      A.    No, I did not.
17      Q.    Have you been represented
18  by Charlie Quinn in the past?
19      A.    Yes, I have.
20      Q.    When was that?
21      A.    Back when this agreement
22  was written.
23      Q.    Did Charlie Quinn draft
24  that agreement?

15 (Pages 54 to 57)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

MARK MAURER

Page 58

1    A.   Yes, he did.
2    Q.   Do you know if he also
3  drafted the agreement for Lou Hill
4  with respect to --
5    A.   I don't know.
6    Q.   Did you sign an
7  engagement letter with Mr. Quinn?
8    A.   What's that?
9    Q.   Any sort of letter
10 explaining his fees and his scope of
11 representation of you and that type of
12 thing?
13   A.   I don't really know.  I
14 mean, I have known Charlie for a long
15 time.  I really don't know.
16   Q.   Do you know who is paying
17 for his representation of you here
18 today?
19   A.   I believe that Kurt Van
20 Scoy is, and that's only because I
21 asked Charlie.  I asked Charlie when I
22 got my $79 check.  Sorry.  It just
23 didn't cover the gas and the
24 aggravation today.

Page 59

1    Q.   Have you reviewed any
2  affidavits recently?
3    A.   I have not.
4      MR. MICHAEL F. PETOCK:  I
5  want to say that Mr. Quinn put a
6  statement on the record earlier
7  about his representation of
8  Mr. Maurer, but I just want to
9  also put on the record that we
10 continue our objection that it's a
11 conflict of interest for him to
12 represent Mr. Maurer and the
13 defendants at the same time.
14     MR. QUINN:  My statement
15 stands.
16     MR. MICHAEL F. PETOCK:  I
17 understand that.
18 BY MR. MICHAEL C. PETOCK:
19   Q.   Have you spoken with any
20 of the other attorneys for the
21 defendants?
22   A.   I have not.
23   Q.   Have you been asked to be
24 a witness at trial?

Page 60

1    A.   I have not.
2      Michael, if I may just
3  make a statement here.  I want to stay
4  as far away from this as possible.
5  I'm here because I have been
6  subpoenaed to be here, give truth --
7  truthful testimony.  I have no sides
8  in this issue and I don't want to have
9  sides, and I don't want to be involved
10 in it in any way.
11   Q.   I understand that
12 completely.
13   A.   Okay.  Okay.
14   Q.   That's perfectly fine and
15 we thoroughly understand that, and we
16 don't mean to be --
17   A.   No, I understand you have
18 to ask your questions.
19   Q.   -- adversarial or
20 anything.  We are just trying to get
21 the facts out.
22   A.   I understand.
23   Q.   I understand.  I do
24 apologize for the fact that you had to

Page 61

1  be here today.
2    A.   No apology necessary.
3  Seriously, I do understand.  I have
4  one Van Scoy that I talk to, and
5  that's Tommy Junior.  We have been
6  friends for years and we just chat
7  every once in a while on the phone and
8  basically about things that guy
9  friends would talk about.  That's it.
10   Q.   Okay.  That's fine.
11 Well, with that said, we will try to
12 get you out of here as soon as
13 possible --
14   A.   Okay.
15   Q.   -- and back on your way.
16   A.   Okay.
17   Q.   But, in the meantime, we
18 are going to take a little bit of a
19 break.  Just a few minutes.  Okay?
20   A.   Okay.
21        - - -
22     (Whereupon, a short recess
23 occurred.)
24        - - -

16  (Pages 58 to 61)

ESQUIRE DEPOSITION SERVICES

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

MARK MAURER

Page 62

1  BY MR. MICHAEL C. PETOCK:
2      Q.   Just a couple more
3  questions and then we'll be all
4  finished.
5      A.   Okay.
6      Q.   For the stores you own,
7  Lancaster, York, Harrisburg,
8  Allentown, Phillipsburg, Norfolk,
9  Virginia, Hampton, Virginia, could you
10  tell me which year each one of those
11  closed?
12      A.   Closed?
13      Q.   You stopped operating a
14  store in those locations?
15      A.   Hampton, Virginia was --
16  this was an approximate.  It was the
17  year of the Gulf War.  That would --
18      Q.   Would it be helpful for
19  to you look at --
20      A.   Yes, of course.
21      Q.   -- page 13 of the
22  agreement?
23      A.   Now I know what you're
24  saying.  Of course.

Page 63

1      I was going to say '89.
2  Okay.  Hampton, Virginia closed in
3  1990.  Norfolk closed in 1991.  York,
4  Pennsylvania I would say -- I'm going
5  to make an educated guess as 1993.
6  Phillipsburg, New Jersey, I'm going to
7  say 1998.  And the South Mall in
8  Allentown I will say the year 2000.
9      Q.   Is the South Mall
10  indicated on that sheet by SABE?
11      A.   Yes, that's correct.
12      Q.   Would you look at section
13  14.2 of the agreement.
14      A.   Okay.
15      Q.   Do you agree that the
16  Mark Van Scoy Diamond Mine is unique?
17      A.   14.2?
18      Q.   Yes.
19      A.   Okay.  So, I agree or do
20  I agree that it's unique?  Is that
21  your question?
22      Q.   Yes.
23      A.   Yes.
24      Q.   Okay.  We are talking

Page 64

1  about the Mark Van Scoy Diamond Mine,
2  you agree?
3      A.   Yes.
4      Q.   Yes?
5      MR. MICHAEL C. PETOCK:
6  Okay.  No further questions.
7  Okay.
8      MR. QUINN:  No questions.
9      (Witness excused.)
10      - - -
11      (Deposition concluded at
12  approximately 3:04 p.m.)
13      - - -
14
15
16
17
18
19
20
21
22
23
24

Page 65

1
2
3  CERTIFICATE
4
5
6      I HEREBY CERTIFY that the
7  witness was duly sworn by me and
8  that the deposition is a true
9  record of the testimony given by
10  the witness.
11
12
13  _____
     Sherry L. Stills,
14  Court Reporter
     Notary Public
15  Dated:  10/10/05
16
17
18      (The foregoing
19  certification of this transcript
20  does not apply to any reproduction
21  of the same by any means, unless
22  under the direct control and/or
23  supervision of the certifying
24  reporter.)

17  (Pages 62 to 65)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

Page 66

1
2       INSTRUCTIONS TO WITNESS
3
4           Please read your deposition
5       over carefully and make any
6       necessary corrections.  You should
7       state the reason in the
8       appropriate space on the errata
9       sheet for any corrections that are
10      made.
11          After doing so, please sign
12      the errata sheet and date it.
13          You are signing same subject
14      to the changes you have noted on
15      the errata sheet, which will be
16      attached to your deposition.
17          It is imperative that you
18      return the original errata sheet
19      to the deposing attorney within
20      thirty (30) days of receipt of the
21      deposition transcript by you.  If
22      you fail to do so, the deposition
23      transcript may be deemed to be
24      accurate and may be used in court.

Page 68

1
2       ACKNOWLEDGMENT OF DEPONENT
3
4           I,_____, do
        hereby certify that I have read
5       the foregoing pages,  1 - 64 , and
        that the same is a correct
6       transcription of the answers given
        by me to the questions therein
7       propounded, except for the
        corrections or changes in form or
8       substance, if any, noted in the
        attached Errata Sheet.
9
                 _____
10      MARK MAURER        DATE
11
12      Subscribed and sworn
        to before me this
13      _____ day of _____,
        20____.
14
        My commission
15      expires:_____
16
                 _____
17      Notary Public
18
19
20
21
22
23
24

Page 67

1           - - - - - -
2           ERRATA
            - - - - - -
3       PAGE LINE CHANGE
4       ____ ____  _____
5       ____ ____  _____
6       ____ ____  _____
7       ____ ____  _____
8       ____ ____  _____
9       ____ ____  _____
10      ____ ____  _____
11      ____ ____  _____
12      ____ ____  _____
13      ____ ____  _____
14      ____ ____  _____
15      ____ ____  _____
16      ____ ____  _____
17      ____ ____  _____
18      ____ ____  _____
19      ____ ____  _____
20      ____ ____  _____
21      ____ ____  _____
22      ____ ____  _____
23      ____ ____  _____
24      ____ ____  _____

Page 69

1       LAWYER'S NOTES
2       PAGE LINE
3       ____ ____  _____
4       ____ ____  _____
5       ____ ____  _____
6       ____ ____  _____
7       ____ ____  _____
8       ____ ____  _____
9       ____ ____  _____
10      ____ ____  _____
11      ____ ____  _____
12      ____ ____  _____
13      ____ ____  _____
14      ____ ____  _____
15      ____ ____  _____
16      ____ ____  _____
17      ____ ____  _____
18      ____ ____  _____
19      ____ ____  _____
20      ____ ____  _____
21      ____ ____  _____
22      ____ ____  _____
23      ____ ____  _____
24      ____ ____  _____

18  (Pages 66 to 69)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

# EXHIBIT S

**REDACTED**

# EXHIBIT T



# Van Scoy

## Diamond Mine®

### Registration and Certification

This is to certify that the Diamond(s) purchased by

_____

has been precision-cut by master craftsmen and has been rigidly inspected, is finely cut and carefully selected for excellent proportions and exquisite brilliance, and accepted as meeting our strict standards.

Diamond Shape _____  Precious Metal _____

Registration No. _____  Date of Purchase _____

#### Lifetime Trade-in Warranty

This diamond solitaire will be accepted for trade-in on a diamond of twice the size at the store where originally purchased.

The trade-in allowance will be equal to the price that we are selling any diamond in stock of the same size and quality on that day.

#### Lifetime Mounting Warranty

The mounting for this diamond is warranted against any and all original defects of material and workmanship for the life thereof, wear and deterioration excepted.

#### VALUE ASSURANCE

This Van Scoy diamond is WARRANTED to be Better Quality than any other store's diamond of the same size and at the price that you paid, when compared, side by side, under a microscope, regardless of whatever grading that other store assigns to their diamond.

#### Loss of Diamond From Mounting

Should the diamond described herein come loose from the mounting within one year from the date of purchase due to original defect in materials and workmanship, The Van Scoy Store where purchased will replace said diamond provided the mounting is returned for inspection to ascertain that the diamond did, in fact, become lost due to original defect in material or workmanship on said mounting.

Even though diamond is the hardest substance known to man ALL diamond jewelry should be treated with care since they can be chipped or scratched by other diamonds.

To be sure that your diamond is safe from loss and damage, return it to Van Scoy Diamond Mine for cleaning and inspection for damaged prongs, etc., at least every 3 months or AS OFTEN AS YOU WISH, AT NO CHARGE.

VAN SCOY DIAMOND MINE ®
154 Mundy St., Wilkes-Barre, PA 18702
570-826-0765

EXHIBIT T

01670

# EXHIBIT U

D000750

DEPOSITION
EXHIBIT
Van Scoy 5
7/26/05

DEPOSITION
EXHIBIT
PX 31



# Van Scoy Diamond Mine

### Registration and Certification

This is to certify that the Diamond(s) purchased by

has been precision-cut by master craftsmen and has been rigidly inspected, is finely cut and carefully selected for excellent proportions and exquisite brilliance, and accepted as meeting our strict standards.

Diamond Shape _____ Precious Metal _____

Registration No. _____ Date of Purchase _____

#### Lifetime Trade-In Warranty

This diamond will be accepted for trade-in on a diamond of twice the size at the store where originally purchased.

The trade-in allowance will be equal to the price that we are selling any diamond in stock of the same size and quality on that day.

#### Lifetime Mounting Warranty

The mounting for this diamond is warranted against any and all original defects of material and workmanship.

**Address** 1117 Churchmans Place

**Manager** _____

### VALUE ASSURANCE

This Van Scoy diamond is WARRANTED to be Better Quality than any other store's diamond of the same size and at the price that you paid, when compared, side by side, under a microscope, regardless of whatever grading that other store assigns to their diamond.

### Loss of Diamond From Mounting

Should the diamond described herein come loose from the mounting within one year from date of purchase due to original defect in materials and workmanship, The Van Scoy Store where purchased will replace said diamond provided the mounting is returned for inspection to ascertain that the diamond did, in fact, become lost due to original defect in material or workmanship on said mounting.

Even though diamond is the hardest substance known to man ALL diamond jewelry should be treated with care since they can be chipped or scratched by other diamonds.

To be sure that your diamond is safe from loss and damage, take it into any Van Scoy Diamond Mine for cleaning and inspection for damaged prongs, etc., at least every 3 months or AS OFTEN AS YOU WISH, AT NO CHARGE.

VAN SCOY DIAMOND MINE

VAN SCOY DIAMOND MINE

EXHIBIT U