# EXHIBIT V

1

1

2          UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF DELAWARE
3

4   WAYNE VAN SCOY,              :
                                 :
5         Plaintiff              :
                                 :
6   -vs-                         :
                                 :  # 05-108
7   VAN SCOY DIAMOND MIND        :
    OF DELAWARE, INC., ET AL,    :
8                                :
          Defendants             :
9

10             Valley Forge, Pennsylvania

11              October 5, 2005

12

13

14             Pretrial examination of LEW HILL,

15   taken on behalf of the Plaintiff at the

16   offices of  PETOCK & PETOCK,  46 The

17   Commons at Valley Forge, Valley Forge,

18   Pennsylvania, on the above date, commencing

19   at 1:30  p.m., before Julie Zatuchni,

20   Registered Professional Reporter.

21

22             JULIE ZATUCHNI, RPR
                202 Fairfax Court
23         Wayne, Pennsylvania 19087

24

EXHIBIT V

2

```
 1

 2  APPEARANCES:

 3      PETOCK & PETOCK
        BY: MICHAEL C. PETOCK and MICHAEL F.
 4           PETOCK, ESQUIRES
        46 The Commons at Valley Forge
 5      Valley Forge, Pennsylvania  19482

 6      Counsel for Plaintiff

 7      FOX ROTHSCHILD
        BY: CHARLES N. QUINN, ESQUIRE
 8      2000 Market Street, 10th Floor
        Philadelphia, Pennsylvania  19103
 9
        Counsel for Mr. Hill
10
    ALSO PRESENT:  KURT VAN SCOY
11                 WAYNE VAN SCOY

12

13

14

15

16

17

18

19

20

21

22

23

24
```

3

```
 1

 2                    I N D E X

 3   WITNESS                      EXAMINATION

 4   LEW HILL

 5        By MR. PETOCK          4, 75
          By MR. QUINN           64
 6

 7

 8
     PLAINTIFF
 9   EXHIBITS                     MARKED

10     #40     Subpoena            6
       #41     Agreement           8
11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

4

```
1
2              (It is stipulated and agreed by and
3    between counsel for the respective parties
4    that the reading, signing, sealing,
5    certification and filing of the within
6    deposition be waived; and that all
7    objections, except as to the form of the
8    question, be reserved until the time of
9    trial.)
10                    ----
11              LEW HILL,
12   was called as a witness and after having
13   been first sworn, according to law, was
14   examined and testified as follows:
15                 EXAMINATION
16   BY MR. PETOCK:
17   Q.       Good morning, Mr. Hill or good
18   afternoon, actually.  My client is William
19   Van Scoy.  William Van Scoy is the son of
20   Tommy Van Scoy, Senior, who I think you
21   knew.  Wayne is a distributor for the mark
22   Van Scoy Diamond Mine.
23              Presently Wayne is involved in
24   litigation against a business in Delaware
```

5

1

2    and its owners respecting the Van Scoy

3    Diamond Mine.  The reason that we brought

4    you here today was to find out what

5    information you might know that might be

6    relevant to the present lawsuit, okay.

7    That being said, I'm going to ask you some

8    questions to find out what you might know,

9    okay?

10   A.      Okay.

11   Q.      You understand that you've taken

12   an oath to tell the truth today?

13   A.      I do.

14          MICHAEL F. PETOCK: Before we

15   begin, I'd like to put on the record that

16   one of the defenses raised by Mr. Quinn in

17   this lawsuit is that the mark is generic

18   and therefore the mark is invalid and Mr.

19   Hill, as a part of the partnership, owns or

20   claims to own and I believe has produced an

21   agreement that says he owns, has exclusive

22   rights to the mark and we believe that is a

23   conflict of interest for Mr. Quinn to be

24   representing Mr. Hill in this deposition.

6

1

2          MR. QUINN:  I disagree.  A) I

3  think that's a mischaracterization of the

4  agreement and B) I don't think there's any

5  conflict in interest and that will become

6  quite clear as the testimony comes

7  forward.

8          MR. PETOCK:  I'd like to have

9  this first document marked as Plaintiff's

10  Exhibit 40.

11          (Whereupon, Subpoena marked

12  Plaintiff's Exhibit 40, for

13  identification.)

14  BY MR. PETOCK:

15  Q.      Mr. Hill, do you recognize this

16  document that's been marked as Plaintiff's

17  Exhibit 40?

18  A.      I do.

19  Q.      This is a subpoena issued from

20  the United States District Court, the

21  Eastern District of Pennsylvania and this

22  is the reason that you're here today; is

23  that correct?

24  A.      That's correct.

12

1

2  BY MR. PETOCK:

3  Q.       Is Charlie representing you in

4  this matter?

5  A.       Yes.

6  Q.       Has anyone explained that Mr.

7  Quinn might have a conflict of interest in

8  his representation of you?

9  A.       No.

10  Q.       And you haven't waived any sort

11  of conflict?

12  A.       No.

13  Q.       I guess I should have asked you

14  this earlier, but can you please state your

15  full name?

16  A.       Lew M. Hill, M as in Michael.

17  Q.       What is your date of birth?

18  A.       1/13/1945.

19  Q.       Where were you born?

20  A.       In Reading, Pennsylvania.

21  Q.       Where did you grow up?

22  A.       Reading, Pennsylvania.

23  Q.       Could you state what your

24  education background is?

18

1

2   Street in Reading, Pennsylvania ever go by

3   any other name beside Van Scoy Diamond

4   Mine?

5   A.        We changed the name to Van Scoy

6   Jewelers probably late '90s, but I don't

7   remember exactly.

8   Q.        Were you operating under the name

9   Van Scoy Diamond Mine and Van Scoy Jewelers

10  at the same time?

11  A.        Well, transitioned a little bit,

12  but we filed a fictitious filing and, you

13  know.

14  Q.        To the best of your memory, it

15  was the late 1990's where you switched from

16  Van Scoy Diamond Mine to Van Scoy Jewelers?

17  A.        Yes.

18  Q.        Do you remember the reason why

19  you made that change?

20  A.        Yes.

21  Q.        What was that reason?

22  A.        There were a lot of bankruptcies

23  occurring within the organization and it

24  was starting to cause problems for us

25

1

2  Q.        Where did you move it to?

3  A.        We moved it to 2733 Paper Mill

4  Road in Wyomissing, Pennsylvania.

5  Q.        When did that move occur?

6  A.        April 1 of 2003.

7  Q.        On April 1, 2003, you opened up

8  your store at 2733 Paper Mill Road in

9  Wyomissing, PA under what name?

10  A.        Van Scoy Jewelers.

11  Q.        Which was the same name you had

12  been previously operating your store in

13  Reading since approximately the late

14  1990's; correct?

15  A.        Correct.

16  Q.        Do you own the store in

17  Wyomissing?

18  A.        It's leased as well.

19  Q.        Are you incorporated?

20  A.        No.

21  Q.        For the business that you operate

22  under the mark Van Scoy Jewelry or

23  Jewelers?

24  A.        Jewelers.

44

1

2  Q.        And again, you paid on a monthly

3  basis?

4  A.        I'm not sure about that.

5  Q.        What did that agreement give you

6  the right to do?

7  A.        Operate a Van Scoy Diamond Mine

8  in Montgomery County.

9  Q.        Then was all this written down in

10 the contract or was it oral?

11 A.        There was a franchise document

12 that I mentioned earlier, but it was never

13 signed.  We never completely agreed on all

14 the stipulations within it and it was never

15 signed, so it was a verbal agreement.

16 Q.        In approximately 1993, whatever

17 agreement you had before with Tommy Van

18 Scoy, Senior changed; is that correct?

19 A.        Correct.

20 Q.        And whatever those changes were

21 is reflected in this Agreement that we've

22 marked as Plaintiff's Exhibit 41; is that

23 correct?

24 A.        The method of operation, yes.

45

```
 1

 2   Q.       Could you describe to me what

 3   those changes were as far as changes in the

 4   method of operation?

 5   A.       Well primarily, the removal of

 6   the obligation to pay an ongoing monthly

 7   fee.

 8   Q.       What else?

 9   A.       Well, there were things in the

10   franchise agreement that had to do with

11   inspection and the like, which I'm

12   imagining those went away, as well.

13   Essentially it severed, I guess pretty much

14   severed the relationship from an

15   operational point of view.

16   Q.       So, after this contract was

17   executed --

18            MR. QUINN:  Objection to the

19   extent that it's not clear from what you

20   say this contract, what it is you're

21   referring to.

22   BY MR. PETOCK:

23   Q.       After the Agreement that has been

24   marked as Plaintiff's 41 was executed
```

46

1

2  between you and Tommy Van Scoy, Senior,

3  your relationship between him was severed;

4  is that correct?

5  A.        That's true.

6  Q.        Did the Agreement grant you the

7  exclusive rights to use the mark Van Scoy

8  Diamond Mine in a defined territory?

9            MR. QUINN:  Objection.  The

10  agreement speaks for itself.

11           MR. PETOCK:  You may answer.

12           THE WITNESS:  That was my

13  understanding.

14           MR. PETOCK:  What territory was

15  that.

16           MR. QUINN:  Objection, agreement

17  speaks for itself.

18  BY MR. PETOCK:

19  Q.        You may answer?

20  A.        Schuylkill, Berks and Montgomery

21  County.

22  Q.        With respect, could you read

23  Section 4.1 of the Agreement that's been

24  marked as Plaintiff's Exhibit 41, please.

50

1

2  understand the question.

3  BY MR. PETOCK:

4  Q.        What don't you understand about

5  the question?

6  A.        I'm not sure I know what a

7  licensee is, how it would be different from

8  having the rights to use the name versus

9  operating under a franchise agreement.  It

10  would be my understanding we were no longer

11  a franchisee at that point.

12  Q.        What was your understanding as to

13  the differences between you having been

14  granted the right to use the mark and how

15  it would have been under a franchisee?

16          MR. QUINN:  Objection.  There's

17  no time frame stated for what his

18  understanding was.

19  BY MR. PETOCK:

20  Q.        At the time the execution was

21  granted?

22  A.        Looking at it from different

23  points of view, I would not expect anything

24  from him at that point any longer, from one

1

2    perspective.

3    Q.        Any other respects, perspectives

4    as to why the differences between?

5    A.        That he wouldn't be expecting

6    anything from me, payments, coming to

7    meetings or something like that.

8    Q.        Could you look at Section 3.6,

9    please.

10    A.        Okay.

11    Q.        Could you read it out loud?

12    A.        "Reading partnership shall

13    continue to conduct its retail jewelry

14    business using the same high standards of

15    integrity in dealing with the public and

16    continue to offer the same high quality

17    jewelry products and jewelry service and as

18    Reading Partnership has offered heretofore,

19    to the extent Reading Partnership can do so

20    and yet continue to meet the prices of its

21    competition".

22    Q.        After the Agreement that's been

23    marked as Plaintiff's Exhibit 41 was

24    executed, did you continue to adhere to

56

1

2    business; right?

3    A.        He closed that store and opened

4    the new store under a different name.

5    Q.        Do you know why he did that?

6    A.        Not really.

7    Q.        Do you have any idea?

8    A.        No, looking for a new name.  I

9    would suspect to increase business.

10   Q.        To your knowledge, did Mark

11   Maurer abandon the name Van Scoy Diamond

12   Mine?

13   A.        I don't know.

14   Q.        Do you know if he still uses the

15   name, Van Scoy Diamond Mine?

16   A.        Not to my knowledge.

17   Q.        Was Mark Maurer a licensee of

18   Tommy Van Scoy, Senior, at one point?

19   A.        To the best of my knowledge he

20   was, yes.

21   Q.        Where did he own stores?

22   A.        He owned stores in Lancaster and

23   Allentown and in Phillipsburg, York.

24   Q.        York, also?

62

1

2    measures means?

3    A.        Yes.

4    Q.        Other than that, though, you

5    understand it?

6    A.        Yes.

7    Q.        Your partner now, you mentioned

8    that you were partnered up with somebody,

9    James Sweeney?

10    A.        Right.

11    Q.        Is he still your partner?

12    A.        No.

13    Q.        Do you have any other partners?

14    A.        No.

15              (Discussion off the record.)

16              MR. PETOCK:  Just a quick --

17              (Brief recess taken.)

18    BY MR. PETOCK:

19    Q.        Just want to make sure the store

20    you operate is Van Scoy Jewelers.  Is that

21    the full name?

22    A.        DBA Van Scoy Jewelers of

23    Wyomissing, Pennsylvania, but the name on

24    the sign is Van Scoy Jewelers.

63

1

2  Q.        Getting back to Avalon Jewelers

3  again, was that the full name of that

4  store?

5  A.        That's my understanding.

6  Q.        Is there any store now operating

7  with the word Avalon in it, a jewelry

8  store?

9  A.        Yes.

10  Q.        Where is that?

11  A.        It's the same store, changed the

12  name to Avalon, Maurer and Bash, I believe.

13  Q.        Are you aware of any other stores

14  operating with the word, Van Scoy in it

15  besides your own?

16  A.        I think Bob Cooke in

17  Greensborough, the last I heard it was Van

18  Scoy Diamond Jewelers.

19  Q.        Anyone else?

20  A.        Well, there's some other Van

21  Scoys.  I think there's one up in

22  Scranton.  I really don't know.  There's

23  probably others still operating.

24  Q.        This Agreement, P41, are you

# EXHIBIT W

Page 1

IN THE UNITED STATES DISTRICT COURT

THE DISTRICT OF DELAWARE

- - -

```
WAYNE VAN SCOY        :
                      :
        v.            :
                      :
VAN SCOY DIAMOND      :
MINE OF DELAWARE,     :
INC., KURT VAN SCOY   :
AND DONNA VAN SCOY    :   NO. 05-108(KAJ)
```

- - -

October 6, 2005

- - -


Oral deposition of MARK

MAURER, taken pursuant to notice, was

held at the law offices of Michael

Petock, 46 The Commons at Valley

Forge, 1220 Valley Forge Road, Valley

Forge, Pennsylvania, commencing at

1:50 p.m., on the above date, before

Sherry L. Stills, Court Reporter and

Notary Public for the Commonwealth of

Pennsylvania.

- - -

ESQUIRE DEPOSITION SERVICES
1880 John F. Kennedy Boulevard
15th Floor
Philadelphia, Pennsylvania 19103
(215) 988-9191

EXHIBIT W

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

Page 2

```
 1   APPEARANCES:
 2
 3   LAW OFFICES OF MICHAEL PETOCK
     BY: MICHAEL F. PETOCK, ESQUIRE
         MICHAEL C. PETOCK, ESQUIRE
 4   46 The Commons at Valley Forge
     1220 Valley Forge Road
 5   Valley Forge, Pennsylvania 19482
     MFP@1PLaw-Petock.com
 6   (610) 933-9300
     Representing the Plaintiff
 7
 8
 9   FOX ROTHSCHILD
     BY: CHARLES N. QUINN, ESQUIRE
10   2000 Market Street
     10th Floor
11   Philadelphia, Pennsylvania 19103
     (215) 299-2000
12   Representing Mark Maurer
13
14
     ALSO PRESENT:
15     Wayne Van Scoy
       Kurt Van Scoy
16
17        - - -
18
19
20
21
22
23
24
```

Page 4

```
 1        - - -
 2   DEPOSITION SUPPORT INDEX
 3        - - -
 4
 5   Direction to Witness Not to Answer
 6   Page Line    Page Line    Page Line
 7   None
 8
 9
10   Request for Production of Documents
11   Page Line    Page Line    Page Line
12   None
13
14
15   Stipulations
16   Page Line    Page Line    Page Line
17   5  6-10
18
19
20   Question Marked
21   Page Line    Page Line    Page Line
22   None
23
24
```

Page 3

```
 1        - - -
           INDEX
 2        - - -
 3   Testimony of: MARK MAURER
 4     BY MR. MICHAEL C. PETOCK 7
 5
 6        - - -
         EXHIBITS
 7        - - -
 8   NO.    DESCRIPTION    PAGE
 9   P-42   Subpoena       10
     P-43   Agreement      38
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1        - - -
 2        MARK MAURER, after having
 3   been duly sworn, was examined and
 4   testified as follows:
 5        - - -
 6        MR. MICHAEL C. PETOCK:  All
 7   objections are reserved except for
 8   form of the question.
 9        MR. QUINN:  That's agreeable
10   to us.
11        I'd like to say before we
12   start, so we avoid the kind of
13   argument that we had yesterday,
14   first of all, I'm here today
15   representing Mr. Maurer.  We have
16   discussed the matter of my
17   representation of the defendants
18   in this matter.  Mr. Maurer, and
19   you can ask him this, has waived,
20   to the extent there is any
21   conflict, and we don't believe
22   there is, but to the extent that
23   you may perceive there to be one,
24   Mr. Maurer waives it and you can
```

2 (Pages 2 to 5)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

Page 6

1    ask him that.
2        Secondly, Mr. Maurer's
3    subpoena asked for him to supply
4    certain documents. We sent those
5    documents to you earlier today and
6    Bates numbered them just for
7    purposes of identification. So,
8    you have all of the documents that
9    Mr. Maurer had that are responsive
10   to the request that you made other
11   than a letter that I sent to him
12   that is in the nature of a
13   privileged communication.
14       MR. MICHAEL F. PETOCK: Are
15   you also representing the
16   defendants in this matter at this
17   deposition?
18       MR. QUINN: No.
19       MR. MICHAEL F. PETOCK: You
20   are not? Who is representing the
21   defendants?
22       MR. QUINN: I don't believe
23   they have one today.
24       MR. MICHAEL F. PETOCK: The

Page 7

1    defendants received notice of this
2    deposition; is that correct?
3        MR. QUINN: That's correct.
4        MR. MICHAEL F. PETOCK: And
5    they have chosen voluntarily not
6    to be represented at this
7    deposition?
8        MR. QUINN: That's correct.
9        MR. MICHAEL F. PETOCK: And
10   the deposition is, therefore,
11   usable for any purpose?
12       MR. QUINN: It's usable for
13   whatever purpose by any party.
14       MR. MICHAEL C. PETOCK:
15   Ready?
16       MR. MICHAEL F. PETOCK: Yes.
17       - - -
18       EXAMINATION
19       - - -
20   BY MR. MICHAEL C. PETOCK:
21       Q.   Okay. Good afternoon,
22   Mr. Maurer.
23       A.   How are you?
24       Q.   Is it all right if I call

Page 8

1    you Mark today?
2        A.   Sure. Sure. May I have
3    your card? You have it already. I
4    just wanted to --
5        Q.   My business card?
6        A.   Yes. No, you don't have
7    to go downstairs to get it. I thought
8    you had one laying there.
9        Q.   Actually, I don't have
10   one.
11       A.   May I call you Michael?
12       Q.   Surely. My name is
13   Michael Petock. This is Michael F.
14   Petock. Are you familiar with the
15   litigation that we are involved in
16   here today at all?
17       A.   No, not really.
18       Q.   Just to give you a basic
19   overview, it's litigation involving
20   the use of a trademark and service
21   mark Van Scoy Diamond Mine in the
22   State of Delaware by the defendants
23   who are Van Scoy Diamond Mine of
24   Delaware, Incorporated and the owners

Page 9

1    of that corporation, Kurt and Donna
2    Van Scoy. And the plaintiff in that
3    litigation is Wayne Van Scoy.
4        You understand that you
5    have taken an oath to tell the truth
6    today; is that correct?
7        A.   That's correct.
8        Q.   Okay. Please state your
9    name and address for the record.
10       A.   Mark Maurer, 830 Plaza
11   Boulevard, Lancaster, Pennsylvania.
12       Q.   Is that your home address
13   or your business address?
14       A.   My business address.
15       Q.   What is your home
16   address?
17       A.   1169 Oakmont Drive,
18   Lancaster, Pennsylvania.
19       Q.   Are you here today in
20   response to a subpoena?
21       A.   Yes, I am.
22       MR. MICHAEL C. PETOCK: I
23   would like to have this marked as
24   Plaintiff's Exhibit 42, please.

3  (Pages 6 to 9)

ESQUIRE DEPOSITION SERVICES

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

MARK MAURER

Page 10

1    P-42.
2         - - -
3         (Whereupon, the document was
4    marked as P-42 for
5    identification.)
6         - - -
7    BY MR. MICHAEL C. PETOCK:
8    Q.    What's been marked as
9    Plaintiff's Exhibit 42 is the subpoena
10   that you just testified that you are
11   here in response to; is that correct?
12   A.    That's correct.
13   Q.    Okay. And the subpoena
14   commands you to bring all agreements
15   with Van Scoy Diamond Mines, Inc.
16   and/or Thomas Van Scoy, Sr., correct?
17   A.    Yeah.
18   Q.    Is it accurate what your
19   counsel represented that what you have
20   previously -- what your counsel
21   previously faxed to us this morning is
22   all the agreements that you have --
23   A.    Yes.
24   Q.    -- between Thomas Van

Page 11

1    Scoy, Sr. or Van Scoy Diamond Mine,
2    Incorporated?
3    A.    Yes.
4    Q.    There are no other
5    documents of that nature?
6    A.    No.
7    Q.    Is it also accurate that
8    you are represented by Charles Quinn?
9    A.    Yes.
10   Q.    And he has explained to
11   you any possible conflicts of interest
12   that may exist in his representation
13   of you?
14   A.    Yes.
15   Q.    Could you tell me what
16   conflicts that he has told you about?
17   A.    Well, he just said -- you
18   know, he didn't really outline
19   conflicts of interest. He just said
20   there could be a conflict of interest,
21   and I said I don't have a problem with
22   that. I don't think that there really
23   are any. I'm really not a part of
24   this action whatever is going on.

Page 12

1    Q.    He didn't disclose to you
2    what the conflict was which he was
3    referring to?
4    A.    Well, he's representing,
5    I think, one of the parties.
6    Q.    Are you aware of the fact
7    that the defendants in this action who
8    are represented by Mr. Quinn are
9    attempting to invalidate the trademark
10   and service mark Van Scoy Diamond
11   Mine?
12   A.    I am not aware of that.
13   Q.    And they are also trying
14   to invalidate or hold the trademark
15   and the service mark Van Scoy Diamond
16   Mine invalid?
17   A.    No, I am not aware of
18   that.
19   Q.    Are you presently
20   operating any jewelry store under the
21   name Van Scoy Diamond Mine?
22   A.    I'm operating two jewelry
23   stores, both of which were operating
24   under Van Scoy Diamond Mine, and I

Page 13

1    maintain clients that have been sold
2    over the years under that name.
3    Q.    Are you aware that if the
4    defendants are successful with their
5    defense and their counterclaims to
6    hold the trademark and service mark of
7    Van Scoy Diamond Mine invalid or
8    generic, any person would be within
9    their rights to open up a Van Scoy
10   Diamond Mine in your town?
11   MR. QUINN: Objection.
12   First of all, that
13   mischaracterizes the defendants'
14   position. The invalidation claim
15   is with respect to the federal
16   registrations of those Marks, and
17   it further mischaracterizes the
18   position in the hypothetical in
19   that it does not take account of
20   any common law rights that
21   Mr. Maurer might have developed
22   over the years through use of
23   those Marks.
24   So, I object to that

4  (Pages 10 to 13)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

MARK MAURER

Page 14

1    question on two bases. I think it
2    is misleading and deceptive.
3        MR. MICHAEL C. PETOCK: That
4    is strictly with respect to the
5    invalid defense. However, the
6    generic defense, that objection
7    would not hold, is that not true?
8        MR. QUINN: No, I don't
9    agree with that. I don't agree
10   with that characterization at all.
11       MR. MICHAEL F. PETOCK:
12   Answer the question.
13   BY MR. MICHAEL C. PETOCK:
14       Q.   You can answer the
15   question. I will repeat it, if you
16   don't --
17       A.   I don't really totally
18   understand the question.
19       Q.   Okay. Are you aware of a
20   fact that if the defendants are
21   successful with one or more of their
22   defenses, it may open the possibility
23   that any person would be within their
24   rights to open up a Van Scoy Diamond

Page 15

1    Mine directly across the street from
2    your business?
3        A.   I am not aware of that.
4        MR. QUINN: Same
5    objection.
6    BY MR. MICHAEL C. PETOCK:
7        Q.   And could you repeat your
8    answer?
9        A.   I am not aware of that.
10       Q.   Okay. Mark, where were
11   you born?
12       And you -- did you waive
13   the conflict?
14       A.   Yes, I did.
15       Q.   Where were you born?
16       A.   Reading, Pennsylvania.
17       Q.   Where did you grow up?
18       A.   Reading, Pennsylvania.
19       Q.   Where did you go to high
20   school?
21       A.   Exeter High School.
22       Q.   I have heard of Exeter
23   before. That's up in New England; is
24   that correct?

Page 16

1        A.   We like people to believe
2    that. When they ask a little deeper,
3    they know it's a little township high
4    school outside of Reading.
5        Q.   So, it's in Reading?
6        A.   Yes.
7        Q.   Did you work in high
8    school?
9        A.   Yeah. Yes.
10       Q.   What did you do?
11       A.   Various jobs. I mean,
12   various jobs. My father died at 15.
13   I worked a lot. It would take a long
14   time to describe all of them.
15       Q.   Okay. Your education
16   beyond high school, did you have any?
17       A.   Yes. Millersville
18   University.
19       Q.   Where is that located?
20       A.   Lancaster, Pennsylvania.
21       Q.   Okay.
22       A.   Outside of Lancaster,
23   actually, in Millersville, but it's a
24   little suburb of Lancaster.

Page 17

1        Q.   Do you have any education
2    beyond Millersville?
3        A.   No.
4        Q.   Did you receive a degree
5    from Millersville?
6        A.   No.
7        Q.   How many years did you
8    attend Millersville?
9        A.   Three and a half.
10       Q.   Were you employed during
11   college?
12       A.   Yes.
13       Q.   What did you do during
14   college?
15       A.   I worked at various
16   construction jobs. I worked for The
17   Boys and Girls Club in Lancaster. I
18   worked for the University doing jobs.
19       Q.   What year did you
20   graduate or did you stop attending
21   Millersville?
22       A.   In 1972.
23       Q.   Why didn't you get your
24   degree from Millersville?

5 (Pages 14 to 17)

ESQUIRE DEPOSITION SERVICES

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

MARK MAURER

Page 42

1  Mark?
2      A.  No, I did not.
3      Q.  Were you aware that the
4  Wilkes-Barre store was forced to
5  change its name at some point?
6      A.  No, I was not.
7      Q.  Are you familiar with
8  what's been marked as Plaintiff's
9  Exhibit 43?
10     A.  Yes.
11     Q.  What is that?
12     A.  It looks like the
13 agreement that was made with Thomas
14 Van Scoy, Sr. to purchase the
15 permanent rights to our areas and stop
16 paying the monthly fee and pay him a
17 lump sum amount.
18     Q.  Is it that agreement?
19     A.  Yes.
20     Q.  This agreement granted
21 you the exclusive right to use and to
22 trade under the Mark in the defined
23 territory; is that correct?
24     A.  Yes.

Page 43

1      Q.  And you paid $25,000 and
2  $25,000 worth of diamonds for that
3  exclusive right; is that correct?
4      A.  That's correct.
5      Q.  After this agreement was
6  executed, you no longer were required
7  to pay the monthly royalty payments;
8  is that correct?
9      A.  That's correct.
10     Q.  Did this agreement change
11 your relationship with respect to
12 Tommy Van Scoy, Sr. or Van Scoy
13 Diamond Mine, Inc. in any way?
14     A.  No, because, at that
15 point, we really didn't have much of a
16 relationship.  That's why we got to
17 that point.  He was collecting a fee
18 for doing nothing.
19     Q.  Looking back on the
20 amount you paid for the rights to use
21 the Mark, do you think it was a good
22 business decision?
23     A.  Well, there is no way to
24 really judge that.  I don't think I

Page 44

1  could really answer that question.
2      Q.  Why can't you answer that
3  question?
4      A.  Well, you know, there's a
5  whole bunch of what ifs.  What could
6  have been if it would have been, you
7  know, all that it was promised to be
8  versus what is it really turned out to
9  be.  But, you know, would I be in the
10 jewelry business without it today?
11 Probably not.  So, I don't really --
12 you know, I could answer that question
13 both ways.
14     Q.  Are you resentful of
15 Tommy Van Scoy, Sr.?
16     A.  Yes.
17     Q.  Do you hold a grudge
18 against him?
19     A.  No.
20     Q.  Despite your contentions
21 as to there not being any
22 relationship, even before you executed
23 this agreement, as a matter of what
24 was put in writing, this agreement

Page 45

1  changed your relationship; is that
2  correct?
3      A.  It changed relationship
4  that I didn't have to pay the money --
5  continue to pay the monthly money,
6  that's correct.
7      Q.  Did it also change the
8  relationship in the sense that --
9  well, let me have you take a look at a
10 specific section.  Section seven on
11 page five.
12     A.  Okay.
13     Q.  Is it true that this
14 agreement changed your relationship
15 with Tommy Van Scoy, Sr. such that he
16 no longer was obligated to provide any
17 type of advertising support or
18 promotional assistance for you?
19     A.  Well, yeah, I guess that
20 maybe it does, in that regard.  It
21 certainly says that there, but he
22 hadn't done that for years beforehand.
23 I mean, we were doing everything.  He
24 was just getting the money and going

12 (Pages 42 to 45)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

MARK MAURER

Page 46

1 to the casinos.
2     Q.   By the way, when I refer
3 to you, I'm referring to --
4     A.   Talking about my company.
5     Q.   -- International.
6     A.   I understand.
7     Q.   Do you know how you would
8 characterize what this agreement
9 granted you?
10    A.   Yes.
11    Q.   What?
12    A.   It grants me the
13 exclusive right to operate a jewelry
14 store and owning the name Van Scoy
15 Diamond Mine in that area.
16    Q.   Okay.
17    A.   In my areas.
18    Q.   Okay. After this
19 agreement was executed, would you say
20 that you in all ways severed your
21 relationship with Tommy Van Scoy, Sr.,
22 any sort of business relationship that
23 may or may not have been ongoing?
24    A.   No, I don't think that.

Page 47

1 I mean, this agreement also guaranteed
2 that he was not going to or anybody
3 was not going to come into my area and
4 compete with me, based on the half
5 million dollars plus that I had paid
6 him. I mean, it was at a point in
7 time where he accepted the money,
8 understood he really didn't do
9 anything, and was, I think, grateful
10 to get the money, at that point.
11    Q.   Are you still bound by
12 this agreement, in your opinion?
13    A.   Yes. I still think that
14 I have the rights to my areas.
15    Q.   And, as a whole, you are
16 still bound by the agreement, correct?
17    A.   I don't know -- what do
18 you mean as a whole versus --
19    Q.   Well, you said that you
20 still have the rights to your area,
21 but there's a lot of provisions. So,
22 I mean, if that part is good, is the
23 rest of it good, too?
24    A.   I would reserve the right

Page 48

1 to sit here and read it and then
2 answer that question, if I could.  Do
3 you want me to?
4         MR. MICHAEL F. PETOCK:
5     Why don't you read it.  Go ahead
6     and read it.
7         MR. MICHAEL C. PETOCK:
8     Sure.
9         MR. MICHAEL F. PETOCK:  You
10     can go off the record.
11         - - -
12         (Whereupon, there was an
13     off-the-record discussion.)
14         - - -
15 BY MR. MICHAEL C. PETOCK:
16    Q.   Back on the record.
17         You have had time to
18 review the entire agreement?
19    A.   Right.
20    Q.   Okay. And do you believe
21 that you are bound by all the
22 provisions of the agreement?
23    A.   Yes.
24    Q.   Okay. Could you look at

Page 49

1 section 3.6 again, please.
2    A.   Yes.
3    Q.   Could you read that
4 section aloud, please.
5    A.   Sure.
6         International shall
7 continue to conduct its retail jewelry
8 business using the same high standards
9 of integrity in dealing with the
10 public and continue to offer the same
11 high quality jewelry products and
12 jewelry service as International has
13 offered heretofore, to the extent
14 International can do so and yet
15 continue to meet the prices of its
16 competition.
17    Q.   Have you continued to do
18 so?
19    A.   Absolutely.
20    Q.   Do you agree that, under
21 the agreement, there was a joint
22 intent to take reasonable measures to
23 protect the Mark and to maintain its
24 enforceability?

13 (Pages 46 to 49)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

Page 66

```
1
2       INSTRUCTIONS TO WITNESS
3
4           Please read your deposition
5   over carefully and make any
6   necessary corrections.  You should
7   state the reason in the
8   appropriate space on the errata
9   sheet for any corrections that are
10  made.
11          After doing so, please sign
12  the errata sheet and date it.
13          You are signing same subject
14  to the changes you have noted on
15  the errata sheet, which will be
16  attached to your deposition.
17          It is imperative that you
18  return the original errata sheet
19  to the deposing attorney within
20  thirty (30) days of receipt of the
21  deposition transcript by you.  If
22  you fail to do so, the deposition
23  transcript may be deemed to be
24  accurate and may be used in court.
```

Page 68

```
1
2       ACKNOWLEDGMENT OF DEPONENT
3
4           I,_____, do
    hereby certify that I have read
5   the foregoing pages, 1 - 64 , and
    that the same is a correct
6   transcription of the answers given
    by me to the questions therein
7   propounded, except for the
    corrections or changes in form or
8   substance, if any, noted in the
    attached Errata Sheet.
9
        _____
10  MARK MAURER      DATE
11
12  Subscribed and sworn
    to before me this
13  _____ day of _____,
    20____.
14
    My commission
15  expires:_____
16
        _____
17  Notary Public
18
19
20
21
22
23
24
```

Page 67

```
1         - - - - - -
2          ERRATA
          - - - - - -
3   PAGE  LINE  CHANGE
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
```

Page 69

```
1       LAWYER'S NOTES
2   PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
```

18 (Pages 66 to 69)

3545c1b7-8c1b-4cf3-9a86-c8ab2a7d4179

# EXHIBIT X

**Main Identity**

| | |
|---|---|
| **From:** | "Quinn, Charles N." <CQuinn@foxrothschild.com> |
| **To:** | <MFP@IPLaw-Petock.com> |
| **Sent:** | Saturday, January 15, 2005 3:36 PM |
| **Subject:** | Van Scoy Diamond Mine |

This letter is also being sent via facsimile and via surface mail.

Charles N. Quinn
Direct Dial:  (215) 299-2135
Internet Address:  cquinn@foxrothschild.com

January 15, 2005

Via facsimile to: 610-933-9300 and via e-mail.

Michael F. Petock, Esq.
46 The Commons at Valley Forge
1220 Valley Forge Road
Post Office Box 856
Valley Forge, PA., 19482-0856

Re:    "Van Scoy Diamond Mine"--U.S. 1,140,958 and 1,140,711
Our ref: 94214.2001; Your ref: 443-12

Dear Mike:

In accordance with our telephone discussion of this past Thursday,  13 January, I want to confirm that we were retained this week to represent Mr. Kurt Van Scoy with respect to the issues surrounding the mark "Van Scoy Diamond Mine" as raised in your letter of 18 November 2004 to our client.

As I mentioned when we spoke and as I am sure you can appreciate, it is going to take me a little time to investigate the facts in this situation, to obtain the file wrappers of the registrations in question and to learn more about our client's view of the allegations set forth in your letter of 18 November in order to respond to that letter and the demands you have made therein.

I have targeted the week of 31 January for furnishing you with our client's response to your letter of 18 November.

Very truly yours,

Charles N. Quinn

EXHIBIT X

12/13/2005

CNQ:cnq
cc:      Mr. Kurt Van Scoy

Charles N. Quinn
Fox Rothschild LLP
2000 Market Street, 10th Floor
Philadelphia, PA., 19103-3291, U.S.A.

215-299-2135
215-299-2150 (fax)
cquinn@frof.com

## Main Identity

**From:**      "Quinn, Charles N." <CQuinn@foxrothschild.com>
**To:**        <MFP@IPLaw-Petock.com>
**Cc:**        <vkurts@comcast.net>
**Sent:**      Friday, February 04, 2005 5:36 PM
**Subject:**   Van Scoy Matter

Mike:  This letter is additionally being sent to you this evening via facsimile.

Charles N. Quinn
Direct Dial:  (215) 299-2135
Internet Address:  cquinn@foxrothschild.com

February 4, 2005

**VIA FACSIMILE (610) 933-9300**
**AND VIA E-MAIL**

Michael F. Petock, Esq.
46 The Commons at Valley Forge
1220 Valley Forge Road
Post Office Box 856
Valley Forge, PA., 19482-0856

> **Re:**    **"Van Scoy Diamond Mine"--U.S. 1,140,958 and 1,140,711**
> **Our ref: 94214.2001; Your ref: 443-12**

Dear Mike:

Further to my letter of 15 January 2005, I need at least an additional week to address this matter and respond to the demands set forth in your letter of 18 November 2004.  Some personal health problems have hindered my ability to address this situation.  I hope to have our complete response to you one week from today.

Regards,

Very truly yours,

Charles N. Quinn

CNQ/ryb

cc:    Mr. Kurt Van Scoy

Charles N. Quinn
Fox Rothschild LLP

2000 Market Street, 10th Floor
Philadelphia, PA., 19103-3291, U.S.A.

215-299-2135
215-299-2150 (fax)
cquinn@frof.com


ATTENTION

This E-mail contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended
only for the use of the Individual(s) named above. If you are not the
intended recipient of this E-mail, or the employee or agent responsible
for delivering this to the intended recipient, you are hereby notified
that any dissemination or copying of this E-mail is strictly
prohibited. If you have received this E-mail in error, please
immediately notify us by telephone at (215)-299-2167 or notify us by
E-mail at helpdesk@foxrothschild.com. Also, please mail a hardcopy of
the E-mail to Fox Rothschild LLP, 2000 Market Street,
Philadelphia PA 19103-3291 via the U.S. Postal Service.
We will reimburse you for all expenses incurred.

Thank you...

******

# EXHIBIT Y

```
1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF DELAWARE

3                        *  *  *

4   WAYNE VAN SCOY                      :

                                        :

5          vs.                          :   C.A. NO. 05-108-KAJ

                                        :

6   VAN SCOY DIAMOND MINE OF            :

    DELAWARE, INC., KURT VAN SCOY :          RECEIVED

7   and DONNA VAN SCOY                  :

8                        *  *  *             SEP 0 2 2005

9                AUGUST 17, 2005            'CHAEL F. PETO

10                       *  *  *

11   PORTIONS OF THIS TRANSCRIPT CONTAIN CONFIDENTIAL

12                      INFORMATION

13                       *  *  *

14              Videotape deposition of WAYNE VAN SCOY,

15   taken pursuant to notice, was held at the law

16   offices of FOX, ROTHSCHILD, O'BRIEN & FRANKEL, LLP,

17   2000 Market Street, 10th Floor, Philadelphia,

18   Pennsylvania 19103-3291, beginning at 10:11 a.m.,

19   before McKinley Wise, a Registered Professional

20   Reporter and an approved Reporter of the United

21   States District Court.

22              ESQUIRE DEPOSITION SERVICES

            1880 John F. Kennedy Boulevard

23                    15th Floor

            Philadelphia, Pennsylvania 19103

24                (215)   988-9191
```

EXHIBIT Y

WAYNE VAN SCOY - 8/17/05

Page 162

1          off the record.)

2                          * * *

3               (Whereupon, Exhibit D-9 was marked

4          for identification.)

5                          * * *

6               THE VIDEOGRAPHER:  Back on the

7          record at 3:01.

8     BY MR. QUINN:

9          Q.      Mr. Van Scoy, we've placed in front

10    of you a document that's been marked as

11    Defendant's Exhibit 9.  Do you recognize that

12    document?

13         A.      Okay.  I think I got it.

14         Q.      Do you know what this document is?

15         A.      Talks about the bankruptcy and the

16    name and stuff.

17         Q.      Do you know who prepared it?

18         A.      No, I don't.

19         Q.      Do you know why it was prepared?

20         A.      Not exactly.

21         Q.      Do you know when --

22         A.      When.  I was going to say when was

23    this?

24         Q.      -- it was prepared?

5a37dead-86f6-4e58-9e27-c031fe58f89e

WAYNE VAN SCOY - 8/17/05

1      A.       '01.  Might have been the settlement

2  thing through the bankruptcy.  I don't remember

3  for sure.

4      Q.       It bears your signature, does it

5  not?

6      A.       Correct.  Yes.

7      Q.       Is this document true and correct,

8  to the best of your knowledge?

9      A.       I'd have to have an attorney look at

10  it again to tell me if it is for sure.

11      Q.       Did you believe it was correct when

12  you signed it?

13      A.       I believe, yes.

14      Q.       Was Mr. Petock representing you at

15  that time?

16      A.       Probably.

17      Q.       Is -- is your answer yes or you're

18  not sure?

19      A.       My parents went through a bankruptcy

20  and we were just going through so much.  So I

21  probably had some counsel then, so I assume it's

22  correct.

23      Q.       But you don't know who that was?

24      A.       No, not offhand.  Would you have

## MEMORANDUM RE: TRANSFER OF TRADEMARK AND SERVICE MARK, REGISTRATIONS, GOOD WILL AND RIGHT TO RECOVER FOR PAST INFRINGEMENT

This Memorandum is intended to be attached to the Order of the United States Bankruptcy Court for the Middle District of Pennsylvania dated January 4, 2001 in the matter of in re: Thomas Van Scoy, Debtor.

The attached Order of the Court reflects that all right, title and interest in the mark "VAN SCOY DIAMOND MINE" became the sole and exclusive property of Wayne Van Scoy for good and valuable consideration including a payment of $45,000.00 paid by Wayne Van Scoy. This included the good will of the business associated with the marks, the registrations covering the marks, and the right to recover for past infringement.

More specifically, Wayne Van Scoy acquired:

1.    Trademark Registration No. 1,140,711 for the mark "VAN SCOY DIAMOND MINE" for jewelry and precious stone which was originally issued on October 21, 1980, along with the mark covered by said registration, the good will of the business associated with the mark and the right to recover for past infringement; and

2.    Service Mark Registration No. 1,140,958 for the mark "VAN SCOY DIAMOND MINE" for rendering of technical aid and assistance in the establishment and/or operation of retail jewelry stores and for retail jewelry store services which was originally issued on October 28, 1980, along with the mark covered by said registration, the good will of the business associated with the mark and the right to recover for past infringement.

TiMemo04.111
443-1
443-2

-1-

EXHIBIT

00038

# MEMORANDUM RE: TRANSFER OF TRADEMARK AND SERVICE MARK, REGISTRATIONS, GOOD WILL AND RIGHT TO RECOVER FOR PAST INFRINGEMENT

This Memorandum is intended to be attached to the Order of the United States Bankruptcy Court for the Middle District of Pennsylvania dated January 4, 2001 in the matter of in re: Thomas Van Scoy, Debtor.

The attached Order of the Court reflects that all right, title and interest in the mark "VAN SCOY DIAMOND MINE" became the sole and exclusive property of Wayne Van Scoy for good and valuable consideration including a payment of $45,000.00 paid by Wayne Van Scoy. This included the good will of the business associated with the marks, the registrations covering the marks, and the right to recover for past infringement.

More specifically, Wayne Van Scoy acquired:

1.     Trademark Registration No. 1,140,711 for the mark "VAN SCOY DIAMOND MINE" for jewelry and precious stone which was originally issued on October 21, 1980, along with the mark covered by said registration, the good will of the business associated with the mark and the right to recover for past infringement; and

2.     Service Mark Registration No. 1,140,958 for the mark "VAN SCOY DIAMOND MINE" for rendering of technical aid and assistance in the establishment and/or operation of retail jewelry stores and for retail jewelry store services which was originally issued on October 28, 1980, along with the mark covered by said registration, the good will of the business associated with the mark and the right to recover for past infringement.

TiMemo04.111
443-1
443-2

-1-

00039

The marks, associated good will and registrations became subject to the Bankruptcy Proceeding in the name of Thomas Van Scoy as Van Scoy Diamond Mines, Inc., the corporation named in the aforementioned registrations as the owner, was an asset of Thomas Van Scoy and was drawn into the Bankruptcy Proceeding along with the registrations, marks and associated good will. Accordingly, the Bankruptcy Court had jurisdiction over the previous owner named in the registrations (Van Scoy Diamond Mines, Inc.), the marks, associated good will and registrations as well as the rights to recover for past infringement. All of the rights and associated good will were transferred to Wayne Van Scoy by the Order of January 4, 2001 of the United States Bankruptcy Court of the Middle District of Pennsylvania.

The Undersigned declares: that all statements made herein of his own knowledge are true and that all statements made on information and belief are believed to be true; and further that the statements were made with the knowledge that willful false statements and the like so made punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the registrations identified above.

_4-13-01_
Date

_Wayne Van Scoy_
Wayne Van Scoy

00040

# EXHIBIT Z

## VAN SCOY DIAMOND MINE
of Delaware, Inc.

Bigger
and Better for Less

| HOME | SHOWCASE GALLERY | ABOUT US | DIRECTIONS | DIAMOND GUIDE | CONTACT US | 1-866-VANSCOY |

## Get More Info

Bracelets & Bangles
   Colored Stone
   Diamond
Colored Stone
Rings
   Bands
Diamond Rings
   Anniversary
   Mountings
   Wedding Bands
Earrings
   Colored Stone
   Diamond
Pendants/Necklaces



| | |
|---|---|
| Price: | $150.00 |
| Carat Weight (approx.): | 0.07 |
| Style Number: | 2M94D |
| Description: | Round |
| Metal: | 14kt w/g |

Contact us to purchase this product or to have your questions answered.

Name:

Email:

Phone:

Comment / Questions:

[ Send ]  [ Reset ]

EXHIBIT Z

Copyright 2002 VanScoy Diamond Mine of Delaware Inc.
Hosting: scoyDev