EXHIBIT "A"

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1353797 (D.Del.)
**(Cite as: 2005 WL 1353797 (D.Del.))**

►

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
AUTOZONE, INC. and Autozone Parts, Inc.,
Plaintiffs,
v.
TRI-STATE AUTO OUTLET, INC. and Robert
Moseder, Defendants.
**No. Civ. 04-103-SLR.**

June 7, 2005.

Richard Montgomery Donaldson, of Montgomery, McCracken, Walker & Rhoads, Wilmington, Delaware, for Plaintiffs, Alan S. Cooper, Alisa C. Key, Jonathan W. Gannon, and Allison G. Olmsted, of Shaw Pittman, L.L.P., Washington, District of Columbia, of counsel.

Karen Jacobs Louden, Maryellen Norieka, and James W. Parrett, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, for Defendants.

OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 On February 17, 2004, plaintiffs AutoZone, Inc. and AutoZone Parts, Inc. [FN1] filed suit against defendants Tri-State Auto Outlet, Inc. and Robert Moseder, alleging service mark and trademark infringement, trade name infringement, unfair competition, and service mark and trademark dilution. [FN2] (D.I.1) Defendants denied plaintiffs' allegations. (D.I.8) The court conducted a bench trial in December 2004. (D.I.68, 69) The following constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 54(a).

FN1. AutoZone Parts, Inc. ("AutoZone Parts") was originally incorporated as Speedbar, Inc. ("Speedbar"). (D.I. 68 at 166) In February of 2004, Speedbar changed its name to AutoZone Parts. (Id .) The caption

in this case has been modified to reflect this change.

FN2. Plaintiffs later withdrew their dilution claim. (D.I.59) Furthermore, federal trademark infringement and federal unfair competition claims are evaluated under identical standards. A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir.2000). For ease of reference the court will refer to plaintiffs' allegations collectively as trademark infringement.

II. FINDINGS OF FACT

A. The Parties

1. Plaintiffs AutoZone, Inc. ("AutoZone") and AutoZone Parts are Nevada corporations with principal offices in the Bahamas. (D.I. 1 at 2) In 1999 plaintiff AutoZone opened a store in Dover, Delaware. (D.I. 68 at 99) Plaintiff AutoZone Parts is a wholly owned subsidiary of AutoZone. (Id. at 166-67) It acts as an intellectual property holding company for AutoZone, and licenses various trademarks, including the trademarks-in-suit, to AutoZone for use in retail store operations. (Id. at 167) AutoZone Parts owns the trademarks-in-suit. (Id.)

2. Defendant Tri-State Auto Outlet, Inc. ("Tri-State") is a Delaware corporation with its principal place of business in Dover, Delaware. (D.I. 1 at 2; D.I. 7 at 2)

3. Defendant Robert Moseder ("Moseder") is a resident and citizen of the State of Delaware, and is an officer and the principal shareholder of Tri-State. (D.I. 7 at 2) Defendant Moseder has operated a used car dealership called CAR ZONE in Dover, Delaware since 1997. (D.I. 68 at 300)

B. Plaintiffs' and Defendants' Marks

4. Plaintiffs own U.S. Trademark Registration Nos.: (1) 1,550,569; [FN3] (2) 1,501,718; [FN4] (3) 1,496,638; [FN5] (4) 2,449,353; [FN6] and (5) 2,721,079. [FN7] (Id. at 168-76; PX 1-5) [FN8] Collectively these are the trademarks-in-suit. (D.I.1) Each of these marks is in full force and effect. (D.I. 68 at 168, 172, 174, 175, 176; PX 1-5) In addition,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1353797 (D.Del.)
(Cite as: 2005 WL 1353797 (D.Del.))

U.S. Trademark Registration Nos. 1,550,569; 1,501,718; and 1,496,638 have been granted uncontestable status. (*Id.* at 169, 173, 174; PX 1-3)

> FN3. A service mark for use of "AUTOZONE" in retail auto parts store services. (D.I. 68 at 168; PX 3)

> FN4. A service mark for use of "AutoZone" together with the speedbar design in retail auto parts store services. (D.I. 68 at 172; PX 2)

> FN5. A trademark for use of "AutoZone" together with the speedbar design in the sale of automotive batteries. (D.I. 68 at 173; PX 1)

> FN6. A service mark for use of "AUTOZONE.COM" for online electronic services (i.e., online ordering services in the field of automotive parts and accessories), and providing information regarding automotive repair and maintenance via a global computer network. (D.I. 68 at 175; PX 4)

> FN7. A service mark for use of "AUTOZONE" for automotive repair services, namely, testing, repair, diagnosis and installation of automotive parts and accessories. (D.I. 68 at 176; PX 5)

> FN8. "PX ____" refers to exhibits submitted by plaintiffs at trial. For example, PX 1 would be plaintiffs' exhibit number 1.

5. Prior to 1987, plaintiffs did business as "Auto Shack." (D.I. 68 at 31-32) In November of 1987, plaintiffs became "AutoZone." (*Id.* at 32-33, 35) Plaintiffs currently operate all of their stores under the AutoZone name. (*Id.* at 51-52) AutoZone is all one word with a capital A and a capital Z. (*Id.* at 52) The letters in AutoZone are red, slanted, written in a special font, and preceded by an orange speedbar design. (*Id.* at 52, 106) This mark has remained essentially the same since November of 1987. (*Id.* at 52) The AutoZone mark appears over the front of each store, on signs outside store buildings, on employee uniforms, on many of the products plaintiffs sell, in all of plaintiffs' advertising, and on plaintiffs' delivery trucks. (*Id.* at 52-53; PX 15, 18-19, 21, 25-37; DX 3-4) [FN9]

> FN9. "DX ____" refers to exhibits submitted

by defendants at trial. For example, DX 3 would be defendants' exhibit number 3.

*2 6. Since September of 1997, defendants sold used cars and offered financing under the name CAR ZONE. (D.I. 69 at 246) The CAR ZONE logo is red and black with all capital letters. (DX 5-8) The Z is larger than all the other letters in the name and it ties in with a road design surrounding the words CAR and ZONE. (*Id.*) The CAR ZONE logo also uses the tag line "The Driving Force!". (*Id.*) The letters in CAR ZONE are equally spaced from adjacent letters. [FN10] (D.I. 69 at 257; DX 5-8) However, the word "CAR" is black and the word "ZONE" is red. (D.I. 69 at 248; DX 5-8) Furthermore, CAR and ZONE are on two different planes. (*Id.*)

> FN10. In other words, the space between the R in CAR and the Z in ZONE is the same as the space between the O and N in ZONE.

C. Plaintiffs' and Defendants' Products and Services

7. Plaintiffs are the leading retailer of automotive parts and supplies in the United States. (D.I. 68 at 5, 45) They also offers services to their customers. [FN11] (*Id.* at 46) However, the only service that plaintiffs charge money for is resurfacing of drums and rotors. (*Id.* at 47) In 2003, plaintiffs had net sales of $5.45 billion. (*Id.* at 38-39; PX 37) They currently have 3500 stores in all 48 continental United States and Mexico. [FN12] (D.I. 68 at 37)

> FN11. These services include: repair advice; diagnostic tests; battery charging; motor oil collection; diagnosis for check-engine lights; and resurfacing drums and rotors. (D.I. 68 at 46-47)

> FN12. As of 1997 plaintiffs did not have any stores in Delaware or New Jersey and only one store in Maryland. (D.I. 68 at 99-100)

8. Defendants are licensed by the State of Delaware to sell used cars and financing for those cars. (D.I. 69 at 301) Defendants do not sell or stock automotive parts. (*Id.*) Defendants employ two mechanics, who ensure automobiles are mechanically sound before they are sold to the public, and perform warranted repairs. [FN13] (*Id.* at 244, 245-46)

> FN13. Defendants do not install windshield wipers or batteries, perform diagnostic tests, service the check engine light, repair burned out headlamps, resurface drums or rotors, or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1353797 (D.Del.)
**(Cite as: 2005 WL 1353797 (D.Del.))**

offer advice on car repair jobs. (D.I. 69 at 303-04)

**D. Defendants' Investigation of Commercial Use of "CAR ZONE"**

9. Sometime in 1997, defendant Moseder performed two searches to see if CAR ZONE was already in commercial use. [FN14] An Internet search revealed several small businesses in the United States used CAR ZONE. (D.I. 69 at 251, 291-92) However, none of these businesses were located in or near Delaware. (*Id.*) The State of Delaware's corporate records also did not indicate any businesses using the name CAR ZONE. (*Id.* at 254, 292-93) Defendant Moseder, in his searches, did not consider any variations of CAR ZONE. (*Id.*)

> FN14. Moseder did not consult with an attorney before adopting CAR ZONE. (D.I. 69 at 250, 252-53) He also did not search the United States Patent and Trademark Office website to see if any other businesses had registered this mark. (*Id.* at 253)

**E. Confusion**

10. Three of plaintiffs' employees testified about phone calls plaintiffs received that the employees believed were intended for CAR ZONE. [FN15] (D.I. 68 at 127, 139, 154) Each employee worked at the Dover AutoZone store for several years. (*Id.* at 124, 139, 154) Each estimated that he or she answered the store phone thousands of times. (*Id.* at 132, 148, 158) Each employee testified that, on between two and twelve occasions, they answered the store phone with a standard greeting [FN16] and the caller inquired about an automobile. The employee indicated that the caller probably wanted CAR ZONE, and the caller either apologized or hung up. (*Id.* at 127-31, 142-45, 155-57) Plaintiffs' employees failed to write down the name or phone number of any of the callers. (*Id.* at 127, 143, 156-57)

> FN15. These three employees were store manager Deborah Caulk, commercial specialist Laurence Kerrick, and product sales manager John Walker. (D.I. 68 at 127, 139, 154)

> FN16. Plaintiffs' standard greeting starts with "Thank you for calling AutoZone, best prices guaranteed." (D.I. 68 at 128, 140, 155)

*3 11. However, one of plaintiffs' employees, Mr. Kerrick, testified that on one occasion, an agitated man called plaintiffs' Dover store about a car he had just purchased. (*Id.* at 146) Despite repeated attempts to explain that the caller had reached AutoZone, not CAR ZONE, the caller consistently responded by stating that he "knew damn well where [he] bought [his] car from." (*Id.* at 146-47)

12. In seven years of operating CAR ZONE, defendant Moseder is unaware of any instances where a customer confused CAR ZONE with AutoZone. (D.I. 69 at 337-38)

**F. Advertising**

13. Since 1987 plaintiffs have spent about $650 million in advertising. (D.I. 68 at 92; PX 24A) Between 1987 and 1989, plaintiffs spent most of their advertising dollars on local advertising. (D.I. 68 at 62-63; PX 24A) In 1990 plaintiffs initially began national advertising. (D.I. 68 at 63; PX 24A) Starting in the late nineties, plaintiffs focused on national television advertising. (D.I. 68 at 64) From 2000 on, plaintiffs have increased their spending on national television and radio advertisements. (*Id.*) Plaintiffs' 2004 expenditures on national television and radio amounted to over 87% of its advertising budget. (D.I. 68 at 114; PX 24A)

14. In the late eighties to early nineties, plaintiffs relied most heavily on newspapers for its advertising needs. (D.I. 68 at 86; PX 24A) In the nineties plaintiffs also purchased local market advertising with various major league baseball and NBA teams in markets where plaintiffs had stores. (D.I. 68 at 75-76; PX 24A) In the last several years, plaintiffs' use of newspapers and team sponsorship has been drastically curtailed. (D.I. 68 at 87; PX 24A) Plaintiffs' expenditures on billboards and direct mail tend to be irregular and modest. (D.I. 68 at 75, 84-85, 115; PX 24A) Most of the magazines plaintiffs advertise in are national magazines. [FN17] (D.I. 68 at 88) Plaintiffs' website sells many of its products and provides its customers with information about their stores and the products and services available at these stores. (*Id.* at 90) Plaintiffs' advertisements in the Yellow Pages are listed under "automobile parts and supplies, new", or under "automotive batteries". (*Id.* at 112-13; D.I. 69 at 316; DX 65)

> FN17. These magazines include Sports Illustrated, Hot Rod Magazine, Road and Track, Car and Driver, Motor Trend, Four Wheel and Off Road. (D.I. 68 at 88-89)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1353797 (D.Del.)
(Cite as: 2005 WL 1353797 (D.Del.))

Plaintiffs only advertised in a couple of regional or local magazines, like Texas Fish and Game Magazine. (*Id.*)

15. Plaintiffs have, on occasion, targeted advertising to particular markets. (D.I. 68 at 113) However, other than Yellow Pages advertising, plaintiffs have not specifically targeted the Dover, Delaware market. (*Id.*) Plaintiffs did not produce any evidence of the amount of money they spent on advertising in the Dover, Delaware market. (*Id.* at 111)

16. Since 1997 defendants have spent about $800,000 on advertising. (D.I. 69 at 275-80; DX 53-59) Defendants have only advertised in the areas surrounding Dover, Delaware. (D.I. 69 at 258-71, 311-30)

17. Approximately 60 to 70% of defendants' advertising budget is spend on advertisements in local free car magazines such as Express and the Guide. (*Id.* at 258-59, 311, 327; DX 10-14) Defendants also rely heavily on word of mouth to generate sales. (D.I. 69 at 311, 331-32, 357-58) Defendants advertise on the cars that they sell by placing their logo on the front tag license plate, the back tag license plate frame, and decals. (*Id.* at 317) Defendants also operate a website which provides contact information, an on-line credit application, and pictures and descriptions of defendants' inventory. [FN18] (*Id.* at 323-24) Defendants' advertisement in the Yellow Pages is listed under "automobile dealers, used cars." (*Id.* at 315; DX 64) Defendants currently advertise on one billboard. (D.I. 69 at 325) Three or four years ago defendants advertised on four billboards. (*Id.*) Defendants also print coupons for their store on the back of receipts from retail stores. (*Id.* at 265-66)

> FN18. Defendants' customers cannot purchase used vehicles or obtain information on automotive repairs or maintenance via defendants' website. (D.I. 69 at 324)

*4 18. Although defendants tried advertising in newspapers, radio, and television, [FN19] they found these media to be ineffective at generating sales. (*Id.* at 259, 261, 264-65, 267-68, 269-70, 320, 326) Defendants no longer advertise through these media. (*Id.*)

> FN19. Defendants' advertisements appeared on national cable television channels like ESPN, TNT, Lifetime, the Family Channel, BET, MTV, USA, and Comedy Central.

However, these advertisements were only broadcast in Kent, Sussex and Cambridge counties. (D.I. 69 at 270, 319)

G. Customers

19. Plaintiffs' customer base includes people who own cars or are responsible for maintaining cars. (D.I. 68 at 49) These tend to be lower income males age 18 to 49 and people who keep their cars longer and buy used cars. (*Id.*) Plaintiffs do extremely well around military bases. (*Id.* at 49-50) Plaintiffs also sell to commercial businesses, including used car dealerships. (*Id.* at 50-51)

20. The average purchase of plaintiffs' customers is $15 to $17 dollars. (*Id.* at 48) Plaintiffs' customers often call in advance to check pricing and availability of parts. (*Id.* at 110) For more complicated parts, plaintiffs' customers exercise even more care in their purchases because they do not like to spend money without being sure the purchased parts will solve their problem. (*Id.* at 110-11)

21. Defendants' customer base includes people who do not have cars and have low credit ratings. (D.I. 69 at 302, 331) These tend to be women age 21 to 35, who have low credit scores. (*Id.* at 331) The majority of defendants' customers do not perform automotive maintenance. (*Id.* at 331) Defendants also target military personnel. (*Id.* at 271, 306) Defendants do not make any sales to commercial businesses. (*Id.* at 271, 306)

22. Defendants sell used automobiles ranging from $4,000 to $12,500. (*Id.* at 301-02) The process of buying a used car on sub-prime credit takes quite a bit longer than buying a conventional new car, since defendants must submit additional documents to sub-prime lenders [FN20] and then wait for approval. (*Id.* at 307) Typically it takes a sub-prime customer two days to purchase a car from CAR ZONE. (*Id.*)

> FN20. Sub-prime lenders take risks on individuals who either have no credit history or have past credit problems. (D.I. 69 at 287) These individuals cannot obtain a loan through conventional financing. (*Id.*)

H. Communications Between the Parties

23. In February of 1999, plaintiffs first became aware of defendants' use of CAR ZONE. (D.I. 68 at 179)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1353797 (D.Del.)
(Cite as: 2005 WL 1353797 (D.Del.))

24. On May 24, 1999, Alan Cooper, counsel for plaintiffs, wrote a letter to defendants, objecting to defendants' use of the mark CAR ZONE. (*Id.;* PX 62) Mr. Cooper informed defendants that, if they did not provide assurances within ten days of receipt of the letter that they no longer would use CAR ZONE, plaintiffs would file suit seeking a permanent injunction. (D.I. 68 at 339; PX 62)

25. On June 1, 1999, defendants' counsel, William Denman, responded to Mr. Cooper's letter. (D.I. 68 at 180; PX 63) Mr. Denman argued that there was no likelihood of confusion between plaintiffs' marks and CAR ZONE. (D.I. 68 at 339-40; PX 63)

26. On June 25, 1999, Mr. Cooper presented counter-arguments to Mr. Denman's June 1st letter. (D.I. 69 at 339-40; PX 64) Mr. Cooper reiterated that, if defendants did not discontinue use of CAR ZONE, plaintiffs would file suit. (PX 64)

**\*5** 27. On July 7, 1999, defendants' new counsel, Barry Gerstenfeld, wrote a letter responding to Mr. Cooper's June 25th letter. (D.I. 69 at 339-40; PX 65) Mr. Gerstenfeld requested all information regarding any other cases where plaintiffs had asserted trademark infringement. (*Id.*)

28. On July 29, 1999, Mr. Cooper responded to Mr. Gerstenfeld's letter. (D.I. 68 at 181) Mr. Cooper provided the information requested by Mr. Gerstenfeld. (*Id.*)

29. On September 1, 1999, Mr. Gerstenfeld responded to Mr. Cooper's July 29th letter. (*Id.;* PX 66) Mr. Gerstenfeld requested information regarding ownership and licensing of plaintiffs' trademarks. (*Id.*)

30. On August 18, 2003, Eric Fingerhut, outside counsel for plaintiffs, sent a letter to defendants, indicating that plaintiffs continued to object to defendants' use of CAR ZONE. (D.I. 68 at 183; PX 67) Mr. Fingerhut's letter did not respond to the specific questions posed in Mr. Gerstenfeld's September 1, 1999 letter. (D.I. 68 at 216; PX 67)

31. In the period between September 1, 1999 and August 18, 2003, plaintiffs filed sixteen civil actions, thirteen proceedings before the Trademark Trial and Advocacy Board, and issued 200 cease and desist letters. (D.I. 68 at 184, 200, 209-10)

32. Plaintiffs did not have more than seven civil actions pending at any given time between September

1999 and August 2003. (*Id.* at 211-12)

33. In September 1999 plaintiffs had two pending civil litigations and two pending opposition proceedings. (*Id.* at 213, 215) In August of 2003, AutoZone had six pending civil litigations and seven pending opposition procedings. (*Id.* at 214, 216)

34. Between September 1999 and August 2003, defendants hired additional employees, increased their advertising by 50% and purchased a new sign. (D.I. 69 at 345; DX 81)

III. CONCLUSIONS OF LAW

A. Trademark Infringement

1. "The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 472 (3d Cir.1994).

2. A plaintiff proves trademark infringement by showing that: (1) the mark is valid and legally protectable; (2) plaintiff owns the mark; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services. [FN21] *Checkpoint Sys. v. Check Point Software Tech.,* 269 F.3d 270, 279 (3d Cir.2001); *Victoria's Secret,* 237 F.3d at 210; *Fisons,* 30 F.3d at 472.

> FN21. It is undisputed that plaintiffs own the trademarks-in-suit, and that these marks are valid and legally protectable. Therefore, the question in this case involves evaluation of likelihood of confusion. (PX 1-5)

B. Likelihood of Confusion

3. Likelihood of confusion exists when consumers viewing a mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark. *Checkpoint,* 269 F.3d at 280; *Victoria's Secret,* 237 F.3d at 211; *Fisons,* 30 F.3d at 472.

4. The Third Circuit has adopted a ten-factor test to determine likelihood of confusion in the market. [FN22] These factors are:

> FN22. The Third Circuit refers to these factors collectively as the *Lapp* factors. *Kos Pharm.,* 700 F.3d at 709; *Checkpoint,* 269

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1353797 (D.Del.)
(Cite as: 2005 WL 1353797 (D.Del.))

F.3d at 280; *Victoria's Secret*, 237 F.3d at 211. This ten-factor test, with minor variations, is applied both when underlying products compete and when they do not compete in the marketplace. *Victoria's Secret*, 237 F.3d at 212-13.

*6 (1) the degree of similarity between the owner's mark and the alleged infringing mark;
(2) the strength of the owner's mark;
(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
(4) the length of time the defendant has used the mark without evidence of actual confusion arising;
(5) the intent of the defendant in adopting the mark;
(6) the evidence of actual confusion;
(7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;
(8) the extent to which the targets of the parties' sales efforts are the same;
(9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors; and
(10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect a prior owner is likely to expand into the defendant's market.
*Kos Pharm., Inc. v. Andrx Corp.*, 700 F.3d 700, 709 (3d Cir.2004); *Checkpoint*, 269 F.3d at 280; *Victoria's Secret*, 237 F .3d at 211; *Fisons*, 30 F.3d at 473.

5. No single *Lapp* factor is determinative in a likelihood of confusion analysis, and each factor must be weighed and balanced against the others. *Kos Pharm.*, 700 F.3d at 709; *Checkpoint*, 269 F.3d at 280; *Fisons*, 30 F.3d at 476 n. 11.

6. The Third Circuit does not discount the strength of one factor because of the weakness of another factor. *Fisons*, 30 F.3d at 476.

7. "Not all of the [*Lapp* ] factors are present in every case." *Fisons*, 30 F.3d at 476 n. 11. However, if a court finds certain *Lapp* factors to be inapplicable or unhelpful in a particular case, the court should explain its choice not to employ those factors. *Kos Pharm.*, 700 F.3d at 711.

8. Degree of similarity of the marks. Degree of similarity of the marks may be the most important of the ten *Lapp* factors. *Kos Pharm.*, 700 F.3d at 712-13; *Checkpoint*, 269 F.3d at 281; *Victoria's Secret*, 237 F.3d at 216; *Fisons*, 30 F.3d at 476.

9. Marks are confusingly similar if ordinary consumers would likely conclude that two products share a common source, affiliation, connection or sponsorship. *Kos Pharm.*, 700 F.3d at 713; *Victoria's Secret*, 237 F.3d at 216. The proper test is not side-by-side comparison but whether the labels create the same overall impression when viewed separately. *Id.; Fisons*, 30 F .3d at 477. Although courts look to the overall impression of the marks, this general rule does not undermine the "common-sense precept" that more forceful and distinctive aspects of a mark should be given more weight, and the other aspects less weight. *Victoria's Secret*, 237 F.3d 216.

10. Courts must compare the appearance, sound and meaning of marks to determine their similarity. *Kos Pharm.*, 700 F.3d at 713; *Checkpoint*, 269 F.3d at 281; *Victoria's Secret*, 237 F.3d at 217-218.

*7 11. AutoZone and CAR ZONE are not likely to create the same overall impression among ordinary consumers. Furthermore, the marks have different appearance, sound and meaning. AutoZone is all one word, while CAR ZONE is two. (DX 3, 5; PX 11, 15, 18-19, 21, 25-37) AutoZone uses lower case and capital letters, while CAR ZONE uses only capitalized letters. (*Id.*) Plaintiffs use a font specially developed for the AutoZone mark. (D.I. 68 at 106) CAR ZONE often, though not always, is accompanied by the tag line "The Driving Force!". (DX 2, 5) In commercial settings both marks use the colors red, white, and black. (DX 3, 5; PX 11, 15, 18-19, 21, 25-37) However, AutoZone is always accompanied by an orange speedbar design. (DX 3-4; PX 11, 15 18-19, 21, 25-37) AutoZone and CAR ZONE also have different sounds. Although AutoZone and CAR ZONE share the term "zone", they have different numbers of syllables and the first syllable of each is different. AutoZone starts with a soft "A-U" sound, while CAR ZONE starts with a hard "K" sound. AutoZone and CAR ZONE have similar, though not identical, meanings. Although "auto" is often used as an abbreviation for automobile or automotive, it is actually a prefix which means "self." Random House Dictionary of the English Language 139 (2d ed.1987). "Cars" are a subset of "automobiles." Thus, the terms are not synonymous. The court concludes that AutoZone and CAR ZONE

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1353797 (D.Del.)
(Cite as: 2005 WL 1353797 (D.Del.))

are not similar marks.

12. Strength of the owner's mark. Under the *Fisons* test the strength of a trademark is determined by: (1) the distinctiveness or conceptual strength of the mark; and (2) the commercial strength or marketplace recognition of the mark. *Kos Pharm.,* 700 F.3d at 715; *Checkpoint,* 269 F.3d at 282; *Victoria's Secret,* 237 F.3d at 221; *Fisons,* 30 F.3d at 478-79.

13. Distinctiveness or conceptual strength of a mark is determined by placing the mark in one of four categories. *Checkpoint,* 269 F.3d at 282; *Victoria's Secret,* 237 F.3d at 221; *Fisons,* 30 F.3d at 479. These four categories are: (1) generic marks, which function as the common descriptive name of a product class; (2) descriptive marks, which convey an immediate idea of the ingredients, qualities or characteristics of the goods; (3) suggestive marks, which suggest a quality or ingredient of goods, and require consumer imagination, thought or perception to determine what the product is; and (4) arbitrary or fanciful marks, which use terms that neither describe nor suggest anything about the product, and bear no logical or suggestive relation to the actual characteristics of the goods. *Checkpoint,* 269 F.3d at 282; *Victoria's Secret,* 237 F.3d at 221-22.

14. In order to qualify for trademark protection, a mark must either be arbitrary, fanciful, suggestive, or descriptive with a demonstration of secondary meaning. [FN23] *Checkpoint,* 269 F.3d at 282-83; *Victoria's Secret,* 237 F.3d at 222. Marks that are descriptive without secondary meaning and generic marks do not receive trademark protection. *Checkpoint,* 269 F.3d at 282-83 & n .10; *Victoria's Secret,* 237 F.3d at 222.

> FN23. A mark is descriptive with a secondary meaning when the mark "is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services." *Checkpoint,* 269 F .3d at 282 n. 10. The Third Circuit has identified a non-exclusive list of factors for determining whether a mark has achieved a secondary meaning, including: (1) the extent of advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimonials; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of

customers; and (11) actual confusion. *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 292 (3d Cir.1990).

**\*8** 15. The classification system's primary purpose is to determine whether a mark is protectable. *Victoria's Secret,* 237 F.3d at 222. Classification of a mark can be used secondarily to determine the degree of protection a mark should receive. *Id.* These two inquiries are often identical, but they can differ. *Id.* Stronger marks are entitled to greater protection. *Id.* A strong trademark carries widespread, immediate recognition that one producer is associated with the mark and the product. *Checkpoint,* 269 F.3d at 282 (citing *Versa Prods. Co. v. Bifold Co. (Mfg.),* 50 F.3d 189, 202 (3d Cir.1995)). A mark is weak if it is used in connection with a number of different products. *Victoria's Secret,* 237 F.3d at 222.

16. Commercial strength or marketplace recognition is another measure of mark strength. *Id.; Fisons,* 30 F.3d at 479. Commercial strength can be demonstrated by showing extensive advertising expenditures together with steady sales increases. *Victoria's Secret,* 237 F.3d at 224.

17. AutoZone is a descriptive term because it conveys an immediate idea of the ingredients, qualities or characteristics of plaintiffs' business. [FN24] "AutoZone" also has weak secondary meaning. [FN25] Because plaintiffs showed both increasing advertising expenditures together with increasing sales, AutoZone also has commercial strength. (PX 24A, 37) The court concludes that AutoZone is entitled to weak trademark protection.

> FN24. Although the name AutoZone does not clearly identify what plaintiffs' business has to do with automobiles (e.g., selling cars, selling car parts and accessories, applying various services to cars), consumers are left with the definite idea that AutoZone is a place for cars.

> FN25. Plaintiffs spend a great deal on advertising. (D.I. 68 at 92; PX 24A) AutoZone's marks have been used since November of 1987. (D.I. 68 at 32-33, 35) Plaintiff AutoZone is a very large company, sells an enormous amount of products, and has a large number of customers. (PX 37) However, plaintiffs do not have exclusive use of "zone," which is the dominant portion of the AutoZone mark. (D.I. 68 at 20) Plaintiffs also failed to produce evidence of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1353797 (D.Del.)
**(Cite as: 2005 WL 1353797 (D.Del.))**

copying, customer surveys, customer testimonials, use of AutoZone in trade journals, or actual confusion. These factors indicate that while AutoZone has secondary meaning, this meaning is weak.

18. The price of goods and other factors indicative of the care and attention expected of consumers when making a purchase. "When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion." *Kos Pharm.,* 700 F.3d at 715; *Checkpoint,* 269 F.3d at 284. If goods are relatively expensive, more care is taken and buyers are less likely to be confused as to source or affiliation. *Id.*

19. Plaintiffs' customers exercise heightened care in evaluating the relevant products before making purchasing decisions. (D.I. 68 at 110-11) Defendants' products are relatively expensive. (D.I. 69 at 301-02) Furthermore, it typically takes two days to purchase a used car on sub-prime credit. (*Id.* at 307) The court concludes that consumers of plaintiffs' and defendants' consumers display a great deal of care in their purchases.

20. The intent of the defendant in adopting the mark. The relevant intent inquiry in a likelihood of confusion case is whether the defendant adopted a mark with the intent of promoting confusion and appropriating the prior user's good will. *Checkpoint,* 269 F.3d at 286; *Fisons,* 30 F.3d at 479. This inquiry extends beyond asking whether a defendant purposely chose its mark to promote confusion. "The adequacy and care with which the defendant investigates and evaluates its proposed mark are highly relevant." *Kos Pharm.,* 700 F.3d at 721.

*9 21. Defendant Moseder testified that he had never heard of AutoZone prior to adopting CAR ZONE as the name of his used car dealership. (D.I. 69 at 334-35) Plaintiffs did not present any evidence to contradict this testimony. The court concludes that defendants did not intend to promote confusion by adopting the mark CAR ZONE.

22. The court also concludes that defendant Moseder was not careless in his investigation of the commercial uses of CAR ZONE. Defendant Moseder performed an Internet search and examined the State of Delaware's corporate records to see if any businesses used the name CAR ZONE. (D.I. 69 at 254, 292-93) The court concludes that defendant Moseder performed a reasonable investigation of the CAR ZONE mark.

23. The relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors. The test for determining the relationship of goods in the minds of consumers is whether the goods were similar enough that a consumer could assume they were offered by the same source. *Checkpoint,* 269 F.3d at 286; *Fisons,* 30 F.3d at 481. "Near-identity" and "similarity of function" are key to assessing whether consumers may see products as related. *Checkpoint,* 269 F.3d at 286. The closer the relationship between the products, the greater the likelihood of confusion. *Kos Pharm.,* 700 F.3d at 722.

24. Plaintiffs sell automotive parts and accessories. (D.I. 68 at 5, 45) Defendants sell used cars. (D.I. 69 at 301) Although plaintiffs' and defendants' products are both in the automotive field, automobiles and parts for automobiles are neither nearly-identical nor functionally similar. The court concludes that consumers would not view these products as closely related.

25. The evidence of actual confusion and the length of time the defendant has used the mark without evidence of actual confusion arising. Ownership of a trademark does not guarantee total absence of confusion in the marketplace. *Victoria's Secret,* 237 F.3d at 227. "Selection of a mark with a common surname naturally entails a risk of some uncertainty and the law will not assure absolute protection." *Id.*

26. Even where there is no evidence of actual customer confusion in connection with the purchase of defendants' products, initial confusion by consumers (i.e., mistakenly calling plaintiffs when intending to call defendants) can give rise to trademark infringement. *Checkpoint,* 269 F.3d at 291-92.

27. "Product relatedness and level of care by consumers are relevant factors in determining initial interest confusion." *Checkpoint,* 269 F.3d at 296. When products are similar, an infringer is more likely to benefit from the goodwill of the firm with an established mark. *Checkpoint,* 269 F.3d at 296. When consumers do not exercise a high level of care in making their decisions, it is more likely that their initial confusion will result in a benefit to the alleged infringer from the use of the goodwill of the other firm. *Id.* at 296-97.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*10 28. Isolated instances of initial interest confusion in large companies which receive many communications from customers on a daily basis are *de minimis* and "counsel against a finding of likely confusion." *Id.* at 298-99.

29. It is undisputed that plaintiffs presented no evidence of actual consumer confusion in the form of mistaken purchasing decisions.

30. However, plaintiffs did produce the testimony of three of their employees describing initial interest confusion by consumers. (D.I. 68 at 122-60) Plaintiffs' and defendants' consumers exercise a great deal of care in making purchases. Plaintiffs' and defendants' products are not closely related. Consequently, the court concludes that plaintiffs' testimony about initial interest confusion is not entitled to great weight. This is especially true given the fact that none of plaintiffs' employees documented any of the alleged initial interest confusion phone calls. (D.I. 68 at 127, 143, 156-57)

31. Furthermore, each of the three employees testified that, through the course of their employment with plaintiffs, they answered the phone thousands of times. (*Id.* 132, 148, 158) Given the large number of phone calls plaintiffs receive from customers, these initial interest confusion calls are *de minimis*. The court concludes that the evidence does not suggest that there was any actual customer confusion. [FN26] *See Checkpoint,* 269 F.3d at 291-300.

> FN26. "When parties have used similar marks for a sufficient period of time without evidence of consumer confusion about the source of the products, there is an inference that future consumers will not be confused either." *Kos Pharm.,* 700 F.3d at 715; *Checkpoint,* 269 F.3d at 291; *Fisons,* 30 F.3d at 476. Since the court finds that there is no evidence of actual confusion, defendants' use of CAR ZONE since 1997 creates the inference that future consumers will not be confused either.

32. Whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media. The greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion. *Kos Pharm.,* 700 F.3d at 722; *Checkpoint,* 269 F.3d at 289. "That there is no overlap in the places these parties market their products tends to diminish the chance" of confusion. *Checkpoint,* 269 F.3d at 289. However, it

is rare to find plaintiffs and defendants with identical marketing strategies. *Victoria's Secret,* 237 F.3d at 225.

33. Plaintiffs' and defendants' marketing strategies are dissimilar. Over 87% of plaintiffs' 2004 advertising budget was spent on national television and radio advertisements. (D.I. 68 at 114; PX 24A) In contrast, 60 to 70% of defendants' advertising budget is spend on advertisements in local free car magazines. (D.I. 69 at 258-59, 311, 327; DX 10-14) Defendants only advertised in the area surrounding Dover, Delaware. (D.I. 69 at 258-71, 311-30) Plaintiffs have increasingly focused their advertising on the national level. (D.I. 68 at 64) Plaintiffs have not specifically targeted the Dover, Delaware market and could not produce evidence quantifying the amount of money it spent on advertising in this market. (*Id.* at 111, 113) Although plaintiffs' and defendants' marketing strategies do overlap, this overlap is minimal. The court concludes that plaintiffs and defendants do not market their products through similar channels of trade or through the same media.

*11 34. The extent to which the targets of the parties' sales efforts are the same. When parties target their sales efforts to the same consumers, there is a stronger likelihood of confusion. *Checkpoint,* 269 F.3d at 289.

35. Plaintiffs' customer base includes people who own cars or are responsible for maintaining cars. (D.I. 68 at 49) These typically are lower income males age 18 to 49. (*Id.*) Plaintiffs also sell to commercial businesses, including used car dealerships. (*Id.* at 50-51) Defendants' customer base includes people who do not have cars and have low credit ratings. (D.I. 69 at 302, 331) People in this group are typically women age 21 to 35. (*Id.* at 331) The majority of defendants' customers do not perform automotive maintenance. (*Id.* at 331) Defendants do not make any sales to commercial businesses. (*Id.* at 271, 306) The court concludes that plaintiffs and defendants do not target the same consumers.

36. Combining the *Lapp* factors. With the exception of the strength of the owner's mark, all of the *Lapp* factors weigh in favor of defendants. [FN27] Furthermore, the court found that plaintiffs' AutoZone mark was only entitled to weak protection. In contrast, several of the remaining factors (e.g., the price of the goods and care used in making purchases, the intent of defendants, and the advertising targets) strongly favored defendants. The

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1353797 (D.Del.)
(Cite as: 2005 WL 1353797 (D.Del.))

court concludes that there is no likelihood of confusion.

> FN27. The only *Lapp* factor that the court did not use in examining the likelihood of confusion in this case is the tenth factor, other facts suggesting the consuming public might be confused. The court did not discern any facts in the record that would suggest, one way or the other, whether the public would be confused by defendants' and plaintiffs' marks.

### C. Laches

37. Laches is one of several defenses to trademark infringement. 15 U.S.C. § 1115(b). The defense serves to bar both monetary and injunctive relief. *Joint Stock Soc'y v. UDV N. Am., Inc.,* 53 F.Supp.2d 692, 712 (D.Del.1999). Laches consists of two elements: (1) inexcusable delay in bringing suit; and (2) prejudice to the defendant as a result of the delay. *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.,* 401 F.3d 123, 138 (3d Cir.2005); *Joint Stock Soc'y,* 53 F.Supp.2d at 712.

38. Once the statute of limitations expires for a cause of action, the defendant "enjoys the benefit of a presumption of inexcusable delay and prejudice." *Santana,* 401 F.3d at 139. Under this presumption plaintiff has the burden of proving both that the delay was excusable and that it did not prejudice the defendant. *Id.* at 139; *Joint Stock Soc'y,* 53 F.Supp.2d at 713.

39. Because the Federal Trademark Act does not contain a specific statute of limitations, the court must look to state law to find the statute of limitations period most analogous to trademark infringement. *Santana,* 401 F.3d at 135; *Joint Stock Soc'y,* 53 F.Supp.2d at 713 n. 18. Under Delaware law the most appropriate time period is three years. *Joint Stock Soc'y,* 53 F.Supp.2d at 713 n. 18 (citing 10 Del. C. § 8106).

40. On May 24, 1999, plaintiffs accused defendants of infringing plaintiffs' trademarks. (PX 62) Between June and September of 1999, the parties exchanged numerous letters discussing the alleged trademark infringement. (PX 63-66) On September 1, 1999, defendants sent a letter to plaintiffs requesting information regarding the ownership and licensing of the trademarks-in-suit. (PX 66) However, plaintiffs did not respond to this letter. Almost four years later, on August 18, 2003, plaintiffs reasserted their

allegations. (PX 67) On February 17, 2004, plaintiffs filed suit against defendants. (D.I.1) The court concludes that the statute of limitations expired on plaintiffs' trademark infringement claims.

*12 41. Plaintiffs did not prove that their delay was reasonable or that defendants did not suffer prejudice. The evidence suggests that plaintiffs' delay was not reasonable. (D.I. 68 at 211-12; 213-16) The evidence also suggests that defendants were prejudiced as a result of plaintiffs' delay. (D.I. 69 at 345) Consequently, the court rules that plaintiffs' trademark infringement allegations are barred by the defense of laches.

### IV. CONCLUSION

For the reasons set forth above, the court finds that defendants do not infringe plaintiffs' trademarks, service marks, or trade name because there is no likelihood of confusion between defendants' and plaintiffs' marks. Furthermore the court finds that plaintiffs' trademark, service mark, and trade name claims are barred by the defense of laches. An appropriate order shall issue.

### ORDER

At Wilmington this 7th day of June, 2005, consistent with the opinion that issued this same date;

IT IS ORDERED that:

1. Defendants do not infringe plaintiffs' trademarks, service marks, or trade name because there is no likelihood of confusion between defendants' and plaintiffs' marks.

2. Plaintiffs' trademark, service mark, and trade name claims are barred by the defense of laches.

3. The Clerk of Court is directed to enter judgment in favor of defendants and against plaintiffs.

Not Reported in F.Supp.2d, 2005 WL 1353797 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:04cv00103 (Docket) (Feb. 17, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.