# EXHIBIT I

# REDACTED

# EXHIBIT J

**VAN SCOY DIAMOND MINE**

Bigger
and Better for Less

| HOME | SHOWCASE GALLERY | ABOUT US | DIRECTIONS | DIAMOND GUIDE | CONTACT US |

## Get More Info

Bracelets & Bangles
  Colored Stone
  Diamond
Colored Stone
Rings
  Bands
Diamond Rings
  Anniversary
  Mountings
  Wedding Bands
Earrings
  Colored Stone
  Diamond
Pendants/Necklaces



| | |
|---|---|
| Price: | $150.00 |
| Carat Weight (approx.): | 0.07 |
| Style Number: | 2M94D |
| Description: | Round |
| Metal: | 14kt w/g |

Contact us to purchase this product or to have your questions answered.

Name:

Email:

Phone:

Comment / Questions:

Send    Reset

EXHIBIT J

Copyright 2002 VanScoy Diamond Mine of Delaware Inc.
Hosting: scoyDev

# EXHIBIT K

# REDACTED

# EXHIBIT L

## Page 1

```
1
2          UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF DELAWARE
3
4  WAYNE VAN SCOY,                    :
5          Plaintiff                  :
6      -vs-                           :
7  VAN SCOY DIAMOND MIND              : # 05-108
   OF DELAWARE, INC., ET AL,          :
8          Defendants                 :
9
10          Valley Forge, Pennsylvania
11             October 5, 2005
12
13
14          Pretrial examination of LEW HILL,
15  taken on behalf of the Plaintiff at the
16  offices of PETOCK & PETOCK, 46 The
17  Commons at Valley Forge, Valley Forge,
18  Pennsylvania, on the above date, commencing
19  at 1:30 p.m., before Julie Zatuchni,
20  Registered Professional Reporter.
21
22          JULIE ZATUCHNI, RPR
23             202 Fairfax Court
             Wayne, Pennsylvania 19087
24
```

## Page 2

```
1
2  APPEARANCES:
3      PETOCK & PETOCK
4      BY: MICHAEL C. PETOCK and MICHAEL F.
              PETOCK, ESQUIRES
5      46 The Commons at Valley Forge
       Valley Forge, Pennsylvania 19482
6      Counsel for Plaintiff
7      FOX ROTHSCHILD
       BY: CHARLES N. QUINN, ESQUIRE
8      2000 Market Street, 10th Floor
       Philadelphia, Pennsylvania 19103
9
10     Counsel for Mr. Hill
11 ALSO PRESENT:  KURT VAN SCOY
                  WAYNE VAN SCOY
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
1
2           I N D E X
3  WITNESS                    EXAMINATION
4  LEW HILL
5      By MR. PETOCK            4, 75
6      By MR. QUINN             64
7
8  PLAINTIFF
   EXHIBITS                   MARKED
9
10  #40     Subpoena             6
11  #41     Agreement            8
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 4

```
1
2          (It is stipulated and agreed by and
3  between counsel for the respective parties
4  that the reading, signing, sealing,
5  certification and filing of the within
6  deposition be waived; and that all
7  objections, except as to the form of the
8  question, be reserved until the time of
9  trial.)
10          ----
11          LEW HILL,
12  was called as a witness and after having
13  been first sworn, according to law, was
14  examined and testified as follows:
15          EXAMINATION
16  BY MR. PETOCK:
17  Q.     Good morning, Mr. Hill or good
18  afternoon, actually.  My client is William
19  Van Scoy.  William Van Scoy is the son of
20  Tommy Van Scoy, Senior, who I think you
21  knew.  Wayne is a distributor for the mark
22  Van Scoy Diamond Mine.
23          Presently Wayne is involved in
24  litigation against a business in Delaware
```

**EXHIBIT L**

Page 5

```
 1
 2  and its owners respecting the Van Scoy
 3  Diamond Mine. The reason that we brought
 4  you here today was to find out what
 5  information you might know that might be
 6  relevant to the present lawsuit, okay.
 7  That being said, I'm going to ask you some
 8  questions to find out what you might know,
 9  okay?
10  A.    Okay.
11  Q.    You understand that you've taken
12  an oath to tell the truth today?
13  A.    I do.
14        MICHAEL F. PETOCK: Before we
15  begin, I'd like to put on the record that
16  one of the defenses raised by Mr. Quinn in
17  this lawsuit is that the mark is generic
18  and therefore the mark is invalid and Mr.
19  Hill, as a part of the partnership, owns or
20  claims to own and I believe has produced an
21  agreement that says he owns, has exclusive
22  rights to the mark and we believe that is a
23  conflict of interest for Mr. Quinn to be
24  representing Mr. Hill in this deposition.
```

Page 6

```
 1
 2        MR. QUINN: I disagree. A) I
 3  think that's a mischaracterization of the
 4  agreement and B) I don't think there's any
 5  conflict in interest and that will become
 6  quite clear as the testimony comes
 7  forward.
 8        MR. PETOCK: I'd like to have
 9  this first document marked as Plaintiff's
10  Exhibit 40.
11        (Whereupon, Subpoena marked
12  Plaintiff's Exhibit 40, for
13  identification.    )
14  BY MR. PETOCK:
15  Q.    Mr. Hill, do you recognize this
16  document that's been marked as Plaintiff's
17  Exhibit 40?
18  A.    I do.
19  Q.    This is a subpoena issued from
20  the United States District Court, the
21  Eastern District of Pennsylvania and this
22  is the reason that you're here today; is
23  that correct?
24  A.    That's correct.
```

Page 7

```
 1
 2  Q.    I just for the record, the
 3  subpoena asks you to have produced all
 4  agreements with Van Scoy Diamond Mines,
 5  Inc. and/or Thomas Van Scoy that you may
 6  have entered; is that correct?
 7  A.    That's correct.
 8  Q.    Just for the record, you did not
 9  bring any records with you today?
10  A.    That is correct.
11  Q.    Do you have any such documents?
12  A.    What I have is an unsigned
13  franchise agreement from 1978, and I have a
14  signed agreement which I cannot currently
15  locate, but expect that I will be able to
16  at some point in time, with my
17  interpretation of rights to use the name in
18  three counties in Southeastern
19  Pennsylvania: Schuylkill, Montgomery and
20  Berks. I believe they were sent which I
21  believe you have a copy of.
22        MR. PETOCK: I'd like to have
23  this marked as Plaintiff's Exhibit 41,
24  please.
```

Page 8

```
 1
 2        (Whereupon, Agreement marked
 3  Plaintiff's Exhibit 41, for
 4  identification.)
 5  BY MR. PETOCK:
 6  Q.    Do you recognize what's been
 7  marked as Plaintiff's Exhibit 41?
 8  A.    It's been awhile since I've seen
 9  it, but in the context that I haven't read
10  it, it appears to be the Agreement that we
11  executed back in 1993, at some point in
12  time, for the exchange of some $30,000, the
13  rights to use the name in those three
14  counts that I mentioned.
15  Q.    Could you take time to review it
16  just to make sure just to the best of your
17  memory and ability that it is the actual
18  Agreement that was executed between you and
19  Tommy Van Scoy, Senior.
20  A.    It looks pretty much okay.
21  Q.    So to the best of your knowledge,
22  this is an accurate copy of the Agreement?
23  A.    Yes.
24  Q.    That was executed between you and
```

1
2 Tommy Van Scoy, Senior?
3 A.    Yes.
4 Q.    If you can find the signed copy
5 of it, when you do find it, could you
6 please send it to us?
7 A.    I will.
8 Q.    Thank you.  According to the
9 Agreement --
10        MR. QUINN: I'd like a copy of it
11 if you find it, as well.
12 BY MR. PETOCK:
13 Q.    You characterized that Agreement
14 as granting you the right to use the
15 federally registered trademarks for Van
16 Scoy Diamond Mine in Berks, Schuylkill and
17 Montgomery Counties of Pennsylvania; is
18 that correct?
19 A.    Yes.
20 Q.    Have you been told by anyone that
21 the defendants in this lawsuit are claiming
22 that the federally registered trademarks
23 that I just spoke of are invalid or
24 generic?

1
2        MR. QUINN: Objection, leading.
3        THE WITNESS: No.
4        MR. QUINN: Please wait until I
5 register any objection.
6 BY MR. PETOCK:
7 Q.    You can answer the objection.
8 A.    I now can?
9 Q.    Yes.
10 A.    No.
11 Q.    Do you understand that if the
12 defendants are able to show that the
13 federally registered trademarks are invalid
14 or generic, someone else would be perfectly
15 within their rights to open up a Van Scoy
16 Diamond Mine store or even possibly a Van
17 Scoy Jewelers across from any store that
18 you might own?
19        MR. QUINN: Objection, leading.
20 Furthermore, the marks at issue are Van
21 Scoy Diamond Mine and any invalidation
22 would go to the mark Van Scoy Diamond Mine
23 as registered, not to the mark that was the
24 subject of the question.

1
2 BY MR. PETOCK:
3 Q.    You can answer the question.
4 A.    I didn't understand the
5 question.
6 Q.    Do you understand that if the
7 defendants are able to show that the marks
8 are invalid or generic, another person
9 would be in their rights, would be
10 perfectly within their rights to open up a
11 Van Scoy Diamond Mine across the street
12 from any jewelry store that you own?
13 A.    Can I answer it?
14        MR. QUINN: I have no objection
15 to that question.  If you understand the
16 question, you can answer it.
17        MICHAEL F. PETOCK: Objection,
18 coaching.
19        MR. QUINN: I object to the
20 question as leading.
21        THE WITNESS: I would say no, I
22 would think I'd have a right to contest
23 that.  I don't know about them, but I would
24 raise some objection.

1
2 BY MR. PETOCK:
3 Q.    Is Charlie representing you in
4 this matter?
5 A.    Yes.
6 Q.    Has anyone explained that Mr.
7 Quinn might have a conflict of interest in
8 his representation of you?
9 A.    No.
10 Q.    And you haven't waived any sort
11 of conflict?
12 A.    No.
13 Q.    I guess I should have asked you
14 this earlier, but can you please state your
15 full name?
16 A.    Lew M. Hill, M as in Michael.
17 Q.    What is your date of birth?
18 A.    1/13/1945.
19 Q.    Where were you born?
20 A.    In Reading, Pennsylvania.
21 Q.    Where did you grow up?
22 A.    Reading, Pennsylvania.
23 Q.    Could you state what your
24 education background is?

**Page 13**

1
2 A.    I graduated from Reading High. I
3 joined the military, the United States Air
4 Force, came home from the Air Force, went
5 to work for International Business
6 Machines, worked for them for some 17 years
7 and started this jewelry business back in
8 1978.
9 Q.    You mentioned that you worked for
10 International Business Machines?
11 A.    Right.
12 Q.    What did you do for International
13 Business Machines?
14 A.    I was a systems engineer.
15 Q.    What years was that
16 approximately?
17 A.    1967 through 1983.
18 Q.    What happened in 1983?
19 A.    I left, I left and went into the
20 jewelry business full time.
21 Q.    Were you working in the jewelry
22 business prior to 1983?
23 A.    It was a second, I was still full
24 time at IBM from '78 until '83, and I was

**Page 14**

1
2 basically doing both.
3 Q.    Was 1978, the first year that you
4 got into the jewelry business?
5 A.    Yes.
6 Q.    Did you work for a jewelry store
7 in 1978?
8 A.    No. I worked for IBM in 1978.
9 Q.    But you said you were in the
10 jewelry business in some capacity in 1978?
11 A.    We opened our store in 1978, on
12 November 11 of 1978.
13 Q.    So you were working two jobs at
14 that point, basically?
15 A.    Right.
16 Q.    In 1978, when you first opened up
17 your store, where was that store located?
18 A.    It was at 3039 North 5th Street
19 in Reading, Pennsylvania.
20 Q.    What was the street?
21 A.    North 5th Street.
22 Q.    What was the name of that store?
23 A.    Van Scoy Diamond Mine.
24 Q.    How did you get into the jewelry

**Page 15**

1
2 business in 1978?
3 A.    We had friends who were
4 franchising jewelry stores in partnership
5 with Tommy Van Scoy, Senior and they
6 approached us and asked us if we were
7 interested in being partners, my partner
8 and I at the time and we did.
9 Q.    Who was your partner at the time?
10 A.    James C. Sweeney.
11 Q.    Who were your friends that were
12 franchising with Tommy Van Scoy, Senior?
13 A.    His name was Al Tooful.
14 Q.    Where was Al tooful, did he -- he
15 was franchising stores in 1978?
16     MR. QUINN: Objection, only
17 because there seem to be two questions
18 there. Just for clarification.
19 BY MR. PETOCK:
20 Q.    Was Al Tooful a franchisee or a
21 licensee of Tommy Van Scoy, Senior or
22 his --
23     MR. QUINN: Wait until Mr. Petock
24 finishes answering his question and then if

**Page 16**

1
2 I have any objection and then please
3 answer. Because the reporter cannot take
4 down more than one speaker at once.
5 BY MR. PETOCK:
6 Q.    Was Mr. Tooful what you
7 characterize as a franchisee? Did he have
8 a franchisee somewhere in 1978, or prior to
9 1978?
10 A.    He had a store.
11 Q.    Where was the store located?
12 A.    Scranton, Pennsylvania.
13 Q.    Prior to 1978, did you have any
14 experience in the jewelry business?
15 A.    No.
16 Q.    Was there any particular reason
17 you felt that you wanted to get into the
18 jewelry business in 1978?
19 A.    We were looking at a number of
20 businesses and it was probably just an
21 issue of timing that the jewelry business
22 opportunity presented itself.
23 Q.    In 1978, you testified that you
24 became a franchisee of Tommy Van Scoy,

Page 17

1
2 Senior at 309 West 5th Street in Reading?
3 A.    3039 North 5th Street, yes.
4 Q.    Is that correct?
5 A.    Yes.
6 Q.    You owned a store there?
7 A.    Yes.
8         MR. QUINN: Asked and answered,
9 objection.
10 BY MR. PETOCK:
11 Q.    Were you renting it or did you
12 own the store?
13 A.    We were leasing the location.
14 Q.    How long did you operate that
15 store?
16 A.    From November 11, 1978 to April 1
17 of 2003.
18 Q.    During that time period, what was
19 the name of the store that you operated at
20 339 North 5th Street in Reading,
21 Pennsylvania?
22 A.    It was 3039. Van Scoy Diamond
23 Mine.
24 Q.    Did that store at 3039 North 5th

Page 18

1
2 Street in Reading, Pennsylvania ever go by
3 any other name beside Van Scoy Diamond
4 Mine?
5 A.    We changed the name to Van Scoy
6 Jewelers probably late '90s, but I don't
7 remember exactly.
8 Q.    Were you operating under the name
9 Van Scoy Diamond Mine and Van Scoy Jewelers
10 at the same time?
11 A.    Well, transitioned a little bit,
12 but we filed a fictitious filing and, you
13 know.
14 Q.    To the best of your memory, it
15 was the late 1990's where you switched from
16 Van Scoy Diamond Mine to Van Scoy Jewelers?
17 A.    Yes.
18 Q.    Do you remember the reason why
19 you made that change?
20 A.    Yes.
21 Q.    What was that reason?
22 A.    There were a lot of bankruptcies
23 occurring within the organization and it
24 was starting to cause problems for us

Page 19

1
2 within the trade, the supply side and it
3 made some sense to differentiate ourselves
4 from that point of view.
5 Q.    Were you aware of any other Van
6 Scoy Diamond Mines being enjoined by the
7 bankruptcy court as to use of the name, Van
8 Scoy Diamond Mine?
9         MR. QUINN: Objection. It
10 assumes facts not at issue. I don't think
11 he's testified about any awareness of any
12 enjoining offer by any bankruptcy court.
13 BY MR. PETOCK:
14 Q.    You were aware that there were
15 other Van Scoy Diamond Mines operating in
16 the 1990's; correct?
17 A.    It was pretty much public
18 knowledge, yes.
19 Q.    And were you aware that, you
20 testified that there was some bankruptcies
21 occurring; is that correct?
22 A.    Yes.
23 Q.    Were you aware of any proceedings
24 within these bankruptcies pertaining to the

Page 20

1
2 bankruptcy court forcing people that were
3 using the name, Van Scoy Diamond Mine from
4 using the name, Van Scoy Diamond Mine?
5 A.    No.
6 Q.    You testified that you had never
7 worked in the jewelry business before you
8 opened your first store in 1978; is that
9 correct?
10 A.    That's correct.
11 Q.    Did you have any experience in
12 the jewelry business at all?
13 A.    No, I don't. I was a systems
14 engineer for IBM.
15 Q.    Was it difficult to open the
16 jewelry store?
17 A.    It was a lot of hard work, yes.
18 We built the store ourselves, physically
19 built the store ourselves while working
20 another job, took a lot of money and put it
21 into the business.
22 Q.    Did you find the fact that you
23 had never worked in the jewelry business
24 before nor did you have any experience in

Page 21

```
1
2  the jewelry business, did you find that to
3  be a major obstacle to the fact that you
4  were opening up a jewelry store?
5         MR. QUINN: Objection, leading.
6  BY MR. PETOCK:
7  Q.    You can answer it.
8  A.    We hired knowledgeable people.
9  Q.    Did Tommy Van Scoy, Senior
10 provide you with any training?
11 A.    Yes.
12 Q.    What kinds of training did he
13 provide you with?
14 A.    We sent the guy who was going to
15 be our jeweler up to the Wilkes-Barre store
16 for days, not weeks, but days, three, four
17 days probably, worked with probably these
18 guys to learn some jewelry skills.
19        We sent our store manager who had
20 many years of jewelry experience up to
21 Wilkes-Barre to spend a couple days with
22 the staff there to learn how they ran the
23 store, and then we spent some time with
24 Senior on the approach to advertising the
```

Page 22

```
1
2  business, primarily through radio at that
3  time, so probably those three from a
4  training point of view.
5  Q.    Besides the store at 3039 North
6  5th Street in Reading, Pennsylvania, did
7  you operate any other jewelry stores?
8  A.    In 1980, we opened a store in
9  Pottsville, Pennsylvania.  In 1983, we
10 opened a store in Pottstown, Pennsylvania.
11 Q.    What year was that?
12 A.    '83.  In 1986, I believe we
13 opened a store in Raleigh, North Carolina.
14 Q.    1980 Pottsville store, could you
15 please tell me whether that's still in
16 operation?
17 A.    No.
18 Q.    What year did that close?
19        MR. QUINN: If you don't know,
20 please say you don't know as opposed to
21 shaking your head which the reporter cannot
22 take down.
23        THE WITNESS: I don't know.
24 BY MR. PETOCK:
```

Page 23

```
1
2  Q.    Could you approximate it?  I
3  don't know if it was yesterday, if it was
4  10 years ago?
5  A.    It was at least 10 years ago.
6  Q.    More than 10 years ago?
7  A.    Probably more than 10 years, yes.
8  Q.    Some time in the '90s?
9         MR. QUINN: Objection.  That's
10 not a question, is it.
11 BY MR. PETOCK:
12 Q.    Would you estimate it was more
13 likely in the 1990's or the 1980's that it
14 closed?
15 A.    I'm trying to tie it --
16 Q.    Take your time.
17 A.    I can verify it by looking at
18 leases and things, but I don't know.  It
19 was probably right around 1990.
20 Q.    At the time the Agreement was
21 signed that has been marked as Plaintiff's
22 Exhibit 41, do you think the Pottsville
23 store was still in operation?
24 A.    Yes, it probably was, which would
```

Page 24

```
1
2  put it into the '90s.
3  Q.    The Pottstown store that you
4  opened up in 1983, do you know
5  approximately what year that store closed?
6  A.    I don't remember those dates.
7  Q.    Approximately, though, could you
8  give me a ballpark?
9  A.    No, don't remember.
10 Q.    Do you think that that store was
11 still operating when the agreement was
12 signed?
13 A.    I'm pretty sure it was.
14 Q.    How about the Raleigh, North
15 Carolina store, do you know approximately
16 what year that store closed?
17 A.    That was before the Agreement or
18 the name would have been in there, so I'm
19 guessing that was in the '90 time frame.
20 Q.    Is the store that is operated at
21 3039 North 5th Street in Reading still in
22 operation?
23 A.    We moved that store.  That's not
24 in operation at that location anymore.
```

Page 25

```
1
2 Q.    Where did you move it to?
3 A.    We moved it to 2733 Paper Mill
4 Road in Wyomissing, Pennsylvania.
5 Q.    When did that move occur?
6 A.    April 1 of 2003.
7 Q.    On April 1, 2003, you opened up
8 your store at 2733 Paper Mill Road in
9 Wyomissing, PA under what name?
10 A.    Van Scoy Jewelers.
11 Q.    Which was the same name you had
12 been previously operating your store in
13 Reading since approximately the late
14 1990's; correct?
15 A.    Correct.
16 Q.    Do you own the store in
17 Wyomissing?
18 A.    It's leased as well.
19 Q.    Are you incorporated?
20 A.    No.
21 Q.    For the business that you operate
22 under the mark Van Scoy Jewelry or
23 Jewelers?
24 A.    Jewelers.
```

Page 26

```
1
2 Q.    Van Scoy Jewelers in Wyomissing,
3 do you advertise?
4 A.    Yes.
5 Q.    How do you do your advertising?
6 A.    I use outdoor billboards, radio,
7 newspaper, magazines, direct mail,
8 partnerships with charitable organizations.
9 Q.    Any other mediums that you use
10 for your advertising?
11 A.    TV.
12 Q.    Any others?
13 A.    I think that might be it.
14 Q.    Start with the first one you
15 listed, the billboards and go down the
16 list. Where do you advertise on
17 billboards?
18 A.    In Berks County.
19 Q.    Anywhere else?
20 A.    Not outside the county, no, Berks
21 County.
22 Q.    Do you do any of your advertising
23 outside Berks County?
24 A.    Yes, I do, some in Schuylkill
```

Page 27

```
1
2 County.
3 Q.    Let's continue with just going
4 down the list. Which radio stations do you
5 advertise on?
6 A.    We advertise on WRFY, YEEU, WRAW.
7 Q.    WRAW?
8 A.    Yes, WRAW and I don't know the
9 call signs, but T102.
10 Q.    Do you know the geographic
11 coverage of WRFY?
12 A.    No.
13 Q.    Is that an AM or FM station?
14 A.    WRFY is FM.
15 Q.    Do you know where it's
16 principally broadcast, what areas?
17 A.    I frankly don't -- it's in
18 Reading. I don't know where list hours
19 are. It's a Reading station.
20 Q.    Do the advertisers when they sell
21 advertising to you, do they make any sort
22 of representation as to the geographic
23 coverage of the radio stations in which you
24 advertise?
```

Page 28

```
1
2 A.    Yes.
3 Q.    So you would have that
4 information probably if you were to -- you
5 would be able to get that information?
6 A.    I could get it.
7 Q.    You said that WRFY is a radio
8 station?
9 A.    Yes.
10 Q.    Is WEEU a radio station?
11 A.    Yes.
12 Q.    Do you know the geographic scope
13 of that radio station?
14 A.    It's a low power AM.
15 Q.    WRAU, is that a Reading station?
16 A.    WRAW is a Reading station.
17 Q.    T102, is that a Reading station?
18 A.    That's a Schuylkill County
19 station, Pottsville.
20 Q.    For none of those radio stations,
21 you know the exact geographic scope of
22 their broadcasting?
23 A.    No.
24 Q.    But they're all except for the
```

Page 29

1
2  T102, Reading stations?
3  A.    Correct.
4  Q.    T102 is a Schuylkill County?
5  A.    Schuylkill County station.
6  Q.    What newspapers do you advertise
7  in?
8  A.    The Reading Eagle and
9  occasionally the Pottsville Republican and
10 the Pottstown Mercury.
11 Q.    Pottstown Mercury?
12 A.    Yes.
13 Q.    Do you know what the principle
14 place of circulation of the Reading Eagle
15 is?
16 A.    Berks and a little bit of
17 Schuylkill County and Sundays because they
18 don't have a Sunday paper.
19 Q.    Do you know what the geographic
20 coverage of the circulation of the
21 Pottsville Republican is?
22 A.    No.
23 Q.    Is it a small newspaper?
24 A.    It's the newspaper in Pottsville.

Page 30

1
2  Q.    Would your guess be the
3  Pottsville Republican is probably
4  circulated pretty limited to the
5  Pottsville?
6  A.    Schuylkill County, I'm sure.
7  Q.    And the Pottstown Mercury, is
8  that what it's called, do you know what the
9  circulation of that is geographically?
10 A.    No.
11 Q.    That's Berks County, though?
12 A.    No. That's Montgomery County.
13 Q.    You mentioned magazines?
14 A.    Yes.
15 Q.    What type of magazines do you
16 advertise in?
17 A.    We have the back page of Berks
18 County Living and we have the back page of
19 the Bravo, which is the symphony orchestra
20 program.
21 Q.    Symphony orchestra of --
22 A.    Reading.
23 Q.    Any other magazines?
24 A.    No.

Page 31

1
2  Q.    And you also said that you will
3  advertise through direct mail?
4  A.    Correct.
5  Q.    Where do you send this direct
6  mail, is it limited to certain counties?
7  A.    Yes, definitely. It's close
8  geographical proximity to the store, 19610
9  zip code.
10 Q.    What charitable organizations do
11 you advertise?
12 A.    The Reading Museum, the Reading
13 Hospital, Saint Joseph's Hospital.
14 Q.    Where is Saint Joseph's Hospital?
15 A.    In Reading, the Heart
16 Association.
17 Q.    Is the Heart Association in
18 Reading?
19 A.    The local chapter.
20 Q.    And that's the one that you
21 advertise in connection with?
22 A.    Yes.
23 Q.    Any other charitable
24 organizations?

Page 32

1
2  A.    Boys club.
3  Q.    Of Reading?
4  A.    Yes.
5  Q.    Are all the charitable
6  organizations that you advertise with in
7  Reading?
8  A.    Yes.
9  Q.    And then television is the last
10 category of advertising you mentioned?
11 A.    Yes.
12 Q.    Do you advertise with cable
13 channels or broadcast channels?
14 A.    All cable.
15 Q.    All cable?
16 A.    Yes.
17 Q.    Which cable company?
18 A.    Comcast.
19 Q.    Do you know where those -- are
20 they commercials that you advertise in
21 connection with television?
22 A.    Yes.
23 Q.    Do you know where those are
24 broadcast geographically?

Page 33

1
2 A.    Berks County, primarily Berks
3 County.
4 Q.    Where do you focus your
5 advertising geographically?
6 A.    Berks County.
7 Q.    Berks County?
8 A.    Yes.
9 Q.    Is there any other place where
10 you focus your advertising?
11 A.    A little bit in Schuylkill and a
12 little bit in Montgomery because we once
13 had stores there and have a little bit of
14 us a customer base there.
15 Q.    Where would you say that you draw
16 the majority of your customer base?
17 A.    Within about a six mile radius of
18 the store.
19 Q.    Do you do any advertising in the
20 Wilkes-Barre, Pennsylvania area?
21 A.    No.
22 Q.    Do you do any advertising in the
23 Scranton, Pennsylvania area?
24 A.    No.

Page 34

1
2 Q.    Do you do any advertising in the
3 Wilmington, Delaware area?
4 A.    No.
5 Q.    Any advertising in the Erie,
6 Pennsylvania area?
7 A.    No.
8 Q.    Any advertising in the Allentown,
9 Pennsylvania area?
10 A.    Not intentionally.
11 Q.    Do you do any advertising in the
12 Lancaster, Pennsylvania area?
13 A.    Once again, not intentionally.
14 Q.    Do you do any advertising in the
15 Greensborough, North Carolina area?
16 A.    No.
17 Q.    How would you define your sales
18 market?
19 A.    I don't understand the question.
20 Q.    You mentioned that the majority
21 of your customers come from a six mile
22 radius of your store?
23 A.    Yes.
24 Q.    Would you say that that six mile

Page 35

1
2 radius is your sales market?
3 A.    I don't know what the term, sales
4 market means.
5 Q.    How far would you say the average
6 jewelry store customer would travel to buy
7 a piece of jewelry from their home?
8 A.    In our case, it's probably less
9 than 10 miles, more like six on average, if
10 that.
11 Q.    In the context of the jewelry
12 business, is your market different than the
13 Wilkes-Barre, Pennsylvania market?
14 A.    I don't know the Wilkes-Barre
15 market.
16 Q.    Does that mean you can't answer
17 the question because you don't know the
18 Wilkes-Barre market?
19     MR. QUINN: He stated that he
20 didn't know the Wilkes-Barre market.
21 BY MR. PETOCK:
22 Q.    Do you know the Lancaster,
23 Pennsylvania market in the context of the
24 jewelry business?

Page 36

1
2 A.    I'm more familiar with that.
3 Q.    Would you contend that your
4 market is different than the Lancaster
5 market in the context of the jewelry
6 business?
7 A.    I think each market is unique,
8 but I think there are a lot of similarities
9 between Lancaster County and Berks County.
10 Q.    Let me rephrase the question. Do
11 you think that they are separate geographic
12 markets?
13 A.    Oh yes, yes.
14 Q.    So you would say that -- would
15 you contend that the Lancaster market is a
16 separate geographic market from the, from
17 your sales market?
18 A.    Yes.
19 Q.    Would you contend that the
20 Allentown market is a separate geographic
21 market than your market?
22     MR. QUINN: Objection, leading.
23     THE WITNESS: Yes.
24 BY MR. PETOCK:

Page 37

1
2 Q.    Would you contend that the
3 Wilkes-Barre market in the context of the
4 jewelry business is a different geographic
5 market from your market?
6        MR. QUINN: Objection, leading.
7 BY MR. PETOCK:
8 Q.    You can answer.
9 A.    Yes.
10 Q.    Would you contend that the
11 Wilmington, Delaware market is a different
12 geographic market than than your market?
13        MR. QUINN: Objection, leading,
14 suggests the answer. Obviously Wilmington
15 is different geographically from Reading.
16 You can answer the question.
17        THE WITNESS: In the context of
18 the jewelry business?
19 BY MR. PETOCK:
20 Q.    Yes.
21 A.    Yes.
22 Q.    In the context of the jewelry
23 business, you contend that the Erie,
24 Pennsylvania market is a different

Page 38

1
2 geographic market than your market?
3        MR. QUINN: Objection, leading,
4 suggests the answer.
5        THE WITNESS: Yes.
6 BY MR. PETOCK:
7 Q.    And in the context of the jewelry
8 business, do you think that the
9 Greensborough, North Carolina market is a
10 different geographic market than your
11 market?
12        MR. QUINN: Objection, leading,
13 suggests the answer obviously from
14 Greensborough, North Carolina is different
15 geographically from Reading, Pennsylvania.
16 You can answer the question.
17        THE WITNESS: Yes.
18 BY MR. PETOCK:
19 Q.    You mentioned that you had a
20 store in Pottsville that you opened in
21 1980, and operated until you're not sure
22 when, but that's okay. Did you advertise
23 in connection with the Pottsville store?
24 A.    Yes.

Page 39

1
2 Q.    Which by the way, that was always
3 a Van Scoy Diamond Mine; is that correct?
4        MR. QUINN: Objection, leading.
5        THE WITNESS: Yes.
6 BY MR. PETOCK:
7 Q.    Where did you focus your
8 advertising for the Pottsville store?
9 A.    Schuylkill County.
10 Q.    Where did you draw your customer
11 base for the Pottsville store?
12 A.    Schuylkill County, primarily.
13 Q.    The Pottstown store, which you
14 had opened in 1983, did you advertise in
15 connection with that store?
16 A.    Yes.
17 Q.    What was the name of that store?
18 A.    It was the Van Scoy Diamond Mine
19 when it opened.
20 Q.    Did it ever change?
21 A.    I think it stayed that until we
22 closed it.
23 Q.    You advertise with that store?
24 A.    Yes.

Page 40

1
2 Q.    Where did you focus your
3 advertising?
4 A.    In that county, Montgomery
5 County. I'm saying Montgomery County. I
6 think it's Montgomery County.
7        MR. QUINN: We'll stipulate that
8 Pottstown is Montgomery County because it
9 is.
10 BY MR. PETOCK:
11 Q.    Where did you draw the majority
12 of your customer base for the Pottstown
13 store?
14 A.    The Pottstown store probably drew
15 from a wider geography than any other
16 store, I'm thinking because of 422. We
17 would have traffic from a little closer to
18 Philadelphia come to that store, but
19 primarily Montgomery County.
20 Q.    Would you draw from the Lancaster
21 area at that store?
22 A.    Not in that store.
23 Q.    What about the Allentown area
24 store?

Page 41

1
2    MR. QUINN: What is the
3 question?
4 BY MR. PETOCK:
5 Q.    Would you draw customers in any
6 significant number?
7 A.    No, no.
8 Q.    From Allentown?
9 A.    No.
10 Q.    And then the other store you
11 owned was in Raleigh, North Carolina. You
12 advertise in connection with the Raleigh,
13 North Carolina store?
14 A.    Yes.
15 Q.    Where did you advertise, where
16 did you focus your advertising?
17 A.    In and about Raleigh.
18 Q.    Was that always a Van Scoy
19 Diamond Mine?
20 A.    Yes.
21 Q.    In 1978, you said you entered a,
22 what you characterize as a franchisee
23 agreement with Tommy Van Scoy, Senior?
24 A.    Yes.

Page 42

1
2 Q.    What were the terms of that
3 agreement?
4 A.    It was a lengthy agreement.
5 Q.    Do you remember what the main
6 substance of the agreement was?
7 A.    Yes, for an initial payment, the
8 amount of which I can't recall, 25,000
9 comes to mind, we were given a geographical
10 area of Berks County and then for ongoing
11 monthly franchise fee, the right to
12 continue to operate and I think that fee
13 was $2,000.
14    MICHAEL F. PETOCK: Per month?
15    THE WITNESS: Correct.
16 BY MR. PETOCK:
17 Q.    Ultimately, did you enter a
18 second franchise agreement with Tommy Van
19 Scoy, Senior in connection with the opening
20 of the other stores?
21 A.    We paid a fee for each store and
22 $1,000 franchise fee, $1,000 monthly.
23 Q.    So in 1983, you paid another up
24 front fee for the Pottstown store; is that

Page 43

1
2 correct?
3 A.    Pottsville -- I'm sorry, what
4 year did you say? Pottsville was second.
5 Q.    In 1980, did you pay another up
6 front fee?
7 A.    Yes.
8 Q.    And did that give you the
9 geographic territory of Schuylkill County?
10 A.    I think so.
11 Q.    And you again agreed to pay what
12 you believe was $2,000 a month?
13 A.    A thousand.
14 Q.    $1,000 a month?
15 A.    And I think the initial fee was
16 20,000.
17 Q.    And do you know what that gave
18 you the right to do?
19 A.    Operate a Van Scoy Diamond Mine
20 in Schuylkill County.
21 Q.    1983, you opened up a store in
22 Pottstown. Did you again pay an up front
23 fee?
24 A.    I believe we did.

Page 44

1
2 Q.    And again, you paid on a monthly
3 basis?
4 A.    I'm not sure about that.
5 Q.    What did that agreement give you
6 the right to do?
7 A.    Operate a Van Scoy Diamond Mine
8 in Montgomery County.
9 Q.    Then was all this written down in
10 the contract or was it oral?
11 A.    There was a franchise document
12 that I mentioned earlier, but it was never
13 signed. We never completely agreed on all
14 the stipulations within it and it was never
15 signed, so it was a verbal agreement.
16 Q.    In approximately 1993, whatever
17 agreement you had before with Tommy Van
18 Scoy, Senior changed; is that correct?
19 A.    Correct.
20 Q.    And whatever those changes were
21 is reflected in this Agreement that we've
22 marked as Plaintiff's Exhibit 41; is that
23 correct?
24 A.    The method of operation, yes.

Case 1:05-cv-00108-KAJ    Document ___    Filed 01/06/2008    Page ___



**Page 45**

1
2  Q.  Could you describe to me what
3  those changes were as far as changes in the
4  method of operation?
5  A.  Well primarily, the removal of
6  the obligation to pay an ongoing monthly
7  fee.
8  Q.  What else?
9  A.  Well, there were things in the
10  franchise agreement that had to do with
11  inspection and the like, which I'm
12  imagining those went away, as well.
13  Essentially it severed, I guess pretty much
14  severed the relationship from an
15  operational point of view.
16  Q.  So, after this contract was
17  executed --
18      MR. QUINN:  Objection to the
19  extent that it's not clear from what you
20  say this contract, what it is you're
21  referring to.
22  BY MR. PETOCK:
23  Q.  After the Agreement that has been
24  marked as Plaintiff's 41 was executed

**Page 46**

1
2  between you and Tommy Van Scoy, Senior,
3  your relationship between him was severed;
4  is that correct?
5  A.  That's true.
6  Q.  Did the Agreement grant you the
7  exclusive rights to use the mark Van Scoy
8  Diamond Mine in a defined territory?
9      MR. QUINN:  Objection.  The
10  agreement speaks for itself.
11      MR. PETOCK:  You may answer.
12      THE WITNESS:  That was my
13  understanding.
14      MR. PETOCK:  What territory was
15  that.
16      MR. QUINN:  Objection, agreement
17  speaks for itself.
18  BY MR. PETOCK:
19  Q.  You may answer?
20  A.  Schuylkill, Berks and Montgomery
21  County.
22  Q.  With respect, could you read
23  Section 4.1 of the Agreement that's been
24  marked as Plaintiff's Exhibit 41, please.

**Page 47**

1
2      MR. QUINN:  You're asking him to
3  read it out loud or to himself?
4  BY MR. PETOCK:
5  Q.  No, to himself.  Do you agree
6  that that section grants you the exclusive
7  right to use and to trade under the mark in
8  the territory?
9      MR. QUINN:  Objection.  The
10  document speaks for itself.
11      THE WITNESS:  That was my
12  interpretation.
13  BY MR. PETOCK:
14  Q.  Could you turn to Section 6.1,
15  please?
16  A.  Yes.
17  Q.  Do you agree that you paid
18  $30,000 for the exclusive right to use and
19  to trade under the mark in the territory?
20      MR. QUINN:  Objection to the
21  extent that that seeks to be a
22  characterization of what the Agreement
23  says.  That is not what the Agreement
24  says.  The question is whether he paid and

**Page 48**

1
2  if that's the question, I'd ask you to
3  restate it.
4      MR. PETOCK:  I think the question
5  is do you agree that you paid, after
6  reading that section, do you agree that you
7  paid $30,000 for the exclusive right to use
8  and trade under the mark in the territory?
9      MR. QUINN:  You may answer the
10  question.
11      THE WITNESS:  That's my
12  interpretation.
13  BY MR. PETOCK:
14  Q.  Was it your understanding that
15  you bought the rights to the trademark for
16  the limited territory of those three
17  counties?
18      MR. QUINN:  Objection to the
19  question in the sense that it asks was your
20  understanding.  It does not specify a time
21  frame as to what the understanding was.
22  BY MR. PETOCK:
23  Q.  Was it your understanding at the
24  time the Agreement was executed that you

Page 49

1
2 bought the rights to the trademark for Van
3 Scoy Diamond Mine in the territory as
4 defined in the Agreement for $30,000?
5 A.    It was my understanding that we
6 were given the right to use it, use that
7 name. I don't know if buy is the right
8 term.
9 Q.    Is that still your understanding?
10 A.    Yes.
11 Q.    And was that an exclusive right?
12 A.    It says that it is back in 4.1.
13 That was my understanding, yes, exclusive
14 right.
15 Q.    After this Agreement was
16 executed, the Agreement I'm referring to is
17 what's had marked as Plaintiff's Exhibit
18 41, was it your understanding after it was
19 executed to this day that you are no longer
20 a licensee of Tommy Van Scoy, Senior or
21 Tommy Van Scoy's representation?
22       MR. QUINN: Objection as to what
23 it was and is.
24       THE WITNESS: I don't know if I

Page 50

1
2 understand the question.
3 BY MR. PETOCK:
4 Q.    What don't you understand about
5 the question?
6 A.    I'm not sure I know what a
7 licensee is, how it would be different from
8 having the rights to use the name versus
9 operating under a franchise agreement. It
10 would be my understanding we were no longer
11 a franchisee at that point.
12 Q.    What was your understanding as to
13 the differences between you having been
14 granted the right to use the mark and how
15 it would have been under a franchisee?
16       MR. QUINN: Objection. There's
17 no time frame stated for what his
18 understanding was.
19 BY MR. PETOCK:
20 Q.    At the time the execution was
21 granted?
22 A.    Looking at it from different
23 points of view, I would not expect anything
24 from him at that point any longer, from one

Page 51

1
2 perspective.
3 Q.    Any other respects, perspectives
4 as to why the differences between?
5 A.    That he wouldn't be expecting
6 anything from me, payments, coming to
7 meetings or something like that.
8 Q.    Could you look at Section 3.6,
9 please.
10 A.    Okay.
11 Q.    Could you read it out loud?
12 A.    "Reading partnership shall
13 continue to conduct its retail jewelry
14 business using the same high standards of
15 integrity in dealing with the public and
16 continue to offer the same high quality
17 jewelry products and jewelry service and as
18 Reading Partnership has offered heretofore,
19 to the extent Reading Partnership can do so
20 and yet continue to meet the prices of its
21 competition".
22 Q.    After the Agreement that's been
23 marked as Plaintiff's Exhibit 41 was
24 executed, did you continue to adhere to

Page 52

1
2 this section?
3 A.    We, I would say grew beyond that.
4 Q.    Do you think that this Agreement
5 is still in force?
6       MR. QUINN: Objection. The
7 Agreement speaks for itself.
8       THE WITNESS: Yes.
9 BY MR. PETOCK:
10 Q.    And do you operate your present
11 jewelry store in accordance with this
12 Agreement?
13 A.    As in section --
14 Q.    Well, let me ask you whether you
15 operate it in accordance with the limited
16 geographic territories set forth in the
17 Agreement?
18 A.    Yes.
19 Q.    What do you know about Avalon
20 Jewelers, if anything?
21 A.    I've been there. It's no longer
22 Avalon Jewelers. It's Avalon, I think that
23 name's been changed.
24 Q.    Where is Avalon or where was

Page 53

```
1
2  Avalon Jewelers located?
3  A.    It's still where it was, right
4  off of 222 near the Whitehall Shopping
5  Center, I believe.
6  Q.    What town is that?
7  A.    It's either Bethlehem or
8  Allentown.  I don't know which town it's
9  in.
10 Q.    I don't know much about it.  It's
11 just something that's popped up a lot in
12 this litigation.  I'm just trying to find
13 out some things about it, so do you know
14 who owns that store or who did own that
15 store?
16        MR. QUINN: Objection.  I thought
17 he said it's no longer there.
18 BY MR. PETOCK:
19 Q.    Did you know who owned that
20 store?
21 A.    It was Mark Maurer, the same guy
22 who owns the Lancaster store.
23 Q.    Did Mark Maurer open that store?
24 A.    Yes.
```

Page 54

```
1
2  Q.    Do you know when?
3  A.    Possibly three years ago.
4  Q.    And that's a jewelry store;
5  right?
6  A.    Correct.
7  Q.    Was a jewelry store.  Was Mark
8  Maurer operating a jewelry store prior to
9  opening up Avalon Jewelers?
10 A.    Yes.
11 Q.    What happened, what was the name
12 of that store that he was operating before
13 he opened up Avalon Jewelers?
14 A.    I believe it was Van Scoy Diamond
15 Mine.
16 Q.    Was that in the same location on
17 22nd and Whitehall Road?
18 A.    No.
19 Q.    Where was the Van Scoy Diamond
20 Mine that he was operating?
21 A.    It was in a strip center off of
22 MacArthur Boulevard.
23 Q.    What town?
24 A.    Once again, I never know where
```

Page 55

```
1
2  the line between Allentown and Bethlehem
3  is.  It's in that area.
4  Q.    What happened to that store?
5  A.    He closed that and opened up
6  Avalon Jewelers.
7  Q.    When was that?
8  A.    Three years ago.
9  Q.    So did they open and close?
10 A.    One down --
11 Q.    Pretty much simultaneously?
12 A.    Yes.
13 Q.    Are you familiar with any
14 advertisements with respect to the Van Scoy
15 Diamond Mine that was operating the strip
16 center off of MacArthur Boulevard, is that
17 where you said it was?
18 A.    Yes.
19 Q.    Are you familiar with respect to
20 that Van Scoy Diamond Mine, any Going Out
21 Of Business advertisements?
22 A.    No.
23 Q.    Do you know if that store did go
24 out of business -- that store went out of
```

Page 56

```
1
2  business; right?
3  A.    He closed that store and opened
4  the new store under a different name.
5  Q.    Do you know why he did that?
6  A.    Not really.
7  Q.    Do you have any idea?
8  A.    No, looking for a new name.  I
9  would suspect to increase business.
10 Q.    To your knowledge, did Mark
11 Maurer abandon the name Van Scoy Diamond
12 Mine?
13 A.    I don't know.
14 Q.    Do you know if he still uses the
15 name, Van Scoy Diamond Mine?
16 A.    Not to my knowledge.
17 Q.    Was Mark Maurer a licensee of
18 Tommy Van Scoy, Senior, at one point?
19 A.    To the best of my knowledge he
20 was, yes.
21 Q.    Where did he own stores?
22 A.    He owned stores in Lancaster and
23 Allentown and in Phillipsburg, York.
24 Q.    York, also?
```

Page 57

1
2 A.    York, Pennsylvania.
3 Q.    When was the last time you spoke
4 with Mark?
5 A.    A few days ago.
6 Q.    Did you call him or did he call
7 you?
8 A.    I don't recall.
9 Q.    Was there a telephone
10 conversation or was it in person?
11 A.    It could have been either.  I saw
12 him just recently.  He drives past my store
13 and he goes from Lancaster to Allentown, he
14 drives right by me and he'll occasionally
15 stop in and compare notes.
16 Q.    What did you guys talk about
17 last?
18 A.    Probably advertising, probably
19 sources of supply, probably health care
20 plans, probably commission programs.  We
21 just spent a lot of time talking about how
22 we run our businesses.  It's a business
23 person to business person trying to make
24 our businesses work better.

Page 58

1
2 Q.    Did you talk about this
3 litigation?
4 A.    We have talked about this.
5 Q.    Whatever you talked about in that
6 regard?
7 A.    Just that he got a deposition,
8 too, a subpoena for a deposition.
9 Q.    What else has he told you about
10 the litigation?
11 A.    I don't think he knows anymore
12 about it than I do.
13 Q.    Does he know, did he mention
14 whether he was in contact with Kurt Van
15 Scoy or with Charlie Quinn?
16 A.    Yes.
17 Q.    Who did he say he was in contact
18 with of those two?
19 A.    Charlie.
20 Q.    Did he tell you what he spoke
21 about with Charlie Quinn?
22 A.    Just this deposition and are you
23 taking an attorney and should I take my
24 attorney and will Charlie be there, those

Page 59

1
2 kinds of things.
3 Q.    Have you been told by anyone that
4 you are at risk of being sued by Wayne Van
5 Scoy?
6 A.    No.
7 Q.    What do you know about this
8 litigation?  Ask you just try to tell me
9 everything you know about it?
10 A.    I have heard that Wayne is suing
11 Kurt for the use of the name, Van Scoy
12 Diamond Mine, whatever that means.
13 Q.    Anything else?
14 A.    No.
15 Q.    When was the first time that you
16 heard about it?
17 A.    When I got the deposition.
18 Q.    You got the subpoena?
19 A.    Yes, the subpoena, I'm sorry.
20 Q.    You knew Wayne prior to today?
21 A.    I met them both, you know, back
22 in the late '70s, when they were probably
23 either in high school or middle school.  I
24 don't remember their exact ages, but it's

Page 60

1
2 been a long time.
3 Q.    What capacity did you meet them?
4 A.    I was traveling to Wilkes-Barre,
5 Pennsylvania to meet with Tommy on the
6 negotiations for the franchise agreements
7 and they would sometimes be in the store.
8 Q.    Do you know Nancy Shindu?
9 A.    Yes.
10 Q.    Who is she?
11 A.    She was the second franchisee in
12 Lancaster, Pennsylvania.
13 Q.    Is she still alive?
14 A.    I don't know.
15 Q.    Do you know if anyone else
16 entered any sort of agreement similar to
17 the Agreement that's marked as Plaintiff's
18 No. 41, for any other former franchisees or
19 licensees who entered a similar agreement?
20 A.    Mark Maurer.
21 Q.    Just Mark?
22 A.    That's all I know of.
23 Q.    How did you find out that the
24 mark Van Scoy Diamond Mine was federally

**Page 61**

```
1
2  registered?
3  A.    I didn't know it was.
4  Q.    Do you know it is now?
5  A.    It appears to be, looking at
6  these documents.
7  Q.    Did you know in 1993?
8  A.    You're assuming I read the whole
9  document.  I probably didn't.
10 Q.    Could you take a look at
11 Plaintiff's Exhibit 41 for me, please
12 Section 3.7.
13 A.    Okay.
14 Q.    Do you agree that under the
15 Agreement, you are to take reasonable
16 measures to protect the mark and maintain
17 its enforceability?
18 A.    I'm not sure I know what that
19 means, but that's what it says.
20 Q.    What don't you understand about
21 it?
22 A.    Does it mean we have to operate
23 the store?  I don't know what it means.
24 Q.    You don't know what reasonable
```

**Page 62**

```
1
2  measures means?
3  A.    Yes.
4  Q.    Other than that, though, you
5  understand it?
6  A.    Yes.
7  Q.    Your partner now, you mentioned
8  that you were partnered up with somebody,
9  James Sweeney?
10 A.    Right.
11 Q.    Is he still your partner?
12 A.    No.
13 Q.    Do you have any other partners?
14 A.    No.
15        (Discussion off the record.)
16        MR. PETOCK:  Just a quick --
17        (Brief recess taken.)
18 BY MR. PETOCK:
19 Q.    Just want to make sure the store
20 you operate is Van Scoy Jewelers.  Is that
21 the full name?
22 A.    DBA Van Scoy Jewelers of
23 Wyomissing, Pennsylvania, but the name on
24 the sign is Van Scoy Jewelers.
```

**Page 63**

```
1
2  Q.    Getting back to Avalon Jewelers
3  again, was that the full name of that
4  store?
5  A.    That's my understanding.
6  Q.    Is there any store now operating
7  with the word Avalon in it, a jewelry
8  store?
9  A.    Yes.
10 Q.    Where is that?
11 A.    It's the same store, changed the
12 name to Avalon, Maurer and Bash, I believe.
13 Q.    Are you aware of any other stores
14 operating with the word, Van Scoy in it
15 besides your own?
16 A.    I think Bob Cooke in
17 Greensborough, the last I heard it was Van
18 Scoy Diamond Jewelers.
19 Q.    Anyone else?
20 A.    Well, there's some other Van
21 Scoys.  I think there's one up in
22 Scranton.  I really don't know.  There's
23 probably others still operating.
24 Q.    This Agreement, P41, are you
```

**Page 64**

```
1
2  still operating under that Agreement?
3  A.    It's my assumption that I'm still
4  protected by it.
5  Q.    And you're still bound by it?
6  A.    Yes.
7        MR. PETOCK:  I don't have any
8  further questions.
9  BY MR. QUINN:
10 Q.    Mr. Hill, you stated at one point
11 during your testimony that you changed to
12 "Van Scoy Jewelers", in the late 1990's
13 and slightly earlier than that, according
14 to my notes, you stated that you changed to
15 Van Scoy Jewelers from Van Scoy Diamond
16 Mine, when you moved to the Paper Mill Road
17 address and then further on you stated
18 that --
19        MICHAEL F. PETOCK:  Objection.
20 Are you testifying?
21        MR. QUINN: I'm laying foundation
22 for my question.
23        MICHAEL F. PETOCK:  Your question
24 has a lot of character in it.
```

Page 65

1
2    MR. QUINN: If you want me to
3 start again, I'll repeat the whole thing.
4 According to my notes, you testified that
5 you changed to "Van Scoy Jewelers", in the
6 late 1990's, but a little bit earlier,
7 again according to my notes, you stated
8 that you changed from Van Scoy Diamond Mine
9 to Van Scoy Jewelers, when you moved to the
10 Paper Mill Road address in Wyomissing on 1
11 April, 2003, and yet another place in my
12 notes, you indicate or according to my
13 notes, you indicated that the change over
14 was --
15    MICHAEL F. PETOCK: Objection.
16    MR. QUINN: Will you state your
17 objection once and for all and then I'm
18 going to ask the question and we'll have
19 him answer it.
20    MICHAEL F. PETOCK: Why don't you
21 establish the facts because it's awfully
22 confusing as to what you're saying.
23    MR. QUINN: If you let me get the
24 question out, it won't be confusing, but

Page 66

1
2 you keep interrupting me, so I'll start
3 again.
4    MR. PETOCK: Why don't you ask
5 the question again.
6    MR. QUINN: If we have to stay
7 here all afternoon, I'll ask the question,
8 without interruption.
9    MICHAEL F. PETOCK: It's an
10 extended statement.
11    MR. QUINN: I haven't gotten to
12 the question yet. I'm laying the
13 foundation and then I'll ask the question.
14    MICHAEL F. PETOCK: You lay a
15 foundation by asking questions.
16    MR. QUINN: You lay a foundation
17 by stating the preamble of the question.
18    MICHAEL F. PETOCK: Not when it
19 contains half his deposition testimony.
20    MR. QUINN: In this case, I'm
21 laying the foundation that I care to lay
22 and if you interrupt me again, I'll start
23 again.
24    MICHAEL F. PETOCK: You are

Page 67

1
2 mischaracterizing his testimony.
3    MR. QUINN: I'm not
4 mischaracterizing anybody's testimony. I'm
5 telling him what I have in my notes.
6    MICHAEL F. PETOCK: You're
7 mischaracterizing his testimony.
8    MR. QUINN: I'm telling him what I
9 have in my notes.
10 BY MR. QUINN:
11 Q.    Mr. Hill, according to my notes,
12 you testified that you changed the name of
13 your store from "Van Scoy Diamond Mine" to
14 "Van Scoy Jewelers" in the late 1990's.
15 At another place in my notes, I have that
16 you testified that you changed the name of
17 your store from Van Scoy Diamond Mine to
18 Van Scoy Jewelers, when you moved to the
19 Paper Mill Road address on 1 April, 2003.
20 And still another place in my notes, I have
21 it that you testified that the change over
22 from Van Scoy Diamond Mine to Van Scoy
23 Jewelers was that of a gradual thing, it
24 was not an all at once thing.

Page 68

1
2    Would you tell us when you
3 believe you last used the name "Van Scoy
4 Diamond Mine" in any part of your
5 operation?
6 A.    We changed the sign at the old
7 store. I remember doing that. Whether or
8 not that was an exact coincidence with the
9 official filing of the fictitious title and
10 tax returns and the like, I could easily
11 research, but the sign was actually changed
12 on an old store because I remember the sign
13 coming and putting it up and I believe that
14 that was in the late 1990's.
15    The fictitious title filing,
16 those would all be matters of records that
17 I could research for you, but when I say
18 gradual, checkbook probably happened at one
19 time and the stationery probably happened
20 at another time.
21 Q.    Was that --
22 A.    All the advertising, probably
23 residuals stayed, so when I -- I don't know
24 that fictitious title filing happened on a

Page 69

1
2  certain date, the sign changed on a certain
3  date.
4  Q.    Did you use the name Van Scoy
5  Diamond Mine on business cards?
6  A.    Yes.
7  Q.    Did you use it on literature in
8  your store?
9  A.    Yes.
10 Q.    Did you use it on advertising?
11       MR. PETOCK: Objection, time
12 frame. We're talking about time frame
13 here.
14 BY MR. QUINN:
15 Q.    At any time did you use the name
16 Van Scoy Diamond Mine on advertisement,
17 print advertisements, excuse me?
18 A.    Yes.
19 Q.    Do you know what was the last or
20 the latest date that you used the name Van
21 Scoy Diamond Mine on print advertisements?
22 A.    I would suspect it was in the
23 late '90s.
24 Q.    Do you have any way of pinning

Page 70

1
2  that date down?
3  A.    Yes.
4  Q.    How is that?
5  A.    I'd go to the newspaper and ask
6  them to look through old advertisements
7  until they found one.
8  Q.    The Reading Eagle?
9  A.    Yes.
10 Q.    Do you maintain any type of
11 archives for your business?
12 A.    By law, yes.
13 Q.    Do those archives contain old
14 advertisements, to your knowledge?
15 A.    Not all of them. There are
16 particular ads that we ran that I probably
17 have, but not all of them.
18 Q.    In addition to business cards and
19 advertisements and the sign that appeared
20 on the store, did you use the mark Van Scoy
21 Diamond Mine anyplace else?
22 A.    Probably on TV, probably on
23 billboards, most cards, any form of
24 programs for charitable events and the

Page 71

1
2  like. They've been used everywhere.
3  Q.    Would any of those materials be
4  in your archives?
5  A.    Some of them would be, yes.
6  Q.    Would they be dated?
7  A.    Some would probably be, yes.
8  Q.    When was the last time you saw
9  Tommy Van Scoy, Senior?
10 A.    Probably when we signed this
11 agreement, early '90s, '93.
12 Q.    To your knowledge, was Tommy Van
13 Scoy, Senior ever in either of your stores
14 after the date of the Agreement, if the
15 date the Agreement marked as Plaintiff's
16 Exhibit No. 41 was signed?
17 A.    Not to my knowledge.
18 Q.    Was he, to your knowledge, was
19 Tommy Van Scoy, Senior ever in your store
20 prior to the date of signing of Plaintiff's
21 No. 41?
22 A.    Yes.
23 Q.    How many times?
24 A.    In the early stages of the

Page 72

1
2  franchise, he would make fairly regular
3  visits. That's to say, three or four times
4  a year to collect money and I would assume,
5  see how we were doing and to help with, in
6  the early stages, he made most of our radio
7  ads for us and we would go down to the
8  radio station and make radio ads.
9  Q.    What do you mean by time frame?
10 A.    Up through early '80s; '82, '83
11 possibly. I don't ever remember him making
12 an ad for the Pottstown store. I don't
13 ever remember him doing that for that
14 store, so it would put it in the '80s, very
15 early '80s; '81, '80, '81.
16 Q.    So from that time until this
17 Agreement was signed, are we assuming the
18 question is are we assuming the Agreement
19 is signed around the date that's printed at
20 the top?
21 A.    I'm assuming that at this point,
22 yes.
23 Q.    Which is?
24 A.    March 8, 1993.

Page 73

1
2 Q.    So from the early '80s, if we
3 define that as '83 to '93, did you have
4 contact with Tommy Van Scoy?
5 A.    No.
6 Q.    Did he visit your store during
7 that time, any of your stores during that
8 time?
9 A.    Not that I recall.
10 Q.    Did anyone representing him and
11 I'm not referring to a lawyer, but I'm
12 referring to a business associate or
13 employee, representing him visit any of
14 your stores during that time?
15 A.    We would see Tommy Van Scoy,
16 Junior from time to time, but I'm not going
17 to say that was an official context.  We
18 were in fact, worked with Tommy to sponsor
19 a race car that Tommy, Junior drove.  So we
20 would see Tommy, Junior on a regular basis,
21 but once again, that ended in the '80s as
22 well.
23        That would have been in the same
24 time frame, '83 and then after that, Tommy,

Page 74

1
2 Junior would visit from time to time just
3 to compare notes on business operation, you
4 know, who designed your cases and what kind
5 of carpet is that because he was building
6 some stores.
7        He built a store prior to the
8 store he just built recently and he came
9 and looked at what we had done, so I would
10 see him from time to time, but it was not a
11 representation of the franchise board, so
12 to speak.
13 Q.    Of Mr. Van Scoy, Senior?
14 A.    Right.
15 Q.    Subsequent to the signing of this
16 Agreement, did anyone come in any
17 representative capacity?
18 A.    Not in a representative
19 capacity.  Tommy, Junior came to the store
20 just recently, months ago to look at, get
21 some thoughts on the store, but not to
22 represent the organization.
23 Q.    So to your knowledge, from at
24 least 1993 until now, no one representing

Page 75

1
2 the owner of the federal registration for
3 the trademark at issue in this case has
4 inspected your store; is that correct?
5 A.    Not to my knowledge.
6        MR. QUINN:  I have no further
7 questions.
8 BY MR. PETOCK:
9 Q.    When you refer to the late
10 1990's, what are you referring to?
11 A.    In answer to what?
12 Q.    You've mentioned the late 1990's,
13 with respect to various things, but in
14 particular I guess it was when you switched
15 from Van Scoy Diamond Mine to Van Scoy
16 Jewelers, approximately, what do you mean
17 by late 1990's?
18 A.    I can find out when the
19 fictitious title was filed, it'll give you
20 an exact date, but I just don't recall.
21 Q.    1998, '97. I don't know.
22 Q.    Prior to 1997, you were licensed
23 by Tommy Van Scoy, Senior to use the mark
24 Van Scoy Diamond Mine; correct?

Page 76

1
2 A.    If I understand license to mean
3 that we had a franchise agreement with him,
4 we had a verbal agreement with him.  The
5 franchise agreement was never signed.
6 Q.    Is that a yes?
7 A.    Yes.
8        MR. QUINN:  His answer was what
9 it was.
10 BY MR. PETOCK:
11 Q.    This Agreement, P41 terminated
12 the license agreements and terminated any
13 obligation that there may have been as far
14 as inspection on the part of Tommy Van
15 Scoy, Junior; is that correct?
16        MR. QUINN:  Objection.  The
17 agreement speaks for itself.
18        MR. PETOCK:  I'll withdraw the
19 question.  When you said that Tommy, Junior
20 came to your store, did he actually --
21 that's my question.  When you said you saw
22 Tommy, Junior, was he at your store?
23 A.    Tommy, Junior has been at our
24 store numerous times.

Page 77

```
1
2  Q.    Including during the 1980's?
3  A.    Yes.
4  Q.    Do you know what his occupation
5  was during the 1980's?
6  A.    Tommy, Junior at various times
7  worked in the, worked in the senior store,
8  as did these gentlemen.  He was a diamond
9  importer for some period of time and at
10 some point, he opened a store under the
11 name Tovon & Company, which was the name of
12 his import business, but I don't know the
13 exact dates of that.
14 Q.    Between 1983 to 1993, would you
15 say that Tommy Van Scoy, Junior came to
16 your store on any sort of regular basis?
17 A.    Well, it varied.  He hadn't been
18 in our store until just recently probably
19 for four or five years and then he came
20 because he was building a new store and
21 came to get some design ideas from our new
22 store.
23 Q.    But in the period from 1983 to
24 1993?
```

Page 78

```
1  A.    It would have just been, you
2  know, social and I know he would stop from
3  time to time if he was in the area or going
4  past or something.
5  Q.    And he came into your store?
6  A.    Yes.
7  Q.    While you characterize it as
8  social, do you have any knowledge that he
9  went reporting back to his father after he
10 left the store?
11 A.    I would think that he probably
12 was not.
13 Q.    But you don't know that for sure;
14 is that correct?
15 A.    I certainly wouldn't know it for
16 sure, but it would be highly unlikely that
17 he was reporting back to his father,
18 because I think if anything their
19 relationship was estranged at that point in
20 time.
21 Q.    Do you have any sort of business
22 connection between, is there any sort of
23 business connection between your store and
24
```

Page 79

```
1
2  any other jewelry store?
3  A.    No.
4  Q.    There's no affiliation?
5  A.    No.
6  Q.    Do you feel the fact that
7  numerous stores operate under the name, Van
8  Scoy, some form of Van Scoy allegedly
9  operate under that name, would be a source
10 of confusion for customers?
11 A.    There are rare occasions where
12 and becoming more rare where someone will
13 come in and sort of make a warranty or a
14 service claim for something that they
15 bought in a store with the name Van Scoy in
16 it someplace other than us.  They either
17 moved into the area or they're passing
18 through and they spotted us, so we'll
19 sometimes get those requests.
20 Q.    In general, do you think it's a
21 source of confusion or not?
22 A.    I think occasionally a customer
23 makes the assumption that the stores are
24 affiliated in some way, yes.  It's
```

Page 80

```
1
2  occasional.
3        MR. PETOCK:  No further
4  questions.
5        MR. QUINN:  No questions from
6  here.
7        (Whereupon, the deposition
8  concluded at 3:20 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

# EXHIBIT M

IN THE UNITED STATES DISTRICT COURT
THE DISTRICT OF DELAWARE

WAYNE VAN SCOY

            PLAINTIFF       :      C.A.NO. 05-108 (KAJ)

       V.                :

VAN SCOY DIAMOND MINE OF
DELAWARE, INC.,  :
KURT VAN SCOY AND
DONNA VAN SCOY

            DEFENDANTS

## DEFENDANTS' RESPONSES TO PLAINTIFF'S
## FIRST SET OF REQUESTS FOR ADMISSIONS UNDER FRCP 36

Pursuant to Federal Rule of Civil Procedure 36, Defendants, through their counsel, hereby respond to Plaintiff's First Set of Requests For Admissions Under Fed. R. Civ.P.36.

## GENERAL OBJECTIONS

1.    Plaintiff's First Set Of Requests For Admissions Under Fed. R. Civ.P.36 is defective and, hence, invalid, in so far as it fails to comply with Fed. R. Civ. P. 36.

2.    Defendants object to all of Plaintiff's Definitions and Instructions in Plaintiff's First Set of Requests For Admissions Under Fed. R. Civ.P.36 to the extent that they do not conform to Fed. R. Civ.P.36.

3.    Defendants object to each and every request in its entirety to the extent it seeks admission that is not relevant to a claim or defense of this litigation and is not reasonably calculated to lead to the discovery of admissible evidence.

EXHIBIT M

94214.90101

4.      Defendants object to each and every request to the extent it calls for information that could have been obtained more efficiently by other means of discovery.

5.      Defendants object to each and every request to the extent it seeks admissions respecting information containing privileged communications, attorney work-product, client work-product, or trial preparation material, on the grounds that such discovery is not permissible under the Federal Rules of Civil Procedure. None of Defendants' specific responses shall be construed to mean that Defendants intend to provide privileged or work-product information in the absence of an intentional waiver. Any inadvertent disclosure of privileged information or work-product shall not constitute a waiver of an otherwise valid claim of privilege, and any failure to assert a privilege or other protection as to certain information shall not be deemed to constitute a waiver of the privilege or other protection as to any other information so protected.

6.      Defendants object to each and every request to the extent that it is vague, ambiguous, overbroad, vexatious, unduly burdensome or seeks information not relevant to a claim or defense involved in the pending action nor reasonably calculated to lead to the discovery of admissible evidence.

7.      Defendants object to each and every request to the extent that it seeks an admission already elicited by plaintiff during the depositions of defendants Kurt Van Scoy, Donna Van Scoy and/or Van Scoy Diamond Mine of Delaware, Inc.

8.      Defendants object to each and every request to the extent that it seeks information protected by any confidentiality obligation owed to a third party, and to the extent such information is sought it is provided under the terms of the Stipulated Protective Order.

9.    Defendants object to Plaintiff's Definitions and Instructions as improperly attempting to impose burdens and obligations upon Defendants beyond the requirements of the Federal Rules of Civil Procedure.

10.    Defendants present each of the general objections set forth above to each of the requests. By setting forth specific objections, Defendants do not intend to limit or restrict the general objections contained in this response. To the extent Defendants provide information in response to a specific request to which objection has been raised, Defendants reserve the right to maintain such objection(s) with respect to any additional information and such objections are not waived by the furnishing of information.

11.    Defendants expressly reserve the right to supplement and/or amend these responses should additional information become available.


## REQUESTS FOR ADMISSIONS


1.    Tommy Van Scoy never expressly gave Kurt Van Scoy permission to use the mark VAN SCOY DIAMOND MINE.

RESPONSE:  Denied


2.    Van Scoy Diamond Mine, Inc. never impliedly nor expressly gave Kurt Van Scoy permission to use the mark VAN SCOY DIAMOND MINE.

RESPONSE:  Denied

26.    Defendant Van Scoy Diamond Mine of Delaware, Inc. operates its jewelry store business in a geographic area which, except for its internet business, is geographically distinct from any other jewelry store using the mark VAN SCOY DIAMOND MINE, VAN SCOY DIAMONDS, VAN SCOY JEWELERS or VAN SCOY.

RESPONSE:  Admitted that Defendants know of no other jewelry store in Defendants' trading area using the any of the marks "VAN SCOY DIAMOND MINE", "VAN SCOY DIAMONDS", "VAN SCOY JEWELERS" or "VAN SCOY".


27.    Defendant, Van Scoy Diamond Mine of Delaware, Inc., operates its jewelry store business in a geographic area which is, except for its internet business, geographically distinct from the jewelry store business in Wilkes-Barre, PA under the mark VAN SCOY DIAMOND MINE.

RESPONSE:  Admitted.


28.    Defendant, Van Scoy Diamond Mine of Delaware, Inc., operates it jewelry store business in a geographic area which is, except for its internet business, geographically distinct from the jewelry store business in Scranton, PA under the mark VAN SCOY DIAMOND MINE or VAN SCOY DIAMONDS.

RESPONSE:  Admitted.


29.    Defendant, Van Scoy Diamond Mine of Delaware, Inc., operates it jewelry store business in a geographic area which is, except for its internet business, geographically distinct from a jewelry store business operated in Lancaster, PA.

RESPONSE:  Admitted.

30.     Defendant, Van Scoy Diamond Mine of Delaware, Inc., operates it jewelry store business in a geographic area which is, except for its internet business, geographically distinct from a jewelry store business operated in Reading, PA.

RESPONSE:  Admitted.

31.     Defendant, Van Scoy Diamond Mine of Delaware, Inc., operates it jewelry store business in a geographic area which is, except for its internet business, geographically distinct from a jewelry store business operated in Erie, PA.

RESPONSE:  Admitted.

32.     Defendant, Van Scoy Diamond Mine of Delaware, Inc., operates it jewelry store business in a geographic area which is, except for its internet business, geographically distinct from a jewelry store business operated in Allentown, PA.

RESPONSE:  Admitted.

33.     Defendant, Van Scoy Diamond Mine of Delaware, Inc., operates it jewelry store business in a geographic area which is, except for its internet business, geographically distinct from a jewelry store business operated in North Carolina.

RESPONSE:  Admitted.

34.     Defendant, Van Scoy Diamond Mine of Delaware, Inc., operates its jewelry store business in a limited geographic area known as the Wilmington, Delaware area.

RESPONSE:  Defendants object to this request to this request as being vague in filing to defnine the modifer "limited" with respect to "geographic area".  Without prejudice to the forgoing objection denied; admitted that Defendant Van Scoy Diamond Mine of Delaware, Inc. operates its jewelry store business in Newark, Delaware.

## CERTIFICATE OF SERVICE

I , the undersigned, hereby certify that the date written below adjacent to my signature I served the following document

## DEFENDANTS' RESPONSES TO PLAINTIFF'S FIRST
## SET OF REQUESTS FOR ADMISSIONS

on Michael C. Petock, Esquire, as an attachment to e-mails addressed to:

MP@IPLaw-Petock.com and

mfpetock@comcast.net

and on John G. Day, Esquire, as an attachment to an e-mail addressed to:

jday@ashby-geddes.com

and by United States Postal Service first class mail, postage prepaid, to the following addresses:

**Michael C. Petock, Esquire**
**Michael F. Petock, Esquire**
**Petock & Petock LLC**
**46 The Commons at Valley Forge**
**1220 Valley Forge Road**
**P.O. Box 856**
**Valley Forge, PA  19482-0856**

and

**John G. Day, Esquire**
**Ashby & Geddes**
**222 Delaware Avenue, 17th Floor**
**P.O. B1150**
**Wilmington, DE 19899**

FOX ROTHSCHILD LLP

Charles N. Quinn

7 October 2005
(date)

# EXHIBIT N



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Van Scoy

## v.

# Van Scoy Diamond Mine of Delaware, Inc.

### C.A. # 05-108 (KAJ)

---

### Transcript of:

### Donna Van Scoy

### September 19, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

EXHIBIT N

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WAYNE VAN SCOY,            )
                          )
            Plaintiff,    )
                          )   Civil Action
v.                        )   No. 05-108 (KAJ)
                          )
VAN SCOY DIAMOND MINE OF  )
DELAWARE, INC., KURT VAN SCOY)
AND DONNA VAN SCOY,       )
                          )
            Defendants.   )

        Videotape deposition of DONNA VAN SCOY taken
pursuant to notice at the law offices of Ashby &
Geddes, 17th floor, 222 Delaware Avenue, Wilmington,
Delaware, beginning at 9:58 a.m. on September 19,
2005, before Lucinda M. Reeder, Registered Diplomate
Reporter and Notary Public.

APPEARANCES:

        MICHAEL F. PETOCK, ESQ.
        MICHAEL C. PETOCK, ESQ.
        PETOCK & PETOCK, LLC
          222 Delaware Avenue, 17th Floor
          Wilmington, Delaware  19801
          for the Plaintiff,

        CHARLES N. QUINN  ESQ.
        FOX ROTHSCHILD LLP
          2000 Market Street - Tenth Floor
          Philadelphia, PA  19103-3291
          for the Defendants.

ALSO PRESENT:

  WAYNE VAN SCOY
  KURT VAN SCOY
  CAROL FEENEY, DISCOVERY VIDEO SERVICES
- - - - - - - - - - - - - - - - - - - - - - - - --
          WILCOX & FETZER, LTD.
  1330 King Street - Wilmington, Delaware  19801
                (302) 655-0477

**Page 2**

1    THE VIDEOGRAPHER: This is the videotaped
2  deposition of Donna Van Scoy, taken by the plaintiff
3  in the matter of Wayne Van Scoy versus Van Scoy
4  Diamond Mine of Delaware, Incorporated, Kurt Van Scoy,
5  and Donna Van Scoy, Civil Action No. 05-108- (KAJ)
6  held in the offices of Ashby & Geddes, 222 Delaware
7  Avenue, Wilmington, Delaware on September 19th, 2005
8  at approximately 9:58 a.m.
9        The court reporter is Cindy Reeder, from
10  the firm of Wilcox & Fetzer. My name is Carol Feeley,
11  a video specialist from Discovery Video Services, in
12  association with Wilcox & Fetzer.
13        Counsel will introduce themselves, and the
14  reporter will swear in the witness.
15
16    MR. MICHAEL F. PETOCK: I'm Michael F.
17  Petock, for the plaintiff.
18    MR. QUINN: I'm Charles M. Quinn, for the
19  defendants.
20    MR. MICHAEL C. PETOCK: Michael C. Petock,
21  for plaintiff.
22
23
24

**Page 3**

1        DONNA VAN SCOY,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5        MR. QUINN: I would like to make a
6  statement before we start. The notice of deposition
7  for Mrs. Van Scoy asked that she bring and produce any
8  documents that have not already been produced for the
9  plaintiff that she reviewed in preparation for this
10  deposition. And I state to you that there are none.
11    MR. MICHAEL F. PETOCK: Thank you.
12  BY MR. MICHAEL F. PETOCK:
13  Q.  Mrs. Van Scoy, I am going to ask you some
14  questions today.
15    MR. QUINN: Excuse me. Are we going to
16  have a stipulation as to read, signing?
17    MR. MICHAEL F. PETOCK: If you want to,
18  yes.
19    MR. QUINN: We had it before. I think
20  it's appropriate.
21    MR. MICHAEL F. PETOCK: So she's going to
22  reserve the right to read and sign you are saying?
23    MR. QUINN: Yes.
24    MR. MICHAEL F. PETOCK: Fine.

**Page 4**

1        Anything else?
2    MR. QUINN: No. That's fine by me.
3    MR. MICHAEL F. PETOCK: Okay.
4    MR. QUINN: She can sign before any notary
5  public.
6    MR. MICHAEL C. PETOCK: Do you want to
7  stipulate to objections, Dad?
8    MR. MICHAEL F. PETOCK: Well, all
9  objections are reserved until the time of trial except
10  to the form of the question.
11    MR. QUINN: That's fine.
12    MR. MICHAEL F. PETOCK: The same
13  stipulation continues.
14  BY MR. MICHAEL F. PETOCK:
15  Q.  Mrs. Van Scoy, I am going to ask you some
16  questions today. The court reporter is taking down
17  everything that is said. Do you understand that?
18  A.  Yes.
19  Q.  And you understand you are under oath and you
20  have an obligation to tell the truth?
21  A.  Yes.
22  Q.  You also understand that you are not to consult
23  with your counsel during the deposition with respect
24  to any questions that have been asked or anticipated

**Page 5**

1  to be asked?
2  A.  Yes.
3  Q.  Do you understand that?
4  A.  Yes.
5  Q.  Do you understand that you have to answer the
6  questions unless your counsel instructs you not to
7  answer the question.
8  A.  Mm-hmm.
9  Q.  Can you tell me: How old are you?
10  A.  42.
11  Q.  And do you have any education beyond high
12  school?
13  A.  Yes.
14  Q.  What is that?
15  A.  An X-ray technician.
16  Q.  When did you -- did you get a certificate as an
17  X-ray technician?
18  A.  Yes. A certificate. I have four years of
19  schooling after high school.
20  Q.  Where did you get that certificate from?
21  A.  Connecticut.
22  Q.  Where in Connecticut?
23  A.  I don't remember the name right now.
24  Q.  Where did you grow up at?

Page 6

1   A. Nanticoke, Pennsylvania.
2   Q. And how far is that from Wilkes-Barre?
3   A. Ten miles.
4   Q. Were you familiar with Van Scoy Diamond Mine
5   Stores at the time you grew up in Wilkes-Barre?
6   A. Yes.
7   Q. Was there radio advertising on the radio by
8   Tommy Van Scoy, Sr.?
9   A. Yes.
10  Q. Did you consider the name to have been well
11  known at the time you were growing up in Wilkes-Barre?
12  A. Yes.
13  Q. What is your work experience after high school?
14  A. My work experience. I went to school and
15  became an X-ray technician.
16  Q. Did you work as an X-ray technician?
17  A. Yes.
18  Q. For how long?
19  A. Ten years.
20  Q. Did you hold any other jobs?
21  A. No.
22  Q. Did you ever work in a Van Scoy Diamond Mine
23  Store?
24  A. I work in one now.

Page 7

1   Q. I'm sorry. Did you ever work in a Van Scoy
2   diamond store before -- strike that. When did you
3   open a store Van Scoy Diamond Mine of Delaware, Inc.?
4   A. My husband opened it in November of '94.
5   Q. Did you also open it as part of the
6   corporation?
7   A. I wasn't there until a year and a half later.
8   Q. Did you ever work in a Van Scoy Diamond Mine
9   store prior to November of 1994?
10  A. No.
11  Q. Did you invest some money in the opening of the
12  Van Scoy Diamond Mine store in Delaware?
13  A. Yes.
14  Q. How much did you invest?
15  A. 20,000.
16  Q. Where did that money come from?
17  A. I took out two consecutive loans at the same
18  time.
19  Q. In your name?
20  A. Yes.
21  Q. And at that time, you became a percentage owner
22  in Van Scoy Diamond Mine of Delaware, Inc. Is that
23  correct?
24  A. I don't know. I just gave my husband money to

Page 8

1   open the store. I don't really know that percentage.
2   Q. Do you know what your percentage is today?
3   A. No, I do not.
4   Q. You are part owner of the store?
5   A. I guess I would say, 50 percent. We do
6   everything half and half.
7      MR. QUINN: I am sure Mr. Petock does not
8   want you to guess. Correct?
9   Q. Yes. You give us your best information.
10  A. Okay.
11  Q. What are your -- do you work in the store
12  Van Scoy Diamond Mine of Delaware, Inc., right now?
13  A. Yes.
14  Q. I'll refer to it as "Van Scoy Diamond Mine
15  store in Delaware." Okay?
16  A. Okay.
17  Q. What are your job duties there?
18  A. I pay the receipts and I pay the bills.
19  Q. What do you mean when you say you do the
20  receipts?
21  A. I open the receipts every day and do -- put the
22  money in the checkbook, and then I pay the bills in
23  turn.
24  Q. These receipts are payments coming in from

Page 9

1   customers?
2   A. Payments and sales, yes.
3   Q. What do you mean by "sales"?
4   A. Anything that is sold. Anything that is
5   documented from a customer.
6   Q. So that's sales in the store and sales -- and
7   receipts that come in through the mail. Is that
8   correct?
9   A. There are none in the mail. It's just usually
10  people coming in.
11  Q. Do you have any other job responsibilities at
12  Van Scoy Diamond Mine in Delaware?
13  A. No. I'm very part-time.
14  Q. How much time do you spend at the store?
15  A. Four hours a day, maybe if I'm there. Maybe
16  four days a week.
17  Q. What days a week do you work?
18  A. Usually Tuesday through Friday.
19  Q. Have these responsibilities, job duties changed
20  from 1994?
21  A. No.
22  Q. From 1994 to present, you were always doing the
23  same thing, working part-time and only handling the
24  receipts and deposits. Is that correct?

e1d9445b-06e6-45b4-8108-014bd9814fd0

Page 10

1   A.  Correct.
2   Q.  Does your husband Kurt Van Scoy have any
3   education beyond high school?
4   A.  No.
5   Q.  When did you meet Kurt Van Scoy?
6   A.  1992.
7   Q.  Where did you meet him?
8   A.  The Woodlands.
9   Q.  What is that?
10  A.  A nightclub.
11  Q.  And where is that?
12  A.  In Wilkes-Barre.
13  Q.  And has your relationship with Kurt been good?
14  A.  Yes.
15  Q.  Do you communicate freely on everything?
16  A.  Yes.
17  Q.  Do you communicate freely with respect to the
18  operation of Van Scoy Diamond Mine store in Delaware?
19  A.  Not in a business sense; just how was our day.
20  Some days are very stressful.
21  Q.  What about decisions on when to advertise and
22  how to advertise?
23  A.  He solely does the advertising.
24  Q.  You don't give him any communication or input

Page 11

1   on that?
2   A.  I think it's expensive and I'd rather not.
3   Q.  Do you discuss like, it's good to advertise
4   before Christmas or something like that?
5   A.  No, I don't.
6   Q.  What about the layout of the ads, do you get
7   involved in that at all?
8   A.  No.
9   Q.  Do you wait on customers?
10  A.  At Christmas time, yes.
11  Q.  Do you wait on customers at any other time of
12  the year?
13  A.  Not usually.
14  Q.  How would you define "Christmas time"?
15  A.  Our busiest time of the year.
16  Q.  But from when to when would that extend?
17  A.  I would say, it depends every year, but mostly
18  two weeks prior.
19  Q.  So in November, you wouldn't be waiting on
20  customers?
21  A.  Not necessarily.
22  Q.  What do you mean by "not necessarily"?
23  A.  If someone were to be on vacation, I may have
24  to cover.  We usually have enough staff to cover how

Page 12

1   many customers come in the door.
2   Q.  And when does the Christmas period end as far
3   as your selling is concerned?
4   A.  Christmas eve.
5   Q.  Do you do anything with respect to keeping
6   track of finances?
7   A.  No.
8   Q.  Who does that?
9   A.  Our accountant.
10  Q.  How does he do that?
11  A.  He comes to our store twice a month and does
12  the bookkeeping.
13  Q.  What does he use to do the bookkeeping?
14  A.  My computer.
15  Q.  What's on your computer?
16  A.  The invoices that go in and the checks that
17  come out.
18  Q.  Who is your accountant?
19  A.  James Bellenger.
20  Q.  He is located where?
21  A.  In Bear, Delaware.
22  Q.  Does the accountant give you back a summary
23  each month?
24  A.  No.

Page 13

1   Q.  Does the accountant give you anything back?
2   A.  No.  He does everything.
3   Q.  What do you mean "he does everything"?
4   A.  I don't need a summary because he does the
5   taxes.  So he does what he needs to do on my computer
6   and then follows up with it every month and at the end
7   of the year.
8   Q.  At some point in time, you changed the name of
9   your website address from Van Scoy Diamond Mine.com to
10  Van Scoy Diamonds of Delaware.com.  Do you know when
11  you did that?
12  A.  No.
13  Q.  Was there an invoice for doing that?
14  A.  No.  The only invoice I get is from the company
15  itself.
16  Q.  What company is that?
17  A.  I believe it was Trusion.
18  Q.  Trusion.  T-R-U-S-I-O-N?
19  A.  Mm-hmm.  Yes.
20  Q.  What do they do?
21  A.  I am not sure.  I didn't have anything to do
22  with the Internet.
23  Q.  You don't recall ever getting an invoice that
24  you had to pay for making that change?

e1d9445b-06e6-45b4-8108-014bd9814fd0

Page 14

1   A.  No.  It was just a monthly Internet fee.
2   Q.  Do you know what Scoy Development, S-C-O-Y-
3   D-E-V is?
4   A.  No.
5   Q.  Have you ever seen that before?
6   A.  Never heard of it.
7   Q.  Why did you decide to open a store in
8   Wilmington, Delaware?
9        MR. QUINN:  Objection to the form of the
10  question.  I don't think the foundation for that has
11  been established.
12  Q.  You can answer the question.  He objected, but
13  you still have to answer the question.
14  A.  Why, I don't really remember.
15  Q.  Why didn't you open one in Wilkes-Barre?
16  A.  Because there was already one there.
17  Q.  Did the same thing apply for Allentown?
18  A.  I don't know.  I don't know.  Sorry.
19  Q.  And the store that was opened in Wilmington at
20  1117 Churchmans Road or street, that was the same
21  location that Tommy Van Scoy previously had a store
22  there.  Is that correct?
23       MR. QUINN:  Objection to the form of the
24  question.  The question presumes a store was opened in

Page 15

1   Wilmington.  I think that's actually not actually
2   correct.
3   Q.  Can you answer the question?
4   A.  I forgot it now.  I'm sorry.
5        MR. QUINN:  You can have it read back if
6   you'd like.
7   Q.  You opened a store at 1117 Churchmans Road, is
8   it?
9   A.  Yes.
10  Q.  You opened that in about November of 1994.  Is
11  that correct?
12  A.  Yes.
13  Q.  And at that same location, about a year and a
14  half year earlier Tommy Van Scoy, Sr. had operated a
15  store there.  Is that correct?
16  A.  I was told that.
17  Q.  Who told you that?
18  A.  My father-in-law and my husband.
19  Q.  Your father-in-law was Tommy Van Scoy, Sr.?
20  A.  Yes.
21  Q.  You signed a personal guarantee on the lease on
22  that property when you opened it.  Isn't that correct?
23  A.  I don't remember.
24       MR. MICHAEL F. PETOCK:  I would like to

Page 16

1   have this marked as Plaintiff's Exhibit 17.
2        (Plaintiff's Exhibit No. 17 was marked for
3   identification.)
4   BY MR. MICHAEL F. PETOCK:
5   Q.  I show you what's been marked as Plaintiff's
6   Exhibit 17.  Can you identify that?
7   A.  It's a lease agreement.
8   Q.  For what is the lease agreement?
9   A.  To lease the property.
10  Q.  What property?  Is it the lease for your store?
11  A.  Yes.
12  Q.  That's Van Scoy Diamond Mine of Delaware, Inc.
13  Is that correct?
14  A.  Yes.
15  Q.  And I direct your attention to the fourth page
16  of the document, which is identified in the lower
17  right-hand corner as D 000754.  Do you see that?
18  A.  Mm-hmm.
19  Q.  Isn't that -- is that your signature on there,
20  Donna Van Scoy?
21  A.  Yes.
22  Q.  That's a lease guarantee.  Isn't that correct?
23  A.  Yes.
24  Q.  It's for the location of your Van Scoy Diamond

Page 17

1   Mine store.  Is that not correct?
2   A.  Yes.
3   Q.  That was in October of 1994?
4   A.  Yes.
5   Q.  Were you an officer or director of Van Scoy
6   Diamond Mine of Delaware, Inc.?
7   A.  Secretary.
8   Q.  When you say you're secretary?
9   A.  That's what it says on the form.
10  Q.  On what form?
11  A.  The corporation form.
12       MR. MICHAEL F. PETOCK:  I guess we
13  haven't received that form, Charlie.  I'd ask that you
14  produce it.
15  BY MR. MICHAEL F. PETOCK:
16  Q.  What do you do as secretary of the corporation?
17  A.  As I told you before, receipts and the bills.
18  Q.  Do you do anything else --
19  A.  No.
20  Q.  -- in connection with being secretary of the
21  corporation?
22  A.  Well, I do sales and take out the trash as
23  well.
24  Q.  Have you attended any corporate meetings?

Page 18

1   A.  No.
2   Q.  Have you ever attended any corporate meetings?
3   A.  I don't remember.
4       MR. MICHAEL F. PETOCK:  I would like to
5   have this marked as Plaintiff's Exhibit 18.
6       (Plaintiff's Deposition Exhibit No. 18 was
7   marked for identification.)
8   BY MR. MICHAEL F. PETOCK:
9   Q.  I show you what's been marked as Plaintiff's
10  Exhibit 18.  Do you recognize that?
11  A.  No.
12  Q.  Do you know what it is?
13  A.  Minutes of annual meeting of shareholders and
14  directors.
15  Q.  Of what corporation?
16  A.  Van Scoy.
17  Q.  Diamond Mine of Delaware, Inc.  Isn't that
18  correct?
19  A.  Correct.
20  Q.  It says there that the only shareholder present
21  was Kurt Van Scoy, is that correct, in the lower
22  portion of the page?
23  A.  Yes.
24  Q.  Those are the minutes for 2005, is that

Page 19

1   correct, the first paragraph?
2   A.  I guess.  I don't know.
3   Q.  That's what it says, isn't that correct, the
4   second line, the first paragraph?
5   A.  I guess.
6   Q.  Is that correct?
7   A.  If that's what it says.
8   Q.  Isn't it true that on page 2 you were appointed
9   as vice-president or elected as vice-president?
10  A.  No.
11  Q.  I direct your attention to the second group of
12  names listing.  It says, "President, Kurt Van Scoy,
13  vice-president, Donna Van Scoy."  Do you see that?
14  A.  Yes.
15  Q.  Isn't it true that you are vice-president of
16  the corporation?
17  A.  I never heard of that before.
18      MR. MICHAEL F. PETOCK:  I would like to
19  have this marked as Plaintiff's Exhibit 19.
20      (Plaintiff's Exhibit No. 19 was marked for
21  identification.)
22  By MR. MICHAEL F. PETOCK:
23  Q.  I show you what's been marked as Plaintiff's
24  Exhibit 19, P-19, Plaintiff's 19.  Can you identify

Page 20

1   that?
2   A.  It looks like the same thing as the prior one.
3   Q.  That's minutes for Van Scoy Diamond Mine of
4   Delaware, Inc., the annual meeting?
5   A.  Yes.
6   Q.  But it's for 2004.  Is that correct?
7   A.  That's what it says, yes.
8   Q.  Again, you were not present at the meeting.  Is
9   that correct?
10  A.  Correct.
11  Q.  Again on the second page, you are nominated and
12  were unanimously elected to be vice-president?
13  A.  No, I was not.
14  Q.  You were not?
15  A.  I am not the vice-president.
16  Q.  You are the secretary?
17  A.  I am the secretary.
18  Q.  Even though the minutes say you are
19  vice-president?
20  A.  It must have been a mistake.
21      MR. MICHAEL F. PETOCK:  I would like to
22  have this marked as P-20.
23      (Plaintiff's Exhibit No. 20 was marked for
24  identification.)

Page 21

1   BY MR. MICHAEL F. PETOCK:
2   Q.  I show you what's been marked as Plaintiff's
3   Exhibit 20.  Can you identify that?
4   A.  I guess it's the same thing again for 2003.
5   Q.  And, again, does it show that you were not
6   present at the meeting?
7   A.  Yes.
8   Q.  And, again, does it show that you were elected
9   to be vice-president of the corporation?
10  A.  My name is listed as vice-president, but I am
11  secretary.  On every form, income tax form, I am
12  secretary.  This must be a mistake at my accountant's
13  office.
14      MR. MICHAEL F. PETOCK:  Charlie, we
15  request that you provide us with all documents that
16  show Donna Van Scoy to be secretary of the
17  corporation.
18      MR. MICHAEL F. PETOCK:  Would you mark
19  this as Plaintiff's Exhibit 21?
20      (Plaintiff's Deposition Exhibit No. 21 was
21  marked for identification.)
22  BY MR. MICHAEL F. PETOCK:
23  Q.  I show you what's been marked as Plaintiff's
24  Exhibit 21.  Can you identify that?

1 A. Shareholders and directors.
2 Q. Is it the minutes of the annual meeting of
3 shareholders and directors for Van Scoy Diamond Mine
4 of Delaware, Inc. for the year 2002?
5 A. Yes.
6 Q. It shows you were not present at the meeting.
7 Is that correct?
8 A. Correct.
9 Q. On page 2, it shows again you were elected to
10 be vice-president of the corporation. Is that
11 correct?
12 A. As far as I know, I am the secretary.
13 Q. But the document says you are vice-president.
14 Is that correct?
15 A. It does say that, yes.
16 Q. Do you have any idea how what you characterize
17 as a mistake happened?
18 A. No, I don't.
19 Q. And to your knowledge, you don't recall
20 attending any corporate meetings?
21 A. No.
22 Q. Even though you are 50 percent stockholder?
23 A. Yes.
24 MR. MICHAEL F. PETOCK: I would like to

1 have this marked as Plaintiff's Exhibit 22.
2 (Plaintiff's Exhibit No. 22 was marked for
3 identification.)
4 BY MR. PETOCK:
5 Q. Can you identify Plaintiff's Exhibit 22?
6 A. Shareholders meeting, 2001.
7 Q. Of the corporation Van Scoy Diamond Mine of
8 Delaware, Inc. Isn't that correct?
9 A. Yes.
10 Q. And it shows, again, you were not present at
11 the meeting. Is that correct?
12 A. Correct.
13 Q. On page 2, it shows also you were elected to be
14 vice-president of the corporation?
15 A. Yes.
16 MR. MICHAEL F. PETOCK: Is the next
17 number 23?
18 (Plaintiff's Exhibit No. 23 was marked for
19 identification.)
20 BY MR. MICHAEL F. PETOCK:
21 Q. I show you what's been marked as Plaintiff's
22 Exhibit 23. Do you recognize that?
23 A. Some minutes of a meeting.
24 Q. It's the minutes of the annual meeting of

1 shareholders and directors of Van Scoy Diamond Mine of
2 Delaware, Inc. for the year 2000. Is that correct?
3 A. Yes.
4 Q. It shows you were present at that meeting. Is
5 that correct?
6 A. I don't remember.
7 Q. Do you recall being at any meetings at the
8 offices of Ralph V. Estep?
9 A. No.
10 Q. Again, on page 2, it shows you being elected as
11 vice-president of the corporation. Is that correct?
12 A. Yes.
13 Q. But, again, you say that was an error and that
14 you were secretary. Is that correct?
15 A. Yes.
16 Q. What forms have you listed as secretary?
17 A. What forms do I have?
18 Q. What forms are you referring to that list you
19 as secretary of the corporation?
20 A. When we first started it. That's the only
21 thing I could think of that would say that, the very
22 first form. The one that would be Cayman
23 incorporated.
24 Q. You think the articles of incorporation say

1 that?
2 A. Yes. To my knowledge.
3 Q. Take a look at Plaintiff's Exhibit P-23. Take
4 a look at the last page, which is marked D000758.
5 A. Mm-hmm.
6 Q. Is that your signature on there?
7 A. No.
8 Q. Above the name "Donna Van Scoy," is that not
9 your signature?
10 A. No.
11 Q. Do you know who signed your name?
12 A. No.
13 Q. Do you know who wrote that signature on there?
14 A. No.
15 MR. QUINN: Objection. The question has
16 been asked and answered.
17 Q. Can you take a look at P-22, the last page?
18 Whose signature is that?
19 A. Kurt's.
20 MR. QUINN: Objection. I instruct the
21 witness to give me a second to get my objection in
22 before you give the answer.
23 A. Sorry.
24 MR. QUINN: To what signature does the

e1d9445b-06e6-45b4-8108-014bd9814fd0

Page 26

1  question refer?
2        MR. MICHAEL F. PETOCK:  Well, okay. The
3  signature above the name "Kurt Van Scoy."
4    Q.  You can answer the question now.
5    A.  Kurt Van Scoy.
6    Q.  Can I ask you to go back and take a look at
7  P-23 again?
8    A.  Absolutely.
9    Q.  The last page, D000758. Above the name "Kurt
10 Van Scoy" in two places, whose signature is that?
11   A.  Kurt Van Scoy.
12       (Plaintiff's Exhibit No. 24 was marked for
13 identification.)
14 BY MR. MICHAEL F. PETOCK:
15   Q.  I show you what's been marked as Plaintiff's
16 Exhibit 24. Is that the minutes of the annual meeting
17 of shareholders and directors of Van Scoy Diamond Mine
18 of Delaware, Inc., for the year 1999?
19   A.  Yes.
20   Q.  It shows you were present as a shareholder at
21 that meeting. Is that correct?
22   A.  Yes.
23   Q.  The second page also shows that you were
24 elected vice-president of the corporation for the

Page 27

1  year. Is that correct?
2    A.  Yes.
3    Q.  On the third page, which is D000761, there is a
4  signature for Donna Van Scoy. Is that your signature
5  on there?
6    A.  No.
7    Q.  Do you know who signed that?
8    A.  No.
9    Q.  Did Kurt sign that?
10       MR. QUINN:  Object. Asked and answered.
11 She's already answered the question she doesn't know.
12 You don't need to answer the question.
13   Q.  Did Kurt sign?
14   A.  I don't know.
15   Q.  Above the -- in two places on that same page
16 above the signature line "Kurt Van Scoy," is that
17 Kurt's signature?
18   A.  Yes.
19       MR. MICHAEL F. PETOCK:  I would like to
20 have this marked as Plaintiff's Exhibit 25.
21       (Plaintiff's Exhibit No. 25 was marked for
22 identification.)
23
24 BY MR. MICHAEL F. PETOCK:

Page 28

1    Q.  I show you what's been marked as Plaintiff's
2  Exhibit 25. Is that the minutes of the annual meeting
3  of shareholders and directors of Van Scoy Diamond Mine
4  of Delaware, Inc. for the year 1998?
5    A.  Yes.
6    Q.  That also shows that you were present at that
7  meeting. Is that correct?
8    A.  It says I was.
9    Q.  Were you present at that meeting?
10   A.  I don't remember.
11   Q.  On page 2, which is D000763, it shows you being
12 elected as vice-president of the corporation. Is that
13 correct?
14   A.  Yes.
15   Q.  I direct your attention to page 3, which is
16 D000764. Above the signature line "Donna Van Scoy,"
17 is that your signature?
18   A.  No.
19   Q.  Did you authorize anyone to put your signature
20 on that?
21   A.  I don't recall.
22   Q.  Above the -- in two places, above the signature
23 line "Kurt Van Scoy," is that Kurt's signature?
24   A.  Yes.

Page 29

1    Q.  Did you ever attend a corporate meeting at a
2  lawyer's name of Aregood in Wilkes-Barre?
3    A.  I believe so.
4    Q.  Do you believe that would have been at the 1996
5  meeting?
6    A.  I don't remember.
7    Q.  Do you recall being at any meeting in
8  Mr. Aregood's office in which tradename issues were
9  discussed?
10   A.  No.
11   Q.  In 1996, were you aware that there was a
12 proceeding started in the bankruptcy court to enjoin
13 the use of the Van Scoy Diamond Mine?
14   A.  I knew there was a bankruptcy case. That's all
15 I knew.
16   Q.  How did you know there was a bankruptcy case?
17   A.  Because my father-in-law was going through it.
18 I didn't know the details.
19   Q.  Did you know that the store in Wilkes-Barre --
20 that the Van Scoy Diamond Mine in Wilkes-Barre was
21 padlocked by the bankruptcy court at one time?
22   A.  Yes. I was told that.
23   Q.  Did you also know at some later date they had
24 to take the name down, they had to change their name

1  on the store in Wilkes-Barre?
2  A.  As of this trial, I found that out.
3  Q.  Prior to the institution of this lawsuit, you
4  didn't know about that?
5  A.  No, I did not.
6  Q.  Do you know where the meetings are for - or
7  the minutes for the meetings for the corporation
8  Van Scoy Diamond Mine for '95, '96, '97?
9  A.  No.
10          MR. MICHAEL F. PETOCK:  Charlie, I'd ask
11  that you produce the minutes for the meetings for the
12  years '95, '96 and '97.
13  BY MR. MICHAEL F. PETOCK:
14  Q.  Was there ever any concern expressed by Kurt or
15  concern on your behalf about using the name "Van Scoy
16  Diamond Mine"?
17  A.  No.
18  Q.  Did Tommy Van Scoy, Sr. ever say anything to
19  you that would give you permission to use the name
20  "Van Scoy Diamond Mine"?
21  A.  Yes.  He gave it to us.
22  Q.  What did he say to you?
23  A.  He said, "Good luck and I hope you guys do
24  well."

1  Q.  When did he say that?
2  A.  When we opened the store.  No.  Prior, when he
3  gave us all the showcases and the sign and everything.
4  Q.  Where was he when he said that?
5  A.  In my store.
6  Q.  He was in your store and he was giving you the
7  showcases and the sign in your store?  Is that
8  correct?
9          MR. QUINN:  Object.
10  A.  He gave Kurt the equipment.  He didn't
11  physically bring it.  He said, "Good luck to you."
12  That's all.
13  Q.  That's all he said?
14  A.  I am sure there was more, but I don't recall.
15  Q.  Did he ever do anything which would imply any
16  type of permission to use the name "Van Scoy Diamond
17  Mine?"
18  A.  He used to come down to our store and work when
19  we had a sale or something big or just to come down
20  and help us out.
21  Q.  When was that?
22  A.  Numerous times.
23  Q.  In what year?
24  A.  '94, '95.

1  Q.  How did he help you out?
2  A.  Actually just stood and helped make sales and
3  helped keep the girls motivated.
4  Q.  Did he ever say anything about the corporation
5  Van Scoy Diamond Mine of Delaware, Inc. impliedly
6  received any permission to use the mark "Van Scoy
7  Diamond Mine"?
8  A.  I knew nothing about a mark until this trial.
9  Q.  So he was telling you good luck with the store
10  hoping you were successful.  Is that correct?
11  A.  That's correct.
12  Q.  And you took his comments "good luck" to mean
13  that you could use the mark in Delaware, is that
14  correct, in Newark, Delaware?
15  A.  I don't understand the question.
16  Q.  What was your understanding of the scope of the
17  permission that was granted to you, allegedly granted
18  to you by the words "good luck"?
19  A.  He allowed us to open the store and wished us
20  good luck.
21  Q.  In Newark, Delaware?
22  A.  Yes.
23  Q.  Nowhere else?
24  A.  Nowhere else was ever brought up, I guess.

1  Q.  Are you aware that at some point in time
2  somebody blocked out the word "Mine" from the sales
3  receipts of Delaware Diamond Mine of Delaware, Inc.?
4  A.  Yes.
5  Q.  Did you ever block out of any of those?
6  A.  No.
7  Q.  Do you know who did it?
8  A.  Yes.  My employees.
9  Q.  Who was that?
10  A.  Pardon?
11  Q.  Who was that?
12  A.  Megan Rump and Karen Vayo.
13  Q.  Megan Rump, R-U-M-P?
14  A.  Yes.
15  Q.  What was the other name?
16  A.  Karen Vayo, V-A-Y-O.
17  Q.  V-A-Y-L-E?
18  A.  V-A-Y-O.
19  Q.  How do you identify yourself on sales receipts?
20  A.  "DVS."
21  Q.  Did the two girls do this jointly?
22  A.  Yes.
23  Q.  Megan and Karen?
24  A.  Yes.

Page 34

1　Q.　When did they do that?
2　A.　After we received notification of the lawsuit.
3　Q.　You mean after you received the cease and
4　desist letter?
5　A.　Yes.
6　Q.　These sales receipts, do they come in a booklet
7　or in individual forms, multi-part individual forms?
8　A.　In a carbon copy form notebook.
9　Q.　They are in a notebook?
10　A.　Mm-hmm.
11　Q.　So you tear one off as you use it?
12　A.　Yes.
13　Q.　Were these crossed out one at a time as --
14　A.　No.
15　Q.　How many were done at one time, do you know?
16　A.　Well, the entire book.
17　Q.　Did you use any of the sales receipts with the
18　name "Mine" blocked out?
19　A.　Yes.
20　Q.　Were you upset that you were doing that?
21　A.　No.
22　Q.　Did you tell the girls Megan and Karen Rump --
23　Megan Rump and Karen --
24　A.　Vayo.

Page 35

1　Q.　-- Vayo not to do it?
2　A.　I'm confused.
3　Q.　Did you tell Karen Rump -- I'm sorry. Did you
4　tell Megan Rump and Karen Vayo not to cross out the
5　word "Mine" from the sales receipts any longer?
6　A.　Yes.
7　Q.　You felt that there was no need to cross out
8　the word "Mine." Is that correct?
9　A.　Yes.
10　Q.　Did you chastise Karen and Megan for crossing
11　out the sales receipts?
12　A.　"Chastise" meaning?
13　Q.　Tell them they really did a wrong thing by
14　crossing it out, that they shouldn't take -- I presume
15　they took this on themselves and did it?
16　　　MR. QUINN: Objection. There is no
17　question on the table.
18　Q.　How did it come that Karen and Megan crossed
19　out the word "Mine" on the sales receipts?
20　A.　I told them to.
21　Q.　You told them to?
22　A.　Yes.
23　Q.　And then you later told them not to do it
24　anymore?

Page 36

1　A.　No. I later said we didn't need to do it.
2　Q.　Why did you later tell her that you did not
3　need to do it?
4　A.　Under the advice of counsel.
5　Q.　What was that advice?
6　　　MR. QUINN: Objection. That's privileged
7　information. You are instructed not to answer.
8　　　MR. MICHAEL F. PETOCK: If she's relying
9　upon advice of counsel, it's not privileged.
10　　　MR. QUINN: It certainly is.
11　　　MR. MICHAEL F. PETOCK: It certainly is
12　not.
13　BY MR. MICHAEL F. PETOCK:
14　Q.　So when you first directed them to cross out
15　"Mine" from the sales receipts, did you believe that
16　crossing out "Mine" would avoid infringement?
17　　　MR. QUINN: Objection to the form of the
18　question. It's leading.
19　A.　I don't understand it anyway.
20　Q.　In the beginning, you requested Megan and Karen
21　to cross out "Mine" from the sales receipt. Is that
22　correct?
23　　　MR. QUINN: Objection. Misleading.
24　A.　Yes.

Page 37

1　Q.　And when you asked them to do that, did you
2　believe that would solve the problem with respect to
3　the cease and desist letter and being a violation of
4　"Van Scoy Diamond Mine"?
5　　　MR. QUINN: Objection to the form of the
6　question. It's a leading question.
7　A.　I don't understand.
8　Q.　When you instructed Megan and Karen to cross
9　out the sales receipts, did you believe that was going
10　to solve the problem with respect to Van Scoy Diamond
11　Mine.
12　　　MR. QUINN: Objection to the question, the
13　form. It's a leading question.
14　　　MR. PETOCK: This is an adverse witness.
15　I'm entitled to lead the witness.
16　　　MR. QUINN: And objections to form are to
17　be made today. We agreed on that at the beginning.
18　By MR. MICHAEL F. PETOCK:
19　Q.　Can you answer the question?
20　A.　I can tell you what I did. I don't really
21　understand your question.
22　　　MR. QUINN: If you don't understand the
23　question, you should not answer it.
24　Q.　Tell me what you did.

Page 38

1     MR. QUINN: Is that a question?
2     MR. MICHAEL F. PETOCK: Yes. Tell me what
3 you did.
4     MR. QUINN: That's not a question.
5     MR. MICHAEL F. PETOCK: I'm asking: What
6 did you do?
7     MR. QUINN: That's a question.
8   A.  I received the letter and it said to stop using
9 the name, so I thought I should cross it out, it would
10 be a good idea. That's it.
11   Q.  By crossing out "Mine," you thought that would
12 avoid the problem with "Van Scoy Diamond Mine"?
13     MR. QUINN: Objection. That's not a
14 question.
15   Q.  Is that correct?
16     MR. QUINN: That's a leading question. I
17 object to it as to form.
18   Q.  Is that correct?
19   A.  I don't know.
20   Q.  Just so the record is clear, what was the
21 advice that you got from counsel with respect to
22 blocking out the name "Mine"?
23     MR. QUINN: Objection. That calls for
24 inquiry into and to break the attorney-client

Page 39

1 privilege. The witness should not answer that
2 question.
3   Q.  When did you tell employees to stop blocking
4 out "Mine" from the sales receipts?
5   A.  They never started and stopped. They just did
6 it one time.
7   Q.  When did you tell them not to do it any longer?
8   A.  I don't believe I have.
9   Q.  You said earlier that you told them not to do
10 it any longer. Isn't that correct?
11     MR. QUINN: Objection. The record will
12 show what she said.
13   A.  I don't remember.
14     MR. MICHAEL F. PETOCK: I guess you need
15 a break now?
16     THE VIDEOGRAPHER: Yes. Going off the
17 record at 10:56 a.m.
18     - - - -
19     THE VIDEOGRAPHER: Going back on the
20 record at 11:05 a.m.
21 BY MR. MICHAEL F. PETOCK:
22   Q.  During the break, did you discuss any of this
23 testimony with your counsel, Mr. Quinn?
24   A.  No.

Page 40

1   Q.  Just so I'm clear here. You said -- is it
2 correct that you said you told Megan and Karen to
3 cross out "Mine" from the receipts?
4     MR. QUINN: Objection. The record will
5 show what she said. The question has been asked and
6 answered.
7   Q.  Will you answer that? I'm unclear.
8   A.  Yes.
9   Q.  When Kurt and you -- when Kurt goes on
10 vacation, do you usually go with him?
11     MR. QUINN: Objection. That's not a
12 question.
13   Q.  Do you usually go with Kurt on vacations?
14   A.  Vacations, yes.
15   Q.  Was Kurt in the store when the cease and desist
16 letter came in?
17   A.  No.
18   Q.  Did you consult with Kurt before you told Megan
19 and Karen to cross out the word "Mine" from the sales
20 receipts?
21   A.  No.
22   Q.  And you said you consulted with counsel with
23 respect to the crossing out of "Mine" from the sales
24 receipts. What counsel was that?

Page 41

1   A.  I never discussed it with counsel. It was
2 what -- I am not sure. I believe it was told to
3 counsel what was done and I was told that it wasn't
4 necessary.
5     MR. QUINN: Limit your response to the
6 question that was asked.
7 BY MR. MICHAEL F. PETOCK:
8   Q.  Who told you it wasn't necessary?
9   A.  I don't recall.
10   Q.  Was it Kurt?
11   A.  I don't recall.
12   Q.  When did this occur?
13   A.  What occur?
14   Q.  That you were told that it was no longer
15 necessary to cross out "mine."
16     MR. QUINN: Objection. That's not a
17 question.
18   Q.  When did it occur?
19   A.  I don't recall.
20   Q.  When you told Megan and Karen to cross out
21 "Mine" from the sales receipts, did you also consider
22 changing the store sign?
23   A.  No.
24   Q.  And why not?

Page 42

1    A.  I don't make those kinds of decisions.
2    Q.  Did you consider changing "Van Scoy Diamond
3    Mine" on the Internet?
4    A.  I don't deal with the Internet.
5    Q.  Who deals with the Internet?
6    A.  Kurt.
7    Q.  Did you believe that "Van Scoy Diamonds of
8    Delaware, Inc." would not be an infringement of
9    "Van Scoy Diamond Mine"?
10   A.  I don't know.
11   Q.  Do you have any belief as to that?
12   A.  I don't really understand the question.
13   Q.  Did you believe that deleting the word "Mine"
14   from "Van Scoy Diamond Mine of Delaware, Inc." would
15   obviate or eliminate the problem with the cease and
16   desist letter?
17   A.  I still don't understand.
18   Q.  What don't you understand about it?
19   A.  I just did it because it said to stop using the
20   name.  That was my own decision.  And I don't know why
21   I did it.
22       (Plaintiff's Exhibit No. 26 was marked for
23   identification.)
24   BY MR. MICHAEL F. PETOCK:

Page 43

1    Q.  I show you what's been marked as Plaintiff's
2    Exhibit No. 26.  Can you identify that?
3    A.  It's a receipt to a customer.
4    Q.  And it's a receipt of the store Van Scoy
5    Diamond Mine of Delaware, Inc.  Is that correct?
6    A.  Yes.
7    Q.  On that receipt the word "Mine" is blocked out.
8    Is that correct?
9    A.  Yes.
10   Q.  The date of this is November 24th, 2004?
11   A.  Yes.
12       MR. QUINN:  Objection.  Leading.  It's not
13   a question.
14   Q.  Whose initials are in there where it says "sold
15   by"?
16   A.  Mine, "DVS."
17   Q.  And was this the first day that a sales receipt
18   was used with the word "Mine" blocked out of the
19   "Van Scoy Diamond Mine of Delaware, Inc."?
20   A.  I am not sure of the first day.
21   Q.  By the way, did you receive the cease and
22   desist letter?
23   A.  I didn't sign for it, no.
24   Q.  Did you open it?

Page 44

1    A.  Yes.
2        (Plaintiff's Exhibit No. 27 was marked for
3    identification.)
4    BY MR. MICHAEL F. PETOCK:
5    Q.  I show you what's been marked as Plaintiff's
6    27.  Can you identify that?
7    A.  It's a receipt.
8    Q.  Of what?
9    A.  From our store.
10   Q.  What date is that?
11   A.  11/24.
12   Q.  That doesn't have "Mine" blocked out.  Is that
13   correct?
14   A.  Correct.
15   Q.  Is that by Megan Rump?
16   A.  Yes.
17   Q.  Does that help refresh your recollection as to
18   whether the first day that sales occurred with "Mine"
19   blocked out was November 24th?
20   A.  It would seem so.
21   Q.  I'll also represent for the record that we
22   requested your counsel to produce all the sales
23   invoices with "Mine" blocked out and the first date
24   was November 24th.

Page 45

1    A.  Okay.
2    Q.  Do you believe that "Van Scoy Jewelers" would
3    not infringe the service mark or trademark "Van Scoy
4    Diamond Mine"?
5    A.  I don't know.
6    Q.  What's your belief?
7        MR. QUINN:  She just answered the
8    question.  So she doesn't have to answer it again.  I
9    object.
10       MR. MICHAEL F. PETOCK:  It's a different
11   question.
12       MR. QUINN:  The first question was:  Do
13   you believe?  And the second question was:  What is
14   your belief?  Those are the same questions.  We can
15   have the reporter read them back.
16   BY MR. MICHAEL F. PETOCK:
17   Q.  Do you have any personal opinion on it?
18       MR. QUINN:  How does that question differ
19   from her belief?
20   Q.  Answer the question, please.
21       MR. QUINN:  I have an objection to the
22   question as to the form.  It's been asked and
23   answered.
24   A.  I don't know.

e1d9445b-06e6-45b4-8108-014bd9814fd0

**Page 46**

1  Q. How did it come about that -- I'll represent to
2  you that the last date that an invoice was produced by
3  your counsel with "Mine" blocked out was March 31,
4  2005. How did it come about that you stopped blocking
5  out"Mine"?
6  A. I only blocked it out one time, all the
7  receipts we had.
8  Q. Were they then told not to block it out any
9  further, any longer?
10  A. It was never really brought up again. We just
11  blocked out the ones we had, and that was the end of
12  it.
13  Q. You never told them not to block it out
14  anymore?
15  MR. QUINN: Objection. It's been asked
16  and answered.
17  MR. MICHAEL F. PETOCK: You are
18  obstructing this deposition, Charlie.
19  MR. QUINN: I'm trying to get the
20  questions to be asked in the proper form.
21  MR. MICHAEL F. PETOCK: Can you read back
22  the last question, please?
23  (The reporter read as requested.)
24  BY MR. MICHAEL F. PETOCK:

**Page 47**

1  Q. You testified they blocked out the word "Mine"
2  on one occasion. Is that correct?
3  A. Correct.
4  Q. And is it your testimony that they never
5  instructed to block it out again after that?
6  A. That is correct.
7  (Plaintiff's Exhibit No. 28 was marked for
8  identification.)
9  BY MR. MICHAEL F. PETOCK:
10  Q. I show you what's been marked as Plaintiff's
11  Exhibit 28. Would you look through that? Are all of
12  those sales receipts sales made by you?
13  A. Some are payments, so, no.
14  Q. I'm sorry. What?
15  A. No, they are not sales made by me.
16  Q. Which ones are not sales made by you?
17  A. 11/29/04, Joe Lamonaco; Tom Sharrar, 3/9/05;
18  Michael Lenoir, 12/24.
19  MR. QUINN: Speak up so she can hear you.
20  A. Michael Lenoir, 12/24/04; David Fillippone,
21  12/28/04; Mark Garcia, 12/21.
22  MR. QUINN: Is that all?
23  A. Chris Harrison, 1/10/05.
24  Q. You said 1/10/05? Is that 1105?

**Page 48**

1  A. 1/10/05.
2  MR. MICHAEL C. PETOCK: She's talking
3  about dates.
4  MR. MICHAEL F. PETOCK: Oh.
5  BY MR. MICHAEL F. PETOCK:
6  Q. First of all, all of those are sales receipts
7  of Van Scoy Diamond Mine of Delaware, Inc. Is that
8  correct?
9  A. Yes.
10  Q. And all of them except for the first one has
11  "Mine" blocked out of "Van Scoy Diamond Mine of
12  Delaware, Inc." Isn't that correct?
13  A. And the last one was.
14  Q. I think you said the invoice -- first of all,
15  these are all sales receipts of Van Scoy Diamond Mine
16  of Delaware, Inc. Is that correct?
17  A. Yes.
18  Q. And I believe you said the invoice of 11/29/04,
19  which is D001269, to Joe Lamonaco --
20  A. Yes.
21  Q. -- was not a sale made by you?
22  MR. QUINN: I instruct the witness to wait
23  till the question is asked before you respond.
24  A. It was a payment taken.

**Page 49**

1  Q. I'm sorry?
2  A. A payment.
3  Q. Oh. So you are distinguishing between sales
4  and payments?
5  A. Yes.
6  Q. But all of these sales receipts are invoices --
7  are transactions handled by you on these invoices. Is
8  that correct?
9  A. Except one.
10  Q. Which one is that?
11  A. Dr. Garcia.
12  Q. 11/21/04?
13  A. Yes.
14  Q. And that bears the initials "DVS." Is that
15  correct?
16  A. Yes.
17  Q. Are you saying that's not your initial on
18  there?
19  A. It is my initials, but it was Kurt's sale.
20  Q. But you wrote up the sales receipt, is that
21  correct, where you marked Garcia on 11/21/04?
22  A. I just put my initials.
23  Q. Is that your handwriting on the sales receipt?
24  A. No. It's Kurt's. Yes, it's Kurt's.

Page 50

1   Q.  Kurt's.  Why did you put your initials on it?
2   A.  Because he forgot to.  When I was doing the
3   receipts, I probably just put "DVS."
4   Q.  Why is that important?
5   A.  Well, just if a customer comes in, you know who
6   waited on them.
7   Q.  Are commissions paid to the salespeople?
8   A.  No.
9       (Plaintiff's Deposition Exhibit No. 29 was
10  marked for identification.)
11      MR. QUINN:  Excuse me.  Does that mean
12  this whole collection?  They're paper-clipped, but not
13  stapled like the others were.
14      MR. MICHAEL C. PETOCK:  It's all a
15  collection.  It should have been stapled.
16      MR. QUINN:  Thank you.
17  BY MR. MICHAEL F. PETOCK:
18  Q.  I show you what's been marked as Plaintiff's
19  Exhibit 29.  First of all, are all of these sales
20  receipts, sales receipts of Van Scoy Diamond Mine of
21  Delaware, Inc.?
22  A.  Yes.
23  Q.  And do all of them have "Mine" crossed out?
24  A.  Yes.

Page 51

1   Q.  Are these all sales made by Kurt?
2   A.  Yes.
3   Q.  Where was Kurt when the cease and desist letter
4   came in.  Do you know?
5   A.  Yes.  He was out of town on a hunting trip.
6   Q.  In Northeast, Pennsylvania?
7   A.  Yes.
8       MR. QUINN:  Object.
9   A.  Sorry.
10      MR. QUINN:  That's not a question.
11  Q.  There are question marks after all those
12  things.
13      MR. QUINN:  Well, it may be in your mind,
14  but not --
15      MR. MICHAEL C. PETOCK:  Charlie, you asked
16  questions in the same exact way in your deposition,
17  and we didn't do that to you.  It's -- you did the
18  exact same thing.  I just want to point that out.
19      MR. QUINN:  Thank you for your assistance.
20  I don't agree with that characterization.
21      MR. MICHAEL C. PETOCK:  Read the
22  transcript, Charlie.  It's very clear from the
23  transcript.
24

Page 52

1   BY MR. MICHAEL F. PETOCK:
2   Q.  Van Scoy Diamond Mine of Delaware, Inc. changed
3   its website address from Van Scoy Diamond Mine.com to
4   Van Scoy Diamonds of Delaware.com.  Is that correct?
5       MR. QUINN:  Objection.  Leading.
6   Q.  Is that correct?
7   A.  I don't know anything about the website.
8   Q.  You don't know that?
9   A.  I have already stated that, nothing.
10  Q.  You don't know that the name has been changed?
11  A.  No.
12  Q.  Do you ever look at the website?
13  A.  No.
14  Q.  Do you know how long that website has been up?
15  A.  No, I do not.
16  Q.  Do you have a computer at home?
17  A.  No.
18  Q.  Do you have Internet access at your computer at
19  your desk in the store?
20  A.  I believe so.
21  Q.  Do you ever go on the Internet?
22  A.  No.
23      (Plaintiff's Exhibit No. 30 was marked for
24  identification.)

Page 53

1   BY MR. MICHAEL F. PETOCK:
2   Q.  I show you what's been marked as Plaintiff's
3   Exhibit 30.  Do you recognize that?
4   A.  Yes.
5   Q.  What is that?
6   A.  The letter that we received in the mail.
7   Q.  That's the cease and desist letter.  Is that
8   correct?
9   A.  If that's what it's called, yes.
10  Q.  In that letter, I am telling you that I
11  represent Mr. Wayne Van Scoy.  Is that correct?
12  A.  Yes.
13  Q.  And attached to the letter were copies of
14  trademark -- copies of the trademark and a service
15  mark registration.  Is that correct?
16  A.  Mm-hmm.  Yes.
17  Q.  And you saw that there were two registrations
18  for "Van Scoy Diamond Mine," both owned by Wayne
19  Van Scoy?
20  A.  Yes.
21  Q.  The letter also represented to you that my
22  client, Wayne Van Scoy, owned the service mark and
23  trademark registrations.  Isn't that correct?
24  A.  Yes.

**Page 54**

1  Q.  At that point in time, you were also -- it was
2  demanded that you immediately cease and desist from
3  infringement of the -- of the identified federally
4  registered service mark and trademark of Mr. Wayne
5  Van Scoy.  Is that correct?
6          MR. QUINN:  Objection.  The letter says
7  what it says.
8  Q.  Isn't that correct?
9  A.  That's what it says.
10  Q.  When you read that letter, you knew then that
11  Wayne Van Scoy owned the federal trademark
12  registration.  Isn't that correct?
13  A.  At that moment, yes.
14  Q.  And that Wayne Van Scoy, the plaintiff, was
15  demanding that you stop any further use of the marks
16  "Van Scoy Diamond Mine."  Isn't that correct?
17  A.  Yes.
18  Q.  And also you knew that any permission which was
19  allegedly given by Tommy Van Scoy, Jr. -- Sr., was
20  terminated.  Isn't that correct?
21  A.  No.
22  Q.  Why do you say that?
23  A.  I didn't even know there was a trademark.
24  Q.  But when you received the letter, you knew

**Page 55**

1  that.  Correct?
2          MR. QUINN:  Objection.  Objection.  That's
3  leading.
4          MR. MICHAEL F. PETOCK:  Objection.  You
5  are obstructing the deposition.
6          MR. QUINN:  The letter is silent --
7          MR. MICHAEL F. PETOCK:  Objection.
8          MR. QUINN:  -- with respect to anything
9  about Mr. Tommy Van Scoy.
10          MR. MICHAEL F. PETOCK:  Objection.  You
11  are testifying.  Mr. Quinn, you are testifying.  And I
12  demand that you stop testifying.
13          MR. QUINN:  You can demand it all you
14  want.  I am not going to stop raising my objections.
15          MR. MICHAEL F. PETOCK:  You are making a
16  speaking objection.
17          MR. QUINN:  Let me speak so we get
18  something clear.  Otherwise, I'm going to talk while
19  you are talking and the transcript is not going to be
20  clear.
21          MR. MICHAEL F. PETOCK:  I don't care.
22  You are not allowed to coach the witness or lead the
23  witness.  You are coaching the witness.
24          MR. QUINN:  When you asked the question

**Page 56**

1  and characterized this letter as saying something
2  about Mr. Tommy Van Scoy and make --
3          MR. MICHAEL F. PETOCK:  I didn't
4  characterize that in the letter.
5          MR. QUINN:  You did.  Please read the last
6  question back.
7          (The reporter read as requested.)
8          MR. QUINN:  I stand on what I just said.
9  There is no mention of Tommy Van Scoy in this letter.
10  And the question as read back mentions his name and
11  asks the question --
12          MR. MICHAEL F. PETOCK:  It mentions his
13  name, but it asks a different question.
14          MR. QUINN:  -- as to what permission was
15  given about Mr. Tommy Van Scoy.  The question is
16  objectionable.  The letter says what it says.  And
17  that's my position.
18  BY MR. MICHAEL F. PETOCK:
19  Q.  Can you answer the question?
20  A.  What question?
21  Q.  The question was:  When you received the cease
22  and desist letter, you knew that any alleged
23  permission given by Tommy Van Scoy, if any, was
24  terminated?

**Page 57**

1  A.  No.
2  Q.  Why do you say that?
3  A.  Because my father-in-law gave us the name to
4  use.  And he was still alive at this time.
5  Q.  But there was nothing in writing as to any
6  permission.  Is that correct?
7          MR. QUINN:  Objection.  Leading.
8  A.  To my knowledge.
9  Q.  And the only permission that was given -- the
10  only words that were given in the form of permission
11  were "good luck"?
12          MR. QUINN:  Objection.  Leading.
13  Q.  Isn't that correct?
14          MR. QUINN:  Objection.  Leading.
15  A.  To my knowledge.
16          MR. MICHAEL F. PETOCK:  Charlie, I am
17  allowed to lead an adverse witness, an adverse party.
18  I wish you'd stop objecting these frivolous objections
19  and obstructing this deposition.
20          MR. QUINN:  I am not obstructing the
21  deposition.
22          MR. MICHAEL F. PETOCK:  Yes, you are.
23          MR. QUINN:  We stipulated at the beginning
24  that all objections were waived until the time of

Page 58

1  trial, except for the form of the question. And those
2  are the objections I am making. They're leading
3  questions.
4      MR. MICHAEL C. PETOCK: The judge would
5  not appreciate a leading objection to an adverse
6  witness. I am sure he wouldn't allow that and I am
7  sure if we were to take it to the judge --
8      MR. QUINN: Then there shouldn't have been
9  any stipulation as to the leading -- all objections
10  being waived except as to leading because then it's
11  meaningless. The stipulation is meaningless.
12      MR. MICHAEL C. PETOCK: It's not an
13  objection in good faith when you know you can't make a
14  leading objection to an adverse witness.
15      MR. QUINN: It is an objection made in
16  good faith. I resent any implication or assertion
17  that these objections are not made in good faith.
18      MR. MICHAEL F. PETOCK: They cannot be
19  made in good faith when you know there is a perfect
20  right to ask leading questions as to an adverse party.
21      MR. QUINN: I am standing on what I said
22  before. If you didn't want leading objections, we
23  should have stipulated that at the beginning, but we
24  didn't. We stipulated that all objections were waived

Page 59

1  except for leading -- objections as to the form of the
2  question. And an objection as to a leading question
3  is an objection as to the form; therefore, I must make
4  them now or they are waived. And I don't intend to
5  waive them. You made the stipulation. We're going to
6  live with it.
7      MR. MICHAEL F. PETOCK: You are not acting
8  in good faith.
9      MR. QUINN: Pardon me?
10      MR. MICHAEL F. PETOCK: You are not acting
11  in good faith.
12      MR. QUINN: I resent that. I tell you I
13  am acting in the best of faith. I am trying to do my
14  job and create a record that is going to be clear for
15  the benefit of both parties and for the court.
16  BY MR. MICHAEL F. PETOCK:
17  Q.  Were you ever involved in any discussions with
18  respect to any contributions to a bankruptcy
19  settlement in the bankruptcy proceeding of Tommy
20  Van Scoy, Sr.?
21  A.  No.
22  Q.  Did Kurt ever say anything to you about --
23  A.  No.
24  Q.  -- a request from Wayne to contribute to the

Page 60

1  bankruptcy settlement?
2  A.  No.
3  Q.  Did you know anything about a settlement being
4  negotiated with the bankruptcy court on behalf of
5  Tommy Van Scoy, Sr. at the time that it was occurring
6  in 2000?
7  A.  No.
8  Q.  On the website, on your website, Van Scoy
9  Diamond Mine of Delaware.com., do you know whether
10  prices are on that site?
11  A.  I do not.
12  Q.  Do you know whether pictures of product are
13  shown on it?
14  A.  I do not.
15  Q.  Do you have any knowledge of any sales having
16  been made via the Internet, via your Internet website
17  in the last two months?
18  A.  No, I do not.
19  Q.  Would you know if sales were made via the
20  Internet?
21  A.  No.
22  Q.  Do you know what portion of your website is
23  called where the products are shown?
24  A.  Once again, I am not associated with the

Page 61

1  website at all.
2  Q.  You have never looked at it?
3  A.  Never. I don't have time.
4  Q.  Why do you not have time?
5  A.  I don't know.
6      (Van Scoy Deposition Exhibit No. 31 was
7  mark for identification.)
8  BY MR. MICHAEL F. PETOCK:
9  Q.  Before we go on to Plaintiff's Exhibit 31, do
10  you recall what day of the week it was when you
11  received the cease and desist letter?
12      MR. QUINN: Excuse me. This is marked as
13  5. So this is -- do you want to keep the same number?
14      MR. MICHAEL F. PETOCK: Well, we're going
15  to mark it again as 31.
16      MR. QUINN: All right.
17  BY MICHAEL F. PETOCK:
18  Q.  Do you recall what day of the week it was when
19  the cease and desist letter was received?
20  A.  Yes.
21  Q.  What day of the week was it?
22  A.  Saturday.
23  Q.  That would have been November 20th. Isn't that
24  correct?

e1d9445b-06e6-45b4-8108-014bd9814fd0

Page 62

1   A.  If that's a Saturday, I would say, yes.
2   Q.  I show you now what's been marked as
3  Plaintiff's Exhibit 31.  Can you identify that?
4   A.  Yes.  It's the warranty that Mr. Van Scoy gave
5  us to use to give to our customers after they purchase
6  something.
7   Q.  And do you use that warranty in your store now?
8   A.  Yes.
9   Q.  And have you always used it?
10   A.  Yes.
11   Q.  And that's signed "Van Scoy Diamond Mine."  Is
12  that correct?
13   A.  Yes.
14   Q.  And also the address "1117 Churchmans Place."
15  Is that correct?
16   A.  Yes.
17   Q.  The last paragraph of that warranty requires
18  you to provide free cleaning and inspection for
19  damaged prongs for free for diamonds or product
20  purchased at any other Van Scoy Diamond Mine.  Is that
21  correct?
22   A.  Yes.
23   Q.  Do you honor that policy?
24   A.  Yes.

Page 63

1   Q.  Is that your policy to honor it?
2   A.  Yes.
3   Q.  Have you always used the warranty --
4   A.  Yes.
5   Q.  -- since opening in 1994?
6   A.  Yes.
7   Q.  Have you ever refused to honor a warranty for
8  products sold by plaintiff Wayne Van Scoy?
9   A.  Not that I know of.
10   Q.  Do you know of anyone in your store refusing to
11  clean jewelry which was purchased at plaintiff Wayne
12  Van Scoy's store?
13   A.  Not that I know of.
14       (Plaintiff's Exhibit No. 32 was marked for
15  identification.)
16  BY MR. MICHAEL F. PETOCK:
17   Q.  I show you what's been marked as Plaintiff's
18  Exhibit 32.  Have you ever seen that letter before?
19   A.  Yes.
20   Q.  When did you see it?
21   A.  In March, probably.
22   Q.  And did you take any steps to preserve evidence
23  after seeing this letter?
24   A.  No.

Page 64

1   Q.  Did you take any steps to preserve any evidence
2  after seeing the cease and desist letter in November?
3   A.  No.
4   Q.  Do you know anything about the bankruptcy
5  proceeding other than what you have already told us?
6   A.  No.
7   Q.  Did you ever go to the bankruptcy court?
8   A.  No.
9   Q.  Do you know if Kurt went to the bankruptcy
10  court?
11   A.  I don't know.
12   Q.  Did Kurt bring back some documents from
13  Wilkes-Barre when he came back from his hunting trip
14  in the end of November of 2004?
15   A.  I don't know.
16   Q.  Did you ever see any documents from the
17  bankruptcy court?
18   A.  Maybe in some of the evidence.  I don't
19  remember.
20   Q.  Did you ever see any at home or in the store?
21   A.  No.
22   Q.  Did Kurt ever show you any bankruptcy
23  documents?
24   A.  Not that I recall.

Page 65

1       MR. MICHAEL F. PETOCK:  33.
2       (Plaintiff's Exhibit No. 33 was marked for
3  identification.)
4  BY MR. MICHAEL F. PETOCK:
5   Q.  I show you what's been marked Plaintiff's
6  Exhibit No. 33.
7   A.  Part of the tax for advertising that you had
8  requested.
9   Q.  That document contains blocked out portions of
10  your corporate tax returns Form 1120S for the years
11  1994 through 2004.  Is that correct?
12   A.  Yes.
13   Q.  On that are shown -- the only numbers that were
14  not blocked out was the advertising expenses?
15   A.  Yes.
16   Q.  And are those correct figures to the best of
17  your knowledge?
18   A.  Did you ask if they are?
19   Q.  Yes, if they are correct figures to the best of
20  your knowledge.
21   A.  Yes.
22   Q.  These are authentic copies of your corporate
23  tax returns showing the advertising expenses for the
24  years 1994 through 2004.  Is that correct?

Page 66

1    A.  Yes.

2    Q.  Continuing to look at Plaintiff's Exhibit 33.
3  The advertising figures fluctuate somewhat.  Do you
4  know any particular reason that they do that?

5    A.  The amounts each year?

6    Q.  Yes.  Is that just normal variation or is there
7  any reason for it?

8    A.  I am not really sure.  Kurt does the
9  advertising.  There could be different expenses, I
10  guess.

11    Q.  Like advertising expenses for 2004 were
12  $52,270.  Do you see that?

13    A.  Yes.

14    Q.  That's slightly less than the advertising
15  expenses for 1995 of $54,803?

16    A.  Yes.

17    Q.  Any comment on why the advertising expenses are
18  just -- stayed constant even though there is
19  inflation, ten years of inflation involved there?

20    A.  I couldn't answer that.  I don't know.

21    Q.  I noticed there was a jump in advertising
22  expenses from '99 to 2000.  Approximately a little
23  less than $60,000 to $84,000.  Any particular reason
24  for that?

Page 67

1    A.  I don't know.

2    Q.  Do you think that's just normal business
3  variation, depending upon what advertising was done a
4  particular year?

5    MR. QUINN:  Is that a question?

6    MR. MICHAEL F. PETOCK:  Yes.  Go ahead.

7    A.  Yes.

8    Q.  I am going to show you a plastic bag I'll
9  represent has been produced by your counsel and marked
10  as D001813.  It bears on both sides marked "Van Scoy's
11  Diamond Mine."  Is this a bag that's used in the
12  operation of your store, Van Scoy Diamond Mine?

13    A.  Yes.

14    Q.  How long have you been using that bag?

15    A.  Since 1994.

16    Q.  I show you a box produced by your counsel,
17  which is marked D001811 and bears the mark on the
18  inside of the box cover "Van Scoy Diamond Mine."  Is
19  that a box that's used in the operation of your
20  business, Van Scoy Diamond Mine of Delaware, Inc.?

21    A.  Yes.

22    Q.  How long has that been used?

23    A.  1994.

24    Q.  Both the bag and this box have been used

Page 68

1  continuously from 1994 to present?

2    A.  Correct.

3    Q.  I show you another box produced by your counsel
4  that's been marked as D001812 and bears on the inside
5  of the box cover "Van Scoy Diamond Mine."  Is that a
6  box that's used in the operation of your business,
7  Van Scoy Diamond Mine of Delaware, Inc.?

8    A.  Yes.

9    Q.  How long has that been used?

10    A.  I am not sure.

11    Q.  More than two years?

12    A.  Yes.

13    Q.  And you are continuing to use all three of
14  these in your business?

15    A.  Yes.

16    Q.  And the boxes and bags are given to customers
17  with product sales.  Is that correct?

18    A.  Correct.

19    Q.  You also have in your possession, isn't it
20  correct, some advertising audio tapes made by Thomas
21  Van Scoy, Sr.  Is that correct?

22    A.  Audio tapes?

23    Q.  Advertising audio tapes.

24    A.  Yes.

Page 69

1    MR. MICHAEL F. PETOCK:  Is there any
2  problem with "attorney's eyes only" to ask about these
3  tapes?  I am not hearing any.  I am just asking some
4  questions about it.  It's already been filed in court
5  papers.

6    MR. QUINN:  Let's start.  If there is,
7  I'll raise the objection.  Is that fair?

8    MR. MICHAEL F. PETOCK:  Okay.

9  BY MR. MICHAEL F. PETOCK:

10    Q.  What are these tapes?

11    A.  Advertisements.

12    Q.  And where did you get them?

13    A.  Tommy Van Scoy.

14    Q.  Sr.?

15    A.  Sr.

16    Q.  Were they made by Tommy Van Scoy, Sr.?

17    A.  Yes.

18    Q.  Where did he make these at?

19    A.  The radio station in Wilkes-Barre, I believe.

20    Q.  Were they used in advertising on the radio?

21    A.  Yes.

22    Q.  And for how long?

23    A.  I am not sure.

24    Q.  Are they still being used on the radio

Page 70

1  advertising?
2     A.  I don't believe so.
3     Q.  When did you stop using them?
4     A.  I don't recall.
5     Q.  A year ago?
6        MR. QUINN:  Objection.  She's answered the
7  question.  She doesn't recall.
8     Q.  Was it more than a year ago when you stopped
9  using them?
10       MR. QUINN:  She's answered that question.
11 She said she didn't recall.
12       MR. MICHAEL F. PETOCK:  Objection.  You
13 are coaching the witness and you are --
14       MR. QUINN:  I am not coaching the witness.
15       MR. MICHAEL F. PETOCK:  Yes, you are.
16       MR. QUINN:  You have asked the question
17 once and now you are twisting the words.
18       MR. MICHAEL F. PETOCK:  It's a different
19 question.  I want to get some --
20       MR. QUINN:  She said she doesn't know.
21       MR. MICHAEL F. PETOCK:  I want to test the
22 ability of her knowledge and of what her recollection
23 is.
24       MR. QUINN:  She said she didn't know.  How

Page 71

1  many times does she have to answer the question?
2     Q.  Was it more than a year ago?
3        MR. QUINN:  Objection.  That question has
4  already been asked.
5     Q.  Was it more than a year ago?
6     A.  I don't know.
7        MR. QUINN:  Objection again.  It's been
8  asked again.
9     A.  We --
10       MR. QUINN:  She's answered it twice now
11 that she doesn't know.
12       MR. MICHAEL F. PETOCK:  Let the witness
13 speak, Charlie.
14       MR. QUINN:  I'll let her speak when I get
15 my objection out.
16    Q.  Will you answer the question?
17    A.  All I know is the advertising is updated.  So
18 that's all I can tell you.  I don't know.  You can't
19 use the same ads over and over.
20    Q.  Well, were these audio tapes used many years
21 ago or just a few years ago?
22    A.  I don't know.
23       MR. QUINN:  Objection.  She's answered the
24 question again she doesn't know.

Page 72

1     Q.  Why don't you want Wayne Van Scoy to hear or
2  see these tapes?
3     A.  I don't know that either.
4     Q.  Wouldn't the radio stations have copies of
5  these tapes on file?
6     A.  I don't know.
7     Q.  What was the extent of the advertising?
8        MR. QUINN:  Objection.  Vague and
9  indefinite.  What does "extent" mean?
10    Q.  You can answer the question, please, still?
11    A.  I don't know.  I don't do the advertising.
12    Q.  But you know they were used on radio
13 advertising?
14    A.  Yes.
15    Q.  Did you hear them on the radio?
16    A.  Yes.
17    Q.  Was it more than one station?
18    A.  I don't remember.
19    Q.  What did the tape say?
20    A.  I don't remember.
21       MR. MICHAEL F. PETOCK:  Why don't we
22 break?
23       THE VIDEOGRAPHER:  Going off the record at
24 12:02 p.m.

Page 73

1        -- -- -- --
2        THE VIDEOGRAPHER:  Going back on the
3  record at 12:11 p.m.
4        MR. MICHAEL F. PETOCK:  Charlie, what I
5  would request that you do is to produce the remainder
6  of the lease documents which are missing.  We've only
7  received a few pages.  We received a page or two of
8  the current renewal and apparently a signature page
9  from back in '94.  And we request that you produce the
10 lease documents and any other documents that we've
11 requested here today prior to the 30(b)(6) deposition
12 scheduled for next week.
13 BY MR. MICHAEL F. PETOCK:
14    Q.  Did you discuss with your counsel any of the
15 questions that are being asked or anticipated being
16 asked in the deposition during the break?
17    A.  No.
18    Q.  Are you under the influence of any medications
19 or alcohol or anything when you are testifying here
20 today which would affect your memory?
21    A.  No.
22    Q.  Have you ever carried ought any
23 responsibilities or duties as secretary of the
24 corporation known as Van Scoy Diamond Mine of

1  Delaware, Inc.?
2  A.  I don't know what they would be.  No.
3  Q.  The answer is "no"?
4  A.  What do you mean "responsibilities."
5  Q.  Well, have you done anything?  Do you keep any
6  minutes?  Do you do anything?
7  A.  No.
8  Q.  Do you still have family living in Nanticoke?
9  A.  Yes.
10  Q.  How often do you get up to visit them?
11  A.  Not often.
12  Q.  In the period of 1994 to 2000, did you get up
13  there often then?
14  A.  I don't recall.
15  Q.  Do you know any other store besides your store
16  and plaintiff's store which operates under the name
17  "Van Scoy Diamond Mine"?
18  A.  I believe my brother-in-law Rick in Scranton.
19  Q.  Doesn't he operate under "Van Scoy Diamonds"?
20  A.  I'm not sure.  It's confusing in the phone
21  book.
22  Q.  Is there anyone else that you are aware of?
23  A.  I know there is a store in Lancaster and one in
24  North Carolina and one in Allentown and Reading.

1  Q.  Do you know what those stores are using for
2  names?
3  A.  No.
4  Q.  You don't know if they're using "Van Scoy
5  Diamond Mine."  Is that correct?
6  A.  Correct.
7  Q.  How did you and Kurt get to Charlie Quinn?
8  A.  I don't know.
9  Q.  Have you ever spoken to Mark Maurer?
10  A.  No.
11  Q.  Do you know anything about Mark Maurer?
12  A.  Just what I have heard.
13  Q.  What have you heard?
14  A.  That he owned a store.
15  Q.  Where did he own a store at?
16  A.  I am not sure.
17  Q.  Do you know where he lives?
18  A.  No.
19  Q.  Do you know where you would call him at if you
20  were going to call him?
21  A.  No.
22  Q.  Have you ever spoken with him?
23  A.  No.
24  Q.  What is Kurt's relationship with Mark Maurer?

1  A.  I don't know.
2  Q.  Do you know the last time Kurt spoke to Mark
3  Maurer?
4  A.  No, I do not.
5  Q.  You don't know what the names of the stores are
6  that he operates under, do you?
7  A.  No.
8  Q.  Who made the decision to open the store
9  "Van Scoy Diamond Mine" in Delaware?
10  A.  Kurt.
11  Q.  You were part of that.  Weren't you?
12  A.  I helped.
13  Q.  You contributed $20,000.  Isn't that correct?
14  A.  Yes.
15  Q.  Did you ever have any discussions with Tommy,
16  Sr. about opening the store?
17  A.  Not that I recall.
18  Q.  Do you believe that it was easier to open a
19  store at 1117 Churchmans Road in Newark where
20  previously Tommy, Sr. had operated a store for a
21  number of years?
22  A.  I don't know.  I never opened a store before.
23  I don't know if it was easier.
24  Q.  Do you believe it was easier?

1        MR. QUINN:  Easier than what?
2        MR. MICHAEL F. PETOCK:  Easier than
3  opening a store someplace where there had never been a
4  Van Scoy Diamond Mine.
5  A.  No.
6  Q.  What do you mean by "no"?  No, you don't know
7  or no --
8  A.  No, I don't believe it would have been easier.
9  Q.  Do you know what was in the store when you
10  first arrived?
11  A.  Nothing.  Oh.  There was a safe.
12  Q.  Wasn't there also a sign on top "Van Scoy"?
13  A.  That I don't remember.
14  Q.  What kind of safe was there when you arrived?
15  A.  I don't know what kind it is.
16  Q.  What size was it?
17  A.  I don't know what size it is.
18  Q.  Six feet tall?
19  A.  Probably five or six.
20  Q.  Do you know where it came from?
21  A.  No.
22  Q.  But it was in the store when you arrived there.
23  Right?
24  A.  Yes.

Page 78

1    Q.  Was it blue?
2    A.  Yes.
3    Q.  Did Wayne ever expressly give you permission to
4    use the name "Van Scoy Diamond Mine," Wayne Van Scoy?
5    A.  No.
6    Q.  Did he ever give Kurt any permission to use
7    "Van Scoy Diamond Mine"?
8    A.  I don't know.
9    Q.  To your knowledge, did he ever give the
10   corporation any permission to use the name "Van Scoy
11   Diamond Mine"?
12   A.  I don't know.
13   Q.  Did Wayne Van Scoy ever imply he gave
14   permission to use the name "Van Scoy Diamond Mine"?
15   A.  I didn't know we needed permission.
16   Q.  That same answer would apply to Kurt and the
17   corporation.  Correct?
18   A.  That's correct.
19   Q.  How did you find out about the bankruptcy of
20   Tommy Van Scoy, Sr.?
21   A.  I don't remember.  I just heard it, I guess.
22   Q.  Where would you have heard it from?
23   A.  That I don't remember.
24   Q.  What did you know about the source of the

Page 79

1    financial difficulties of Tommy Van Scoy, Sr.?
2    A.  I didn't know much.
3    Q.  I'm sorry?
4    A.  I didn't know much.
5    Q.  What did you know?
6    A.  Not much at all.  Just that there was a
7    bankruptcy.
8    Q.  Did you know that Pam and Rick Sendrick's store
9    in Scranton were enjoined from using the name
10   "Van Scoy Diamond Mine"?
11   A.  No.  I knew they were involved in the
12   bankruptcy.  But that's all I know.
13   Q.  How did you know they were involved in the
14   bankruptcy?
15   A.  Just hearing it, I guess.
16   Q.  Did you know that Betsy Williams was enjoyed
17   from using the name "Van Scoy Diamond Mine" in the
18   bankruptcy court?
19   A.  I knew her name was in the bankruptcy, but
20   that's all.
21   Q.  How did you know her name was in the
22   bankruptcy?
23   A.  I don't know.
24   Q.  Did you know that the store, Van Scoy Diamond

Page 80

1    Mine store on Monday Street in Wilkes-Barre was
2    enjoyed from using the name "Van Scoy Diamond Mine" by
3    the bankruptcy court?
4    A.  I just know that there was a bankruptcy thing.
5    I don't know that anyone was told not to use the name
6    or anything, the details of it.  Only that there was a
7    bankruptcy.  That's it.
8    Q.  Do you recall any discussion at all of anyone
9    approaching your store, your company or you or Kurt
10   with respect to seeking a franchise to franchise
11   Van Scoy Diamond Mine, possibly in Baltimore or
12   something like that?
13   A.  No.
14   Q.  No knowledge of that?
15   A.  No.
16   Q.  Am I correct in saying that you don't know why
17   the domain name was changed from "Van Scoy Diamond
18   Mine.com" to "Van Scoy Diamonds of Delaware.com."  Is
19   that correct?
20   A.  Yes.
21   Q.  Who made that decision?
22   A.  For me not to know?
23   A.  No.  To make that change in the domain name.
24   A.  I don't know.  I don't know anything about

Page 81

1    that, I have stated before.
2    Q.  If it wasn't you, it would have been Kurt.
3    Right?
4    A.  I guess.
5    Q.  Since there is only two of you that have an
6    ownership interest in your company, is that correct,
7    Van Scoy Diamond Mine of Delaware?
8    A.  Yes.
9    Q.  Do you consider "Van Scoy Diamond Mine" to be
10   the same as "Van Scoy Diamonds" as far as the mark the
11   jewelry store services?
12   A.  It depends.
13   Q.  Depends on what?
14   A.  Who is using it.  If the person is Van Scoy, I
15   guess, yes.
16   Q.  You would consider those two to be the same
17   then if the person was a Van Scoy?
18   A.  I think so, in my opinion.
19   Q.  Is "Van Scoy Diamond Mine" a better or more
20   creative mark than "Van Scoy Diamonds"?
21   A.  I don't know if it's more creative.  I don't
22   know.  But I don't think about it that much.
23   Q.  Do you think your business would be harmed if
24   it was forced to stop using "Van Scoy Diamond Mine"

1   but was permitted to use "Van Scoy Diamonds"?
2   A.  No.
3   Q.  Are you aware of any customers of your store
4   Van Scoy Diamond Mine that were customers of the
5   previous Van Scoy Diamond Mine previous to 1994?
6   A.  Not that I know of.
7   Q.  Where do the majority of the customers of
8   Van Scoy Diamond Mine of Delaware, Inc. come from?
9        MR. QUINN:  Where did or do?
10  Q.  Do come from.
11  A.  Newark, surrounding areas.
12  Q.  How far does the average person travel to buy a
13  diamond ring or jewelry?
14  A.  I don't know.
15  Q.  Do you think that someone on the Internet that
16  came across the website Van Scoy Diamond Mine.com
17  would think there is a connection between that website
18  and the store in Wilkes-Barre, Pennsylvania, operated
19  by plaintiff?
20       MR. QUINN:  I think that question lacks
21  foundation.  So I object to it.
22  A.  I don't really know.
23  Q.  Are you aware of any complaints against any
24  Van Scoy Diamond Mine store?

1   A.  From customers?
2   Q.  Yes.
3   A.  Yes.
4   Q.  What are you aware of?
5   A.  There's always going to be some complaints.
6   You can't just run a perfect business.  I don't know
7   of a particular instance.
8   Q.  Do you know anything specific?
9   A.  There was one recent that came to mind about
10  someone purchased a diamond and they went to trade it
11  in and they said it wasn't the diamond that it was
12  supposedly purchased.  I do have a letter from that
13  person.
14  Q.  Where was that diamond purchased from?
15  A.  I don't recall which store, but Wayne
16  Van Scoy's name is at the bottom of the appraisal.
17  Q.  Is that the Delaware store?
18  A.  I don't recall which store it was purchased in.
19  It was before my time.
20  Q.  That was purchased back prior to 1994?
21  A.  Yes.
22  Q.  But you don't know that the diamond that was
23  brought in is the same diamond that was sold to that
24  person either.  Do you?

1   A.  No.  All I saw was the letter.
2   Q.  What's your relationship with Tommy Van Scoy,
3   Jr.?
4   A.  My brother-in-law.
5   Q.  What is your relationship with your
6   brother-in-law?
7   A.  Very good.  Close.
8   Q.  How often do you speak to him?
9   A.  A couple times a week.
10  Q.  What do you speak about?
11  A.  Kids.
12  Q.  Kids?
13  A.  Children.  He has a son the same age as my son.
14  Just personal.
15  Q.  Do you ever talk about the litigation?
16  A.  No.
17  Q.  What's your relationship with Tony Van Scoy?
18  A.  Close.
19  Q.  How often do you speak to him?
20  A.  Not as often.  Maybe once a month.
21  Q.  Have you spoken to him at all about the
22  litigation?
23  A.  No.
24  Q.  When was the last time Kurt spoke to Tommy

1   Van Scoy, Jr.?
2   A.  Yesterday.
3   Q.  Do you know what the substance of that
4   discussion was?
5   A.  Fish.
6   Q.  Anything about the litigation?
7   A.  No.
8   Q.  What's your relationship with Rick Sendrick?
9   A.  We don't have one.
10  Q.  Do you have any relationship with his wife,
11  Pam?
12  A.  Not really.
13  Q.  What's your relationship with Ken Van Scoy?
14  A.  We don't really have one.
15  Q.  When was the last time you saw Ken?
16  A.  At the funeral, Mr.'s funeral.
17  Q.  What's your relationship with Wayne Van Scoy's?
18  A.  Don't have one.
19  Q.  My understanding is that at one time in the ten
20  years since you've had the store you made some
21  improvements to the store.  Is that correct?
22  A.  Yes.
23  Q.  And what were those improvements?
24  A.  New carpeting, wallpaper.

Page 86

1  Q.  Did you extend the showroom, too?
2  A.  Yes.
3  Q.  By how much?
4  A.  Four feet, five feet.
5  Q.  When did that take place?
6  A.  I am not sure of the exact date.
7  Q.  What's your best estimate of the date?
8  A.  Either '99 or 2000.
9  Q.  How much did it cost?
10  A.  I don't recall.
11  Q.  Do you have some estimate?
12  A.  A couple thousand.
13      MR. MICHAEL F. PETOCK:  I would like to
14  take a five-minute break.
15      THE VIDEOGRAPHER:  Going off the record at
16  12:31 p.m.
17      -- -- -- --
18      THE VIDEOGRAPHER:  Going back on the
19  record at 12:37 p.m.
20      MR. MICHAEL F. PETOCK:  We would -- we're
21  going to retain the originals of the exhibits and make
22  copies for the court reporter.  Is that acceptable?
23      MR. QUINN:  You are going to retain the
24  original?

Page 87

1      MR. MICHAEL F. PETOCK:  Yes.
2      MR. QUINN:  That's fine.  We have a set.
3  Are you finished?
4      MR. MICHAEL F. PETOCK:  We have no
5  further questions.
6      THE WITNESS:  Okay.
7      THE VIDEOGRAPHER:  Going off the record at
8  12:38 p.m.
9      -- -- -- --
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 88

1            INDEX
2  WITNESS: DONNA VAN SCOY        PAGE
3  Examination by Mr. Petock        3
4     PLAINTIFF'S DEPOSITION EXHIBITS
   NO.              MARKED
5
   17  Lease agreement              16
6
   18  1/10/05 Minutes of annual meeting    18
7     of shareholders and directors
8  19  1/10/04 Minutes of annual meeting    19
     of shareholders and directors
9
   20  1/10/03 Minutes of annual meeting    20
10    of shareholders and directors
11  21  1/10/02 Minutes of annual meeting    22
     of shareholders and directors
12
   22  1/10/01 Minutes of annual meeting    23
13    of shareholders and directors
14  23  1/10/00 Minutes of annual meeting    23
     of shareholders and directors
15
   24  1/10/99 Minutes of annual meeting    26
16    of shareholders and directors
17  25  1/10/98 Minutes of annual meeting    27
     of shareholders and directors
18
   26  Receipt, stamped D1243          42
19
   27  Receipt, stamped D1239          44
20
   28  Series of receipts, stamped D1233    47
21    1243, 1268, 1269, D1390, D1391,
     D1438, D1509, D1513, D1539, D1540,
22    D1588, D1633, D1638, D1644, D1657,
     D1684, D1698, D1729, D1738, D1751,
23    D1762, D1767, D1775, D1791, D1799,
     D1296, D1340, D1370, D1374, D0987,
24    D1013, D1016, D1067, D1080, D1083,

Page 89

1      PLAINTIFF'S DEPOSITION EXHIBITS
2  NO.              MARKED
3  29  Series of receipts, stamped D0979,    50
     D1092, D1395, D1404, D1416, D1449,
4     D1455, D1464, D1479, D1488, D1532,
     D1541, D1548, D1573, D1579, D1607,
5     D1639, D1650, D1652, D1662, D1683,
     D1737, D1295, D1299, D1335, D1362,
6     D1377, D1380
7  30  Cease and desist letter          52
8  31  Van Scoy Diamond Mine Registration    61
     and Certificate, stamped D0750
9
   32  Letter, dated 2/22/05, to C. Quinn    63
10    from M. F. Petock
11  33  Form 1120S U. S. Income Tax Returns,    65
     dated 1994 through 2004
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 90

```
 1
 2
 3        REPLACE THIS PAGE
 4        WITH THE ERRATA SHEET
 5        AFTER IT HAS BEEN
 6        COMPLETED AND SIGNED
 7        BY THE DEPONENT.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 91

```
 1   State of Delaware  )
                        )
 2   New Castle County  )
 3
 4          CERTIFICATE OF REPORTER
 5
        I, Lucinda M. Reeder, Registered Diplomate
 6   Reporter and Notary Public, do hereby certify that
     there came before me on the 19th day of September
 7   2005, the witness herein, DONNA VAN SCOY, who was duly
     sworn by me and thereafter examined by counsel for the
 8   respective parties; that the questions asked of said
     witness and the answers given were taken down by me in
 9   Stenotype notes and thereafter transcribed by use of
     computer-aided transcription and computer printer
10   under my direction.
11       I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.
13       I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.
15
16
17          Lucinda M. Reeder, RDR, CRR
            Certification No. 132-RPR
18          (Expires January 31, 2008)
19
20
     DATED:   9-26-05
21
22
23
24
```