```
 1   and Desist Letter, was marked for identification.)
 2   BY MR. PETOCK:
 3       Q.   Can you tell me what you have in front of you
 4   that has been marked as Exhibit 2?
 5       A.   A notification via filing a suit towards me for
 6   using the name Van Scoy.
 7       Q.   I'm going to refer to this as a cease and desist
 8   letter. Is that okay? Is that understood?
 9       A.   That's fine.
10       Q.   Did you receive this cease and desist letter?
11       A.   Yes.
12       Q.   Do you remember the approximate date that you
13   received it?
14       A.   November the 18th, 2004.
15       Q.   After you received the cease and desist letter,
16   did you continue to direct the acts of your corporation?
17       A.   I did because I believe this was in disbelief.
18       Q.   What do you mean you believe it was in disbelief?
19       A.   I wasn't aware of a trademark.
20       Q.   You weren't aware of -- what do you mean? Could
21   you explain that further, you weren't aware of a
22   trademark?
23       A.   When I received this letter, this is the first
24   time I knew anything, certainly, about a trademark for
```

1    Van Scoy Diamond Mine.
2        Q.    So after you received this cease and desist
3    letter, you continued to authorize and approve the
4    advertising of the corporation?
5        A.    I seeked counsel.
6        Q.    And you continued to author and approve -- is
7    that a yes?
8        A.    That is a yes.
9        Q.    Did you continue to author and approve what
10   trademark to use?
11       A.    Yes.
12       Q.    And did you continue to authorize and approve the
13   design and publication of the website hosted at
14   vanscoydiamondmine.com?
15       A.    After I seeked counsel, we agreed to, actually to
16   shut it down until we find out the results.
17       Q.    Of this litigation?
18       A.    Correct.
19       Q.    Did you review all of our requests for documents
20   that you have received during this discovery period?
21       A.    Yes.
22       Q.    Have you produced everything that we have asked
23   for?
24                MR. QUINN:    The record's clear that we

1  opinion?

2  A.  Yes.

3  Q.  Did you have knowledge of the fact that -- do you
4  have knowledge of the fact that the mark Van Scoy Diamond
5  Mine is federally registered?

6  A.  No.

7  Q.  I asked you -- I will repeat the question.

8      Do you have knowledge of the fact that the
9  mark Van Scoy Diamond Mine is federally registered?

10 A.  No, until now.

11 Q.  Do you know now that the mark Van Scoy Diamond
12 Mine is federally registered?

13 A.  Yes.

14 Q.  When did you first become aware of this?

15 A.  November the 18th of 2004.

16 Q.  How did you become aware of it that day?

17 A.  From a letter from your office or your dad's
18 office.

19 Q.  What did you do after you received the cease and
20 desist letter of November 18th, 2004?

21 A.  Seeked counsel.

22 Q.  Who did you contact to be your counsel?

23 A.  It was actually in Wilmington.  Someone -- it was
24 just a brief encounter with counsel in Wilmington.  And

1    concerning contributing any money towards a bankruptcy
2    settlement?
3        A.   No, not that I know.  No.
4        Q.   Did he have any conversations with you about
5    contributing money to anything regarding the bankruptcy?
6        A.   None whatsoever.  Not that I know of, no.
7        Q.   When did you learn that the plaintiff, Wayne
8    Van Scoy, bought the trademark Van Scoy Diamond Mine?
9        A.   November 18th, 2004.  I didn't have any idea of
10   anything certainly with a trademark.. 2004, yes.
11       Q.   Has Wayne ever asked you to help pay for the
12   trademark?
13       A.   Nothing of the kind, no.
14       Q.   Were you aware that the bankruptcy court ordered
15   that the Mundy Street Van Scoy Diamond Mine be closed?
16       A.   Yes, I was aware of that.  Yes.
17       Q.   How did you find out about that?
18       A.   A family member, if I'm not mistaken.  I think it
19   was my mom actually.
20       Q.   Do you remember when that was that you found out
21   about it?
22       A.   Exact date I don't know.
23       Q.   Was it probably about the date it was forced to
24   be closed, approximately?

1   Van Scoy Diamond Mine?
2       A.   Absolutely not.
3       Q.   What about the time where you, where Wayne was
4   visiting your father in the hospital in 1996 and 1998,
5   did Wayne ever discuss anything with you concerning your
6   use of the trademark or mark Van Scoy Diamond Mine?
7       A.   When he stopped in to use the bathroom, no, he
8   did not, at our store.
9       Q.   What about any other time?
10      A.   Nothing, nothing of the kind.
11      Q.   Has Wayne ever talked to you about your use of
12  the mark Van Scoy Diamond Mine?
13      A.   Not until November the 18th of 2004 was when I
14  knew anything about any kind of a mark, trademark or
15  anything of any sort.  Again, all I know is, in 1994, my
16  father gave me the name and the sign for the business to
17  open.
18      Q.   I'm not asking you specifically about whether you
19  knew about the trademark.  I'm just asking you whether he
20  ever discussed the name of your store with you.
21      A.   None whatsoever.
22      Q.   Did he ever tell you that you were getting away
23  with murder with respect to your use of the trademark?
24      A.   Not that I'm aware of, no.  No, I would

12

1  Q. But there was no one senior to you at the store
2  in New Haven, Connecticut; is that correct?
3  MS. MORGAN: Objection.
4  A. There was quite a few people actually just kind
5  of, you know, bounced around, if they were assistant
6  manager or manager. I mean, you know, I did my thing and
7  I was family -- you know, a family member of the
8  business. If there was other people there, if they were
9  classified as higher than me... You know, I think as a
10 family member, I think you have a little more say than
11 certainly with a manager.
12 Q. Did your father ever complain to you that another
13 store was using the Van Scoy Diamond Mine without his
14 permission?
15 A. Not to my knowledge.
16 Q. When you worked in the Wilkes-Barre store, did
17 everyone there know that the mark was a registered
18 trademark and service mark?
19 A. Again, like I stated before, I wasn't -- or,
20 anyone -- I'm not anybody else. I'm speaking for myself.
21 I was not aware of any, certainly, mark or trademark or
22 anything of that sort until actually November 18th of
23 2004. That's the first time I have heard of anything
24 about any kind of a mark. And I stated that before.